JS 44 (Rev. 02/19)                                    CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Democratic National Committee

**DEFENDANTS**
Republican National Committee

**(b)** County of Residence of First Listed Plaintiff    District of Columbia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    District of Columbia
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question *(U.S. Government Not a Party)*
☐ 2  U.S. Government Defendant
☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | **PERSONAL INJURY** | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | ☐ 367 Health Care/ Pharmaceutical | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | Personal Injury Product Liability | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 830 Patent | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | **LABOR** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 751 Family and Medical Leave Act | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 791 Employee Retirement Income Security Act | ☒ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☒ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 871 IRS—Third Party 26 USC 7609 | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | | |
| | | ☐ 550 Civil Rights | **IMMIGRATION** | |
| | | ☐ 555 Prison Condition | ☐ 462 Naturalization Application | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | |

## V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Federal Arbitration Act 9 U.S.C. § 9
Brief description of cause:
Confirmation of Arbitration Award 2018 WL 7568871 (June 4, 2018)

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE    Ashely M. Chan
DOCKET NUMBER    2:BK-19-10093

DATE
September 5, 2019
SIGNATURE OF ATTORNEY OF RECORD    Trustee

**FOR OFFICE USE ONLY**

SEP - 6 2019

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: Democratic National Committee 430 South Capitol St SE #3, Washington, DC 20003

Address of Defendant: Republican National Committee 310 First St SE, Washington, DC 20003

Place of Accident, Incident or Transaction: Philadelphia, PA          **19    4079**

---

**RELATED CASE, IF ANY:**

Case Number: 2:BK-19-10093          Judge: Chan          Date Terminated: Sept. 3, 2019

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?          Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?          Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?          Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?          Yes ☐   No ☒

I certify that, to my knowledge, the within case ☐ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 9/6/19          _____          _____
                      *Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*
                      Must sign here

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☒ 11. All other Federal Question Cases
     *(Please specify):* ___Arbitration___

**B.** *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
     *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____, counsel of record *or pro se plaintiff*, do hereby certify:

☐ XPursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: _____          _____          _____
                                 *Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*
                                 Sign here if applicable

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

In re motion to Confirm   Arbitration  Award  :
Democratic National Committee            :
Republican National Committee    v.      :
by Hon. Peter J. Wirs, Trustee           :
Lincoln Charitable Trust                 :

CIVIL ACTION

**19**    4072

NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                     ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                            ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                       ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.           (X)

9/6/19
**Date**

**Attorney-at-Law** Trustee

**Attorney for**

717-584-1776

Trustee@LincolnCharitableTrust.org

**Telephone**

**FAX Number**

**E-Mail Address**

(Civ. 660) 10/02

SEP - 6 2019



$4₂

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re Motion to Confirm Arbitration Award : | |
| Democratic National Committee : | |
| v : | |
| Republican National Committee : | Docket No. 2:19-cv-_____ - ___ |
| 2018 WL 7568871 (June 6, 2018) : | |
| by Hon. Peter J. Wirs : | |
| Trustee of the Lincoln Charitable Trust : | |

19    4072

### UNCONTESTED MOTION TO CONFIRM ARBITRATION AWARD
### AND APPLICATION FOR AUTHORIZATION FOR ATTORNEY FEES
### FOR RECEIVER IN AID OF ARBITRATION

NOW COMES Hon. Peter J. Wirs, Trustee who respectfully moves for confirmation of an

Arbitration Award, 2018 WL 7568871 ("Award") pursuant to the Federal Arbitration Act ("FAA"),

9 U.S.C. § 9, or in the alternative, withdrawal of reference pursuant to 28 U.S.C. § 157(d) of the

motion to confirm arbitration now before the U.S. Bankruptcy Court for the Eastern District of

Pennsylvania, if there is no equitable tolling of the statute of limitations under 9 U.S.C. § 9, and in

support thereof avers:

1.     The Trustee is the Trustee of the Lincoln Charitable Trust, a PA active, *inter vivos* trust

established to protect civil rights secured by law.

2.     The Trustee commenced arbitration to resolve a dispute between two of the Trust's

beneficiaries, the prevailing grievant, Democratic National Committee ("DNC") versus the

non-prevailing respondent, Republican National Committee ("RNC") regarding the

interpretation and administration of the trust pursuant to the Trustee's statutory authority

under 20 Pa.C.S. § 7780.6(a)(3) and the Trust Agreement ¶ 8(E).

-1-

3.      The Trustee issued a Rule *Nisi* on May 31, 2015 which under the Trust's Internal Operating Procedures, IOP Rule 4(d)(2)-(3) converts the DNC's informal grievance into a formal grievance upon finding that arbitration, and not mediation will resolve the dispute.

4.      The Trustee's May 31, 2015 Rule *Nisi* ordered the RNC to make out its defense that being a non-signatory, RNC was not bound by the Trust Agreement's arbitration procedures, despite black letter law beneficiaries assent of trust interests is presumed *eo instanti* upon a trust's establishment.

5.      The Trustee's May 31, 2015 Rule *Nisi* also ordered the RNC to make any objections to the Proposed Findings of Fact and Conclusions of Law which would constitute the Award.

6.      The Trustee convened the arbitration hearing on June 6, 2018, which the RNC abstained from appearing.

7.      The Trustee issued the Award on June 6, 2018, published at 2018 WL 7568871, and held that the RNC has and continues to violate the Civil Rights Act of 1957, Pub. L. 85--315, 71 Stat. 637, 52 U.S.C. § 10101(b) which simultaneously violates the Trust Agreement, ¶ 2(A), ¶ 8(A), ¶ 8(B)(1)-(2), ¶ 30(L) and ¶ 30(M).

8.      The Trustee exercised his *Ex Aequo et Bono* authority in the Award by imposing two Surcharges, reinstated a consent decree between the DNC and RNC originally entered in the U.S. District Court for District of New Jersey Nov. 2, 1980 regarding the RNC's illegal voter suppression efforts, but thereafter expired, mandated multiple provisions to remedy the RNC's illegal conduct and required the RNC to satisfy the Award's Order by Sept. 28, 2018 otherwise a receiver in aid of arbitration would be appointed to effectuate the Award.

9.      RNC failed to timely file a motion to vacate or modify the Award on or before Sept. 4, 2018 as required under the Federal Arbitration Act ("FAA") 9 U.S.C. § 12.

10.     The Trustee pursuant to his statutory authority under 20 Pa.C.S. §§ 7780.5 and 7780.6(a)(4) and contractual authority under the Trust Agreement, ¶8(E)(2) timely filed a motion to confirm the Award in the U.S. Bankruptcy Court for the Eastern District of Pennsylvania February 5, 2019 (ECF No. 14) and amended the motion March 11, 2019 (ECF No. 41) (the Trustee became a debtor due to denial to recoup the Trustee's statutory liens pursuant to 20 Pa.C.S. §§ 7769(a), 7772(h)(5), 7780.6(a)(7) because of this arbitration proceeding).

11.     The Bankruptcy Court abstained and upon mutual agreement of the Trustee and the Chapter 7 Trustee, dismissed the bankruptcy case pursuant to 11 U.S.C. § 707(a) this Tuesday, September 3, 2019, so that the motion to confirm can be referred to and refiled in this Court.[1]

12.     This Motion is uncontested as a matter of law in that the RNC failed to timely move to vacate the award under the FAA, 9 U.S.C. § 12 and moreover is governed by the Trust Agreement, ¶8(E)(2) which provisions control, 20 Pa.C.S. § 7705(a), and Internal Operating Procedure (IOP) Rule 4(d)(4) that it consents without objection to the Trustee entering judgment in a court of competent jurisdiction. The RNC cannot be heard to interpose any objection of any claim or defense, as there is no dispute the RNC forfeits judicial review by refusing to timely move to vacate under 9 U.S.C. § 10(a). The expert declaration of PA's leading ADR authority, Robert A. Creo, Esquire, is attached in support herein.

---

[1] Under *Doherty v. Teamsters Pension Trust Fund of Philadelphia and Vicinity*, 16 F.3d 1386, 1393-1394 (3rd Cir. 1994) it was held that equitable tolling of arbitration deadlines was proper when "the plaintiff has raised the precise statutory claim in issue but has mistakenly done so in the wrong forum." Admittedly, Judge Chan did not explain her reasons to abstain but it is a reasonable inference that the Judge felt the Trustee was in the wrong forum.

    If this Court finds that the Trustee does not qualify under *Doherty* for equitable tolling of the one-year statute of limitations imposed by 9 U.S.C. § 9, then in the alternative, the Trustee moves for withdrawal of reference under 28 U.S.C. § 157(d) and seeks leave to brief the court on *In re Pruitt* grounds for withdrawal. *Id.* 910 F.2d 1160 (3rd Cir. 1990).

13.   In the Bankruptcy Court, the RNC fallaciously imposed jurisdictional objections alleging *Rooker-Feldman* arising from a prior arbitration proceeding against the RNC brought by the Trust's Settler without citing any pertinent law or evidence. When confronted by the Trustee for demand of proof under controlling *Great Western Mining & Mineral Co. v. Fox Rothchild, LLP*, 615 F.3d 159, 166 (3rd Cir. 2010), the RNC forfeited and waived this claim.

14.   Because the RNC has failed to obey any provisions of the Award's Order and refusing to answer an April 23, 2019 Rule *Nisi* notice of hearing to show cause why the receiver should not be appointed, rule became absolute May 1, 2019 which upon mandatory confirmation of this Award, the Trustee becomes the Receiver in aid of arbitration.

15.   The RNC has unabashedly obfuscated the Awards' confirmation with unrelenting dilatory tactics of conclusions and formulaic labels in a scheme to interfere with the Court's integrity to force misjudgment by deliberately deceiving courts with multiple fallacies including, but not limited to Denial of the Antecedent, Fallacy of Irrelevance (Strawman arguments), False Premise, False Dilemmas, all the while viperously attacking the Trustee with malignant Fallacy of *Arumentum ad Hominem*, Emotive Language and Poisoning the Well.

16.   Delaying justice further denies justice and continues to inflict immediate and irreparable injury on all American voters by the RNC's inexcusable repugnant attack abridging voters' First Amendment rights of political association.

17.   Confirmation of the Award is mandatory under 9 U.S.C. § 9, *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587, 128 S.Ct. 1396, 1405, 170 L.Ed.2d 254 (2008); *Stone v. Bear, Stearns & Co., Inc.*, 872 F.Supp.2d 435, 457 (E.D.Pa. 2012) *affirmed*, 538 Fed. Appx. 169 (3d Cir. 2013), *cert. denied*, 572 U.S. 1115 (2014), this purely a non-discretionary ministerial act. *In re Consolidated Rail Corp.*, 867 F.Supp.25, 31 (D.D.C. 1994).

-4-

18.   Upon confirmation of the Award and qualification of the Trustee as Receiver by oath of office, the Trustee seeks authorization to retain the following nationally eminent counsel:

    A.   Pamela A. Mann, Esquire of Carter, Ledyard & Milburn, LLP, New York, NY as Tax Counsel (which is in addition to her separate appointment as General Counsel to the Trust) for a retainer of $100,000, to be replenished monthly. Ms. Mann was formerly the Chief, Charities Bureau, New York Attorney General's office.

    B.   Michael Shapiro, Esquire, of Carter, Ledyard & Milburn, LLP as Special Counsel (re GOP Rule 48 Proceeding) for a retainer of $100,000, to be replenished monthly. He was formerly Special Assistant Attorney General, Chief Appellate Counsel, New York State Special Prosecutor for Corruption.

    C.   Thomas G. Wilkinson, Esquire., Cozen O'Connor as Special Counsel for Judicial Ethics for a retainer of $25,000 to be refreshed monthly. He is the former President of the PA Bar Association, is co-editor of the *Pennsylvania Ethics Handbook.*

    D.   J. Matthew Wolfe, Esq., Law office of J. Matthew Wolfe as RNC Chief Counsel for a Salary of $150,000 per annum, plus Independence Blue Cross PPO Insurance.

19.   Authorization for additional counsel will be sought upon confirmation of the Award and qualification of the Trustee as Receiver by oath of office.

20.   Upon confirmation of the Award and qualification of the Trustee as Receiver by oath of office, the Trustee seeks authorization to for payment in advance the sum of $50,000 for expenses for himself and the same for Chief Counsel J. Matthew Wolfe, to be set aside for travel and accommodation and other reasonably-incurred out of pocket expenses.

21.   Funds for payment of legal representation and expenses comes from the Receivership Assets upon confirmation of the Award and qualification of the Trustee as Receiver by oath office.

22.   In anticipation of the confirmation of the Award and qualification of the Trustee as Receiver by oath office, the Attorney General of Pennsylvania has been provided the Trustee's Receivership Plan and advisories of the Trustee's implementation of Award, which the Proposed Order confirming the Award proposes the Trustee to advise the Attorney General daily so as not burden this Court's scarce judicial resources.

23.   In anticipation of the confirmation of the Award and qualification of the Trustee as Receiver by oath office, the United States Marshal's Service, professional representatives and service providers are prepared to immediately seize and hold all real, personal and mixed property belonging to the RNC, to remove all agents, attorneys, directors and officers, employees and and to deliver possession to the Receiver, as against the RNC and all persons claiming under or through the RNC until the possession of the same by the Receiver is demonstrated.

24.   The papers required by 9 U.S.C. § 13 are hereby filed with the Clerk.

WHEREFORE, the Trustee prays this Court:

1.   Confirm the Award, issued June 6, 2018 and published at 2018 WL 7568871 pursuant to the Federal Arbitration Act, 9 U.S.C. § 9 and direct the Clerk forthwith enter judgment and certify the same without assessing any fee, and deliver forthwith a copy of the certified order to the U.S. Marshal, with accompanying Form USM 285 and writs of assistance, to the Republican National Committee ("RNC") and any bank or other financial or depository institution holding accounts for or on behalf of RNC, and web hosting service providers maintaining RNC's domain name, email and database.

2.   Authorize the Trustee, upon confirmation of the Award and qualification of the Trustee as Receiver by oath of office, to retain as counsel for retainers or compensation as prayed for out of the Receivership Assets, the following:

A.   Pamela A. Mann, Esquire of Carter, Ledyard & Milburn, LLP as Tax Counsel.

B.   Michael Shapiro, Esquire, of Carter, Ledyard & Milburn, LLP as Special Counsel.

C.   Thomas G. Wilkinson, Esquire., Cozen O'Connor as Special Counsel.

D.   J. Matthew Wolfe, Esquire of Law Office of J. Matthew Wolfe as Chief Counsel.

3.   Authorize the Trustee, upon confirmation of the Award and qualification of the Trustee as Receiver by oath of office, to advance $50,000 for reasonably incurred expenses to the Trustee as Receiver and the same to J. Matthew Wolfe as chief counsel.

4.   Authorize the Trustee, upon confirmation of the Award and qualification of the Trustee as Receiver by oath of office, to file daily reports as the administration of Receivership Assets to the Attorney General of Pennsylvania.

5.   Such other and additional relief as is just and proper.

Dated: September 6, 2019

Hon. Peter J. Wirs
Trustee
Lincoln Charitable Trust
600 Chestnut Street, Suite 1056
POB 1776
Philadelphia, PA 19105
717-584-1776
Trustee@LincolnCharitableTrust.org
PJWirs@PeterJWirs.com

## CERTIFICATE OF SERVICE PURSUANT TO E.D.PA.R.Civ.P 7.1(d)

Pursuant to E.D.Pa.R.Civ.P. 7.1(d), I Peter J. Wirs, hereby certify that a true and correct copies of this Motion and accompanying Points of Authority have been served upon the following by email as authorized by Fed.R.Civ.P.5(b)(2)(E).

Mark A. Pacella
Chief Deputy Attorney General
Charitable Trusts & Organizations Section
Office of Pennsylvania Attorney General
14th Floor, Strawberry Square
Harrisburg, PA 17120-0001
mark.pacella@attorneygeneral.gov

Rajiv Parikh, Esq.
Counsel to Democratic National Committee
Genova Burns LLP
494 Broad Street
Newardk NJ 07102-3230
RParikh@genovaburns.com

Justin Reimer, Esq.
General Counsel
Republican National Committee
310 First Street, S.E.
Washington, D.C. 20003-1885
jreimer@gop.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

|  |  |
|---|---|
| In re Motion to Confirm Arbitration Award : | |
| Democratic National Committee : | |
| v : | |
| Republican National Committee : | Docket No. 2:19-cv-_____ - ___ |
| 2018 WL 7568871 (June 4, 2018) : | |
| by Hon. Peter J. Wirs : | |
| Trustee of the Lincoln Charitable Trust : | |

---

## **EXPERT OPINION AND AFFIDAVIT OF ROBERT A. CREO, ESQUIRE**

I, Robert A. Creo, Esquire, do hereby state under pain of perjury that:

1.  For over 40 years, I have practiced law as an arbitrator, mediator, special master, author and educator, serving as a neutral in thousands of cases.

2.  I am an Adjunct Professor at Duquesne University School of Law, a member of National Academy of Arbitrators, on the roster of many appointing agencies such as the American Arbitration Association, the Federal Mediation and Conciliation Service, the National Mediation Board, the Court of Arbitration for Sports (CAS-TAS).

3.  My service includes serving as an arbitrator for Major League Baseball and for the National Football League, and as an Independent Hearing Officer for the U.S. Senate Select Committee on Ethics.

4.  I am the author of numerous publications on alternative dispute resolution and the practice of law. Since 2012, my column *The Master Mediator* has been published by Alternatives to the High Cost of Litigation, The Center for International Conflict Prevention and Resolution (New York, NY) and the *Effective Lawyer* column in *Pennsylvania Lawyer* since 2015.

5.    I am the author of the two-volume *Alternative Dispute Resolution: Law Procedure and Commentary for the Pennsylvania Practitioner* (Bisel, Oct. 2006) ("ADR § __").

6.    For decades I have been a presenter at CLE programs of the Pennsylvania Bar Institute and other attorney and dispute resolution organizations.

7.    I served as an advisor to the Trustee of the Lincoln Charitable Trust in the abovementioned Arbitration Proceeding and as member of a mediation team assembled by the Trustee in a matter between the Governor of Pennsylvania and Legislative leaders.

8.    Given the controversy over the prior arbitration, I advised Mr. Wirs it would be appropriate to convene hearings for procedural matters as well as for the grievance.

## I. Mandatory Requirement for Confirmation of Arbitration Award.

9.    Mr. Wirs is deeply concerned that he is not serving the Court's best interest of proffering legal argument as a *pro se* litigant, therefore the Court would be better served by recognized authority on arbitration law.

10.   As such authority, I can categorically and unequivocally state that the Court is required under the Federal Arbitration Act, 9 U.S.C. § 9, to confirm the Arbitration Award, published 2018 WL 7568871 (June 6, 2018) because no timely motion to vacate was filed within the three-month time period required by 9 U.S.C. § 13 that being September 4, 2018, raising claims and defenses under 9 U.S.C. § 10(a).

11.   This is black letter law, the mandate to confirm in absence of a timely motion to vacate is defined as not malleable in *Hall Street Associates, Inc. v Mattel*, 552 U.S. 576, 582, 128 S.Ct. 1396, 1402, 170 L.Ed.2d 254 (2008).

12.   Decisional authority routinely describes arbitration confirmation which the award was not vacated as summary proceedings.

13.  The Federal Arbitration Act has its own procedure, as affirmed by *Hall Street*. 552 U.S. at 582, 128 S.Ct. at 1402. Vacatur and confirmation motions are merely continuations of the arbitration proceeding, and are not supposed commence new litigation.

14.  There is no dispute the Republican National Committee, having failed to timely move for vacatur under 9 U.S.C. § 12, is now time-barred to assert any claim or defense, and certainly cannot raise any claim or defense to oppose mandatory confirmation.

15.  The issue of whether the Arbitration Award was irregular or otherwise subject to legal challenge is not ripe, based on upon the Respondent's failure to act in a timely manner.

16.  Even if there were legitimate grounds for overturning the award, that avenue is foreclosed based upon application of clear and unambiguous statutory deadlines.

## II. Injunctive Relief and Appointment of a Receiver.

17.  The arbitrator, in issuing an award, has the authority to grant relief *Ex Aequo et Bono*. ADR § 14.5.3(a). In fact, arbitrators "may grant equitable relief that a Court could not." *Sperry Intern. Trade, Inc. v. Government of Israel*, 532 F.Supp. 901, 905 (S.D.N.Y. 1982) *affirmed* 689 F.2d 301.

18.  My treatise states: "Injunctive relief is common in arbitration. Over the years I have issued orders for injunctive relief in hundreds of labor arbitration cases and other employment and commercial disputes. * * * Injunctive relief may involve the arbitrator setting forth conditions to be followed or conditions precedent for participants. I have done this countless times * * * often in the context of * * * a cease and desist order after finding that a practice or policy violated [a contract]." *Id.* at pp. 14-131 - 14-132.

19.  In *Stone v. Theatrical Investment Corp.*, 64 F.Supp.3d 527, 540-542 (S.D.N.Y 2014), the court recognized the arbitrator's authority to appoint a receiver.

20.   State courts likewise have recognized arbitrators appointing receivers. *Sun Valley Ranch 308 Ltd. Partnership ex rel. Englewood Properties, Inc. v. Robson*, 231 Ariz. 287, 294, 294 P.3d 125, 132 (2012) (recognizing AAA Rule 31's broad remedial powers includes appointment of receiver); *Estate of Hoskins*, 501 S.W.3d 295, 299 (Tex.App. 2016) (recognizing arbitrator appointed receiver under Texas law).

Dated: September 3rd, 2019

Respectfully yours,

Robert A. Creo, Esquire
PA Bar I.D. 26185
3934 Foster Street, Suite B531
Pittsburgh, PA 15201
Email racreo@gmail.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

:
In re Motion to Confirm Arbitration Award  :
Democratic National Committee            :
v                          :
Republican National Committee            :          Docket No. 2:19-cv-004072 - NIQA
2018 WL 7568871 (June 6, 2018)          :
by Hon. Peter J. Wirs                  :
Trustee of the Lincoln Charitable Trust    :

_____

**CONCISE STATEMENT OF LEGAL CONTENTIONS & AUTHORITIES RELIED
UPON FOR UNCONTESTED MOTION TO
CONFIRM ARBITRATION AWARD
AND APPLICATION FOR AUTHORIZATION FOR ATTORNEY FEES
FOR RECEIVER IN AID OF ARBITRATION**

I.     **Objection to Confirmation of Arbitration Award Cannot be Heard, as RNC Waives all
Claims and Defenses for Failure to Timely Move to Vacate per 9 U.S.C. § 12.**

A.   **Issue**: If the RNC failed to timely move to vacate Arbitration Award, can it raise
objections (claims and defenses) on Motion to Confirm.

B.   **Rule:**

(1)   RNC cannot raise waived claims and defenses on motion to confirm. *Service Emp.
Intern. Union, Local No. 36, AFL-CIO v. Office Center Services, Inc.*, 670 F.2d 404,
409 (3rd Cir. 1982) (The FAA disallows the raising of a defense to confirmation of
an arbitration award more than three months after the award is issued); *Service
Employees International Union Local 36, AFL–CIO v. City Cleaning Company, Inc.*,
982 F.2d 89, 93 (3d Cir.1992).

(2)   "A party to an arbitration award who fails to comply with the statutory precondition

-1-

of timely service of notice forfeits the right to judicial review of the award." *Silicon Power Corp. v. General Elec. Zenith Controls, Inc.*, 2009 WL 1971390 *2 (E.D.Pa. July 7, 2009) (cites and internal quotations omitted). See also *Local 966, Intern. Broth. of Teamsters v. JCB, Inc.*, 2013 WL 1845607 *2 (D.N.J. April 30, 2013); *Western Kraft East, Inc. v. United Paperworkers Intern. Union, Local 375*, 531 F.Supp. 666, 671 (E.D.Pa. 1982) ("I am now satisfied that once an action to vacate is time-barred, a party is thereby precluded from asserting defenses to a counterclaim for enforcement which could have been raised in a timely suit to vacate the award").

(3)   In facts analogous to this case, the non-prevailing party's failure to move to vacate is held to constitute implicit approval of confirmation of arbitration award. *Teamsters-Employer Local No. 945 Pension Fund v. Acme Sanitation Corp.*, 963 F.Supp. 340, 349-350 (D.N.J. 1997).

C.   **Facts:** RNC not only failed to timely file a motion to vacate, 9 U.S.C. § 12 on grounds under 9 U.S.C. § 10(a), but it failed to exercise any of its statutory remedies, i.e. challenging the arbitration's jurisdiction, putting the arbitration on notice that it objects to jurisdiction, raising the issues before the arbitrator, etc.

D.   **Conclusion:** The RNC cannot be heard on any objection whatsoever in this Motion to Confirm. "A party who receives adequate notice of an arbitration proceeding, yet who elects to sit idly by in silence until the arbitration is complete, the award has been rendered, and the prevailing party has moved to confirm, cannot emasculate all that has been done by asserting a technical right for which there has been no substantive deprivation." *International Technologies Integration, Inc. v. PLO*, 66 F.Supp.2d 3, 13 (D.D.C. 1999).

-2-

## II. Confirmation of Arbitration Award is a Summary Proceeding Constituting a Ministerial Function without Notice.

A.  **Issue:** Whether this Court can grant summary relief in confirming the Arbitration Award.

B.  **Rule:**

(1)  Confirmation of an arbitration award is a ministerial, summary proceeding. See e.g., *Textile Workers Union of America v. Cast Optics Corp.*, 1971 WL 933 (D.N.J. April 29, 1971) ("wherein 9 U.S.C. § 9, providing for the confirmation of an arbitration award mandates that all such actions be by way of summary proceedings").

(2)  Actions to confirm arbitration awards are straightforward proceedings in which no other claims are to be adjudicated. *Marker Volkl (Intern.) GmbH v. Epic Sports Intern., Inc.*, 965 F.Supp.2d 308, 311 (S.D.N.Y. 2013).

(3)  The relevant provision of the Federal Arbitration Act, 9 U.S.C. § 9, makes it clear that judicial confirmation of an arbitration award is a ministerial act that a Court must undertake unless at least one of the specifically enumerated grounds in 9 U.S.C. § 10 or § 11 exists for vacating the Award. *Sperry Intern. Trade, Inc. v. Government of Israel*, 532 F.Supp. 901, 905 (S.D.N.Y. 1982) *affirmed* 689 F.2d 301.

(4)  "Confirmation of an arbitration award 'is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.'" *Salus Capital Partners, LLC v. Moser*, 289 F.Supp.3d 468, 476 (S.D.N.Y. 2018), quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006); *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984).

C. **Facts:** RNC waived all claims and defenses by failing to timely file a vacatur motion, 9 U.S.C. §§ 10(a), 12, and is bound by the Trust Agreement, ¶8(E)(2) authorizing confirmation and entry of judgment of an arbitration award without objection.

D. **Conclusion:** The Court commits no abuse of discretion in granting motion to confirm the Arbitration Award without further notice.

III. **Trustee Can Appoint a Receiver in Aid of Arbitration.**

A. **Issue:** Can the Trustee appoint a Receiver in aid of arbitration? And can the Trustee appoint himself if his first two choices to be Receiver declined?

B. **Rule:**

(1) When faced with extraordinary circumstances, an arbitrator is expected to exercise his "informed judgment to reach a fair solution of [the] problem." *Steelworkers v. Enterprise Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). An in-depth analysis on the appropriateness of an arbitrator appointing a receiver is provided in *Stone v. Theatrical Investment Corp.*, 64 F.Supp.3d 527, 540-542 (S.D.N.Y 2014). Other Federal courts are in accord, *In re Southwest Ranching Inc.*, 2017 WL 4274309 *2 (S.D.Tex. 2017); *In re Teknek, LLC*, 343 B.R. 850 (Bankr.N.D.Ill 2006), as are state courts. *Sun Valley Ranch 308 Ltd. Partnership ex rel. Englewood Properties, Inc. v. Robson*, 231 Ariz. 287, 294, 294 P.3d 125, 132 (2012); *Estate of Hoskins*, 501 S.W.3d 295, 299 (Tex.App. 2016). The ULA Note to the Revised Uniform Arbitration Act § 21 acknowledges the well-settled history behind arbitrators' broad-based powers includes appointing receivers.

-4-

(2)   In *Marcus v. Meyerson*, 5 A.D.2d 818, 8181, 170 N.Y.S.2d 924, 925 (1958) the court recognized one appointed as both arbitrator and receiver, and in *Deutsche Bank Nat. Trust Co. v. F.D.I.C.*, 784 F.Supp.2d 1142, 1160 (C.D.Cal. 2011) *vacated in part on other grounds* 854 F.Supp.2d 756 citing *Bullion Servs., Inc. v. Valley State Bank,* 50 F.3d 705, 709 (9th Cir.1995) the court noted that the FDIC acted in both its regulatory role and as a receiver, kepting both functions legally separate.

C.   **Facts:** The Trustee, sitting as the Arbitrator, fully anticipating the RNC's contemptuous behavior as documented by both courts and academic authorities exercised his authority *Ex Aequo et Bono* to craft the only relief that would reasonably assure the GOP would no longer coerce, intimidate or threaten voters in violation of the City Rights Act of 1957. Because neither of the Trustee's choices, Gov. Robert List of Nevada and PA Senate President Pro Tempore Joseph Scarnati, were available for appointment, the Trustee provided that he would serve on an interim basis (despite and because he is terminally ill with Mitochondrial Disease) until he was able to find another candidate.

D.   **Conclusion:** The Trustee, sitting as the Arbitrator, has full authority *Ex Aequo et Bono* which includes appointment of a Receiver in aid of Arbitration, and courts have recognized arbitrators who thereafter were receivers.

Dated: September 6, 2019                 Hon. Peter J. Wirs
                                           Trustee
                                           Lincoln Charitable Trust
                                           600 Chestnut Street, Suite 1056
                                           POB 1776
                                           Philadelphia, PA 19105
                                           717-584-1776
                                           Trustee@LincolnCharitableTrust.org
                                           PJWirs@PeterJWirs.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

                                                      :
In re Motion to Confirm Arbitration Award  :
Democratic National Committee              :
              v                             :
Republican National Committee              :        Docket No. 2:19-cv-004072 - NIQA
2018 WL 7568871 (June 6, 2018)             :
by Hon. Peter J. Wirs                       :
Trustee of the Lincoln Charitable Trust    :

_____


# Papers required to be filed with the Clerk pursuant to 9 U.S.C. § 13

1.      The Lincoln Charitable Trust Agreement.
2.      The June 6, 2018 Arbitration Award, 2018 WL 7568871.

# LINCOLN CHARITABLE TRUST

## *Of, By, and For the People* ™

**Know all Men by these Present, Greeting**

Whereas, the 59th Republican Ward Executive Committee, a lawful entity pursuant to the Election Code, Act of June 3, 1937, P.L. 1333, art. VIII, § 807, 25 P.S. § 2837, ("Settlor") hereby transfer the property re to the Trustee, and the Trustee hereby acknowledge receipt thereof and agree to hold such property re and all investments and reinvestments thereof in trust as the Trust Property, pursuant to the Uniform Trust Act, Act of July 7, 2006, P.L. 625, No. 98, 20 Pa.C.S. §§ 7701 - 7799.3, upon the following terms and conditions.

ARTICLE I - PURPOSE AND RE

**¶ 1. Name of Trust.** The name of this Trust shall be the Lincoln Charitable Trust ("Trust") which the Trust Property shall be shared equally among Democratic, Republican and independent beneficiaries each having equal fractional interests of the assets and liabilities therein.

**¶ 2. Purpose of Trust.**

(A) The Trust is created for the charitable purpose of providing the Trust Property as hereinafter described, for the complete and full access to, benefit of, and usage by any and all duly qualified national, state, county, municipal, ward, district, local and subordinate committees of the Democratic and Republican Parties as defined under Section 301 of the Federal Election Campaign Act (FECA) of 1971, as amended, Pub.L. 92-225, 86 Stat. 3, 2 U.S.C. § 431(4)(C)(14), (15) and (16) and each and every elected member therein, hereinafter ("Qualified Beneficiaries"); elected public officeholders ("Current Beneficiaries"), and the general public for whom the elected public and party officeholders represent (hereinafter the "Beneficiaries"), to protect the exercise of their First Amendment rights to meaningfully participate within the political parties of their choice in furtherance of their inalienable and indefeasible political powers and otherwise promote exemplary public accessibility, accountability, ethical conduct and unity through increased voter participation without dilution or diminishment by undue influence, interference or obstruction by any person or persons and to otherwise organized exclusively for educational and charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1954 ("Code").

(B) Any income in excess of expenses shall be distributed to any other nonprofit corporation which has established its tax exempt status under Section 501(c)(3) of the Code or another charitable trust, to satisfy the requirements under Section 4947(a)(1) of the Code.

(C) Notwithstanding any other provision of this Trust Agreement, the Trust shall not carry on any other activities not permitted to be carried on (a) by an organization exempt from Federal income tax under section 501(c)(3) of the Code (or the corresponding provision of any future United States Internal Revenue Law) or (b) by an organization, contributions to which are deductible under section 170(c)(2) of the Code (or the corresponding provision of any future United States Internal Revenue Law).

(D) If upon order of the Orphans Court of the Court of Common Pleas under the Uniform Trust Act, there is termination of the Trust, after paying or adequately providing for the debts and obligations of the Trust, the remaining assets shall be distributed to a nonprofit fund, foundation or corporation which is organized and operated exclusively for educational and charitable purposes and which has established its tax exempt status under section 501(c)(3) of the Code.

**¶ 3. Life of Trust.** The Trust shall continue forever.

**¶ 4. Original Trust Res.** The Settlor acknowledges that it has transferred to the Trustee without consideration, to constitute the original corpus of the Trust Property, all intellectual property ownership rights of:

(A) An open architecture, Internet-based, contact relationship management ("CRM"), social networking ("SocNet") software as a service ("SAAS") program ("Trust Property"); and

(B) A federally registered standards development body ("SDB") registered December 11, 2006 with the U.S. Dept. of Justice and Federal Trade Commission pursuant to the National Cooperative Research and Production Act Pub. L. 103–42, § 3(b)-(c), 107 Stat. 117, 118, 15 U.S.C. 4301 *et seq*.

**¶ 5. Additions to the Trust Res.** The Trustee may receive and accept additional property, whether real or personal, by way of gift, bequest, or devise, from any person, firm, trust, or corporation, to be held, administered and disposed of in accordance with and pursuant to the provisions of this Trust Agreement, but no gift, bequest or devise of any such property shall be received or accepted if it is conditional or limited in such a manner as to violate the purpose of this Trust and provisions of this Trust Agreement, or shall be the opinion of the Trustee, jeopardize the Federal income tax exemption of this Trust pursuant to application sections of the Internal Revenue Code of 1986 or any Federal or state law governing campaign finances, electioneering and political parties. All such original and additional property is referred to herein collectively as the Trust Property.

**¶ 6. Retention of the Property Character.** Any Trust Property transferred to this Trust shall retain its original character.

**¶ 7. Private Benefit and Advocacy Prohibited.** No part or portion of the Trust Property or any income or interest earnings therein shall inure or be payable to or for the benefit of any private individual, and the Trustee when acting in his official capacity, shall not violate his duty of impartiality or undivided loyalty due all beneficiaries by promoting, attacking, supporting or opposing any candidate for public or political office.

**¶ 8. Distributional Requirements of Trust Property.**

(A) *Trust Property for Use by Beneficiaries.* The Trust Property shall at all times be available, without interference or obstruction by any person or persons, for distribution for lawful campaigning and electioneering on behalf of their respective political party and its candidates, nominees, and all other persons in affinity with the purposes of the Trust, and upon election thereto, the inspection of the government to hold accountable those officials elected to assure performance of their duties with faith and fidelity, and for all other protected First Amendment right of association or petition for redress of grievance or of speech or of the press or inspection of the affairs of Government, and to exercise all other and additional inalienable and indefeasible political powers without assessment, cost or fee to any Beneficiary. Distribution shall be through the Trust Property's public portal. Each beneficiary's interest in the Trust is inalienable and cannot be disclaimed to injure the Trust's charitable purposes.

(B) *Trust Property for Use by Beneficiaries.*

(1) The Trust Property ("We the People Today SAS") shall at all times be available, without interference or obstruction by any person or persons, for distribution for lawful campaigning and electioneering on behalf of their respective political party and its candidates, nominees, and all other persons in affinity with the purposes of the Trust, to any Qualified Beneficiary, candidates, nominees and all other persons in affinity with the purpose of the Trust pursuant to the terms and conditions required by the Trustee deems prudent to assure no violation of applicable campaign finance, revenue or trust law.

(2) The Trust Property (the "NCOPO") shall at all times be available, without interference or obstruction by any person or persons, for distribution for lawful use as prescribed by such rules and regulations adopted by the Trustee within the Internal Operating Procedures consistent with generally accepted practices and procedures promulgated by standards development bodies.

(C) *Expense Divided Evenly Among Parties.* The expense of distribution and for the administration of the Trust, 20 Pa.C.S. §7780.6(a)(8), and protection of the Trust Property, 20 Pa.C.S. § 7779, and any advances heretofore or hereinafter made by the Trustee under 20 Pa.C.S. §§ 7769, 7780.6(a)(7) shall be divided equally between the two political parties to assure that the Trust is undiminished and self-perpetual, and any expense there in made by one party on behalf its Qualified Beneficiaries not equally shared by the other party shall be reimbursed by the latter party before distribution of the Trust Property under subparagraph (B)(1) to any Qualified Beneficiary of the respective party in addition to any surcharge under subparagraph (E).

(D) *Distribution of Expense by Candidates.* Each party may elect to surcharge candidates for public office or Current Beneficiaries who are not Qualified Beneficiaries within each respective state to offset or subsidize the expenses under Subparagraph (C) by payment of an equitable End User License Fees in such manner as the Trustee may elect in accordance with campaign finance laws of the respective state; *provided that*, such requirement be limited only to statewide, Congressional or other major candidates.

(E) *Alternative Dispute Resolution, Surcharge for Breach of Fiduciary Duty, Impoundment*.

(1) Any Qualified Beneficiary and all elected members therein or any candidate or nominee, or any Current Beneficiary who shall abridge, interfere or obstruct the rights of any other Beneficiary, shall be liable, jointly and severally, for damages limited to the loss incurred by the injured Qualified or Current Beneficiary or class of Qualified or Current Beneficiaries caused by such breach, the sum the Trustee shall impound from proceeds generated by the Trust Property, in addition to any other remedy under law.

(2) The Trustee, pursuant to his authority under 20 Pa.C.S. § 7780.6(a)(3), shall arbitrate the dispute between the Qualified or Current Beneficiaries pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and the Pennsylvania Uniform Arbitration Act, 42 Pa.C.S. §§ 7341-7342, and after a due process hearing, issue an arbitration award which may be confirmed and entered as judgment in any court having jurisdiction thereof, including the jurisdiction of any U.S. District Court in which the respondent beneficiary may be found.

(3) Any surcharge levied by an arbitration award shall limited to actual damages, including any advances or liens against the Trust made pursuant to 20 Pa.C.S. §§ 7769(b), 7772(h), 7780.6(a)(7) and any reserves required by ¶ 8(C) and ¶ 15(D) of this Trust Agreement, and all reasonable attorney fees and court expenses.

(4) Any advance by any co-beneficiary equal to the surcharge levied by an arbitration award shall reimbursed by all remaining beneficiaries until the respondent satisfies the surcharge or sufficient sums are impounded by the Trustee.

(F) *Indemnification*. No national, state, county, municipal, ward, district and local committees of the Democratic or Republican Party as is or as a Qualified Beneficiary or any elected member therein shall be liable for and are fully indemnified and held harmless for any expense of distribution and for the administration of the Trust, 20 Pa.C.S. § 7779, or for any advances heretofore or hereinafter made by the Trustee under 20 Pa.C.S. §§ 7769, 7780.6(a)(7), except for any surcharge assessed under subparagraph (E) in accordance with all due process.

(G) *Commercial Software.* The use of commercial products shall not exempt any Qualified Beneficiary and its elected members or candidate or nominee from their duties entrusted to them by law as tenants in common and owners of equitable interests in the Trust Property.

(H) *Use of Trust Property by the Trustee.* Distribution of the Trust property to the Trustee or any state co-trustee when acting as a Qualified Beneficiary or

as a candidate or nominee shall not constitute self-dealing provided no other Qualified Beneficiary, candidate or nominee is denied distribution of the Trust Property by a breach of trust or other tortious conduct.

(I) *Distribution of Annual Basis.*  The Trustee shall, as required by the Internal Revenue Code, distribute to each Qualified Beneficiary his undivided fractional interest as an equitable owner of the Trust, such to be noticed in the Annual Report, and report the same, along with funds in reserve and impounded to the Internal Revenue Service and all applicable Federal, state or local campaign finance regulatory agency.  The Qualified Beneficiary shall be solely responsible for the reporting of same to the Internal Revenue Service and to any other Federal, state or local campaign finance regulatory agency.

**¶ 9. Rights of Amendment.**  The Settlor may at any time and upon successive occasions, alter or amend this Trust in whole or in part, for good and just cause, if and only any of the Original Trustees are a duly elected officer thereof the Settlor.  Notwithstanding the right of amendment, this Trust is irrevocable.

**¶ 10. Spendthrift Clause.**  No equitable right or interest or principal or income of any part of the Trust Property created under this Trust Agreement shall be alienated, anticipated, assigned, destroyed by conveyance, surrender or release, or encumbered, or subject to any creditors' claim or to legal process, prior to its actual receipt by the Beneficiary or Qualified Beneficiary, the distribution being the sole and absolution discretion of the Trustee.  If the creditor of any Beneficiary or of any Qualified Beneficiary who is entitled to any distribution under this Trust Agreement attempts by any means to subject to the satisfaction of his claim the interests of the Beneficiary or Qualified Beneficiary in any distribution, then, notwithstanding any other provision of this Trust Agreement, unless the release of the writ of attachment or garnishment or other process, the Trustee collectively shall act as advised by counsel.

ARTICLE II - THE TRUSTEE

**¶ 11. Trustee.**  The current Trustee is the Honorable Peter J. Wirs of Pennsylvania.

**¶ 12. Organization, Appointment, Death or Resignation or Removal of Trustee.**

(A)  There shall be one Trustee, who shall have authority pursuant to the Uniform Trust Act, 20 Pa.C.S. § 7780.6(32) to appoint one Democratic and one Republican co-trustee to act in each respective state jurisdiction ("Ancillary Trustees") and confer upon the appointed Ancillary Trustee all powers and duties of the appointing Trustee, require that the appointed Ancillary Trustee furnish security and remove the appointed Ancillary Trustee thereto.

(B)  In the event of the death, resignation or removal of the Trustee, a successor Trustee shall be appointed as designated by the incumbent Trustee prior to his leave of office or in the alternative, then the Democratic and Republican National Committee shall by unanimous agreement, designate the successor Trustee, upon due

notice of a rule nisi answerable in thirty days, to all registered qualified beneficiaries, and provided that the Attorney General of Pennsylvania concurs in the selection, such consent shall not be unreasonably withheld.  Otherwise, the successor trustee shall be appointed by the court upon petition by the Attorney General of Pennsylvania.

(C)  Any former Trustee upon retirement may be afforded such per diem compensation and privileges as Trustee Emeritus.

**¶ 13. Change in Trusteeship.**  Upon any change in any trusteeship hereunder, the continuing Trustee or successor Trustee, as the case may be, shall have all of the powers, authorities, rights, discretions, immunities, estates, titles, duties and obligations of the original Trustees, without the necessity of any conveyance or the taking of any action whatsoever.

**¶ 14. Limitations on Duties with Respect of Successor Trustee.**  No successor Trustee shall have any responsibility for the acts or omissions of any prior Trustee and no duty to audit or investigate the accounts or administration of any such Trustee, nor, unless in writing requested to do so by a person having a present or future beneficial interest under the Trust hereunder, any duty to take any action to obtain redress for breach of trust.  It is the intent of the Settlor that the successor Trustee shall not be required to obtain approval or discharge by any court of law or equity or to pursue any other court proceeding at the request of the Beneficiaries.  However, regardless of any such circumstances, any claim or action in law or equity against any previous Trustee must in any event be asserted or commenced or filed within one (1) year after the appointment of a successor Trustee, unless otherwise provided by law.

**¶ 15. Trust Management.**

(A) *Powers Generally.* The Trustee shall exercise and discharge all powers as provided by law, including all illustrative powers of trustee as provided under the Uniform Trust Act, inclusive, together with any amendments thereto, such specific powers being hereby incorporated by reference thereto and made part of this Trust Agreement, of which the incorporation of one or more of the powers contained in the Uniform Trust Act, 20 Pa.C.S. § 7701-7799, shall be in addition to and not in limitation of the common law or statutory powers of trustee.  The Trustee shall have, in addition to all powers granted by law, require each Ancillary Trustee to act in accordance with any directive issued by the Trustee as set forth within Internal Operating Procedures promulgated by the Trustee to assist each of the Ancillary Trustees in the administration of the Trust Property within their jurisdiction; *provided that*, such rules are not inconsistent with law or this Trust Agreement.

(B) *Integration with other Software.*  The Internal Operating Procedures shall provide for the integration of the Trust Property with any other software program or software as a service offered by any other corporation or nonprofit organization or political committee to the Beneficiaries or to any Qualified Beneficiary without

undue burden or cost to either the Trust, corporation, the nonprofit organization or political committee, but the Trustee is not obliged to integrate the Trust Property the expense of the Trust or any other Qualified Beneficiary.

(C) *Duty of Impartiality.*  As officers of the court, the Trustee and each Ancillary Trustee shall at all times act impartially in the administration of the trust and the protection and distribution of the Trust Property, 20 Pa.C.S. § 7773, and at no time shall deliberately cause any advantage accrue to a Qualified Beneficiary at the expense of another, the only loss which a Qualified Beneficiary may incur shall be that of its own doing arising from non-compliance with the terms of this Trust Agreement or applicable law.

(D) *Sufficient Endowment.*  In administering the Trust, the Ancillary Trustees shall assist the Trustee who at all times shall assure that the Trust Property is at all times fully protected, 20 Pa.C.S. § 7779, by possessing adequate funds to assure that the Trust is undiminished and self-perpetual, which shall include an endowment or escrow to represent such funds as necessary to sustain the administration of the trust for not less than ten subsequent years.

(E) *Civil Procedures.*  Whenever a due process hearing is required any provision herein, such applicable parts and provisions the Federal Rules of Civil Procedure shall be adapted by the Trustee to assure a full and fair opportunity for all parties-in-interest to be heard, including governmental agencies. 20 Pa.C.S. § 767.  The Trustee shall provide all accommodations reasonable and prudent to assure no party-in-interest is denied the fair and full opportunity to be heard by himself or by his counsel, which may include convening such due process hearings telephonically or online; *provided however*, that all persons participating in the hearing are able to fully hear each other. 15 Pa.C.S. § 5708. All parties-in-interest shall be solely responsible for their own attorney's fees and legal costs.

(F) *Annual Audit.*  The Trustee shall submit annually to an independent audit by a nationally reputable certified public accountant and publish such independent audit in the Annual Report required by law. 20 Pa.C.S. § 7780.3(i)(5).

**¶ 16. Inclusion of Prudent Man Rule.**  Notwithstanding the fact that the Trustee is granted broad powers under this Trust Agreement, it is the intent of the Settlors that these powers only be utilized in a way as to meet the needs of the various kinds of administrative, financial, and distribution responsibilities imposed upon the Trustee in this Trust Agreement. It is assumed and imposed upon the Trustee that under any and all circumstances the Trustee shall follow the Prudent Man Rule and perform all acts within the limits of the fiduciary responsibility imposed on a trustee by law.  Accordingly, the Trustee shall administer the trust as officers of the court in good faith in accordance with the provisions of this Trust Agreement solely in the interests of the Beneficiaries and in accordance with applicable law and shall at all times administer the Trust by acting impartially in investing, managing and distributing the Trust Property, giving due regard to the Beneficiaries' respective interests in light of

the purpose of the Trust, and otherwise treat all Beneficiaries equitably in light of the purpose of the Trust. In administering the Trust, the Trustee may incur only costs that are reasonable in relation to the Trust Property, and otherwise administer the Trust as a prudent person would, by considering the purposes, provisions, distributional requirements and other circumstances of the Trust and by exercising reasonable care, skill and caution. The Trustee shall take reasonable steps to take control of and protect the Trust Property, and keep adequate records of the administration of the Trust.

**¶ 17. Intent of Settlor, Conflicts of Interests, Disclosure, Compliance with Applicable Standards.**

(A) *Compliance with Fiduciary Standards.*  It is the intent of the Settlor that the Trustee may act freely under all and any of the powers and authority granted in this Trust Agreement as to all matters concerning the Trust Property after forming a reasonable judgment based upon all of the circumstances of any particular situation as to the wisest and best court to pursue in the interest of the Trust and the Beneficiaries.  The Trustee shall exercise his powers at all times in their fiduciary capacity solely in the interests of the Beneficiaries.  If there is an inherent conflict of interest by virtue of an act or acts, or omission of an act or acts, the Trustee shall make full disclosure to the appropriate parties in interest on a timely basis.  In managing the Trust, any outside fee, commission, or similar compensation not otherwise specified or prohibited within this Trust Agreement, shall be fully disclosed to the Beneficiaries,

(B) *Compliance with NCOPO Standards.*  It is moreover the intent of the Settlor that the Trustee shall adhere to act in conformance with all applicable standards promulgated by NCOPO which may govern the Trust or any trustee.  The Trustee shall undertake all reasonable efforts to facilitate as many Qualified Beneficiaries, candidates and nominees to adhere to and act in conformance with all applicable standards promulgated by NCOPO and as a condition of the End User License Agreement each Qualified Beneficiary, candidate or nominee so eligible for voting or non-voting membership in NCOPO shall maintain such membership.  The Trustee shall contribute to NCOPO any excess funds and collect earmarked contributions and dues from Qualified Beneficiaries for NCOPO.

**¶ 18. Duty to Inform.**  The Trustee shall have and exercise the duty to inform and report to any and all Beneficiaries as governed by the Uniform Trust Act.  All Beneficiaries shall be informed of the fact of the Trust's existence, the identity of the Settlor, the names, addresses, phone numbers and email addresses of the Trustee and each Ancillary Trustee, the right to receive a copy of this Trust Agreement and to receive not less than annually, a written report from the Trustee.  Such annual report by the Trustee shall include, but not be limited to, the assets, liabilities, receipts and disbursements of the Trust.

**¶ 19. Trustee Compensation and Reimbursement of Expenses.**  The Trustee shall be compensated the annual sum ten percent greater than the annual compensation of

the highest paid chairman of the respective national party committees, or a sum not less than One Hundred Fifty Thousand Dollars and each Ancillary Trustee may be a commission predicated on contributions and End-User License fees paid by statewide or congressional candidates or any other funds advanced to the Trust solicited by the Ancillary Trustee in accordance with law.  The Trustee may be provided such additional benefits including pension, health and major medical insurance coverage as may be reasonable and prudent.  All Ancillary Trustees shall be reimbursed for reasonably incurred out-of-pocket expenses for the administration of the Trust, which shall include meals, travel, and stationary, and for compensation and benefits for such full or part time administrative staff as may be reasonable and prudent and for legal counsel, *provided that*, any legal counsel retained by a Ancillary Trustee shall not duplicate the representation provided by general counsel.  The Trustee shall receive no other compensation, including fees or honorariums for performing his duty or appearing in his official capacity as Trustee.  All other income, obligations and interests shall be reported to all Beneficiaries in the same manner as is required of public officeholders in the state of which is the situs for the Trust.

¶ **20.  Appointment of Agents and Independent Auditors.**  The Trustee shall have the power to appoint such agents upon establishing the scope and specific terms of delegation, consistent with the purposes and provisions of the Trust, including a firm responsible for the maintenance and upgrade of the Property Trust, legal counsel, and a certified public accountant to act as Treasurer, and provide such compensation that is reasonable.  Each agent shall comply with the scope and terms of the delegation and shall exercise the delegated duties and powers with reasonable care, skill and caution and shall be liable to the Trust for failure to do so.  Any agent possessing special skills or expertise shall diligently employ and use those special skills or expertise for the sole benefit of the Trust.

¶ **21.  Authority to Grant Power of Attorney.**  The Trustee is authorized to delegate any powers under this Trust Agreement to an Attorney-in-Fact pursuant to a Special Power of Attorney for the purposes of carrying out the delegated assignment specified in the Special Power of Attorney.  The Special Power of Attorney may be issued for any purpose by the Trustee to the recipient of that power; provided, however, that such power shall not exceed the terms, conditions, and powers of this Trust Agreement.  Any third party being shown a Special Power of Attorney from the recipient of that power shall have a right without further investigation to rely upon the Special Power of Attorney.

¶ **22.  Trust Expenses.**
(A) *Expenses, Indemnification.*  The Trustee shall have the authority to pay all costs, charges and expense of the Trust.  The Qualified Beneficiaries agree to fully indemnify and hold harmless the Trustee, jointly and severally, against any and all liability on the part of the Trustee for lawful and proper acts within their powers and on account of ownership of the Trust Property to the fullest extent allowed by law

(B) *Allocation.*  The Trustee shall have the power to budget the estimated annual income and expenses relative to access, benefit and use of the Trust Property in the manner as to equalize as far as possible the allocation of expenses among the Qualified Beneficiaries for the employment of the Trust Property, in addition to any campaign contributions raised by the Trustee.

(C) *Escrow.*  The Trustee shall have the authority to require any Qualified Beneficiary to establish or maintain any account or accounting practice or procedure by which a campaign contribution by a donor for the express purpose of underwriting the Qualified Beneficiary's access to and use of the Property Trust is transferred forthwith from the account of the Qualified Beneficiary to the account of the Trust.

(D) *Addition to Property.*  Nothing within this Trust Agreement shall abridge, inhibit, impair or otherwise prevent the Trustee from soliciting any campaign contributor or donor to proffer a contribution or donation for expenses incurred by the Trustee herein for addition to the Trust. 20 Pa.C.S. § 7780.6(a)(9).

(E) *Endowment to Protect Against Deficiencies.*  The Trustee shall set aside and maintain such reserves equal in sum to a reasonable expectation of expenses required for the protection of the Trust Property and administration of the trust for ten-years subsequent to the current fiscal year, and shall among other provisions, replenish such endowment from contributions resulting from use of the Trust Property unless otherwise prohibited by applicable law.

(F) *Prohibitions.*  Nothing within this Trust Agreement shall be construed as to authorize the Trustee to perform any act which is in violation of Federal or state law but at no time shall the Trustees' authorization to perform any act which is permitted by law in the Commonwealth of Pennsylvania or any state be denied or deprived because of law within another state.

¶ **23.  Adjustment for Tax Consequences**.  The Trustee shall have the power, in the Trustee's absolute discretion to take any action and to make any decision to minimize the tax liabilities of this Trust and its Beneficiaries and to otherwise assure compliance with the Internal Revenue Code of 1986.

¶ **24.  Authorization and Limitations for Trustee to Modify Language.**  The Trustee is authorized to modify the language of the Trust as may be required by law or upon the advice of counsel, provided however that such modification of language shall not materially affect the rights of Beneficiaries or the method by which the Trust would be taxed for any such modification.  In the event that the Trustee attempts to bring about a modification in accordance with this paragraph and it is found to adversely affect the rights of any Beneficiary in any respect whatsoever, and/or the modification in any way which would adversely affect the taxation of the Trust or its Beneficiaries as it applies to income taxation or exercise of First Amendment rights, then such attempted modification of language shall be treated as *void ab inito*.

In the event of an unintended result, the Trustee is directed to rescind all transactions that were performed under this paragraph allowing change of verbiage. Where necessary and appropriate, the Trustee is directed and authorized to obtain court approval to effectuate the rescission.

**¶ 25. Right of Trustee to Petition Court.** Notwithstanding any other provision of this Trust Agreement, the Trustee is specifically authorized in his sole discretion to file a petition seeking a declaratory judgment or injunctive relief or pray for any and all other relief as may be just and appropriate with and in a court of competent jurisdiction for instructions and approval of any transaction concerning the Trust Property, including, but not limited to campaign contributions solicitations and accounting, distribution, tax questions, trust administration or any other question, which in the sole discretion of the Trustee, shall be determined by the court. The Trustee shall incur no expense in making a petition to the court, provided the petition is made in good faith, which is presumed.

ARTICLE III - GENERAL AND MISCELLANEOUS PROVISIONS

**¶ 26. Situs of Trust, Offices.**
(A) The situs of this Trust shall be the City and County of Philadelphia in and of the Commonwealth of Pennsylvania, to which applicable law and rules of procedure shall govern unless transferred to another situs by the Trustee. However no other state shall serve as situs of the trust if the law of the state imposes excessively restrictive campaign contribution limitations or which has not adopted the Uniform Trust Code promulgated by the National Conference of Commissioners on Uniform State Laws.

(B) The Trustee shall establish a General Office and such additional offices as they may deem advisable.

**¶ 27. Communications, Delivery of Notices.**
(A) *Notice by Qualified Beneficiary.* Each Qualified Beneficiary shall provide the Trustee a current listing of name of officers, address, telephone number(s), URL and email addresses. It shall be the sole and exclusive duty and obligation of the Qualified Beneficiary to assure such name, address, phone number and email address is at all times current. Each Beneficiary shall provide his or her name, address, telephone number(s) and email address(es) in accordance with the Internal Operating Procedures which shall include such instructions indicating preference relative the Beneficiary's right of privacy, which at all times shall be fully protected by the Trustee.

(B) *Reference.* All inquiries and matters regarding administration of the Trust or the Trust Property and use thereof shall be directed to the Trustee at his office. All other notices as may be required shall be as provided by the Internal Operating Procedures.

(C) *Notice by Trustee.* All notices by the Trustee shall be provided by posting the same on the Trustees' URL and by transmission of an email address at the last known email address provided to the Trustee by the Qualified Beneficiary. 20 Pa.C.S. § 7709(a). All notices posted or transmitted by the Trustee shall include and convey the information required under 20 Pa.C.S. § 7780.2(i).

**¶ 28. Construction, Severability and Partial Invalidity.** The validity, effect and construction of this Trust shall be determined in accordance with the laws of the Commonwealth of Pennsylvania or any other state wherein the situs of the trust has been transferred. If any provision of this Trust Agreement is void, invalid, or unenforceable, the remaining provisions shall nevertheless be valid and carried into effect. If any Trust herein established exceeds the longest permissible period, it shall persist in its period for the longest period permissible, then terminate. The headings within this Trust Agreement are for convenience only and are not part of the text.

**¶ 29. Copies, Counterparts.**
(A) Any person may rely on a copy, certified by a notary public, of the executed original of this Trust Agreement held by the Trustee, and of any of the notations on it and writings attached to it, as fully as he might rely on the original documents themselves. Any such person may rely fully on the statements of fact certified by anyone who appears from such original documents or from such certified copy to be a Trustee under this Trust Agreement. No one dealing with the Trustee need inquire concerning the validity of anything the Trustee purport to do. No one dealing with the Trustee need to see the application of anything paid or transferred to or upon the orders of the Trustee of this Trust.

(B) This Trust Agreement may be executed in any number of counterparts and each shall constitute an original of one and the same instrument.

**¶ 30. Definitions.**
(A) The term "**any endorsed candidate or nominee**" as used in this Trust Agreement shall mean either any candidate for public or political office endorsed by any of the aforementioned national, state, county, municipal, ward, district or local committee of the Democratic or Republican Party or any nominee of the Democratic or Republican Party as elected or selected by virtue of a direct or indirect primary or nominating convention in accordance with applicable Federal or state law. The term shall not apply to any other candidate opposing any endorsed Democratic or Republican candidate or nominee of the Democratic or Republican Party, except by express written authorization of any of the aforementioned national, state, county, municipal, ward, district or local committees of the Democratic or Republican Party, of which such consent shall not be unreasonably withheld.

(B) The term "**association, campaign finance, election, revenue and trust laws**" as used in this Trust Agreement shall mean Chapter 51 of Title 15 of Pennsylvania Consolidated Statutes, entitled and cited as the Nonprofit Corporation Law of 1988; Title 25 of Pennsylvania Statutes, entitled and cited as the Election Code, Title 26 of the United States Code, entitled and cited as the Internal Revenue Code, and Chapter 77 of Title 24, Pennsylvania Consolidated Statutes, entitled and cited as the Uniform Trust Act, and any Federal or state equivalent of such statutes, in any other state which may

be applicable to or govern transactions involving this Trust.

(C) The term "**Attorney General**" as used in this Trust Agreement shall mean such person or persons delegated by the Attorney General of the respective state which the Trust is situs thereof to exercise the *paren patraie* powers of the state and may include the general counsel and other regulatory authorities for matters delegated by law or consent of the Attorney General.

(D) The term "**beneficiary**" or any derivation thereof as used in this Trust Agreement shall mean any registered voter or person of adult age desiring to be a registered voter or any person not of adult age who desires to participate in the political party of his choice, i.e., the general public, in addition to the meaning such term shall have under the Uniform Trust Act. 20 Pa.C.S. § 7703. *Cf.* "Qualified Beneficiary."

(E) The term "**FECA**" as used in this Trust Agreement shall mean Federal Election Campaign Act (FECA) of 1971, as amended, Pub.L. 92-225, 86 Stat. 3, 52 U.S.C. § 30101, *et seq.* and shall include any amendments hereinafter.

(F) The term "**funds necessary for the trust to be undiminished and self-perpetual**" as used in this Trust Agreement shall mean such funds that are necessary for the ongoing administration of the Trust independent of the expense of distributing the Trust Property which is tax-exempt under 26 U.S.C. § 501(c)(3).

(G) The term "**or any elected member**" or derivation thereof as used in this Trust Agreement shall mean the office of any member of any regularly constituted committee of the Democratic or Republican Party or duly qualified national, state, county, municipal, ward, district and local committees of the Democratic or Republican Party who upon being elected in a primary or election or by caucus or convention to such party office by popular vote, and entrusted by law to represent all electors therein the district for a term definite and tenure certain; and of which said powers, duties, and emoluments become vested in a successor when the office becomes vacant, and the chairman and treasurer of the such committees consisting of elected members, to which equitable interest shall attach. The term shall include any person lawfully appointed to fill a vacancy in such elected office until the next election as set forth by law. Any other member not directly or popularly elected is not an elected member.

(H) The term "**Qualified Beneficiary**" or any derivation thereof as used in this Trust Agreement shall mean "regularly constituted committee" or "duly qualified national, state, county, municipal, ward, district and local committees" of the Democratic or Republican Party or "any elected member" of any of the aforementioned, and who by virtue thereto, have a subordinate fiduciary duty to the Beneficiaries for distribution of the Trust Property, in addition to the meaning such term shall have under the Uniform Trust Act. 20 Pa.C.S § 7703. *Cf.* "Beneficiary."

(I) The terms "**regularly constituted committee**" or "**duly qualified national, state, county, municipal, ward, district and local committees**" as used in this Trust Agreement shall mean a committee authorized under applicable law as a permanent committee of the Democratic or Republican Party which consists of

members chosen by the electorate in a primary, election or by caucus or convention by popular vote for a term definite and tenure certain; and of which said powers, duties, and emoluments become vested in a successor when the office becomes vacant, to which equitable interest shall attach. Reference to a state shall include also include the District of Columbia, Guam, Puerto Rico, U.S. Virgin Island, and any other territory of the United States. Reference to any county shall also include a similar reference, as to Parish (as in the case of the State of Louisiana) or Borough (as in the case of the State of Alaska). Reference to municipal shall also include, but not be limited to borough, city, town, township, village or any similar political division within any state. Reference to ward shall include any political division commonly known as a ward within any city, borough, or similar political subdivision, provided however, there exist a committee of the Democratic or Republican Party as provided by state law.

(J) The term "**responsible persons**""as used in this Trust Agreement shall convey the same intent and meaning as the term is used in Canon 7b(2) of the Code of Judicial Conduct or its successor.

(K) The term "**subordinate committee**" as used in this Trust Agreement shall mean such subordinate committee as defined under 11 C.F.R. 100.14(c) and shall include but not be limited to such ancillary entities organized under the Internal Revenue Code, 26 U.S.C. §§ 501(c)(4) or 527 sanctioned by a Qualified Beneficiary any may include, upon certification by the appropriate Qualified Beneficiary, any connected organization as such is defined under 2 U.S.C. § 431(7).

(L) The term "**undue influence**" or any derivation thereof as used in this Trust Agreement shall mean any act or omission of any act committed in violation of the Civil Rights Act of 1957, Pub. L. 85–315, 71 Stat. 637, 42 U.S.C. § 1971(b) [now codified at 52 U.S.C. ¶ 10101(b)] notwithstanding the absence of any Federal candidate on the ballot thereto.

(M) The term "**without interference or obstruction by any person or persons**" as used in this Trust Agreement shall mean any act or omission of act committed in violation of the Civil Rights Act of 1957, Pub. L. 85–315, 71 Stat. 637, 42 U.S.C. § 1971(b) [now codified at 52 U.S.C. § 10101(b)] notwithstanding the absence of any Federal candidate on the ballot thereto.

I, Hon. Peter J. Wirs, do hereby certify this is a true and correct copy of the Trust Agreement on the undersigned date.



December 23 2016

BEFORE THE TRUSTEE
THE LINCOLN CHARITABLE TRUST

|  |  |  |
|---|---|---|
| | : | |
| Democratic National Committee, | : | |
| Grievant | : | |
| | : | |
| v. | : | Resolution No. 2018-5A (MUR 2018-1) |
| | : | |
| Republican National Committee, | : | |
| Respondent | : | |
| | : | |

**AWARD OF PERMANENT INJUNCTION
AND IMPOSITION OF SURCHARGE**

*Syllabus*

Trustee finds breach of fiduciary duty owed to voters by "Republican Curia" of attorneys, staff and independent contractors who usurp the authority of institutional entity Respondent Republican National Committee ("RNC") by reneging on a pledge to a charitable entity which as a matter of law is enforceable. After hearing combined with trial on merits on injunctive relief, Fed.R.Civ.P. Rule 65, held June 4, 2018 the Trustee:

Found as Fact;

(1) As majority of various classes of voters no longer affiliate with or support the Republican Party and Partisan Composition Index shows decreasing vote splitting; the RNC increasingly relies on (1) voter suppression of social-demographic constituencies traditionally aligned with Democratic Party and (2) fund-raising from increasingly narrow pool of approximately 31,000 pool of affluent donors to sustain itself. §§ 18-10, ¶¶ 127-203, pp. 21-28.

(2) In a March 18, 2013 *Growth and Opportunity Project* report, a post-mortem analysis of the 2012 Presidential election, the RNC formally ratified long-held academic criticisms that the RNC was dedicated to messaging, not policy-making to win elections, will accelerate usurping the powers and duties of 365,858 elected Republican precinct party committee among 182,851 U.S. voting districts, declaring them as "old fashioned" by diverting their responsibilities to party professionals and aligned 527 organizations, and while written euphemistically with "dog-whistles" affirmed ongoing voter suppression efforts against African-American voters. § 30, ¶¶ 215-282, pp. 30-38.

(3) Despite millions spend on vendors purveying out-dated political technology that is static "Web 1.0" platforms. The Trust Property's *MyVoterPage.com*™ a political version of *Facebook*™ is interactive "Web 2.0" platform as is *Election Day Whip*™ a GOTV (acronym for get-out-the-vote) application for precinct party representatives and poll workers fulfilling the Feb. 21, 1840 "Lincoln Rule." As neither DNC or RNC has Web 2.0 political technology, and thus Trust Property does not compete against any existing technology used by DNC or RNC, there is no rationale under Business Judgment rule not to employ the Trust Property. It is also the only economially efficient software due to impositions under McCain-Feingold. §§23-24, 62-78, ¶¶ 283-304, 864-1171, pp 38-48, 134-1171.

(4) When a "Mega-Donor," upset over RNC's arbitrary abandonment of U.S. Republican Sen. Rick Santorium's 2016 losing re-election campaign, established a trust to mitigate RNC' usurpation of local elected party representatives to be funded by pooling of resources among fellow mega-donors, the RNC superceded the mega-donor by first pledging, then reneging on a $20 million pledge under the pretext of demanding McCain-Feingold compliance. §§ 46-63, ¶¶ 658-919, pp. 112-143.

i

(5) The RNC refuses to acknowledge that it is a co-beneficiary of the trust, despite one of its RNC members serving as the trust's co-trustee, and multiple RNC members attempting to mitigate the RNC's reneging on its $20 million pledge; all because of the RNC top-down culture which requires obsequious to party rule is threatened by the trust's "watchdog" existence. §§ 54-59, ¶¶ 757-824, pp. 123-130.

(6) Although Hillary Clinton committed errors, Donald Trump was elected President in 2016 only because RNC suppressed African-American voter turnout by euphemistic dog-whistle messaging, and moderate Republican voter turnout by usurping precinct committee representatives, and by denying Trust Property to DNC, state, county and local Democratic Party committees. §§ 80-81, ¶¶ 1180-1258, pp. 165-172.

(7) The RNC refuses to acknowledge its failure to adhere to rational politics per Anthony Down's political marketplace theory, is dominated by its top heavy corporate hierarchy's intolerance of dissent as documented by Jo Freeman, and increasingly relies on rent-seeking professional party operatives criticized by Samuel Issacharoff and Daniel R. Ortiz, who are fulfilling the "I" political culture of profiteering at the expense of the Moralistic political culture of public service per Daniel J. Elazar's three-political culture theory. Pp. 133-140.

(8) When election crimes are committed, public corruption almost always exist, because election crime is driven by a motive to control governmental power for corrupt purposes which must be concealed from the public's scrutiny. §§82-96, ¶¶ 1259-1532, pp. 172-216.

Held as Conclusion of Law.

(1) The Trustee exercising his statutory authority to sit as the Arbitrator under the Pennsylvania Uniform Trust Act, 20 Pa.C.S. § 7780.6(a)(3), is a neutral in disputes among co-beneficiaries, *In re Trust of David H. Keiser,* 392 Pa.Super. 146, 150 & n.2, 572 A.2d 734, 736 & n.2 (1990), and although has the right to summarily dispose of the grievance when there is no genuine dispute of material fact and disposition as by governing law, will nonetheless hold a hearing. Trustee also has the authority to grant relief *ex aequo et bono*. ¶ 3, 16, pp. 262,264.

(2) Because the RNC never disclaimed its interests in the Trust, *arguendo*, if such is legally permissible but for the Statutes of Elizabeth, RNC is bound by arbitration pursuant to contract law, as RNC clearly and unmistakably agreed to arbitration being expressly specified within the Trust Agreement, ¶ 8(E), the failure to disclaim constituting assent to Trust Agreement despite not being a signatory, further affirmed by actual election to utilize ¶ 8(E) provisions and deriving direct benefits from such usage. ¶ 1, 14-15, pp. 262, 264.

(3) Because the Trust is a charitable trust, co-beneficiaries are barred from disclaiming by the Statutes of Elizabeth, 20 Pa.C.S. § 7706, co-beneficiaries who are political parties or public officeholders, are merely conduits through which charitable purposes flow to the public, *In re Trust of Brooke*, 82 Ohio St. 3d 553,561, 697 N.E.2d 191 (1998). ¶ 4, pp. 262.

(4) When co-beneficiary provides no democratic means of governance and controls intra-party participation and voter outreach by intimidation, threats or coercion to suppress party participation and subsequent voter turnout, made official by the RNC in its' March 18, 2013 *Growth and Opportunity Project* report, co-beneficiary ceases being a political party, because political parties have no existence of their own, as they are only manifestations of their members who choose to associate, and co-beneficiary's failure to facilitate participation by and representation of party electors is a violation of the Civil Rights Act of 1957, multiple criminal statutes and the Trust Agreement, ¶ 2(A), ¶ 8A, ¶ 8(B)(1)-(2), ¶ 30(L) and ¶ 30(M), and thus is subject to arbitrability under PA Uniform Trust Act, 20 Pa.C.S. § 7780.6(a)(3) and see also Uniform Trust Code § 816(23) and comment, because such constitutes a breach of fiduciary duty owed by one co-beneficiary to all other co-beneficiaries. ¶ 5-15, pp.262-264.

(5) Election crimes and resulting public corruption violates public official's constitutional oath of office, U.S. Const., Art. VI, cl 3, 5 U.S.C. § 3331. ¶ 13, p. 263.

(6) A pledge to a charitable entity, such as the Trust, is enforceable under its original terms and conditions if subsequently reneged by the donor. ¶ 14, p. 264.

(7) A co-beneficiary who breaches its fiduciary duty to other co-beneficiaries by violating the Trust Agreement, ¶ 2(A), ¶ 8(A), ¶ 8(B)(1)-(2), ¶ 30(L), and ¶ 30 (M), is required to make the charitable trust whole which is by surcharge. Restatement (Third) Trusts § 104(1)(c) ("Liability of Beneficiary to Trust") and comment f ("the beneficiary is personally liable to the trust for all [or part] of the loss..."). See also Austin W. Scott, William F. Fratcher & Mark L. Ascher, *Scott and Ascher on Trusts* §§ 22.6, 25.1-25.3 (5th ed. 2007); George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 191 (Rev. 2d ed. 1979); id. § 814 (Rev. 2d ed. 1981); and Amy M. Hess, George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 718 (3d ed. 2009), being Black Letter. *DuPlaine's Estate*, 185 Pa. 332, 334-335, 39 A. 947, 948 (1898). ¶ 15, p. 264.

(8) In as Trustee has the authority to grant relief *ex aequo et bono*, his powers no less and probably greater than that of a judge, and given that Respondent's illegal customs and usages have become so entrenched but that a major political party is too important to fail, Trustee will appoint receiver to takeover Respondent if Respondent does not cease and desist in violating Civil Rights Act of 1957 and implement reforms as ordered. ¶ 16, p 264.

*The Syllabus constitutes no part of the Resolution, but is prepared by the Trustee for the convenience of the reader.*

## Table of Contents

**A. FINDINGS OF FACT.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
§ 1. Statutory Authority, Arbitrariness, Probable Cause (¶¶ 1-13) . . . . . . . . . . . . . . . . . . . 1
§ 2. Trust Organized for Charitable Purposes (¶¶ 14-19). . . . . . . . . . . . . . . . . . . . . . . . . . 3
§ 3. Pre-Election First Amendment Right of Political Association (¶¶ 20-21) . . . . . . . . 4
§ 4. Post-Election First Amendment Right of Political Association (¶¶ 22-24). . . . . . . . 4
§ 5. Applicable Terms of Trust Agreement Being Violated (¶¶ 25-30) . . . . . . . . . . . . . . 6
§ 6. Compliance with Internal Revenue Code (¶¶ 31-38) . . . . . . . . . . . . . . . . . . . . . . . . . 7
§ 7. Parties and Parties-in-Interest (¶¶ 39-43) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
§ 8. DNC's Grievance (¶ 44) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
§ 9. Procedures Governing Grievances (¶¶ 45-49). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
§ 10. RNC's Purported Defense (¶ 50). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
§ 11. Prior Grievances against RNC (¶¶ 51-52) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
§ 12. Trustee's Authority to Sit as Arbitrator (¶ 53). . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
§ 13. The "Lincoln Rule" of Electioneering (¶¶ 54-108) . . . . . . . . . . . . . . . . . . . . . . . . 11
§ 14. History of Political Parties (¶¶ 109-113) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
§ 15. Application of Downs, Keys, Elazar and Freeman (¶ 114) . . . . . . . . . . . . . . . . . . 19
§ 16. V.O. Key's Classification of Party Participants (¶¶ 115-119). . . . . . . . . . . . . . . . 19
§ 17. Elazar's Three Political Cultures (¶¶ 120-126) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
§ 18. Freeman's Theory re the Party Cultures (¶¶ 127-199) . . . . . . . . . . . . . . . . . . . . . 21
§ 19. Nationalization of the Political Parties (¶¶ 200-203). . . . . . . . . . . . . . . . . . . . . . . 27
§ 20. Professionalism of Super Agents and Party Elites (¶¶ 204-205). . . . . . . . . . . . . . 28
§ 21. Super Agents Interests Depart from Party Members (¶¶ 206-214) . . . . . . . . . . . . 28
§ 22. The March 18, 2013 *Growth and Opportunity Project* Report (¶¶ 215-282) . . . . 30
§ 23. How RNC Violates Civil Rights Act with "Voter Data" (¶¶ 283-291) . . . . . . . . 38
§ 24. Vendors exploit GOP Data Center's Web 1.0 technology (¶¶ 292-304). . . . . . . . 48
§ 25. RNC's Surreptitious Voter Suppression Acts (¶ 305-306). . . . . . . . . . . . . . . . . . . 53
§ 26. RNC's Alleged Voter Fraud Merely Strawman (¶¶ 307-321). . . . . . . . . . . . . . . . 54
§ 27. RNC Voter Suppression Expands Beyond Minorities (¶¶ 322-323) . . . . . . . . . . . 55

§ 28. RNC Now Suppressing Moderate GOP Voters (¶ 324-325) . . . . . . . . . . . . . . . . . 55
§ 29. Photo IDs as Form of Voter Suppression (¶¶ 326-345) . . . . . . . . . . . . . . . . . . . . . 55
§ 30. Purging Voter Rolls Form of Voter Suppression (¶¶ 346-367) . . . . . . . . . . . . . . . 59
§ 31. Caging and Exact Matching Form of Voter Suppression (¶¶ 368-382) . . . . . . . . . 61
§ 32. Felon Disenfranchisement Form of Voter Suppression (¶¶ 383-397) . . . . . . . . . . . 63
§ 33. RNC Disinformation Form of Voter Suppression (¶¶ 398-402) . . . . . . . . . . . . . . . 64
§ 34. Inequitable Election Resources Form of Voter Suppression (¶¶403-404) . . . . . . . 67
§ 35. RNC's Voter Suppression Violates State Election Laws (¶¶ 405-517) . . . . . . . . . . 67
§ 36. RNC's Adverse Impact on State & Local Party Committees (¶¶ 518-525) . . . . . . 88
Table No. 1 Number of Precincts and Committee People by State . . . . . . . . . . . . . . . . . . 89
§ 37. Nationalization Compels RNC to Resist Loss of Soft Money (¶¶ 526-532) . . . . . . 90
§ 38. RNC "Dog Whistles" Promoting Black Voter Suppression (¶¶ 533-548) . . . . . . . 94
§ 39. RNC's Confidential Relationship with State/Local Committees (¶¶ 549-552) . . . . 96
§ 40. Consequence of RNC's Abuse of Confidential Relationship (¶¶ 553-559) . . . . . . 97
§ 41. Proof of Disparity re RNC Abuse of Confidential Relationship (¶¶ 560-572) . . . . 98
§ 42. RNC Exalts Fund Raising at Expense of Participatory Politics (¶¶ 573-633) . . . . 100
§ 43. Trust Established to Correct RNC Violating Civil Rights Act (¶¶ 634-641) . . . . 108
§ 44. CIIM: Fundamentals of Political Communications (¶¶ 642-648) . . . . . . . . . . . . . . 109
§ 45. Importance of Party Mobilization (¶¶ 649-657) . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
§ 46. RNC's 2006 Failure is Impetus for Creating Trust (¶¶ 658-667) . . . . . . . . . . . . . 112
§ 47. Comparing Trust Res and RNC's Antiquated Technology (¶¶ 668-717) . . . . . . . 113
§ 48. Difference Between Trust Res and other PACs (¶¶ 718-725) . . . . . . . . . . . . . . . . . 118
§ 49. House List Development is Principal Expense (¶¶ 726-728) . . . . . . . . . . . . . . . . . 119
§ 50. Trust Less Costly than Commercial Vendors (¶¶ 729-730) . . . . . . . . . . . . . . . . . 119
§ 51. Trust Property Saves Parties Millions in Expenditure (¶¶ 731-732). . . . . . . . . . . 119
§ 52. RNC's Effort to Destroy the Trust (¶¶ 733-735) . . . . . . . . . . . . . . . . . . . . . . . . . . 120
§ 53. RNC's Feb. 26, 2009 $20 Million Pledge (¶¶ 736-756) . . . . . . . . . . . . . . . . . . . 121
§ 54. RNC's Acceptance of Trust Interest (¶¶ 757-798) . . . . . . . . . . . . . . . . . . . . . . . . . 123
§ 55. RNC Does Not Disclaim Interest in Trust (¶799-801) . . . . . . . . . . . . . . . . . . . . . . 127
§ 56. Participation in Mediation is Direct Benefit RNC Exploited (¶¶ 802-804) . . . . . 128
§ 57. RNC Asst. Chief Counsel's Resistance to Trust (¶¶ 805-807) . . . . . . . . . . . . . . . 128
§ 58. Trustees' Conversion from Mediation to Arbitration (¶¶ 808-817) . . . . . . . . . . . 128
§ 59. RNC Never Officially Disclaimed (¶¶ 818-824) . . . . . . . . . . . . . . . . . . . . . . . . . . . 130
§ 60. No RNC Due Diligence to Satisfy Business Judgment Rule (¶¶ 825-825) . . . . . . 130
§ 61. RNC Counsel Perpetrates Fraud on the Court (¶¶ 836-863) . . . . . . . . . . . . . . . . . 131
§ 62. RNC's Failure to Duplicate the Trust Res (¶¶ 864-916) . . . . . . . . . . . . . . . . . . . . 134
§ 63. RNC Spends $40 Million on Software Trust Provides Free (¶¶ 917-919) . . . . . . 138
§ 64. RNC's GOP Data Center Failure (¶¶ 920-957) . . . . . . . . . . . . . . . . . . . . . . . . . . . 139
§ 65. Venders Concede GOP Data Center Failure (¶¶ 958-962) . . . . . . . . . . . . . . . . . . 143
§ 66. Widespread Criticism of GOP Data Center (¶¶ 963-989) . . . . . . . . . . . . . . . . . . . 143
§ 67. Preibus Takes Credit for GOP Data Center (¶¶ 990-1003) . . . . . . . . . . . . . . . . . . 146
§ 68. RNC Acquiesce GOP Data Center Privacy Breaches (¶¶ 1004-1024) . . . . . . . . . 148
§ 69. RNC Maintains Secret Voter Files (¶¶ 1025-1041) . . . . . . . . . . . . . . . . . . . . . . . . . 149
§ 70. Prevailing Condemnation of RNC Political Technology (¶¶ 1042-1099) . . . . . . . 151
§ 71. RNC Acquiescence of Cambridge Analytica (¶¶ 1100-1112) . . . . . . . . . . . . . . . . 156
§ 72. Cambridge Analytica Also Promotes Voter Suppression . . . . . . . . . . . . . . . . . . . . 157
§ 73. RNC Support for Cambridge Analytica (¶¶ 1118-1122) . . . . . . . . . . . . . . . . . . . . 158
§ 74. DOJ, FBI Investigating Cambridge Analytica (¶¶ 1123-1124) . . . . . . . . . . . . . . . 158

iv

§ 75. Russian Interfere in 2016 Election Benefits RNC (¶¶ 1125-1135) . . . . . . . . . . . 159
§ 76. RNC Knows It Could Prevent Russian Interference (¶¶ 1136-1141) . . . . . . . . . 160
§ 77. RNC Usurps Elected Precinct Committee People (¶¶ 1142-1148) . . . . . . . . . . . 161
§ 78. State, Local GOP Suffer Loss of Adequate Funding (¶¶ 1149-1171) . . . . . . . . . 161
§ 79. RNC Circumvents Consent Decree to Suppress Voters (¶¶ 1172-1179) . . . . . . . 164
§ 80. Denying DNC Use of Trust Res Why Clinton Lost  (¶¶ 1180-1195) . . . . . . . . . 165
§ 81. RNC Voter Suppression and Destroying Trust Elects Trump (¶¶ 1196-1258) . . . 167
§ 82. Trump Election Result of Total Institutional Meltdown (¶¶ 1259-1269). . . . . . . 173
§ 83. RNC Voter Suppression Increases Polarization  . . . . . . . . . . . . . . . . . . . . . . . . 174
§ 84. Cost to GOP for RNC to Abandon Trust Property (¶ 1273) . . . . . . . . . . . . . . . 174
§ 85. RNC Judicial Admissions re Its Internet Failures (¶¶ 1274-1276) . . . . . . . . . . 175
§ 86. RNC Increases Dependence on Large Donors (¶¶ 1277-1324). . . . . . . . . . . . . 175
§ 87. RNC Impairs Two-Party System Viability (¶¶ 1325-1343)  . . . . . . . . . . . . . . . 178
§ 88. RNC Voter Suppression Promotes Public Corruption (¶¶ 1344-1349) . . . . . . . . 191
§ 89. Trump's Pathological Lying Violate Oath of Office (¶¶ 1350-1373) . . . . . . . . . 193
§ 90. GOP Acquiescence of Trump's Crimes Proves Freeman (¶ 1374) . . . . . . . . . . . 196
§ 91. Historical Trends Suggest Future GOP Marginality (¶¶ 1375-1432) . . . . . . . . . 196
§ 92. RNC's Consciousness of Guilt (¶¶ 1433-1458). . . . . . . . . . . . . . . . . . . . . . . . 204
§ 93. Trust Promotes Ethical Standards of Conduct (¶¶ 1459-1481) . . . . . . . . . . . . . 208
§ 94. RNC Constitutes Immediate and Irreparable Injury (¶¶ 1482-1489)  . . . . . . . . 210
§ 95. Summary of Findings of Fact (¶¶ 1490-1501). . . . . . . . . . . . . . . . . . . . . . . . 211
§ 96. Total Number of Potential Voter Suppression (¶¶ 1502-1532). . . . . . . . . . . . . 212
Table No. 2 Number of Voters Not Casting Ballots due to RNC Suppression  . . . . . . 212
§ 97. Computation of Damages (¶ 1533-1556). . . . . . . . . . . . . . . . . . . . . . . . . . . . 216
§ 98. Computation of Attorney Fees (¶ 1557-1560) . . . . . . . . . . . . . . . . . . . . . . . . 218
**B. DISCUSSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219
I. Trust's Legitimate Charitable Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219
    (1) RNC Doesn't Want a Watchdog Who Bites . . . . . . . . . . . . . . . . . . . . . . . . 219
II. Trustee's Authority to Arbitrate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221
    (1) Authorize for Trustee to Arbitrate Now Statutory  . . . . . . . . . . . . . . . . . . . 221
    (2) Trust Agreement ¶ 8(E) Clear and Unmistakable Agreement . . . . . . . . . . . 222
    (3) Trust More Competent under Law of Shop  . . . . . . . . . . . . . . . . . . . . . . . . 223
III. Procedure Governing Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224
    (1) Authority for Arbitral Summary Disposition . . . . . . . . . . . . . . . . . . . . . . . 224
    (2) Generally No Arbitration Hearing Require . . . . . . . . . . . . . . . . . . . . . . . . . 224
    (3) Fed.R.Civ.P Rule 65 Requires Hearing  . . . . . . . . . . . . . . . . . . . . . . . . . . . 224
    (4) Claims and Defenses Waived if Not Made in Hearing . . . . . . . . . . . . . . . . . 224
    (5) Hearing in *Absentia* Authorized When RNC Fails to Appear  . . . . . . . . . . . 225
    (6) Trustee's Authority to Issue Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . 225
    (7) Judicial Notice of Matters of Public Record . . . . . . . . . . . . . . . . . . . . . . . . 226
    (8) No Bar Under Political Question Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . 226
    (9) Election Crimes, Fraud on Court Rebuts Evidentiary Presumption . . . . . . . 228
    (10) Evoking *Res Ipsa Loquitur* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228
    (11) Claim or Issue Preclusion No Bar to Ongoing Acts . . . . . . . . . . . . . . . . . . 229
    (12) Prior Award No Bar under *Res Judicata* or Collateral Estoppel  . . . . . . . . 230
    (13) Prior Court Ruling No Bar under *Res Judicata*  . . . . . . . . . . . . . . . . . . . . 231
    (14) Consent Decree's Paragraph 4 No Defense  . . . . . . . . . . . . . . . . . . . . . . . 232
IV. RNC Strawman Objections to Arbitrarity Frivolous . . . . . . . . . . . . . . . . . . . . . . 233

(1) RNC's Strawman Objections is Vexatious, Consuming Scare Resources . . 233
(2) Arbitration is a Matter of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234
(3) Trustee Has Authority to Sit as Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . 234
(4) RNC Not Required to be Signatory to be Bound to Trust . . . . . . . . . . . . . 235
(5) RNC Has Exploited Trust Agreement to Receive Direct Benefits . . . . . . . . 235
(6) By Not Disclaiming, RNC Assents to Arbitration Provision . . . . . . . . . . . 237
(7) RNC Presumed to Accept Interest in Trust, Prior Consent Not Required . . 237
(8) RNC Has Never Officially Disclaimed Its Interest . . . . . . . . . . . . . . . . . . . 238
(9) RNC Estopped from Disclaiming Its Interest . . . . . . . . . . . . . . . . . . . . . . . 238
(10) RNC's Disclaimer Prohibited by Statutes of Elizabeth . . . . . . . . . . . . . . 239
(11) Equitable Estoppel Evoked due Agents' *Ultra Vires* . . . . . . . . . . . . . . . . 240
V. RNC's Agents Shirking Violates Trust Agreement . . . . . . . . . . . . . . . . . . . . . . . . 240
(1) Republican Curia Self-Serving Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . 240
(2) RNC Members as Principals Liable for Agents Malfeasance . . . . . . . . . . . 241
(3) GOP Staff's Intractability Not Comporting to Party Objectives . . . . . . . . 241
VI. RNC's Agents Shirking Cannot Injure Co-Beneficiaries . . . . . . . . . . . . . . . . . . . 241
(1) RNC Cannot Block Co-Beneficiaries' Access to Trust . . . . . . . . . . . . . . . 241
(2) Co-Beneficiaries Have Fiduciary Duty to Each Other . . . . . . . . . . . . . . . . 241
(3) RNC Has Confidential Relationship with State, Local Parties . . . . . . . . . . 242
(4) RNC Has Confidential Relationship with Voters, Officeholders . . . . . . . . 243
(5) RNC Breaches Each Element of Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . 243
(6) RNC Violates its Fiduciary Duty under Business Judgment Rule . . . . . . . . 244
(7) RNC Violates its Fiduciary Duty as Co-Beneficiary . . . . . . . . . . . . . . . . . 245
VII. Constitutional Violations From RNC's Agents Shirking . . . . . . . . . . . . . . . . . . . 245
(1) RNC's Breach Arises to Violation of Constitutional Principles . . . . . . . . . 245
(2) Importance of First Amendment Right of Political Association . . . . . . . . . 246
(3) RNC Violates *Associated Press* and *Thornhill* to Avoid Public Scrutiny . . 246
(4) RNC Violates *Reynolds v. Sims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247
(5) RNC Violates *Virginia Pharmacy* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250
(6) RNC's Seeking Soft Money Control to Overcome Unpopularity . . . . . . . . 250
(7) Voters First Amendment Rights Require Protection . . . . . . . . . . . . . . . . . . 251
(8) RNC No Longer a Political Party per se, but Only a PAC . . . . . . . . . . . . . . 252
(9) Lack Democratic Transparency Violates Civil Rights Act . . . . . . . . . . . . . 253
(10) Intimidation, Threats and Coercion Violates Civil Rights Act . . . . . . . . . 254
(11) Usurpation of Precinct Representatives is Voter Suppression . . . . . . . . . 255
(12) RNC Careering to Becoming Criminal Enterprise . . . . . . . . . . . . . . . . . . 256
VIII. Trustee's Duty to Award Relief *Ex Aequo et Bono* . . . . . . . . . . . . . . . . . . . . . . 257
(1) Effectuating Remedy by Surcharge and Impoundment . . . . . . . . . . . . . . . 257
(2) Trustee's Exercise of Discretion Not to be Disturbed . . . . . . . . . . . . . . . . 257
(3) Authority to Enforce Pledge to Charity . . . . . . . . . . . . . . . . . . . . . . . . . . . 257
(4) Authority to Set Aside Reserves to Prevent Deficiencies . . . . . . . . . . . . . . 258
(5) Authority to Assess Surcharge for Damages . . . . . . . . . . . . . . . . . . . . . . . . 258
(6) Payment of Surcharge Proceeds to Co-Beneficiaries Not Contributions . . . 259
(7) Authority to Impound . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
(8) Authority to Prevent Future Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
(9) Attorneys' Fees Exception to American Rule . . . . . . . . . . . . . . . . . . . . . . . 260
(10) Authority to Appoint Receiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261
**C. CONCLUSIONS OF LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

¶ 1. Co-Beneficiaries Bound to Arbitration Notwithstanding Non-Signatory . . . . . . . . 262
¶ 2. Arbitrarity as Violation of Civil Rights Act Violates Trust Agreement . . . . . . . . . 262
¶ 3. Trustee Neutral, Award *Ex Auquo et Bono* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263
¶ 4. Interests in Charitable Trust Inalienable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263
¶ 5. Election Crimes, Fraud on Court Defeat Evidentiary Presumption . . . . . . . . . . . . 263
¶ 6. Immediate and Irreparable Injury Requires Immediate Injunctive Relief . . . . . . . . 263
¶ 7. Co-Beneficiary Bound by Community of Interest . . . . . . . . . . . . . . . . . . . . . . . . . 263
¶ 8. Violation of Civil Rights Act is Violation of Trust Agreement . . . . . . . . . . . . . . . 263
¶ 9. Voter Challenges Limited Only to Those Authorized by Law . . . . . . . . . . . . . . . 263
¶ 10. Racial Euphemisms Violate Civil Rights Act & Trust Agreement . . . . . . . . . . . . 263
¶ 11. Usurping Party Officials Violate Civil Rights Act & Trust Agreement . . . . . . . . 264
¶ 12. No Transparent Governance Violate Civil Rights Act & Trust Agreement . . . . . 264
¶ 13. Election Crimes, Public Corruption Violate Oath of Office . . . . . . . . . . . . . . . . 264
¶ 14. Pledge to Charitable Trust Enforceable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264
¶ 15. Co-Beneficiary Breach of Fiduciary Duty Required to Make Trust Whole . . . . . 264
¶ 16. Trustee Required to Grant Relief *Ex Auquo et Bono* . . . . . . . . . . . . . . . . . . . . . 264
**D. AWARD ORDER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264
  I. Prohibition of Violating the Civil Rights Act of 1957 . . . . . . . . . . . . . . . . . . . . . . 265
    A. Cease and Desist Violations of Civil Rights Act of 1957 . . . . . . . . . . . . . . . 265
    B. Reinstatement of Nov. 1, 1982 Consent Decree . . . . . . . . . . . . . . . . . . . . . 266
    C. Prohibition of Retaliation against Co-Beneficiaries and Trustee . . . . . . . . . 268
    D. Drafting Standards to Eliminate Unequal Electoral Resources . . . . . . . . . . 268
    E. Future Grievances Commence under Fed.R.Civ.P. Rule 65 . . . . . . . . . . . . 268
    F. DNC or State Democratic Party to Prosecute Grievances . . . . . . . . . . . . . . 268
  II. Surcharge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268
    A. Basic Surcharge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268
    B. Supplemental Surcharges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 269
    C. UCC Blanket Lien . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 269
    D. Respondent Prohibited from Change of Banks, etc . . . . . . . . . . . . . . . . . . . 270
    E. Additional Prohibition Imposed on Respondent . . . . . . . . . . . . . . . . . . . . . 270
    F. Additional UCC Blanket Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271
    G. Prohibitions Same Against State Committees . . . . . . . . . . . . . . . . . . . . . . . 271
    H. All UCC Liens in First Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271
    I. Third-Party Indemnification of Respondent for Surcharge . . . . . . . . . . . . . . 271
    J. Authority to Solicit Third Party for Indemnification . . . . . . . . . . . . . . . . . . 271
    K. IRS Circular 230 Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272
    L. Arbitrator Immunity re Third Party Solicitation . . . . . . . . . . . . . . . . . . . . . 272
    M. Attorney Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272
    N. Continuance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272
    O. Future Grievances Commence under Fed.R.Civ.P. Rule 65 . . . . . . . . . . . . 272
    P. DNC or State Democratic Party to Prosecute Grievances . . . . . . . . . . . . . . 272
  III. Restoration of the Trust Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272
    A. Notice to Beneficiaries to Register with the Trust . . . . . . . . . . . . . . . . . . . . 272
    B. Content of Notice to Beneficiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 273
    C. Requirement of State Party Committees to Retransmit Notice . . . . . . . . . . . 275
    D. Delivery of *MyVotePage.com*™ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275
    E. Prohibition Against Maintaining Secret Voter Files . . . . . . . . . . . . . . . . . . 275
    F. Delivery of *We The People National Conference Calls*™ . . . . . . . . . . . . . . 275

G. Delivery of Levin Fund Contribution Conduit Service . . . . . . . . . . . . . . . . . 275
H. Delivery of *Election Day Whip*™ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 276
I. Timing of Delivery of Trust Property Services . . . . . . . . . . . . . . . . . . . . . . 276
J. Collection of November 6, 2018 Election Day Data . . . . . . . . . . . . . . . . . . 276
K. Future Grievances Commence under Fed.R.Civ.P. Rule 65 . . . . . . . . . . . . 276
L. DNC or State Democratic Party to Prosecute Grievances . . . . . . . . . . . . . . 276
IV. Renunciation of Fraud on the Court and Sanctionable Acts . . . . . . . . . . . . . . . . . 277
A. Cure Prior Fraud on Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 277
B. Full Cooperation and Candor with Prosecutorial Authorities . . . . . . . . . . . 277
C. Prohibition of Retaliation Against Persons in this Case . . . . . . . . . . . . . . . 277
D. Future Grievances Commence under Fed.R.Civ.P. Rule 65 . . . . . . . . . . . . 277
E. DNC or State Democratic Party to Prosecute Grievances . . . . . . . . . . . . . . 278
V. Conforming Conduct to Comply with Fiduciary Duties . . . . . . . . . . . . . . . . . . . . 278
A. Adoption of Model Code of Official Conduct . . . . . . . . . . . . . . . . . . . . . . . 278
B. Prohibiting Repudiation of Law Enforcement Agencies . . . . . . . . . . . . . . . 278
C. Prohibiting Retaliation Against Whistle-Blowers . . . . . . . . . . . . . . . . . . . . 278
D. Amend Bylaws for Election of RNC Members, Other Reforms . . . . . . . . . 278
E. Establishment of Association of County Party Chairs . . . . . . . . . . . . . . . . . 279
F. Future Grievances Commence under Fed.R.Civ.P. Rule 65 . . . . . . . . . . . . 279
G. DNC or Individual RNC Members to Prosecute Grievances . . . . . . . . . . . 279
VI. Appointment of Receiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279
A. Appoint of Receiver to Take Control of Respondent . . . . . . . . . . . . . . . . . 279
B. Cause for Appointment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279
C. Powers and Duties of Receiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279
D. Candidates for Receiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 280
E. Compensation, Expenses, Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . 280
VII. Additional Trust Administration Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 280
A. Subsequent Action under Federal Arbitration Act . . . . . . . . . . . . . . . . . . . 280
B. Respondent Posting of Bond . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 280
C. Prohibition against Certain Extrajudicial Statements . . . . . . . . . . . . . . . . . 280
D. DNC and RNC Pay for Hearing Transcript . . . . . . . . . . . . . . . . . . . . . . . . 281
E. Service of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281
F. Retention of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281
G. Federal Income Tax Consequences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281

## Table of Authorities

**Cases**

94 *Journal of the House of Lords* 149 (1862). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234
*A Pickett Construction, Inc. v. Luzerne Co. Convention Authority,* 738 A.2d 20, 24 (Pa.Cmwlth. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228
*Advanced Micro Devices, Inc. v. Intel Corp.*, 9 Cal.4th 362, 885 P. 2d 994, 36 Cal. Rptr.2d 581 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225
*Aiello v. Ed Saxe Real Estate, Inc.*, 508 Pa. 553, 559, 562, 499 A.2d 282, 285, 287 (1985) . . . 241
*Allen v. McCurry*, 449 U.S. 90, 94 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230
*Allentown Ahead Fund v. Kraynick,* 65 Pa. D. & C.2d 611 (Lehigh Co. 1974) . . . . . . . . . . . 257
*American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236
*American Eagle Outfitters v. Lyle Scott Ltd.*, 584 F.3d 575, 584 (3d Cir. 2009) . . . . . . . . . . . 235

*American Exp. Co. v. Italian Colors Restaurant*, 570 U.S. 228, 232-233 (2013) . . . . . . . . . . 234

*American Federation, Grain v. Int'l Multifoods*, 116 F.3d 976, 981 (2d Cir. 1997) . . . . . 236, 238

*Ammond v. McGahn*, 390 F.Supp. 655, 660 (D.N.J. 1975) *rev. on other grounds*, 532 F.2d 325 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

*Anchel v. Shea*, 762 A.2d 346, 356-357 (Pa.Super. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

*Anderson v. Celebrezze* 460 U.S. 780, 787-90 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

*Andros Compania Maritima v. Marc Rich & Co., A.G.*, 579 F.2d 691, 701 (2d Cir.1978) . . . . 223

*Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

*Arthur Andersen, LLP v. Carlisle*, 556 U.S. 624, 631 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 235

*Associated Press v. United States*, 326 U.S. 1, 7, 20 (1945) . . . . . . . . . . . . . . . . . . . . . 108, 227

*Athens Roller Mills, Inc. v. Commissioner*, 136 F.2d 125 (6th Cir. 1943) . . . . . . . . . . . . . . . . 257

*Baker v. Carr*, 369 U.S. 186, 208 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 256

*Baltimore County v. Mayor & City Council of Baltimore*, 329 Md. 692, 621 A.2d 864 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

*Basile v. H& R Block, Inc.*, 777 A.2d 95, 101 (Pa.Super. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 242

*Bentman v. Seventh Democratic Ward Exec. Comm.*, 421 Pa. 188, 218 A.2d 261 (1966) . 3, 108, 227, 239

*Beth v. Carroll*, 155 F.R.D. 529, 530-531 (E.D.Pa. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

*Bob Jones Univ. v. United States*, 461 U.S. 574, 589 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

*Bontempo v. Carey*, 64 N.J.Super. 51, 57, 165 A.2d 222, 225 (Law. Div. 1960) . . . . . . . . . . 109

*Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 361-362 (5th Cir. 2003) . . . 236

*Brooks v. Conston*, 356 Pa. 69, 51 A.2d 684, 688 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

*Brownfield Estate v. St. Vincent Archabbey*, 28 Fiduc. Rep.2d 231 (Westmoreland Co. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

*Buchanan v. Brentwood Federal Savings & Loan Association*, 457 Pa. 135, 143, 320 A.2d 117, 122 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

*Buckley v. Valeo*, 424 U.S. 1, 47 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

*Campbell v. Bysiewicz*, 242 F.Supp.2d 164, 175 (D.Conn. 2003) . . . . . . . . . . . . . . . . . . . . . . . 251

*Capital Investors Co. v. Devers*, 360 F.2d 462, 465-466 (4th Cir. 1966) . . . . . . . . . . . . . . . . . 242

*Carr Estate*, 22 Fid.Rep.2d 364, 366 (O.C. Mont. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

*Certain Underwriters at Lloyd's, London v. AT&T, Corp.*, 142 AD 3d 921, 37 N.Y.S.3d 886 (1st Dep. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

*Chervenak, Keane & Co., Inc. v. Hotel Rittenhouse Assocs,Inc.*, 477 A.2d 482, 485 (Pa.Super. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

*Chester City School Authority v. Aberthaw Construction Co.*, 460 Pa. 343, 353, 333 A.2d 758, 763 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

*Chiron Corp. v. Ortho Diagnostic Systems*, 207 F.3d 1126, 1128 (9th Cir. 2000) . . . . . . . . . . 229

*Chisom v. Roemer*, 501 U.S. 380, 383 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

*Christman v. Seymour*, 145 Ariz. 200, 202, 700 P.2d 898, 900 (1985) . . . . . . . . . . . . . . . . . . . 242

*City of Greenwood v. Peacock*, 384 U.S. 808 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

*City of Philadelphia v. Fox*, 64 Pa. 169, 185 1870 WL 8678 (1870) . . . . . . . . . . . . . . . . . . . . . 282

*Coar v. Kaimir*, 990 F.2d 1413, 1418 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

*Cole v. Burns International Security Service*, 323 U.S. App. D.C. 133, 105 F.3d 1465, 1485-1486 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

*Collier v. Lindley*, 203 Cal. 641, 266 P. 526 (1928) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 109, 220

*Colo. Republican Fed. Campaign Comm. v. FEC* (Colo. Republican I), 518 U.S. 604, 608 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Commissioner v. Schleier*, 515 U.S. 323, 336-337 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

*Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 150 (1968) . . . . . 223
*Commonwealth ex rel. Toole v. Tanoshak*, 464 Pa. 239, 242, 346 A.2d 304, 306 (1975) . . . . . 243
*Commonwealth v. Barnes Foundation*, 398 Pa. 458, 159 A.2d 500 (1960) . . . . . . . . . . . 133, 205
*Commonwealth v. Pestinikas*, 421 Pa. Super. 371, 387, 617 A.2d 1339, 1348 (Pa.Super. 1992)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206
*ConocoPhillips, Inc. v. Local 13-0555 United Steelworkers Int'l Union*, 741 F.3d 627, 630 (5th
Cir.2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222
*Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 255 (5th Cir. 2014) (same)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235
*D'Angelo v. Bob Hastings Oldsmobile, Inc.*, 89 A.D.2d 785, 786, 453 N.Y.S.2d 503, 504 (4th Dept.
1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237
*Daniel v. United Nat. Bank*, 202 W.Va. 648, 653, 505 S.E.2d 711, 715 (1998) . . . . . . . . . . . 238
*Dardovitch v. Haltzman,* 190 F.3d 125, 145-147 (3d Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
*Davis v. Bandemer*, 478 U.S. 109, 145 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181
*Decker v. State*, 408 Md. 631, 640, 641, 971 A.2d 268, 274 (2009) . . . . . . . . . . . . . . . . . . . . 204
*Delaware Valley Factors, Inc. v. Ronca*, 442 Pa.Super 609, 612, 660 A.2d 623, 625 (1995)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133, 205
*Delegates to the Republican Nat'l Convention v. Republican Nat'l Comm.*, No. SACV 12-00927
DOC(JPRx), 2012 WL 3239903 (C.D.Cal. Aug, 7, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231
*Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060, 1064 (2d Cir.1993) . . . . . . . . 236
*Democratic National Committee v. Republican National Committee*, 2016 WL 6584915 (Nov. 5,
2016) at * 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232
*DePlaine's Estate*, 185 Pa. 332, 334-335, 39 A.2d 947, 948 (1898) . . . . . . . . . . . . . . . . 242, 245
*Derringe v. Donovan*, 308 Pa. 469, 473-477, 162 A. 439, 441 (1932) . . . . . . . . . . . . . . . . . . . 260
*Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207, 211
*Donaldson Company, Inc. v. Burroughs Diesel, Inc.*, 581 F. 3d 726, 732 (8th Cir. 2009) . . . . 235
*DuPlaine's Estate*, 185 Pa. 332, 334-335, 39 A. 947, 948 (1898) . . . . . . . . . . . . . . . . . . . . . . 258
*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187,
199-200 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236
*Elrod v. Burns,* 427 U.S. 347, 373 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211, 251
*Emporium Area Joint School Authority v. Anundson Const. & Bldg. Supply Co.*, 402 Pa 18, 166 A.2d
269 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234
*Equibank, N.A. v. Fidelco Growth Investors*, 1977 Pa. D. & C. Dec LEXIS 397, 3-4 (Pa. C.P. 1977)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
*Estate of Bodger,* 130 Cal.App.2d 416, 424–425, 279 P.2d 61 (1955) . . . . . . . . . . . . . . . . . . 235
*Estate of Brant*, 463 Pa. 230, 235, 344 A.2d 806, 809 (1975) . . . . . . . . . . . . . . . . . . . . . 133, 205
*Estate of Burch,* 402 Pa.Super. 314, 318, 586 A.2d 986, 988 (1991). . . . . . . . . . . . . . . . . . . . 261
*Estate of Calloway v. Marvel Entertainment Group*, 9 F.3d 237, 241 (2d Cir. 1993) . . . . . . . . 233
*Estate of Clark (2)*, 467 Pa. 628, 634, 359 A.2d 777, 781 (1976) . . . . . . . . . . . . . . . . . . . . . . 244
*Estate of Geniviva,* 450 Pa.Super. 54, 68, 675 A.2d 306, 313 (1996) . . . . . . . . . . . . . . . . . . . 260
*Estate of Munro v. Commonwealth Nat'l Bank* , 373 Pa. Super. 448, 452, 541 A.2d 756, 758 (1988),
*alloc. denied*, 520 Pa. 607, 553 A.2d 969 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259
*Estate of Thompson,* 426 Pa. 270, 232 A.2d 625 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
*Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214 (1989). . . . . . . . . . . . . . 227
*FEC v. Nat. Conservative Political Action Comm.*, 470 U.S. 480, 500–501 (1984) . . . . . . . . . 93
*FEC v. National Right to Work Comm.*, 459 U.S. 192, 208 (1982) . . . . . . . . . . . . . . . . . . 108, 119
*Fenton v. Dudley*, 761 F.3d 770, 776 (7th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231
*Fierst v. Commonwealth Land Title Ins. Co.* 499 Pa. 68, 74, 451 A.2d 674, 677 (1982) . . . . . 241
*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989). . . . . . . . . . . . . . . . . . . . . . . 257

x

*First American Title Ins. Co. v. DJ Mortg., LLC*, 328 Ga.App. 249, 254, 761 S.E.2d 811, 816 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

*First Options of Chicago., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995) . . . . . . . . . . . . . . . . . . . 221

*Fishman v. Saligan*, 64 Pa.D.&C. 325, 329 (Phila C.P. 1948). . . . . . . . . . . . . . . . . . . . . . . . . . 242

*Flightways Corp. v. Keystone Helicopter Corp.*, 459 Pa. 660, 331 A.2d 184 (1975) . . . . . . . . 234

*Foley Bros., Inc. v. Commonwealth*, 400 Pa. 584, 592, 163 A.2d 80, 85 (1960) . . . . . . . 133, 205

*Foley v. City of Lowell, Mass.*, 948 F.2d 10, 15 (1st Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . 229

*Fontana v. White*, 334 F.3d 80, 85 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

*Foulger–Pratt Residential Contracting, LLC v. Madrigal Condos., LLC*, 779 F.Supp.2d 100, 115 (D.D.C.2011) *appeal dismissed* 2011 WL 3241465 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . 224

*Freeman v.Vivacolor, Inc.*, 2004 WL 2884429 (D.D.C.) (Nov. 1, 2004). . . . . . . . . . . . . . . 11, 235

*Fresh Kist Produce, LLC v. Choi Corp, Inc.*, 223 F.Supp.2d 1, 8 (D.D.C. 2002) *amended* 251 F.Supp. 138 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

*Friedman v. Yula*, 679 F. Supp. 2d 617, 628 (E.D. Pa. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 236

*Frowen v. Blank*, 293 Pa. 137, 145-46, 425 A.2d 412, 416-17 (1981). . . . . . . . . . . . . . . . . . . . 242

*Garbish v. Malvern Fed. Sav. & Loan Assoc.*, 517 A.2d 547, 553-54 (Pa. Super. 1986) . . . . . 244

*Garfield v. White*, 326 Mass. 20, 27, 90 N.E.2d 890, 895 (1963) . . . . . . . . . . . . . . . . . . . . . . . 238

*Geer v. State of Connecticut*, 161 U.S. 519, 529 (1896) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Giddings v. Tartler*, 130 Pa.Cmwlth. 175, 177, 567 A.2d 766, 767 (1989) . . . . . . . . . . . . . . . 224

*Girard College Trusteeship*, 391 Pa. 434, 448, 138 A. 2d 844 (1958). . . . . . . . . . . . . . . . . . . . . 220

*Gold Reserve v. Bolivarian Republic of Venezuela*,146 F.Supp.3d 112, 121 (D.D.C. 2015). . . 223

*Green v. Connally*, 330 F.Supp. 1150, 1157 (D.D.C. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

*Greene v. Oliver Realty, Inc.*, 363 Pa.Super. 534, 543, 526 A. 2d 1192, 1196 (1987) . . . . . . . 133

*Gruenwald v. Advanced Computer Applications, Inc.*, 730 A.2d 1004, 1013 (Pa.Super. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

*Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008). . . . . . . . . . . . . . . . . . . . . . . 234

*Harkinson v. Pa. Co. for Insurances on Lives and Granting Annuities*, 329 Pa. 209, 198 A. 11 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

*Hauff v. Petterson*, 755 F. Supp.2d 1138, 1145 (D.C.N.M 2010) . . . . . . . . . . . . . . . . . . . . . . . 282

*Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517-18 (5th Cir. 2006) . . . . . . . 236

*Herbert v. Lando*, 441 U.S. 153, 194 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

*Hicks v. Saboe*,521 Pa. 380, 555 A.2d 1241, 1345 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

*Higgens Lumber Co. v. Marucca*, 159 Pa.Super. 405, 407, 48 A.2d 48, 49 (1946). . . . . . 133, 205

*Hohe v. Casey*, 868 F.2d 69, 72-73 (3rd Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

*Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 426 (1934) . . . . . . . . . . . . . . . 5

*Howard Univ. v. Metro. Campus Police Officer's Union*, 379 U.S.App.D.C. 282, 512 F.3d 716, 720–721 (D.C.Cir.2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

*Huntt v. Government of the Virgin Islands*, 339 F.2d 309, 310 (3d Cir. 1964) . . . . . . . . . . . . . 226

*In re Anderson*, 372 Pa. 351, 353, 93 A.2d 480, 481 (1953) . . . . . . . . . . . . . . . . . . . . . . . 133, 205

*In re Application of Roosevelt*, 9 Misc.2d 205, 160 N.Y.S.2d 747, 749-750 (New York Co.), *affirmed*,3 A.D. 988, 163 N.Y.S.2d 403 (1st Dept. 1957), *affirmed*, 4 N.Y.2d 19, 171 N.Y.S.2d 841, 148 N.E.2d 895 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 109, 239

*In re Avellino*, 547 Pa. 398, 400, 690 A.2d 1144, 1145 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 241

*In re Bishop College*, 151 B.R. 394, 399 (Bkrtcy.N.D.Tex. 1993) . . . . . . . . . . . . . . . . . . . . . . . 240

*In re Borsch's Estate*, 362 Pa. 581, 589-590, 67 A.2d 119, 123 (1949). . . . . . . . . . . . . . . . . . . . 239

*In re Church of St. James the Less*, 2003 WL 2205337 (Phila. O.C. 2003) (O'Keefe J.), *affirmed* 833 A.2d 319 (Pa.Cmwlth. 2003) *affirmed in part, rev. in part*, 585 Pa. 428, 888 A. 2d 785 . . . . . 244

*In re Estate of Coleman*, 456 Pa. 163, 167, 317 A.2d 631, 633 (1974) . . . . . . . . . . . . . . . . . . . . 233

*In Re Estate of Feinstein*, 364 Pa.Super. 221, 227, 527 A.2d 1034, 1037 (1987) . . . . . . . . . . . 257

xi

*In re Estate of Murphy*, 7 Ca1.2d 712, 715, 62 P.2d 374 (1936) . . . . . . . . . . . . . . . . . . . . . . . 220
*In re Estate of Pruner*, 390 Pa. 529, 531, 136 A.2d 107, 109 (1957). . . . . . . . . . . . . . . 8, 133, 205
*In re Estate of Pruner*, 400 Pa. 629, 634, 62 A.2d 626, 629 (1960). . . . . . . . . 220, 236, 237, 242
*In re Estate of Scott*, 455 Pa. 429, 432, 316 A.2d 883, 995 (1974) . . . . . . . . . . . . . . . . . . . . . 242
*In re Francis Edward McGillick Foundation*, 406 Pa. Super. 249, 266, 594 A.2d 322, 331 (1991), *rev'd on other grounds*, 537 Pa. 194, 642 A.2d 467 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
*In re Henlien's Estate*, 46 D.&C. 47, 50, 24 Erie 240, 242 (1942) . . . . . . . . . . . . . . . . . . . . 133
*In re Johnson Estate*, 4 Fiduc. Rep.2d 6, 8 (Chester O.C. 1983) . . . . . . . . . . . . . . . . . . . . . . . 218
*In re Kaiser Group International, Inc.,* 307 B.R. 449, 456 (D.Del. 2004). . . . . . . . . . . . . . . . . 236
*In re Main Inc.*, 239 B.R. 281, 289 (Bank.E.D.Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 244
*In re Nirdlinger's Estate*, 331 Pa. 135, 142-143, 200 A. 656, 659 (1938). . . . . . . . . . . . . . . . . 260
*In re Pew's Estate*, 411 Pa. 96, 107, 191 A.2d 399, 405-06 (1963) . . . . . . . . . . . . . . . . . . . . . 234
*In re Pruner's Estate*, 400 Pa. 629, 636, 162 A.2d 626, 630 (1960) . . . . . . . . . . . . . . . . . . . 238
*In re Roosevelt-Bentman Trust*, 2016 WL 783628 (Feb. 29, 2016) at *3 . . . . . . . . . . . . . . . . 231
*In re Rosenfeld Foundation Trust*, 29 Fiduc.Rep.2d 271, 2006 WL 3040020 (Phila. O.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
*In re Scheidmantel*, 868 A.2d 464, 493 (Pa.Super. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
*In re Smith's Estate*, 385 Pa. 416, 419, 123 A.2d 623, 624-625 (1950). . . . . . . . . . . . . . . . . . . 258
*In re Sonnott's Estate*, 310 Pa. 463, 466, 165 A. 244, 245 (1933). . . . . . . . . . . . . . . . . . . . . . . 258
*In re Sternberger's Estate*, 121 Pa.Super. 50, 53, 182 A. 723, 725 (1936) . . . . . . . . . . . . . . . 258
*In re Trust of Brooke*, 82 Ohio St. 3d 553, 561, 697 N.E.2d 191, 197 (1998) . . . . . . . . . . . . . . 20
*In re Trust of Keiser,* 392 Pa.Super. 146, 150 & n.2, 572 A.2d 734, 736 & n.2 (1990). . . . 11, 235
*In re Tunnell's Estate*, 325 Pa. 554, 560, 190 A. 906, 907 (1937). . . . . . . . . . . . . . . . . . . . 236, 237
*In re Wormley's Estate*, 359 Pa. 295, 289-301, 59 A.2d 98, 100 (1948) . . . . . . . . . . . . . . . . . 260
*Ingersoll v. Curran*, 188 Misc. 1003, 70 N.Y.S.2d 435, 437 (Sup. N.Y. Co., 1947) *affirmed* 297 N.Y. 522, 74 N.E.2d 465 (1947. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243
*Ingersoll v. Heffernan*, 188 Misc. 1047, 71 N.Y.S.2d 687, 690 (Sup. N.Y.Co. 1947) *affirmed without opinion*, 297 N.Y. 524, 74 N.E.2d 466 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243
*Inter. Paper v. Schwabedissen Maschinen & Anlagen*, 206 F. 3d 411, 418 (4th Cir. 2000) . . . 236
*International Reform Federation v. District Unemployment Compensation Board*, 76 U.S.App.D.C. 282, 131 F.2d 337 (1942), *cert. denied* 317 U.S. 693. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220
*Invista North America, SA.R.I.. v. Rhodia Polyamide Intermediates S.A.S.*, 503 F.Supp.2d 195 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
*Jennings v. Shuman*, 567 F.2d 1213 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229
*Jewish Federation v. Baroness*, 234 N.J. Super. 526, 527-529, 560 A.2d 1353 (1989) . . . . . 257
Joseh Gershtenson, *Mobilization Strategies of the Democrats and Republicans, 1956-2000,* POLITICAL SCIENCE QUARTERLY, Vol. 56, No. 3 (September 2003), pp. 293-308. . . . . . . . . . . . . . . . . . 110
*Judge Rotenberg Educational Center v. Commissioner, Dept. of Mental Health*, 424 Mass. 430, 467, 677 N.E.2d 127, 151 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261
*Karl Rove & Co. v Thornburgh*, 39 F.3d 1273, 1280-1283 (5th Cir. 1994). . . . . . . . . . . . . . . 238
*Kees v. Green*, 365 Pa. 368, 375, 75 A.2d 602, 605 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . 244
*Kelly v. Nationwide Ins. Co.*, 414 Pa.Super. 6, 10, 606 A.2d 470, 471 (1992) . . . . . . . . . . . . 224
*Kennedy v. Upper Milford Twp. Zoning Hearing Board*, 575 Pa. 105, 135, 834 A. 2d 1104, 1123 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133, 205
*Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1009 (3d Cir. 1984). . . . . . . . . . . . . . . . . . . . . 233
*Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 228
*Laidley v. Rowe*, 275 Pa. 389, 119 A. 474 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257
*LaRocca Estate,* 431 Pa. 542, 546, 246 A.2d 337, 339 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . 261
*Larson v. Smith*, 18 Wis.2d 366, 375, 118 N.W.2d 890, 895 (1963) . . . . . . . . . . . . . . . . . . . . 238

*Las Vegas Railway and Power Co. v. Trust Co. of St. Louis*, 17 N.M. 286, 287, 126 P. 1009, 1010-101 (1912) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

*Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 327-328 (1955). . . . . . . . . . . . . . . . . . 230

*Lewis' v. Casey*, 518 U.S. 343, 362 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

*Lewis' Estate*, 152 Pa.477, 25 A. 878 (1893) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

*LG Elecs., Inc. v. Interdigital Commc'ns, Inc.*, 98 A.3d 135, 140-146 (Del. Ch., 2014) . . . . . . 226

*Lindsey v. District of Columbia*, 609 F.Supp.2d 71, 79 (D.D.C. 2009) . . . . . . . . . . . . . . . . . . 230

*Lopez-Torres v. New York State Board of Elections*, 552 U.S. 196 (2008) . . . . . . . . . . . . . . . . 227

*Madole v. Barnes*, 20 N.Y.2d 169, 282 N.Y.S.2d 225, 229 N.E.2d 20 (1967) . . . . . . . . . . . . 243

*MAG Portfolio Consultant, GmbH v Merlin Biomed Group LLC*, 268 F.3d 58, 61 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

*Marino v. Dillard's Inc.*, 413 F.3d 530, 532 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 235

*Matter of Belzberg v. Verus Investments*, 21 N.Y.3d 626, 999 N.E.2d 1130, 977 N.Y.S.2d 685 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

*Matter of Spector*, 47 N.Y.2d 462, 468-469, 392 N.E.2d 552, 555, 418 N.Y.S.2d 565, 568 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Matthews v. Freedman*,128 F.R.D. 194 (E.D.Pa. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

*McConnell v. FEC*, 251 F.Supp.2d 176, 255 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 8, 96

*McConnell v. FEC*, 540 U.S. 93, 140-144 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 119

*McConnell v. FEC*, 540 U.S. 93, 144 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*McConnell v. FEC*, 540 U.S. 93, 167-168 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

*McConnell v. Howard Univ.*, 260 U.S.App.D.C. 192, 818 F.2d 58, 68 (1987) . . . . . . . . . . 11, 235

*McDavitt Estate*, 379 Pa. Super. 610, 550 A.2d 1015 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . 260

*McDermott v. Party City Corp.*, 11 F.Supp.2d 612, 626-627 (E.D. Pa. 1998) . . . . . . . . . . . . . 244

*McHugh v. McHugh*, 186 Pa. 197, 203, 40 A. 410, 412 (1898) . . . . . . . . . . . . . . . . . . . . . . . . 206

*McKenna v. North Strabane Twp.*, 700 A.2d 577, 580 (Pa.Cmwlth 1997) . . . . . . . . . . . . . . . 234

*McKinstry v. Russell*, 114 Ind.App. 27, 44, 49 N.E. 349, 356 (1943) . . . . . . . . . . . . . . . . . . . 238

*McMillen v. Olmstead*, 85 Cal.App. 656, 664, 259 P. 1104, 1107 (1927) . . . . . . . . . . . . . . . . 242

*Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) . . . . . . . . . . . . . . . . . . . . . 6

*Mendelson v. Shrager*, 432 Pa. 383, 248 A.2d 234 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

*Merrill Lynch Inv. Managers v. Opibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) . . . . . . . . . . 235

*Meyer v. Grant*, 486 U.S. 414, 424 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 109, 237

*Milliken v. Bradley*, 433 U. S. 267, 280-281 (1977 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

*Montana v. United States*, 440 U.S. 147, 153 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

*Montgomery v. Levy*, 406 Pa. 547, 550, 177 A.2d 448, 450 (1962) . . . . . . . . . . . . . . . 133, 205

*Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) . . . . . . . 234

*Mullins v. DeSoto Securities Co.*, 56 F.Supp. 907 (E.D.La 1944) *affirmed* 149 F.2d 864 . . . . . 257

*Murphy v. IRS*, 493 F.3d 170, 175 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

*NAACP v. Button*, 371 U. S. 415, 430 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

*NAACP v. Button*, 371 U.S. 415, 432-433 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

*NAACP v. Patterson*, 357 U. S. 449, 460 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228

*Napier v. Unidentified Federal Agents*, 855 F.2d 1080, 1091 (3d Cir. 1988) . . . . . . . . . . . . . . 233

*National Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129, 135-136 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

*New York Hotel and Motel Trades v. Hotel St. George*, 988 F. Supp. 770, 776 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

*Nuyen v. Hong Thai Ly*, 74 F.Supp.3d 474, 480 (D.D.C. 2014) . . . . . . . . . . . . . . . . . . . . . . . . 224

*O'Gilvie v. United States*, 519 U.S. 79, 82-83 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

*Oehme, van Sweden & Assoc., Inc. v. Maypaul Trading & Svcs., Ltd.*, 902 F.Supp.2d 87, 97

(D.D.C.2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

*Pa. R. Co. v. Bogert*, 209 Pa. 589, 600, 601, 59 A. 100, 101 (1904) . . . . . . . . . . . . . . . . . . . . . 260

*Page v. United States*, 234 U.S.App.D.C. 332, 335-336, 729 F. 2d 818, 821-820 (1984). . . . . 230

*Parasco v. Pacific Indemnity Co*, 870 F.Supp. 644, 646 n. 1 (E.D.Pa. 1994) . . . . . . . . . . . . . . 233

*Parsons v. Power Mountain Coal Co*., 604 F. 3d 177, 183 (4th Cir. 2010) . . . . . . . . . . . . . . . . 234

*Passarelli v. Shields*, 191 Pa.Super. 194, 156 A.2d 343, 347 (1959) . . . . . . . . . . . . . . . . . . . . . 241

*Pepper v. Litton*, 308 U.S. 295, 306 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

*Perez v. Boston Housing Authority*, 379 Mass. 703, 734-735, 400 N.E.2d 1231, 1250 (1980)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

*Perin v. Carey*, 65 U.S. (24 How.) 456, 506 (1860). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

*Pioneer Investment Services Company v. Brunswick Associates Limited Partnership*, 507 U.S. 380,
385 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Presbyterian Board of Foreign Missions v. Smith*, 209 Pa. 361, 58 A. 689 (1904) . . . . . . . . . 257

*Provenzano v. Ohio Valley Gen. Hosp.* 121 A.3d 1085, 1097 (Pa.Super. 2015) . . . . . . . . . . . 235

*Rachal v. Reitz*, 56 Tex. Sup. Ct. J. 530, 403 S.W.3d 840, 847-848 (2013). . . . . . . . . . . . . . . . 236

*Ray v. Blair*, 343 U.S. 214, 220-221 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Re Estate of Pellicer*, 118 So.2d 59, 60 (Fla.App. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

*Re Trust of David H. Keiser,* 392 Pa.Super. 146, 150 & n.2, 572 A.2d 734, 736 & n.2 (1990)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

*Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . 247

*Republican Party of Minnesota v. White*, 536 U.S. 765, 788 (2002) . . . . . . . . . . . . . . . . . . . . 228

*Reynolds v. Sims*, 377 U.S. 533 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 108, 227, 228

*Ripon Society v. National Republican Party*, 173 U.S.App.D.C. 331, 525 F.2d 548, 559-560 (1975)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 249

*Robbins v. Day*, 954 F. 2d 679, 685 (11th Cir. 1992) *cert. denied* 506 U.S. 870. . . . . . . . . . . 224

*Roop v. Greenfield*, 352 Pa. 232, 235-236, 42 A.2d 614, 615-616 (1945). . . . . . . . . . . . . . . . . 237

*Sanford Home for Adults v. LOCAL 6, IFHP*, 665 F. Supp. 312, 319 (S.D.N.Y. 1987) . . . . . . 223

*Santimyer v. Westmoreland Co. Board of Elections*, 9 Pa. D. & C.3d 303, 305-306 (Westmoreland
C.P. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

*Scarnati v. Wolf*, ___Pa. ___, 173 A.3d 1110 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Schoneberger v. Oelze*, 208 Ariz. 591, 96 P.3d 1078, 1081 (Az.App. 2004). . . . . . . . . . . . . . . 236

*Seergy v. Kings County Republican County Committee*, 459 F.2d 308, 310 (2d Cir. 1972) . . . 243

*Selheimer v. Manganese Corp.*, 423 Pa. 563, 581, 224 A.2d 634, 644 (1966) . . . . . . . . . . . . . 244

*Shamah v. Schweiger*, 21 F.Supp.2d 208, 214 (E.D.N.Y 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 225

*Shelby County v. Holder*, 400 U.S. App. D.C. 367, 679 F.3d 848 (2012) *rev. on other grounds* 570
U.S. ___ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

*Sherrock Bros. Inc. v. DaimlerChrysler Motors Co., LLC*, 465 F. Supp. 2d 384 (M.D.Pa. *affirmed*
2008 WL 63300 (3rd Cir. Jan. 7, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

*Shovel Transfer Storage, Inc., v. Pa. Liquor Control Bd.*, 559 Pa. 56, 63, 739 A.2d 133, 136 (1999)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

*Signature Tech. Solutions v. Incapsulate, LLC*, 58 F.Supp. 3d 72, 80 (D.D.C. 2014) . . . . . . . . 235

*Smith v. Allwright*, 321 U.S. 649, 663 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 249

*Smith v. Gallagher*, 408 Pa. 551, 185 A.2d 135 (1962) *overruled on other grounds* 487 Pa. 438, 409
A.2d 848 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 249

*South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

*Spencer v. Harris*, 70 Wyo. 505, 516, 252 P.2d 115, 118 (1953). . . . . . . . . . . . . . . . . . . . . . . . 242

*Sperry International Trade, Inc. v. Government of Israel*, 532 F. Supp. 901 (S.D.N.Y.), *affirmed*,
689 F.2d 301 (2d Cir. 1982), *later proceeding*, 602 F. Supp 1440 (S.D.N.Y. 1985). . . . . . . . 225

*Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 305, 469 A.2d 563,

566 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133, 205
*State ex rel. Guior and Miles*, 210 Mo. 127, 156, 109 S.W. 593, 603 (1908) . . . . . . . . . . . . . 109
*Stern v. Lucy Webb Hayes National Training School for Deaconesses and Missionaries*, 381 F.
Supp. 1003, 1018 (D.D.C. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
*Stilp v. Commonwealth*, 588 Pa. 539, 905 A. 2d 918, 928 (2006) . . . . . . . . . . . . . . . . . . . . . . . 282
*Storer v. Brown*, 415 U.S. 724, 736 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181
*Suh v. Superior Court*, 181 Cal.App.4th 1504, 1513, 105 Cal.Rptr.3d 585 (2010) . . . . . . . . . 235
*Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243
*Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986) . . . . . . . . . . . . . . . . . . . . . 227, 228
*Taylor v. Beckman (No.1)*,178 U.S. 548, 577 (1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
*Taylor v. Hoag*, 278 Pa. 194, 116 A. 826 (1922) . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 220, 239
*Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . 224
*Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) . . . . . . . . . . . 235
*Thornhill v. Alabama*, 310 U.S. 88, 95 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247
*Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247
*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367 (1997). . . . . . . . . . . . . . . . . . . . . 181
*Tower Ins. Co. v. Davis*, 967 F. Supp. 2d 72, 79 (D.D.C. 2013) . . . . . . . . . . . . . . . . . . . . . . . . 235
*Trist (Burke) v. Child* 88 U.S. (21 Wall) 441, 450-451 (1875). . . . . . . . . . . . . . . . . . . . . . . . . . . 5
*Trust of Munro v. Commonwealth National Bank*, 373 Pa.Super. 448, 541 A.2d 756, 758 (1988)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
*Turbe v. Gov't of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991) . . . . . . . . . . . . . . . . . 224
*U.S. v. Carolene Products*, 304 U.S. 144, 152 n.4 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 249
*Unionville-Chadds Ford School District v. Chester Co. Board of Assessment Appeals*, 552 Pa. 212,
220, 714 A.2d 397, 400 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251
*United States ex rel. Katzenbach v. Original Knights of the Klu Klux Klan*, 250 F.Supp. 330 (E.D.La.
1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191, 221, 231
*United States v. Board of Educ. of Greene County, Mississippi*, 332 F.2d 40, 46 (5th Cir. 1964)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191, 221
*United States v. Carter*, 217 U.S. 286, 306 (1910). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
*United States v. Classic*, 313 U.S. 299 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 256
*United States v. McLeod*, 385 F. 2d 734, 740 (5th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . 191, 221
*United States v. Washington*, 233 F.2d 811 (9th Cir. 1956). . . . . . . . . . . . . . . . . . . . . . . . . . . . 257
*United States v. Wells*,347 F.3d 280, 285 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230
*United States v. Will*, 449 U.S. 200, 213-216 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282
*US Claims, Inc. v. Dougherty*, 914 A.2d 874, 879 (Pa.Super.2006) *appeal denied* 593 Pa. 729, 928
A.2d 1291 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225
*Vega v. Borough of Burgettstown*, 394 Pa. 406, 412, 147 A.2d 620, 623 (1958) . . . . . . . . . . . 243
*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748 (1976)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227
*Waters v. New Amsterdam Cas. Co.*, 393 Pa. 247, 254, 144 A.2d 354, 357 (1958). . . . . . 133, 205
*Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133, 205
*Will v. Killmer*, 39 Pa. D. & C. 3d 627, 630 (Bucks Co. C.P. 1986) . . . . . . . . . . . . . . . . . . . . 182
*Williams v. Rhodes*, 393 U.S. 23, 32 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133, 205
*Wilson v. City of New Castle*, 301 Pa. 358, 365, 152 A. 102, 104 (1930) . . . . . . . . . . . . . . . . 181

## Other Authorities

Sandy Bergo, Agustín Armendariz and John Perry, *A Wealth of Advice*, Center for Public Integrity
(2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205, 228
1 Pa.C.S. § 1503(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

11 CFR § 112.5(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259

13D Wright & Miller, Federal Practice & Procedure § 3576 (3d ed.) . . . . . . . . . . . . . . . . . . . 231

2 John Henry Wigmore, *Evidence in Trials at Common Law* § 278 (Chadbourn rev. 1979). . . 204

20 Pa.C.S. § 6201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

20 Pa.C.S. § 6201(1)-(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

20 Pa.C.S. § 6206(a)(4),(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

20 Pa.C.S. § 7706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

20 Pa.C.S. § 7735 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

20 Pa.C.S. § 7780.6(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 222, 234

20 Pa.C.S.§ 7705(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259

21 Wright & Miller, Federal Practice and Procedure § 5016, at p. 505 (1977 & Supp. 1998)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

26 CFR § 1.501(c)(3)-1(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 220

26 U.S.C. § 4942(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

26 U.S.C. § 4947(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5 U.S.C. §3331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

52 U.S.C. 30108(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259

52 U.S.C. § 10101(b) . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 191, 221, 231, 251, 265

52 U.S.C. § 30125(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

72 *Federal Register* 3416 (Jan. 25, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

9 U.S.C. § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234, 235

9 U.S.C. § 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

A. James Reichley, The Rise of National Parties, John E. Chubb and Paul E. Peterson, eds. *The New Direction in American Politics* 175-200 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

AAA R-31(relating to Arbitration in the Absence of a Party or Representative) . . . . . . . . . . . 225

*ABA Standards for Imposing Legal Sanctions,* Std. 4.5.3 and 4.5.4. . . . . . . . . . . . . . . . . . . 239

Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 HARV.L.REV. 1281, 1282, 1291, 1302 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

Adam Winkler, *Expressive Voting*, 68 N.Y.U. L. REV. 330, 368 (1993). . . . . . . . . . . . . . . . 249

ALI *Restatement of the Law of Nonprofit Organizations*, Tentative Draft No. 2 . . . . . . . . . . . 258

American National Standards Institute *Essential Requirements: Due Process requirement for American National Standards* (Jan. 2012 ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Andrea L. Campbell, *Parties, Electoral Participation, and Shifting Voting Blocs*, Paul Pierson and Theda Skocpo eds., *The Transformation of the American Polity* (2006) . . . . . . . . . . . . . . . . . . 96

Anne N. Contain, *Changes in the Role of Ideology in American National Conventions and Among Party Identifiers*, WESTERN POLITICAL QUARTERLY, 33 (March 1980) 73-86. . . . . . . . . . . . . 29

Anthony Downs, *An Economic Theory of Democracy* 137 (1957) . . . . . . . . . . . . . . . . . . 19, 196

Barbara C. Burrell, *Local Party Committees, Task Performance and Organizational Vitality*, WESTERN POLITICAL QUARTERLY Vol. 39, No. 1 (March 1986) pp 48-66 . . . . . . . . . . . . . . . 88

Catherine Megan Bradley, *Note, Old Remedies Are New Again: Deliberate Indifference and the Receivership in Plata v. Schwarzenegger*, 62 N.Y.U. ANN. SURV. AM. L. 703, 706 (2007) . . . 261

Charles F. Sabel & William H. Simon, *Destabilization Rights: How Public Law Litigation Succeeds*, 117 HARV.L.REV. 1015, 1062 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

Charles S. Bullock and David J. Shafer, *Party Targeting and Electoral Success*, LEGISLATIVE STUDIES QUARTERLY, Vol. 22 No. 4 (November 1997) at pp. 573-589 . . . . . . . . . . . . . . . . . . 48

Chester J. Antieau, *Federal Civil Rights Acts, Civil Practice* (2d ed.1980) § 2. . . . . . . . . 191, 221

Clyde D. Wee, *What Happened to the Republicans in the 1930s: Minority Party Dynamics during Political Realignment*, POLITY, Vol. 22, No. 1 (Autumn, 1989) at 5-6. . . . . . . . . . . . . . . . . . 196

Cornelius P. Cotter and John F. Biddy, *Institutional Development and the Thesis of Party Decline*

POLITICAL SCIENCE QUARTERLY Vol. 95 (Spring 1980) pp 1-27. . . . . . . . . . . . . . . . . . . . . . . 97
Cornelius P. Cotter, James L. Gibson, John F. Biddy and Robert J. Huckshorn, *Party Organizations in American Politics* (1984); Leon D. Epstein, *Political Parties in American Mold* (1986) . . . . 97
Craig C. Donsanto, Nancy N. Simmons, et al, *Federal Prosecution of Election Offenses* (8th ed. Dec.2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88, 221, 228
Daniel H. Lowenstein & Richard L. Hason, *Election Law* 429 (2d ed.) (2001) . . . . . . . . . . . . . 19
Daniel J. Elazar, *American Federalism: A View from the States* 85-94 (1966) . . . . . . 4, 19, 20
Darren B. Moore, *Who Would Have Thought: Charitable Trusts as a Viable Entity*, State Bar of Texas 7 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239
David All and Saul Anuzis, *GOP Should Get Serious About CyperSpace*, POLITICO.COM (July 14, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
David Horton *The Federal Arbitration Act and Testamentary Instruments*, 90 N.C.L.REV.1027, 1060-1062, 1064-1065 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237
Dean Burnham, *Critical Elections and the Mainsprings of American Politics* 7 (1969) . . . . . . 196
Denise L. Baer & David A. Bositis, *Elite Cadres and Party Coalitions: Representing the Public in Party Politics* (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
Diana Dwyre, *Political Parties and Campaign Finance, What Role Do the National Parties Play*, Campaign Finance Task Force Conference, Bipartisan Policy Center (April 21, 2017) . . . . . . 100
Donald L. Horowitz, *Decreeing Organizational Change: Judicial Supervision of Public Institutions*, 1983 DUKE L.J. 1265, 1297 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261
Donald P. Green & Alan S. Gerber, *Get Out the Vote! How to Increase Voter Turnout* (Washington: Brookings Institution Press, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215
Donald P. Green, Alan S. Gerber and David W. Nickerson, *Getting Out the Vote in Local Elections: Results from in Door-to-Door Canvassing Experiments*, AMERICAN JOURNAL OF POLITICAL SCIENCE 53 (4) (2009) pp. 787–804. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215
E.D. Cavanaugh, *Developing Standards under Amended Rule 11 of the Federal Rules of Civil Procedure*, 14 HOFSTRA L.REV. 499 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233
Edward Yorio and Steve Thel, *The Promissory Basis of Section 90*, 101 YALE L.J. 111 (1991)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 258
F. Morley, I *Unemployment insurance in the United States. Editorial research reports* (Washington, DC: CQ Press. 1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234
Fed. R. Evid. 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226
Geoffrey C. Hazard, W. William Hodes, Peter R. Jarvis, *The Law of Lawyering* § 3.2 (3d ed. 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . )239
George A. Bogert and George T. Bogert, *The Law of Trusts and Trustees* § 363 . . . . . . . . . . . . 20
Gerald M. Pomper, *Party Organization and Electoral Success*, POLITY, Vol. 23, No. 2 (Winter, 1990) pp. 187-206. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
Gerald M. Pomper, *The Fate of Political Parties*, 2 ELEC.L.J.69, 74-77 (2003). . . . . . . . . . . . . 4
Gerald Pomper, ed. *Party Renewal* in America: Theory and Practice , 6986, 83-84. (1980) . . . 29
Harold F. Gosnell, *Getting-Out-The-Vote: An Experiment in the Stimulation of Voting*. Chicago: University of Chicago Press (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216
*In re Larson*, AO 1995-21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259
Issues Related to State Voter Identification Laws [Reissued on February 27, 2015] GAO-14-634: Published: Sep 19, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
J. Peter Mulhern, *In Defense of the Political Question Doctrine*, 137 U. PA. L. REV. 97, 156–62 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226
James A. Reichley, *The Life of the Parties* 355. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
James L. Sundquist, *Dynamics of the Party System: Alignment and Realignment of Political Parties in the United States* 290 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196
James M. Hirschhorn, *Where The Money Is: Remedies To Finance Compliance With Strict*

*Structural Injunctions*, 82 MICH. L. REV. 1815, 1826 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 261
James Madison, *The Federalist No. 46*, 243 (1788). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
James Q. Wilson and John J. DiIulio, Jr, AMERICAN GOVERNMENT (10th ed.) (2006) . . . . 19, 21
James Q. Wilson, *The Amateur Democrat: Club Politics in Three Cities* 1-4 (1962) . . . . . 28, 109
Jason Bello and Robert Y. Shapiro, *On to the Convention*, POLITICAL SCIENCE QUARTERLY Vol.
123, No. 1 (Spring, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21
Jo Freeman, *The Political Culture of the Democratic and Republican Parties*, POLITICAL SCIENCE
QUARTERLY Vol. 101, No. 3, 327-356 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19, 21, 87, 96
John Aldrich, *Why Parties? The Origin and Transformation of Party Politics in America*(1995)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
John F. Bibby, *State Party Organizations: Strengthened and Adapting to Candidate-Centered
Politics and Nationalization*, in L. Sandy Maisel ed., *In The Parties Respond: Changes in American
Parties and Campaigns* 19-4 (4th ed. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
John Hart Ely, *Democracy and Distrust* (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 249
John Kenneth White and Daniel M. Shea, *New Party Politics* 192-193 (2000). . . . . . . . . . . . 108
John W. Soule and James W. Clarke, Amateurs and Professionals: A Case Study of Delegates to the
1968 Democratic National Convention AMERICAN POLITICAL SCIENCE REVIEW Vol 64 (Sept. 1970)
pp 888-898 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
Jonathan R. Siegel, Political Questions and Political Remedies, Bruce E Cain & N. Sabbah, eds., *The
Political Question Doctrine and the Supreme Court of the United States*, 241268 (2007) . . . . 256
Joseph Lawless *Sanctions the Federal Law of Litigation Abuse* 169 (3d ed. 2000) . . . . . . . . 233
Julie Barko Germany, *Constituent Relationship Management: The New Little Black Book of
Politics*, (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Justin Levitt, *The Truth About Voter Fraud* (Brennan Center for Justice 2007) . . . . . . . . . . . . 54
Kirsten A. Foote and Steven Schneider, *Web Campaigning* (2006) . . . . . . . . . . . . . . . . . . . . 110
Larry J. Sabato, *The Party's Just Begun: Shaping Political Parties for America's Future* 26-27
(1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Leon Epstein, *Political Parties in the American Mold* 236-237 (1986). . . . . . . . . . . . . . . 29, 226
Leonard Packel and Anne Poulin, *Pennsylvania Evidence*, Ch. IV, § 423 (1987) at p. 277 . . . 206
Liat Weingart, *Receiverships in the Prison Litigation Context: Factors Necessary for an Effective
Judicial Remedy of Last Resort*, 9 CARDOZO PUB. L. POL'Y & ETHICS J. 193, 195 (2010) . . . . 261
Louis Bartlett, *Charitable Trusts to Effect Changes in the Law*, 16 CAL. L. REV. 478 (1928)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
Louis Henkin, *Is There a Political Question Doctrine?* 85 YALE L.J. 597, 622 (1976) . . . . . . 226
M. Margaret Conway, *Republican Political Party Nationalization, Campaign Activities, and Their
Implications For the Party System,* PUBILUS, THE JOURNAL OF FEDERALISM, Vol, 13, No. 1 (Winter
1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 97, 109
Margaret A. Neale, *Are You Giving Away the Store? Strategies for Savvy Negotiation*, STANFORD
SOC. INNOVATION REV. 34 (Winter 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
Mary Frances Budig; Gordon T. Butler; Lynne M. Murphy, *Pledges to Nonprofit Organizations:
Are They Enforceable and Must They Be Enforced*, 27 U.S.F. L.REV. 47, 86-89 (1992) . . . . . 258
Michael Tipton, *Can You Trust Your Trust?: Analyzing the Decision and Implications of Rachal v.
Reitz on Arbitration Provisions in Trust Agreements*, 48 AKRON L. REV. 979 (2015) . . . . . . 236
Nancy L. Rosenblum, *Primus Inter Pares: Political Parties and Civil Society*, 75 Chi.-Kent L. Rev.
493, 513 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111, 249
Nicol C. Rae, *The Modern Republican Party: Resurgence or Decline?* JOURNAL OF AMERICAN
STUDIES, Vol. 22, No. 2 (Aug. 1988) pp 225-247 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
Note, Beatty, *Private Economic Coercion and the Civil Rights Act of 1957*, 71 YALE L.JOUR. 536,
543 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232
Note, *Charitable Trusts for Political Purposes*, 37 VIRGINIA L.REV 988 (1951) . . . 108, 220, 239

Note, *Private Economic Coercion and the Civil Rights Act of 1957*, 71 Yale L.J. 537 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191, 221

Office of Management and Budget Circular Number A-119 (1998 WL 216930) . . . . . . . . . . . . 5

Paul Frymer, Thomas P. Kim, and Terri L. Bines, *Party Elites, Ideological Voters and Divided Party Government,* LEGISLATIVE STUDIES QUARTERLY, Vol. 22 No. 2 (May 1997) pp. 195-216 . . . 88

Paul Peretz, ed., *The Politics of American Economic Policy Making* 249 (2d ed. 1996). . . . . . 229

Phillip E. Stebbins, *Arbitrator's Authority to Issue Injunctive Relief under the New York Anti-Injunction Act*, 19 OHIO S.L.J STATE LAW JOURNAL 754 (1958) . . . . . . . . . . . . . . . . . . 225

Pierre Schlag and David Skover, *Tactics of Legal Reasoning* 22 (1986). . . . . . . . . . . . . . . . . . 233

Rachel Barkow, *More Supreme than Court? The Fall of the Political Question Doctrine and the Rise of Judicial Supremacy*, 102 COLUM. L. REV. 237, 329 (2002) . . . . . . . . . . . . . . . . . . . . . . . . 226

Res. 2016-5, *In re Financing Options for Proposed Las Vegas Football Stadium per Executive Order 2015-09* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Res.2014-11, *In re July 10, 2014 Veto Message of Hon. Thomas Corbett, Governor of HB 278, PN 3930 (Fiscal Code) on Inquiry of Pennsylvania Senate Majority Caucus* . . . . . . . . . . . . . . . . . . 5

Restatement (Second) Contracts § 90. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 258

Restatement (Second) of Contracts, § 90 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

Restatement (Second) Trusts § 253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259

Restatement (Third) Trusts § 104(1)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 258

Richard H. Pildes, *The Constitutionalization of Democratic Politics*, 118 HARV. L. REV. 25 (2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . )249

Richard L. Briffault, *The 527 Problem . . . and the Buckley Problem*, 73 GEO. WASH. L. REV. 949, 968 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

Richard L. Hasen, *Political Equality, the Internet, and Campaign Finance Regulation Forum*, Loyola-LA Legal Studies Paper No. 2008-11Vol. 61 Art.7 (2008) . . . . . . . . . . . . . . . . . . . . . . 94

Richard L. Hason, *Jurisprudence the Law, Lawyers, and the Court*, SLATE, Nov. 27 2017 . . . 87

Robert C. Wigton, *American Political Parties under the First Amendment*, 7 J.L. & Pol'y 411, 415 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 226

Robert J. Huckshorn, James L. Gibson, Cornelius P. Cotter and John F. Biddy, *Party Integration and Party Organizational Strength*, THE JOURNAL OF POLITICS, Vol. 48, No. 4 (November 1986), pp. 976-991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 108

Ruggero J. Aldisert, *Logic for Lawyers* 169 (3d ed. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Samuel Issacharoff & Richard H. Pildes, *Politics as Markets*, 50 STAN. L. REV. 643 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 249

Samuel Issacharoff and Daniel R. Ortiz, *Governing Through Intermediaries*, 85 Va. L. Rev. 1627, 1637 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 109

Samuel Issacharoff, *Collateral Damage: The Endangered Center in American Politics*, 46 WM. & MARY L. REV. 415 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 249

Samuel Issacharoff, *Private Parties with Public Purposes: Political Parties, Associational Freedoms, and Partisan Competition*, 101 COLUM. L. REV. 274, 301 (2001) . . . . . . . . . 19, 109

*Special Project: The Remedial Process in Institutional Reform Litigation*, 78 COLUM. L. REV. 784, 790-810 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

Stephen P. Bedell, & Louis K. Ebling, *Equitable Relief in Arbitration: A Survey of American Case Law*, 20 LOY. U. CHI. L.J. 39 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

Steve Weissman and Ruth Hassan, *BCRA and the 527 Groups, in The Election After Reform: Money, Politics, and the Bipartisan Campaign Reform Act*, Michael Malbin ed., *The Election after Reform: Money, Politics and the Bipartisan Campaign Reform Act* (2005) . . . . . . . . . . . . . . . . . . . . . . . 120

Steven E. Schier, *By Invitation Only: The Rise of Exclusive Politics in the United States* (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Susan P. Sturm, *A Normative Theory of Public Law Remedies*, 79 GEO. L.J. 1355, 1365-76 (1991)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

The Charitable Uses Act of 1601 (43 Eliz I, c.4) (Statute of Elizabeth) (1601) . . . . . . . . . . . . 239

Thomas B. Edsall, "In Data We Trust," *New York Times* (May 8, 2013) . . . . . . . . . . . . . . . . 38

V.O. Key, Jr., *Politics, Parties, and Pressure Groups* 211-212 (5th ed. 1964) . . . . . . . . . . 20, 227

W. Lance Bennett, Mike Xenos, and David Iozzi, *The Digital Election* (2004) . . . . . . . . . . . 110

Whig Committee, *Illinois State Register* (Feb. 21, 1840), I Collected Works of Abraham Lincoln, 65-66 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

William B. Rubenstein, *The Concept of Equality in Civil Practice*, 23 CARDOZO L. REV. 1865 1901 n. 141 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 235

William E. Wright, *A Comparative Study of Party Organization* 46 (1971) . . . . . . . . . . . . . 4

William L. Prosser, *The Procedural Effect of Res Ipsa Loquitur*, 20 MINN. L. REV. 241, 260 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Xandra Kayden, The Nationalization of the Party System, Michael J. Malbin, ed. *Parties, Interest Groups and Campaign Finance Laws*, (1980) p. 263. . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 109

Xandra Kayden, *The New Professionalism of the Oldest Party*, 229-236, Public Opinion 8 (June/July 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 109

Zoltan Hajnal, Nazita Lajevardi, Lindsay Nielson, *Voter Identification Laws and the Suppression of Minority Votes*, Univ. of CA San Diego (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Upon hearing had June 4, 2018 at 10:00 AM, EDT and in due consideration thereof, both Grievant and Respondent being granted the opportunity to object to or propose new or extend and revise any Findings of Fact and Conclusions of Law as proposed in the Rule *Nisi* issued May 31, 2018, and there none, we hereby find that:

## A. FINDINGS OF FACT.

### § 1. Statutory Authority, Arbitrarity, Probable Cause (¶¶ 1-13).

FOF ¶ 1.     The Trustee, exercising his statutory authority pursuant to 20 Pa.C.S. § 7780.6(a)(3) to arbitrate disputes between co-beneficiaries regarding interpretation of the Trust Agreement and administration of the Trust, convened this arbitral tribunal May 17, 2018 pursuant to the Trust Agreement, ¶ 8(E)(2) and held a hearing, Tuesday, June 4, 2018 at 10:00 AM EST, conducted by a toll-free telephone conference call service and transcribed by Veritext Court Reporting Service, Phila. PA. Pursuant to the Rule *Nisi* Respondent was specifically ordered to address at the June 4, 2018 Hearing what we perceived to be Respondent's claims and defenses:

(1)     Respondent was required to show why this Award shall not find that (i) the service as trustee of this Trust by Honorable H. Paul Senft, Jr, the duly elected member of Respondent from the State of Florida, and (ii) involvement of other duly elected members of Respondent in mediation of the grievance docketed at Res. 2009-23A (MUR 2009-1) shall not constitute affirmative evidence of a bar to disclaimer of Respondent's interests in the Trust under the Pennsylvania Uniform Disclaimer Act, 20 Pa.C.S. § 6206(a).

(2)     Respondent was required to show why this Award shall not find Respondent having not disclaimed its interest in the Trust, assuming *arguendo*, it could do so, constitutes assent to terms of Trust Agreement at ¶ 8(E) requiring arbitration to resolve disputes regarding interpretation of the trust agreement and administration of the trust, further affirmed and by utilization of the express provisions of ¶ 8(E) conferring a direct benefit thereto on the Respondent.

(3)     Both Grievant and Respondent were afforded full opportunity to object to or propose new or extend and revise any Findings of Fact and Conclusions of Law by the Trustee proposed in the May 31, 2018 TRO/Rule to Show Cause, both were put on full notice that upon issuance of the Final Award the Trustee's Findings of Fact and Conclusions of Law are binding and not subject to challenge or review by a court of law pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*

(4)     Both Grievant and Respondent were given notice of availability of the Trustee granting a continuance which would not have been unreasonably withheld and which any competent attorney would have sought under similar circumstances and which the Trustee was fully expecting to hear a request and prepared to grant thereto.

(5)     We kept the Hearing, conducted via telephone conference call, in session for thirty (30) minutes, to provide Respondent ample time to appear. When thirty minutes had passed, we concluded that Respondent was given sufficient opportunity to appear and be heard by itself or by counsel, and if Respondent

1

had not entered appearance by then, it would not be appearing.

FOF ¶ 2.    There is good cause to believe that the Respondent Republican National Committee ("Respondent" or "RNC") has, and unless enjoined and restrained, will continue to commit acts of intimidation, threats and coercion in violation of the Civil Rights Act of 1957, Pub. L. 85–315, 71 Stat. 637, 52 U.S.C. § 10101(b) which simultaneously violates the Trust Agreement, ¶ 2(A), ¶ 8(A), ¶ 8(B)(1)-(2), ¶ 30(L) and ¶ 30(M) to include acts:

    (1)    To intimidate, threaten and coerce voters of African-American ethnicity, Latino-American ethnicity and voters of other specific age, ethnicity, gender and social-economic attributes who generally cast ballots for Democratic candidates as confirmed as official policy in a November 18, 2013 *Growth and Opportunity Project* Report; and

    (2)    To intimidate, threaten and coerce duly elected precinct party representatives, commonly referred to as committee people, from representing their constituents by usurping their powers and duties by replacing with professional operatives and third-party volunteers, and denying them access to interactive political technology, as confirmed as official policy in the aforementioned November 19, 2013 *Growth and Opportunity Project* Report; and

    (3)    To specifically make false and deceptive statements of fact and frivolous legal argument in judicial proceedings against the Grievant, the Federal Election Commission, campaign finance reform advocates and even this Trust;

    (4)    All in furtherance to deny open, free and robust debate on qualification of Republican Party candidates and nominees for Federal office.

FOF ¶ 3.    Good cause exist to believe that unless Respondent is enjoined and restrained, voters will continue to suffer immediate and irreparable injury in denial of their First Amendment rights of political association by being chilled to express any form of dissent or open, free and robust date within the Republican Party, that such immediate and irreparable injury is so great and egregious that it warrants imposition of temporary restraining order without notice to the Respondent.

FOF ¶ 4.    Weighing the equities and considering the Grievant's likelihood of ultimate success on the merits, the Trustee first issued a Temporary Restraining Order May 31, 2018 without notice to Respondent, Fed.R.Civ.P. Rule 65(b)(1) upon finding such was in the public interest and no injury is suffered by the Respondent to require it to comply with the Civil Rights Act of 1957, Pub. L. 85–315, 71 Stat. 637, 52 U.S.C. ¶ 10101(b), and the Trust Agreement, ¶ 2(A), ¶ 8(A), ¶ 8(B)(1)-(2), ¶ 30(L) and ¶ 30(M).

FOF ¶ 5.    For purposes of the initial Temporary Restraining Order and now this Award for Permanent Injunction and Surcharge, the following definitions shall apply:

FOF ¶ 6.    The term "**Attorney General**" shall mean such person or persons delegated by the Attorney General of Pennsylvania exercising the *paren patraie* powers of the state.

FOF ¶ 7.  The term "**beneficiary**" or any derivation thereof shall mean any registered voter or person of adult age desiring to be a registered voter or any person not of adult age who desires to participate in the political party of his choice, i.e., the general public, in addition to the meaning such term shall have under the Uniform Trust Act. 20 Pa.C.S. § 7703. *Cf.* "Qualified Beneficiary."

FOF ¶ 8.  The term "**FECA**" as used in this Trust Agreement shall mean Federal Election Campaign Act (FECA) of 1971, as amended, Pub.L. 92-225, 86 Stat. 3, 52 U.S.C. § 30101 *et seq.* and shall include any amendments hereinafter.

FOF ¶ 9.  The term "**Qualified Beneficiary**" or any derivation thereof shall mean "regularly constituted committee" or "duly qualified national, state, county, municipal, ward, district and local committees" of the Democratic or Republican Party or "any elected member" of any of the aforementioned, in addition to the meaning such term shall have under the Uniform Trust Act. 20 Pa.C.S. § 7703. *Cf.* "Beneficiary."

FOF ¶ 10.  The term "**Current Beneficiary**" or any derivation thereof shall mean any elected Federal, state, county or municipal officeholder who is also of the Democratic or Republican Party in addition to the meaning such term shall have under the Uniform Trust Act. 20 Pa.C.S. § 7703. *Cf.* "Beneficiary."

FOF ¶ 11.  The term "**undue influence**" or any derivation thereof as used in this Trust Agreement shall mean any act or omission of any act committed in violation of the Civil Rights Act of 1957, Pub. L. 85–315, 71 Stat. 637, 42 U.S.C. § 1971(b) [now codified at 52 U.S.C. ¶ 10101(b)] notwithstanding the absence of any Federal candidate on the ballot thereto.

FOF ¶ 12.  The term "**without interference or obstruction by any person or persons**" as used in this Trust Agreement shall mean any act or omission of act committed in violation of the Civil Rights Act of 1957, Pub. L. 85–315, 71 Stat. 637, 42 U.S.C. § 1971(b) [now codified at 52 U.S.C. § 10101(b)] notwithstanding the absence of any Federal candidate on the ballot thereto.

FOF ¶ 13.  The term "**we**" or "**us**" means the Trustee of the Lincoln Charitable Trust utilizing *pluralis maiestatis* as a matter of common courtesy.

## § 2. Trust Organized for Charitable Purposes (¶¶ 14-19).

FOF ¶ 14.  The Trust is organized for charitable purposes, 20 Pa.C.S. § 7735, for the protection of civil rights secured by law, 26 CFR § 1.501(c)(3)-1(d)(2) ("term charitable is used in section 501(c)(3)...includes... organizations designed to ... (iii) to defend ... civil rights secured by law..."), to wit the First Amendment right of political association by "the most effective, fundamental, and perhaps economical avenue of political discourse [being] direct one-on-one communication" *Meyer v. Grant*, 486 U.S. 414, 424 (1988) through the Trust Property "to purge national politics of the pernicious influence of 'big money' campaign contributions," *McConnell v. FEC*, 540 U.S. 93, 144 (2003), by protecting the embodiment of representation entrusted upon elected party officials, *Bentman v. Seventh Democratic Ward Exec. Comm.*, 421 Pa. 188, 218 A.2d 261 (1966), is not diluted or diminished, *Reynolds v. Sims*, 377 U.S. 533 (1964), assuring the right of all persons to participate in the political party of their choice. *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973). The Trust Agreement constitutes a transaction involving interstate commerce.

FOF ¶ 15.   The Trust was established October 4, 2007 pursuant to restricted financial contributions by John M. Templeton, Jr., M.D. (1940 - 2015) to the 59th Republican Ward Executive Committee, Philadelphia, PA, then under the administration of Ward Leader Joseph L. Messa, Sr., Esq. (1925 - 2014).

FOF ¶ 16.   The Lincoln Charitable Trust was initially known as the Republican Leadership Trust as proposed by Dr. Templeton, but was renamed the Roosevelt - Bentman Trust for American Voters after administrative deviation was evoked in Res. 2009-23A (June 9, 2009) to convert the Trust to a bipartisan entity pursuant to the Pennsylvania Attorney General's guidance.

FOF ¶ 17.   The Trust was renamed the Lincoln Charitable Trust in 2016 by Res. 2016-12 (Dec. 12, 2106) to improve branding as "Lincoln" is more recognizable to the general public than the two supreme court cases, *Application of Roosevelt* and *Bentman v. Seventh Democratic Ward Exec. Committee* of which constituted the prior name.

FOF ¶ 18.   There were originally three co-trustees, including the Honorable Arlen M. Adams (1921 - 2015), former U.S. Court of Appeals Judge, who was succeeded by Hon. H. Paul Senft, the Republican National Committeeman from Florida, Frederick W. Hess, III of New Jersey, and Hon. Peter J. Wirs of Pennsylvania.

FOF ¶ 19.   The Trust Agreement was subsequently amended to provide for only one trustee, which Hon. Peter J. Wirs of Pennsylvania remains as the Trustee, after enactment of Res. 2006-23A abandoned prior efforts to enlarge the number of Trustees as proposed during mediation between the Co-Trustees and RNC Members as discussed more fully *infra*.

### § 3. Pre-Election First Amendment Right of Political Association (¶¶ 20-21).

FOF ¶ 20.   The initial Trust Property is a powerful interactive CIIM/GOTV Web 2.0 social networking software is designed specifically for elected precinct committee people to employ the Internet's social networking power, see, e.g., Julie Barko Germany, *Constituent Relationship Management: The New Little Black Book of Politics*, (2007), to mitigate adverse consequences historically attributed to the GOP, Jo Freeman, *The Political Culture of the Democratic and Republican Parties*, POLITICAL SCIENCE QUARTERLY Vol. 101, No. 3, 327-356 (1986); and certain states, Daniel J. Elazar, *American Federalism: A View from the States* 85-94 (1966) which causes dysfunctional membership participation, William E. Wright, *A Comparative Study of Party Organization* 46 (1971), resulting in loss of electorate appeal. John Aldrich, *Why Parties? The Origin and Transformation of Party Politics in America*(1995). In plain English, people are more responsive when they feel they're involved. Barko Germany, *supra*, see also Gerald M. Pomper, *The Fate of Political Parties*, 2 ELEC.L.J.69, 74-77 (2003).

FOF ¶ 21.   As the former Mich. GOP Chairman Saul Anuzis asserted: "The open Internet is antithetical to the hierarchical, top-down model that heretofore dominated American politics. The Washington-centered model of campaign committees and big-money fund-raisers and media buys is rapidly collapsing. * * * ." David All and Saul Anuzis, *GOP Should Get Serious About CyperSpace*, POLITICO.COM (July 14, 2008).

### § 4. Post-Election First Amendment Right of Political Association (¶¶ 22-24).

FOF ¶ 22.  The additional Trust Property is the National Conference of Public Officials, Inc. ("NCOPO") a Federally registered standards development organization under the National Cooperative Research and Production Act, Pub. L. 103–42, § 3(b)-(c), 107 Stat. 117, 118, 15 U.S.C. 4301 *et seq*. See 72 *Federal Register* 3416 (Jan. 25, 2007).

    (1)  The NCOPO promulgates the *Model Code of Official Conduct*, to assure a public office is a public trust. See e.g., James Madison, *The Federalist No. 46*, 243 (1788) ("[G]overnments are in fact ... agents and trustees of the people"). See also *United States v. Carter*, 217 U.S. 286, 306 (1910); *Taylor v. Beckman (No.1),*178 U.S. 548, 577 (1900) ("public offices are mere agencies or trusts"); *Geer v. State of Connecticut*, 161 U.S. 519, 529 (1896) (public office is to be exercised "as trust for the benefit of the people, and not as a prerogative for the advantage of the government as distinct from the people, or for the benefit of private individuals as distinguished from the public good"); *Trist (Burke) v. Child* 88 U.S. (21 Wall) 441, 450-451 (1875) ("all public stations are trusts, and that those clothed with them are to be animated in the discharge of their duties solely by considerations of right, justice, and the public good. They are never to descend to a lower plane").

    (2)  The NCOPO model code development process is pursuant to the American National Standards Institute *Essential Requirements: Due Process requirement for American National Standards* (Jan. 2012 ed.) ("ANSI Essential Requirements") employing a voluntary consensus standards using procedures that incorporate the attributes of openness, balance of interests, due process, an appeals process, and consensus in a manner consistent with the Office of Management and Budget Circular Number A-119 (1998 WL 216930), revised Feb. 10, 1998; and accordingly is prohibited from dominance by any single interest to the exclusion of fair and equitable consideration of other viewpoints.

    (3)  The NCOPO promulgates additional model codes for government accountability and productivity promote public officials' fiduciary duties, *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 426 (1934); *Hirabayashi v. United States*, 320 U.S. 81, 93 (1943). The first of these model codes is the *Model Abandoned and Blighted Property Receivership Code*. Pennsylvania is currently considering its version of the aforementioned code.

FOF ¶ 23.  The NCOPO also provide technical advice and assistance as authorized under IRC § 4945(d)-(e). For example,

    (1)  In Res.2014-11, *In re July 10, 2014 Veto Message of Hon. Thomas Corbett, Governor of HB 278, PN 3930 (Fiscal Code) on Inquiry of Pennsylvania Senate Majority Caucus*, the Trust instructed the Pennsylvania Senate to sue then Gov. Tom Corbett for line-item veto a bill (the Fiscal Code Amendment) other than the general appropriations act. The Trust's instructions resulted in commencing *Scarnati v. Corbett sub. nom Scarnati v. Wolf*, first denied by the PA Commonwealth Court at 579 MD 2014 (Dec. 30, 2105), which was reversed by the PA Supreme Court in *Scarnati v. Wolf*, ___Pa. ___, 173 A.3d 1110 (2017)

    (2)  In Res. 2016-5, *In re Financing Options for Proposed Las Vegas Football*

> *Stadium per Executive Order 2015-09*, the Trust advised the Governor of Nevada to consider generating naming rights revenue for its Las Vegas NFL football stadium in lieu of taxes. *See* Richard M. Velotta, "Panel won't finalize Las Vegas stadium financing, but it could come close," *Las Vegas Review Journal* (June 22, 2016)

FOF ¶ 24.   These principles of fiduciary duty are beginning to be reasserted by the courts. *Matter of Spector*, 47 N.Y.2d 462, 468-469, 392 N.E.2d 552, 555, 418 N.Y.S.2d 565, 568 (1979) ("The community, and surely the Judges themselves, are entitled to insist on a more demanding standard. As Chief Judge Cardozo wrote in *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928): 'A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. And there is no higher order of fiduciary responsibility than that assumed by a Judge'"). This writer, in his forthcoming treatise, *Government Ethics, Accountability and Productivity* (Dec. 2018) argues that because all three branches are co-equal, the fiduciary standards courts hold themselves is equally applicable to the first and second branches.

### § 5. Applicable Terms of Trust Agreement Being Violated (¶¶ 25-30).

FOF ¶ 25.   The terms of the Trust Agreement we find the Respondent has violated and which under 20 Pa.C.S. § 7780.6(a)(3) is subject to arbitrability are as follows:

FOF ¶ 26.   The Trust Agreement, ¶ 2(A) *Trust Property for Use by Beneficiaries.* The Trust Property shall at all times be available, without interference or obstruction by any person or persons, for distribution for lawful campaigning and electioneering on behalf of their respective political party and its candidates, nominees, and all other persons in affinity with the purposes of the Trust, and upon election thereto, the inspection of the government to hold accountable those officials elected to assure performance of their duties with faith and fidelity, and for all other protected First Amendment right of association or petition for redress of grievance or of speech or of the press or inspection of the affairs of Government, and to exercise all other and additional inalienable and indefeasible political powers without assessment, cost or fee to any Beneficiary.  Distribution shall be through the Trust Property's public portal.  Each beneficiary's interest in the Trust is inalienable and cannot be disclaimed to injure the Trust's charitable purposes.

FOF ¶ 27.   The Trust Agreement, ¶ 8(A). *Trust Property for Use by Beneficiaries.* The Trust Property shall at all times be available, without interference or obstruction by any person or persons, for distribution for lawful campaigning and electioneering on behalf of their respective political party and its candidates, nominees, and all other persons in affinity with the purposes of the Trust, and upon election thereto, the inspection of the government to hold accountable those officials elected to assure performance of their duties with faith and fidelity, and for all other protected First Amendment right of association or petition for redress of grievance or of speech or of the press or inspection of the affairs of Government, and to exercise all other and additional inalienable and indefeasible political powers without assessment, cost or fee to any Beneficiary.  Distribution shall be through the Trust Property's public portal.  Each beneficiary's interest in the Trust is inalienable and cannot be disclaimed to injure the Trust's charitable purposes.

FOF ¶ 28.   The Trust Agreement, ¶ 8(B). *Trust Property for Use by Beneficiaries.*

    (1)   The Trust Property ("We the People Today SAS") shall at all times be available, without interference or obstruction by any person or persons, for distribution for lawful campaigning and electioneering  on behalf of their respective political party and its candidates, nominees, and all other persons in affinity with the purposes of the Trust, to any Qualified Beneficiary, candidates, nominees and all other persons in affinity with the purpose of the Trust pursuant to the terms and conditions required by the Trustee deems prudent to assure no violation of applicable campaign finance, revenue or trust law.

    (2)   The Trust Property (the "NCOPO") shall at all times be available, without interference or obstruction by any person or persons, for distribution for lawful use as prescribed by such rules and regulations adopted by the Trustee within the Internal Operating Procedures consistent with generally accepted practices and procedures promulgated by standards development bodies.

FOF ¶ 29.   The Trust Agreement, ¶ 30(L). *Definitions.* The term "**undue influence**" or any derivation thereof as used in this Trust Agreement shall mean any act or omission of any act committed in violation of the Civil Rights Act of 1957, Pub. L. 85–315, 71 Stat. 637, 42 U.S.C. § 1971(b) [now codified at 52 U.S.C. § 10101(b)] notwithstanding the absence of any Federal candidate on the ballot thereto.

FOF ¶ 30.   The Trust Agreement, ¶ 30(M). *Definitions.* The term "**without interference or obstruction by any person or persons**" as used in this Trust Agreement shall mean any act or omission of act committed in violation of the Civil Rights Act of 1957, Pub.  85–315, 71 Stat. 637, 42 U.S.C. § 1971(b) [now codified at 52 U.S.C. § 10101(b)] notwithstanding the absence of any Federal candidate on the ballot thereto.

### § 6. Compliance with Internal Revenue Code (¶¶ 31-38).

FOF ¶ 31.   The Trust is a non-exempt charitable trust under IRC § 4947(a)(1).

FOF ¶ 32.   Because of such, the Trust must comply with IRC § 4942(a) which is commonly referred to as the 5% Payout Rule, the Trust being required to distribute five percent of income to other 501(c)(3) entities.

FOF ¶ 33.   It appears that $155,826,281.31 is required to be distributed per the 5% Payout Rule, which appears distribution from the total sum of the surcharge due the Trust from the RNC under Res. 2009-23A, reissued as Res. 2016-03, and which is carried forward under this Res. 2018-05 in the sum of $287,691,507.81, as of the Trustee's forthcoming July 1, 2018 Report of Trust Assets and Liabilities & Receipts and Disbursements.

FOF ¶ 34.   The recipients of the 5% Payout Rule must satisfy IOP Rule 7(o) which requires such recipient to qualify for distribution "if and only when such charitable purposes of the other 501(c)(3) entity promotes the charitable purposes of the Trust or otherwise brings favorable earned media to the Trust or the Trustee so as to reflect credibly on the Trust and its charitable purposes," being Drexel University, The Germantown Conservancy, Jenkins Law Library, Pennsylvania Bar Association, Pennsylvania Hospital, Pennsylvania Wrestling Club, Temple University, United World Wrestling

and the University of Pennsylvania.

FOF ¶ 35.   The Trustee, out of an abundance of caution, notified the IRS of the of the 5% issue.

FOF ¶ 36.   The Trustee believes that the Trust qualifies as a private operating foundation, IRC § 4942(j)(3), primarily through its activities administering the National Conference of Public Officials, Inc. ("NCOPO"), a Standards Development Body under the National Cooperative Research and Production Act, Pub. L. 103–42, § 3(b)-(c), 107 Stat. 117, 118, 15 U.S.C. 4301 *et seq*. See U.S. DOJ/FTC Notice at 72 *Federal Register* 3416 (Jan. 25, 2007), and the Germantown Conservancy, Inc., a 501(c)(3) community development corporation, and thus would not be required to adhere to the 5% Payout Rule. Notwithstanding this contention, the Trustee will honor the aforementioned pledges as a matter of public policy.

FOF ¶ 37.   Because the IRS has "strongly recommended" that the Trust converts itself from a 4947(a)(1) non-exempt charitable trust to a 501(c)(1) charitable trust, which can be effectuated only by filing an IRS Form 1023 Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code, Ledyard & Milburn, LLP, upon funding by this Award, Carter, will commence filing the IRS Form 1023 to convert the Trust from a 4947(a)(1) to a 501(c)(3) charitable trust.

FOF ¶ 38.   Because such filing of the Form 1023 is well beyond the 27-month required filing period, the Trustee will require the Pennsylvania Attorney General to provide the grounds for the IRS to allow a late filing in order to convert from a 4947(a)(1) trust to a 501(c)(3) trust. According to the IRS as published on its website: "An organization that files an application after the 27-month deadline may be recognized as tax-exempt from the date of the application. It may also request exemption effective back to the date of creation by completing Schedule E, Form 1023, and checking the Yes box in Question 5 of that schedule. A request will be approved if the organization acted reasonably and in good faith, and granting relief will not prejudice the interests of the government. These standards are usually met if the organization files its application before the failure to file is discovered by the IRS." See e.g. Treasury Regulation §301.9100-1.

### § 7. Parties and Parties-in-Interest (¶¶ 39-43).

FOF ¶ 39.   The Grievant, the Democratic National Committee ("DNC") is a nonprofit corporation under the laws of the District of Columbia. D.C. Code § 29-401.01 *et seq.*, the "Nonprofit Corporation Act of 2010".

FOF ¶ 40.   The Respondent, Republican National Committee, ("RNC") is an unincorporated association. D.C. Code §§ 29-1101, *et seq*. the "Uniform Unincorporated Nonprofit Association Act of 2010." *McConnell v. FEC*, 251 F.Supp.2d 176, 255 (D.D.C. 2003).

FOF ¶ 41.   The Attorney General of Pennsylvania is a public office, charged under law *inter alia*, with enforcement of charitable trusts. 20 Pa.C.S. § 7710(d) and 71 P.S. § 732-204(c). The Attorney General is always a party of record in all proceedings regarding charitable trusts. *In re Estate of Pruner*, 390 Pa. 529, 531, 136 A.2d 107, 109 (1957).

FOF ¶ 42.   We find that State, county and local Democratic Party and Republican Party

8

committees are usually unincorporated associations, although some, i.e. Pennsylvania State Republican Committee, have perfected their status as nonprofit corporations.

FOF ¶ 43.     The Federal Election Commission ("FEC") is an agency of the Untied States responsible for administering the Federal Elections Campaign Act of 1971 ("FECA") 52 U.S.C. § 30101 *et seq.*, as amended by the Bipartisan Campaign Reform Act of 2002 ("BCRA")("McCain-Feingold"). The FEC is a party because we have found the Respondent has, since 2009, fail to report the initial award under Res. 2006-23A and the reissued award under Res. 2016-3A as in indebtedness as required by 11 C.F.R. § 104.3(d),[1] thus filing of all campaign finance reports since 2009 under oath as required 52 U.S.C. §§ 30104(b), 30114

## § 8. DNC's Grievance (¶ 44).

FOF ¶ 44.     The question before us is:

(1)     Has the RNC committed a breach of trust (fiduciary duty), violating its community of interests among co-beneficiaries, in reneging on a $20 million pledge to the Trust upon discovering the Trust was expressly established to cure the RNC's ongoing violation of the Civil Rights Act of 1957, Pub. L. 85–315, 71 Stat. 637, 52 U.S.C. § 10101(b), and otherwise violate ¶ 2(A), ¶ 8(A), ¶ 8(B)(1)-(2) ¶ 30 (L) and ¶ 30(M) of the Trust Agreement, by its custom and usage of intimidation, threats and coercion to first, usurp the powers and duties of elected precinct party representatives, and secondly, suppress voter turnout of constituencies who otherwise are prone to vote Democratic, all solely to assure electoral victory, in lieu of acting rationally by appealing to the broadest possible base of voters in order to win elections.

## § 9. Procedures Governing Grievances (¶¶ 45-49).

FOF ¶ 45.     Grievances are governed by the Trust Agreement, ¶ 8(E), ¶ 15(E) and IOP Rule 4(d).

FOF ¶ 46.     The DNC's grievance originated as an action for declaratory judgment and injunctive relief in the U.S. District Court for the District of New Jersey docketed at docketed at Civil Action 81–03876 (2:81-cv-03876-DRD-SDW).

FOF ¶ 47.     Because the DNC's allegations against the RNC also violated the Trust Agreement, the Federal Court complaint, once the Trust became aware of the action, the matter was treated as an informal grievance, IOP Rule 4(d)(2), pending resolution of the controversy by the respective Federal court regarding the DNC's complaint or the Trustee's petition to confirm the prior Arbitration Award Res. 2016-3A under the Federal Arbitration Act ("FAA").

FOF ¶ 48.     The DNC informal grievance ripen into a formal grievance as MUR 2018-1, IOP Rule 4(d)(3), when:

---

[1] 11 C.F.R. § 104.3(d) *Reporting debts and obligations*. Each report filed under 11 CFR 104.1 shall, on Schedule C or D, as appropriate, disclose the amount and nature of outstanding debts and obligations owed by or to the reporting committee. * * *.

(1)     On or about March 18, 2013, the Respondent published *Growth Opportunities Project* report, a post-mortem analysis of the 2012 Romney electoral defeat, which affirmed and ratified the RNC's customs and usages to intimidate, threaten and coerce both African-American voters and other constituencies who commonly vote Democratic by voter suppression and party-exclusion measures; and to intimidate, threaten and coerce elected precinct party representatives by usurping their powers and duties by delegating to professional operatives and third-party volunteers. This report although made public was not made generally known so as to alert parties-in-interest of the RNC's continued plans to violate the Civil Rights Act of 1957, because such illegal activity is extensively concealed in euphemisms to such a degree that only political scientists would be able to detect such concealment.

(2)     On November 5, 2016, the Federal Court in the District of New Jersey in the aforementioned action docketed at Civil Action 81–03876 (2:81-cv-03876-DRD-SDW) in a slip opinion 2016 WL 6584915 denying the DNC relief to continue the Nov. 1, 1982 Consent Decree between the DNC and the RNC, in particular by inadvertently omitting a qualifying adjective term in Paragraph 4 of the Nov. 1, 1982 Consent Decree, which if had been properly read, could not have sustained the court's reasoning; combined with

(3)     On May 16, 2018 the Federal Court in the District of the District of Columbia, effectively required the Trust to do over a prior arbitration proceeding, docketed at Res. 2009-23A and subsequently at Res. 2016-3A (MUR 2009-1) notwithstanding the court's erroneous misreading of the Pennsylvania Superior Court in applying the *Rooker-Feldman* abstention doctrine as to a prior confirmation proceeding of the award in Res. 2009-23A to the subsequent award in Res. 2016-3A; and

(4)     Finally, the Federal Court in the aforementioned held in a January 8, 2018 order that the Nov. 1, 1982 Consent Decree had expired, affirmed on appeal at 2019 WL 117555 (3rd Cir. Jan. 7, 2019).

FOF ¶ 49.     IOPs (Internal Operating Procedures) are promulgated by the Trustee in aid of administration of the Trust as authorized by the Trust Agreement, ¶ 15(A).

### § 10. RNC's Purported Defense (¶ 50).

FOF ¶ 50.     It appears to us that the RNC's sole defense is that it not bound by the Trust Agreement because as a non-signatory, it never accepted its interests in the Trust, notwithstanding its failure to disclaim as required by law and moreover, that one of its own elected members was a co-trustee of the Trust, as the RNC has never mounted a defense to the underlying grievance before the Trustee in Res. 2009-23A (MUR 2009-1) or the original DNC complaint in the Federal Court, 2:81-cv-03876-DRD-SDW, of its ongoing violation of civil rights of voters.

### § 11. Prior Grievances against RNC (¶¶ 51-52).

FOF ¶ 51.     The grievance found in MUR 2009-1 is merged into the informal grievance found in the DNC's action against the RNC, which remedies were left to expire, but the infractions which was the cause of action in the Federal action, not only persist, but

have worsen.

FOF ¶ 52.   Both of the aforementioned grievances are merged into the additional grievance arising out of the discovery of the March 18, 2013 *Growth and Opportunity Project* Report. *Cf.* Fed.R.Civ.P. Rule 18(a) re joiner of claims and see also 6A Charles Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* 2d § 1588, at 535 (2d ed. 1990) succinctly states the rule supported by the numerous cases footnoted there: ("The general rule is that in an action involving a single plaintiff and a single defendant, a party may aggregate all the claims he has against an opposing party * * * ").

### § 12. Trustee's Authority to Sit as Arbitrator (¶ 53).

FOF ¶ 53.   The Trustee's authority to undertake arbitration in this matter is that a violation of the Civil Rights Act of 1957 is a violation of the Trust Agreement, ¶ 2(A), ¶ 8(A), ¶ 8(B)(1)-(2), ¶ 30(L) and ¶ 30(M) and thus is subject to arbitrability under PA Uniform Trust Act, this concerning interpretation of the Trust Agreement the administration of the Trust. 20 Pa.C.S. § 7780.6(a)(3).[2]

### § 13. The "Lincoln Rule" of Electioneering (¶¶ 54-108).

FOF ¶ 54.   Writing a Campaign Circular from Whig Committee, *Illinois State Register* (Feb. 21, 1840), I Collected Works of Abraham Lincoln, 65-66, our future 16th President wrote "the only way you win elections is by getting more of your supporters to the polls than your opponents . . .divide the county into small districts and appoint in each a subcommittee . . . make a perfect list of voters and ascertain with certainty for whom they will vote. . . and on election day see that every Whig is brought to the polls." The Trust routinely refers to this as the "Lincoln Rule."

FOF ¶ 55.   Accordingly, our system of governance boils down to simple arithmetic. Whoever governs is whoever achieved the larger voter turnout on Election Day. However, resigning governance to happenstance, or for that matter, historical performance is not effective protection of First Amendment rights of political association, as discussed more fully *infra* in Legal Analysis. If voters desire to effectuate governance, which can only be done through their political parties, then they must implement what is nowadays referred to CIIM - Connect, Inform, Involve and *finally* Mobilize. And of these components, the Lincoln Rule is rises or fails on the final actor - Mobilization. Nothing advances unless there are the votes.

FOF ¶ 56.   In its latest missive, the U.S. Census Bureau, Dept. of Commerce reminds us that: "Voting is among our most fundamental domestic responsibilities and important civic opportunities. Without free and open elections, American democracy would not

---

[2] Trustee-Arbitrators are usually found in union pension trusts, see e.g. *Freeman v.Vivacolor, Inc.*, 2004 WL 2884429 (D.D.C.) (Nov. 1, 2004) (KOLLAR-KOTELLY, J.). Trustee-Arbitrators must comport with the rule of equity, William B. Rubenstein, *The Concept of Equality in Civil Practice*, 23 CARDOZO L. REV. 1865 1901 n. 141 (2002) citing *McConnell v. Howard Univ.*, 260 U.S.App.D.C. 192, 818 F.2d 58, 68 (1987). The Trustee satisfies this requirement as under the PA Uniform Trust Act, he is mandated to be impartial. 20 Pa.C.S. § 7773, and is regarded as a neutral in disputes among beneficiaries. *In re Trust of Keiser,* 392 Pa.Super. 146, 150 & n.2, 572 A.2d 734, 736 & n.2 (1990).

exist. Maintaining and improving our system of elections requires not only documenting election results, but also understanding the composition of America's electorate, both historically and presently. Since 1964, the U.S. Census Bureau has fielded the Voting and Registration Supplement to the Current Population Survey ("CPS") every two years. Generally speaking, national American elections fall into two categories: elections where voters decide on the office of the President and congressional seats, and elections where congressional seats are the highest offices decided." The Census Bureau employs the following definitions are used in the CPS analysis, which from here forward we quote liberally from the official test:

(1)     Voting rates: Voting rates represent the number of voters relative to a given population or subpopulation. For example, in this report overall voting rates are calculated by dividing the total number of reported voters by the total number of eligible voters (i.e., citizens who are at least 18 years old).

(2)     Voting population: This is the estimated number of people who reported voting. In this report, this population will occasionally be referred to as "the electorate."

(3)     Voting-age citizens: In the United States, only native-born or naturalized citizens can vote legally in elections. While the U.S. Census Bureau has collected voting and registration data since 1964, the CPS has gathered citizenship data for congressional voting only since 1978. Although the number of voters in any given year is not affected by accounting for citizenship, removing noncitizens from the population base results in higher turnout rates than when the voting-age population is used. For example, in 2014, 92.3 million Americans reported voting. When the voting-age population is used (239.9 million people), the voting rate is 38.5 percent, but when voting-age citizens serve as the population base (219.9 million people), the voting rate increases to 41.9 percent.

(4)     Voting-age population: Since 1972, every state has required that voters be at least 18 years of age in order to vote, therefore the voting-age population has historically been a common population base used for calculating voting statistics. Some Census Bureau products, such as the voting detailed and historical table packages, present voting estimates using this population as the base in order to allow historical comparisons all the way back to 1964. The voting-age population does not account for citizenship status.

(5)     Registered population: With the exception of North Dakota, every state requires eligible voters to formally register before casting a ballot. In terms of methods and deadlines, registration procedures vary greatly from state to state, but by definition, anyone who is registered is both a citizen and at least 18 years old.

FOF ¶ 57.     "Since 1978, voting rates have been consistently higher in presidential election years than in congressional election years. In 2014, the overall voting rate was the lowest for a congressional election since the CPS first asked about voting and citizenship status in 1978. At 41.9%, the 2014 turnout rate was 3.6 percentage points lower than in 2010 and 5.9 percentage points lower than in 2006. The number of voting-eligible citizens has increased in every congressional election since 1978, while the number of citizens who reported voting has increased (1982, 1990, 1994, 2002, and 2006) or

12

decreased (1998 and 2014) depending on the year.

FOF ¶ 58.     "When increases in the voting population outpace increases in the voting eligible population, the end result is an increase in the voting rate, but when increase in the voting population do not keep pace with increases in the voting-eligible population, or when the voting population decreases, there is a decrease in the voting rate. Voting rates for presidential elections have shifted from year to year, but have ultimately decreased across the duration of the time series (64.0% in 1980 and 61.8 % in 2012), while voting rates for congressional elections have decreased as well (48.9% in 1978, 41.9% in 2014).

FOF ¶ 59.     "In the two most recent congressional elections, the size of the voting population was not statistically different in 2010 (in comparison to 2006), and decreased in 2014 (in comparison to 2010) despite increases in the eligible population in both those years. This resulted in voting rate decreases in both 2010 (45.5%, compared with 47.8 % in 2006) and 2014 (41.9%).

FOF ¶ 60.     "Historically, voting rate levels have been associated with certain demographic characteristics, such as race, Hispanic origin, and age (Brooks and Manza, 1997; File and Crissey, 2010; File, 2013). Since 1978, voting rates for non-Hispanic Blacks and Hispanics have trailed those for non-Hispanic Whites in every congressional election, although the size of those differences has fluctuated depending on the year.

FOF ¶ 61.     "Over the course of the congressional election time-series, voting rates declined for non-Hispanic Whites (50.6% in 1978, 45.8% in 2014) and Hispanics (35.7 in 1978, 27.0% in 2014), but the apparent change for non-Hispanic Blacks over this period was not statistically significant (39.5% in 1978, 40.6% in 2014).

FOF ¶ 62.     "In recent elections, voting rates have also tended to increase with age (File, 2008; File, 2014). Since 1978, voting rates for 18- to34-year-olds have trailed those for older Americans in every congressional election, although the size of those differences has fluctuated depending on the year.

FOF ¶ 63.     "Since 1986, Americans 65 and 34-year-olds, to a high of 59.4 % for those 65 and older. In 2014, 43.0 % of women reported voting, compared with 40.8 % of men. Reported voting rates were also higher for non-Hispanic Whites (45.8 %) than for non-Hispanic Blacks (40.6 %), non-Hispanic Asians (26.9 %), and Hispanics (27.0%).

FOF ¶ 64.     "Being married with a spouse living in the same household corresponded to higher voting rates (50.9 %), particularly in comparison with those who reported having never been married (25.9%).

FOF ¶ 65.     "Native-born citizens were more likely to report voting than naturalized citizens (42.7 % and 34.1 %, respectively).

FOF ¶ 66.     "Reported voting rates were also high among those had lived in their current home for 5 years or longer (57.2 %), and those living in households making over $150,000 in family income (56.6 %). Voting rates were not significantly different between the following income groups: $10,000–$14,999 and $15,000–$19,999; $30,000–$39,999 and $40,000–$49,999; and $100,000–$149,999 and $150,000 and above

13

FOF ¶ 67.    " The top tier of the voting rate distribution also included government workers (56.5 %) and military veterans (54.2%). The voting estimates for living in current home for 5 years or longer, living in households with family income over $150,000, and government workers are all not significantly different from one another.

FOF ¶ 68.    "Previous Census Bureau research has documented how the voting population has grown more diverse in recent presidential elections, and it is worth exploring whether the same applies to congressional elections (File, 2013). Any examination of voting behavior must consider the type of election. For example, reports of voter turnout may differ by race and Hispanic origin, but those differences may vary by type of election. Therefore, in addition to presenting the characteristics of the 2014 voting population, a meaningful analysis also explores how the voting population's composition has changed in recent congressional and presidential elections.

FOF ¶ 69.    "Between 2004 and 2014, there were six national elections: three presidential and three congressional. Across presidential elections during this period, the no-Hispanic White share of the voting population dropped from 79.2% in 2004 to 73.7% in 2012. Across congressional elections, the non-Hispanic White share fell from 80.4% in 2006 to 76.3% in 2014. Overall, across the last three election cycles, the share of the voting population that is non-Hispanic White has decreased in both types of elections, although the percentage point shift has been slightly more pronounced in presidential elections (5.5%) than in congressional elections (4.1%).

FOF ¶ 70.    "Age is another factor that impacts voter turnout (File, 2014). Between 2004 and 2014, no matter the type of election in question, voters between the ages of 45 and 64 years consistently made up a higher percentage of voters than other age groups. This is largely attributable to the fact that the overall population of this age group is larger than the other age groups. In 2014, for example, the voting rate for the 65 and older group was 59.4%, about 10 percentage points above the next-highest age group.

FOF ¶ 71.    "The population 65 and older is also the only age group where voting rates did not drop between 1978 and 2014. In 2014, voting rates increased steadily with age, from a low of 23.1% among 18- to 34-year olds.

FOF ¶ 72.    "This analysis is most informative when we look at how the percentages of voters within age groups have changed over time and between elections. For example, young people aged 18 through 34 consistently made up larger percentages of the electorate in presidential election years than in congressional election years.

FOF ¶ 73.    "For 35- through 44-year-olds, there has been a steady decline in share of the electorate for both congressional and presidential elections. Older voters ran in the opposite direction, as voters 65 and older increased their share of the electorate over the course of the time series for both types of elections.

FOF ¶ 74.    "Older voters also made up a larger percentage of congressional electorates than presidential electorates. In 2014, for example, voters 65 and older composed 28.4% of all voters, compared with 22.3% in the most recent presidential election.

FOF ¶ 75.    "The share of the electorate for those aged 35 through 44 were not significantly different for 2006 and 2008 and for 2010 and 2012. Between 2004 and 2008 electoral shares were not statistically different for the 65 years and older population.

14

FOF ¶ 76.    "Overall, across the last three election cycles, the voting population has grown more racially and ethnically diverse, while the share of the voting population that is 65 and older has also increased, both for congressional and presidential elections.

FOF ¶ 77.    "At least part of these observed increases are attributable to population trends, as the American population at large has grown older and more diverse in recent years (Colby and Ortman, 2014).

FOF ¶ 78.    "However, the question of whether these changes in the electorate are being driven by simple population change, or by increased or decreased engagement from certain groups, remains an open question, one that" this analysis now addresses.

FOF ¶ 79.    "The following [analysis] looks specifically at how voter turnout intersects with voter eligibility in an effort to better understand the dynamics of recent congressional electorates. By comparing a subpopulation's share of the voting population to their share of the voting-eligible population, an assessment can be made concerning how a given subpopulation is voting relative to their eligibility.

FOF ¶ 80.    "For example, if a subpopulation based on age or race accounts for both 50% of the voting population and 50% of the eligible population (i.e., citizens 18 and older), then it can be said that this subpopulation is voting evenly with their eligibility. However, in many instances, a subpopulation will report voting in either higher or lower percentages than their share of the eligible population would indicate.

FOF ¶ 81.    For example "[i]n 2006, non-Hispanic Whites made up 74.5% of the voting-eligible population and 80.4% of the population that actually voted. This means that in the congressional election of 2006, non-Hispanic Whites' share of the vote exceeded their share of the eligible population by 5.9 percentage points.

FOF ¶ 82.    "In the following congressional elections of 2010 and 2014, non-Hispanic Whites continued to make up a larger share of voters than of the eligible population, by 4.9 percentage points in 2010 and by 6.4 percentage points in 2014.

FOF ¶ 83.    "Meanwhile, in 2006, minority groups made up a smaller share of the electorate than they did of the eligible population: non-Hispanic Blacks by −1.6 percentage points and Hispanics by −2.8 percentage points.

FOF ¶ 84.    "In 2010 and 2014, however, non-Hispanic Blacks' share of the vote grew to a level consistent with their eligibility. During the same period, the difference between Hispanics' share of the vote and share of the eligible population had fallen to −4.1 percentage points.

FOF ¶ 85.    "In 2006, young people aged 18 to 34 made up 28.9 % of the voting eligible population and 17.3 % of the population that actually voted. This means that in the congressional election of 2006, the 18- to 34-year-old share of the vote was lower than their share of the eligible population by −11.6 percentage points.

FOF ¶ 86.    "In the following congressional elections of 2010 and 2014, young people continued to vote at rates lower than their eligibility, first by −12.1 percentage points in 2010, then by −13.2 percentage points in 2014.

FOF ¶ 87.    "Over the course of the last three congressional elections, people aged 35 to 44 also

made up a smaller share of voters than they did of the eligible population, although to a lesser degree than 18- to 34-year-olds (–0.9 percentage points in both 2006 and 2010; –1.5 percentage points in 2014).

FOF ¶ 88.    "People aged 45 to 64 accounted for a larger proportion of voters than of eligible population in each election, while individuals 65 and older have made up a larger share of voters than their share of eligible population in every congressional election since 2006. Moreover, the magnitude of their voting differentials for individuals 65 and older has increased to 8.3 percentage points in 2014 (up from 5.3 percentage points in 2006 and 6.0 percentage points in 2010).

FOF ¶ 89.    " * * * Among Hispanics in the most recent congressional election, young people between the ages of 18 to 34 made up 43.5% of the Hispanic eligible population and 25.4 % of the Hispanic population that actually voted. This means that among Hispanics, 18- to 34-year-olds made up a smaller share of voters than of the eligible population in 2014 by –18.1 percentage points, the largest observed gap in either direction.

FOF ¶ 90.    "Hispanics between the ages of 45 to 64 showed one of the largest differences between turnout and eligibility (10.9 percentage points), while Hispanics 65 and older were more prevalent among voters than among the eligible population by 7.6 percentage points. Young non-Hispanic Whites and non-Hispanic Blacks, aged 18 to 34, voted at levels below their eligibility (–11.7 percentage points for non-Hispanic Whites and –12.2 percentage points for non-Hispanic Blacks). Non-Hispanic Whites and non-Hispanic Blacks aged 45 to 64 made up a larger share of the electorate than of the eligible population (5.2 percentage points for non-Hispanic Whites and 6.9 percentage points for non-Hispanic Blacks), as did non-Hispanic Whites and non-Hispanic Blacks aged 65 and older (8.0 percentage points for non-Hispanic Whites and 5.8 percentage points for non-Hispanic Blacks).

FOF ¶ 91.    "Overall, these results point to an electorate that is growing older and more diverse, although non-Hispanic Whites continue to be a larger portion of the voting population than of the eligible population.

FOF ¶ 92.    "Young people across all races and origins had shares of the voting population that were lower than their eligibility, although this disparity was largest for young Hispanics, while older Americans, regardless of race and Hispanic origin, had shares of the voting population that were higher than their share of the eligible population in 2014.

FOF ¶ 93.    "This increased electoral engagement among older Americans is not simply the product of the American population aging as a whole, as the low levels of voting among young people and the high levels of voting among older Americans have increased in recent congressional elections, even after accounting for changes in age distributions.

FOF ¶ 94.    Any analysis of voter patterns requires inspection of traditional and alternative voting methods.

FOF ¶ 95.    "Many states have policies in place to allow eligible voters to cast ballots before Election Day, either during an early voting period, by voting with an absentee ballot, or both. According to the National Conference of State Legislatures ("NCSL"), there

16

are currently 14 states where early voting is *not* offered and an excuse is required to vote with an absentee ballot.

FOF ¶ 96.     "The NCSL has provided the following summary of early voting across states:

    (1)    Early Voting. In 33 states and the District of Columbia, any qualified voter may cast a ballot in person during a designated period prior to Election Day. No excuse or justification is required.

    (2)    Absentee Voting. All states will mail an absentee ballot to certain voters who request one. The voter may return the ballot by mail or in person. In 20 states, an excuse is required, while the other 27 states and the District of Columbia permit any qualified voter to vote absentee without offering an excuse. Some states offer a permanent absentee ballot list: once a voter asks to be added to the list, s/he will automatically receive an absentee ballot for all future elections.

    (3)    Mail Voting. A ballot is automatically mailed to every eligible voter (no request or application is necessary), and the state does not use traditional precinct poll sites that offer in person voting on Election Day. Three states use mail voting.

FOF ¶ 97.     The Census Bureau's "CPS first asked about early and absentee voting in 1996 and has done so in every voting supplement since. In 2014, 10.3 % of voters reported voting in person before Election Day, while 20.9% reported voting by mail, meaning that in the most recent congressional election, nearly a third of all voters reported some form of alternative voting (31.2%).

FOF ¶ 98.     "The level of alternative voting in 2014 represents about a threefold increase since 1996, when only 10.5 % of voters reported voting by alternative methods. Over this period, alternative voting has increased in a seesaw pattern, with alternative voting rates tending to increase in presidential election years, decrease slightly in the following congressional election, and then increase again in the following presidential election.

FOF ¶ 99.     "In 2008, for example, the rate of alternative voting increased to 30.7 % and then dropped to 26.5 % in 2010. In the next presidential election, 2012, the rate of alternative voters once again increased (32.8 %) before dropping off slightly again in the most recent congressional election of 2014 (31.2 %).

FOF ¶ 100.     "In most years of this analysis, non-Hispanic Whites and Hispanics have reported relatively comparable rates of alternative voting. In 1996, the rates for non-Hispanic Whites were slightly higher than for Hispanics, whereas in the two most recent congressional elections, the rates for Hispanics have been higher than for non-Hispanic Whites.

FOF ¶ 101.     "Alternative voting rates for non-Hispanic Blacks, meanwhile, have tended to lag behind those for both Hispanics and non-Hispanic Whites . However, exceptions were observed in the presidential elections of both 2008 and 2012, when reporting of alternative voting increased among non-Hispanic Blacks to a level not significantly different from both non-Hispanic Whites and Hispanics in 2008 and to a level not significantly different from non-Hispanic Whites but still trailing

Hispanics in 2012.

FOF ¶ 102.    The Census Bureau's CPS summarizes its conclusions thus: "In 2014, the overall voting rate was the lowest for a congressional election since the CPS first asked about voting and citizenship status in 1978. [And historically, 2014 voter turnout was the lowest since 1942 - World War II].

FOF ¶ 103.    "However, certain demographic patterns were observed, as voting rates were highest for Americans 65 years and older, non-Hispanic Whites, individuals with high levels of education, and those with relatively high incomes.

FOF ¶ 104.    "Overall, across the last three election cycles, the voting population has grown more racially and ethnically diverse. Still, despite this recent diversification, non-Hispanic Whites continued to make up a larger share of voters than of the eligible population, while Hispanics continued to make up a smaller share of voters than of the eligible population. Meanwhile, non-Hispanic Blacks reported voting at a level not statistically different from their eligibility in 2010 and 2014.

FOF ¶ 105.    "In recent elections, voting rates have been low among young people and high among older Americans.

FOF ¶ 106.    "These results are not the product of the American population aging as a whole, as both the low level of engagement among young people and the high level of engagement among older Americans have increased in recent congressional elections, even after accounting for changes in age distributions.

FOF ¶ 107.    "Finally, since 1996, Americans have reported about a threefold increase in alternative voting methods. In most elections, alternative voting has been significantly higher among non-Hispanic Whites and Hispanics than for non-Hispanic Blacks, with exceptions observed in both 2008 and 2012, when alternative voting for non-Hispanic Blacks increased.

FOF ¶ 108.    "The population represented (i.e., the population universe) in the Voting and Registration Supplement to the November 2014 CPS is the civilian noninstitutionalized population living in the United States. The excluded institutionalized population is composed primarily of individuals in correctional institutions and nursing homes.  The November CPS supplement, which asks questions on voting and registration participation, provides the basis for estimates in the CPS. As in all surveys, the CPS estimates are subject to sampling and nonsampling error.

## § 14. History of Political Parties (¶¶ 109-113).

FOF ¶ 109.    The aforementioned voter analysis must necessarily be broken down by political parties, since as in most (but not all) states, voters register by party affiliation, North Dakota and Virginia being the most notable exceptions.

FOF ¶ 110.    Political parties were creatures of necessity, and not originally envisioned in the frame of government. *Ray v. Blair*, 343 U.S. 214, 220-221 (1952). Parties, which did not emerge until the Jacksonian era, were anticipated by the Founders only to the extent of a profound distrust of mass electorates, majoritarianism and political factions. *The Federalist* Nos. 10, 47, 48 (James Madison).

FOF ¶ 111.    Instead of constitutional rules refereeing partisan dynamics and demanding fairness for the supporters of both parties, Madison preferred parties be eliminated altogether. Samuel Issacharoff, *Private Parties with Public Purposes: Political Parties, Associational Freedoms, and Partisan Competition*, 101 COLUM. L. REV. 274, 301 (2001) ("The emergence of these parties was, of course, all the more striking for the extreme hostility of the founding generation to what were seen as permanent factions").

FOF ¶ 112.    While the 8th President of the United States, Martin Van Buren is credited of creating political parties by divorcing their functions from the predecessor Congressional caucuses, it is the 16th President of the United States, Abraham Lincoln, who established the three-level party structure we know today.

FOF ¶ 113.    National party committees initially were federations of state party committees responsible primarily for national presidential conventions. The RNC never materialized into the full-time, professional entity until after the 1964 "Goldwater debacle." Daniel H. Lowenstein & Richard L. Hason, *Election Law* 429 (2d ed.) (2001).

### § 15. Application of Downs, Keys, Elazar and Freeman (¶ 114).

FOF ¶ 114.    Today's political environment is required to be evaluated under the scholarly scrutiny of three specific political theories:

    (1)    **Downs Theory.** Parties are required to act rationally to win elections so as to appeal to the broadest possible base of voters. Anthony Downs, *An Economic Theory of Democracy* 137 (1957).

    (2)    **Elazar Theory.** The United States is divided into three different political cultures: Moralistic, Traditionalistic, and Individualistic. Daniel J. Elazar, *American Federalism: A View from the States* 85-94 (1966).

    (3)    **Freeman Theory.** The Nation's two major political parties have their own culture, the Democrats being pluralistic and the Republicans being autocratic. Jo Freeman, *The Political Culture of the Democratic and Republican Parties*, POLITICAL SCIENCE QUARTERLY Vol. 101, No. 3, 327-356 (1986). See also Jason Bello and Robert Y. Shapiro, *On to the Convention*, POLITICAL SCIENCE QUARTERLY Vol. 123, No. 1 (Spring, 2008); James Q. Wilson and John J. DiIulio, Jr, AMERICAN GOVERNMENT (10th ed.) (2006).

### § 16. V.O. Key's Classification of Party Participants (¶¶ 115-119).

FOF ¶ 115.    V.O. Key determined that political parties consists of three constituencies: the "party organization" (the party's active officers); the "party-in-government" the party's officeholders; and the "party-in-the-electorate" composed of the registered voters who are the Trust's *general Beneficiaries*.

FOF ¶ 116.    The Trust links the "party-in-the electorate" – the voters – with the "party organization," the Qualified Beneficiaries, Trust Agreement ¶ 30(H) and IOP Rule 1(c)(10) and the "party-in-government," the Current Beneficiaries, IOP Rule 1(c)(4).

FOF ¶ 117.    The Trust's Qualified and current Beneficiaries are merely the conduits which flows

the Trust's charitable benefits to the 170 million voters who are the Trust's beneficiaries. *In re Trust of Brooke*, 82 Ohio St. 3d 553, 561, 697 N.E.2d 191, 197 (1998) quoting George A. Bogert and George T. Bogert, *The Law of Trusts and Trustees*(hereafter "Bogert") § 363 ("it is more accurate to say that the real beneficiary is the public or community and the persons involved are merely instrumentalities through which the community benefits flow").

FOF ¶ 118.   In addition to the 170 million registered voters, there are 365,858 elected precinct party committee people in each major political party, from182,851 voting districts, who are Qualified Beneficiaries which in 27 states, 552,776 committee people (or 75.6%) are directly elected in party primaries; and in 21 states, 177,940 (or 24.3%) are elected by caucus or convention.

FOF ¶ 119.   The Trust also represents current Beneficiaries who minimally include 512,658 non Federal and 537 Federal party candidates, nominees and elected public officials within each party. Robert C. Wigton, *American Political Parties under the First Amendment*, 7 J.L. & Pol'y 411, 415 (1999) citing V.O. Key, Jr., *Politics, Parties, and Pressure Groups* 211-212 (5th ed. 1964) and Frank J. Sorauf, *Party Politics in America* 197 (1968); *see also* Larry J. Sabato, *The Party's Just Begun: Shaping Political Parties for America's Future* 26-27 (1988).

### § 17. Elazar's Three Political Cultures (¶¶ 120-126).

FOF ¶ 120.   Elazar posits as existing in the nation's different regions due in significant part to which ethnic groups settled and/or dominated the region three distinct political cultures. *In extenso*:

FOF ¶ 121.   The **Moralistic Culture**, found primarily in New England and northern Plain States such as Minnesota and Wisconsin is that political involvement, more commonly styled as public service, is a duty owed (by reason of status, private success, conviction) to which no or little enumeration is required or expected. This culture was brought to the United States by the Puritans who settled in New England, and was transported across the upper Great Lakes into the Midwest to the Northwest primarily by Germans and Scandinavian ethnic groups.

FOF ¶ 122.   Among the more common attributes of the Moralistic Culture are:

(1)   Government advances the public interest and is a positive force in the lives of citizens.

(2)   Politics involves around and politicians run for office to advance issues.

(3)   Corruption is not tolerated because government service is seen as public service.

(4)   It is a citizen's duty to participate in politics.

FOF ¶ 123.   The **Individualistic** or **"I"** Culture, primarily found in the Mid Atlantic and Northern Industrial states, is that politics is an occupational pursuit which enumeration is fully expected, engendering a public response of skepticism and in many instances, cynicism.

FOF ¶ 124.  Elazar submits the I Culture developed out of the intensive economic competition among multiple ethnic groups when forced into a limited marketplace, i.e., New York City or Philadelphia, both regarded as the historical homes of the I Culture due to NYC's Democratic Tweed Machine and Philadelphia's ongoing GOP Machines under Penrose, Vare and now Meehan.

FOF ¶ 125.  Among the more common attributes of the I Culture are:

> (1)  Politicians' motives for running for office are based on material self-interests and to advance themselves professionally.

> (2)  Elections are oriented toward gaining office and do not deal with issues.

> (3)  Bureaucracy is viewed negatively because it hinders patronage.

> (4)  Corruption is tolerated because politics *is* dirty. (Emphasis original).

FOF ¶ 126.  The **Traditionalistic** Culture is what Elazar hypothesizes is the middle ground between the Moralistic and I Cultures, and is prevalent throughout the Southern states. Among the more common attributes of the Traditionalistic Culture are:

> (1)  Government is to maintain the existing social and economic hierarchy.

> (2)  Politicians come from society's elite and have a family obligation to govern.

> (3)  Ordinary citizens are not expected to participate in politics or even to vote.

> (4)  Politics is competition between rival factions within the elite rather than between class-based parties.

### § 18. Freeman's Theory re the Party Cultures (¶¶ 127-199).

FOF ¶ 127.  Notwithstanding the Democratic and Republican Parties have the same purpose – to win elections – they have radically opposite cultures. Jo Freeman, *The Political Culture of the Democratic and Republican Parties*, Political Science Quarterly, Vol. 101, No. 3 (Fall 1986) pp. 327-356. See also Jason Bello and Robert Y. Shapiro, *On to the Convention*, POLITICAL SCIENCE QUARTERLY Vol. 123, No. 1 (Spring, 2008); James Q. Wilson and John J. DiIulio, Jr, AMERICAN GOVERNMENT (10th ed.)(2006).

FOF ¶ 128.  Freeman makes the following salient points which we quote at length. (Some references are to the online version, which was an expanded version of the published text, available at JoFreeman.com).

FOF ¶ 129.  "Essentially, the Democratic party is pluralistic and polycentric. It has multiple power centers that compete for membership support in order to make demands on, as well as determine, the leaders.

FOF ¶ 130.  "The Republicans have a unitary party in which great deference is paid to the leadership, activists are expected to be "good soldiers," and competing loyalties are frowned upon.

FOF ¶ 131.  "These differences are a direct consequence of the different direction in the flow of power.

FOF ¶ 132.  "In a collectivity in which power flows downward, separate and distinct internal groups are potentially dangerous; they provide loci for the development of competing loyalties and competing leadership.

FOF ¶ 133.  "But when power flows upward, it must do so through some mechanism.

FOF ¶ 134.  "Unorganized individuals without institutional authority or financial resources cannot exercise power. They must organize into groups in order to develop an agenda and act collectively in order to effect that agenda. Organization is the creator of collective power; it is the means by which followers influence leaders."

FOF ¶ 135.  "There are two fundamental differences between the parties in which all others are rooted.

FOF ¶ 136.  "The first one is structural: In the Democratic Party power flows upward and in the Republican Party power flows downward.

FOF ¶ 137.  "The second is attitudinal: Republicans perceive themselves as insiders even when they are out of power and Democrats perceive themselves as outsiders even when they are in power."

FOF ¶ 138.  "The Democratic Party is composed of multiple constituencies with competing interests . . . which identify themselves as having a salient characteristic creating a common agenda which . . . the party must respond [to win elections]." *Id.*, online. "The Democratic Party is quite conscious that it is a coalition party. . . [P]arty leaders are aware that the Democratic Party must incorporate groups . . . to remain the majority party. . ."

FOF ¶ 139.  "The Republican Party[s'] components. . .are not as important . . .because they are not mechanisms for exercising power and they are not primary reference groups. * * * The basic components of the Republican Party are geographic units and ideological factions [which] exist only as internal party mechanisms [and] are primarily channels for mobilizing support and distributing information on what the Party leaders want. They are not separate and distinct levels of operation. * * * Unlike Democratic caucus leaders, Republican faction leaders do not feel themselves accountable to their followers."

FOF ¶ 140.  "[Unlike Democrats] Republicans do not attend caucuses . . . [t]hey go to receptions. These receptions are usually by invitation only. Invitations may not always be hard to obtain, but they are required. Receptions are privately sponsored, with each group responsible for getting its own space. There may be some speeches, but they are perfunctory ones and no debate is asked for or expected.

FOF ¶ 141.  "Republican receptions do have one major characteristic in common with Democratic caucuses; they are both places for demonstrating the status of the group and individuals within it.

FOF ¶ 142.  "Status at [Democratic Party] caucuses is conveyed to those individuals invited to sit at the speakers' platform, as well as to the group by those who agree to speak.

22

FOF ¶ 143.  "Status at [Republican] receptions is conveyed to those introduced or acknowledged by the occasional speaker and to the sponsoring group by the prominent people attending the reception who are not also sponsors. Despite the occasional speech . . . discussion is largely private. Consequently, people usually talk to those they already know and who most likely agree with them. Even when participants of different views encounter each other, the exchange is expected to be very civil in keeping with the rules of polite society.

FOF ¶ 144.  "Receptions are not places to exercise group influence. They are places to network, to be seen, and to get information. If one wishes to exercise influence, it is best to arrange an introduction to a recognized leader by a mutual friend"

FOF ¶ 145.  "The different direction in the flow of power also creates different conceptions of legitimacy. In the Democratic Party, legitimacy is determined by who you represent, and in the Republican Party by whom you know and who you are."

FOF ¶ 146.  "Legitimacy within the Republican Party is dependent on having a personal connection to the leadership."

FOF ¶ 147.  "While the importance of personal connections works against those Republicans who have the wrong connections, it rewards those who spend years toiling in the fields for the party and its candidates. The longer one spends in any organization, the more personal connections one has an opportunity to make. These aren't lost when one's party or leaders are out of power, and thus can be "banked" for future use ."

FOF ¶ 148.  "[T]he Republican Party . . .is not very hospitable to [reform]. To the contrary . . . the GOP will in many instances be openly hostile to any element of reform, no matter how innocuous.

FOF ¶ 149.  "Whereas the Democrats are receptive to changing the Party to make it more representative of the populace, Republicans are more concerned with packaging what the Party represents to make it more saleable to the populace."

FOF ¶ 150.  "The different structure of the Parties has different consequences for the fate of activists within it. Since the Democratic Party is composed of groups, the success of individuals whose group identification is highly salient . . . is tied to that of the group as a whole. They succeed as the group succeeds.

FOF ¶ 151.  "That is not the case within the Republican Party. It officially ignores group characteristics. . . . Generally, individuals succeed insofar as the leaders with whom they are connected succeed. . . . Another means of getting access is through sponsorship. If a person who is already accepted passes favorably on someone new it is a lot easier for that person to obtain recognition than if they must make it on their own. Group members who are sponsored by someone who is a leader or connected to a leader will be favored over those who lack such sponsorship."

FOF ¶ 152.  "It has often been noted that Democratic party politics are open, loud, and confrontational, while those of the Republican party are closed, quiet, and consensual. These contrasting characteristics are consequences of the structural and attitudinal differences discussed earlier. They result in different styles of party organization, even though there is a superficial similarity in the formal structure of both parties and they have the same ultimate goal of winning elections.

23

FOF ¶ 153.   "The Republican party sees itself as an organic whole whose parts are interdependent. Republican activists are expected to be 'good soldiers' who respect leadership and whose only important political commitment is to the Republican Party.

FOF ¶ 154.   "Since direction comes from the top, the manner by which one effects policy is by quietly building a consensus among key individuals, and then pleading one's case to the leadership as furthering the basic values of the party.

FOF ¶ 155.   "Maneuvering is OK. Challenging is not.

FOF ¶ 156.   "This approach acknowledges the leadership's right to make final decisions and reassures them that those preferring different policies do not have competing allegiances.

FOF ¶ 157.   "On the other hand, open challenges or admissions of fundamental disagreements indicates that one might be too independent to be a reliable soldier who will always put the interests of the Party first. This cuts off access to the leadership. . . While not risky like an open challenge, quietly building an internal consensus is nonetheless costly of one's political resources.

FOF ¶ 158.   "The national Republican Party has more characteristics of the corporate style and fewer typical of social movements than does the national Democratic Party.

FOF ¶ 159.   "The open confrontations that occur in the Democratic party do not take place within the Republican party, because it is a very different kind of organization. If one were to place the many different forms of collectivities on a spectrum, the Democratic and Republican parties would not occupy the same point.

FOF ¶ 160.   "At one end would be groups exhibiting a great deal of spontaneity that are easy to join and have minimal structure, such as fads and crowds.

FOF ¶ 161.   "At the other would be formal organizations that have well developed divisions of labor, hierarchical layers of authority, are selective in their membership, and are relatively impervious to spontaneous impulses, such as corporations or at the extreme end, military bodies.

FOF ¶ 162.   "In the middle are most social movements, which, however diverse they may be, exhibit both noticeable spontaneity and a describable structure.

FOF ¶ 163.   "Parties and campaigns lie on the more organized end of the spectrum, but because they must mobilize voters, raise money from contributors rather than by selling a product, and recruit volunteers to accomplish their goals, they exhibit many properties of social movements.

FOF ¶ 164.   "Like corporations, or well-established interest groups, Republican party organizations rely heavily on money and professional expertise.

FOF ¶ 165.   "Like social movements and volunteer organizations, Democratic party organizations rely more on donations of time and commitment.

FOF ¶ 166.   "The RNC has had a larger staff for decades, while the DNC has always relied

24

heavily on volunteers to fulfill its functions.

FOF ¶ 167. "Nationally the Republican party supports its larger permanent staff and its numerous services for candidates by raising and spending several times the amount of money that the Democrats do. The attitude toward money raising of the 1950s and 1960s is still true today. The Republican party approaches the problem of national party financing with businesslike matter-of-factness.

FOF ¶ 168. "The Democratic national finance machinery is decentralized, with each committee doing what it damned well pleases. * * * In general, money-raising procedures at the Democratic National Committee remain informal and largely oral.

FOF ¶ 169. "The greater financial resources of the Republican party are somewhat illusory, though their greater centralization is not. The party organizations outspend their Democratic rivals, but Democratic candidates often have more money than Republican ones. (internal quotations omitted).

FOF ¶ 170. "[E]ven if the [Democratic] party [had] the same financial resources it would still be a very different party with a different organizational style. Any organization that is polycentric, pluralistic, and in which power flows upward will require greater attention to internal matters and be more contentious than one which is hierarchical, unitary and in which power flows downward.

FOF ¶ 171. "The latter will be able to use more of its resources for attaining its goals and direct them more efficiently.

FOF ¶ 172. "Nonetheless, it does not follow that the Democratic style lacks any advantages over that of the Republicans.

FOF ¶ 173. "In the short run it appears disruptive, but in the long run it is more stable.

FOF ¶ 174. "Once a consensus develops about the desirability of a particular course of action, whether it be programmatic or procedural, it is accepted as right and proper and is not easily thwarted by party leaders, even when one of them is the president.

FOF ¶ 175. "Except for its core values, the Republican party is more likely to change directions when it changes leaders. If it were to change directions too drastically, it could undermine both its credibility and its programs.

FOF ¶ 176. "After Watergate the Republican Party was very concerned both with rebuilding the Party and with restoring its image.

FOF ¶ 177. "Thus it has placed considerable emphasis on winning elections and on marketing itself.

FOF ¶ 178. "It's response to any public distaste toward its programs is to change their image so as to better sell the Party to the public rather than to change the programs themselves."

FOF ¶ 179. "Different factions of the Republican party are held together by their common ideology, but this is not what holds the party as a whole together.

FOF ¶ 180.    "The fact that the party is not ideologically homogenous is a potential source of fragmentation. Instead the party is held together by social homogeneity.

FOF ¶ 181.    ""Party activists share membership in common social strata, with common rules of behavior and a common definition of who is acceptable. These rules of behavior or acceptability create an informal language and style that is hard for outsiders to learn and thus operates as a barrier to their assimilation. Some aspects of this homogeneity are easily visible.

FOF ¶ 182.    "A crowd of traditional Republicans can be identified by their common dress and their unspoken understanding that someone who dresses differently is not one of them.

FOF ¶ 183.    "A crowd of Democrats cannot be identified by a common appearance; indeed they are so diverse that a few Republicans in their midst would not even be noticed.

FOF ¶ 184.    "While Republicans have much in common, their style and the rules of social acceptability vary somewhat by geography. An "Eastern Establishment" Republican is not the same as a "Midwestern Mainstreet" or "Western conservative" Republican.

FOF ¶ 185.    "Thus an active Republican in one part of the country who relocates can have trouble being accepted as an active Republican in another [region].

FOF ¶ 186.    "Similarly, entire groups seeking to become Republican activists who do not share the common style find acceptance difficult because their presence threatens the social homogeneity that holds the party together."

FOF ¶ 187.    "The greater sense of boundaries that Republicans have, of knowing who's acceptable and who's not, serves an important social function. It facilitates trust. People normally trust those who are like them to think like them and do what they would do. People understand others who are like themselves. Organizations or communities whose members trust each other function more smoothly and take direction more willingly than those where trust is more limited. Republicans trust their party and their leaders to do what they think is right more than Democrats do, because they are socially homogeneous."

FOF ¶ 188.    "* * * the Republican party is not a poor imitation of a normal coalition-building party, but a different type of political organization that does things in different ways. The differences in its political culture have put the Republican party at a disadvantage in its competition with the Democratic party for most of the New Deal era.

FOF ¶ 189.    "The Republican party has drawn upon modern technology to create a highly sophisticated direct mail operation [to] provide resources to campaigns. It also channels money and staff to the state party organizations * * *. However the money is not given away. The RNC analyzes what local party projects can best meet its long-term goals and restricts its largesse to those. Its resources have enabled the RNC to build up the state parties and solidify their loyalty.

FOF ¶ 190.    "Despite its laissez-faire ideology, the Republican party has much more central control than the Democratic party has ever contemplated. A spin-off of its efforts has been the creation of a community of professional political managers who rotate

among state party staff positions, national party staff positions, campaigns, and other political jobs. People in this community generally know each other and rely on their mutual connections through the national party to pro- mote their careers. They have developed a cosmopolitan attitude and a loyalty to the national Republican party greater than to any state organization.

FOF ¶ 191.    "This in turn makes those in this community who are in state staff jobs more amenable to national party direction. As this community becomes self-sustaining, the strings the national party attaches to its state aid become less important, because the state staffs in effect become agents of the national party.

FOF ¶ 192.    "The Republican Party's concern with exclusive loyalty is partially a consequence of its having been a minority party for so long. To a limited extent it exhibits [a] 'siege mentality.' . . . When the leadership puts its stamp of approval on a particular position, public criticism must cease.

FOF ¶ 193.    "The glue which holds the Democratic Party together is pluralism.

FOF ¶ 194.    "The Republican strategy for renewal is more expensive but less problematical. As students of social movements know, individual recruiting is more costly than bloc recruiting. The latter can utilize preexisting networks of like-minded people, who reinforce each others' changing beliefs. Individual recruiting requires a heavy expenditure of time and energy both to get and keep each recruit. * * * It has invested a great deal of money in developing mailing lists of potential contributors of money and votes. However, impersonal recruitment is most effective when what is wanted is not actual participation but superficial indexes of support such as money and voting. That is currently what the party wants from its followers.

FOF ¶ 195.    "However, the Republican party will face problems should its new recruits want to do more than just contribute money and votes. The social homogeneity of the party's primary base has served as a barrier to full participation by people from other social strata.

FOF ¶ 196.    "Although the Republican Party relies heavily on raising money to pay for media and professional expertise it still needs to recruit volunteers. It seeks to do this on a one-to-one basis rather than through groups [however] individual recruiting is more difficult than bloc recruiting. . . [The GOP is unable to respond when] its new recruits want to do more than contribute money and vote.

FOF ¶ 197.    "Should the Republican party [ ] becom[e] the majority party it will attract many newcomers, including organized groups who have not previously thought it worth their time to join.

FOF ¶ 198.    "It will discover that the price of success is that everyone wants a share, even when they have not made a contribution. Coping with increased demands, rapid expansion, and inadequate assimilation has destroyed many developing organizations.

FOF ¶ 199.    "Styles and approaches to problems that are compatible with being a minority faction or underdog are not appropriate to being a majority party.

**§ 19. Nationalization of the Political Parties (¶¶ 200-203).**

27

FOF ¶ 200.    Traditionally, parties were a two-tier system. William Dean Burnham, *Critical Elections and Mainsprings of American Parties* (1970); Everett C. Ladd and Charles D. Hadley, *Transformation of the American Party System*, 281 (1978).

FOF ¶ 201.    This however, has changed, White and Shea, *supra* at 87-88, when former U.S. Senator William Brock (R-TN) defeated for re-election by then U.S. Rep. (later Vice President and 2000 Democratic Presidential nominee) Albert Gore, Jr. (D-TN) in 1974, was named RNC Chairman.

FOF ¶ 202.    "Brock opted to centralize power within the RNC [by] aggressive fund-raising, organizational improvements, better candidate recruitment, and changing the party's image. . . Brock also revamped the organizational structure of the national committee by installing fifteen regional directors . . . providing regional finance directors to help raise money... and sending one organizational expert to help each state committee. Brock also initiated a program by whereby state and local party organizations could use RNC-owned equipment and technologies at a minimal cost. A massive computer network allowed the state and local parties to download a variety of software programs . . .Brock reconfigured the RNC to meet the demands of modern-day campaigns [with] Information Age tools." *Id.*, at 87-88.

FOF ¶ 203.    "While national committee members certainly play a role in communications between the two levels of party (and under the rules of some state parties are ex officio state officers), the state party chair is the principal link between the state and national parties [with t]he degree of involvement in national committee affairs (membership or leadership roles on major committees are the most frequent activity references." Robert J. Huckshorn, James L. Gibson, Cornelius P. Cotter and John F. Bibby, *Party Integration and Party Organizational Strength*, The Journal of Politics, Vol. 48 976, 978 (1986).

### § 20. Professionalism of Super Agents and Party Elites (¶¶ 204-205).

FOF ¶ 204.    "A spin off of [the RNC efforts to centralize party control] has been the creation of a community of professional political managers who rotate among state party staff positions, national party staff positions, campaigns and other political jobs. People in this community generally know each other and rely on their mutual connections through the national party to promote their careers. They have developed a cosmopolitan attitude and a loyalty to the national Republican Party greater than to any state organization." Freeman, *supra,* at 354.

FOF ¶ 205.    Professor Conway, who has conducted extensive academic research on the GOP, concurs, finding these professionals "loyalty and allegiance is greater to the RNC than to state parties. M. Margaret Conway, *Republican Political Party Nationalization, Campaign Activities, and Their Implications For the Party System,* Pubilus, The Journal of Federalism, Vol, 13, No. 1 (Winter 1983).

### § 21. Super Agents Interests Depart from Party Members (¶¶ 206-214).

FOF ¶ 206.    White and Shea, *supra* at 193-194, citing James Q. Wilson, *The Amateur Democrat: Club Politics in Three Cities* 1-4 (1962) find that this new cadre of party professionals "winning elections mattered most" as compared to body civic of political "amateurs" who seek to achieve ideological goals. See also John W. Soule and James W. Clarke, Amateurs and Professionals: A Case Study of Delegates to the

1968 Democratic National Convention AMERICAN POLITICAL SCIENCE REVIEW Vol 64 (Sept. 1970) pp 888-898; Anne N. Contain, *Changes in the Role of Ideology in American National Conventions and Among Party Identifiers*, WESTERN POLITICAL QUARTERLY, 33 (March 1980) 73-86.

FOF ¶ 207.   Professor Epstein writes: "The Republican contributors seem only to support, not control, a professionalized staff . . . In practice, the staff . . . may itself be a substantial policymaking influence in the manner of other established professional bureaucracies. The staff members can thus be important elements of the "generally well-insulated party elites" which, in Professor Charles H. Longley's words, characterize the new Republican national model in contract to a projected Democratic model for mass participation. The fact that the Republican model is like that of most durably successful nonparty political organizations suggests to me, as it has to Xandra Kayden, The Nationalization of the Party System, Michael J. Malbin, ed. *Parties, Interest Groups and Campaign Finance Laws*, (1980) p. 263, that it "appears to be representative" [of] centralization of party activity and the technical professionalization of that activity." *See also* Xandra Kayden, *The New Professionalism of the Oldest Party*, 229-236, Public Opinion 8 (June/July 1985) at pp. 229-236." Leon Epstein, *Political Parties in the American Mold* 236-237 (1986).

FOF ¶ 208.   Conway concurs. The power such cadre of professional exert is great, as "candidates must agree to conduct their campaign in the manner required by [RNC] or resources are withheld." *Id.* at 14.

FOF ¶ 209.   Esptein argues that the GOP wants to be "contemporary derivative of the classical cadre party mode. Unlike the Democratic mass-party mode, the new Republican Party ... generally well-insultate[s] party elites." citing Charles H. Longley, National Party Renewal, in Gerald Pomper, ed. *Party Renewal* in America: Theory and Practice , 6986, 83-84. (1980)." *Id.* at 216.

FOF ¶ 210.   "[Political] Agents do have costs, however. They seldom work for free, they require continuing supervision, and, worst of all, they often serve themselves at the expense of their principals. This last cost, called "shirking" or "self-dealing" by economists, occurs when agents either ignore or actually act contrary to the interests of their principals." Samuel Issacharoff and Daniel R. Ortiz, *Governing Through Intermediaries*, 85 Va. L. Rev. 1627, 1637 (1999).

FOF ¶ 211.   "[Political s]uperagents, just like the primary agents they supervise, can shirk. They too have interests that diverge from their principals' and will be tempted to pursue them. Theirs is, moreover, a particularly dangerous form of shirking. When they shirk, they may take all the primary agents with them. They threaten to commandeer the principals' own primary agents to work for them at the principals' expense.

FOF ¶ 212.   "The danger, then, is that, instead of solving the problem of primary agent shirking, superagents may merely add another problem to it: that of primary agents following false principals. The more effectively superagents supervise primary agents, the more help and danger the superagents offer to the principals. Here, the added danger of what may be termed superagent self-serving behavior rises to the fore. Political parties, for example, provide many helpful services to voters. They help voters understand where candidates stand and serve to discipline those candidates once elected. Parties also have their own interests, however. *Id.* at 1652.

29

FOF ¶ 213.    Our observation of Republican staff, including the chief and assistant chief counsels are that they are so detached from and therefore hold themselves not to be accountable to the RNC Members (the institutional entity) that they can be best described as the *Republican Curia*.

FOF ¶ 214.    The RNC Chairman is in all respects, a mere figurehead of the national Republican structure, and although some chairmen have attempted to formulate policy, most, such as Reince Preibus, simply concentrating on raising funds to feed the Frankenstein that is the Republican Curia.

### § 22. The March 18, 2013 *Growth and Opportunity Project* Report (¶¶ 215-282).

FOF ¶ 215.    Further evidence of the RNC's nationalization of the Republican Party is exhibited in the *Growth and Opportunity Project* Report issued March 18, 2013 after Romney's defeat by President Obama, as ordered by then RNC Chairman Reince Preibus, who took over as chairman after former MD Lt. Gov. Michael Steele was forced to resign. Pertinent parts of the *Growth and Opportunity Project* follows:

FOF ¶ 216.    "The GOP today is a tale of two parties. One of them, the gubernatorial wing, is growing and successful. The other, the federal wing, is increasingly marginalizing itself, and unless changes are made, it will be increasingly difficult for Republicans to win another presidential election in the near future.

FOF ¶ 217.    "Republicans have lost the popular vote in five of the last six presidential elections. [It is now six of the last seven presidential races, as Trump lost the popular vote]. States in which our presidential candidates used to win, such as New Mexico, Colorado, Nevada, Iowa, Ohio, New Hampshire, Virginia, and Florida, are increasingly voting Democratic. We are losing in too many places.

FOF ¶ 218.    "It has reached the point where in the past six presidential elections, four have gone to the Democratic nominee, at an average yield of 327 electoral votes to 211 for the Republican. During the preceding two decades, from 1968 to 1988, Republicans won five out of six elections, averaging 417 electoral votes to Democrats' 113.

FOF ¶ 219.    "Public perception of the Party is at record lows. Young voters are increasingly rolling their eyes at what the Party represents, and many minorities wrongly think that Republicans do not like them or want them in the country. When someone rolls their eyes at us, they are not likely to open their ears to us.

FOF ¶ 220.    "At the federal level, much of what Republicans are doing is not working beyond the core constituencies that make up the Party. On the state level, however, it is a different story. Republicans hold governorships in 30 states with 315 electoral votes, the most governors either party has had in 12 years, and four short of the all-time GOP high of 34 governors who served in the 1920s.

FOF ¶ 221.    In the chapter entitled "Campaign Mechanics" pertinent parts of the *Growth and Opportunity Project* are as follows:

FOF ¶ 222.    "The Campaign Mechanics subgroup of the *Growth and Opportunity* project conducted significant research to gain insight and to make recommendations with the single purpose of electing more Republican candidates at all levels. We spoke directly with hundreds of practitioners at every level of the Party and presidential,

statewide, congressional, and legislative races to seek their input on voter files, voter contact, data, digital communications and technology, absentee and early voting, survey research/polling, and media placement and buying, among other areas.

FOF ¶ 223.    *But the Report indicates no communications with elected precinct party representatives.*

FOF ¶ 224.    "In addition, we conducted online surveys of both professional campaign and Party staffers and strategists and GOP pollsters regarding campaign mechanics. Survey summaries and additional data have been provided to Chairman Preibus and RNC staff.

FOF ¶ 225.    *But again the Report indicates no communications with elected precinct party representatives.*

FOF ¶ 226.    "Some of the recommendations listed apply directly to the RNC, state parties, and other Party committees (NRCC, RSLC, NRSC, and RGA). Others will require RNC leadership working with outside entities and supporters.

FOF ¶ 227.    "First and foremost, with respect to campaign mechanics, there was general consensus and concern about the quality of our voter contacts in comparison to our competition. Despite reaching more voters than ever before through traditional forms of voter contact, we lost. Our conversion rates from contact to votes are a serious challenge for future campaigns and the 2016 presidential race. And volunteer contact has to be used not only to identify voters but also to persuade them to support our candidates.

FOF ¶ 228.    "Democrats had the clear edge on new media and ground game, in terms of both reach and effectiveness. Obama's campaign knocked on twice as many doors as the Romney campaign, and Obama's campaign had a ballot edge among those contacted by both campaigns.

FOF ¶ 229.    "In addition, the president's campaign significantly changed the makeup of the national electorate and identified, persuaded, and turned out low-propensity voters by unleashing a barrage of human and technological resources previously unseen in a presidential contest. Marrying grassroots politics with technology and analytics, they successfully contacted, persuaded and turned out their margin of victory. There are many lessons to be learned from their efforts, particularly with respect to voter contact.

FOF ¶ 230.    "Another consistent theme that emerged from our conversations related to mechanics is the immediate need for the RNC and Republicans to foster what has been referred to as an "environment of intellectual curiosity" and a "culture of data and learning," and the RNC must lead this effort.

FOF ¶ 231.    "We need to be much more purposeful and expansive in our use of research and more sophisticated in how we employ data across all campaign and Party functions. No longer can campaign activities be compartmentalized or "siloed" in a way that makes sharing resources and knowledge less efficient.

FOF ¶ 232.    "To that point, greater collaboration and sharing of information is critical. Republicans do not do this very well, but we must if we intend to compete with

Democrats who have naturally embraced a more collective approach. Doing so has allowed them to assemble more complete and detailed snapshots of voters — what motivates them and how to better reach them in a way that actually results in votes.

FOF ¶ 233.    "The RNC must take the lead in developing an environment in which information is shared and GOP entities work together to ensure greater communication.

FOF ¶ 234.    "Use of data and measurement is critical in this process — determining how best to message, target voters through paid and volunteer turnout efforts, and raise funds. And we need candidates, managers, Party operatives, communications professionals, fundraisers and strategists who understand and are willing to employ data in decisionmaking at every level. We must also test messaging and voter contact throughout the election process to determine what methods and messages are most effective in converting contacts to votes. Whether we are fundraising online or using volunteer phone scripts or developing television advertising, we need to know what language is most likely to motivate a voter and convert them into a vote for Republican candidates. Republican campaigns in the future need to be grounded in rigorous testing and trial-and-error processes to ensure our strategies, messages and tactics are effective in persuading voters. We cannot leave anything to intuition, gut instincts or "traditional" ways of doing things. Modern technology gives us the ability to run pretests on just about everything a campaign does in terms of contacting a voter. We should pressure test our assumptions before allowing them to drive our campaigns.

FOF ¶ 235.    "A commitment to greater technology and digital resources in all areas referenced above is critical. These are not stand-alone functions but tools that must be used to improve the quality and effectiveness of our voter contact. Much has been written about the Democrats' advantage in this area. *The need to integrate these functions across all levels of both the national Party structure and national campaigns is clear.* Related to this concern was a strong belief that we must develop a deeper talent pool that understands and can deploy data and technology/digital campaigning in decisionmaking processes and targeting efforts. More active recruiting on college campuses, providing internships and scholarships, and recruiting from commercial firms that may harbor talent with relevant skills sets is critical in providing the talent for future campaigns. The RNC should strive to establish working relationships and open lines of communication with thought leaders in Silicon Valley to ensure the Party is at the forefront of new developments and trends in digital technology. The Party can and should play an important role in building bridges between its digital operatives and the best minds in the Valley and elsewhere. *And we must make an earlier commitment to field operations and ground game than we have made in the past to ensure a year round, election -cycle -to- election -cycle presence that can improve the quality of our voter contact. Growth and Opportunity Project* at p. 25. (Emphasis added).

FOF ¶ 236.    "All of these areas of focus will require a reprioritization of resources through not only the RNC budget *but also the budgets of the other national party committees, state parties, campaigns, allied groups, and Super PACs.* But this is critical in order for us to move forward." *Growth and Opportunity Project* at p. 25 (Emphasis added).

FOF ¶ 237.    *Again, as noted by the text in italics, the RNC's entire focus is on increasing the nationalization of the party.* At no time does the *Growth and Opportunity Project* mention providing political technology to county and local Republican committees.

32

The RNC observations in the *Growth and Opportunity Project* Report stops at the State Party Committees.

FOF ¶ 238.  The RNC *Growth and Opportunity Project* Report's first recommendation is entitled "Generating Better Data." The pertinent parts follows:

FOF ¶ 239.  "To win campaigns, the GOP needs better data, better access to data, and better tools to make the most of that data. Although the RNC has always made significant investment in data, there is significant remaining work to do to ensure that our data is the best it can be.

FOF ¶ 240.  "First, the GOP needs every available data asset at its disposal. New sources of data must be identified, additional data enhancements must be purchased, and all data must be compiled as frequently as possible, including in real time.

FOF ¶ 241.  "In addition, better integration of data is needed to support more efficient campaigns. Voter and volunteer data, fundraising and donor data, digital data, consumer data, and media habits must be better integrated to better understand voter habits and behavior. Data must not be allowed to exist in "silos." To facilitate better access to data, a robust data platform is needed. The data platform must be accessible for analysis and reporting and available to interact with web and mobile applications. Application programming interfaces (APIs) should be open to Republican candidates, state and national committees, friendly third-party organizations, and supporting vendors/ consultants/ developers in primary and general elections. These APIs should facilitate more user interfaces (UI) to address all manner of campaign function and level of sophistication including file selections, modeling and analysis, and the feedback of touch-point and response to marketing initiatives. As an inducement to marketing and technical innovation, the platform should allow vendors/users to share insights and applications for free and for profit. The data should be secured by agreements with data contributors and users and strict permission-based access. Data exchange agreements and other legal mechanisms must be in place to ensure the strict legality of this effort. With such a platform, GOP users will have access to advance information and intelligent technology without significant financial burden and with the assurance that valuable proprietary information of the GOP will not be misused.

FOF ¶ 242.  "According to our survey of GOP professionals in an open-end question, better data management, and an enhanced voter file were the second most prevalent theme in answers, with 31 percent of responders commenting on it.

FOF ¶ 243.  "In an effort to provide more data at a lower cost during the 2012 election cycle, the RNC entered into a list exchange agreement with Data Trust. Although it is the preference of the task force that the RNC continue its relationship with Data Trust, if Data Trust is not capable of rising to the new data challenges we face, other partners should be identified.

FOF ¶ 244.  "The commitment of Democrats to make significant investment in data and data platforms extends back eight years to the 2004 cycle. This effort is expensive and labor-intensive, but we must make this a priority in order to be competitive on data going forward. And although the RNC tracked early and absentee votes in real time during the 2012 cycle, we must improve on not only tracking these votes in real time, but also developing a strategy to win in every state instead of assuming we will make

up the ground on Election Day."

FOF ¶ 245.    The chapter's recommendations included the following:

FOF ¶ 246.    "Support the creation of a new data platform accessible (through rentals, subscriptions, licenses or data exchange agreements) to all qualified Republican organizations and campaigns, approved vendors and research organizations for data enhancement, analytics and application development. To facilitate better access to data, advanced open-source access must be in place to make it easy to receive data, contribute data, and see the benefits in real time.

FOF ¶ 247.    In Chapter 7, entitled "Training Campaign Managers and State Party Staff in the Use of Data" the *Growth and Opportunity Project* makes absolutely no mention of county and local GOP committees or the fact that elected precinct party committee people are the "boots on the ground" who most require data for voter outreach.

FOF ¶ 248.    In Chapter 8, entitled "Investment in Field Operations" the Report provides: "There is a strong consensus that we have not invested the financial resources in a labor pool that can actively conduct and run "in-person" contact at the ground level. The Obama campaign budgeted its spending to ensure the most personal forms of voter contact were a priority. But they went beyond this. They gave volunteers and field staff flexibility in implementation and creativity in decision-making to get the most out of their field teams. And they acted based on information they received from volunteers through their voter contact operation. We need to write campaign plans that reflect an increased presence of field staff in states starting much earlier than we have done in the past.

FOF ¶ 249.    For its Recommendation, the *Growth and Opportunity Project* states:

FOF ¶ 250.    "By June 15, 2013, make an investment in field staff beyond traditional battleground states and make an earlier commitment to building the field team in all state operations. It is essential for the Party to grow the playing field. There are too few existing paths to 270 electoral votes for our presidential nominee under current trend lines. We need to aggressively work to put more states in play where we have infrastructure advantages over the Democrats based on our foothold in the governorships. And this requires an early commitment to building the team."

FOF ¶ 251.    Again, the *Growth and Opportunity Project* Report makes no observation, let alone acknowledgment of county and local Republican Committees or elected precinct party representatives.

FOF ¶ 252.    Chapter 9 of the *Growth and Opportunity Project* is entitled "Voter Contact." It's pertinent part is as follows:

FOF ¶ 253.    "The use of highly targeted and personal voter contact based on data was an area where the Obama campaign clearly excelled in 2012. Despite the GOP expanding voter contact significantly over the previous election cycles (more than 2.5 times more volunteer voter contacts — 65 million — occurred in 2012 than in 2004 and 2008 combined), we did not see the conversion rates necessary to turn contacts into votes at a level that could have driven the outcome of the election our way. And we are facing a very real deficit between our vote goals and the number of known GOP supporters.

34

FOF ¶ 254.   "We need to better understand the role that peer-to-peer contact has in improving direct political communication, and we need to test every form of political communication and contact that we employ. We need to look at our methods of contact and test each — mail, phones, door-to-door, and digital efforts, and fund raising appeals — to determine what provides the best quality of contact and most likely conversion to actual votes."

FOF ¶ 255.   *Again, the Report omits any reference to precinct committee people, as if non-existent*, despite referring to door-to-door efforts.

FOF ¶ 256.   The *Growth and Opportunity Project* Chapter 9 recommendations are as follows: "The RNC Political Division, working with other committees, state parties, and new GOP data analytics entities should conduct tests of paid mail, phone and volunteer phones, digital and personal "in person" voter contact in target areas during the 2013 cycle to determine most effective messaging, contact and conversion to votes.

FOF ¶ 257.   Potential tests include messaging/paid media tests as to whether targeted media buys are more impactful and at what GRP level does an ad reach its maximum impact. "In person" contact should be tested vs. "personal" contact (volunteer phone calls; live phone calls).

FOF ¶ 258.   Also, tests should be conducted on not only advocacy but actual interaction with voters.

FOF ¶ 259.   The Obama campaign asked voters what they needed to make their decision; information was then provided to volunteers and relayed to the same voters. Additionally, "72-Hour Project" tests conducted in Virginia and New Jersey in 2001 could be revisited, strengthened, and retested.

FOF ¶ 260.   "Where possible, the RNC should encourage and support the hiring of locals who are known to be active in a particular area for participation in field operations. * * * It is important for the RNC to strive to cultivate a roster of field operatives who are from the battleground states and/or well-versed in the unique politics and culture of each one."

FOF ¶ 261.   *Again, this is an astonishing statement about "hiring locals" again, as if precinct committee people do not exist.*

FOF ¶ 262.   In Chapter 10 regarding Voter Registration the *Growth and Opportunity Project* makes the following recommendations:

FOF ¶ 263.   "The RNC Political Division working with state parties should set target registration goals and identify target groups and locations for a registration program, and registration volunteers and drives should be identified and implemented quarterly. These drives could focus on issue areas and target opportunities like gun shows, naturalization services, church fellowship opportunities, and so on.

FOF ¶ 264.   "State parties should create a specific program for follow-up with new registrants. One thing we learned during our 72-hour program testing is to treat a newly registered voter uniquely, making certain they know their polling location and how to vote early or absentee.

FOF ¶ 265.   In Chapter 13, entitled "State Parties" the *Growth and Opportunity Project* again totally fails to mention county and local party committees as if 365,858 precinct committee people don't exist.

FOF ¶ 266.   This is evident by Recommendation No. 5: "The RNC should work with state parties to find new ways to recruit and motivate our volunteers. We need to establish programs that incentivize and reward volunteers for their work in multiple areas. And we need to provide them with better tools to assist in their efforts and ensure that they know we value their importance. They are a critical path to our success. We cannot contact and persuade voters without them."

FOF ¶ 267.   In the Part dealing with Third Party entities, the *Growth and Opportunity Project* makes a recommendation entitled "Bottom-Up, Not Top-Down" which provides the first of two acknowledgments of the existence of precinct committee people.

FOF ¶ 268.   "With regard to organization, the RNC, campaigns and our friends and allies have become too Washington-centric and top-down oriented. *The best campaigns and organizations hire senior people and empower them at the state and local level*. We need to grow the Republican Party from the ground up, not from the top down. This grassroots plan must be hinged with our political and social media plan. *Growth and Opportunity Project* Report at page 50.

FOF ¶ 269.   "The RNC must hire seasoned Regional Political Directors and field finance directors to help state parties and campaigns win from the precinct level up. We need a lot more of the Evelyn McPhail grassroots approach to politics. As the committee was told by a participant during a listening session in North Carolina, "Make the precinct captain the most important person in a campaign." While the 72-hour program was incredibly effective during the Bush 43 years, we need to recruit significant local volunteers, rather than shipping in outsiders to do fieldwork. This should be a neighbor-to neighbor effort, and non-party organizations with local ties and knowledge can play a key role." *Growth and Opportunity Project* Report at page 50-51.

FOF ¶ 270.   Yet despite such acknowledgment, the *Growth and Opportunity Project* focuses more on volunteers from the Tea Party than county and local party committees.

FOF ¶ 271.   This total absence of recognition of elected precinct party representatives continues in Chapter 9 entitled "Training and Ground Game" as follows:

FOF ¶ 272.   "In our discussions with our friends, allies, and state parties, it's clear that voter registration efforts are struggling. The answer is not to punt. While county and state parties must lead on party-building activities such as voter registration, we urge a bottom-up approach to voter registration, and our friends and allies need to be willing to invest smartly. Cluster voting is a good tool for 501(c) (4) groups where we have a high percentage of conservative voters in a certain area.

FOF ¶ 273.   "There can be testing of various approaches, but oftentimes the best answers are the old ways of setting up voter registration tables at targeted grocery stores in red neighborhoods. Again, make your precinct captains your most important people and empower them to get real people to register people one person at a time. It's not sexy, but it works. It also works to target voter registration to issue areas such as Second Amendment rights, restrictions on prayer, etc. This is an area where key

friends and allies can play a significant role in voter registration and complement the Party's efforts.

FOF ¶ 274.   *This is the first and only positive statement regarding "precinct captains" apparently a reference to elected precinct party representatives.*

FOF ¶ 275.   "More and better training is a consistent theme in this report. It is critical that we train and empower volunteers who share our core principles. This is needed at the local level, and our friends and allies should aggressively develop training opportunities throughout the country; state parties should do the same. Certainly, the RNC and interested friends and allies should have this on their list of nuts-and-bolts organizing that needs tending and planning.

FOF ¶ 276.   "It sounds simple, but if campaigns, state parties, and our friends and allies don't know how to reach potential voters and volunteers, we have a problem. Well, we have a problem. Too often, our lists do not have cell phone numbers, email addresses or social media handles. We cannot function if we cannot reach people. Friends and allies should invest in getting cell phone numbers added to the voter file. There is the old fashioned approach of doing it by asking our precinct captains to help get cell phone numbers for voters in their neighborhoods. Most schools, churches, civic organizations, etc., have lists of names with email and cell phone numbers. Give local volunteers a job to do and they will do it. This is not glamorous work, but it's necessary. Again, state parties must lead in this area, but our friends and allied groups can augment their efforts. Party organizations and campaigns can buy these lists inexpensively and engage in list exchange agreements with groups that may have uses for voter file information." *Growth and Opportunity Project* at p. 52.

FOF ¶ 277.   This is only the second time that elected precinct party committee people are acknowledged, but is condemned as "old fashioned." The final recommendation Chapter 9 is "Our friends and allies should augment the effort of state parties to include cell phones and email addresses in the voter file." *Growth and Opportunity Project* at p. 52.

FOF ¶ 278.   The *Growth and Opportunity Project* Report continues its ignoring county and local political parties in the Fund-Raising part of the report by requiring "volunteers" to report only to the State Party Committees in regard to "Low-Dollar Fund Raising. *Growth and Opportunity Project* at p. 57.

FOF ¶ 279.   The Report likewise omits any reference to Levin Fund Campaign fund raising. *Growth and Opportunity Project* at p. 58.

FOF ¶ 280.   The report emphasizes that "After all, state parties are the bread and butter of our grassroots-oriented political system." *Growth and Opportunity Project* at p. 67. This assertion obviously loses account of county and local party committees, particularly in New England, Mid-Atlantic, Mid-West and Great Plains states.

FOF ¶ 281.   The relative autonomy of county party committees, be they Democratic or Republican are more prevalent in states which are not ethnically or social-economically homogeneous, such as Massachusetts, Illinois, New York or Pennsylvania. Prominence of county party committees of both parties are also more readily apparent in states which have distinguishing urban metropolitan areas with suburban collars. Additionally, New England states place emphasis not on counties,

37

which in Massachusetts and Rhode Island, for example, are virtually non-existent, the emphasis is on towns, which make them even more autonomous.

FOF ¶ 282.   The *Growth and Opportunity Project* authors, led by Mississippi's Haley Barbour, being more involved in the Washington-centric environment that is the RNC, would not necessarily be cognizant of the considerable variants found throughout states. Pennsylvania, for example, this author's home state, is so municipal-centric, that a major Local Government provision written into the 1968 State Constitution candidly acknowledged this attribute. The PA Supreme Court long ago acknowledged the Balkanized nature of Pennsylvania's 67 counties. See *Laffey v. Cumberland County Court of Common Pleas*, 503 Pa. 103, 108, 468 A.2d 1084, 1087 (1983) citing *Diamond Anniversary History of the Pennsylvania Bar Association*,42 PA.B.A.Q.130, 131 (1971).

### § 23. How RNC Violates Civil Rights Act with "Voter Data" (¶¶ 283-291).

FOF ¶ 283.   The efforts of the national party committees to control political technology is best summed by one commentator: "Here's why data ownership is a big deal. To paraphrase the geographer Halford Mackinder: Who controls the data controls the candidates; who controls the candidates controls the party." Brian Fung, What it Really Means to 'Close the GOP Tech Gap, *New Republic*, as quoted by Thomas B. Edsall, "In Data We Trust," *New York Times* (May 8, 2013).  The following article "Midterm elections: How politicians know exactly how you're going to vote. Here's what happens to your information after you fill out a voter registration form" from the *Atlantic* posted November 5, 2018 provides the background of political technology to lay people:

"It's scary how much each candidate in the upcoming midterm elections knows about you. And it's all information you've willingly given up over time.

"The trove of data goes beyond voter registration information like your name, home address and date of birth. Thanks to an army of data crunchers who marry that information with data you drop at a clothing or automobile site, many candidates often have intimate knowledge of who you are and whether you're likely to support them.

"The increasingly effective use of big data to create targeted political ads is one of the main causes for the climbing costs of running a campaign. Spending on this year's midterms is about to pass $5 billion, making it a billion dollars more expensive than the 2016 presidential election, according to the Center for Responsive Politics.

"The political-data industry has raked in millions of dollars selling voter information to campaigns and political organizations, and this year's races signal continued big business. And it's a largely unregulated industry.

"Facebook's data scandal involving consultancy Cambridge Analytica shed light on how companies can take personal information we give away and transform it into highly effective targeted ads. Data was used to help sway the 2016 US presidential elections, one of the most dramatic examples of a practice that's been around for much longer.

"While you may be aware your data is being used, you might not know the full extent of the process. So we dug in to find out how data goes from your voter registration form to data brokers and back to you in the form of a political ad.

"You start giving away personal information when you register to vote.

"That information is added to a database each state keeps, thanks to the Help America Vote Act. The legislation required states to maintain centralized, computerized voter registration databases to help election administrations keep track of eligible voters.

"In some states, the information can be obtained free. Other states charge, with fees ranging from $2.50 in Arkansas to $30,250 in Alabama. The data includes, at a minimum, your full name, address, voting history and jurisdiction. Some states, such as Florida and Texas, include more information, like date of birth, phone number or race.

"All states allow access to voter data for election purposes, which usually lets political campaigns request voter files from state authorities. Companies can also request the information, if it's being used for political purposes.

"Campaign software companies, like NationBuilder, turn to state offices to keep their voter files updated.

""NationBuilder works with state offices [secretaries of state] across the country to acquire each file, standardize the data for easy use for all those running for office and regularly update the information to include current voter registration and recent elections,' Sorcha Rochford, an enterprise account manager at NationBuilder, said in an emailed statement.

"The rules differ when it comes to uses of voter data for purposes other than elections. California, New York, Nebraska and others have specific laws limiting who can access the data and what it can be used for. Many states don't allow commercial use of voter information. Vermont specifically prohibits sharing voter data with foreign governments and agencies.

"However, Alabama, Alaska, Florida and some others have no restrictions. Anyone can request the data for any purpose. In the hands of data brokers

"Voter information alone, however, isn't that helpful. That's where data brokers come in.

"You've probably heard of the term Big Data, the ability to make sense of huge amounts of data. Data brokers do that when they link your voter information to information you've submitted on retail sites. That isn't hard, because the personal information you provide for voter registration is likely the same as what you give to online merchants. This enables data brokers to match your purchases, your house and your car to you.

"Consumer data comprises all sorts of odds and ends of varied importance, including property ownership, marital status, wealth and income, all of which provide a high-level picture of you. It can also include magazine subscriptions,

club memberships and other granular information that gives a sense of your interests.

"'When we interact with any entities online, they keep logs of our trails,' said Augustin Chaintreau, a computer science professor at Columbia University. 'If you visit a site that sells shoes, and then you see similar shoes on another site -- that information is shared between firms.'

Companies can also identify you by tracking the browser you use, according to Chaintreau.

**Data companies also need to make sure their voter data is as current as possible.**

"Aristotle, a data mining firm founded by John and Dean Aristotle Phillips in 1983, uses phone and utility records to verify when someone moves from one jurisdiction to another. That helps campaigns engage with new residents, Aristotle representatives said during a public webinar hosted on Oct. 3. Aristotle also flags swing voters, tracks specific registered voters to see if they actually voted, and tells campaigns which voter is more likely to pick up the phone.

"The next step is to take all that voter and consumer information and combine it with data gleaned from surveys that are often sent to your smartphone.

"PredictWise, a political data analytics startup, is building a database that collects more than 25,000 responses to smartphone surveys every month. On top of buying up credit card and spending data, it partners with device engagement companies, such as Pollfish, that administer in-app surveys to randomly selected groups of app users, often based on age ranges. That's what those survey pop-ups you get on your phone are.

"'We're literally tracking 250 million Americans,' said Tobias Konitzer, co-founder of PredictWise. 'We use voter data to give us details on an individual level.'

"Pollfish partners with more than 150,000 app makers, and the company can target people with specific apps like Amazon and Facebook, according to Michael Harbolt, vice president of marketing at Pollfish.

"'With pollsters, we accurately predicted Brexit, the 2016 election and the winners of the last three special elections,' Harbolt said.

"Device engagement companies can reach millions of Americans every day, says PredictWise's Konitzer, who uses the results to build a profile of you.

"For example, those companies can estimate your level of education by looking at what kind of phone apps you use. If you have newspaper apps like The Wall Street Journal and The New York Times, you're probably educated. At the other end of the spectrum are users who only have apps like Candy Crush Saga.

The companies didn't detail how they know which apps are on your phone.

40

They also scrape data from social networks, like Facebook.

**Campaigns use this information to figure out where you likely stand on any given issue.**

For example, i360, a firm owned by the Koch brothers, has a tool called Issue Cluster Model. Based on voter records and on consumer and social data, it generates a score that rates an individual's likelihood to support or oppose an issue, such as taxes or gun control. i360 didn't respond to a request for comment.

"Once your personal information is crunched, hundreds of political entities, including local, state and federal campaigns, buy it from the data brokers and campaign software firms.

"*It takes a lot of money to run data-driven campaigns, so that favors rich candidates*,' said Colin Bennett, a politics and privacy expert and professor at the University of Victoria in Canada. *That can be problematic, he says, if politicians use the data to simply parrot what voters want to hear*. (Emphasis added).

"During the 2017-18 election cycle, i360 raked in $3.4 million from campaigns, according to Federal Election Commission records obtained by Open Secrets, a nonprofit and nonpartisan group that tracks the effect of money and lobbying on elections and public policy.

"Some of i360's bigger clients include the Republican Party of Massachusetts, the campaign of Mississippi Sen. Roger Wicker and Arizona Grassroots Action, a Republican PAC, according to Open Secrets.

"Aristotle received over $3 million, with top clients like the campaigns of California Rep. Devin Nunes and New York Rep. Eliot Engel, as well as Argentum Silver PAC, a nonpartisan organization promoting issues for seniors.

"NationBuilder received more than $1 million, from political entities including Donald J. Trump for President, Prosperity Action and the Republican Party of Tennessee. That personal touch

"The ultimate purpose of collecting and analyzing big data is to advertise the right political message to the right voters. So all of that information comes back to you in the form of social media and TV ads, phone calls or a knock on the door.

"For example, i360 partners with social media and technology companies to deliver tailored ads to individuals, according to its website. It also partners with D2 Media Sales, a joint venture between DirectTV and Dish, to push TV ads to specific households that meet a candidate's criteria "no matter which stations or programs they're watching." This means some audiences see a specifically tailored political message. D2 Media Sales, DirectTV and Dish didn't respond to requests for comment.

"Besides targeted advertising, i360 offers Walk, an app that directs door-to-door campaign volunteers in real time, letting them see who lives in a specific house and what household information is available about the residents.

41

"The data firm also offers tools to help political campaigns make robocalls and send text messages. In addition, it can target specific users on Facebook.

"Alan Mislove, a professor at Northeastern University, found that you can target a specific individual for an ad.

"Advertisers can upload a list of 15 different fields on Facebook's advertising platform -- phone number, name, date of birth, address and more -- and the social network then matches that information against its user base of more than 2 billion people. If your information matches, you become part of that audience,' Mislove said. Facebook will tell advertisers how many users they've matched, but it doesn't provide those users' names, he said.

"A Facebook spokesperson confirmed that campaigns can upload their lists of targeted voters and show the ad specifically to them. He also said you can delete the contact information you've uploaded, and that Facebook is reviewing how it uses contact information for ads.

On Monday [November 5, 2018],  the Daily Beast's reported that President Donald Trump's re-election campaign is targeting voters in swing states Arizona and Florida with an anti-immigration Facebook ad. The video ad reportedly features a cop-killer who was deported several times, and a message that says 'America cannot be allow this invasion. The migrant caravan must be stopped. President Trump and his allies will protect our border and keep our families safe.'

The Trump campaign reportedly spent between $25,000 and $85,000 promoting the ads.

Though Facebook and Twitter are trying to be more transparent. In May, they began labeling political ads so that you can see who paid for them and how much they paid. You can also search an ad in Facebook's Ad Archive.Is all of this legal?

**Have you clicked on "Accept" or "Continue" when you see a cookie notification on a website?**

Then yes, this is all legal.

When it comes to voter data, however, some states specify that it can't be used for commercial purposes. Still, a lot of data firms can get their hands on voter information and profit.

The Federal Trade Commission, the U.S. government's consumer watchdog, produced a report on data brokers in 2014 and recommended that Congress require greater transparency from the data industry. Congress hasn't passed any legislation in response to this report.

"'Under US [federal] law, regulations are on credit agencies, but [there's] no regulations on data brokers,' said Steven Bellovin, a privacy expert and computer science professor at Columbia University.

42

There's also little regulation on political campaigns.

"'The US has a lot of policy laws that may not touch political campaigns,' said Joseph Jerome, policy counsel at the Center for Democracy and Technology. Jerome said that there's no infrastructure in place on regulating political campaigns, such as who watches over the use, sharing or protection of voter data by candidates and committees.

Generally, states don't have the resources to keep track of where the data goes after purchase. Vermont, for example, prohibits the sharing of voter files to foreign governments and agencies, but the state doesn't keep track of data after it's been requested, according to Will Senning, the director of elections and campaign finance for the Vermont secretary of state. He said the state relies on illegal activity being reported before they investigate.

**Sometimes voter information gets leaked online.**

"Earlier this month, researchers found hackers selling 35 million voter records from 19 states on the dark web, according to a report from Anomali Labs. The hackers charged between $150 and $12,500 for statewide voter lists.

"In July, Virginia-based political campaign and robocalling company RoboCent left hundreds of thousands of voter records online without protection, according to ZDNet. A RoboCent spokesperson told CNET in July that the company partners with data firms NationBuilder, Aristotle and i360 for voter data.

"'The very politicians who fight for consumer data are also using it and not responsible for [where] that data goes to after campaigns,' said Kim Alexander, founder and president of California Voter Foundation. 'If the government collects all this info on people, they need to protect it.'

Additional background is provided by Dr. Collin Bennett of the University of Toronto, one of the world's leading experts in political data. A November 4, 2018 article by Dr. Bennett in the *Times Colonist* is as follows:

"Cambridge Analytica was a symptom of a pervasive belief that elections are now won with data. The more a party knows about voters, actual and potential, the better its chances. Companies then compete on the basis of how many data points they can analyze on the typical voter. At one point, Cambridge Analytica boasted that it collected up to 5,000 data points on more than 220 million Americans, using more than 100 data variables to model target audience groups and predict voting behaviour.

"A lot of this is corporate hype. And it is particularly prevalent in the United States, where weaker privacy laws have allowed a multimillion-dollar voter-analytics industry to develop. But Canadian politicians have also got into their heads that election campaigns should be "data-driven," so that precise messages can be delivered through social media, email, text or old-fashioned campaign pamphlets to increasingly narrow segments of voters. And several practices pioneered in the U.S. are gradually creeping into our politics."

A brief and relatively incomplete chronology of political technology is provided by Alex Howard, the former deputy director of the Sunlight Foundation in *MIT Technology Review* posted August 22, 2018 article entitled "US election campaign technology from 2008 to 2018, and beyond," as follows:

"The first Obama campaign kicked off a technological revolution in electioneering. Where is it going next?

"What a difference a decade makes.

"Consider: In 2008, the iPhone was less than a year old. BlackBerrys and e-mail dominated the palms of corporate and political information junkies. Television continued to be the dominant medium for political advertising and debates. Social media was a curiosity; governments and politicians who used it were still something of a novelty. It took the protests of the 2009 #IranElection—Time magazine dubbed Twitter "the medium of the movement"—to make mainstream journalists and politicians realize that smartphones and internet connections were fundamentally shifting how we lived, worked, played, advocated, campaigned, and governed.

"Since then we've been living through probably the most rapid evolution of political campaigning in recent history. In each US election cycle, the technology used has advanced and morphed; the tools that gave Barack Obama the edge in 2008 and 2012 are very different from the ones that nudged Donald Trump to victory in 2016.

"So where might things go next? What lessons will candidates for Congress in November's midterms have taken from Trump's victory? How will algorithm changes at a Facebook chastened by the Cambridge Analytica scandal alter the mechanics of influencing voters? Will 2020 or 2024 look as different from 2016 as 2016 did from 2008?

"First, here's a brief history of a heady decade.

**2008**

"The key technological innovation that brought Barack Obama to the White House wasn't his tweets or a smartphone app. It was the Obama campaign's novel integration of e-mail, cell phones, and websites. The young, technology-savvy staffers didn't just use the web to convey the candidate's message; they also enabled supporters to connect and self-organize, pioneering the ways grassroots movements would adapt and adopt platforms in the campaign cycles to come.

"The Obama campaign integrated social--networking features into My.BarackObama.com, where supporters could form groups, raise money, organize local events, and get information on the voters in their neighborhoods. The campaign converted online energy into offline action, from virtual phone bank rallies to voter registration to get-out-the-vote drives during primaries and the general election.

"Of course, it didn't hurt that Obama was a unique and inspirational candidate to many—young, charismatic, and African-American. But it was adopting existing

44

modern technology that helped an agile, insurgent campaign defeat Hillary Clinton, a member of one of America's political dynasties, in the primaries and then John McCain, a popular war hero, in the general election.

## 2012

"The 2012 campaigns drew on these technologies still further. TV remained the dominant political medium for debates, but by August 2012, a majority of US adults were on Facebook. That meant more voters could now watch the social-media chatter accompanying the debates on a phone or computer screen, creating new opportunities for the campaigns to respond in real time and craft fund-raising appeals or amplify the messages that had resonated most.

"Once again, the Obama campaign built a dream team of nerds to create the software that drove many aspects of the campaign. From messaging to fund--raising to canvassing to organizing to targeting resources to key districts and media buys, the reelection effort took the political application of data science to unprecedented heights. The Obama team created sophisticated analytic models that personalized social and e-mail messaging using data generated by social-media activity.

"The Republican side, too, tried to create smarter tools, but it botched them. The Romney campaign's "Orca," a platform for marshaling volunteers to get out the vote on election day, suffered severe technical problems, becoming a cautionary tale of how not to manage a large IT project. For the moment, the technology gap between Democrats and Republicans remained wide.

## 2016

"In many ways, Hillary Clinton's presidential campaign operation was a descendant of Obama's.

"A big team of engineers led by ex-Googler Stephanie Hannon built dozens of tools, with a special focus on voter registration and turnout, and similarly formed an analytics unit to inform campaign decisions. The Clinton team built upon the institutional knowledge of the Democratic Party, trying to optimize and improve little things instead of developing a new "killer app."

"In contrast, for all of Trump's prowess at messaging on Twitter, his campaign was an improvisational, bare-bones operation. Whereas Obama's and Clinton's teams poured resources into building their own systems in 2012 and 2016, Trump's campaign chose off-the-shelf tools and everyday vendors. It used social-media platforms and relatively simple websites to target voters, with data acquired from Facebook apps and targeting tools designed for commercial advertisers.

"Just how much Cambridge Analytica helped in this effort is still highly contested. The firm, which worked for the Trump campaign, boasted that its "psychographic profiles," assembled using data that turned out to have been purloined from Facebook by an academic, contained as many as 5,000 data points on each of 220 million Americans. Yet Brad Parscale, who ran Trump's digital operation and has been named his 2020 campaign manager, has repeatedly insisted the campaign didn't use those profiles, relying instead on data from the Republican Party.

"It's also hard to judge the impact of the $100,000 or so in "dark ads" that Facebook confirmed Russia ran on its platform in 2016. Their cost was tiny compared with the tens of millions spent on Facebook by the Clinton and Trump campaigns, and vanishingly small alongside the $6.5 billion that OpenSecrets estimates as the cost of the entire 2016 election cycle.

"While the Trump campaign didn't have dozens of engineers and analysts on staff, however, it had something else that helped to close a yawning technological gap. These were the "embeds"—employees from Facebook, Twitter, and Google, picked for their Republican sympathies, who worked directly in the campaign's offices, teaching staffers how to get the most out of the platforms. The Clinton campaign was offered embeds but chose not to accept them. While it also spent tens of millions of dollars advertising on Facebook, it was much less sophisticated about it.

"We have Facebook's own word for this. An internal company white paper that Bloomberg News obtained earlier this year reported that from June to November of 2016, Clinton's campaign tested 66,000 distinct ads while Trump's tested 5.9 million. Parscale told CBS's 60 Minutes that they tested, on average, 50,000 to 60,000 different ads daily. This, in the words of the memo, "better leveraged Facebook's ability to optimize for outcomes."

"On top of this, of course, the Trump campaign had Trump himself, whose personal communication style turned out to be perfectly suited both to social media and to the political moment. His capacity for regularly provoking outrage won him $5.9 billion worth of free attention from the mainstream media over the whole campaign, more than twice as much as Clinton, according to the analytics firm mediaQuant.

"And it would be a mistake to forget that media attention, and the news that drives it, still matter more than any Facebook ad campaign. The scandals over Hillary Clinton's private e-mail server and the leaks of e-mails from the Democratic National Committee and her campaign chairman—believed to be the work of Russian hackers—generated vast amounts of coverage at critical moments, possibly enough to have swung the vote in Trump's favor.

**2018**

"This year, campaigns will again deploy a broad range of technological tools to find and communicate with voters, using what they know about them to personalize ads, calls to volunteer and vote, and requests to donate. But the targeting is becoming ever more effective as more data on voters becomes available and tools for using it get better and more numerous.

"The Democratic National Committee has set up a marketplace of vendors for the party's candidates. Left-leaning Higher Ground Labs has a portfolio of incubated startups offering polling, cheaper advertising, "persuasion science," and fund-raising tools like CallTime.ai, which tries to apply artificial intelligence to attracting donations. On the right-leaning Lincoln Network's app marketplace, many of the same vendors, from Salesforce to the community-management platform Nationbuilder, are available to conservative campaigns.

46

"While the main factor in the midterms will be the voters' judgments on the Trump administration, smart uses of technology could make a difference in tight races. The tools available allow political novices to quickly gain direct access to attention and fund--raising if their candidacies and messages resonate with people—even if they are ignored by media outlets. Alexandria Ocasio-Cortez, a 28-year-old community activist, unseated a 20-year incumbent who outspent her fivefold in New York's Democratic primary for Congress, thanks in part to her viral video.

"After the Russian "dark ads" and Cambridge Analytica scandals, will online campaigning at least be less murky? Yes, but not by much. Twitter and Facebook have made political ads more transparent, enabling the public to see who has bought them and putting advertisers through a vetting process; Google is expected to follow suit. But true transparency would mean having a file of all paid political ads, on a public website, with bulk open data downloads and an application programming interface (API) so that people could get the data without having to log into Twitter or Facebook themselves. It would also be backed up by a law instead of being voluntary. (Disclosure: I have a position on this, since while at the Sunlight Foundation I helped senators draft the Honest Ads Act. If enacted, the bill would not only mandate disclosures and disclaimers but update the definition of electioneering to include online platforms.)

"In any case, these moves address only a tiny part of the problem. Political organizations and foreign states have long been able to channel "dark money" into political campaigns through nonprofits without identifying the source, and in July of this year, the US Treasury relaxed those rules even further. Regulating ads on social media also wouldn't address disinformation by foreign states or reverse the various Supreme Court decisions that have weakened US campaign-finance laws over the past decade.

**2020 and beyond**

"Expect the campaigns in the next presidential race to use not radically new sorts of tools but more of the same: more data, better algorithms, and, consequently, more fine-grained targeting of voters, especially those judged to be crucial to tipping a district or a state in a candidate's favor.

"What will probably evolve faster are the ways messages to those voters are created and spread. There may be gimmicks such as virtual-reality town-hall meetings or geotargeting—sending voters ads on their phones when they're near polling places or campaign events, for example. But the technology that's likely to have the most impact is something seemingly less advanced: video.

"Many more people now have good enough mobile broadband to stream high-quality video on their phones than did just a few years ago. That's part of why unknown candidates on small budgets, such as Ocasio-Cortez, can become overnight sensations. As mobile video becomes more popular, though, it's also going to be exploited more as a tool of misinformation. Readily available software for creating video "deepfakes," such as the head of one person digitally swapped onto the body of another, is rapidly improving (see "Fake America great again"). Generative adversarial networks (GANs), AI tools that pit two algorithms against each other, can be used to automate the creation of entirely artificial but believable imagery from scratch.

47

"If the 2016 presidential race brought "fake news" into the lexicon, in 2020 the struggle to distinguish it from reality will reach a new level. For companies like Facebook, already under siege for permitting conspiracies and hate speech to circulate on their platforms, this may finally force a reckoning with society—and with legislators and regulators—about their responsibility, as the world's largest purveyors of information, to prevent the spread of personalized disinformation.

FOF ¶ 284.   The RNC at one time had ORVIS, Optimal Republican Voting Strategy. Charles S. Bullock and David J. Shafer, *Party Targeting and Electoral Success*, LEGISLATIVE STUDIES QUARTERLY, Vol. 22 No. 4 (November 1997) at pp. 573-589. However, the "strong impact of ORVIS, coupled with non-significant results from previous elections demonstrate the top-bottom Republican approach to winning elections. * * * These results suggest that the emergence of Republican legislative candidates is lagging behind shifts in the partisan behavior of the electorate." *Id.* at 582. ORVIS graduated into Voter Vault.

FOF ¶ 285.   Currently, the RNC maintains GOP Data Center, of which counsel informs us RNC paid FLS Connect, a software development firm with close affinity to GOP insiders $10 million. GOP Data Center is a Web 1.0 level technology, providing detailed but stale micro-targeting information about voters.

FOF ¶ 286.   As with all commercial campaign database services, GOP Data Center is nothing more than a digital telephone directory, out of date on the date its' information is gathered, because there is no economical or efficient means to continuously update the data. The RNC allowed GOP Data Center's development to be outsourced to Compulink Systems of Maharashtra, India. Daniel Tynan, *PC World* (Sep 24, 2004).

FOF ¶ 287.   We heard repeated allegations throughout multiple campaigns by Qualified Beneficiaries and GOP candidates that GOP Data Center was not productive.

FOF ¶ 288.   We have examined what counsel purports is the RNC model agreement for use of the original GOP Voter Vault. The RNC requires License Fee Credits, ¶ 4.1, from state GOP committees, and represents itself as the licensor and the state committee the licensee. ¶ 5.1.

FOF ¶ 289.   We have likewise examined the RNC model agreement for use of GOP Data Center.

FOF ¶ 290.   The denial of access to Voter Vault, now GOP Data Center and the Pennsylvania State Republican Committee's Blue Card, is a primary reason that prompted the Trust's creation in 2007.

FOF ¶ 291.   In any respect, GOP Data Center and other databases are recognized as technologically obsolete because they rely on static data, unlike the Trust Property, which as it is Web 2.0 technology, relies on interactive input to maintain current files.

### § 24. Vendors exploit GOP Data Center's Web 1.0 technology (¶¶ 292-304).

FOF ¶ 292.   One commercial vendor, doing business as FILPAC, states on its website: "The [GOP] Data Center is basically an enhancement of the publicly-available voter file. It tends to be rather 'stale,' which means it contains voters and vote history from the last time they collected your state's voter file. Which means it's probably missing

data from the most recent election, as well as those who've recently registered or changed their addresses.

FOF ¶ 293.    "Voter Vault is the [most] recent name for the 20-year project of the Republican National Committee to produce an enhanced voter file. An enhanced voter file is one that is cross-matched with public and consumer information such as phone numbers, driver licenses, hunting and fishing licenses, veteran records, property records, census results, phone numbers and, in at least one state we've seen, the results of past telephone surveys, in addition to a run through the Postal Service's National Change of Address (NCOA) system." *Id.*

FOF ¶ 294.    The *Washington Post* reported that detailed information on nearly every U.S. voter — including in some cases their ethnicity, religion and views on political issues — was left exposed online for two weeks by a political consultancy that works for the Republican National Committee and other GOP clients. *See* Brian Fung, Craig Timberg and Matea Gold, "A Republican contractor's database of nearly every voter was left exposed on the Internet for 12 days, researcher says," *Washington Post,* June 19, 2017.

FOF ¶ 295.    A Center for Digital Democracy white paper by Kathryn C. Montgomery, School of Communication, American University, Washington, DC, argues that "Computational politics—the application of digital targeted-marketing technologies to election campaigns in the US and elsewhere—are now raising the same concerns for democratic discourse and governance that they have long raised for consumer privacy and welfare in the commercial marketplace."

FOF ¶ 296.    "Though political campaigns have employed micro-targeting techniques—which use an array of personalized and other data sets and marketing applications to influence the actions of individuals—during the last several election cycles, recent technological innovations and industry advances have created a much more robust system than what was in place in 2012 (IAB, n.d.-b; Rubinstein, 2014). For years, political campaigns have been able to combine public voter files with commercial information from data brokers, to develop detailed and comprehensive dossiers on American voters (Rubinstein, 2014).

FOF ¶ 297.    "With recent advances in the advertising technology and data industries, they can now take advantage of a growing infrastructure of specialty firms offering more extensive resources for data mining and targeting voters. Among the new entities are data marketing clouds. Developed by well-known companies such as Adobe, Oracle, Salesforce, Nielsen, and IBM, these clouds sell political data along with an exhaustive amount of detailed consumer information for each potential target, including, for example, credit card use, personal interests, consumption patterns, and TV viewing patterns (Salesforce DMP, 2017).

FOF ¶ 298.    "Some of these massive cloud services also operate what has become a new and essential component for contemporary digital targeting—the data management platform (DMP) (Chavez, 2017).

FOF ¶ 299.    "DMPs provide marketers with "centralized control of all of their audience and campaign data" (BlueKai, 2011). They do this by collecting and analyzing data about individuals from a wide variety of online and offline sources, including first-party data from a customer's own record, such as the use of a supermarket loyalty card, or

49

their activities captured on a website, mobile phone, or wearable device; second-party data, information collected about a person by another company, such as an online publisher, and sold to others; and third-party data drawn from thousands of sources, comprising demographic, financial, and other data-broker information, including race, ethnicity, and presence of children (O'Hara, 2016).

FOF ¶ 300.    "All of this information can be matched to create highly granular "target audience segments" and to identify and "activate" individuals "across third party ad networks and exchanges". DMPs are quickly becoming a critical tool for political campaigns (Bennett, 2016; Kaye, 2016, July; Regan, J., 2016).

FOF ¶ 301.    "Facebook and Google now play a central role in political operations, offering a full spectrum of commercial digital marketing tools and techniques, along with specialized ad "products" designed for political use (Bond, 2017). Not surprisingly, these companies have also made generating revenues from political campaigns an important "vertical" category within their ad business (Facebook, n.d.-d; Facebook IQ, n.d.-b; Stanford, 2016). Facebook's role in the 2016 election was particularly important. With users required to give their real names when they sign up as members, Facebook has created a powerful "identity-based" targeting paradigm, enabling political campaigns to access its more than 162 million US users and to target them individually by age, gender, congressional district, and interests (Facebook, n.d.-b).Its online guide for political campaign marketing urges political campaigns to use all the social media platform tools it makes available to advertisers—including through Instagram and other properties—in order to track individuals, capture their data through various "lead-generation" tactics, and target them by uploading voter files and other data (Facebook, n.d.-a-c-f).

FOF ¶ 302.    "The company also employs teams of internal staff aligned with each of the major political parties to provide technical assistance and other services to candidates and their campaigns (Chester, 2017; Kreiss & Mcgregor, 2017).

FOF ¶ 303.    "Google heavily promoted the use of YouTube, as well as its other digital marketing assets, during the 2016 US election, reaching out to both major political parties (YouTube, 2017). The growth and increasing sophistication of the digital marketplace has enhanced the capacities of political campaigns to identify, reach, and interact with individual voters. Below we identify seven key techniques that are emblematic of this new digital political marketing system, providing brief illustrations of how they were employed during the 2016 election." *Id.*

FOF ¶ 304.    But perhaps the best description of vendor exploitation of political technology and the self-dealing by the Super Agents to exploit the revenue potential arising from such exploitation is the November 28, 2012 *RedState* article "The Incestuous Bleeding of the Republican Party" by GOP/conservative columnist, attorney Erick Erickson"

"If money is the root of all evil, for the Republican Party evil is located on the fifth floor of 66 Canal Center Plaza, Alexandria, VA 22314.Strip away the candidate and coalition and it is on the fifth floor of 66 Canal Center Plaza where the seeds of Mitt Romney's ruin and the RNC's get out the vote (GOTV) effort collapsed — bled to death by charlatan consultants making millions off the party, its donors, and the grassroots.66 Canal Center Plaza is also why Jeff Larson, the Chief of Staff of the Republican National Committee, should not be put in charge of the autopsy of the

GOP's defeat.  [The *Growth, Opportunity Project* Report referred *supra* at § 21 at ¶¶ 215-282]. Multiple sources confirm to me that RNC Chairman Reince Priebus has already put Larson in charge of the so called autopsy

"This is like putting the fox in charge of the hen house. The fifth floor of 66 Canal Center Plaza reveals a tangled web of incestuous relationships among Republican consultants who have made millions all while the GOP went down the tubes. Here the top party consultants waged war with conservative activists and here they waged war with the Democrats. On both fronts, they raked in millions along the way with a more fractured, minority party in their wake. And they show no signs of recognizing just how much a part of the problem they are.

"According to a Lexis business search, the fifth floor of 66 Canal Center Plaza houses the following groups:

* Crossroads Media

* Black Rock Group

* WWP Strategies

* Restore Our Future

* Targeted Victory

* DDC Advocacy/Blue Front Strategies

* Target Point Consulting

* Digital Franking

* Americans for Job Security

"Suite 555 alone houses Black Rock Group, Crossroads Media, WWP Strategies, TargetPoint Consulting, and Americans for Job Security.TargetPoint Consulting and WWP Strategies, two groups connected to Alexander and Katie Packer Gage, both received money from the Romney Campaign wherein Katie Packer Gage served as deputy campaign manager while also serving as a partner at WWP Strategies.Katie Packer Gage's husband, Alexander, is the CEO and founder of TargetPoint Consulting, which got money both from the Romney campaign and also from Restore Our Future, the Romney Super PAC. Also getting money from the Romney Super PAC was the Black Rock Group. Carl Forti is a partner at the Black Rock Group, the political director of American Crossroads, and a senior strategist for Restore Our Future. He also has ties to the Romney campaign itself, having served as Political Director for Campaign 2008. Restore our Future not only gave money to TargetPoint Consulting, but also to the Black Rock Group. Carl Forti is also involved with Americans for Job Security and Crossroads Media does ad placement for that group too.Karl Rove's American Crossroads gave money to the Blackrock Group and to Crossroads Media. Michael Dubke is a partner of both.

"But supposedly there was a great firewall, no inappropriate coordination, and we should all presume everything was kosher between Black Rock Group, TargetPoint

Consulting, WWP Strategies, and Crossroads Media all sharing Suite 555. The New York Times has a great graphic on these relationships.

"Go down the hall to suite 501 and it becomes more problematic and gets to the heart of the problem with Jeff Larson. Suite 501 contains the offices of Targeted Victory.

"Zac Moffatt, Mitt Romney's Digital Director, is or was a part of Targeted Victory.

"To understand the problems, we need to go back in time. Michael Beach is a co-founder of Targeted Victory, LLC, as is Zac Moffatt. Before that, he was the National Victory Director for the Republican Party during the 2008 campaign.

"Targeted Victory, LLC operates from suite 501 of 66 Canal Center Plaza in Alexandria as a foreign limited liability company. Targeted Victory, LLC is actually a Minnesota limited liability company. In Virginia, its co-founder Michael Beach, is listed as its registered agent by the Virginia Secretary of State. It was formed on February 5, 2009, around the time Michael Beach left the RNC.

"Targeted Victory, LLC's registered office is 7300 Hudson Blvd, Suite 270, St. Paul, MN 55128. It's manager, who is the person who controls the day to day operations of an LLC on behalf of its members, is Tony Feather.

"Drum roll please — Tony Feather happens to also be the F in FLS Connect, LLC, which made millions off both the Romney campaign and the RNC. The "L" in FLS Connect is Jeff Larson, the present Chief of Staff of the Republican National Committee.

"Curiously, the Virginia Secretary of State notes that FLS Connect, LLC uses a registered agent in Virginia Beach, VA, but is a foreign limited liability company just like Targeted Victory, LLC. More curious, its principal office is the same office in St. Paul, MN as Targeted Victory, LLC, but FLS Connect is actually an Arizona limited liability company.

"Interestingly enough, the Virginia Secretary of State shows that FLS Connect, LLC registered in Virginia on August 13, 2009, and subsequently had its registration cancelled.

"A search of the Arizona Corporation Commission shows that FLS Connect, LLC is a limited liability company in good standing located in Glendale, AZ. The Arizona Corporation Commission also lists two members: Tony Feather of St. Paul, MN, and, at the same address, Jeff Larson.

"FLS Connect changed from Feather Hodges Larson & Synhorst, L.L.C. to FLS-DCI, L.L.C. on January 2, 2001, then to FLS, LLC on January 19, 2005, and finally to FLS Connect, LLC in May of 2006. The Tangled Web of FLS Connect

"Few want to talk about FLS Connect. One person I talked to said the group is commonly referred to as the "FLS Mafia." FLS Connect seems to control the RNC and controlled Team Romney to a degree.

"FLS Connect was the phone vendor for Bush 2000, Bush-Cheney 2000, Bush-Cheney 2004, and McCain-Palin 2008. In 2008, the NRCC also sent a hefty chunk of money to FLS Connect.

"During the Bush era, the Republican National Committee developed Voter Vault, a database used to identify and mobilize voters to the polls. At some point a parter at FLS Connect, Rich Beeson, went to work at the RNC as Political Director. Also, the RNC sold its Voter Vault data to FLS Connect and then leased that data back from FLS Connect. By the end of 2008 activists and others were complaining that the voter vault data was no longer very good.

"Likewise, according to friends at the RNC at the time, Rich Beeson gave the RNC's phone vendor contract to FLS Connect without bidding to others. The rate was not out of line, but it was a multi-million dollar contract to Rich Beeson's former firm, FLS Connect.

"Fast forward to 2012.Rich Beeson moved from the RNC to the Romney Campaign as its Political Director. Jeff Larson moved from FLS Connect to the RNC.FLS Connect continued to get business from the RNC and also got business from Team Romney. But now Targeted Victory enters the picture.

"Targeted Victory, LLC's principal office is the same office in St. Paul, MN that FLS Connect, LLC lists as its own principle office. Targeted Victory's manager is Tony Feather, who is the F in FLS Connect.Rich Beeson, who used to work for FLS Connect, is now with Team Romney and Team Romney awards a contract to Targeted Victory, LLC for its digital work with Zac Moffatt as Digital Director of the campaign.

"Targeted Victory, LLC and FLS Connect, LLC rake in millions in commissions. The central component to Rich Beeson's get out the vote operation is Project ORCA, which is headed by Zac Moffatt of Targeted Victory, LLC, whose principal office in Minnesota is shared by FLS Connect, LLC. As of October 26, 2012, Targeted Victory had been paid $64 million by Team Romney and FLS Connect had been paid $16.5 million.

"And now the "L" in FLS Connect, Jeff Larson, will perform the autopsy on why Election Day and its related operations collapsed. [The *Growth, Opportunity Project* Report referred *supra* at § 21 at ¶¶ 215-282].

"I bet I know which companies won't be blamed."

### § 25. RNC's Surreptitious Voter Suppression Acts (¶ 305-306).

FOF ¶ 305.    The RNC has undertaken multiple forms of voter suppression acts, explicit and now implicit to suppress voter turnout among constituencies which generally vote Democratic, namely African-Americans, Latino-Americans, Asian-Americans, and Native Americans.

FOF ¶ 306.    The RNC's voter suppression has become more sophisticated in using prevailing political technology, to suppress voter turnout among constituencies which are primarily college-educated, domiciled in the East or West Coast, register independent, or are aligned or have affinity with political causes which the RNC

suspects will trend Democratic.

### § 26. RNC's Alleged Voter Fraud Merely Strawman (¶¶ 307-321).

FOF ¶ 307.   When paper ballots were the primary means of casting ballots, voter fraud included falsely registering voters who did not live in the respective precinct and "stuffing the ballot box" with ballots cast per persons not eligible to vote in the respective precinct or generally.

FOF ¶ 308.   Today, voting machines prevent stuffing the ballot box.

FOF ¶ 309.   Voting fraud, in the form of allowing persons not eligible to cast ballots to vote, can only occur by means of conspiracy with the precinct election board.

FOF ¶ 310.   The primary form of voting fraud is illegal interference or influence by precinct election board officials, who politick by persuading or instructing voters to cast ballots in a particular manner.

FOF ¶ 311.   Registration fraud, that is registering to vote by persons otherwise not qualified to register.

FOF ¶ 312.   A significant, if not total breakdown in the registration process, or conspiracy by one or more persons who are employed to register voters to alter or manipulate records is the principal means to accomplish registration fraud. *See* Justin Levitt, *The Truth About Voter Fraud* (Brennan Center for Justice 2007).

FOF ¶ 313.   There is no evidence that voting fraud or registration fraud is more prevalent in communities or precincts that are Africa-American, Latino or of any other social economic character who vote more over than not as Democratic than not, than in communities or precincts that are primarily Republican. *Id.*

FOF ¶ 314.   "Ballot security" and "voter fraud" are euphemisms or code words for the RNC strategy to suppress voter turnout among constituencies that primarily vote Democratic, i.e., African-American, Latino, immigrated voters.

FOF ¶ 315.   Political science professors Zoltan Hajnal, Nazita Lajevardi, and Lindsay Nielson of University of California, San Diego write in *Voter Identification Laws and the Suppression of Minority Votes* (2014) state: "The proliferation of increasingly strict voter identification laws around the country has raised concerns about voter suppression and inequality. Although there are lots of reasons to suspect that these laws could harm groups like racial minorities and the poor, existing studies have generally failed to demonstrate a link between voter ID laws and voter turnout among these groups. We question these null effects. We argue that because most of the studies occurred before states enacted the strictest photo identification requirements, they tend to uncover few effects. Focusing on the validated vote in recent elections using the Cooperative Congressional Election Study we are able to offer a more definitive test. The analysis shows that strict photo identification laws have a differentially negative impact on the turnout of Hispanics, Blacks, and mixed-race Americans in primaries and general elections. Voter ID laws skew democracy in favor of whites and those on the political right"

FOF ¶ 316.   After controlling for variables, the University of California San Diego study found

"substantial drops in turnout for minorities under strict voter ID laws." Turnout for Latino voters was suppressed by 10.8 points in states with strict photo ID laws, compared to states without them. For multiracial Americans, the drop was 12.8 points.

FOF ¶ 317.    The laws also increased the participation gap between whites and non-whites. "For Latinos in the general election, the predicted gap from whites doubled from 5.3 points in states without strict photo ID laws to 11.9 in states with strict photo ID laws."

FOF ¶ 318.    For African-American voters in the primaries, the strict photo ID laws caused the gap with European-American (white) voters to almost double to 8.5 points.

FOF ¶ 319.    The net effect is that "Democratic turnout drops by an estimated 7.7 percentage points in general elections when strict photo identification laws are in place."

FOF ¶ 320.    The data showed that Republican turnout was also depressed by 4.6 percentage points.

FOF ¶ 321.    An exhaustive study by Justin Levitt, Associate Dean for Research and Professor of Law, Loyola Law School, found that between 2000 and 2014, there were indeed 31 reported instances of voter impersonation. Out of more than a billion votes cast, the odds being one in 32 million. Compare for example odds of dying in a plane crash are one in 7,178. Odds of being struck by lightning are one in 134,906. Justin Levitt, "A comprehensive investigation of voter impersonation finds 31 credible incidents out of one billion ballots cast," *Washington Post* (August 6, 2014).

### § 27. RNC Voter Suppression Expands Beyond Minorities (¶¶ 322-323).

FOF ¶ 322.    What has not been noticed is that the RNC's voter suppression has expanded beyond African-Americans and other minorities, but now includes college-educated persons, millennials, voters registered Independent or no party, and most strikingly, moderate Republicans.

FOF ¶ 323.    The form of voter suppression used against African-Americans and other minorities are being expanded to be used against any stakeholder whose social-demographic attributes suggest the voter leans Democratic.

### § 28. RNC Now Suppressing Moderate GOP Voters (¶ 324-325).

FOF ¶ 324.    Voter suppression of moderate Republicans is perpetrated by the RNC's ongoing practice to usurp precinct committee people with paid professionals and volunteers from third-party groups such as the Tea Party, to assure GOTV efforts are directed only to partisans, who are primarily non-college educated, evangelical and otherwise identified with specific conservative or fringe viewpoints, such as racism or anti-Semitism.

FOF ¶ 325.    This new form of voter suppression was expressly endorsed by the March 18, 2013 *Growth and Opportunity Project* Report, as discussed throughout this Opinion.

### § 29. Photo IDs as Form of Voter Suppression (¶¶ 326-345).

FOF ¶ 326.   A principal means of voter suppression is the legislative command to possess and present a governmental Photo ID, such as a driver's license upon presenting oneself at the polls.

FOF ¶ 327.   Supporters of photo ID laws say that photographic IDs are readily available and that presenting such IDs is a minor inconvenience when weighed against the possibility of ineligible voters affecting elections.

FOF ¶ 328.   Opponents argue that photo ID requirements disproportionately affect minority, handicapped and elderly voters who do not normally maintain driver's licenses. Also, requiring such groups to obtain and keep track of photo IDs that are otherwise unneeded is considered a suppression tactic aimed at those groups.

FOF ¶ 329.   Because of the administrative mechanics involved in voter registration and confirmation of the voter upon presentation at the polls, requiring a driver's license is superfluous, as signature comparison, while not foolproof, is relatively simple and easily detectable as to attempted fraud by forensic examination.

FOF ¶ 330.   Forensic examination for electoral purposes is common place, used routinely in challenging signatures on nominating petitions.

FOF ¶ 331.   The U.S. Government Accountability Office ("GAO") conducted a study of Photo ID. *See* Issues Related to State Voter Identification Laws [Reissued on February 27, 2015] GAO-14-634: Published: Sep 19, 2014. Publicly Released: Oct 8, 2014. The summary of the report follows:

FOF ¶ 332.   The studies GAO reviewed on voter ownership of certain forms of identification (ID) documents show that most registered voters in the states that were the focus of these studies possessed the selected forms of state-issued ID, and the direct costs of required ID vary by state. GAO identified 10 studies of driver's license and state ID ownership, which showed that estimated ownership rates among all registered voters ranged from 84 to 95 percent, and that rates varied by racial and ethnic groups. For example, one study estimated that 85 percent of White registered voters and 81 percent of African-American registered voters in one state had a valid ID for voting purposes. The costs and requirements to obtain certain forms of ID, including a driver's license, state ID, or free state ID, vary by state. GAO identified direct costs for these forms of ID in 17 states that require voters to present a photo or government-issued ID at the polls and do not allow voters to affirm their own identities, and found that driver's license direct costs, for example, range from $14.50 to $58.50.

FOF ¶ 333.   Another 10 studies GAO reviewed showed mixed effects of various forms of state voter ID requirements on turnout. All 10 studies examined general elections before 2008, and 1 of the 10 studies also included the 2004 through 2012 general elections. Five of these 10 studies found that ID requirements had no statistically significant effect on turnout; in contrast 4 studies found decreases in turnout and 1 found an increase in turnout that were statistically significant.

FOF ¶ 334.   GAO conducted a quasi-experimental analysis to compare voter turnout in Kansas and Tennessee to turnout in the four comparison states that did not have changes in their voter ID requirements from the 2008 to 2012 general elections. In selecting these states from among 14 potential states that modified their ID requirements and

56

35 potential comparison states, GAO applied criteria to ensure that the states did not have other factors present in their election environments that may have significantly affected turnout. GAO selected states that did not experience contemporaneous changes to other election laws that may have significantly affected voter turnout; had presidential general elections where the margin of victory did not substantially change from 2008 to 2012 and all other statewide elections, such as U.S. Senate races, were non-competitive in both the 2008 and 2012 general elections; and ballot questions were not present, noncompetitive, or similarly competitive in both the 2008 and 2012 general elections. GAO analyzed three sources of data on turnout among eligible and registered voters, including data from official voter records and a nationwide survey. GAO's evaluation of voter turnout suggests that turnout decreased in two selected states—Kansas and Tennessee—from the 2008 to the 2012 general elections (the two most recent general elections) to a greater extent than turnout decreased in the selected comparison states—Alabama, Arkansas, Delaware, and Maine. GAO's analysis suggests that the turnout decreases in Kansas and Tennessee beyond decreases in the comparison states were attributable to changes in those two states' voter ID requirements. GAO found that turnout among eligible and registered voters declined more in Kansas and Tennessee than it declined in comparison states—by an estimated 1.9 to 2.2 percentage points more in Kansas and 2.2 to 3.2 percentage points more in Tennessee—and the results were consistent across the different data sources and voter populations used in the analysis.

FOF ¶ 335.    To further assess the validity of the results of this analysis, GAO (1) compared Kansas and Tennessee with different combinations of comparison states and with individual comparison states, and (2) controlled for demographic characteristics that can affect turnout, such as age, education, race, and sex. GAO also conducted an analysis using survey data on registrants from Kansas and Tennessee and a nationwide comparison group of all states other than the selected comparison states. These additional analyses produced consistent results. GAO's estimates are limited to turnout in the 2012 general election in Kansas and Tennessee and do not apply to other states or time periods.

FOF ¶ 336.    GAO also estimated changes in turnout among subpopulations of registrants in Kansas and Tennessee according to their age, length of voter registration, and race or ethnicity. In both Kansas and Tennessee, compared with the four comparison states, GAO found that turnout was reduced by larger amounts:

> (1)    among registrants, as of 2008, between the ages of 18 and 23 than among registrants between the ages of 44 and 53;

> (2)    among registrants who had been registered less than 1 year than among registrants who had been registered 20 years or more; and

> (3)    among African-American registrants than among White, Asian-American, and Hispanic registrants. GAO did not find consistent reductions in turnout among Asian-American or Hispanic registrants compared to White registrants, thus suggesting that the laws did not have larger effects among these subgroups.

FOF ¶ 337.    A small portion of total provisional ballots in Kansas and Tennessee were cast for ID reasons in 2012, and less than half were counted. In Kansas, 2.2 percent of all provisional ballots in 2012 were cast due to ID reasons, and 37 percent of these

57

provisional ballots were counted. In Tennessee, 9.5 percent of all provisional ballots in 2012 were cast due to ID reasons and 26 percent were counted. Provisional ballots cast for ID reasons may not be counted for a variety of reasons in Kansas and Tennessee, including the voter not providing valid ID during or following an election. GAO's analysis showed that provisional ballot use increased between the 2008 and 2012 general elections by 0.35 percentage points in Kansas and by 0.17 percentage points in Tennessee, relative to all other comparison states combined; these findings are not generalizable.

FOF ¶ 338.    Challenges exist in using available information to estimate the incidence of in-person voter fraud. For the purposes of this report, "incidence" is defined as the number of separate times a crime is committed during a specific time period. Estimating the incidence of crime involves using information on the number of crimes known to law enforcement authorities—such as crime data submitted to a central repository based on uniform offense definitions—to generate a reliable set of crime statistics. Based on GAO's review of studies by academics and others and information from federal and state agencies, GAO identified various challenges in information available for estimating the incidence of in-person voter fraud that make it difficult to determine a complete picture of such fraud. First, the studies GAO reviewed identified few instances of in-person voter fraud, but contained limitations in, for example, the completeness of information sources used. Second, no single source or database captures the universe of allegations or cases of in-person voter fraud across federal, state, and local levels, in part because responsibility for addressing election fraud is shared among federal, state, and local authorities. Third, federal and state agencies vary in the extent they collect information on election fraud in general and in-person voter fraud in particular, making it difficult to estimate the incidence of in-person voter fraud.

FOF ¶ 339.    In comments on draft report excerpts the Kansas, Tennessee, and Arkansas Secretary of State Offices disagreed with GAO's criteria for selecting treatment and comparison states and Kansas and Tennessee questioned the reliability of one dataset used to assess turnout. GAO notes that any policy evaluation in a non-experimental setting cannot account for all unobserved factors that could potentially impact the results. However, GAO believes its methodology was robust and valid as, among other things, GAO's selection of treatment and comparison states controlled for factors that could significantly affect voter turnout, and GAO used three data sources it determined to be reliable to assess turnout effects.

FOF ¶ 340.    **Why GAO Did This Study.** The authority to regulate U.S. elections is shared by federal, state, and local officials. Congress has addressed major functional areas in the voting process, such as voter registration. However, the responsibility for administration of state and federal elections resides at the state level. In 2002 Congress passed the Help America Vote Act (HAVA), which requires states to request ID from first time voters who register by mail, when they register to vote or cast a ballot for the first time, and to permit individuals to vote a provisional ballot if they do not have the requisite ID. Numerous states have enacted additional laws to address how an individual may register to vote or cast a ballot. As of June 2014, 33 states had enacted requirements for all eligible voters to show ID before casting a ballot at the polls on Election Day.

FOF ¶ 341.    GAO was asked to review issues related to voter ID laws. This report reviews (1) what available literature indicates about voter ownership of and direct costs to obtain

select IDs; (2) what available literature and (3) analyses of available data indicate about how, if at all, voter ID laws have affected turnout in select states; (4) to what extent provisional ballots were cast due to ID reasons in select states; and (5) what challenges may exist in using available information to estimate the incidence of in-person voter fraud.

FOF ¶ 342.    GAO reviewed relevant literature to identify 10 studies that estimated selected ID ownership rates. GAO reviewed the studies' analyses and determined that these studies were sufficiently sound to support their results and conclusions. GAO also reviewed state statutes and websites to identify acceptable forms of voter ID in selected states and the price for certain forms of ID.

FOF ¶ 343.    GAO also reviewed relevant literature and identified 10 other studies that estimated the effect of voter ID laws on turnout. GAO reviewed the studies' design, implementation, and analyses, and determined that the studies were sufficiently sound to support their results and conclusions. Further, GAO compared turnout in two states—Kansas and Tennessee—that changed ID requirements from the 2008 to 2012 general elections with turnout in four selected states—Alabama, Arkansas, Delaware, and Maine—that did not. GAO used a quasi-experimental approach, a type of policy evaluation that compares how an outcome changes over time in a treatment group that adopted a new policy, to a comparison group that did not make the same change. GAO selected states for evaluation that did not have other factors in their election environments that also may have affected turnout, such as significant changes to other election laws. GAO analyzed three sources of turnout data for the 2008 and 2012 general elections: (1) data on eligible voters, using official voter records compiled by the United States Elections Project at George Mason University, (2) data on registered voters, using state voter databases that were cleaned by a vendor through data-matching procedures to remove voters who had died or moved, and (3) data on registered voters, as reported to the Current Population Survey conducted by the U.S. Census Bureau.

FOF ¶ 344.    GAO also analyzed data from Kansas and Tennessee election officials on the number of provisional ballots cast for ID reasons in the 2012 general election, and data from the Election Assistance Commission's Election Administration and Voting Survey on the number of provisional ballots cast in select states in 2008 and 2012.

FOF ¶ 345.    GAO reviewed relevant literature and identified 5 studies that attempted to identify instances of in-person voter fraud. GAO reviewed the studies' analyses, and determined that these studies were sufficiently sound to support their results and conclusions. GAO also interviewed election officials in 46 states and the District of Columbia and officials from federal agencies that maintain federal crime data to determine how, if at all, instances of in-person voter fraud are tracked in state and federal databases.

### § 30. Purging Voter Rolls Form of Voter Suppression (¶¶ 346-367).

FOF ¶ 346.    On August 24, 2016, *Rolling Stone* magazine published a report by investigative reporter Greg Palast entitled, "The GOP's Stealth War Against Voters: Will an anti-voter-fraud program designed by one of Trump's advisers deny tens of thousands their right to vote in November?"

FOF ¶ 347.    Palast reported that "In January 2013, Kobach [the Secretary of State of Kansas]

addressed a gathering of the National Association of State Election Directors about combating an [alleged] epidemic of ballot-stuffing across the country.

FOF ¶ 348.   He announced that Crosscheck had already uncovered 697,537 'potential duplicate voters' in 15 states, and that the state of Kansas was prepared to cover the cost of compiling a nationwide list. That was enough to persuade 13 more states to hand over their voter files to Kobach's office."

FOF ¶ 349.   Palast alleges that virtually all of these 697,537 'potential duplicate voters' failed to meet Kobach's claims that they matched first, middle, and last names, birth dates, and the last 4 digits of people's Social Security number.

FOF ¶ 350.   Palast interviewed Donald Alexander Webster Jr., an African-American registered in Ohio; Crosscheck claimed that D. A. Webster, Jr., was also registered as Donald Eugene Webster (no "Jr.") in Charlottesville, Virginia.

FOF ¶ 351.   D. A. Webster, Jr., assured Palast he had never been to Charlottesville. Both of these individuals "were subject to losing their ability to vote," Palast reported. Voting twice is a felony, but Palast failed to find any prosecutions of double voting.

FOF ¶ 352.   In his documentary "The Best Democracy Money Can Buy" (2016), Palast explains that over 7 million voters—almost entirely voters of color—were on the Crosscheck lists by the time of the 2016 presidential election, allegedly because these voters had all voted multiple times in previous elections (although no one from these lists had been prosecuted for voting twice, which is a felony crime with a five-year jail sentence).

FOF ¶ 353.   Palast explains that these cross-check lists were produced only in GOP-controlled states and that the names on the list were common last names of Latinos, African-Americans, and Asian-Americans, such as "Garcia," "Hernandez," "Washington," and "Lee."

FOF ¶ 354.   Since the election, Palast has appeared on the independent media news program Democracy Now! and has explained that on election day, approximately 1.1 million voters of color found themselves bumped off the official voter rolls through Crosscheck.

FOF ¶ 355.   In 2017, researchers at Stanford University, the University of Pennsylvania, Harvard University, and Microsoft found that for every legitimate instance of double registration it finds, Crosscheck's algorithm returns approximately 200 false positives.

FOF ¶ 356.   In 2008, more than 98,000 registered Georgia voters were removed from the roll of voters because of a computer mismatch in their personal identification information. Some 4,500 voters had to prove their citizenship to regain their right to vote.

FOF ¶ 357.   Between November 2015 and early 2016, over 120,000 voters were dropped from rolls in Brooklyn, NYC.

FOF ¶ 358.   Officials have stated that the purge was a mistake and that those dropped represented a "broad cross-section" of the electorate.

FOF ¶ 359.   However an WNYC analysis found that the purge had disproportionately affected majority-Hispanic districts.

FOF ¶ 360.   The board announced that it would reinstate all voters in time for the 2016 Congressional primary.

FOF ¶ 361.   The Board of Elections subsequently suspended the Republican appointee in connection to the purge, but kept on her Democratic counterpart.

FOF ¶ 362.   In 1998, Florida created the Florida Central Voter File to combat vote fraud documented in the 1997 Miami mayoral election. Many people were purged from voter registration lists in Florida, because their names were similar to those of convicted felons, who are not allowed to vote under Florida law.

FOF ¶ 363.   According to the *Palm Beach Post*, African-Americans accounted for 88% of those removed from the rolls but were only about 11% of Florida's voters. Authorities argue this was a contributing factor that may have cost Democratic Al Gore the presidency in 2000.

FOF ¶ 364.   Fact that voters move from one location to another is no secret and their relocation is easily verifiable by change of address for driver's licenses and utility bills at the new location as compared to the old, and finally wherever the USPS delivers the mail.

FOF ¶ 365.   Equally important, perpetration of voter fraud which purging the voter rolls is suppose to cure, presumes that the voter will go through the expense and time of casting ballots at both locations.

FOF ¶ 366.   More often than not, the evil which will occur is ghost voting by the election officials or precinct committee people at the voter's former location.

FOF ¶ 367.   Ghost voting is easily detected by forensic examination of the voter's purported signature on the voter register, roll or pollbook.

### § 31. Caging and Exact Matching Form of Voter Suppression (¶¶ 368-382).

FOF ¶ 368.   Voter caging is challenging the registration status of voters and calling into question the legality of allowing them to vote.

FOF ¶ 369.   In many instances, it involves sending direct mail to the addresses of registered voters and compiling a list of addressees from which the mail is returned undelivered.

FOF ¶ 370.   The list is then used to purge or challenge voters' registrations on the grounds that the voters do not legally reside at the registered addresses.

FOF ¶ 371.   Although the practice is legal in many states. it has been challenged in the courts for perceived racial bias when minority neighborhoods are targeted, and it has been declared illegal under the Voting Rights Act of 1965.

FOF ¶ 372.   Section 8 of the National Voter Registration Act of 1993 (NVRA), P.L. 103-31, 107 Stat.77, 52 U.S.C. §§ 20501–2051, has been interpreted to prohibit voter caging per

se.

FOF ¶ 373.   Pursuant to the NVRA, a voter may not be removed from the voters list unless (1) the voter has requested removal; (2) state law requires removal by reason of criminal conviction or mental capacity; (3) the voter has confirmed in writing that he has moved outside the jurisdiction maintaining the specific voter list, or (4) the voter both (a) has failed to respond to a cancellation notice issued pursuant to the NVRA and (b) has not voted or appeared to vote in the two federal general elections following the date of notice.

FOF ¶ 374.   Voter caging may thus be legal if the primary purpose is to identify those who are not properly registered to vote and to prevent them from voting illegally but not if the primary purpose is to disenfranchise legitimately registered voters on the basis of a technicality.

FOF ¶ 375.   On January 10, 2018, the Supreme Court heard oral arguments in *Husted v. Randolph Institute*, No. 16-980, a challenge to Ohio voter caging laws. The Supreme Court on June 11, 2018 held that Ohio's removal process follows subsection (d) to the letter: It does not remove a registrant on change-of-residence grounds unless the registrant is sent and fails to mail back a return card and then fails to vote for an additional four years.

FOF ¶ 376.   At issue is whether 52 U.S.C. § 20507 permits Ohio's list-maintenance process, which uses a registered voter's voter inactivity as a reason to send a confirmation notice to that voter under the National Voter Registration Act of 1993 and the Help America Vote Act of 2002. If the mail is returned, the voter is stricken from the rolls, albeit four years subsequent to the mailing, a practice called voter caging.

FOF ¶ 377.   Caging should be limited only to Election authorities, such as Secretaries of State or county election boards and should be a two-tier process of first ascertaining a voter's proof of domicile by certified mail, return receipt required USPS delivery, and upon not deliverable return, a personal inspection of the purported domicile by the constable or sheriff to verify the domicile is in fact, appearing to be abandoned or vacant.

FOF ¶ 378.   Such process however, must exempt homeless voters from using their prior voting addresses in order to continue to cast ballots.

FOF ¶ 379.   Similarly, GOP dominated states purge voter rolls by mandating that information contained by the voter registration file "perfectly matches" other government information files, such as social security and driver licenses, in all attributes such as names, e.g. "Robert M. Smith" instead of "Robert Smith" or "Bob Smith."

FOF ¶ 380.   Georgia appears to be a prime example of perfect matching gone amok. According to press accounts, see e.g., Brenton Mock, Where Voter Suppression Hits Hardest in Georgia, City Labs website post Oct. 19, 2018, nearly 53,000 people in Georgia whose voter registrations have been frozen, or are "pending," under perfect matching a controversial new election administration scheme mostly live in the urban parts of the state. About 98% of these aforementioned frozen voter registration are from just ten counties, all which are predominantly urban and therefore, African-American.

FOF ¶ 381.   These counties are: Bibb County, (City of Macon) (933). Dougherty County, (City

of Albany) (1,287). Richmond County (City of Augusta) (1,557). Chatham County City of Savannah) (2,827), Muscogee County (City of Columbus) (3,076). The other five counties where the bulk of the voter registrations are frozen, are in Atlanta's metro suburbs, and four of those have the highest total number of pending voter registrations in the state. In all but two of the ten counties, the percentage of pending voter registrations that belong to African Americans is larger than the black share of the population in those counties.

FOF ¶ 382.   Gwinnett County, in Atlanta's northeast suburbs, only has a black population of 25.4% percent, and yet 35.4% of the voter registrations challenged come from African Americans (Gwinnett also has a population that is 20 percent Latino, which is roughly the same percentage of Latino voter registrations that have been flagged). Fulton County has more voter registrations placed on hold by far than any other county—20,768 compared to DeKalb County, which is number two with 10,541. Roughly 44% of Fulton County is African American, but 75% of the voter registrations on hold come from African Americans.

### § 32. Felon Disenfranchisement Form of Voter Suppression (¶¶ 383-397).

FOF ¶ 383.   A record 6.1 million Americans are forbidden to vote because of felony disenfranchisement, or laws restricting voting rights for those convicted of felony-level crimes. The number of disenfranchised individuals has increased dramatically along with the rise in criminal justice populations in recent decades, rising from an estimated 1.17 million icoern 1976 to 6.1 million today.

FOF ¶ 384.   Twelve states, Alabama, Arizona, Delaware, Florida, Iowa, Kentucky, Mississippi, Nebraska, Nevada, Tennessee, Virginia and Wyoming permanently disenfranchise convicted felons. Of these states, half are former Confederate states, and one (Delaware) is a Border state. The remaining states are in the West.

FOF ¶ 385.   Eighteen states, Alaska, Arkansas, Georgia, Idaho, Kansas, Louisiana, Minnesota, Missouri, New Jersey, New Mexico, North Carolina, Oklahoma, South Carolina, South Dakota, Texas, Washington, West Virginia and Wisconsin restore voting rights after completion of prison, parole, and probation.

FOF ¶ 386.   Four states, California, Colorado, Connecticut, and New York, re-enfranchise felons after they have been released from prison and have completed parole.

FOF ¶ 387.   14 states, Hawaii, Illinois, Indiana, Maryland, Massachusetts, Michigan, Montana, New Hampshire, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, Utah and the District of Columbia allow felons who have been released from prison to vote.

FOF ¶ 388.   Two states, Maine and Vermont, do not disenfranchise felons at all.

FOF ¶ 389.   Some states require felons to complete a process to restore voting rights, but offender advocates say such processes can be very difficult.

FOF ¶ 390.   The U.S. is the only democracy in the world that regularly bans large numbers of felons from voting after they have discharged their sentences.

FOF ¶ 391.   Many other countries including Canada, Denmark, France, Germany, Israel, Japan, Kenya, Norway, Peru, Sweden, and Zimbabwe allow prisoners to vote (unless

convicted of crimes against the electoral system).

FOF ¶ 392.    Some countries, notably the U.K., disenfranchise people for only as long as they are in prison (however, this has been challenged by the European Court of Human Rights).

FOF ¶ 393.    In Florida during the 2000 presidential election, some non-felons were banned due to record-keeping errors and not warned of their disqualification until the deadline for contesting it had passed.

FOF ¶ 394.    This form of vote suppression in the United States disproportionately affects minorities including African-Americans and Latinos.

FOF ¶ 395.    Disenfranchisement of felons is opposed by some as a form of the medieval practice of civil death.

FOF ¶ 396.    Felon disenfranchisement is the result of the "Law and Order" reaction to rising crime rates in the past century, which included other measures such as mandatory sentencing guidelines and "three strikes" in response to criminal recidivism.

FOF ¶ 397.    It is generally recognized that such provisions were not responsive to criminal recidivism and disproportionally impacted African-Americans and other ethnic minorities.

### § 33. RNC Disinformation Form of Voter Suppression (¶¶ 398-402).

FOF ¶ 398.    The RNC's new form of stealth voter suppression is disseminating false information about when and how to vote, leading them to fail to cast valid ballots.

FOF ¶ 399.    For example, in recall elections for the Wisconsin State Senate in 2011, Americans for Prosperity (a conservative organization that was supporting Republican candidates) sent many Democratic voters a mailing that gave an incorrect deadline for absentee ballots. Voters who relied on the deadline in the mailing would have sent in their ballots too late for them to be counted. The organization said that the mistake purportedly was a typographical error.

FOF ¶ 400.    *The New York Times* published an alert on November 5, 2018 by Kevin Roose with Natasha Singer entitled "Types of Misinformation to Beware Of on Election Day. (And What to Do if You Spot Them.)"

    (1)    "*Polling Place Hoaxes.* In 2016, several false rumors cropped up around behavior at polling stations. One false rumor, which spread primarily on Twitter and right-wing blogs, claimed that poll workers in Nevada were wearing "Defeat Trump" shirts, despite being forbidden by election law from wearing partisan apparel. The photo, it turned out, was actually taken at a union event days earlier. Another false rumor in 2016 used doctored photos to claim that agents from Immigration and Customs Enforcement were arresting voters at the polls. The rumor, which was accompanied by threatening language, was meant to intimidate Latino voters. ICE has addressed similar rumors spreading ahead of Tuesday's election by clarifying that immigration officials will not be patrolling polling stations.

(2)     "*Remote Voting Options*. In 2016, false information circulated on social media — including some that was spread by Russia-linked accounts — that told voters they could cast their ballots by text message, email or over the internet. These rumors may circulate again in 2018, and again, they will be false. Except for certain overseas absentee voters who qualify under the Uniformed and Overseas Citizens Absentee Voting Act, no state allows ballot submission over the internet, and no state offers a vote-by-text option.

(3)     "*Suspicious Texts*. Text messages are the breakout technology of the 2018 campaign, and many campaigns have been using peer-to-peer texting apps to encourage voters to turn out on Tuesday. If you are on a campaign or party committee's voter list, you may receive legitimate text messages on Tuesday encouraging you to vote, offering you a ride to the polls, or telling you where your polling place is. But beware any text messages that tell you that voting hours or locations have changed, that new forms of voter ID are required, or that your voter registration is not valid. Voters across Indiana who filed absentee ballots last month have been receiving text messages purporting to be from President Trump — and claiming their votes have not been registered. The texts included a link to a Republican National Committee website that asks users to enter their names, addresses and phone numbers and then provides information about their polling locations. "This is President Trump," read one message received by a voter in Elkhart County, Ind., who had voted by absentee ballot. "Your early vote has NOT been RECORDED on Indiana's roster." Voters in Georgia, Kansas and Michigan have reported receiving similar messages from "President Trump." Voters have also reported receiving texts from Democratic organizations, telling them that their absentee ballots have not been returned.

(4)     "*Voting Machine Malfunction Rumors*. Reports of broken, rigged or technically compromised voting machines are common on Election Day. You may even see videos of malfunctioning voting machines going viral on social media. Unless you have rock-solid evidence that the claims are true, it's usually best to be skeptical. On Election Day in 2016, a Pennsylvania woman posted a viral Twitter video that claimed that her voting machine was not allowing her to vote for Donald Trump. The video was shared thousands of times online, and set off fears of a rigged election. But it turned out to be user error, as ProPublica reported. Mr. Trump also spread voting machine-related misinformation on Election Day, falsely citing reports about isolated problems with voting machines in one Utah county as evidence that problems were being reported across the entire country. There may also be accurate reports of troubles with voting machines. Several weeks ago, Texas's election commissioner issued an advisory after some voters reported a problem with the state's electronic voting machines. The machines switched the votes of some people who had selected a straight-party ticket but had also pushed another button on the machine before the screen had finished rendering. In the Texas case, only a handful of complaints were received, and all of the complaining voters were able to recast their votes, according to The *Washington Post*. The best thing to do, in any case, is to take extra precautions. In states that issue a paper record of electronically submitted votes, check the paper record to make sure that your choices are accurately reflected. And in the five states that provide no paper trail of votes — Louisiana, Georgia, South Carolina, New Jersey and Delaware — double- or

65

triple-check your choices before submitting them. If you believe your voting machine is malfunctioning, notify a poll worker.

(5)    "*Misleading Photos and Videos*. The 2016 election gave rise to an influx of doctored and mislabeled photos, and this year's Election Day could be a repeat. Voters could be shown photos of long lines at polling places to discourage them from voting, or could be shown manipulated videos of malfunctioning voting machines. (This happened in Brazil last month, when a doctored video showing a voting machine automatically casting votes for a left-leaning candidate went viral on social media.) Social networks have tried to combat the spread of false and misleading information about voting. Facebook set up a "war room" to coordinate responses to suspicious activity on Election Day, and has set up a channel where state election officials can send the company examples of voting-related misinformation they find, according to *The Washington Post*. Twitter has teamed with state election officials and built a portal to handle reports of voting-related disinformation on Election Day, The *Post* reported. Still, it's likely that someone will try to mislead voters through manipulated photos or videos on Election Day, so it's best to be prepared to give extra scrutiny to everything you see.

(6)    "*False Voter Fraud Allegations*. During the 2016 election, Mr. Trump claimed without evidence that widespread voter fraud would occur. After he won the presidency but lost the popular vote, he claimed, again without proof, that millions of undocumented immigrants had cast ballots. In the real world, voter fraud is exceedingly rare, but you can expect rumors to fly on Election Day anyway. In Brazil, which held its presidential election last month, viral rumors and hoaxes on Facebook, Twitter and WhatsApp claimed to show evidence of widespread voter fraud. These hoaxes are often meant to undermine an election's integrity and delegitimize the winners. Unless you witness indisputable evidence of voter fraud, it's best to ignore these claims.

FOF ¶ 401.    The *New York Times* article continues with "Tips for Checking Misinformation, and What to Do if You Spot Some."

(1)    "Whenever possible, it's best to rely on official government websites for voting-related information. (Look for the .gov at the end of the website address.) *The New York Times* published a guide to figuring out how, where and when to vote on Tuesday. There are also several sites, including Vote411 and BallotReady, that provide independent and nonpartisan voter information.

(2)    "Before sharing a viral story on Election Day that looks suspicious, check a fact-checking website such as Snopes or FactCheck.org first, to see if it has been debunked. If it is a photo, try doing a reverse image search using a website like TinEye to see if the photo is old or mislabeled, or if it has been manipulated.

(3)    "If you witness voter intimidation, you can tell a poll worker, or report it via the Election Protection Hotline, which is administered by the nonpartisan group Lawyers' Committee for Civil Rights Under Law: 1-866-OUR-VOTE or 1-888-VE-Y-VOTA (in Spanish). You can also report it to the Justice Department's voting rights hotline: 1-800-253-3931.

(4)   "And if you do find misinformation online that has the potential to mislead voters, you can take it directly to social media platforms through their reporting tools, or send it to *The New York Times*."

FOF ¶ 402.   The Federal complaint in the Federal Court in New Jersey which resulted in the Nov. 2, 1982 Consent Decree alleged RNC disinformation.

### § 34. Inequitable Election Resources Form of Voter Suppression (¶¶403-404).

FOF ¶ 403.   The RNC implicitly encourages State Legislatures controlled by the Republican Party to underfund Electoral resources particularly in urban and rural areas dominated by minorities.

FOF ¶ 404.   Inequitable Election Day resources are burdensome, taxing and vexatious on voters, particularly low-income workers who are generally employed by hourly wages and as a result, cannot afford to stand in long lines to cast ballots.

### § 35. RNC's Voter Suppression Violates State Election Laws (¶¶ 405-517).

FOF ¶ 405.   The RNC's principal means of winning elections is not adhering to the Lincoln Rule, but instead to suppress voter turnout among constituencies not inclined to vote Republican, i.e., African-American and Hispanic voters.

FOF ¶ 406.   The National Association of Secretaries of State assemble data on who has the right to challenge voters' qualifications to cast ballots. This data by state follows.

**Alabama.**

FOF ¶ 407.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. In general elections, a poll watcher must be appointed by the chairman of the party's county executive committee, or by a nominee, or by a beat committeeman. Each watcher shall be a resident and qualified elector of the State of Alabama. Election officials, including returning officers, may not serve as poll watchers. (Alabama Code § 17-8-7).

FOF ¶ 408.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. An election inspector may challenge an individual's eligibility to vote. (Alabama Code 17-10-2).

**Alaska.**

FOF ¶ 409.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. One or more persons may be appointed as a poll watcher for each precinct or counting center for any election. Poll watchers are appointed by: the precinct party committee where an organized precinct committee exists; the district party committee where no organized precinct committee exists; the state party chair where no precinct or district committee exists; candidates not representing a political party; organizations or organized groups that sponsor oppose an initiative, referendum or recall. A watcher must be a United States citizen. (Alaska Stat. § 15-10-170).

FOF ¶ 410.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Every

67

election official shall question, and every watcher and any other person qualified to vote in the precinct may question, a person attempting to vote if the questioner has good reason to suspect that the questioned person is not qualified under AS 15.05. (Alaska Stat. § 15-15-210).

**Arizona.**

FOF ¶ 411.     Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The county chairman of each party may designate a party agent or representative and alternates for a polling place in the precinct who may act as challengers for the party which appointed him. At each voting place, one challenger for each political party may be present. (Ariz. Rev. Stat. § 16-590).

FOF ¶ 412.     Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Any qualified elector of the county may orally challenge a person offering to vote as not qualified under section 16-121.01 or on the ground that the person has voted before at that election. (Ariz. Rev. Stat. § 16-591)

**Arkansas**

FOF ¶ 413.     Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Poll watchers shall include any: (1) candidate in person, but only during the counting and tabulation of ballots and the processing of absentee ballots; (2) authorized representative of a candidate; (3) authorized representative of a group seeking the passage or defeat of a measure on the ballot; and (4) authorized representative of a political party with a candidate on the ballot. Only one authorized poll watcher per candidate, group, or party at any one given time may be officially recognized as a poll watcher at each location within a polling site where voters identify themselves to election officials. (Ark. Code Ann. § 7-5-312).

FOF ¶ 414.     Individuals Authorized to Challenge a Voter's Eligibility on Election Day. A poll watcher may challenge a voter on the grounds that the voter is not eligible to vote in the precinct or that the voter has previously voted at that election. (Ark. Code Ann. § 7-5-312).

**California.**

FOF ¶ 415.     Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. See *Elections Observation Rights and Responsibilities*, California Office of Secretary of State.

FOF ¶ 416.     Individuals Authorized to Challenge a Voter's Eligibility on Election Day. On the day of the election no person, other than a member of a precinct board or other official responsible for the conduct of the election, shall challenge or question any voter concerning the voter's qualifications to vote.(California Elections Code Ann. § 14240).

**Colorado.**

FOF ¶ 417.     Individuals Authorized to Serve as Appointed/Designated Poll Watchers or

Challengers and Other Authorized Polling Place Observers. Each participating political party or issue committee whose candidate or issue is on the ballot, and each unaffiliated and write-in candidate whose name is on the ballot for a general or congressional vacancy election, is entitled to have no more than one watcher at any one time in each voter service and polling center in the county and at each place where votes are counted. The chairperson of the county central committee of each major political party, the county chairperson or other authorized official of each minor political party, the issue committee, or the write-in or unaffiliated candidate shall certify the names of one or more persons selected as watchers on forms provided by the county clerk and recorder and submit the names of the persons selected as watchers to the county clerk and recorder. (Colo. Rev. Stat. § 1-7-106; 1-7-108).

FOF ¶ 418.     Individuals Authorized to Challenge a Voter's Eligibility on Election Day. An election judge shall challenge any person intending to vote who the judge believes is not an eligible elector. In addition, challenges may be made by watchers or any eligible elector of the precinct. (Colo. Rev. Stat. § 1-9-201;also see 1-9-203).

**Connecticut**

FOF ¶ 419.     Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Each registrar may appoint one or more challengers in his town or district, one of whom may be present at the offering of any vote. (Conn. Gen. Stat. § 9-232).

FOF ¶ 420.     Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Each registrar may appoint one or more challengers in his town or district, one of whom may be present at the offering of any vote; and any such challenger or any elector may challenge the right of any person offering to vote, on the ground of want of identity with the person on whose name the vote is offered, or disfranchisement or lack of bona fide residence, and the moderator shall decide upon the right of the person so challenged to vote. (Conn. Gen. Stat. § 9-232).

**Delaware.**

FOF ¶ 421.     Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Each of the political parties, acting through their respective county committees, may appoint and accredit some suitable person as a challenger. One challenger from any political party which is represented by a candidate in that district may be present inside the polling place and shall be permitted to observe the conduct of the election and all the election records. (Del. Code Ann. tit. 15, § 4934). The following persons shall be admitted to the voting room: members and employees of the Department identified by a badge or written authorization; the State Election Commissioner and the Commissioner's employees identified by a badge or written authorization; persons voting and waiting to vote, or a child lawfully accompanying such a person; one challenger from a political party with a candidate on the ballot; persons with business in the building that is not connected to the election; a person or persons deemed necessary to the conduct of the election by majority vote of the inspector and judges. (Del. Code Ann. tit. 15, § 4933 for information on other individuals allowed in the polling place).

FOF ¶ 422.     Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Each of

69

the political parties, acting through their respective county committees, may appoint and accredit some suitable person as a challenger. (Del. Code Ann. tit. 15, § 4934; also see 4934-4941).

**Florida.**

FOF ¶ 423.    Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Each political party and each candidate may have one watcher in each polling room or early voting area at any one time during the election. A political committee formed for the specific purpose of expressly advocating the passage or defeat of an issue on the ballot may have one watcher for each polling room or early voting area at any one time during the election. Each poll watcher shall be a qualified and registered elector of the county in which he or she serves. (Fla. Stat. § 101.131).

FOF ¶ 424.    Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Any registered elector or poll watcher of a county may challenge the right of a person to vote in that county. (Fla. Stat. § 101.111).

**Georgia.**

FOF ¶ 425.    Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. In a primary or run-off primary, each candidate entitled to have his or her name placed on the primary or run-off primary ballot may submit the name of one poll watcher for each precinct in which he or she wishes to have an observer to the chairperson or secretary of the appropriate party executive committee at least 21 days prior to such primary or 14 days prior to such run-off primary. The appropriate party executive committee shall designate at least seven days prior to such primary or run-off primary no more than two poll watchers for each precinct, such poll watchers to be selected by the committee from the list submitted by party candidates. In an election or run-off election, each political party and political body shall each be entitled to designate, at least seven days prior to such election or run-off election, no more than two official poll watchers in each precinct to be selected by the appropriate party or body executive committee. Each independent candidate shall be entitled to designate one poll watcher in each precinct. In addition, candidates running in a nonpartisan election shall be entitled to designate one poll watcher in each precinct. In an election or run-off election, each political party and political body, which body is registered pursuant to Code Section 21-2-110 and has nominated a candidate for state-wide office, shall additionally be entitled to designate, at least 14 days prior to such election or run-off election, no more than 25 official state-wide poll watchers to be selected by the appropriate party or body executive committee. Each independent candidate shall also be entitled to designate no more than 25 official state-wide poll watchers. In addition, candidates running in a state-wide nonpartisan election shall be entitled to designate no more than 25 official state-wide poll watchers. (Ga. Code Ann. § 21-2-408).

FOF ¶ 426.    Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Any elector of the county or municipality may challenge the right of any other elector of the county or municipality, whose name appears on the list of electors, to vote in an election. (Ga. Code Ann. § 21-2-230).

**Hawaii.**

FOF ¶ 427.     Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Each qualified political party shall be entitled to appoint no more than one watcher who may be present at any time in each precinct and absentee polling place in which the candidates of that political party are on the ballot. All watchers so appointed shall be registered voters. (Haw. Rev. Stat. § 11-77).

FOF ¶ 428.     Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Any voter rightfully in the polling place may challenge the right to vote of any person who comes to the precinct officials for voting purposes. The challenge shall be on the grounds that the voter is not the person the voter alleges to be, or that the voter is not entitled to vote in that precinct. (Haw. Rev. Stat. § 11-25).

**Idaho.**

FOF ¶ 429.     Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The county clerk shall, upon receipt of a written request, direct that the election judges permit one (1) person authorized by each political party, if the election is a partisan election, to be at the polling place for the purpose of challenging voters, and shall, if requested, permit any one (1) person authorized by a candidate, several candidates or political party, to be present to serve as a watcher to observe the conduct of the election. (Idaho Code § 34-304).

FOF ¶ 430.     Individuals Authorized to Challenge a Voter's Eligibility on Election Day. At the time of any election, any registered elector may challenge the entry of an elector's name as it appears in the election register. (Idaho Code § 34-431).

**Illinois.**

FOF ¶ 431.     Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Each established political party shall be entitled to appoint two poll watchers per precinct. Such poll watchers must be affiliated with the political party for which they are pollwatching. For all elections, the pollwatchers must be registered to vote in Illinois. Each candidate shall be entitled to appoint two poll watchers per precinct. For all elections, the pollwatchers must be registered to vote in Illinois. Each organization of citizens within the county or political subdivision, which has among its purposes or interests the investigation or prosecution of election frauds…, shall be entitled to appoint one pollwatcher per precinct. For all elections, the pollwatcher must be registered to vote in Illinois. Each State nonpartisan civic organization within the county or political subdivision shall be entitled to appoint one pollwatcher per precinct, provided that no more than 2 pollwatchers appointed by State nonpartisan civic organizations shall be present in a precinct polling place at the same time. The pollwatchers must be registered to vote in Illinois. (10 Ill. Comp. Stat. § 5/17-23; also see *Illinois Guide for Pollwatchers*).

FOF ¶ 432.     Individuals Authorized to Challenge a Voter's Eligibility on Election Day. An election judge, a pollwatcher, or a voter may challenge a person's right to vote. (See *Illinois Guide for Pollwatchers*).

**Indiana.**

FOF ¶ 433.    Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Watchers may be appointed by the state chairman and county chairman of bona fide political parties, independent candidates for federal office certain candidates, the county election board in certain votes on public questions, or by the media to monitor activities at the polling place. Each political party, independent candidate, and media may have only one watcher at each precinct at any time during Election Day. A watcher must be a registered voter of the county. (Indiana Code 3-6-8-1; 3-6-8-2.5).

FOF ¶ 434.    Individuals Authorized to Challenge a Voter's Eligibility on Election Day. A member of the precinct election board (the inspector or either judge); a poll clerk (but only if the clerk does so based on a questionable signature by the voter on the poll list); or a challenger appointed by a candidate, or a political party, with the proper credentials. (*2012 Indiana Election Day Handbook*).

**Iowa.**

FOF ¶ 435.    Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Poll watchers may be appointed by the following: political party executive or central committees; non-party political organizations (NPPOs); candidates who are "Nominated by Petition," and groups opposing or supporting public measures on the ballot. Poll watchers may also be called challenging committees or observers. Poll watchers acting as challengers must be registered voters in the county where the challenge occurs. While the polls are open on election day, there is a limit to the number of poll watchers that can be in a polling place: 3 appointed by each political party that has a candidate on the ballot; 1 appointed by each NPPO that has a candidate on the ballot; 1 appointed by each candidate nominated by petition, and 3 for public measures on the ballot (except for primary and general elections).(*Iowa Poll Watchers Guide*). The following persons shall be permitted to be present at and in the immediate vicinity of the polling places, provided they do not solicit votes: a person who is by law authorized to perform or is charged with the performance of official duties at the election; any number of persons, not exceeding three at a time from each political party having candidates to be voted for at such election, to act as challenging committees, who are appointed and accredited by the executive or central committee of such political party or organization; any number of persons not exceeding three at a time from each of such political parties, appointed and accredited in the same manner as prescribed in subsection 2 for challenging committees, and any number of persons not exceeding three at a time appointed as observers under subsection 5, to witness the counting of ballots; any peace officer assigned or called upon to keep order or maintain compliance with the provisions of this chapter, upon request of the commissioner or of the chairperson of the precinct election board; one observer at a time representing any nonparty political organization, any candidate nominated by petition pursuant to chapter 45, or any other nonpartisan candidate in a city or school election, appearing on the ballot of the election in progress. Candidates who send observers to the polls shall provide each observer with a letter of appointment in the form prescribed by the state commissioner; any persons expressing an interest in a ballot issue to be voted upon at an election except a general or primary election. Any such person shall file a notice of intent to serve as an observer with the commissioner before election day.

If more than three persons file a notice of intent to serve at the same time with respect to ballot issues at an election, the commissioner shall appoint from those submitting a notice of intent the three persons who may serve at that time as observers, and shall provide a schedule to all persons who filed notices of intent. The appointees, whenever possible, shall include both opponents and proponents of the ballot issues; any person authorized by the commissioner, in consultation with the secretary of state, for the purposes of conducting and attending educational voting programs for youth; reporters, photographers, and other staff representing the news media. (Iowa Code § 49.104).

FOF ¶ 436.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Any person offering to vote may be challenged as unqualified by any precinct election official or registered voter. It is the duty of each official to challenge any person offering to vote whom the official knows or suspects is not duly qualified. (Iowa Code § 49.79).

**Kansas.**

FOF ¶ 437.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Each person who is authorized to appoint poll agents may appoint one per polling place. Each person appointed to be an authorized poll agent shall be a registered Kansas voter; a member of any candidate's immediate family; or be a person under 18 years of age but at least 14 years of age who meets all other requirements for qualification of an elector except that of age (Kan. Stat. Ann. § 25-3005a; Kansas Secretary of State). At most points in the electoral process, interested individuals and groups may observe the proceedings at the precinct polling sites, at the county election office, or at the county or state canvass. The principal means recognized in state law for public observation of electoral proceedings is the authorized poll agent. Poll agents are commonly referred to as poll watchers. Each of the following persons is automatically a poll agent because of the position they hold: state or county party chair; chair of a committee formed to support or oppose a question submitted election; candidate; political party precinct committee man or woman; write in candidate for statewide office who has filed an affidavit of write in candidacy with the Secretary of State. A person may be appointed to be a poll agent by one of the persons listed above. Election observers—In some cases political organizations, including international groups and foreign groups, will request permission from the county election officer or the Secretary of State to observe the voting process in a county or counties. The Secretary of State or county election officer may grant permission on a case-by-case basis, reminding all such groups that they must follow all laws and all policies established by the election officer. (Kansas Election Administration Standards).

FOF ¶ 438.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. It shall be the duty of each judge of election to challenge any person offering to vote, whom the judge shall know or suspect not to be qualified as an elector. (Kan. Stat. Ann. § 25-414).

**Kentucky.**

FOF ¶ 439.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The county executive

committee of any political party having a ticket to elect at any regular or special election may designate not more than two (2) challengers to be present at and witness the holding of the election in each precinct in the county. (Ky. Rev. Stat. Ann. § 117.315; also see §§ 117.315 - 117.317). No person, other than the election officers, challengers, person assisting voters, and a minor child in the company of a voter, shall be permitted within the voting room while the vote is being polled, except as follows: For the purpose of voting; (b) By authority of the election officers to keep order and enforce the law; (c) With the express approval of the county board of elections to repair or replace voting equipment that is malfunctioning and to provide additional voting equipment; or (d) At the voter's discretion, a minor child in the company of a voter may accompany the voter into a voting booth or other private area provided for casting a vote. (Ky. Rev. Stat. Ann. § 117.235).

FOF ¶ 440.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. The county executive committee of any political party having a ticket to elect at any regular or special election may designate not more than two (2) challengers to be present at and witness the holding of the election in each precinct in the county. (Ky. Rev. Stat. Ann. § 117.315; also see 117.316).

**Louisiana.**

FOF ¶ 441.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. A qualified voter of the state of Louisiana who is not entitled to assistance in voting and is not a candidate in the election may serve as a watcher. If the number of watchers inside a polling place is so great as to interfere with the orderly conduct of the election, the commissioners shall regulate the number of watchers inside the polling place for each precinct so that the election may be conducted in an orderly manner. (Louisiana Rev. Statutes § 18:427).

FOF ¶ 442.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. A commissioner, watcher, or qualified voter may challenge a person applying to vote in a primary or general election. (Louisiana Rev. Statutes § 18:565).

**Maine.**

FOF ¶ 443.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Municipalities must allow at least one worker from each political party to remain outside the guardrail enclosure as a pollwatcher. (21-A Me. Rev. Stat. Ann. § 627).

FOF ¶ 444.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. A voter of a municipality or an election official may challenge the right of another to vote at an election in that municipality. (21-A Me. Rev. Stat. Ann. § 673).

**Maryland.**

FOF ¶ 445.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The following persons or entities have the right to designate a registered voter as a challenger or a watcher at each place of registration and election: the State Board for any polling place in the State; a local board for any polling place located in the county of the local board; a

candidate; a political party; any other group of voters supporting or opposing a candidate, principle, or proposition on the ballot. An election judge shall permit an individual other than an accredited challenger or watcher who desires to challenge the right to vote of any other individual to enter the polling place for that purpose. A majority of the election judges may limit the number of nonaccredited challengers and watchers allowed in the polling place at any one time for the purpose of challenging the right of an individual to vote. A nonaccredited challenger or watcher shall leave the polling place as soon as a majority of the election judges decides the right to vote of the individual challenged by the challenger or watcher. (Md. Ann. Code Art. 33, § 10-311). An election judge shall allow the following individuals to have access to the voting room at a polling place: a voter; an individual who accompanies a voter in need of assistance in accordance with § 10-310(c) of this subtitle; polling place staff; a member or other representative of the State Board or local board; an accredited watcher or challenger; an individual under the age of 18 who accompanies a voter; and any other individual authorized by the State Board or local board. (Md. Ann. Code Art. 33, § 10-308 for information on individuals authorized to be in the polling place).

FOF ¶ 446.    Individuals Authorized to Challenge a Voter's Eligibility on Election Day. An election judge shall permit an individual other than an accredited challenger or watcher who desires to challenge the right to vote of any other individual to enter the polling place for that purpose. (Md. Ann. Code Art. 33, §10-311). The right of an individual to vote may be challenged at the polls only on the grounds of identity. (Md. Ann. Code Art. 33, § 10-312).

**Massachusetts.**

FOF ¶ 447.    Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The state committee of a political party may appoint a person to act as a challenger of voters at any polling place in the commonwealth at a state election (Mass. Gen. Laws ch. 54, § 85A). To achieve the legal requirement that the election be held in public view, observers shall be allowed inside the polling place, outside the guard rail, unless they are disorderly or obstruct the access of voters. Observers may keep notes including marked voting lists. If there are so many observers in the polling place that they obstruct voters, they may be asked to cooperate in collecting information. The warden may exclude from the polling place any person who is disorderly or who obstructs the access of voters. (950 C.M.R. § 54.04(22a).

FOF ¶ 448.    Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Any election officer or other person may challenge a person's right to vote for any legal cause (Massachusetts Secretary of State Election Day Legal Summary).

**Michigan.**

FOF ¶ 449.    Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. At an election, a political party or an incorporated organization or organized committee of citizens interested in the adoption or defeat of a ballot question being voted for or upon at the election, or interested in preserving the purity of elections and in guarding against the abuse of the elective franchise, may designate challengers as provided in this act. A political party, incorporated organization, or organized committee of interested citizens may

designate not more than 2 challengers to serve in a precinct at any 1 time. A challenger shall be a registered elector of the state (Mich. Comp. Laws §168.730). An election is an open process that may be observed by any interested person. A person who wishes to observe the election process -- who is not a qualified election challenger -- is commonly called a "poll watcher." (Michigan Secretary of State, *The Appointment, Rights, and Duties of Election Challengers and Poll Watchers*).

FOF ¶ 450.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. At an election, a political party or an incorporated organization or organized committee of citizens interested in the adoption or defeat of a ballot question being voted for or upon at the election, or interested in preserving the purity of elections and in guarding against the abuse of the elective franchise, may designate challengers (Mich. Comp. Laws § 168.730). An election inspector shall challenge an applicant applying for a ballot if the inspector knows or has good reason to suspect that the applicant is not a qualified and registered elector of the precinct, or if a challenge appears in connection with the applicant's name in the registration book. A registered elector of the precinct present in the polling place may challenge the right of anyone attempting to vote if the elector knows or has good reason to suspect that individual is not a registered elector in that precinct. (Mich. Comp. Laws § 168.727).

**Minnesota.**

FOF ¶ 451.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. At election to fill partisan offices, the chair of an authorized committee of each major political party may appoint by written certificate voters from that political party to act as challengers of voters at the polling place for each precinct. Only one challenger from each major political party for each precinct shall be allowed to remain in the polling place at one time. A challenger must be a resident of the state. (Minn. Stat. § 204C.07). Representatives of the secretary of state's office, the county auditor's office, and the municipal or school district clerk's office may be present at the polling place to observe election procedures. Except for these representatives, election judges, sergeants-at-arms, and challengers, an individual may remain inside the polling place during voting hours only while voting or registering to vote, providing proof of residence for an individual who is registering to vote, or assisting a disabled voter or a voter who is unable to read English. During voting hours no one except individuals receiving, marking, or depositing ballots shall approach within six feet of a voting booth, ballot counter, or electronic voting equipment, unless lawfully authorized to do so by an election judge or the individual is an election judge monitoring the operation of the ballot counter or electronic voting equipment. Teachers and elementary or secondary school students participating in an educational activity may be present at the polling place during voting hours. (Minn. Stat. § 204C.06 for information on other individuals allowed in the polling place).

FOF ¶ 452.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. An election judge, an authorized challenger or other voter may challenge an individual, based upon the personal knowledge they know that the voter is not eligible to vote at that precinct. (Minnesota Secretary of State, *Voting Challenges*).

**Mississippi.**

FOF ¶ 453.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or

Challengers and Other Authorized Polling Place Observers. The following persons shall be designated as authorized challengers and shall be allowed to challenge the qualifications of any person offering to vote (a) any candidate whose name is on the ballot in the precinct in which the challenge is made; (b) any official poll watcher of a candidate whose name is on the ballot in the precinct in which the challenge is made;  any official poll watcher of a political party for the precinct in which the challenge is made; (d) any qualified elector from the precinct in which the challenge is made; or (e) any manager, clerk or poll worker in the polling place where the person whose qualifications are challenged is offering to vote. (Miss. Code. Ann. § 23-15-571).

FOF ¶ 454.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. The following persons shall be designated as authorized challengers and shall be allowed to challenge the qualifications of any person offering to vote (a) any candidate whose name is on the ballot in the precinct in which the challenge is made; (b) any official poll watcher of a candidate whose name is on the ballot in the precinct in which the challenge is made; (c) any official poll watcher of a political party for the precinct in which the challenge is made; (d) any qualified elector from the precinct in which the challenge is made; or (e) any manager, clerk or poll worker in the polling place where the person whose qualifications are challenged is offering to vote. (Miss. Code. Ann. § 23-15-571).

**Missouri.**

FOF ¶ 455.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The chair of the county committee of each political party named on the ballot shall have the right to designate a challenger for each polling place, who may be present during the hours of voting, and a challenger for each location at which absentee ballots are counted, who may be present while the ballots are being prepared for counting and counted. All persons selected as challengers shall have the same qualifications required by section 115.085 for election judges, except that such challenger shall be a registered voter in the jurisdiction of the election authority for which the challenger is designated as a challenger. (Mo. Rev. Stat. § 15-115.105.1). Who may be admitted to the polling place: except election authority personnel, election judges, watchers and challengers, law enforcement officials at the request of election officials or in the line of duty, minor children under the age of eighteen accompanying an adult who is in the process of voting, international observers who have registered as such with the election authority, persons designated by the election authority to administer a simulated youth election for persons ineligible to vote because of their age, members of the news media who present identification satisfactory to the election judges and who are present only for the purpose of bona fide news coverage, provided that such coverage does not disclose how any voter cast the voter's ballot on any question or candidate or in the case of a primary election on which party ballot they voted or does not interfere with the general conduct of the election as determined by the election judges or election authority, and registered voters who are eligible to vote at the polling place, no person shall be admitted to a polling place. (Mo. Rev. Stat. § 15-115.409 for information on other individuals authorized to be in the polling place).

FOF ¶ 456.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. The identity or qualifications of any person offering to vote may be challenged by any

election authority personnel, any registered voter, or any duly authorized challenger at the polling place. (Mo. Rev. Stat. § 15-115.429.1).

**Montana.**

FOF ¶ 457.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The election judges shall permit one poll watcher from each political party to be stationed close to the poll lists in a location that does not interfere with the election procedures. A candidate may not serve as a poll watcher at a polling place where electors are voting on ballots with the candidate's name on them. (Mont. Code. Ann. § 13-13-120).

FOF ¶ 458.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. An elector's right to vote may be challenged at any time by any registered elector by the challenger filling out and signing an affidavit stating the grounds of the challenge and providing any evidence supporting the challenge to the election administrator or, on election day, to an election judge. (Mont. Code. Ann. § 13-13-301).

**Nebraska.**

FOF ¶ 459.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Not reported.

FOF ¶ 460.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Any person offering to vote, even though such person is registered, may be challenged as unqualified by any inspector, judge or clerk of election, or registered voter. The judge or clerk of election shall challenge any person offering to vote whom he or she knows or suspects not to be duly qualified. (Neb. Rev. Stat. § 32-926).

**Nevada.**

FOF ¶ 461.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The county clerk shall allow members of the general public to observe the conduct of voting at a polling place. A member of the general public does not include any person who: gathers information for communication to the public; is employed or engaged by or has contracted with a newspaper, periodical, press association, or radio or television station; and is acting solely within his or her professional capacity. (Nev. Rev. Stat. § 293.274).

FOF ¶ 462.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. A person applying to vote may be challenged orally by any registered voter of the precinct upon the ground that he or she is not the person entitled to vote as claimed or has voted before at the same election. (Nev. Rev. Stat. § 293.303).

**New Hampshire.**

FOF ¶ 463.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The state committee of a political party may appoint a person to act as challenger of voters at any polling place in the state at a state election. (N.H. Rev. Stat. Ann. § 666.4). The attorney general may appoint a person to act as challenger of voters at any polling place in the

state at a state election. (N.H. Rev. Stat. Ann. § 666.5).

FOF ¶ 464.    Individuals Authorized to Challenge a Voter's Eligibility on Election Day. A voter offering to vote at any state election may be challenged by any other voter registered in the town or ward in which the election is held, an election official, a challenger appointed by a political committee pursuant to RSA 666:4, or a challenger appointed by the attorney general pursuant to RSA 666:5. (N.H. Rev. Stat. Ann. § 659. 27).

**New Jersey.**

FOF ¶ 465.    Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The chairman of the county committee of any political party that has duly nominated any candidate for public office to be voted for at an election by all the voters within the county or any political division thereof greater than a single municipality, or where the election is within and for a single municipality only, or any subdivision thereof, then the chairman of the municipal committee of the political party making such nomination within and for such single municipality, or subdivision thereof, may appoint two challengers for each election district in the chairman's county or municipality, as the case may be. (N.J. Stat. Ann. § 19:7-1). No person shall be allowed or permitted to be present in the polling place or polling room during the progress of the election except the officers connected with the election, persons connected with the operation of a simulated election for minors, the several candidates, the duly authorized challengers, such voters as are present for the purpose of voting and their dependent children, minors present for the purpose of voting in a simulated election, and such officers as may be duly detailed to be present, for preserving the peace or enforcing the provisions hereof. (N.J. Stat. Ann. § 19:15-8).

FOF ¶ 466.    Individuals Authorized to Challenge a Voter's Eligibility on Election Day. The members of the district boards and any duly authorized challenger, respectively, shall at any election challenge every person who shall claim to have a right to vote therein whom they or he shall know, suspect or believe not to be qualified or entitled to so vote, and said members of the district board or challenger shall have the power and right to ask all questions which are suitable and necessary to determine such person's right. (N.J. Stat. Ann. § 19:15-18. Also see 19:15-18.1, 18.2).

**New Mexico.**

FOF ¶ 467.    Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The county chair of each political party represented on the ballot may appoint in writing challengers for each polling location. (N.M. Stat. Ann. § 1-2-21). An election-related organization may appoint watchers in a county if the organization provides a written notice to the secretary of state at least ten days prior to the election date and specifies the names of the qualified appointees. Any group of three candidates for elected office may appoint watchers in a county. The secretary of state shall notify the county clerk of the qualified appointees at least five days before the election. (N.M. Stat. Ann. § 1-2-27). Challengers and watchers shall be voters of a precinct located in that county to which they are appointed. (N.M. Stat. Ann. § 1-2-22).

FOF ¶ 468.    Individuals Authorized to Challenge a Voter's Eligibility on Election Day. A challenge may be interposed by a member of the precinct board or by a party

challenger (N.M. Stat. Ann. § 1-2-20).

**New York.**

FOF ¶ 469.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. At any general, special, town or village election, any party committee or independent body whose candidates are upon the ballot, and at any primary election, any two or more candidates and any political committee may have for each election district three watchers at any one time, not more than one of whom may be within the guard rail at any one time. Watchers shall be appointed by the chairman of any such party, committee or independent body or by the candidates. Each watcher must be a qualified voter of the city or county in which he is to serve No person shall be appointed or act as a watcher who is a candidate for any public office to be voted for by the voters of the election district in the same election in which the watcher is to serve. (N.Y. Election Law § 8-500).

FOF ¶ 470.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Before his vote is cast, any person may be challenged by any registered voter properly in the polling place, watcher, or clerk or inspector of election. An inspector shall challenge every person offering to vote, who he shall know or suspect is not entitled to vote in the district, and every person whose name appears on the list of persons to be challenged on Election Day which is furnished by the board of elections. (N.Y. Election Law § 8-502).

**North Carolina.**

FOF ¶ 471.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The chair of each political party in the county shall have the right to designate two observers to attend each voting place at each primary and election and such observers may, at the option of the designating party chair, be relieved during the day of the primary or election after serving no less than four hours and provided the list required by this section to be filed by each chair contains the names of all persons authorized to represent such chair's political party. Not more than two observers from the same political party shall be permitted in the voting enclosure at any time. Persons appointed as observers must be registered voters of the county for which appointed and must have good moral character. (N.C. Gen. Stat. § 163 45). During the time allowed for voting in the voting place, only the following persons may enter the voting enclosure: an election official; an observer; a runner but only to the extent necessary to announce that runner's presence and to receive the voter list; a person seeking to vote in that voting place on that day but only while in the process of voting or seeking to vote; a voter in that precinct while entering or explaining a challenge; a person authorized to assist a voter but, except as provided in subdivision (6) of this section, only while assisting that voter; ,minor children of the voter under the age of 18, or minor children under the age of 18 in the care of the voter, but only while accompanying the voter and while under the control of the voter; persons conducting or participating in a simulated election within the voting place or voting enclosure, if that simulated election is approved by the county board of elections; any other person determined by election officials to have an urgent need to enter the voting enclosure but only to the extent necessary to address that need. (N.C. Gen. Stat. § 163 166.3).

FOF ¶ 472.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. On the day of a primary or election, at the time a registered voter offers to vote, any other registered voter of the precinct may exercise the right of challenge, and when he does so may enter the voting enclosure to make the challenge, but he shall retire therefrom as soon as the challenge is heard. (N.C. Gen. Stat. § 163 87).

**North Dakota.**

FOF ¶ 473.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Three poll challengers appointed by the district chairman of each political party represented on the election board are entitled to be in attendance at each polling place. (N.D. Cent. Code § 16.1-05-06).Election observers must be allowed uniform and nondiscriminatory access to all stages of the election process (N.D. Cent. Code § 16.1-05-09). An election observer is a nonpartisan individual wishing to monitor the administration of the election. The law permits these people to observe but not interfere with those marking their ballot or with officials performing their duties. Election observers are selected by the organizations they represent. Election observers must wear a name badge indicating their identity and affiliation, however there are no residency restrictions for these individuals. (North Dakota Secretary of State, *Election Observers*).

FOF ¶ 474.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Any member of the election board may challenge the right of an individual to vote if the election board member has knowledge or has reason to believe the individual is not a qualified elector. A poll challenger may request members of the election board to challenge the right of an individual to vote if the poll challenger has knowledge or has reason to believe the individual is not a qualified elector of the precinct. (N.D. Cent. Code § 16.1-05-06).

**Ohio.**

FOF ¶ 475.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. At any primary, special, or general election, any political party supporting candidates to be voted upon at such election and any group of five or more candidates may appoint to the board of elections or to any of the precincts in the county or city one person, a qualified elector, who shall serve as observer for such party or such candidates during the casting of the ballots and during the counting of the ballots; provided that separate observers may be appointed to serve during the casting and during the counting of the ballots. (Ohio Rev. Code Ann. § 3505.21).

FOF ¶ 476.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Any person offering to vote may be challenged at the polling place by any precinct election official. (Ohio Rev. Code Ann. § 3505. 20).

**Oklahoma.**

FOF ¶ 477.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Any candidate or any recognized political party shall be entitled to have a watcher present at any place where an official count is being conducted. (Oklahoma Statutes 26-7-130).

FOF ¶ 478.    Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Not reported.

**Oregon.**

FOF ¶ 479.    Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Not reported.

FOF ¶ 480.    Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Not reported.

**Pennsylvania.**

FOF ¶ 481.    Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Each candidate for nomination or election at any election shall be entitled to appoint two watchers for each election district in which such candidate is voted for. Each political party and each political body which has nominated candidates in accordance with the provisions of this act, shall be entitled to appoint three watchers at any general, municipal or special election for each election district in which the candidates of such party or political body are to be voted for. Such watchers shall serve without expense to the county. Each watcher so appointed must be a qualified registered elector of the county in which the election district for which the watcher was appointed is located. (Pa. P.S. § 2687).

FOF ¶ 482.    Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Any person, although personally registered as an elector, may be challenged by any qualified elector, election officer, overseer, or watcher at any primary or election as to his identity, as to his continued residence in the election district or as to any alleged violation of the provisions of section 1210. (Pa. P.S. § 3050).

**Rhode Island.**

FOF ¶ 483.    Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The officers required to furnish and equip any voting place shall also provide a table in the room where the voting is conducted, outside the enclosed space near the first bipartisan pair of supervisors, at which a representative of each recognized political party bearing credentials signed by the proper ward or town committee chairperson, shall be allowed to sit for the purpose of keeping track of those who are voting, and these representatives, who shall be known as "checkers," may be changed during the day. A representative, known as a "runner," of each of the parties shall be allowed to come to the table at frequent intervals for the purpose of taking whatever list or memoranda the checkers may wish to give the runner. A representative of each recognized political party bearing credentials signed by the proper ward or town committee chairperson, shall also be allowed outside the enclosed place to observe the voting and assist the checkers, and these representatives shall be known as "watchers." (R.I. Gen. Laws § 17-19-22).

FOF ¶ 484.    Individuals Authorized to Challenge a Voter's Eligibility on Election Day. The watchers and any election official shall have the right to challenge the right to vote of any person offering himself or herself as a voter. (R.I. Gen. Laws § 17-19-22).

**South Carolina.**

FOF ¶ 485.  Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Each candidate who is not unopposed in a primary and each nonpartisan candidate, including announced write-in candidates in a general or special election, may appoint a watcher for any voting place where his name appears on the ballot. However, in any general or special election, all candidates who are certified by a political party must be jointly represented at each polling place by not more than two watchers from the party for each one thousand registered voters or fraction thereof registered at the polling place. Each watcher appointed hereunder must be a qualified voter in the county where he is to watch. (S.C. Code Ann. § 7-13-860).

FOF ¶ 486.  Individuals Authorized to Challenge a Voter's Eligibility on Election Day. It is the duty of the managers of election to, and any elector or qualified watcher may, challenge the vote of a person who may be known or suspected not to be a qualified voter. However, the challenges by persons other than a manager must be addressed to the manager and not directly to the voter. (S.C. Code Ann. § 7-13-810).

**South Dakota.**

FOF ¶ 487.  Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. At least one poll watcher for each political party, one poll watcher for each independent candidate, one poll watcher for each slate of presidential electors, and one poll watcher for each side of any ballot issue to be voted on may be present at each polling place for general elections. (Administrative Rule 5:02:12:02). Any person, except a candidate who is on the ballot being voted on at that polling place, may be present at any polling place for the purpose of observing the voting process. (S.D. Codified Laws § 12-18-9).

FOF ¶ 488.  Individuals Authorized to Challenge a Voter's Eligibility on Election Day. The person's right to vote at that poll and election may be challenged only as to the person's identity as the person registered whom the person claims to be or on grounds that within fifteen days preceding the election the person has been convicted of a felony or declared by proper authority to be mentally incompetent. (S.D. Codified Laws § 12-18-10).

**Tennessee.**

FOF ¶ 489.  Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Each political party and any organization of citizens interested in a question on the ballot or interested in preserving the purity of elections and in guarding against abuse of the elective franchise may appoint poll watchers. The county election commission may require organizations to produce evidence that they are entitled to appoint watchers. All appointed poll watchers must have reached the age of seventeen (17) by election day. A spouse of a candidate on the ballot shall not be eligible for appointment as a poll watcher. Each political party which has candidates in the election and each citizens' organization may have two (2) watchers at each polling place. One (1) of the watchers representing a party may be appointed by the chair of the county executive committee of the party and the other by a majority of the candidates of that party running exclusively within the county in which the watchers are appointed. (Tenn.

83

Code. Ann. § 2-7-104). No person may be admitted to a polling place except election officials, voters, persons properly assisting voters, the press, poll watchers appointed under § 2-7-104 and others bearing written authorization from the county election commission. (Tenn. Code. Ann. § 2-7-103).

FOF ¶ 490.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. If any person's right to vote is challenged by any other person present at the polling place, the judges shall present the challenge to the person. (Tenn. Code. Ann. § 2-7-123).

**Texas.**

FOF ¶ 491.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. "Watcher" means a person appointed to observe the conduct of an election on behalf of a candidate, a political party, or the proponents or opponents of a measure. Each appointing authority may appoint no more than two watchers for each precinct polling place. To be eligible to serve as a watcher, a person must be a qualified voter. (Tex. Elections Code Ann. § 33.001; 33.007).

FOF ¶ 492.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Not reported.

**Utah.**

FOF ¶ 493.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. For each regular general election or statewide special election, and for each regular primary and Western States Presidential Primary, each registered political party and any person interested in a ballot proposition appearing on the ballot may appoint one person to act as a voting poll watcher to observe the casting of ballots, another person to act as a counting poll watcher to observe the counting of ballots, and another person to act as an inspecting poll watcher to inspect the condition and observe the securing of ballot packages. (Utah Code Ann. § 20A-3-201).

FOF ¶ 494.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. A poll worker or a person who lives in the voting precinct may challenge a voter's right to vote in that voting precinct or in that election. (Utah Code Ann. § 20A-3-202.5).

**Vermont.**

FOF ¶ 495.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Each organized political party, each candidate on the ballot not representing an organized political party, and each committee supporting or opposing any public question on the ballot shall have the right to have not more than two representatives outside the guardrail for the purpose of observing the voting process and challenging the right of any person to vote. (Vt. Stat. Ann. tit. 17, § 2564).

FOF ¶ 496.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. In all cases the representatives shall have the right to hear or see the name of a person seeking to vote, and they shall have the right to make an immediate challenge to a person's right to vote. (Vt. Stat. Ann. tit. 17, § 2564).

**Virginia.**

FOF ¶ 497.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The officers of election shall permit one authorized representative of each political party or independent candidate in a general or special election, or one authorized representative of each candidate in a primary election, to remain in the room in which the election is being conducted at all times. The officers of election shall have discretion to permit up to three authorized representatives of each political party or independent candidate in a general or special election, or up to three authorized representatives of each candidate in a primary election, to remain in the room in which the election is being conducted. Each authorized representative shall be a qualified voter of any jurisdiction of the Commonwealth. (Va. Code Ann. § 24.2-604) A local electoral board or general registrar may authorize in writing the presence of additional neutral observers as may be deemed appropriate subject to restrictions. (Va. Code Ann. § 24.2-604).

FOF ¶ 498.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Any qualified voter may, and the officers of election shall, challenge the vote of any person who is listed on the pollbook but is known or suspected not to be a qualified voter. (Va. Code Ann. § 24.2-651).

**Washington.**

FOF ¶ 499.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Anyone has the right to observe any part of the election process. Major political parties have a responsibility to provide observers to monitor the election process. County auditors must request that observers be appointed by the major political parties to be present during the processing of ballots at the counting center. County auditors have discretion to also request that observers be appointed by any campaigns or organizations. The absence of the observers will not prevent the processing of ballots if the county auditor has requested their presence. (See *An Observer's Guide to Washington State Elections*; RCW 29A.40.100).

FOF ¶ 500.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Not reported.

**West Virginia.**

FOF ¶ 501.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Not reported.

FOF ¶ 502.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. It is the duty of the members of the receiving board, jointly or severally, to challenge the right of any person requesting a ballot to vote in any election in certain circumstances. (W. Va. Code § 3-1-41).

**Wisconsin.**

FOF ¶ 503.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. Any member of the

public may be present at any polling place for the purpose of observation of an election except a candidate whose name appears on the ballot at the polling place or on an absentee ballot to be cast at the clerk's office or alternate site at that election. The chief inspector or municipal clerk may reasonably limit the number of persons representing the same organization who are permitted to observe at the same time. Each person permitted to observe under shall print his or her name in and sign and date a log maintained by the chief inspector or municipal clerk for that polling place, office, or alternate site. The chief inspector or municipal clerk shall clearly designate observation areas for election observers. The observation areas shall be so positioned to permit any election observer to readily observe all public aspects of the voting process. (see Wis. Stat. § 7.41).

FOF ¶ 504.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. Each inspector shall challenge for cause any person offering to vote whom the inspector knows or suspects is not a qualified elector or who does not adhere to any voting requirement under this chapter. Any elector may challenge for cause any person offering to vote whom the elector knows or suspects is not a qualified elector. (Wis. Stat. § 6.92, 6.925).

**Wyoming.**

FOF ¶ 505.   Individuals Authorized to Serve as Appointed/Designated Poll Watchers or Challengers and Other Authorized Polling Place Observers. The county chairman of each political party may certify poll watchers prior to the day of the election to serve in each precinct. Not more than one (1) poll watcher from each political party may serve simultaneously unless the chief judge determines that one (1) additional poll watcher from each political party may be accommodated in the polling premises without disrupting the polling process. A poll watcher shall belong to the political party he represents and shall be a registered elector residing in the county. (Wyo. Stat. Ann. § 22-15-109).

FOF ¶ 506.   Individuals Authorized to Challenge a Voter's Eligibility on Election Day. It is the duty of the judges to challenge electors whenever existence of legal grounds for doing so is known or apparent to the judges. (Wyo. Stat. Ann. § 22-15-108).

FOF ¶ 507.   In only one state, Kansas, would the RNC even be authorized to act as an observer of the election process.

FOF ¶ 508.   In no state would the RNC be authorized to challenge a voter's qualifications to vote.

FOF ¶ 509.   Yet, as reported by then state GOP coordinator, now Pennsylvania Superior Court Judge Vic Stabile, the RNC, in conjunction with the Romney presidential campaign organized "strike forces" from both Washington, D.C. and Boston, MA, of paid party professionals to literally evade states and usurp local party officials of voter qualification challenges and other Election Day matters legally reserved only for duly registered poll watchers.

FOF ¶ 510.   The Texas Republican State Committee actually posts a web page for people to register to join the "Mighty American Strike Force." The page provides a link to the a registration letter that pointedly states"We will also help with ballot integrity programs..."

86

FOF ¶ 511.    In August, 2016, as reported by *Politico*, then Republican vice presidential nominee, Mike Pence, said at a town hall meeting in Denver: "The Trump campaign and the Republican National Committee are working very, very closely with state governments and secretaries of state all over the country to ensure ballot integrity." RNC counsel subsequently repudiated Pence' statements by denying such efforts existed.

FOF ¶ 512.    Then Trump's 2016 campaign manager, Kellyanne Conway, reportedly told the *Washington Post* that the Trump campaign is "actively working with the national committee, the official party, and campaign lawyers to monitor precincts around the country." There is no reported publication that RNC counsel repudiated Conway's remarks.

FOF ¶ 513.    The Trump Presidential campaign subsequently created a website to recruit a "Trump Election Day Observer."

FOF ¶ 514.    Given Freeman's articulation about the GOP's top-bottom corporate hierarchy, repeated warnings by scores of professors of political science regarding super agent domination of the RNC, the RNC's lack of transparency, its counsel's fraud on the court, and the RNC's judicially admitted objective of dominating all spheres of political funding raising and campaign, as expressed by its 2013 *Growth and Opportunity Project* report, it would be disingenuous for the RNC to assert it is not coordinating, let alone master-minding voter suppression efforts, through proxies to conceal its convert control.

FOF ¶ 515.    This point was expressed by Professor Richard L. Hason, the Slate website, *Jurisprudence the Law, Lawyers, and the Court*, Nov. 27 2017 2:55 PM who stated:

> "With the consent decree gone, the RNC will for the first time in 35 years be free to begin anew efforts to spur purges of voter rolls and take potentially suppressive ballot security measures in the name of preventing voter fraud. No doubt RNC lawyers would advise against taking these steps, at least for a while, to forestall the DNC from running back to court seeking to have the consent decree reinstated.

> "But with Trump the real head of the Republican Party these days, it is quite possible he could order a national effort to combat phantom voter fraud, just like he did with his own campaign. Indeed, making false claims about Democratic and minority voter chicanery is a cornerstone of Trump's divisive agenda. Yelling voter fraud riles up the base, helps with fundraising, and can depress minority voter turnout.

> "The Trump era has caused voting rights activists to be extra vigilant against efforts to suppress the vote, from Trump's faux "election integrity" commission to the Department of Justice's reversal of an Obama-era position against a particular form of voter purging in Ohio. But the removal of the consent decree could supercharge voter suppression efforts, offering Trump the opportunity to hijack the RNC and direct it toward his own efforts to explain away his 3 million voter loss in the American popular vote and rile his base against poor and minority voters."

FOF ¶ 516.    As an arbitrator, we are responsible for bringing expertise and experience to bear

upon determining issues, which are beyond that possessed by most judges and attorneys. It is because of such expertise and experience, we are more successful in decoding dog whistles and recognizing covert political activities intended to "skate on thin ice" so as to frustrate the law.

FOF ¶ 517.    As stated by in Craig C. Donsanto, Nancy N. Simmons, et al, *Federal Prosecution of Election Offenses* (8th ed. Dec.2017):

> "Although corrupt government may exist without election crime, when election crime exists, public corruption of some form is also usually present. This is so because virtually all election crime is driven by a motive to control governmental power for some corrupt purpose. Election crime cases therefore often provide effective tools for attacking other forms of public corruption. The task of the federal prosecutor and investigator is not only to vindicate the fundamental principle of fair elections by convicting those who corrupt them but also to find the motive behind the election fraud and, when possible, to prosecute those involved in the underlying corruption."

### § 36. RNC's Adverse Impact on State & Local Party Committees (¶¶ 518-525).

FOF ¶ 518.    Paid party professionals, referred to as "Super Agents" according to academic authorities, discourage electoral appeal. Paul Frymer, Thomas P. Kim, and Terri L. Bines, *Party Elites, Ideological Voters and Divided Party Government,* LEGISLATIVE STUDIES QUARTERLY, Vol. 22 No. 2 (May 1997) pp. 195-216.

FOF ¶ 519.    At one time "[t]here [was] no substitute for that willing, effective precinct worker." Senator Paul Laxalt (R-NV), RNC Chairman 1983, as quoted by Barbara C. Burrell, *Local Party Committees, Task Performance and Organizational Vitality,* WESTERN POLITICAL QUARTERLY Vol. 39, No. 1 (March 1986) pp 48-66.

FOF ¶ 520.    Burrell properly observes that whether precinct committee people "will perform tasks helpful to the party's achievement of its goals determines whether it will be a vigorous participant in the political process." *Id.* at 53.

FOF ¶ 521.    "Voter mobilization and related organizational activities constitute the bulk of task performed by [precinct committee people]. *Id.* citing Wright, *supra* at 337.

FOF ¶ 522.    "While there are many subtle forms of such influence, the national committees have the greatest opportunity for influence through the provision of services to the state parties." Huckshorn, Gibson, Cotter and Biddy, *supra* at 980. "Generally, the RNC is much more active than the DNC in supporting its state parties. For instance, the RNC was reported to have provided staff- reflecting a quite high level of integration-to nearly two-thirds of the state party organizations, while only a single Democratic organization reported receiving such support. " *Id*. at 981.

FOF ¶ 523.    "The strength of the state party organizations can be indicated by . . . "party organizational strength. [The authors] define strong parties as those which have an enduring headquarters operation and which engage in a variety of activities related to electoral goals. "Strong" parties require both organizational complexity and programmatic capacity. As a minimum, organizational complexity demands the existence of a party headquarters, but beyond that it requires adequate resources in budget and staff to provide for operations of the headquarters. A higher level of

complexity implies bureaucratization with clearly defined responsibilities and with tasks assigned to meet them. Over time these assigned duties and positions develop predictable, stable interactions that tend to formalize the structure. A second component of strong organizations . . . is also required . . . the necessity of developing programmatic capacity that will enable the party to build a constituency, create support, and resist disintegrative forces such as factionalism. . . . party organizational strength can be assessed in terms of organizational complexity and programmatic capacity. * * * [I]t is the national party organizations that have been instrumental in strengthening their state counterparts, even in the face of diminishing local party support. Huckshorn, Gibson, Cotter and Biddy, *supra* at 981.

FOF ¶ 524.   "Our central hypothesis is that state party organizational strength is in part a function of levels of state party integration with the national party. The hypothesis reflects two assumptions. The first is that state party organizations will be responsive to national party leadership. The second is that it is difficult for party organizations to acquire strength in the absence of resources. While the initiative for strengthening the party organization may derive from the national committee, the state party, interest groups, or from officeholders, it is rare that weak parties can acquire strength without the intervention or assistance of nonindigenous forces. Thus, a positive correlation between strength and the two dimensions of integration is expected." Huckshorn, Gibson, Cotter and Biddy, *supra* at 985. [Because the p]arties have become nationalized, [ ] state party organizations have become less dependent upon short-term perturbations in local electoral systems. There is now no reason to believe that state party organizational strength, . . . [will be able to increase] in the face of diminished electoral support for the parties, [because such will be] determined by the level of party success at the polls or by the level of subjective support for the party in the electorate." *Id.* at 990.

FOF ¶ 525.   The total number of precinct committee members and elected officeholders by state, are as follows:

### TABLE NO. 1 NUMBER OF PRECINCTS AND COMMITTEE PEOPLE BY STATE

| State | Counties† | Municipalities | Precincts | Committee Members |
|---|---|---|---|---|
| Alabama | 67 | 451 | 2,210 | 4,420 |
| *Alaska* | 27 | 149 | 436 | 872 |
| Arizona | 15 | 87 | 2,110 | 4,220 |
| Arkansas | 75 | 75 | 2,693 | 5,386 |
| California | 58 | 475 | 21,857 | 43,714 |
| Colorado | 64 | 270 | 3,370 | 6,740 |
| Connecticut | 8 | 179 | 769 | 1,538 |
| Delaware | 3 | 57 | 437 | 874 |
| District of Columbia | 0 | 1 | 142 | 284 |
| Florida | 67 | 404 | 6,892 | 13,784 |
| Georgia | 159 | 531 | 3,163 | 6,326 |
| Hawaii | 5 | 0 | 353 | 706 |
| Idaho | 44 | 200 | 949 | 1,898 |
| Illinois | 102 | 2,722 | 11,738 | 23,476 |
| Indiana | 92 | 1,577 | 5,571 | 11,142 |
| Iowa | 99 | 948 | 1,996 | 3,932 |
| Kansas | 105 | 1,926 | 3,882 | 7,764 |
| Kentucky | 102 | 424 | 3,482 | 6,964 |

89

| State | | | | |
|---|---|---|---|---|
| Louisiana | 64 | 302 | 4,124 | 8,248 |
| Maine | 16 | 489 | 601 | 1,202 |
| Maryland | 23 (1) | 157 | 1,779 | 3,558 |
| Massachusetts | 14 | 351 | 2,177 | 4,354 |
| Michigan | 83 | 1,775 | 5,235 | 10,470 |
| Minnesota | 87 | 2,647 | 4,108 | 8,216 |
| Mississippi | 82 | 296 | 1,707 | 3,414 |
| Missouri | 114 | 1,258 | 5,462 | 10,924 |
| Montana | 56 | 129 | 856 | 1,712 |
| Nebraska | 93 | 977 | 1,668 | 3,336 |
| Nevada | 16 | 19 | 1,585 | 3,170 |
| New Hampshire | 10 | 234 | 242 | 484 |
| New Jersey | 21 | 566 | 6,283 | 12,566 |
| New Mexico | 33 | 101 | 684 | 1,368 |
| New York | 62 | 1,545 | 15,153 | 30,306 |
| North Carolina | 100 | 541 | 2,749 | 5,498 |
| North Dakota | 53 | 1,692 | 607 | 1,214 |
| Ohio | 88 | 2,250 | 11,366 | 22,732 |
| Oklahoma | 77 | 590 | 2,152 | 4,304 |
| Oregon | 36 | 240 | 1,448 | 2,896 |
| Pennsylvania | (361) 67 | 2,564 | 9,264 | 18,528 |
| Rhode Island | 5 | 39 | 577 | 1,154 |
| South Carolina | 46 | 269 | 2,168 | 4,336 |
| South Dakota | 66 | 1,248 | 827 | 1,654 |
| Tennessee | 95 | 349 | 2,287 | 4,574 |
| Texas | 254 | 1,196 | 8,554 | 17,108 |
| Utah | 29 | 236 | 1,880 | 3,760 |
| Vermont | 14 | 284 | 277 | 554 |
| Virginia | 95 (39) | 229 | 2,294 | 4,588 |
| Washington | 39 | 279 | 6,664 | 13,328 |
| West Virginia | 55 | 234 | 1,977 | 3,954 |
| Wisconsin | 72 | 1,850 | 3,563 | 7,126 |
| Wyoming | 23 | 98 | 483 | 966 |
| Total | 3,099 | 35,933 | 182,851 | 365,642 |

Combined Total precinct committee members of both parties . . . . . . . . 731,284


Numbers in parenthesis under counties are "independent cities" regarding Maryland and Virginia, cities and towns for Massachusetts.

### § 37. Nationalization Compels RNC to Resist Loss of Soft Money (¶¶ 526-532).

FOF ¶ 526.   This matter would not have otherwise arose but for the Federal Elections Campaign Act of 1971 ("FECA") 52 U.S.C. § 30101 *et seq.*, as amended by the Bipartisan Campaign Reform Act of 2002 ("BCRA") pursuant to regulations promulgated by the Federal Election Commission ("FEC"). BCRA is popularly known as "McCain-Feingold." "Federal funds" or "hard money" are those complying with FECA limits, bans, and reporting requirements. 11 C.F.R. 300.2(g). "Nonfederal funds," or "soft money," are funds raised outside of the source and amount limitations imposed by FECA, which political parties other than the national party committees may solicit and accept for purposes not related to federal elections, provided that they are placed in accounts separate from federal funds. 52 U.S.C. §

30101, 11 C.F.R. 300.2(k).

FOF ¶ 527.   BCRA is "the most recent federal enactment designed 'to purge national politics of . . . the pernicious influence of "big money" campaign contributions.'" *McConnell*, 540 U.S. at 115. Title I of BCRA, entitled "Reduction of Special Interest Influence," closed the soft-money loophole. Specifically, BCRA § 101(a), codified at 52 U.S.C. § 30125(a), prohibited national political parties and their officers from soliciting, receiving, or disbursing soft money. *McConnell*, 540 U.S. at 133 ("[Section 101(a)] takes national parties out of the soft-money business"). They may solicit and use only federal funds. 52 U.S.C. § 30125(a).

FOF ¶ 528.   "BCRA § 101(b) also prohibited state and local parties from receiving soft money for "Federal election activity." 52 U.S.C. § 30125(b). Federal election activity, in relevant part, was defined as: (I) voter registration activity during the period . . . 120 days before . . .a regularly scheduled Federal election . . .; (ii) voter identification, get-out-the-vote activity, or generic [party only] campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot); [or] (iii) a public communication that refers to a clearly identified candidate for Federal office . . . and that promotes or supports . . . or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate) . . . .52 U.S.C. § 30101(20)(A)(i)-(iii). Through these provisions, BCRA eliminated the receipt of soft money by national political party committees and the receipt of soft money by state and local parties for Federal election activity. State and local parties remain free to receive funds under applicable state and local law for all other activities, and all political parties remain free to spend an unlimited amount of hard money for any activity." *FEC* Motion to Dismiss, *RNC v. FEC*, 1:08-cv-01953-RJL-RMC Document 20 (Jan. 26, 2009) (citation to FECA corrected from original Title 2 to current Title 52).

FOF ¶ 529.   BCRA, upon amending FECA, does provide for "Levin Funds," best described as a hybrid between Federal and non-Federal or soft funds. 52 U.S.C. § 30125(b)(2); 11 CFR §§ 300.2(i), 300.31, 300.32. Under the Amendment, the federal election activity described in 52 U.S.C. § 30101(20)(A)(i) & (ii) can be financed by state and local party committees with either federal funds or a combination of federal and "Levin funds." Individuals can donate as much as $10,000 per year in Levin funds to a state or local political party.11 CFR 300.2(i). Levin Funds is intended as a safety value under McCain-Feingold for county and local political party committees. *McConnell*, 540 U.S. at 162-163, 169. Such Levin fund raising has always been intended as "home grown" for county and local party committees to rely upon, while the national and state party committees shouldered the hard money burden. *McConnell*, 540 U.S. at 173. In a 2004 FEC compilation, Democratic State Committees raised $1,087,577 in Levin Fund contributions, the GOP only $99,033.

The FEC on its website further describes Levin Fund contributions as thus:

> *Donations of Levin funds to state and local party committees*

Limitations on Levin funds

"A state or local party committee may not solicit or accept Levin funds which

aggregate to more than $10,000 per donor in a calendar year. If the laws of the state in which the committee is organized limit donations to that committee to less than $10,000, that lower limit would apply.

"Certain sources that cannot contribute federal funds (e.g., corporations and labor organizations) may contribute Levin funds, so long as the applicable state law permits it.

"Levin fund donations are not subject to the normal aggregation requirements based on affiliation between committees. While other contributions to state and local committees aggregate toward the same limit, donations of Levin funds do not.

"Similarly, while state, district and local parties can typically transfer among themselves without limit, Levin funds cannot be transferred. Any Levin funds expended or disbursed by a committee must have been raised solely by that committee. A state, district or local party committee must itself raise the federal component of an expenditure or disbursement allocated between federal and Levin funds.

"Moreover, when making allocated payments for federal election activity (FEA), a committee must be able to show that the federal and Levin funds it uses to make a disbursement for FEA do not include federal funds transferred to it by any other party committee.

"Additionally, Levin funds may not be raised via a joint fundraiser with any other party committee.

Fundraising expenses

"Expenditures to raise only federal funds which are to be used for FEA must be made with federal funds. However, expenditures to raise Levin funds which are to be used for FEA must be made with either entirely federal funds or Levin funds. These fundraising expenses include the cost of solicitation and the administration and planning for the event. A party committee may use federal funds raised in a federal/nonfederal fundraiser for FEA if proper allocation is used.

Prohibited sources

"Party committees may not accept donations to their Levin accounts which were solicited, received, transferred or spent by, or in the name of:

"A national committee of a political party, including their national congressional campaign committee, any officer or agent acting on behalf of the national party committee, or any entity that is directly or indirectly established, financed, maintained or controlled by the national party committee;

"A federal candidate or officeholder, an agent of a federal candidate or officeholder, or an entity directly or indirectly established, financed, maintained or controlled by, or acting on behalf of, one or more federal candidates or individuals holding federal office; or

"A foreign national.

92

"Corporate and union donations and donations from federal government contractors are permissible, as long as state law does not prohibit them.

What must be reported

"If a committee has less than $5,000 of aggregate receipts and disbursements for FEA in a calendar year, it is required only to report receipts and disbursements of federal funds for FEA.

"If the committee has $5,000 or more of aggregate receipts and disbursements for FEA in a calendar year, it must disclose all receipts and disbursements for FEA, including Levin funds, on Schedules L, H5 and H6. Note: Once a committee crosses this threshold, it must file on a monthly basis.

Schedule L

"State, district and local party committees use Schedule L to aggregate receipts and disbursements of Levin funds for the reporting period and for the calendar year-to-date.

Schedules L-A and L-B

"Committees itemize receipts and disbursements of Levin funds of $200 or more on Schedules L-A and L-B.

Reporting Levin Fund receipts

"Itemize any receipt of $200 or more on Schedule L-A.

"Committees must categorize their receipts between donations, which are reported on Line 1a of the Levin fund aggregation page, and other receipts such as refunds or uncashed checks which are reported on Line 2. Use separate Schedules for the different categories of receipts and note the Line number in the upper-right corner.

Committees without a separate Levin account

"If a committee has Levin-eligible funds in its nonfederal account, the committee is not required to report them as Levin funds until it characterizes them as such. When reporting these funds, the date of receipt is the date that the committee received them under state law, even though they are itemized on Schedule L-A in a later reporting period."

FOF ¶ 530.    "Mega-donors" are political contributors donating more than $1 million. "Super-donors" are political contributors donating more than $250,000. Briffault *supra* at 1718. There is an expectation that "megadonor" contributions are significantly less "corrupting" because they are aimed at voters with no coordination with candidates. Briffault, at 1738-1739 citing *Buckley v. Valeo*, 424 U.S. 1, 47 (1975); see also *FEC v. Nat. Conservative Political Action Comm.*, 470 U.S. 480, 500–501 (1984); *Colo. Republican Fed. Campaign Comm. v. FEC* (Colo. Republican I), 518 U.S. 604, 608 (1996).

FOF ¶ 531.    Hasen notes "[The] 2008 election [proved] that big money is beginning to matter

less, rather than more, thanks in large part to the enhanced role of the Internet in campaigning and fundraising, and especially thanks to the viability of campaigns funded substantially by small donors. . . The promise of small donors, rather than regulation, stands the best chance of countering the role of big money in future presidential elections." Richard L. Hasen, *Political Equality, the Internet, and Campaign Finance Regulation Forum*, Loyola-LA Legal Studies Paper No. 2008-11Vol. 61 Art.7 (2008).

FOF ¶ 532.    In, *RNC v. FEC*, 1:08-cv-01953-RJL-RMC, its current action to overturn BCRA, the RNC judicially concedes that its interests in the litigation are competitive in nature. Affidavit of Richard Clinton Beeson, filed in support of RNC Summary Judgment Motion, ¶ 21 (citing the competitive difficulties experienced by the RNC in adjusting to BCRA, including being "negatively affected by the explosion of Internet fundraising"); *see also* Republican Party Challenges Soft MoneyLaws, AP, Nov. 13, 2008, (quoting former RNC Chairman Mike Duncan as stating that the purpose of the suit is to "strengthen the Republican Party and bring a more level playing field to campaign finance"). The DNC on the other hand, has conformed its activities to comply with the law. It has invested considerable sums in revamped compliance procedures and training of its officers, employees, and those supporting its operations with fundraising and in other ways. No less significantly, the DNC has endeavored to explore fresh avenues of "hard money," including through fundraising using the Internet and other means." *DNC Motion to Intervene* in *RNC v. FEC*, (Jan. 29, 2009).

### § 38. RNC "Dog Whistles" Promoting Black Voter Suppression (¶¶ 533-548).

FOF ¶ 533.    The March 18, 2013 *Growth and Opportunity Project* Report continues promoting RNC segregation and suppression of the African-American voting population by using extensive euphemistic language, commonly known as political Dog-Whistling.

FOF ¶ 534.    The report at p. 18 asserts the following:

FOF ¶ 535.    "Similar to the approach it must take with other demographic communities, the RNC must embark on a year-round effort to engage with African American voters. The engagement must include not only persuasion based upon our Party's principles but also a presence within community organizations. There are numerous outside groups that are studying the best way for the Republican Party to better reach African American voters. The Republican Party should leverage the best practices identified by such organizations. Investing time and resources in African American communities by leveraging best practices of organizations like the Texas Federation for Republican Outreach (an affiliate of the Republican Party of Texas) is essential." *Id.*

FOF ¶ 536.    This is code for assertion that Black voters are akin to a separate and foreign universe and that the GOP should continue to treat Black voters as such. It also ignores the fact that there is a minimal presence of precinct GOP committee people within Black voting divisions which would otherwise be required to be filled in order to connect with voters.

FOF ¶ 537.    "The African American community has a lot in common with the Republican Party, and it is important to share this rich history. More importantly, the Republican Party must be committed to building a lasting relationship within the African American

community year-round, based on mutual respect and with a spirit of caring." *Id.*

FOF ¶ 538.    This statement is among the most bizarre assertions in the entire Report. Historically, the overwhelming majority African-American voters were Republicans, because it was the GOP that prosecuted the Civil War, enacted the 13th, 14th and 15th Amendments to the U.S. Constitution and passed all of the major civil rights legislation in the 19th century. Even when in the Congressional minority, Republicans were essential to passage of major civil rights legislation in the 20th century, giving Democratic leaders like Lyndon B. Johnson the necessary votes to overcome Southern Democratic resistance.

FOF ¶ 539.    Secondly, "mutual respect" and "spirit of caring" are "dog-whistle" euphemisms for countenancing the GOP's exclusion of Black voters within the Party. These phrases are being used as a modifier, in what linguists refer to as "pejoration." This is due the fact that "[i]f a word that refers to something always appears in sentences where that thing is framed negatively, then that term will take on that negativity," according to Lauren Hall-Lew, a sociolinguist at the University of Edinburgh, quoted in a November 7, 2014 NPR posting by Gene Nemby. The terms imply a deviation from a neutral default, i.e. African-Americans require special attention.

FOF ¶ 540.    "The Party must also engage with each of its demographic partners and allies individually. Hispanics and Asians are not the only demographic groups emotionally invested in immigration issues. Caribbean, Jamaican, and Haitian immigrants, as well as many other black minority groups, have a vested interest in immigration policy because it affects them and their families." *Id.*

FOF ¶ 541.    This statement is again "dog whistle" code for two major reasons. First it denies that civil rights in general and the criminal justice system in particular is the principal divisions between the GOP and African-American constituencies. There is no discussion about economic disparity or inner-urban poverty.

FOF ¶ 542.    Secondly, the paragraph is "dog-whistle" code for debased Black voters as if they are a recent class of immigrants. While undoubtedly there are constituencies within the Black community, as identified above, that are concerned with immigration, such views are not community-wide.

FOF ¶ 543.    The above paragraphs implicit language are evident when comparing the *Growth and Opportunity Project* report's discussion about other ethnic groups, e.g. "Asian and Pacific Islander Americans." The RNC must actively engage Asian and Pacific Islander American (APA) communities to help welcome in new members of our Party. One common theme throughout our discussion with various APA groups is that the Republican Party needs to stop talking about outreach and begin talking about inclusion." *Id.* at p. 17.

FOF ¶ 544.    And see also discussion relating to Hispanic voters. "It is imperative that the RNC changes how it engages with Hispanic communities to welcome in new members of our Party." *Id.* at 15.

FOF ¶ 545.    "It is also a fair criticism that Republicans do not do enough to elevate Hispanic leaders within the Party infrastructure. This includes not just candidates running for office, but also senior decision-makers in the RNC's infrastructure. These personnel should not be pigeonholed into demographic outreach, but should be promoted to

positions to develop political strategy and provide input on all budgeting decisions." *Id.* at 16.

FOF ¶ 546.    There is no inclusion within the party or party structure recommendations concerning Black voters as there are for Hispanic or Asian-Pacific voters.

FOF ¶ 547.    The overall discussion is predicated on the "us versus them" frame of reference, "us" being "older, white men" and them being all other voters of various ethnicity, gender and age.

FOF ¶ 548.    There is no acknowledgment that the Republican Party is an "big tent" to include all stakeholders, let alone concede the point that the Republican Party belongs to minority voters as it does to all other electors.

### § 39. RNC's Confidential Relationship with State/Local Committees (¶¶ 549-552).

FOF ¶ 549.    To find a Confidential Relationship, we must find trust and reliance on one side and the corresponding opportunity to abuse that trust for the personal gain on the other side; and the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or on the other, weakness, dependence or trust, justifiably reposed.

FOF ¶ 550.    The courts have found that the RNC "has historically participated and participates today in electoral and political activities at the federal, state and local levels. [These activities in state and local elections] are substantial both in their importance to the RNC's mission and in their resource commitment. . . Even for elections in which there is no federal candidate on the ballot, the RNC trains state and local candidates, donates to state and local candidate campaign committees, funds communications calling for the election or defeat of state and local candidates and engages in get-out-the-vote activities." *McConnell v. FEC*, 251 F.Supp.2d 176, 335-336 (D.D.C. 2003).

FOF ¶ 551.    "The Republican Party offers its state parties a lot more than rules. In turn, it gets much more central control than the Democratic Party has ever contemplated. Freeman, *supra* at 354. "[T]he Republicans have enhanced their resource acquisition ability and emphasized the provision of resources and services to candidates and to other levels of the party organization."Conway *supra* at 1. "Faced with [the] new reality [of candidate-centered campaigns], the [political] parties reconfigured themselves as fund-raisers and as providers of services to candidates. However, the new environment confronting the parties has resulted in [an] outcome[ ] harmful to democratic participation. * * * It helps [the GOP is] the party of the affluent in an increasingly money-dominated campaign system. * * * The parties have been able to raise enormous amounts of money, and unlike individual and PAC donors, disburse it in a timely manner, enhancing electoral competition, provid[ing] a marvelous array of polling, media, and policy services to candidates, many of whom cannot otherwise afford them." Andrea L. Campbell, *Parties, Electoral Participation, and Shifting Voting Blocs*, Paul Pierson and Theda Skocpo eds., *The Transformation of the American Polity* (2006). "Today, the political parties are now less broad-based mobilizers of American voters than targeted fund-raisers and activators of select slices of the electorate." Steven E. Schier, *By Invitation Only: The Rise of Exclusive Politics in the United States*(2000). *RNC Taking Over State and Local GOP Committees*. The RNC has organized itself to a level of "efficacy and

sophistication . . . unprecedented in American history. Nicol C. Rae, *The Modern Republican Party: Resurgence or Decline?* JOURNAL OF AMERICAN STUDIES, Vol. 22, No. 2 (Aug. 1988) pp 225-247, quoting A. James Reichley, The Rise of National Parties, John E. Chubb and Paul E. Peterson, eds. *The New Direction in American Politics* 175-200 (1981); Xandra Kayden and Eddie Mahe, Jr. *The Party Goes On: Persistence of the Two Party System in the United States* (1985); Cornelius P. Cotter, James L. Gibson, John F. Biddy and Robert J. Huckshorn, *Party Organizations in American Politics* (1984); Leon D. Epstein, *Political Parties in American Mold* (1986). "The Republican National Committee has achieved increased power and an enlarged role in the political system... by performing or supplementing the organizational and campaign functions previously considered to be the domain of state and local party and candidate committees. The GOP has shunned rule changes [that aids state and local parties] while the national committee interjected itself into the organizational and campaign activities of the state parties." John F. Bibby, Party Renewal in the Republican Party, in Gerald Pomper, ed. *Party Renewal in America* (1982) at p 113-114. Robert J. Huckshorn, James L. Gibson, Cornelius P. Cotter, and John F. Biddy, *Party Integration and Party Organizational Strength*, THE JOURNAL OF POLITICS, Vol. 48, No. 4, (Nov. pp. 976-991.

FOF ¶ 552.   The RNC is taking over state and local GOP committees. Robert J. Huckshorn, James L. Gibson, Cornelius P. Cotter and John F. Biddy, *Party Integration and Party Organizational Strength*, THE JOURNAL OF POLITICS, Vol. 48, No. 4 (November 1986), pp. 976-991. "Unlike the DNC . . . the RNC has achieved increased power and an enlarged role in the political system by performing or supplementing the campaign functions previously thought to be the exclusive domain of state party and candidate organizations." Conway at 3.

### § 40. Consequence of RNC's Abuse of Confidential Relationship (¶¶ 553-559).

FOF ¶ 553.   "[Today] state parties operate as franchise dealerships for the larger parent party corporation. [The RNC] operate[s] in a Hamilton-like fashion - as strong, centralized leaders with greater control over the state parties than at any time in history. The Jeffersonian approach to party governance, with its deference to localism, seems anchored in the past." White and Shea, *supra.* at 92-93. Nationalization of the party system has resulted in the subordination of the state and local organization to the national organization. Charles Longley, *Party Reform and Party Nationalization*, 359-378(1980).

FOF ¶ 554.   National committees create increased interdependence. Cornelius P. Cotter and John F. Biddy, *Institutional Development and the Thesis of Party Decline* POLITICAL SCIENCE QUARTERLY Vol. 95 (Spring 1980) pp 1-27. State and county Republican committees have an increasingly greater dependence on the RNC. *Conway* at 16. "Some state organizations have not developed a modern system of small donors. Fund raising, which enables the party to operate effectively on a continuing basis [and] those state organizations which most need help are usually the least able to secure necessary financial resources. Conway at 8.

FOF ¶ 555.   While the RNC focus is on campaigns, "the result is not as lasting if the RNC would pay greater attention to the development and maintenance of effective and permanent party organizations working in the precinct, county and state area. Strong and effective party organizations could help the party maintain achievements in the face of adverse evaluations of national performance." Conway at 14.

FOF ¶ 556.  "[T]o a much greater extent than earlier, the state parties are constituent units of a national party, influenced by national party performance norms, and capable of coordinated effort to influence the party's electoral standing, both in targeted areas of the country and at specific office levels. Huckshorn, Gibson, Cotter and Biddy, *supra* at 990.

FOF ¶ 557.  "[The] technological, institutional, and legal changes [caused by enactment of FECA] have fundamentally altered the nature of political mobilization in the United States, with profound consequences for democratic politics, political inequality, and the prospects for the two major parties. The reimagined parties, despite their enormous bank accounts, have largely lost their grassroots ties. * * * Voters have lost their emotional and social ties to the parties. The political party is yet another professionally run organization . . . effective fundraisers which do succeed in contacting millions but which no longer forge a personal bond with citizens." Campbell, *supra*.

FOF ¶ 558.  "What the Republicans have singularly failed to do in recent American elections is to threaten seriously the Democratic dominance of the lower levels of American government. In previous realignment phases the dominant party in presidential elections ultimately replicated that dominance at the lower levels of electoral competition. [The GOP however, has failed in this cycle]. Rae, *supra*, at 231. "[While t]he growth in importance of the Republican National Committee has certainly been one of the most fascinating developments in U.S. politics since the early 1960s (when Cotter and Hennessey could still refer to the national party committees as "politics without power")[there is no] evidence of "party renewal" in the sense of the development of mass national party organizations. Instead the "new" Republican National Committee should be seen as a response by the national party bureaucracy to a changed political environment [on the national level] while eliminating party as a means of government and as a significant actor in candidate selection at all levels * * *. *Id.*

FOF ¶ 559.  "Christopher Arterton concludes, "the national party machinery on the Republican side resembles more the functioning of a political action committee than it does a revitalized and nationalized version of traditional parties." *Id.* at 245.

### § 41. Proof of Disparity re RNC Abuse of Confidential Relationship (¶¶ 560-572).

FOF ¶ 560.  Historically, by 1980 [before BCRA] the RNC helped pay the salary of all 50 Republican state chairmen, gave financial support to more than 4000 state legislative candidates, and sponsored campaign seminars attended by more than 10,000 prospective candidates. James A. Reichley, *The Life of the Parties* 355.

FOF ¶ 561.  Because of its deep pockets, the national Republican committees were able to fund state parties long before the Democrats followed suit. John F. Bibby, *State Party Organizations: Strengthened and Adapting to Candidate-Centered Politics and Nationalization*, in L. Sandy Maisel ed., *In The Parties Respond: Changes in American Parties and Campaigns* 19-4 (4th ed. 2000).

FOF ¶ 562.  Currently, the RNC, Republican National Congressional Committee and the Republican National Senatorial Committee collectively have raised $75.5 million year-to-date according to latest FEC reports, or $.40 per each of the nation's 186,983,927 registered voters.

FOF ¶ 563.  By contrast, based on the latest state campaign finance reports up to Cycle 3, the Pennsylvania State Republican Committee has raised $.05 for each of state's 8,549,848 voters; and the Philadelphia City Republican Committee $.08 for each of city's 1,063,130 voters. In 2008, the three national Republican committees raised $920,362,727 (the RNC alone raised $427,558,768) which is approximately $5.00 for all voters. The Penna. State Republican Committee raised $6,668,630, or $.77 per registered voter; the Philadelphia GOP raised $427,465 or $.40 per voter.

FOF ¶ 564.  FEC records suggests the national Republican committees employ over 270 full time personnel plus up to 600 paid consultants. Among the RNC personnel are "regional political directors" who provide assistance to state, county and local GOP committees. As noted by Professor Conway: "Another element in the effort to develop state and local party organizations has been the use of Regional Political Directors. From eight to ten RNC staff people have been assigned to work with state party organizations, each regional director having responsibility for working with from two to six state organizations. The services provided and assistance given varies; but facilitation of service provision by the RNC to state party organizations and candidates is important. Coordination of RNC and senatorial and congressional campaign committee activities is another component of the regional director's work." Conway, *supra* at 8.

FOF ¶ 565.  State campaign finance reports suggest the Penna. State Republican Committee 15 full and part-time employees, Philadelphia City GOP employs one secretary. We are aware that the staffing of many other state Republican committees, i.e., Maine, more closely resembles Philadelphia City Committee's one secretary manning-the-fort than a full staffing contingent. The study by White and Shea that suggests almost all county committees has at least one full time staff personnel appears to us to be outdated, based on our prior survey of Pennsylvania's 67 county Republican committees, where we found no such office or full-time personnel.

FOF ¶ 566.  As noted, RNC paid $10 million to FLS Connect for Voter Vault, an out-of-date micro-targeting voter database. The Democrats now have their own micro-targeting voter database, Demzilla. Experts believe each database system has approximately 165 million entries.

FOF ¶ 567.  While many state Republican committees have resorted to other software programs, notably Arizona and California, they must obtain such at their own expense. In Pennsylvania, a software program, "Blue Card" was developed reputedly by the state House Republican campaign committee. Press accounts now suggest that Blue Card and its vendors are subject of the Attorney General's grand jury in a series of investigations on scandals commonly known as "Bonusgate." "Victory 08" is another voter database service still burdened as Web 1.0 technology.

FOF ¶ 568.  We observe that BlueCard was not made available to the Settlor during the 2006 campaign and was only made available in 2007 when then Pennsylvania House Speaker John Perzel (R-Phila.) became alarmed about the loss of Republican registration in the city. Now, because of the Attorney General's ongoing investigation, Blue Card is no longer available.

FOF ¶ 569.  Notwithstanding the $10 million investment the RNC made in Voter Vault, major online authorities, such as TechPolitics, ranks all of the top commercial vendors are either Democratic-leaning or for use by both parties.

FOF ¶ 570.  In any respect, we have discovered (and representatives of Aristotle International, Inc., one of the bipartisan commercial vendors have openly conceded) is that the vendors' pricing strategy is deliberately skewed in favor of statewide and Congressional candidates, so as to discourage minor office candidates.

FOF ¶ 571.  This is because the service demands imposed by a candidate exceeds the return on investment, if the campaign is not large enough to subsidize service requirements.

FOF ¶ 572.  A review of the 16 leading SAAS (software as a service) political technology vendors by Personal Democracy Form shows none are Republican oriented, while ten (10) are exclusive Democratic providers being Media Mezla LLC, Democracy in Action (Wired for Change), DCS Congressional, Liberty Concepts, ActBlue, Blue Utopia, Plus Three (ARCUS), NGP Software, Inc., Civic Space and Blue State Digital.                   A r i s t o t l e   I n t e r n a t i o n a l , CompleteCampaigns.com, and ElectionMall Technologies are bipartisan. Kintera is geared to NGOs Capital Advantage primarily for PACs.

## § 42. RNC Exalts Fund Raising at Expense of Participatory Politics (¶¶ 573-633).

FOF ¶ 573.  Far from being the broad-based mobilizers of the past, the political parties now focus their energies primarily on those who can make a donation and who are predisposed to vote. This exacerbates participatory inequality in the United States Steven J. Rosenstone and John Mark Hansen, *Mobilization, Participation, and Democracy in America* (1993); Schier, *supra*.

FOF ¶ 574.  In *Political Parties and Campaign Finance, What Role Do the National Parties Play*, a report Prepared for the Campaign Finance Task Force Conference, Bipartisan Policy Center, Washington, D.C., April 21, 2017, California State University Professor Diana Dwyre writes: "In the past two decades, the rules and regulations governing campaign finance activities for federal elections have changed, and the various campaign finance actors have adapted and adjusted in ways that aim to maximize their ability to raise and spend money. [While it] is most clear is that the parties have effectively adapted to the changing regulatory landscape to pursue majority status and White House victory, [y]et, parties also face an increasingly crowded field of new and newly energized campaign finance actors, such as super PACs and 501(c) nonprofit corporations. Some of these non-party actors raise and spend money in ways that are congruent with party goals, while others act in different or even contrary ways. The changes in the rules also impact where large individual and institutional contributors direct their donations. *So, the parties now face a more competitive fundraising environment where contributions to their committees are limited but contributions to other organizations are not*. The overall picture is of vibrant parties beginning to rely on allied organizations that are technically not political parties but are focused on the same goals as the parties to raise and spend money beyond what the parties can, given the restrictions on contributions to and spending by the parties." (Emphasis added).

FOF ¶ 575.  Dwyre further observes that "Party spending relative to all other spenders appears to have declined significantly since BCRA banned party soft money in 2002, particularly since 2010, as super PAC and 501(c) spending has increased. However, some of the non-party spenders, especially super PACs closely allied with the party committees in extended party networks, follow the parties' allocation strategies and therefore extend the reach and influence of the parties." *Id.*

FOF ¶ 576.   Dwye along with other scholars "view the party organizations themselves as more central to the party network. For instance, Herrnson views contemporary American parties as "enduring multilayered coalitions" with the parties as the central node in a wider network of allied outside groups and activists (Herrnson 2009, 1207). In the campaign finance world, certain party-allied organizations, such as some traditional PACs, 527 organizations, super PACs and 501(c) groups, are viewed as *part of* a party's "extended party network" (Bedlington and Malbin 2003; Dwyre and Kolodny 2014a; Herrnson 2009; Koger, Masket, and Noel 2009; Kolodny and Dwyre 1998; Skinner 2005; Skinner, Masket, and Dulio 2013). These party-allied organizations are thought to often *compliment* rather than contradict the parties' pursuit of majority status.' *Id*. at 10.

FOF ¶ 577.   "Yet, other scholars argue that the goals of non-party organizations are not necessarily congruent with those of the party organizations, and that as the campaign finance landscape has changed, the influence of parties has diminished relative to non-party organizations and resulted in negative consequences for the health of representative democracy itself. For instance, La Raja and Schaffner contend that limits on state party campaign finance activities have contributed to polarization and thus to governmental dysfunction (La Raja and Schaffner 2015). They find that limits on party fundraising alter the flow of campaign money away from the parties and toward outside groups, which they argue are more ideologically extreme than pragmatic party leaders. These groups, they assert, help elect more extreme candidates who then contribute to heightened partisan polarization and decreased representation in state legislatures." *Id.* at 10.

FOF ¶ 578.   "Yet, Hamm *et al.* examine party and non-party spenders in states with and without limits on party fundraising, and they find that these campaign finance rules have little clear impact on party and non-party spending before and after *Citizens United* (Hamm et al. 2014). Comparing party and what they call "party-affiliated" (e.g., the Republican Governors Association) and "party-allied" (e.g., Crossroads) group spending in 2006 and 2010 (before and after *Citizens United*), Hamm et al. find that the partisan groups most removed from the parties, the "party-allied" groups, spent little in states with limits on party fundraising in both years, and there was more spending by both types of non-party groups in both years in states with *no* party limits (Ibid., 313). They argue that this finding "throws a monkey wrench into the notion that limits on political party contributions are the key mechanism driving money away from the formal party organizations" (Ibid.). Hamm et al. also found that the parties are 'vertically networked,' whereby some *national*, party-affiliated groups, specifically the Republican Governors Association and the Democratic Governors Association, are involved in *state* elections across the country. They maintain that the 'parties are networked not only horizontally, across actors within jurisdictions. They are now networked vertically as well, with the key actors including national party organizations that operate with fluidity across state boundaries' (*Id*., 326)."

FOF ¶ 579.   "[While the RNC's developmental efforts regarding candidates and campaign management have been highly successful, t]he RNC's efforts in fostering state and local organizational development have not, in the short run, been as successful as the campaign oriented activities. In 1978, the RNC created an Organizational Director program, assisting each state party organization by paying the salary of an organizational director who would be hired to work for the state organization. The state organizations agreed to pay the other expenses of the Organizational Director;

unfortunately, some of the less affluent state organizations were unable to budget adequate travel and other operating funds to permit this staff person to carry out the expected tasks. In some states, there were also problems of integrating this staff person into the state party organizations. Since the program was costing the RNC $1.0 million per year and proved not to be as effective as expected, the National Committee did not continue it in 1979. Conway, *supra* at 8. "The first [implication of the RNC's increased nationalization of party affairs] is that, while the activities of the national committees have made a significant contribution to the electoral success of Republican candidates, they are not an unmixed blessing to the state and local party organizations. [Because of emphasis on candidate-centric policy] Republican committees' activities have been heavily focused on campaigns for specific offices. While electoral victories may be attained quickly, and trained pools of campaign workers and potential candidates for future contests are created, the result may not be as lasting as would be greater attention to the development and maintenance of effective and permanent party organizations working in precinct, city, and state arenas. Strong and effective organizations could help the party maintain its achievements in the face of adverse evaluations of national performance." Conway, *supra* at 14.

FOF ¶ 580.   Another important outcome of the national committees' activities is that their control over the allocation of financial and other resources gives it considerable control over who may successfully compete for various offices. * * * [A] candidate must agree to conduct the campaign in the manner required by the national committees, or resources are withheld. Conway, *supra* at 14, citing Saundra Saperstein, "Campaign Blessing from the GOP," *Washington Post* (October 2 1980).

FOF ¶ 581.   "Longley argues that the process of nationalization of the party system has resulted in the subordination of state and local organizations to the national organizations. Cotter and Bibby suggest instead that patterns of increased interdependence are being created. During the period from 1977 through 1982, Republican national party activity has resulted in a higher proportion of candidates for several types of offices having a greater level of dependence on the national committees than has occurred in the past. The national committees may bypass state and local organizations in their campaign related activities; for federal offices, federal law in effect makes it difficult to operate any other way. Since the Republican focus has been the traditional one of winning elections, activities leading to organization development which do not contribute directly to that outcome have, with few exceptions, not received as much support." Conway, *supra*, at 16.

FOF ¶ 582.   [Critics asserts] parties are [now] institutions that candidates and officeholders invent and reinvent to solve problems that face them at particular times in history. Today's parties are organizations "in service" to their candidates. Facing a dealigned electorate contemporary officeholders have reconstructed parties as repositories of modern campaign expertise on polling, media, and strategy, and increasingly as fundraising operations. Traditionalists, however, favor conceptual stability, objecting that the organizations operating under the party labels today are not parties in the classic sense-mass mobilization organizations [but that] party strategies today include the deliberate demobilization of the electorate. What we call parties today are giant campaign consulting firms or super-PACs, not classic parties. Morris P. Fiorina *Parties and Partisanship: A 40-Year Retrospective*, POLITICAL BEHAVIOR, Vol. 24, (Jun., 2002) 93 at 103; Rae, *supra*, at 245.

FOF ¶ 583. This is evident as the RNC in particular exploits what is commonly known as Joint Fund Raising Committees. *Politico* provides the following report: "[A] new Center for Public Integrity analysis of campaign finance data indicates Democrats and Republicans alike are now aggressively trafficking in a new—and perfectly legal—kind of soft money, enabled by a 2014 Supreme Court decision, the latest in a series gutting major parts of McCain's 2002 law. The new tactic is also changing political fundamentals.

FOF ¶ 584. "In a fundraising environment that had come to be dominated by super PACs—committees that may raise and spend unlimited amounts of money to advocate for or against specific candidates—it's helping national political parties regain some relevancy after years of declining power. It's also reviving an era when politicians were able to directly solicit six- and seven-figure checks from donors on behalf of the political parties, raising the specter of corruption and scandals that dogged politicos during the 1990s.

FOF ¶ 585. "Here's how this shell game works: Top donors spent the 2016 election cycle legally writing six-figure checks to so-called joint fundraising committees—committees that can dole their contributions out to multiple allies, notably including state political parties. But rather than keep all the cash, the state parties have been quickly steering the money to the national parties, taking advantage of their ability to transfer unlimited cash to their national affiliates.

FOF ¶ 586. "The joint fundraising vehicles aren't new, but the Supreme Court's 2014 decision to eliminate some obscure but important campaign contribution limits in *McCutcheon v. FEC* had the effect of supercharging them. The 2016 election provided a first, full glimpse at what the new legal landscape would mean in reality.

FOF ¶ 587. "The result: Parties are more aggressively and successfully courting a small number of deep-pocketed donors, giving the wealthy another way to exert their ever-growing influence over politics. And the national parties, which had lost their luster as deep-pocketed donors steered their money to other vehicles, are once again flush with burgeoning amounts of cash whose origins can be difficult to divine.

FOF ¶ 588. "Foes of McCain's effort to restrict political giving welcome the changes. But nonpartisan watchdog groups aren't happy. The situation is "effectively a form of legalized money laundering and it is something that we've seen on both sides," says Brendan Fischer of the Campaign Legal Center.

FOF ¶ 589. "Both Donald Trump and Hillary Clinton took great advantage of this latter-day soft money system as they barreled toward Election Day, the Center for Public Integrity's review shows.

FOF ¶ 590. "When, for example, Clinton's main joint fundraising committee received a contribution, it divvied the money up among Clinton's campaign committee, the Democratic National Committee and a gaggle of state-level Democratic Party committees.

FOF ¶ 591. "State Democratic parties then often shifted the money they received from Clinton's joint fundraising committee right to the DNC, allowing the national committee to pocket significantly more cash than federal contribution limits would appear to allow.

FOF ¶ 592.    "Republicans did the same, an even higher percentage of the time: *Republican state parties shifted more than 90 percent of the dollars they received from the Trump Victory committee to the Republican National Committee*. (Emphasis added).

FOF ¶ 593.    "In the post-*McCutcheon* world, this fundraising tactic has vaulted joint fundraising committees out of obscurity and enshrined them as prominent players in federal politics.

FOF ¶ 594.    "During the 2016 election cycle, for example, Clinton's joint fundraising committee took in over $300 million more than Barack Obama's did during the 2008 election cycle, when he was the Democratic nominee.

FOF ¶ 595.    "The new reality has also pushed national parties to court — even more assertively than before — a small cohort of donors who can write them huge checks.

FOF ¶ 596.    "During the 2016 election cycle, at least 1,700 donors each spread $127,000 or more among federal candidates, party committees and political action committees, the Center for Public Integrity's analysis of campaign finance data from the Center for Responsive Politics found. The $127,000 figure (adjusted to current dollars) is significant because it represents the so-called aggregate cap, or limit on the amount donors could give all federal candidates, political parties and political action committees combined, that was struck down by *McCutcheon*.

FOF ¶ 597.    "Combined, that small universe of megadonors injected more than $500 million into federal-level elections in 2016, and slightly more than half of that money was in contributions that would not have been legally permitted before the McCutcheon v. FEC decision, when the aggregate caps were still in place.

FOF ¶ 598.    "Some donors in previous cycles exceeded the limits, despite the law, but the change has funneled hundreds of millions of additional dollars into federal elections, much of it into party coffers. During the 2012 presidential election cycle, only about $16 million went over the limits.

FOF ¶ 599.    "The total includes contributions to new accounts Congress created for the parties in December 2014, after the *McCutcheon v. FEC* decision. Those accounts can accept six-figure contributions, but the money is earmarked for restricted purposes such as convention costs or recount expenses.

FOF ¶ 600.    "[I]n a May 2016 email exchange among top Democratic Party officials and their lawyers, released by WikiLeaks, they acknowledged that any formal agreement between state parties and the national party to transfer the money "would raise serious legal question for the DNC." (The email was prompted by media coverage of some transfers.) Instead, the Democrats said, the party should stress there is "definitely no formal agreement or obligation" requiring the transfers, even though "in practice" state parties, the DNC and the Clinton campaign would move the money where "it will be the most useful."

FOF ¶ 601.    An example is the "[c]ontributions to Trump's campaign machine by Julianna Holt, chairwoman of the NBA's San Antonio Spurs, [which] show[s] how the nation's new soft money system works — and how it makes a mockery of campaign finance law.

FOF ¶ 602.    "Holt wrote checks totaling $499,400 in 2016 to the Trump Victory Committee,

Trump's main joint fundraising committee benefiting his presidential campaign and Republicans writ large. Of Holt's contribution, Trump's own campaign received $5,400—the legal maximum for a presidential committee. The RNC, meanwhile, received $284,000, split among its general account and several restricted accounts that fund specific projects, such as national conventions or election recounts. Finally, 20 state Republican parties reported receiving $10,000 each from Holt, via her original contribution to Trump's joint fundraising committee.

FOF ¶ 603.   "But of these 20 state parties, 18 of them held the money only briefly before transferring it to the RNC. The state parties did this by exploiting a law that allows them to transfer unlimited amounts of money to their national party committee cousins.

FOF ¶ 604.   "In the end, the transfers from the state parties meant the RNC pulled in an additional $180,000 from Holt. (Holt didn't respond to an inquiry from the Center for Public Integrity about her contributions and how they were used.)

FOF ¶ 605.   "Hundreds of other Trump Victory Committee donors had their big-dollar donations used in similar fashion. In all, state Republican parties transferred nearly every dollar they received from the Trump Victory Committee to the RNC—more than $27 million from the committee's formation in May 2016 to the end of that year, according to the Center for Public Integrity's analysis.

FOF ¶ 606.   "One state party chairwoman, Terry Lathan of the Alabama Republican Party, said the RNC made it clear to her that the Trump Victory Fund would be sending her state party committee money—and she knew most of it would go to the RNC.

FOF ¶ 607.   "That was perfectly fine," Lathan said. "We wanted to be team players to help in a presidential election year."

FOF ¶ 608.   "On the Democratic side, donors contributing to the Hillary Victory Fund—and thereby eventually filling the DNC's coffers with bonus cash—included Illinois venture capitalist J.B. Pritzker, media mogul Fred Eychaner and former Dreamworks SKG CEO Jeffrey Katzenberg.

FOF ¶ 609.   "Democratic state parties pocketed about one-fourth of the money they received from Clinton's joint fundraising committee. But they sent the other three-fourths—at least $84 million—to the DNC.

FOF ¶ 610.   "Seth Masket, chairman of the political science department of the University of Denver, notes that political parties have always found innovative ways of adapting their fundraising practices. Often, he says, "reforms are designed to kind of limit their ability to transfer around money or spend money on campaigns and usually parties are very skilled at finding new ways at getting that money to candidates who need them in competitive districts."

FOF ¶ 611.   "In an unusual move, the Hillary Victory Fund itself spent some proceeds on advertisements designed to boost Clinton's campaign. This novel use of political money worried watchdogs who said it effectively violated federal campaign contribution limits by shifting Clinton's own campaign costs onto groups funded by donors writing six- and seven-figure checks. (By law, 2016 presidential campaign committees could accept contributions of up to only $2,700 per election, per person.)

FOF ¶ 612.    "More than two dozen Democratic state parties did not respond to a request for comment from the Center for Public Integrity regarding their transfers to the DNC.

FOF ¶ 613.    "The 2016 election's tangled web of soft money transfers makes following political money—often a daunting task even for election lawyers and political reporters—that much more difficult. And that makes it hard for voters to understand what interests are behind the political ads they're seeing on television, or assess the full influence of a big donor.

FOF ¶ 614.    "The dollars given to the joint fundraising committees ricocheted around "like pinball," says Daniel Weiner, senior counsel for the Brennan Center for Justice at New York University School of Law, which advocates for campaign finance reform.

FOF ¶ 615.    "But other campaign finance lawyers noted that the transfers, while confusing, represent fundraising coordination between state and national parties—something that's perfectly permissible and to be expected during the heat of an election season.

FOF ¶ 616.    "Besides, as pro-deregulation campaign finance lawyer Jim Bopp notes, the national parties transfer money "to the states that matter" closer to Election Day, and those critical states then use the money locally.

FOF ¶ 617.    "When Congress passed McCain's 2002 law, it was responding to a public backlash after a series of scandals that showed the growing influence of corporations, labor unions and big donors writing big checks. Now, campaign finance watchdogs say, the pre-2002 system is essentially back as a result of *McCutcheon v. FEC,* the 2014 Supreme Court ruling that allowed wealthy Americans to contribute money to as many different federal candidates and political parties as they want. Previously, their overall contributions were capped each election cycle under the "aggregate limit" rule.

FOF ¶ 618.    "The decision didn't change the base limits that contributors can give to each candidate or political party, but essentially allows donors to give to more recipients than they could before *McCutcheon v. FEC.*

FOF ¶ 619.    "Individuals had been prohibited from giving more than $48,600 combined to all federal candidates and more than $74,600 combined to all parties and political action committees. That meant that per election cycle, contributors weren't allowed to give more than $123,200 (though campaign finance data suggest some contributors slipped past that limit).

FOF ¶ 620.    "Campaign finance watchdogs warned before *McCutcheon v. FEC* was decided that it would create a loophole allowing donors to circumvent base contribution limits.

FOF ¶ 621.    "The amounts of money involved likely will only grow as joint fundraising committees get bigger.

FOF ¶ 622.    "But supporters of the aggregate limits said, among other things, that the limits prevented donors from circumventing base campaign contribution limits by giving money to other political committees that then transferred it, or used it to support a particular candidate. The Supreme Court found that argument to be insufficient and struck down the limits.

FOF ¶ 623.    "Chief Justice John Roberts wrote it was "divorced from reality" to think the resulting river of cash would be funneled to benefit a single candidate. There are enough legal safeguards in place without the aggregate limits, Roberts argued, to ensure that donors don't violate the base limits. He also said there were strong First Amendment considerations arguing against the aggregate caps, writing, "The Government may no more restrict how many candidates or causes a donor may support than it may tell a newspaper how many candidates it may endorse."

FOF ¶ 624.    "What Roberts didn't predict: The money would flow to the national political parties in amounts not seen since the heyday of soft money, when politicians such as McCain and George W. Bush were fighting over how to address it.

FOF ¶ 625.    "There is one key difference between today's system and the soft-money era, however: Now, the dollars must be used in accordance with federal regulations, as opposed to the nebulous "party building" activities the old, unlimited soft money contributions could be spent on.

FOF ¶ 626.    "In a blistering dissent that he read from the bench, Supreme Court Justice Stephen Breyer said Roberts and the majority were making the wrong decision in *McCutcheon v. FEC*. The *McCutcheon v. FEC* ruling "creates a loophole that will allow a single individual to contribute millions of dollars to a political party or to a candidate's campaign," he wrote, adding that it "eviscerates our Nation's campaign finance laws, leaving a remnant incapable of dealing with the grave problems of democratic legitimacy that those laws were intended to resolve."

FOF ¶ 627.    "Now, campaign finance watchdogs say, events have proven Roberts wrong and Breyer right. Even though the transfers are legal, the practice "drastically undermines the contribution limits, and opens the door wide for corruption to flow from deep-pocketed donors who can write huge checks to the party committees," says Paul S. Ryan, vice president of Common Cause and formerly of the Campaign Legal Center.

FOF ¶ 628.    "The joint fundraising committees will only grow in size in coming election cycles, as more state party committees join up, observers on both sides of the debate agree. Even though they don't get to keep the money, the state parties have little incentive not to boost the national parties' efforts. "The donors are not coming from the state party base," Ryan points out. "It doesn't cost them anything, it gains them favor and it helps their party."

FOF ¶ 629.    "But Bopp, a campaign finance lawyer who was part of the legal team involved in bringing the *McCutcheon* case, says the scenario taking place appears materially different than the one referenced in the *McCutcheon v. FEC* ruling. That's because the cash is flowing to national parties, not a candidate.

FOF ¶ 630.    "The point of campaign limits is to avoid corruption, he says, and parties aren't public officials. "What is different is a particular donor can give to more state parties than those they were limited to in the past," he says, which was "the whole purpose and point of the case."

FOF ¶ 631.    "There are some upsides to this brave new money era, political scientists allow—notably the rebuilding of political parties that had atrophied under the old rules. Parties, says Masket, exert "kind of a moderating influence on the system in

that they channel most of their funds to the more centrist candidates in the more competitive district," isolating extremists. Nonetheless, he says, the convoluted path traveled by the money "means declining accountability in the campaign finance system, which is problematic."

FOF ¶ 632.   "I don't like these kinds of politics, where money is just circulating in these circuitous ways," adds Ray La Raja, a professor of political science at the University of Massachusetts Amherst.

FOF ¶ 633.   "Political operatives see the issue in more practical terms. Alabama businessman Shaun McCutcheon, the plaintiff in the Supreme Court case that overturned the limits, says his primary motivation was allowing individual donors to give to as many candidates and political committees as they chose. But if the decision in the case that bears his name helps the political parties raise more money and compete with the super PACs that can raise unlimited amounts, he's happy about that. "That's a good thing in my opinion," he says. "A million in the parties is worth a billion in the super PACs. The people in the parties … know how to get a lot more out of their money than some of these super PACs."

## § 43. Trust Established to Correct RNC Violating Civil Rights Act (¶¶ 634-641).

FOF ¶ 634.   The Trust is a charitable trust, *Taylor v. Hoag*, 278 Pa. 194, 116 A. 826 (1922); Note, *Charitable Trusts for Political Purposes*, 37 VIRGINIA L.REV 988 (1951); Restatement (Second) Trusts § 374 comment j; Bogart & Bogert, BOGART ON TRUSTS&TRUSTEES (2d ed.1964) § 378 ("Bogert"); 4 Scott, SCOTT ON TRUSTS (2d ed.1956) § 374.4 ("Scott"); Louis Bartlett, *Charitable Trusts to Effect Changes in the Law*, 16 CAL. L. REV. 478 (1928).

FOF ¶ 635.   The Trust's charitable purpose is to enforce existing civil rights secured by law, voters' First Amendment right to participate in the political process, *Collier v. Lindley*, 203 Cal. 641, 266 P. 526 (1928); Bartlett, *supra* n. 4, 12, 16 CAL. L. REV. 478; *In re Application of Roosevelt*, 9 Misc.2d 205, 160 N.Y.S.2d 747, 749-750 (New York Co.), *affirmed*, 3 A.D. 988, 163 N.Y.S.2d 403 (1st Dept. 1957), *affirmed*, 4 N.Y.2d 19, 171 N.Y.S.2d 841, 148 N.E.2d 895 (1958); *Bentman v. Seventh Democratic Ward Exec. Committee*, 421 Pa. 188, 218 A.2d 261 (1966).

FOF ¶ 636.   Such First Amendment rights are now impermissibly diluted, *Associated Press v. United States*, 326 U.S. 1, 7, 20 (1945) (First Amendment rights does not include the right to deny the same right to others); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise").

FOF ¶ 637.   These rights are being denied by both national party committees, "dark money" Super-PACs, *See e.g.*, *McConnell v. FEC*, 540 U.S. 93, 140-144 (2003) (recognizing "the pernicious influence of 'big money' campaign contributions"); *FEC v. National Right to Work Comm.*, 459 U.S. 192, 208 (1982) (recognizing the eroding of public confidence in the electoral process due corruption). See e.g., John Kenneth White and Daniel M. Shea, *New Party Politics* 192-193 (2000); Benjamin D. Black, *Developments in the State Regulation of Major and Minor Political Parties*, 82 CORNELL L.REV. 109, 115 (1996); Robert J. Huckshorn, James L. Gibson, Cornelius P. Cotter and John F. Bibby, *Party Integration and Party Organizational Strength*, THE JOURNAL OF POLITICS, Vol. 48 976, 978 (1986); Leon Epstein, *Political Parties*

*in the American Mold* 9, 236-237 (1986); Xandra Kayden, *The New Professionalism of the Oldest Party* 229-236, Public Opinion 8 (June/July 1985); M. Margaret Conway, *Republican Political Party Nationalization, Campaign Activities, and Their Implications For the Party System,* PUBILUS, THE JOURNAL OF FEDERALISM, Vol, 13, No. 1 (1983); Xandra Kayden, The Nationalization of the Party System, Michael J. Malbin, ed. *Parties, Interest Groups and Campaign Finance Laws*, (1980); Anne N. Costain, *Changes in the Role of Ideology in American National Conventions and Among Party Identifiers*, WESTERN POLITICAL QUARTERLY, 33, 73-86 (March 1980); Everett C. Ladd and Charles D. Hadley, *Transformation of the American Party System*, 281 (1978); William Dean Burnham, *Critical Elections and Mainsprings of American Parties* (1970); James Q. Wilson, *The Amateur Democrat: Club Politics in Three Cities* 1-4 (1962).

FOF ¶ 638.    The aforementioned offending national political parties, super PACs, etc. dilution of voters' First Amendment rights are driven primarily by political operatives. Samuel Issacharoff and Daniel R. Ortiz, *Governing Through Intermediaries*, 85 Va. L. Rev. 1627, 1637 (1999). See also Esptein, *supra* n. 4, 12 at 237-237 (no one can control consultants); Nancy L. Rosenblum, *Political Parties as Membership Groups*, 100 COLUM. L. REV. 813, 819 (2000); Denise L. Baer & David A. Bositis, *Elite Cadres and Party Coalitions: Representing the Public in Party Politics* (1988) (discussing the changing dynamics within party elites and between those elites and the electorate) (cited in Daniel Hays Lowenstein, *Associational Rights of Major Political Parties: A Skeptical Inquiry*, 71 TEX. L. REV. 1741, 1766 n.90 (1993)); Samuel Issacharoff, *Private Parties With Public Purposes: Political Parties, Associational Freedoms, and Partisan Competition*, 101 CALUM. L. REV. 274, 301 (2001;.Bruce E. Cain, *Party Autonomy and Two-Party Electoral Competition*, 149 UNIV. OF PA. L. REV. 793 (2001); Stephen Breyer, *Our Democratic Constitution*, 77 N.Y.U. L. REV. 245, 253 (2002).

FOF ¶ 639.    Seeking "improvements in the direct, popular nomination and election of public officials enabling the electorate to vote more intelligently and efficiently" has long been a charitable purpose. *Collier v. Lindley*, 203 Cal. at 645-646, 649-652, 266 P. at 527, 528-529; Bartlett, *supra* n. 4, 12, 16 CAL. L. REV. 478.

FOF ¶ 640.    The Trust effectuates its charitable purpose through *We the People TODAY*™ an online interactive ("Web 2.0) CIIM/GOTV software program, to aid elected party officeholders. *Ammond v. McGahn*, 390 F. Supp. 655, 660 (D.N.J.1975) *rev. on other grounds*, 532 F.2d 325 (1976) ("No elected representative of the people may be barred from participation in the forum to which he or she was elected").

FOF ¶ 641.    The most efficient, economical and efficient way to win elections is direct voter dialogue. *Meyer v. Grant*, 486 U.S. 414, 424 (1988). Because they are elected, party officials, no less than public officials, represent voters, *Roosevelt*, 9 Misc.2d at 208, 106 N.Y.S.2d at 749-750. Accord, *Bontempo v. Carey*, 64 N.J.Super. 51, 57, 165 A.2d 222, 225 (Law. Div. 1960), as a Progressive Era court asserted, such election is "to lift party management to a plane where it will assist, rather than hinder, the expression of the will of the people." *State ex rel. Guior and Miles*, 210 Mo. 127, 156, 109 S.W. 593, 603 (1908).

### § 44. CIIM: Fundamentals of Political Communications (¶¶ 642-648).

FOF ¶ 642.    The political party remains a "most important intermediary between citizens and

109

elected public officials." Joseh Gershtenson, *Mobilization Strategies ofthe Democrats andRepublicans,1956-2000,* POLITICAL SCIENCE QUARTERLY, Vol. 56, No. 3 (September 2003), pp. 293-308. The party cannot serve such an intermediary role without mobilization. However Professor Pomper notes that because of the party's decline to mobilize voters, their influence on electoral outcomes wanes. Gerald M. Pomper, *Party Organization and Electoral Success*, POLITY, Vol. 23, No. 2 (Winter, 1990) pp. 187-206. "While parties have some influence on electoral outcomes, their principal influence is in the period leading up to registration." *Id.* at 205-206.

FOF ¶ 643.   Politics requires deliberate series of communication stages to motivate voters from (1) inaction to (2) interest, then (3) concern, to conclude in (4) engagement (motivation). Known as "CIIM,"acronym for Connect, Inform, Involve. Mobilize, require successful advance through these stages.

FOF ¶ 644.   Political parties must built coalitions of multiple constituencies to collectively achieve a common electoral objective. Kirsten A. Foote and Steven Schneider, *Web Campaigning* (2006). This is accomplished by consensus building leadership, not top-down imposed authority, by moderating competing interests to promote mutual values. Margaret A. Neale, *Are You Giving Away the Store? Strategies for Savvy Negotiation*, STANFORD SOC. INNOVATION REV. 34 (Winter 2004).

FOF¶ 645.   These constituencies, such as committee people, expect the right to participate in the decision-making process of the organizations they join, in this case the political party Freeman, *supra*; Foote and Schneider, *supra.*

FOF¶ 646.   Because the party's every communications must be in support of its relationship with the voter Peter Churchill, "Constituent Relationship Management: How Smart Business Equals Winning Politics" Barko-Germany, ed., *Little Black Book* 8 (2006), the GOP must first mobilize committee people, who as direct intermediaries are the only means of peer-to-peer contact, which trumps all other mediums, including TV; Kenneth Smukler, press interview (2006); and secondly, the general public, both through the Internet, the only medium that delivers interactive social networking. W. Lance Bennett, Mike Xenos, and David Iozzi, *The Digital Election* (2004). The Internet is now the only means to successfully disseminate the ever increasing volume of information required for participatory political decision-making processes to correspond to the accretion of knowledge. Foot and Schneider, *supra.*

FOF ¶ 647.   Any CRM application must promote via the Internet peer to peer communications. Such is not accomplished by merely collecting data, as data must be organized to be useful. Barko Germany, *supra.* "The principle of CRM is simply this: the focus on the customer, not the product. In political terms, this translates into "focus on the constituent (or voter), not the candidate." Churchill, *supra*, at 9, citing Don Peppers and Martha Rogers Ph.D., *The One to One Future* (1993).

FOF ¶ 648.   Additionally, such CRM must deliver universally disseminated information, the resulting transparency disciplines party leadership to focus on performance, (RIPA, 2007), without being confrontational. Freeman, *supra*.

### § 45. Importance of Party Mobilization (¶¶ 649-657).

FOF ¶ 649.   "As self-interested organizations whose primary aim is electoral success, political

parties mobilize citizens in order to benefit their candidates. Encouraging supporters to vote is perhaps the most obvious way in which party efforts can lead to electoral victories, and mobilization has been shown to increase turnout. [M]obilization has also proven helpful in spawning campaign activity [such as fund-raising]." Joseph Gershtenson, *Mobilization Strategies of the Democrats and Republicans, 1956-2000*, POLITICAL RESEARCH QUARTERLY, Vol. 56, No. 3 (Sep., 2003), at 293.

FOF ¶ 650.   "Vote mobilization and related organizational activities constitute the bulk of task performed by American local [party] officials." Burrell, *supra*, at 53, citing Wright, *supra* at 337.

FOF ¶ 651.   "We now know that where the parties are reputed to have had strong organizations in the past and where political conditions continue to exist (i.e., competitiveness) which are conducive to the development of viable parties, they are still able to maintain organizations." *Id.* at 65. "To serve their purposes effectively, parties must have long-run organizational and political goals--unlike PACs and the campaign organizations of individual candidates. In contrast to most interest and advocacy groups, parties must continuously seek to establish contact with the electorate in a fashion that elicits participation on a large scale." Nancy L. Rosenblum, *Primus Inter Pares: Political Parties and Civil Society*, 75 Chi.-Kent L. Rev. 493, 513 (2000).

FOF ¶ 652.   "Because mobilization is a costly activity, political parties are not able to mobilize all members of society. As a result, parties must be strategic in their efforts. [Gershtenson] identif[ies] four primary strategic considerations.

FOF ¶ 653.   "First, parties consider the participatory predispositions of individuals. That is, parties target individuals who are more likely to respond to mobilization, individuals who are more predisposed to activity by their individual characteristics. Thus, predictors of voting (and other political activity) such as income, education, age, and party identification should also have positive effects on the likelihood of party mobilization efforts. While parties inevitably contact some individuals who are unlikely to participate, their financial and electoral needs promote greater attention to citizens who might be active even with- out recruitment efforts.

FOF ¶ 654.   "At the same time that parties want their mobilization efforts to promote participation, they should not indiscriminately contact individuals likely to be active. In attempting to win elections, parties should focus their efforts on individuals supportive of their party and its candidates and avoid mobilizing individuals who support their opponents. Converting people predisposed to support the opposition party, if possible at all, will usually be quite expensive. Furthermore, contacting such people may arouse their interest and spur them to action on behalf of the other party."

FOF ¶ 655.   "A third consideration entering parties' mobilization decisions is the social positioning of individuals. Namely, parties are more inclined to mobilize individuals who have greater social connections. The returns on mobilization efforts can be greatly enhanced if those people targeted will in turn exert influence on others.

FOF ¶ 656.   "In addition to targeting specific types of people, parties will consider contextual circumstances, most notably their electoral prospects. A party that finds itself in the midst of opposition territory is unlikely to devote significant resources to mobilization. Conversely, a dominant party may have no need to engage in

111

recruitment either. In contrast, competitive districts or states should encourage greater mobilization by both parties"

FOF ¶ 657.　"Just as declining turnout may make individual characteristics more important as determinants of mobilization, it may also enhance the importance of social connections. Again, the logic of mobilizing those citizens who can help achieve trickle-down effects from contacting should be persistent. However, as the potential trickle-down effects grow with more citizens abstaining, parties may increase efforts to target individuals well situated in social networks." *Id.* at 294 (citations omitted).

### § 46. RNC's 2006 Failure is Impetus for Creating Trust (¶¶ 658-667).

FOF ¶ 658.　In 2006, the GOP lost 6 U.S. Senators, 32 Congressmen, 6 governors (and one in 2007), 74 state senators (6 more in 2007), 285 state representatives. Democrats lost no U.S. Senators or Congressmen, only 3 state senators, 8 state representatives in 2006; 1 governor and 3 state representatives in 2007.

FOF ¶ 659.　The 403-11 changeover to Democrats resulted in the GOP loss of control of the Congress; Iowa, New Hampshire and Oregon legislatures; Wisconsin Senate; and Indiana, Michigan, Minnesota, Oregon and Pennsylvania House.

FOF ¶ 660.　2006 was only the time in history Democrats do not lose a Federal or gubernatorial election. Democrats won 42,082,311 or 52% of all Congressional votes, up 5.4%, the GOP captured only 35,674,808 or 45.6%, down 3.6%. Democrats won 33,929,202 (53.8%) of all U.S. Senate votes, the GOP 26,674,169 (42.4%).

FOF ¶ 661.　These results however belie the narrowness of the MOV (Margin of Victory). 11 U.S. House seats, control of the U.S. Senate and several state legislatures were lost by razor-thin margins (1% or less). 22 U.S. House races were decided by two points or less. 18 U.S. House races were decided by fewer than 5,000 votes, six races fewer than 1,000 votes, 58 races decided by 10% or less

FOF ¶ 662.　In 2006, the GOP spent on average, $1,141,661 for a U.S. House race; the Democrats spent only $836,795. The average GOP Senate race cost $6,792,513, Democrat race $8,548,258. The GOP spent $11.49 per each Congressional vote the Democrats only $9.56. In the U.S. Senate races, the GOP spent $8.33 per vote, Democrats only $8.06.

FOF ¶ 663.　One additional point which prompted the creation of the Trust was the RNC's cutting off all financial support to then U.S. Sen. Rick Santorum (R-PA), when he began trailing in the polls to then State Treasurer Robert P. Casey (D). As Freeman notes: "[t]he RNC analyzes what local party projects can best meet its long-term goals and restricts its largesse to those. Its resources have enabled the RNC to build up the state parties and solidify their loyalty, * * *." *Id.* at 353.

FOF ¶ 664.　The Trust was created due the experiences of both the Settlor and its primary benefactor, the late Dr. John Templeton arising from the 2006 campaign. Dr. Templeton, the heir to the Franklin/Templeton fortune, is a well known contributor to conservative and Republican causes.

FOF ¶ 665.　The 59th Republican Ward, by virtue of election of new committee people, was under new leadership, sought access to existing political software, GOP Data Center or the State House Republican Committee's BlueCard. Without just cause, the 59th

Republican Ward was denied access to both.

FOF ¶ 666.   The 59th Republican Ward then sought to obtain commercial software, but failed because they were priced primarily for Federal and statewide campaigns, was out of the reach of the ward committee. Out of these experiences, it was decided that the ward committee would write its own software. Apprehensive of reaction from city and state Republican leadership, the software was put into a trust to insulate it from self-serving interests of superior Republican Party leaders.

FOF ¶ 667.   Commercial political technology vendors have candidly admitted to the Trustee they markup their products and services to expressly discourage small users since the expense to service such small users would devour the product or service's profit margin. Even after the 2012 Romney ORCA debacle, commercial vendors are still trying to wring a profit out of providing political technology to a market which in most respects, cannot afford even a $250 monthly fee.

### § 47. Comparing Trust Res and RNC's Antiquated Technology (¶¶ 668-717).

FOF ¶ 668.   *Trust Property is Web 2.0 Technology.* Unlike GOP Data Center which is merely a static collection of rapidly inaccurate data, or any other commercial product, such as NDP-VAN, the Trust Property is an interactive exchange between voters and their elected precinct committee-people, resulting in demographic and contact data being continuously updated.

FOF ¶ 669.   "Web 2.0," the collective name for prevailing technology is best summed up as "interactive." It *is* two-way communications through the Internet. Web 2.0 is to the Internet, what telephone is to letters, newspapers, radio or TV.

FOF ¶ 670.   Unlike existing political technology, there is no top-bottom marketing message that's driven home.

FOF ¶ 671.   McKinsey, a leading international consulting firm, discovered, in the corporate setting, that "as the popularity of Web 2.0 has grown, companies have noted the intense consumer engagement and creativity surrounding these technologies."

FOF ¶ 672.   But McKinsey also discovered after extensive study that corporations who simply jumped on the bandwagon soon fell off.

FOF ¶ 673.   The reasons discouraging embrace of Web 2.0 included impediments such as organizational structure, the executive suite's inability to "understand the new levels of change and a lack of understanding about how value is created using Web 2.0 tools."

FOF ¶ 674.   Unless a certain number of key components are in place, attempts to capitalize on Web 2.0 will often fail.

FOF ¶ 675.   McKinsey also noted that 'historical perspective is useful" to understand that Web 2.0 is the latest wave in technology, and could have a more far-reaching organizational impact than technologies adopted in the 1990s—such as enterprise resource planning (ERP) or customer relationship management (CRM).

FOF ¶ 676.   Web 2.0 has a strong bottom-up element and engages a broad base of constituencies.

113

And it requires a totally different mind-set because Web 2.0 cannot be instituted solely by executive edict.

FOF ¶ 677.   *Web 2.0 Distinguishable by Participation.* Web 2.0 has ushered a new range of technologies. The most widely used are blogs, wikis, podcasts, information tagging, prediction markets, and social networks. What one must understand is that new technologies are constantly appearing as the Internet continues to evolve.

FOF ¶ 678.   What distinguishes Web 2.0 from previous technologies is the high degree of participation Web 2.0 technologies require to be effective.

FOF ¶ 679.   Unlike old technology (such as GOP Data Center where most users either simply process information in the form of reports) Web 2.0 technologies are interactive and require users to either (1) generate new information and content or (2) edit the work of other participants.

FOF ¶ 680.   Another difference between Web 2.0 and prior technologies is the latter required expensive and lengthy technical implementation, as well as realignment of processes in order to accommodate the old technology.

FOF ¶ 681.   Web 2.0 is radically different, although inherently disruptive of "the ways things were," Web 2.0 is not technically complex to master.

FOF ¶ 682.   Instead, according to McKinsey, Web 2.0 is "a relatively lightweight overlay to the existing infrastructure and do not necessarily require complex technology integration."

FOF ¶ 683.   *Web 2.0 Reach Extensive.* Shirkly concludes the Internet is commanding an ever increasingly significant role on the formation and experience of modern group dynamics, bridging geographical and cultural gaps. Shirky, *Here Comes Everybody, The Power of Organizing without Organizations* (2008).

FOF ¶ 684.   The Internet is changing the way people form groups and exist within them, with profound long-term economic and social effects with advantageous and adverse consequences. *Id.*

FOF ¶ 685.   *Critical Factors for Web 2.0 Success.* McKinsey identified six critical factors that will govern the successful implementation of Web 2.0, which we take liberty to modify for politics:

FOF ¶ 686.   "*The Transformation to a Bottom-up Culture Needs Help from the Top.*" Web 2.0 projects are not merely grassroots experiments that will bubble up on their own accord. Web 2.0 still requires leadership intervention, for no other reason that someone has to be on the receiving end. Party leadership must become role models and lead through the Web 2.0 technology to encourage the bottom-up involvement from the front-line.

FOF ¶ 687.   "*The Best Uses Come from Users—but They Require Help to Scale.*" In the past, the Party could simply identify and prioritize the application it deemed most useful. GOP Data Center being a prime example, as everyone sought to focus on improving the effectiveness and efficiency of known political processes within existing, functional silos.

114

FOF ¶ 688.   Web 2.0 on the other hand is *ala carte*. Leadership cannot dictate which technology grassroots is to employ, without the entire effort backfiring.

FOF ¶ 689.   Instead, party leadership must first observe what works, then scale it up. Party leadership must recall that party activists are, first and foremost, volunteers, representing a broad social-demographic characteristics all with different and competing time constraints who, more likely than not, already use Web 2.0 in their work and home.

FOF ¶ 690.   "*What's in the Workflow Is What Gets Used.*" Because of the novelty of the initiative, Web 2.0 technology appears to be separate from the mainstream to those "looking in." Earlier generations of technology explicitly replaced outdated tools everyone used to accomplish tasks. Participating in online communities made possible by Web 2.0 becomes just another "to do" on an already crowded list of tasks. Experts agree that participatory technologies have the highest chance of success when incorporated into a user's daily workflow. The reason why Web 2.0 technology is successful because users seamlessly integrate Web 2.0 into their existing routine.

FOF ¶ 691.   "*It is about Their Egos and Needs—not Their Wallets.*" Because Web 2.0 is participatory, its benefits are subjective as well as technical. Party and civic activists don't want to constantly "hit up" for donations which, a perusal visit to the current RNC website, is the prevailing strategy.

FOF ¶ 692.   One the most prevalent complains we got during one presidential campaign wasn't about Sen. John McCain, but the RNC was "hawking" plush toys, which people blithely complained about even after the campaign.

FOF ¶ 693.   Precinct committee people want to command the respect that the civic textbooks say comes with the honor of being elected to office. Volunteers want to know that they are an important part of something that's bigger than their everyday lives. While they are sophisticated enough to understand they can't change the world overnight, they want to know that whatever they are doing, has a measurable impact.

FOF ¶ 694.   "*The Right Solution Comes from the Right Number of Participants.*" Targeting users who can create a critical mass for participation is another indispensable key to success, particularly in politics. Paraphrasing McKinley: "People don't want to be stuck in their own silo." In the age of instant gratification, the results which online users seek must be readily apparent.

FOF ¶ 695.   We repeatedly observe that the RNC's entries into Web 2.0 on their website and on the RNC technology oriented website constantly and continuously fail for lack of critical mass.

FOF ¶ 696.   Moreover, the group dynamics over the Internet is significantly different than in a meeting room. Credibility assessments are not based on "the cover of the book" but its actual contents, since personality, dress, mannerisms are not clouding one's judgment. When debating or exchanging ideas online, you care less what clothes the other person is wearing, because such "is out of sight, out of mind."

FOF ¶ 697.   Reaching critical mass admittedly appears to be a challenge particularly to rural based county Republican committees. The reality is that the Internet is more

accessible than people believe. If there's DSL or cable, then there is the opportunity to not only adopt Web 2.0, but to link to the rest of the world.

FOF ¶ 698.    For example, one Sunday, we received a complaint that the contribution page for the Trust Property's public portal was inoperative (it was down for upgrading). We exchanged emails with the complainant, little recognizing that he one of our military, on duty in Afghanistan, half way around the world.

FOF ¶ 699.    "*Balance Top-down and Bottom-up*." The real objection to Web 2.0 is not so much the technology, but the fear of the content — through blogs, social networks, etc. The other fear is the self-organizing nature and control, or more to the point, the lack of control over the participants.

FOF ¶ 700.    The secret of success with Web 2.0 technology is to understand leadership succeeds only if there is leadership. In other words, Web 2.0 requires actual leadership skills, which is building consensus among coalitions to advance common value-judgments, versus merely managerial skills of barking orders to subordinates.

FOF ¶ 701.    If the Party structure, like a corporate hierarchy is a pyramid, the only difference is before Web 2.0, the arrow was only one way. With Web 2.0, the arrow goes both way. Ultimately, paraphrasing McKinsey, everyone must "recognize that successful participation means engaging in authentic conversations with participants."

FOF ¶ 702.    *Web 2.0's Future Impact.* "Smart mobs emerge when communication and computing technologies amplify human talents for cooperation. The impacts of smart mob technology already appear to be both beneficial [as] used by some of its earliest adopters to support democracy. . . The technologies that are beginning to make smart mobs possible are mobile communication devices and pervasive computing - inexpensive microprocessors embedded in everyday objects and environments. * * *.

FOF ¶ 703.    The people who make up smart mobs cooperate in ways never before possible because they carry devices that possess both communication and computing capabilities. Their mobile devices connect them with other information devices in the environment as well as with other people's telephones. * * * When they connect the tangible objects and places of our daily lives with the Internet, handheld communication media mutate into wearable remote control devices for the physical world.

FOF ¶ 704.    Media cartels and government agencies are seeking to reimpose the regime of the broadcast era in which the customers of technology will be deprived of the power to create and left only with the power to consume.

FOF ¶ 705.    That power struggle is what the battles over file-sharing, copy-protection, regulation of the radio spectrum are about. Are the populations of tomorrow going to be users, like the PC owners and website creators who turned technology to widespread innovation? Or will they be consumers, constrained from innovation and locked into the technology and business models of the most powerful entrenched interests? Howard Reingold, *Smart Mobs, The Next Social Revolution: Mobile Communication, Pervasive Computing, Wireless Networks, Collective Action* (2008). And see also Clay Shirky, *Here Comes Everybody: The Power of Organizing Without Organizations* (2008) (With accelerating velocity, our age's new technologies of

116

social networking are evolving, and evolving us, into new groups doing new things in new ways, and old and new groups alike doing the old things better and more easily).

FOF ¶ 706.   *Trust Property Features.* The Trust Property generates multiple features which are economically beyond the means of any for-profit commercial platform.

FOF ¶ 707.   The Trust Property generates a "Competition Index" (CI) is a voter measurement index generated by election results, measured in a decimal taken out four digits. A CI that is .5000 means a highly competitive district, county or state, anything above .5000 means stronger Democratic and anything lower than .5000 means stronger Republican.

FOF ¶ 708.   *Election Whip*™ is the feature within the Voter Module of *We the People TODAY*™ that (1) provides contact information which the precinct committee person either gathers or validates prior to Election Day and on Election Day (2) monitors whether the voter has shown up at the polls per his Re-PAT.

FOF ¶ 709.   The software more easily identifies a "Misaligned Voter" means a voter registered one party, but who usually votes the other party.

FOF ¶ 710.   "Partisan Competitive Index" ("PCI") is a voter measurement index generated by *We the People TODAY*™ on election results, measured by comparing the spread between the Democratic or Republican with the highest number of votes versus the Democratic or Republican with the lowest number of votes in any general election.

FOF ¶ 711.   "PAT" is the software's term for a voter's regular poll arrival time, i.e., the time of day when the voter customarily appears at his polling place. This information is well beyond the competence of any commercial product and is data generated exclusively by the party committee people examining the poll registration.

FOF ¶ 712.   The reality is that precinct committeepeople will intuitively know a voter's PAT based on community interaction that is customarily found among neighbors.

FOF ¶ 713.   "Referral" is an inquiry, request or offer to contribute or volunteer from a voter that is generated by *MyVoterPage.com.*™ "Re-PAT" means a voter's intended poll arrival time in the event the voter has failed to arrive at his regular (customary) poll arrival time.

FOF ¶ 714.   "Turnout Loyalty Index" ("TLI") is a voter measurement index generated by We the People TODAY™ on election results, measured by dividing the number of votes obtained by the leading Democratic or Republican on the ticket by the number of total registered Democrats or Republicans.

FOF ¶ 715.   The Trust Property enables precinct committee people to validate," that is the confirmation by the precinct committee person of data inputted by an individual voter through *MyVoterPage.com*™ public portal, to be confirmed as accurate and not constituting interference, i.e. "hacking" by unauthorized persons.

FOF ¶ 716.   The most important and indeed, the most critical two differences between the Trust Property and all commercial vendors, let alone GOP Data Center is first, voters have access to and can correct or delete data on their voter files, and secondly, only the

117

Trust Property collects realtime Election data because precinct committee people and their poll watchers are inputting voter data live into the Trust Property.

FOF ¶ 717.   This latter attribute is the effectuation of the Lincoln Rule of making sure "you get your supporters to the polls."

### § 48. Difference Between Trust Res and other PACs (¶¶ 718-725).

FOF ¶ 718.   *What Distinguishes Trust Property.* The Trust Property *is the only* CIIM/GOTV social networking software designed *exclusively for* elected precinct committee people to maximize Election Day grassroots mobilization.

FOF ¶ 719.   While other software programs and other 527 organizations, most notably MoveOn.org, may provide some Election Day mobilization, such is, first *ad hoc*, dependent on the candidate, campaign or cause; secondly, has no permanency, since there is no office of which the collected resources, i.e. contacts, can be passed onto a successor; thirdly, evokes no badge of authority equal to that of the embodiment of representation that is vested into an elected party official; and finally cannot be effectively and efficiently undertaken by a 527 organization without being in violation of FECA, as amended by BCRA; and likewise cannot be done by a national party committee without likewise being in violation of 52 U.S.C. § 30125.

FOF ¶ 720.   Moreover, with the development of case law, primarily *Shays v. FEC* ("*Shays III*"), 381 U.S.App.D.C. 296, 528 F.3d 914 (2008), the cost factor of the state or county party committees being able to provide the same functionality as the Trust is rapidly deteriorating by the imposition that funds to provide such software be paid out of Federal or Levin funds, not soft funds. *Id.* at 932-933.

FOF ¶ 721.   In other words, the Trust does what national party committees, PACs and 527s are prohibited by law from providing, 52 U.S.C. § 30125(d), 11 CFR 300.1(a)-b), and see also 11 CFR 109.20-.23 (re coordination), without limiting itself exclusively to Federal funds, 11 CFR 106.6 (re allocation), and what the state and local party committees cannot afford to provide.

FOF ¶ 722.   The probability that commercial software vendors would be able to compete with the Trust is highly remote, because of the prohibitive cost-factor that is imposed by the service demands of approximately 388,000 (and with the addition of Democratic committee people, now 776,000) precinct committee people (on the presumption there are two per party per division or precinct).

FOF ¶ 723.   Despite its political nature, the Trust Property fulfills a fundamental requirement imposed by charitable trust law, that "a purely public charity can provide members of the general public with resources that would not otherwise be within their financial reach." *Unionville-Chadds Ford School District v. Chester Co. Board of Assessment Appeals*, 552 Pa. 212, 220, 714 A.2d 397, 400 (1998).

FOF ¶ 724.   *How Trust Property Operates.* The Software facilitates the full range of CRM and social networking capability between the elected precinct committeeman/committeewoman and their elected voters within their election district, division or precinct, *then* compiles the success/failure ratio of interaction as data for review by the county party chairman to for accountability and oversight of the precinct committee people, in other words, are the committee people promptly and fully

118

responding to voters' inquiries and requests. Such data is then compiled via county for report to the state party chairman, such data thereafter compiled for the national party chairman.

FOF ¶ 725.    The Trust Property also provides a full range of software services that commercial software programs provide for campaigns, but such services are obviously peripheral to the main purpose of voter-representative interaction.

### § 49. House List Development is Principal Expense (¶¶ 726-728).

FOF ¶ 726.    *Web 2.0 Entry Expense Factor.* The costly aspect of Web 2.0 is not the software, but the marketing expense to develop the House List (organic list of voters with contact and profile information developed and owned by an organization).

FOF ¶ 727.    McKinsey notes obtaining critical mass is necessary for successful social networking. While the ongoing costs are minuscule compared to traditional media, the up-front costs to develop the House List are substantial. Balko-Germany, *supra* at 68.

FOF ¶ 728.    The Trustee received initial cost estimates of $5 million. Obama spent over $6 million in his 2008 campaign. However, once this initial investment is made, ongoing development is self-sustaining.

### § 50. Trust Less Costly than Commercial Vendors (¶¶ 729-730).

FOF ¶ 729.    *Cost Difference between Trust Property and Commercial Vendors.* The Settlor solicited in 2007, a bid from one of the nation's leading software vendors, Aristotle International, Inc., which responded with a bid for $321,600 a year to provide its CRM to a single a major state, plus $40,000 per month for its online voter data, and $20,860 for publicly available donor data.

FOF ¶ 730.    Extrapolating this data, employing Aristotle's software on a nationwide basis would cost each county party committee $12,274.62 per year, as compared to obtaining the service free of charge as result of equitable ownership of the Trust Property. Given that there are 3,007 counties in the nation, this would amount to $36,918,803.34 per year, which is what we estimate is the appropriate annual operating cost for GOP Data Center and NDP-VAN in 2007.

### § 51. Trust Property Saves Parties Millions in Expenditure (¶¶ 731-732).

FOF ¶ 731.    Both the RNC and the DNC will be saving millions of dollars in campaign expenditures, among other innumerable benefits. *See* e.g., *McConnell v. FEC*, 540 U.S. 93, 140-144 (2003) (recognizing "the pernicious influence of 'big money' campaign contributions"); *FEC v. National Right to Work Comm*., 459 U.S. 192, 208 (1982) (recognizing the eroding of public confidence in the electoral process due corruption).

FOF ¶ 732.    Campaign contributions not wasted on consultants and other commercial vendors for developing Web 1.0 platforms and endlessly acquiring new (but static) voter data to replace the outdated voter data can be applied to substantially more viable campaign purposes.

119

## § 52. RNC's Effort to Destroy the Trust (¶¶ 733-735).

FOF ¶ 733.   Templeton sought the Trust be funded similar to other efforts.

FOF ¶ 734.   The endowment of the Trust was envisioned to model that of the Democratic counterparts, i.e., ActBlue and MoveOn.org, *See* Democrats Forming Parallel Campaign, *Washington Post*, (March 10, 2004) and see also Richard L. Briffault, *The 527 Problem . . . and the Buckley Problem*, 73 GEO. WASH. L. REV. 949, 968 (2005) ("Democratic 527s were [ ] critical to the Democratic "ground war" and undertook massive voter registration, voter identification, and voter mobilization efforts,whichcontributedtoa substantial increase in Democratic turnout [in 2004]"); in that the Settlor would be responsible for development of the Trust Property itself, the Software, while the Qualified Beneficiaries would be responsible for all additions to the Trust, specifically what is technically known as the "House List," that being the voluntary providing of names, addresses, phone numbers and email addresses of willing participants (the General Public). Some of the major financial contributors to MoveOn.org have included: Linda Pritzker over $4,000,000, George Soros $1,460,000, and Peter B. Lewis $500,000. *Washington Post, supra.* ("The Democratic 527 organizations have drawn support from some wealthy liberals determined to defeat Bush [in 2004]. They include financier George Soros who gave $1.46 million to MoveOn.org Voter Fund (in the form of matching funds to recruit additional small donors); Peter B. Lewis, chief executive of the Progressive Corp., who gave $500,000 to MoveOn.org Voter Fund; and Linda Pritzker, of the Hyatt hotel family, and her Sustainable World Corp., who gave $4 million to the joint fundraising committee").

FOF ¶ 735.   Dr. Templeton took notice of his participation with other GOP mega-donors were previously able to assemble significant financial wherewithal by organizing Freedom's Watch. *See* Don Van Natty, Big Coffers and a Rising Voice Lift Group on the Right, *The New York Times*, (Sept. 30, 2007); Paul Kane and Jonathan Weisman, A Conservative Answer to MoveOn, *Washington Post* (January 20, 2008). Briaffault, *supra*, at 964, quoting Steve Weissman and Ruth Hassan, *BCRA and the 527 Groups, in The Election After Reform: Money, Politics, and the Bipartisan Campaign Reform Act*, Michael Malbin ed., *The Election after Reform: Money, Politics and the Bipartisan Campaign Reform Act* (2005), notes the extent of such donors: " A total of 1,882 individuals made contributions to 527s of $5,000 or more apiece, and they gave an aggregate of $256 million. Although the median donation was only $12,000, the mean contribution was $135,805 — twenty-seven times the statutory ceiling on individual donations to FECA political committees--because of the dominant role of a small number of extremely large donors. Indeed, there were twenty-four individuals or couples who each gave $2 million or more. This handful of megadonors collectively gave a staggering $142.5 million. To put this number in context, it is roughly equal to the aggregate of $149.2 million in public funds provided to the two presidential nominees for the general election campaign. The $142.5 million in 527 funds, however, came from just two dozen megadonors, while the $149.2 million in public funds came from the entire American public. Beyond the top two dozen megadonors, a somewhat larger group of 113 donors--superdonors--gave $250,000 or more. Of this larger group, 73 had been active in the former soft money system and had given a total of $50 million in soft money to party committees over the 2000 and 2002 elections (and an additional $4 million to 527s in 2002). These 73 superdonors, however, provided $157 million to 527s in 2004, or three times their level of support for the parties in 2000 and 2002

combined."

## § 53. RNC's Feb. 26, 2009 $20 Million Pledge (¶¶ 736-756)

FOF ¶ 736. RNC preempted Dr. Templeton's instructions with a $20 million offer proffered to then co-Trustee Fred Hess in a February 26, 2009 Washington, D.C. meeting at RNC headquarters by the RNC general counsel Reince Preibus, accompanied by long-time political operative Tony Marsh, which was subsequently imposed with the caveat that the Trust "obtain FEC approval" by the Trust retaining another political operative, former FEC Chairman Thomas Josefiak, Esq. The first condition precedent was later discovered to be either the result of RNC misunderstanding of what is a trust, or alternatively a pretext.

FOF ¶ 737. As a matter of law, as nothing was reduced to writing, Preibus' offer was an oral pledge.

FOF ¶ 738. Because of the absence therefore of a written instrument evidencing the terms of the offer and consideration, we are required to examine circumstantial evidence, namely the subsequent acts and or omissions by the relevant parties, being the RNC members on the one hand, and the initial and subsequently, three co-trustees on the other hand, including this writer.

FOF ¶ 739. However, to assure the appropriate degree of objectivity, we omit all acts by this writer and focus particularly on that of the co-trustee, the Honorable H. Paul Senft, as he was both a trustee and a RNC Member. As documented below, it is hard to argue that Mr. Senft would have put himself out in the mediation efforts, including seeking a meeting with then RNC Chairman Michael Steele, if Mr. Senft didn't believe that Preibus had, in fact, proffered the $20 million pledge.

FOF ¶ 740. Additionally, the acts and omissions of Mr. Preibus and all other RNC members is likewise compelling, in that at any given moment, one or more fellow RNC members could have pulled their colleague aside and confide in Mr. Senft that there was no $20 million pledge in the first place.

FOF ¶ 741. At no time is there any evidence that Mr. Preibus sought to deny, dissuade or otherwise repudiate his February 26, 2009 despite multiple opportunities that would have risen in the normal course of business, i.e. RNC meetings.

FOF ¶ 742. At all relevant times, Mr. Senft was also a member of the RNC Executive Committee, which under the *Rules of the Republican Party* is responsible for the governance of the party during RNC recesses.

FOF ¶ 743. We also believe that the RNC actors, such as Attorney Josefiak, would not have insisted on obtaining FEC authorizations and waivers relative Part 300 of the FEC regulations governing the BCRA ban on soft money for national parties, if they likewise did not believe that Mr. Preibus proffered the $20 million pledge.

FOF ¶ 744. At any given time, these actors, being well acquainted with Preibus, could have easily confirmed the veracity of the Trust's belief in Preibus' $20 million pledge. The reasonable inference would be that if there was no pledge, then their activities would have ceased (regardless of extending courtesies to the Trust advising us of their belief there is no $20 million pledge).

121

FOF ¶ 745.   Finally, the multiple attorneys involved in the mediation, led by the imminent Washington insider, David Norcross, the NJ RNC member who also was head of Blank Rome's governmental affairs unit, would likewise not invest the extensive time and effort, if they didn't believe Preibus made a $20 million pledge. The scarce time and resources of these individuals would not be dissipated on some Quixote belief held by gullible "outsiders" involved with the Trust.

FOF ¶ 746.   Additionally, no reasonable fact-finder would conclude that these attorneys would not have performed their own due diligence as to the Trustees' expectation that Preibus pledged $20 million.

FOF ¶ 747.   Accordingly, when looking into the totality of the evidence, the most reasonable inference to draw from the activities of scores of leading attorneys is there was the collective belief that Preibus proffered the $20 million pledge to the Trust on February 26, 2009.

FOF ¶ 748.   Additionally, at no subsequent time has the RNC through its counsel denied the Trust's averments regarding the February 26, 2009 $20 million pledge. At any given time, Opposing Counsel could have attacked the Trust's veracity by demonstrating that no $20 million pledge was made, therefore the entire matter being the result of misguided understandings or (as significant as has been Opposing Counsel's prevarications) intended fraud by the Trustee (and now this lone Trustee).

FOF ¶ 749.   The RNC's *Republican Curia* conduct unquestionably suggests that it was not Preibus' intent to pledge $20 million to the Trust, accordingly there is no breach of contract, or as provided in charitable law, no pledge. Then, if not a breach of contract, then what occurred in fraud.

FOF ¶ 750.   Fraud constitutes a "misrepresentation" which is any assertion, which can be by words or action, that is not in accordance with the facts. The "misrepresentation" becomes fraudulent when the RNC individuals involved with this controversy, makes a misrepresentation (A) knows that the misrepresentation is untrue, or (B) does not believe it is true or is indifferent as to whether it is true, and (C) given that entity being defrauded is a charitable trust, the RNC has a special duty to know whether its misrepresentation is true.

FOF ¶ 751.   As we have previously surmised, there is a common threat among the *Republican Curia* that the Trust was simply another vendor seeking to do business with the RNC. It appears that only Heather Sidwell understood there were disclaimer rights associated with being a beneficiary of a trust, and as discussed *infra*, she did attempt her due diligence as to the RNC disclaimer rights.

FOF ¶ 752.   That the RNC may or may not have construed the Trust as such is immaterial, as it is solely the Settlor's intent which is the polestar that governs all decisions.

FOF ¶ 753.   Nonetheless, as the law requires us to extend the evidentiary presumption that all persons act lawfully, we must presume that Preibus intended to offer $20 million once (as we now know to be fully unfounded) compliance with BCRA was assured.

FOF ¶ 754.   In any respect, the basic test of materiality is whether a reasonable person would attach importance to the fact in determining his course of conduct.

FOF ¶ 755.   The test regarding reliability, that is the degree that the Co-Trustees (this writer included) were induced or influenced by the Pledge or Misrepresentation. As documented above, Mr. Hess, Mr. Senft and this writer all acted in good faith, responding as any person would to Preibus' $20 million pledge, that of satisfying the RNC concerns over the FEC's Part 300 rules governing national political parties and soft money.

FOF ¶ 756.   We are also reminded that the RNC was at all times governed by the duty of good faith and fair dealing is implied in all actions relevant to $20 million pledge.  Any person is prohibited from do any act or omission of act that destroys or injure the rights of the Trustee (and by extension the general public who are the Trust's beneficiaries) to receive the benefit of Preibus' pledge. Even discretionary powers must be exercised in a reasonable manner that is consistent with the pledge's purposes.

### § 54. RNC's Acceptance of Trust Interest (¶¶ 757-798).

FOF ¶ 757.   Since the Trust's creation, in addition to ongoing email delivery of Beneficiary Bulletins and Legal Notices to all RNC members, (Like most email distribution software services, ours, Constant Contact® provides us a full listing of all email recipients who have "opened" our email) the Trustees have had extensive involvement with the following RNC offices and members as follows:

FOF ¶ 758.   **William Bennett** of Ohio, now the former Ohio State Republican Chairman. Chairman Bennett was instructed as to the Trust and the obligations of each county Republican Committee to register by the Deputy Trustee & Local Counsel appointed by us for Ohio, former Attorney General James M. Petros, assisted in significant degree by D. Michael Grodhaus, Esq., now Ohio Gov. John Kasich's general counsel. The legal fees for the Local Counsel for Ohio was $25,000 and remains a lien on the Ohio State Republican Committee's interest in the trust.

FOF ¶ 759.   **James Bopp, Esq.** of Indiana, whose involvement includes acceptance as counsel and proffering invoices for legal services, and which included a waiver of conflict of interest from the Indiana State Republican Committee.

FOF ¶ 760.   **Joseph W. Brown, Esq.** of Nevada, also general counsel to the Nevada State Republican Committee. Then the managing partner of Jones Vargas, Mr Brown facilitated discussions on our behalf with Bill and Weidner, a key assistant and Andy Aboud, Director of Operations of the Venetian, Inc., regarding contact with Sheldon Adelson. Attorney Brown subsequently aided us in appointment of the ancillary trustee for Nevada.

FOF ¶ 761.   **William Crocker, Esq.** of Texas. Mr. Crocker participated in multiple conversations with us and now Senior Trustee SENFT.

FOF ¶ 762.   **Kevin DeWine** of Ohio, also at the time the Ohio State Republican Chairman. Our telephonic discussion with DeWine included his recommendation of Saul Anuzis to be Circuit Trustee for what was originally intended to the 7th Circuit of a board of trustees (the circuits modeled after the Federal court system). We also responded to his inquiry about website hosting for the county committees by referring our Managing Technology Agent to his technical personnel.

FOF ¶ 763.   **Frank Donatelli** of Virginia, the RNC Deputy Chairman in 2008. Both Trustee HESS and this author briefed the Deputy Chairman during lunch at the Republican National Finance Committee meeting May 15, 2008 in Washington, D.C., however, we recall nothing came about from his promises to assist.

FOF ¶ 764.   **Mike Duncan, Esq.** of Kentucky, the former RNC Chairman. We briefed Chairman Duncan on May 15, 2009, although we would suspect he would not recall such, due to the perfunctory nature of such discussions.

FOF ¶ 765.   **Blake Hall, Esq.**, of Idaho. RNC member and also RNC General Counsel under then Chairman Mike Duncan. We were referred to Hall by RNC Rules Committee Chairman David Norcross, Esq., to have State Associations selection of successor trustees be put on the January 28-30, 2009 RNC Winter Meeting agenda. We sent him multiple emails in January, 2009.

FOF ¶ 766.   **Kris Kobach**, of Kansas, then the Kansas State Republican Chairman. We had a productive telephone call with the Chairman.

FOF ¶ 767.   **Sue Lawdon** of Nevada, also the Nevada State Republican Chairman. We had a productive telephone call with the Chairwoman.

FOF ¶ 768.   **David Norcross, Esq.** of New Jersey, formerly chairman of the RNC Rules Committee. At the time, Norcross was a partner and chair of a department within Blank Rome, one of Philadelphia leading law firms (and which represented interests of the Trustee regarding The Poor Richard Corporation).

FOF ¶ 769.   Involvement has included extensive email traffic throughout all of 2008 regarding interaction with then RNC Chairman Mike Duncan and in addition to other advice, particularly in regard to our satisfying our duty to inform and report to all RNC members, as required under 20 Pa.C.S. § 7780.3(g) upon election of Paul Senft, Jr., of Florida as Trustee, as such constituted a "triggering event" that required beneficiary notice.

FOF ¶ 770.   Our first contact with Norcross was on July 14, 2008. Our records suggest that Norcross recommend we arrange for financial support of the RNC convention to facilitate our accommodations at the 2008 pre-convention meeting, hence our subsequent email to Kevin Niehause on the same date.

FOF ¶ 771.   Our records also indicates that we asked Norcross for assistance that discussion of the Trust be placed on the RNC's August 25, 2008 agenda.

FOF ¶ 772.   We also observe that in response to Norcross's comments, we sent an email to now Senior Trustee SENFT and Texas RNC Member William "Bill" Crocker memorializing our telephone conversation with Norcross as follows: "Gentlemen: FYI. We had a telephone conversation with David Norcross this morning as to how to get on the RNC August 25th Agenda. He informed us that Ann Hathaway is the final arbiter of the RNC meeting agenda. He agreed that a letter from Pennsylvania Attorney General Tom Corbett urging that all courtesies be extended to assure beneficiary notice compliance to satisfy Pennsylvania law will more likely than not be the devise to assure we get on the agenda. Norcross agreed to be available to assist the Attorney General's office. Because he is traveling on July 31st, he will be unable to join in the conference call. We will be arranging a separate means to bring

124

him to speed on the software."

FOF ¶ 773.  Norcross emailed a reference to Anna Hathaway on behalf of us. Norcross requested the Attorney General to communicate to Ms. Hathaway with a letter requesting all courtesies be extended. The Attorney General respectfully declined due to the appearance of a conflict of interest in addition to "opening the barndoor" to such requests. A letter in PDF file was emailed to Norcross. Norcross confirmed that while "[t]hirty minutes would be out of the question. I have notified Ms Hathaway of your concerns and suggest you contact her directly."

FOF ¶ 774.  Our records also indicates we discussed with Norcross filing with the court a Report of Fiduciary as a means to focus attention on protecting the Trust Property.

FOF ¶ 775.  Our records also indicate that we fully briefed Norcross of our Levin fund-raising webcast plans.

FOF ¶ 776.  Finally, it was Norcross who we first informed that the Trust Agreement was amended by the Settlor to enlarge the Board of Trustees from 3 to 15 and that the State Associations under Republican Party Rule 5 would be the entities to designate candidates for successor trustees.

FOF ¶ 777.  We solicited Norcross' assistance to put the matter of appointment on the January 28-30, 2009 RNC Winter Meeting agenda.

FOF ¶ 778.  Norcross, after suggesting the matter be introduced to the Resolutions Committee by the Pennsylvania delegation (which could not as it had not registered with the Trust) referred us to Blake Hall, Esq, the Idaho RNC committee member and then the RNC General Counsel. All told, we have record of eleven emails with or relating to our discussions with Norcross.

FOF ¶ 779.  **Reince Preibus, Esq.** of Wisconsin, also the Wisconsin State Republican Chairman who, in the company of consultant Tony Marsh, met with Trustee Hess on February 26,2009 and who acquiesced to Marsh instructing us to immediately contact Thomas Josefiak, Esq., to "obtain assurances from the FEC" regarding the RNC tendering a $20 million pledge.

FOF ¶ 780.  This meeting appears to be prompted by this writer's Feb. 12, 2009 letter to Preibus and also Saul Anuzis, Cyrus Kokn and Tony Marsh as to why the Trust was lumped into a "Friday Tech Summit" with commercial political technology vendors.

FOF ¶ 781.  We have record of eight direct and 25 carbon copied emails (including 20 with Thomas Josefiak, Esq.) with or relating to our discussions with Preibus, in addition to the February 26, 2009 meeting.

FOF ¶ 782.  Prior to the meeting, this author sent to Mr. Preibus the following February 25, 2009 email, with attachments. "Attached is (1) a Resolution re our FECA Certification Letter to the RNC and State GOP committees, (2) a Resolution re the RNC Designating the Successor Trustees and (3) a brief Plan re the 155th Republican Anniversary Campaign - all three items to be discussed. We are preparing for your due diligence, the Trust's Internal Operating Procedures, for your reference use." At this February 26, 2009 meeting, Trustee HESS specifically recalls that Marsh inquired as to how "we can transfer $20 million to the Trust." We also recall that

125

Marsh wanted (and which we subsequently arranged to provide) extensive redistricting software for use after the 2010 census.

FOF ¶ 783.   In a March 3, 2009 email, this author stated: "We met with the RNC last Thursday, Reince Preibus, Esq., a partner in Michael Best LLC (Milwaukee, WI) who is also the WI State GOP Chairman, and is de facto, the Number 2 man inside the RNC, as he is Steele's Transition Team Chairman; and Tony Marsh, a WDC operative, who is basically acting as Preibus' virtual Chief of Staff during the transition." "Preibus and Marsh, once understanding that the Trust can do what the RNC cannot do, wants the Trust to happen. They intimate that they can transfer or move at least $20 million to the Trust, although the time frame was not made clear."

FOF ¶ 784.   "What Preibus (or more to the point Marsh) want is one of their own to sign off on the Certification Letter. They specifically want Tom Josefiak, of Holtzman Vogel, LLC, a former NRSC general counsel and former chairman of the Federal Election Commission to be appointed by us to be our FECA Compliance counsel. (In fact, they wouldn't allow us to leave until they tracked down his phone number). I talked to Tom on Friday. Because I knew Betty Southland Murphy, a major GOP powerhouse and labor attorney over at Baker & Hostetler, was of comfort to Tom. We agreed to go over everything in detail this Thursday once he completes testimony in the RNC v. FEC evidentiary hearing."

FOF ¶ 785.   We have a letter of March 31, 2009 to Rosemary C. Smith, Esq., the FEC associate general counsel inquiring why the RNC would require us to obtain the aforementioned certification letter.

FOF ¶ 786.   PAUL SENFT, JR., of Florida, who accepted service as a Trustee on May 21, 2008 to succeed the Honorable Arlin Adams as Trustee. *See* Res. 2008-09. Senft participated in the May 21, 2009 mediation session with RNC Chief of Staff Kenneth K. McKay IV and former FEC Chairman Thomas Josefiak, Esq., and now is a Senior Trustee.

FOF ¶ 787.   At all times the other RNC members and the RNC staff, including the Chief Counsel were aware of, or if they were not so aware, should have known that Senft was both a RNC member and a co-trustee.

FOF ¶ 788.   Senft at all times distinguished himself as a co-trustee when acting in such capacity, as versus his role as a RNC Member.

FOF ¶ 789.   At no time did the RNC, or any employee or counsel of the RNC demanded or directed that Senft not sit as a co-trustee or thereafter resign either his RNC membership or sitting as a co-trustee.

FOF ¶ 790.   In a Feb. 9, 2009 letter to then RNC Chairman Steele, we advised him that "Also be advised that Paul [Senft] is donating, or more specifically waiving his 2007 trustee compensation. Under the original Trust Agreement, the co-trustees were compensated a full time salary. Paul wants to assure you that he seeks no financial gain, and has instructed me to waive all 2007 income due him." Senft, due to medical reasons, resigned May 14, 2009 as acknowledged by Res. 2009-21, but he elected to remain as a Senior Trustee.

FOF ¶ 791.   **Dick Wadhams** of Colorado, then the Colorado State Republican Chairman. We briefly gave Wadhams an overview after Deputy Trustee & Local Counsel Giessler

126

was able to establish contact. We had at least one productive telephone call with the Chairman.

FOF ¶ 792. **Thomas Wilson** of New Jersey, then the New Jersey State Republican Chairman. After receipt of one of the Trustees' legal notice, Chairman Wilson responded by email advising us this is the first he heard of the Trust. The Trustee Chairman responded by advising Chairman Wilson that Trustee Hess, by virtue he represents the Third Circuit, would respond to his inquires. Trustee Hess reports that no subsequent response was had.

FOF ¶ 793. **Mark Ellis** of Maine, also the Maine State Republican Chairman. Our contact with him was merely a single phone call.

FOF ¶ 794. **Fegus Cullen** of New Hampshire, also the New Hampshire State Republican Chairman He was specifically contacted by Charles Gallagher, Esq., who became a regular participant in the Trust Property through the public portal. We had one telephone conversation with Chairman Cullen but to date received no followup.

FOF ¶ 795. **Kevin Niehause**, of the RNC Finance Committee. Mr. Niehause first facilitated arrangements for us to be guests at the May 14-15, 2008 Republican National Finance Committee (Republican Regents) meeting and fund-raiser; and thereafter assisted us with plans for the our 48 Hours or 48 Days endowment campaign by *inter alia*, referring us to RNC Assistant Chief Counsel Troy McCurry.

FOF ¶ 796. **Anne Hathaway**, then RNC Chairman Michael Duncan's chief of staff. We were referred to Ms. Hahaway by Mr. Norcross. We are informed that she assured Norcross she would answer our inquires, and as noted *infra*, we had telephonic conversations with her assistant, Benjamin Grove. We briefly met her during Republican Regents, but nothing substantive resulted either from that meeting.

FOF ¶ 797. **Benjamin Grove**, administrative assistant to RNC Chief of Staff Anne Hathaway.

FOF ¶ 798. **Tom McCurry, Esq.**, RNC assistant chief counsel. Our records indicate extensive conversations during the week of May 29, 2008 relative the FEC's Advisory Opinion 2004-02. (At that time, we also discussed the aforementioned AO with Hans von Spakousky, Esq., a former FEC commissioner). We again conversed with McCurry on or about June 3, 2008 relative a letter opinion. We also note a May 19, 2008 email to Kevin Niehaus which we stated "Tom McCurry in the General Counsel's office authorized us to let you know he's now involved in the discussion."

### § 55. RNC Does Not Disclaim Interest in Trust (¶799-801).

FOF ¶ 799. *No Indicia of Intent to Disclaim*. None of the aforementioned, many who learned attorneys well vested in experience, indicated in any manner whatsoever as a desire to disclaim interests in the Trust. To the contrary, many offered substantive assurances that the RNC's interest has been or will be accepted to us to which we relied upon to the Trust's detriment.

FOF ¶ 800. It is observed that of the 19 RNC Members involved in the Mediation, seven were attorneys, and of the three RNC staff members involved in the mediation, one was the RNC assistant chief counsel.

FOF ¶ 801.    Out of 20 attorneys, we cannot find as fact that not one of them failed to understand they were involved with a trust and thus, are presumed by law to know of the nature of the Trustee's powers and duties as a matter of law.

### § 56. Participation in Mediation is Direct Benefit RNC Exploited (¶¶ 802-804).

FOF ¶ 802.    Not only did the RNC not disclaim its interest in the Trust, but the aforementioned employing the provisions of the Trust Agreement, ¶ 8(E) is evidence of the RNC obtaining a direct benefit of the Trust Agreement, the benefit of the economies and efficiencies of alternate dispute resolution provided by the Trust Agreement in lieu of more costly litigation.

FOF ¶ 803.    Moreover, RNC members subsequently used ¶ 8(E). Curly Haugland, the (now former) RNC Committeeman for North Dakota and former chairman of the North Dakota State Republican Committee filed a formal grievance against the RNC for violating the Unit Rule. His grievance was declined on the grounds such did not involve interpretation or administration of the Trust under 20 Pa.C.S. § 7780.6(a)(3).

FOF ¶ 804.    Other Republican entities also employ the Trust's services for direct benefits. The Pennsylvania State Republican Caucus and the Governor of Nevada, a Republican, solicited the Trust for technical advice and assistance. The PA Senate has even modified the NCOPO's *Model Abandoned and Blighted Property Receivership Code*, now awaiting formal introduction in the PA State Senate.

### § 57. RNC Asst. Chief Counsel's Resistance to Trust (¶¶ 805-807).

FOF ¶ 805.    We had an extended telephone conversation with RNC Assistant Chief Counsel Heather Sidwell, which yielded no results. In that Ms. Sidwell graduated from law school in 2005, we cautioned her as to her duty and obligation to comply with RPC 1.1 to either undertake sufficient study or associate with an attorney learned in charitable trust law.

FOF ¶ 806.    Ms. Sidwell's remarks strongly suggested that she knew more about Pennsylvania trust law than either us or the Attorney General, and accordingly was quite competent to comment on the matter without the benefit of study or association with competent counsel, although all publicly available information does not suggest any experience or expertise that would allow Ms. Sidwell to make such an assertion.

FOF¶ 807.    Ms. Sidwell, at the Trustees' recommendations, had a telephonic conference with the Chief Deputy Attorney General for Charitable Trusts and Organizations on May 14, 2009. We are informed that the RNC Assistant Chief Counsel was persistent in soliciting instructions on how to disclaim the RNC's beneficiary interests. Yet, we observe no specific effort by Ms. Sidwell to proffer a disclaimer, as we have received no such Notice of Disclaimer as is required by 20 Pa.C.S. § 6204.

### § 58. Trustees' Conversion from Mediation to Arbitration (¶¶ 808-817).

FOF ¶ 808.    On May 6, 2009 now Senior Trustee Paul Senft wrote to Chairman Michael Steele, proposing Circuit Trustees. He wrote "As you may know, after the February 26 meeting with Reince Priebus and Tony Marsh, we were instructed to work with Tom Josefiak to obtain approval from the Federal Election Commission for the RNC to select candidates for the new trustee positions, as already allowed by Pennsylvania

128

law. * * * Because of the FEC's April 27th response * * * we have exercised our statutory authority to allow you [ ] to *recommend* candidates . . . for the vacant trustee positions. * * * Under the previous plan we were proceeding before the FEC's April 27th [decision], I was in charge of preparing a slate of candidates to be submitted to the court."

FOF ¶ 809.   Senft requested a meeting on May 21, 2009, if Chairman Steele was not inclined to announce his recommendations for successor trustees at the May 18, 2009 meeting of State Chairs, so as to "discuss any questions and/or your plans or preferences for moving forward."

FOF ¶ 810.   The candidates which Senior Trustee Senft put forward are, per circuit: 1st Circuit Edward Tobin III; 2nd Circuit - Jennifer Saul or John Frey; 4th Circuit - Matt Brooks, Benjamin Ginsberg, Esq., Thomas Josefiak, Esq., Cleta Mitchell, Esq., or Scott Ward, Esq. ;5th Circuit - Dr. Fred Eshelman; 7th Circuit - Saul Anuzis; 8th Circuit - Pat Brady, Esq.; 9th Circuit - Henry Barbour; 10th Circuit - Reince Priebus, Esq.; 11th Circuit - Bob Perry; 12th Circuit - Norm Semanko (Dr. Randy Ruedrich, the Alaska GOP Chairman subsequently expressed his interest to participate); 13th Circuit - Sheldon Adelson and 14th Circuit - Shawn Steel, Esq., or Charles H. Bell, Esq.

FOF ¶ 811.   *Meeting with Steele Never Materialized.* The meeting Senft requested with Chairman Steele instead amounted to a May 21, 2009 meeting with the RNC Chief of Staff Kenneth K. McKay IV and counsel Thomas Josefiak.

FOF ¶ 812.   Although not unwelcome, we had no prior notice of Josefiak's interest or reason to participate. We were never informed as to Attorney Josefiak's role or authority to act or speak on behalf of the RNC. Is he retained as counsel? Is he acting as a consultant? At no time has his professional relationship with the RNC been offered or explained to us.

FOF ¶ 813.   We were never afforded a reason why the decision-maker, Steele, was not participating in the meeting. We have reason to believe that Steele was not even in the building.

FOF ¶ 814.   *May 21, 2009 Mediation Session Unsuccessful.* Because we regard the May 21, 2009 meeting as a mediation session, the actual discussion is privileged. 42 Pa.C.S. § 5949. Accordingly, we summarize our reasonable inferences and conclusions from the meeting.

FOF ¶ 815.   We perceived that the RNC still did not view us not as trustees, but as a vendor. We concluded that the RNC was totally incapable of identifying any FECA statutory or FEC regulatory provision to justify their clearly obvious subject objections.

FOF ¶ 816.   We concluded that the RNC does not want to incur legal expenses to perform due diligence, for which it purports is necessary, although at no time was any justification proffered.

FOF ¶ 817.   *Josefiak Offer*. The mediation session concluded with no resolution, although than attorney Josefiak reiterated his offer (which was previously made to us outside the content of mediation) to confer with the FEC. We advised attorney Josefiak then, as we had previously advised him by email, that he should first confer with the Attorney

129

General to obtain an understanding of Pennsylvania trust law to assure compliance with RPC 1.1 before conferring with the FEC, so that a proper frame of reference be had to arrive at the correct resolution.

### § 59. RNC Never Officially Disclaimed (¶¶ 818-824).

FOF¶ 818.   No written disclaimer has been filed with us as required by the PEF Code. 20 Pa.C.S. § 6201 (requirement that a disclaimer be reduced to writing and describe the interest disclaimed), 20 Pa.C.S. § 6204(b) (disclaimer be delivered to trustee), and 20 Pa.C.S. §6201(3) (be signed by disclaimant)  We are unaware of any process by which a resolution under Republican Party Rule 10(a)(2)(i)-(ii) to effectuate a disclaimer or ascertain any official position has been made.

FOF ¶ 819.   At all times during 2008, one of the major RNC members whom we corresponded with was David Norcross, Esq., chairman of the Rules Committee. We also observe that Republican Party Rule 6(b) provides in pertinent part: "The Executive Committee may exercise all the executive and administrative functions required of the Republican National Committee between meetings of the Republican National Committee * * *." McNelly/Goldstein haded us a letter dated Sept. 29, 2014 stating that the RNC disclaimed its interests in the Trust.

FOF ¶ 820.   However, in *Daniel v. United Nat. Bank*, 202 W.Va. 648, 653, 505 S.E.2d 711, 715 (1998) the court held that a letter signed by disclaimant's attorney does not comply with W.Va.Code § 42–6–4, the state's adoption of the Uniform Disclaimer of Property Interests Act.

FOF ¶ 821.   The D.C. Uniform Disclaimer of Property Interests Act, D C. Code § 19-1505(c)(1)(D) contains the identical requirement ("Be signed by the person making the disclaimer") as does the PA version at 20 Pa.C.S. § 6201 ("be signed by the disclaimant").

FOF ¶ 822.   Moreover, disclaiming everything without definition is not acceptable. *Whitney v. Faulkner*, 95 P.3d 270, 273 (Utah 2004) see also Bogert at § 170.

FOF ¶ 823.   Finally the disclaimer was not timely submitted within the nine-month time period imposed by the Internal Revenue Code. IRC §§2054 and 2518 as amended by Sec. 2209(b) of Tax Reform Act of 1986. *See* Bogert § 171.

FOF¶ 824.   Furthermore, McNelly/Goldstein never proffered any evidence they were authorized by the RNC to act on its behalf, other than their self-serving declaration in the Sept. 29, 2014 letter.

### § 60. No RNC Due Diligence to Satisfy Business Judgment Rule (¶¶ 825-825).

FOF¶ 825.   *No Evidence of Acts Satisfying Business Judgment Rule.* We observed no indications whatsoever that anyone within the RNC, including counsel, staff or consultants have or are acting on an informed basis.

FOF¶ 826.   We have observed no indication whatsoever that anyone within the RNC, including counsel, staff or consultants have obtained and considered outside legal or expert advice, other than one instance of the Assistant Chief Counsel, at our invitation, telephoning the Attorney General.

FOF ¶ 827.  We do not believe that our own February 26, 2009 briefing would be satisfactory evidence of acting on an informed basis.

FOF ¶ 828.  We do not believe that Attorney Josefiak's offer to confer with the FEC is evidence of acting in good faith when he is not informed as to charitable trust law in that without full understanding of the premise, he is unable to proffer the necessary questions to obtain the answers to solve the issue.

FOF ¶ 829.  We are not aware of his acceptance of our invitation that he confer with the Attorney General.

FOF ¶ 830.  We do believe that both Mr. Norcross and Mr. Preibus have acted properly in delegating the responsibility to subordinates to become informed, the former deferring to then RNC General Counsel Blake Hall, the latter deferring to Attorney Josefiak.

FOF ¶ 831.  We are not aware of any RNC personnel contacting Mark Bursic, our Managing Technology Agent to ascertain the merits of the Trust Property.

FOF ¶ 832.  We had no request from anyone within the RNC for the password which our website requires in order to download the technical information that describes the Trust Property and its multiple uses.

FOF ¶ 833.  Our General Counsel has not been contacted by anyone within the RNC. This is despite the fact that a partner in his firm was at all relevant times the general counsel to the Pennsylvania State Republican Committee.

FOF ¶ 834.  All discussions with us leaves us the distinct impression that none of the parties are fully informed as the basics of charitable law or prevailing political technology.  In fact, the first evidence of any informed basis was the Assistant Chief Counsel's superficial demand to disclaim interest, but such discussions were flawed, as disclaimer is a self-help remedy which does not require our assistance.

FOF ¶ 835.  We also observe that none of the aforementioned persons apparently have opened our Beneficiary and Technical Bulletins we emailed to the RNC membership during all relevant times.

### § 61. RNC Counsel Perpetrates Fraud on the Court (¶¶ 836-863).

FOF ¶ 836.  When the Settlor, as per its right under the PA Uniform Trust Act, 20 Pa.C.S. § 7735, filed a petition in the Orphans Court to confirm the original arbitration award docketed at 2009-23A, the RNC first refused to answer the petition or file responsive pleadings as required by the local rules.

FOF ¶ 837.  When we tracked down now former RNC Chief Counsel Heather Sidwell on July 17, 2014, the Settlor's attorney, Larry Otter, sent her an email advising of the pendency of confirmation petition.

FOF ¶ 838.  Immediately thereafter, on July 18, 2014, the state trial judge, Matthew Carrafiello, issued a bizarre ruling which *inter alia*, intimidated the Trust's general counsel, Victor A. Young, to abstain from further legal representation. The July 18, 2014 order even contemplated whether the PA Attorney General should be usurped by

131

appointing a guardian *at litem*.

FOF ¶ 839.   We have filed the appropriate papers with the U.S. Attorney for the Eastern District of Pennsylvania and the Philadelphia District Attorney's Office, who thereafter referred the matter to the PA Attorney General. We alleged that Ms. Sidwell upon contacting her former colleagues at the RNC, reached out to a certain Philadelphia political operative, who then engaged in illegal, *ex parte* communications with the state trial judge, hence the bizarre ruling the subsequent day.

FOF ¶ 840.   Thereafter, the political operative knowing he could not personally appear in the confirmation proceeding, because Attorney Young was the Trust's general counsel, solicited and engaged another attorney/political operative to act in his place.

FOF ¶ 841.   The state trial judge, in violation of the FAA, 9 U.S.C. § 9 and 42 Pa.C.S. § 7342, raised *sua sponte* RNC's claims and defenses waived by operation of law for failure to file an application to modify or vacate the Arbitration Award, 9 U.S.C. §§ 10-12 under the time-line therein required by law, and thereafter invented and manufactured fictional facts in complete contradiction by the uncontroverted record.

FOF ¶ 842.   The state trial judge's first manufactured fact was only one trustee, when it is uncontroverted that in  2009, there were three co-Trustees, one a member of RNC and its executive committee.

FOF ¶ 843.   The judge's second manufactured fact was that the RNC had no notice of whom were the arbitrators, RNC knew co-trustees sit as board of arbitrators for disputes among co-beneficiaries.

FOF ¶ 844.   The judge's third manufactured fact was that there was no notice of commencement of arbitration, when it is uncontroverted that notice was served when mediation converted to Arbitration, given personally to RNC counsel, Thomas Josifik, Esq., who was in attendance at the May, 2009 mediation session

FOF ¶ 845.   The judge's fourth manufactured fact was there was no notice of any opportunity for an arbitration hearing, when it is uncontroverted that notice of hearing was provided. The judge's fifth manufactured fact was that there were no rules of procedure, when it is uncontroverted that there were rules of procedures, as published in both the Trust Agreement and under the Internal Operating Procedures, specifically IOP Rule 4(d), both basically adopting the Federal Rules of Civil Procedure.

FOF ¶ 846.   The judge's sixth manufactured fact was that the Trust had no "in personam jurisdiction over the RNC, when it is black letter law that an agreement to arbitrate is contractual, the RNC did not disclaim interest in the Trust.

FOF ¶ 847.   The judge's seventh manufactured fact was that the RNC was "ambushed" with a self-proclaimed award, when it is uncontroverted that RNC fully involved in mediation, counsel includes ex-Attorney General of Ohio, and a leading Blank Rome partner, David Norcross, the NJ National Republican Committeeman and chairman of the RNC Rules Committee.

FOF ¶ 848.   The judge's eight manufactured fact was that our filings were not transparent and moreover, were his confusing and prolix, when the official state court docket demonstrates we were not even a party to the confirmation proceeding, the judge

132

confusing our appearance in a related petition for declaratory judgment which we subsequently withdrew, for leave to obtain court instructions a right afforded to all fiduciaries under Pennsylvania law.

FOF ¶ 849.   The judge furthermore impermissibly stripped both the Trust, the Trustee and even the Attorney General stripped the Trustees and the Attorney General of their proper evidentiary presumptions. *Greene v. Oliver Realty, Inc.*, 363 Pa.Super. 534, 543, 526 A.2d 1192, 1196 (1987). These presumptions are as follows:

FOF ¶ 850.   Return of Service (R.R. at 20) evokes the Presumption of Receipt, which was not rebutted by the RNC. *Higgens Lumber Co. v. Marucca*, 159 Pa.Super. 405, 407, 48 A.2d 48, 49 (1946). That service was by certified mail, return receipt on both RNC headquarters and the law office of the RNC chairman, "presumes conclusively that the person to whom it was addressed actually received it." *In re Anderson*, 372 Pa. 351, 353, 93 A.2d 480, 481 (1953).

FOF ¶ 851.   It is presumed that each of the Trustees obeys the law and performs his legal duties and obligations thereunder. *Waters v. New Amsterdam Cas. Co.*, 393 Pa. 247, 254, 144 A.2d 354, 357 (1958). Unless the presumption of regularity is rebutted, it is conclusive. *Kennedy v. Upper Milford Twp. Zoning Hearing Board*, 575 Pa. 105, 135, 834 A. 2d 1104, 1123 (2003). The presumption *Ex diurturnitate temporis omnia praesumuntur rite et solenniter esse acta* is black letter for fiduciaries. *In re Henlien's Estate*, 46 D.&C. 47, 50, 24 Erie 240, 242 (1942).

FOF ¶ 852.   It is presumed each of the co-Trustees properly performed his duties as arbitrator. *Foley Bros., Inc. v. Commonwealth*, 400 Pa. 584, 592, 163 A.2d 80, 85 (1960).

FOF ¶ 853.   It is presumed RNC and its counsel know the terms of the Trust Agreement. *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983); *Estate of Brant*, 463 Pa. 230, 235, 344 A.2d 806, 809 (1975); *Montgomery v. Levy*, 406 Pa. 547, 550, 177 A.2d 448, 450 (1962).

FOF ¶ 854.   It is presumed the RNC and its counsel know the Trustee's legal powers and authority. *Delaware Valley Factors, Inc. v. Ronca*, 442 Pa.Super 609, 612, 660 A.2d 623, 625 (1995); *Will v. Killmer*, 39 Pa. D. & C. 3d 627, 630 (Bucks Co. C.P. 1986).

FOF ¶ 855.   It is presumed that the Attorney General, in performing his duties pursuant to his power as *parens patriae*, in supervising charitable trusts, *In re Estate of Pruner*, 390 Pa. 529, 531, 136 A.2d 107, 109 (1957), represents the general public, *Commonwealth v. Barnes Foundation*, 398 Pa. 458, 159 A.2d 500 (1960).

FOF ¶ 856.   On appeal, the PA Superior Court put the best spin possible on the fraud on the court, by explaining that the [2009-23A] award was not valid or enforceable under [the PA Uniform Arbitration Act] 42 Pa.C.S. § 7341, and thus the lower court's obligation to confirm an arbitration award under § 7342(b) was never triggered."

FOF ¶ 857.   RNC admitted such in its Jan. 25, 2018 brief before the Federal Court in the subsequent confirmation proceeding.

FOF ¶ 858.   The Superior Court specifically noted that the denial by the state orphans court was limited only to procedural error, and not the substance of the award itself. Specifically the Superior Court, citing *Chervenak, Keane & Co., Inc. v. Hotel*

133

*Rittenhouse Assocs, Inc.*, 477 A.2d 482, 485 (Pa.Super. 1984), stated that the "[a]n 'irregularity' that requires reversal of a common-law arbitration award refers to the process employed in reaching the results of the arbitration, not to the result itself."*In re Roosevelt-Bentman Trust*, 2016 WL 783628 (Feb. 29, 2016) at *3.

FOF ¶ 859.   RNC Counsel exploited the fraud on the court by making factual misrepresentations totally contradicted by the record in the subsequent Federal Court proceeding, despite at all times knowing there is a total absence of evidentiary support behind such misrepresentations. Such misrepresentations include, but not limited to:

FOF ¶ 860.   RNC counsel misrepresenting the instant award was issued June 12, 2009, RNC Brief Nov. 22, 2017 at 2 n. 1, when the award was issued June 10, 2016, ignoring the fact and controlling authority the Trustee, sitting as the arbitrator, may act upon an award remanded and thereafter reissue the same, at all times providing the RNC a second bite at the apple to move for reconsideration or to vacate under the FAA or PA UAA.

FOF ¶ 861.   RNC counsel misrepresented it was the Trustee, not the Settlor, who filed the original Petition to confirm the award in the state trial court. RNC Nov. 22, 2017 Brief at 2, 11, 15.

FOF ¶ 862.   RNC counsel misrepresented that the Trustee is the Trust's sole beneficiary, when Opposing Counsel possesses or if he had conducted a reasonable inquiry, should possess a copy of the publicly available Trust Agreement. RNC Nov. 22, 2017 Brief at 13.

FOF ¶ 863.   RNC counsel misrepresented the infirm state trial court judgment's fanciful assertions which are categorically contradicted by the record, which *inter alia*, establishes:

(1)   At the time of the original arbitration award there were three co-trustees, and not just the singular current Trustee.

(2)   That one of the three co-trustees was a Member of the RNC.

(3)   RNC fully participated in the mediation before it was converted to arbitration; was fully noticed of the conversion from mediation to arbitration on May 21, 2009, and was afforded full opportunity to move the Trustees for reconsideration, and put on notice of its statutory rights.

### § 62. RNC's Failure to Duplicate the Trust Res (¶¶ 864-916).

FOF ¶ 864.   As discussed *ibid,* the Trust Property is an interactive CIIM software program for precinct committee people and their constituents.

FOF ¶ 865.   A principal component is the *Election Day Whip*™ module, which is a digital version of what is commonly called a "strike list" to ascertain which voters have cast their ballot, so the precinct committee people can whip up those voters who haven't yet arrived at the polls.

FOF ¶ 866.   Instead of the using the Trust Property which obviously at all times would be outside

the RNC's control, the RNC has spend well over a half a billion in funds to duplicate the Trust Property.

FOF ¶ 867.  ORCA was the RNC's effort to duplicate the Trust Property by developing its own a mobile-optimized web application used as the GOTV component of the Mitt Romney's 2012 presidential campaign.

FOF ¶ 868.  It was intended to enable volunteers in polling stations around the country to report which voters had turned out, so that "missing" Republican voters and underperforming precincts could be targeted for last-minute efforts to get voters to the polls.

FOF ¶ 869.  According to Romney himself, it would provide an "unprecedented advantage" to the campaign to "ensure that every last supporter makes it to the polls." The system had major technical problems during Election Day that prevented many volunteers from using it.

FOF ¶ 870.  It crashed periodically and at one point was intentionally taken down when a surge of traffic from campaign volunteers was misinterpreted as a denial of service attack. Frustrated volunteers reported being unable to access ORCA and criticized a lack of prior briefing, misleading instructions and patchy on-the-day support.

FOF ¶ 871.  A Romney aide commented that "Orca is lying on the beach with a harpoon in it." The system's failings have been attributed by technology writers to a combination of factors including not doing prior quality assurance or beta testing, inadequate documentation and poor design.

FOF ¶ 872.  Conservative activists and writers blamed ORCA for depressing Republican turnout on election day.

FOF ¶ 873.  While political scientists have rebutted these claims, suggested that it probably did not have a decisive effect on the outcome, it may have negatively affected turnout figures.

FOF ¶ 874.  ORCA has been compared unfavorably with Obama's GOTV and data effort from President Obama, including Project Narwhal.

FOF ¶ 875.  The ORCA system had not received extensive beta testing before election day, nor did the campaign know how it would interact with the data infrastructure in the TD Garden until the day itself.

FOF ¶ 876.  Robert X. Cringely, writing in *InfoWorld*, concluded that "everything in the Orca rollout went great, except for a failure to do any quality assurance, proof its documentation, or beta test in the seven months from conception to implementation. Whoever was behind Orca apparently also failed to hire a competent Web designer, anticipate server loads, beef up its bandwidth, or notify its ISP to expect a bump in traffic." Sean Gallagher of *Ars Technica* commented that the key failure was the dependency on automated testing rigs, which "can't show what the system's performance will look like to the end user. And whatever testing environment Romney's campaign team and IT consultants used, it wasn't one that mimicked the conditions of Election Day. As a result, Orca's launch on Election Day was essentially a beta test of the software – not something most IT organizations would

135

do in such a high-stakes environment."

FOF ¶ 877.    *Slate* writer Sasha Issenberg argued that the problems ran far deeper than ORCA's technical failings, as the Romney campaign had been left behind by the cutting edge of data science.

FOF ¶ 878.    He noted that while a system like ORCA could not have changed the demographics, data science did make a great difference to the ability of the two campaigns to target and mobilize their voters.

FOF ¶ 879.    As he put it, "The Democrats have it and the Republicans don't."

FOF ¶ 880.    He suggested that ORCA's ability to affect the outcome had been over-hyped by the Romney campaign, as there was only so much that could be done on election day itself: "On short notice, you can send robocalls, reorder a call list and employ paid phone banks, but you are not radically changing the shape of the electorate. They acted like they had invented the wheel, but really all it would have been was a slightly better tread on the tire."

FOF ¶ 881.    This account is extracted from the online narrative "The Unmitigated Disaster Known As Project ORCA" posted by John Ekdahl, who was an active participant in ORCA.

FOF ¶ 882.    "Project ORCA is a massive undertaking – the Republican Party's newest, unprecedented and most technologically advanced plan to win the 2012 presidential election."

FOF ¶ 883.    Pretty much everything in that sentence is false. The "massive undertaking" is true, however. It would take a lot of planning, training and coordination to be done successfully (oh, we'll get to that in a second). This wasn't really the GOP's effort, it was Team Romney's. And perhaps "unprecedented" would fit if we're discussing failure.

FOF ¶ 884.    The entire purpose of this project was to digitize the decades-old practice of strike lists. The old way was to sit with your paper and mark off people that have voted and every hour or so, someone from the campaign would come get your list and take it back to local headquarters. Then, they'd begin contacting people that hadn't voted yet and encourage them to head to the polls. It's worked for years.

FOF ¶ 885.    From the very start there were warning signs. After signing up, you were invited to take part in nightly conference calls. The calls were more of the slick marketing speech type than helpful training sessions. There was a lot of "rah-rahs" and lofty talk about how this would change the ball game.

FOF ¶ 886.    Working primarily as a web developer, I had some serious questions. Things like "Has this been stress tested?", "Is there redundancy in place?" and "What steps have been taken to combat a coordinated DDOS attack or the like?", among others.

FOF ¶ 887.    These types of questions were brushed aside (truth be told, they never took one of my questions). They assured us that the system had been relentlessly tested and would be a tremendous success.

FOF ¶ 888.    On one of the last conference calls (I believe it was on Saturday night), they told us that our packets would be arriving shortly. Now, there seemed to be a fair amount of confusion about what they meant by "packet."

FOF ¶ 889.    Some people on Twitter were wondering if that meant a packet in the mail or a pdf or what.

FOF ¶ 890.    Finally, my packet arrived at 4PM on Monday afternoon as an emailed 60 page pdf. Nothing came in the mail. Because I was out most of the day, I only got around to seeing it at around 10PM Monday night. So, I sat down and cursed as I would have to print out 60+ pages of instructions and voter rolls on my home printer.

FOF ¶ 891.    They expected 75-80 year old veteran volunteers to print out 60+ pages on their home computers? The night before election day? From what I hear, other people had similar experiences.

FOF ¶ 892.    In fact, many volunteers never received their packets at all.

FOF ¶ 893.    At 6:30AM on Tuesday, I went to the polls. I was immediately turned away because I didn't have my poll watcher certificate. Many, many people had this problem. The impression I got was this was taken care of because they had "registered me." Others were as well. But apparently, I was supposed to go on my own to a Victory Center to pick it up, but that was never communicated properly.

FOF ¶ 894.    Outside of the technical problems, this was the single biggest failure of the operation. They simply didn't inform people that this was a requirement. In fact, check out my "checklist" from my ORCA packet:

FOF ¶ 895.    Notice anything missing? My guess is the second "Chair (if allowed)" was supposed to be "poll watcher certificate" but they put chair twice. This was an instruction packet that went out to 30,000+ people. Did no one proof-read it? So, I headed back home to see if I could get my certificate. I called their official help line. It went unanswered.

FOF ¶ 896.    I tried their legal line. Same thing.

FOF ¶ 897.    I emailed them. No response.

FOF ¶ 898.    I continued to do this for six straight hours and never got a response.

FOF ¶ 899.    I even tried to call three local victory centers. All went straight to voicemail. While I was home, I took to Twitter and the web to try to find some answers. From what I saw, these problems were widespread.

FOF ¶ 900.    People had been kicked from poll watching for having no certificate. Others never received their pdf packets.

FOF ¶ 901.    Some were sent the wrong packets from a different area.

FOF ¶ 902.    Some received their packet, but their usernames and passwords didn't work. Now a note about the technology itself.

137

FOF ¶ 903.   For starters, this was billed as an "app" when it was actually a mobile-optimized website (or "web app").

FOF ¶ 904.   For days I saw people on Twitter saying they couldn't find the app on the Android Market or iTunes and couldn't download it.

FOF ¶ 905.   Well, that's because it didn't exist. It was a website. This created a ton of confusion. Not to mention that they didn't even "turn it on" until 6AM in the morning, so people couldn't properly familiarize themselves with how it worked on their personal phone beforehand.

FOF ¶ 906.   Next, and this part I find mind-boggingly absurd, the web address was located at "https://www.whateveritwas.com/orca". Notice the "s" after http.

FOF ¶ 907.   This denotes it's a secure connection, something that's used for e-commerce and web-based email. So far, so good.

FOF ¶ 908.   The problem is that they didn't auto-forward the regular "http" to "https" and as a result, many people got a blank page and thought the system was down.

FOF ¶ 909.   Setting up forwarding is the simplest thing in the world and only takes seconds, but they failed to do it.

FOF ¶ 910.   This is compounded by the fact that mobile browsers default to "http" when you just start with "www" (as 95% of the world does).

FOF ¶ 911.   By 2PM, I had completely given up. I finally got a hold of someone at around 1PM and I never heard back. From what I understand, the entire system crashed at around 4PM. I'm not sure if that's true, but it wouldn't surprise me.

FOF ¶ 912.   decided to wait for my wife to get home from work to vote, which meant going very late (around 6:15PM). Here's the kicker, I never got a call to go out and vote. So, who the hell knows if that end of it was working either.

FOF ¶ 913.   So, the end result was that 30,000+ of the most active and fired-up volunteers were wandering around confused and frustrated when they could have been doing anything else to help.

FOF ¶ 914.   Like driving people to the polls, phone-banking, walking door-to-door, etc.

FOF ¶ 915.   We lost by fairly small margins in Florida, Virginia, Ohio and Colorado. If this had worked could it have closed the gap? I sure hope not for my sanity's sake.

FOF ¶ 916.   The bitter irony of this entire endeavor was that a supposedly small government candidate gutted the local structure of GOTV efforts in favor of a centralized, faceless organization in a far off place (in this case, their Boston headquarters). Wrap your head around that.

### § 63. RNC Spends $40 Million on Software Trust Provides Free (¶¶ 917-919).

FOF ¶ 917.   According to FEC filings, the Romney campaign spent over $40 million on technology vendors.

138

FOF ¶ 918.    Targeted Victory, the firm founded by Romney's Director of Digital Zac Moffatt, was the biggest single beneficiary of that spending, receiving more than $14 million as of the end of October, 2012.

FOF ¶ 919.    Proceeds were for payment for its own social media consulting and development work, and for "pass-through" IT spending that went to other contractors.

### § 64. RNC's GOP Data Center Failure (¶¶ 920-957).

FOF ¶ 920.    The RNC in an August 3, 2015 press release announced the launch of GOP Data Center, basically a make-over of the old Voter Vault.

FOF ¶ 921.    "Today the Republican National Committee launched Data Center 2016, a completely revamped version of GOP Data Center with an enhanced easy-to-use User Interface and new features allowing users of all levels to access, manipulate, and utilize more of the RNC's data, tools, and resources.

FOF ¶ 922.    "Data Center 2016 is a powerful query and data management tool that interfaces with the RNC's 300+ terabytes of data and over 20 years of voter contact data to provide campaigns and organizers with on-demand access to the RNC's expansive voter warehouse. Data Center 2016 now empowers users with vastly increased access to the full scope of the RNC file in order to give them every resource needed to elect Republicans in 2016 and beyond.

FOF ¶ 923.    "The RNC provides access to Data Center free of charge to all Republican candidates up and down the ballot.

FOF ¶ 924.    *It is noticeable that at no time does the RNC announce availability of Data Center to precinct party representatives.*

FOF ¶ 925.    "Data Center 2016 is the centerpiece of the RNC's new data-driven political ground game," said RNC Chairman Reince Preibus.

FOF ¶ 926.    "The user-friendly interface, revamped reporting tools, and live support will give Republican campaigns across the country a state of the art program to match our state of the art data, and it will only continue to evolve with each upgrade. I am extremely proud of Data Center 2016 and of our entire team for their tireless work in upholding our commitment to the enhanced data that we need to target and turn out voters in 2016."

FOF ¶ 927.    The RNC says among Data Center's "new" features are:

FOF ¶ 928.    "New User-Friendly Interface: State-driven user platform data: Dynamically driven statistics regarding GOP Data Center platform uploads, state calculated party, election voter turnout, election popular and electoral votes.

FOF ¶ 929.    "Updated Reporting Tools: New voter information for even more comprehensive data management including contact info, voter info and geographic location. "Geo-Targeting Turf Cutting Tool: A robust turf cutting feature that allows users to develop customized lists for voter contact simply by encircling households or individuals on a map, forming the basis for voter walk list. Maps are available in multiple formats.

FOF ¶ 930.    "Voter Model Sliding Scale: These new user-friendly sliding scales allow a user to utilize predictive analytics when either expanding or narrowing a voter contact universe. It also allows an end user to utilize the National Voter Scores, which include propensity, partisanship, Obamacare affiliation and ballot models.

FOF ¶ 931.    "Live Chat Support: Users will now have the ability to live chat with a member of the RNC's external support staff for any questions they have about the new features. The RNC reported that Data Center's "Upcoming New Features" includes " enhancements described above are only the first of many updates the Party plans on making to GOP Data Center. New features on the horizon include:" "A mobile-friendly easy-to-use interface responsive to tablets and smart phones. "A completely rebuilt Advanced Counts tool that is more powerful and easy to use, including simplified logic and preview-as-you-go features. Users can easily segment, pull and preview voter data and households while building a list. "User friendly tool tips and built-in glossary section.

FOF ¶ 932.    "Feature-based screen casts and tutorials including platform specific features.

FOF ¶ 933.    The RNC reports that the background On GOP Data is:

FOF ¶ 934.    "Voter Scoring: The RNC has invested nearly $200 million into the proprietary voter file over the last 20 years and will spend another $20 million on data this cycle. The open system allows for real-time communication from every campaign and candidate who utilizes RNC data. Campaigns are encouraged to use as much data as they can to gain a competitive advantage.

FOF ¶ 935.    "Voter Scoring is a continued evolution of statistical modeling being utilized to predict a voter's behavior.

FOF ¶ 936.    "The idea of Voter Scoring evolved during 2012 when the RNC gathered over 80M voter contacts. There was heavy analysis on how we contacted a voter (mail, door, phone), if they voted and whether they voted absentee or on Election Day. This data is valuable in knowing how best to motivate and contact a voter, at the right time to engage their individual voting behavior.

FOF ¶ 937.    The Texas State Republican Committee disseminated a GOP Data Center Registration Form, found online. The terms and conditions are as follows:

FOF ¶ 938.    In order to gain access to the voter registration and other information contained in the GOP Data Center, you must affirmatively accept these terms by signing at the bottom of the page to indicate your understanding of and agreement to the terms under which access to GOP Data Center is granted.

FOF ¶ 939.    This Texas Voter File User Agreement (the "Agreement") is entered into by and between the Republican Party of Texas ("RAPT"), the Republican National Committee ("RNC"), and the undersigned user ("User").

FOF ¶ 940.    In consideration of the mutual promises and agreements contained in this Agreement, including without limitation, the recitals set forth above, the value and sufficiency of which are hereby acknowledged, the parties additionally agree as follows:

FOF ¶ 941.    Non-Exclusive Access – User will be given non-exclusive access via the Internet to

140

the portion of the Voter File deemed appropriate in the sole discretion of the RAPT and RNC (the applicable portion of the Voter File will be referred to as the "File" hereafter) for the limited use set forth in this Agreement.

FOF ¶ 942.    Denial of Access – User understands that RAPT may deny access to the File. Denial of access may occur due to: past Democrat primary voting history; User has no justifiable reason for accessing the File; User uses the File to assist the Democrat Party or its candidate(s); User fraudulently updates information in the File; User access to the File would be a violation of federal, state, or local statute; and any other legitimate reasons the RAPT finds which may conflict with the law or the operating rules/bylaws of the organization.

FOF ¶ 943.    Limited Use – User agrees that he will use the File and use any information extracted from the File exclusively for political purposes for or on behalf of User's local party/organization/campaign/entity. User acknowledges that each and every individual within a local party/organization/campaign/entity that is given access to the File must agree to this Texas Voter File User Agreement. Immediately after the authorized usage, all information derived from the File shall be completely destroyed and/or erased from all storage devices upon which it resides. User agrees to avoid any action that may impair the RAPT's or the RNC's ownership rights in the File and its related information. User agrees that use of the File or any information contained therein is limited to the duration of this Agreement. Further, User shall not disclose, transfer, duplicate, reproduce, or retain information contained in the File in any form or manner, nor permit any employee, agent, contractor or third party to do so, except in those computer processing activities necessary to obtain the information in a usable form for the authorized use of the File as set forth in this Paragraph 2. Under no circumstances will User make or permit any commercial usage of the File or information contained therein.

FOF ¶ 944.    Username and Password – RAPT will provide User with one username and password for access to the File. User shall not share his username and password with any other individual or entity. User also agrees to immediately advise the RAPT if User has reason to believe that his username and password have been obtained by any other individual, organization, or entity.

FOF ¶ 945.    No Assignment – User shall not assign this Agreement.

FOF ¶ 946.    Legal Compliance – User understands that any data acquired from a state, county or local government in connection with the construction or maintenance of a statewide registered voter file are, when in their original governmental entity-supplied format, considered to be public data, and the use thereof is subject to the laws and regulations of the originating state and/or county or local governmental entity. User shall be exclusively responsible for complying with the laws and regulations of the United States, the State of Texas, and all relevant localities, with respect to his use of any and all data incorporated into the File. Further, User is responsible for any and all use of the File or the information contained therein as well as any other activity related to use of the File obtained or conducted using his username.

FOF ¶ 947.    Monitoring of Access - User understands that the File is monitored to deter improper and unauthorized use by a combination of methods, including, without limitation, activity reports, access times, access locations, as well as the insertion of planted and/or varied names and addresses. Such allows tracing the use of the File to a given

141

User.

FOF ¶ 948.   Term – User agrees that access to the File is granted as a temporary privilege granted by the RAPT or the RNC and may be revoked at any time by the grantor. User also understands that access to the File will be terminated no later than thirty (30) days after the User's eligibility expires. Public and party officers shall retain access to the File while he/she is in office. Candidates shall retain access to the File while he/she is a candidate.

FOF ¶ 949.   NO WARRANTIES OR LIABILITY – RAPT AND RNC makes no warranties, whether express or implied, or representations of any kind, regarding the accuracy or completeness of information contained in the File. User agrees that neither the RAPT nor the RNC, nor either's representatives shall have any liability to him or his representatives resulting from the provision or use of the information. In no event shall RAPT or RNC be liable for any indirect, special, incidental, consequential (including without limitation damages for loss of profits, business interruption, loss of data or other pecuniary damages) or punitive damages whether under tort, contract, strict liability, statute or otherwise.

FOF ¶ 950.   HOLD HARMLESS – USER WILL HOLD HARMLESS AND FULLY INDEMNIFY RAPT AND/OR RNC IN THE EVENT ANY THIRD PARTY OR THIRD PARTY REPRESENTATIVE AT ANY TIME IN THE FUTURE MAKES ANY CLAIM(S) AGAINST RPT AND/OR RNC ARISING OUT OF THE ACTIONS/INACTION OF USER RELATED TO THE FILE.

FOF ¶ 951.   Confidentiality – User acknowledges and agrees that the Voter File, the File, the format and manner in which it is accessed and manipulated, and the resulting information obtained therefrom, is confidential and proprietary and shall be held in strict confidence and shall not be disclosed or used except as set forth in this Agreement. User agrees to use best efforts to protect such confidential and proprietary information.

FOF ¶ 952.   Remedies – User acknowledges and agrees that, in the event of any breach of this Agreement, the RAPT and the RNC would be irreparably and immediately harmed and could not be made whole by monetary damages. Accordingly, it is agreed that, in addition to any other remedy to which it may be entitled at law or in equity, the RAPT and RNC shall be entitled to an injunction or injunctions (without the posting of any bond and without proof of actual damages) to prevent breaches or threatened breaches of this Agreement and/or to compel specific performance of this Agreement, and that neither User nor his representatives will oppose the granting of such relief. User also agrees to reimburse the RAPT and RNC for all costs and expenses, including attorneys' fees, incurred by the RAPT and RNC in attempting to enforce the obligations of User or of his representatives hereunder. RAPT and RNC do not intend that any remedy given to it under this Agreement be exclusive, but each shall be cumulative and in addition to any other remedy RAPT and RNC have by virtue of this Agreement or otherwise available to it at law or in equity.

FOF ¶ 953.   Waiver – No waiver of any default of this Agreement constitutes a waiver of any prior or subsequent breach of the same, or any prior, concurrent, or subsequent default or breach of any other provision of this Agreement, and no waiver is effective unless made in writing and signed by RAPT or RNC.

FOF ¶ 954.   Governing Law –This Agreement shall be governed by, construed, and enforced in accordance with and subject to the internal laws of the State of Texas, without regard to its conflicts of law principles, and venue for any dispute arising out of or concerning this Agreement shall be proper only in Travis or Williamson County, Texas.

FOF ¶ 955.   Severability – If any provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect.

FOF ¶ 956.   Survival - Paragraphs 6, 9, 10, 11, 12, 14, and 15 will survive termination or expiration of this Agreement.

FOF ¶ 957.   Entirety – This Agreement, including any attachments, is intended by the parties to be the final, complete and exclusive embodiment of their agreement about the matters covered in this Agreement, and no prior stipulation, agreement or understanding of the parties or agents is valid or enforceable. This Agreement may not be altered, amended, or changed in any way except by a written instrument executed by both parties. In the event of a conflict between this Agreement and any attachment, this Agreement will control.

### § 65. Venders Concede GOP Data Center Failure (¶¶ 958-962).

FOF ¶ 958.   FILPAC, a Republican vendor provides the following online comment about GOP Data Center.

FOF ¶ 959.   "If you are a Republican candidate or party leader with GOP Data Center access, you should be taking full advantage of it

FOF ¶ 960.   "Here's why using the GOP Data Center (formerly Voter Vault) with the Filpac system is so effective:

FOF ¶ 961.   "The Data Center is basically an enhancement of the publicly-available voter file. It tends to be rather "stale", which means it contains voters and vote history from the last time they collected your state's voter file. Which means it's probably missing data from the most recent election, as well as those who've recently registered or changed their addresses.

FOF ¶ 962.   "Which is why we recommend to candidates and party organizations that they download and enhance their own voter file, and then import any of the very-useful Voter Vault / Data Center "affiliation" information. In other words: use the GOP Data Center to enhance your own, more current, voter file."

### § 66. Widespread Criticism of GOP Data Center (¶¶ 963-989).

FOF ¶ 963.   Jon Ward wrote in the *Huffington Post* April 18, 2014 entitled "The Behind The Scenes Story Of The RNC's Quest For Data Supremacy" the following observations. "The Republican National Committee, in particular, has staked its reputation — in the press and with conservative donors — on becoming the center of data and tech for the GOP. The RNC is not only seeking to imitate what the Democrats have been doing for years, they hope to improve upon it. And the committee has made some progress toward building the infrastructure they need to be successful.

FOF ¶ 964.   "But as the 2014 midterm elections grow nearer, behind-the-scenes, intra-party squabbling has highlighted where the RNC still has a ways to go in using tech to win the future. The friction between the RNC and a handful of state parties and Republican campaigns has revealed the committee's struggle to assert its control over the GOP's data and tech strategy, despite an incapability to fully occupy that role.

FOF ¶ 965.   "Few Republican sources were willing to comment on the record, for fear of either losing business or angering the Republican establishment. Because comments from a number of independent sources corroborated a conflict between the RNC and several state parties, campaigns and Republican consultants, The Huffington Post agreed not to identify some of those who spoke.

FOF ¶ 966.   "After the GOP's 2012 election loss, private sector groups responded quickly to offer new data and technology solutions to a party shocked by the sophistication of the Obama campaign. The RNC, meanwhile, went through a more deliberative process: they compiled an after-action report, then decided to invest in data and technology, and only then hired a team that includes Facebook engineer Andy Barkett as chief technology officer and Chuck DeFeo as chief digital officer, plus a team of engineers, who started building systems. Most recently, the RNC hired chief data officer Azarias Reda to focus on analytics.

FOF ¶ 967.   "For years, Democrats have been united around a single voter file management system, the Vote Builder system from NGP VAN, a company that helps campaigns leverage technology. Vote Builder has allowed campaigns and state parties to draw on data from voter contacts of past campaigns, and to feed the results of their subsequent conversations with voters back into the same massive file. Beacon is intended to finally allow the GOP to do the same, bringing a level of cohesion to data collection and voter contact that has not existed previously.

FOF ¶ 968.   For now, the RNC is using a program called GOP Data Center, built by FLS Connect, a political data technology company [controlled by multiple long-term RNC political operatives who have spent considerable time going the RNC HQ's revolving door].

FOF ¶ 969.   Data Center was built in 2012 to connect primarily with the door-to-door mobile device application GeoConnect, also built by FLS Connect. But it is harder for Data Center to connect with other applications not built by the company.

FOF ¶ 970.   This has limited the ability of outside users to tap into the resources available in the RNC's voter file, thus limiting the ability of the RNC to continually update and refine that same file.

FOF ¶ 971.   The head of a prominent Republican technology firm in Washington commented recently on the RNC's recent tech challenges, requesting anonymity in order not to compromise business interests.

FOF ¶ 972.   "It's been tough up to this point to utilize [the RNC's] data," he said, adding that the new VRM, Beacon, will be a step in the right direction. It is intended to allow much more freedom of use by outside vendors and technology products, as long as the RNC signs off on them.

144

FOF ¶ 973.   But a handful of state parties, and some number of Republican campaigns, have been unhappy with RNC tools such as the GOP Data Center. In 2013, the executive director of the South Carolina GOP compared it to a VW Beetle. More tellingly, the RNC official said, "We decided we needed to improve on Data Center, which is why we have Beacon."

FOF ¶ 974.   The dissatisfied state parties and campaigns were unwilling to wait last year for the RNC to finish its work on Beacon and began using private sector alternatives, even if they had to pay for it: from the i360 system owned by a subsidiary of the Koch brothers' empire; to Voter Gravity, created by Republican operative Ned Ryun; to NationBuilder, a company viewed with suspicion by some conservatives because of the progressive background of its founders.

FOF ¶ 975.   "The RNC's been saying for a year, we're going to have these field programs out earlier than ever, and they've hired those field reps. But those field reps need the tools," a senior official at one state party noted, speaking on condition of anonymity. "We've just been rolling out the i360 canvassing app to people in the state because they haven't given us a hard date but we need to get working."

FOF ¶ 976.   "We couldn't wait so we needed a system to give people right away," the official said.

FOF ¶ 977.   Even one of the party's own Washington-based committees, the Republican Governors Association, is using i360 rather than the RNC's products (the Koch brothers are one of the RGA's biggest donors). Arizona, Montana and West Virginia's state parties are using i360, Virginia is considering it, and a few others are talking to Voter Gravity about signing on with them. Two other states, Pennsylvania and Colorado, are using NationBuilder in addition to using RNC data. In addition, the Republican State Leadership Committee signed a contract with NationBuilder in 2012.

FOF ¶ 978.   Not surprisingly, some officials at the RNC have pressured state parties and campaigns not to use the outside products, according to multiple sources. The pressure has been "fairly heavy handed," said one Republican consultant working on multiple statewide campaigns who spoke on condition of anonymity.

FOF ¶ 979.   The RNC has been "discouraging for a year people from using other systems," the state party official said.

FOF ¶ 980.   Yet one source at a technology company involved in competing for business from campaigns said recently there wasn't anything wrong with the RNC's request for state parties and campaigns to stay in a holding pattern until their technology platforms are fully operational.

FOF ¶ 981.   "They asked everybody to hold off on purchasing new technology until they figure out how they were going to proceed and how things were going to connect," the technology company source said. "What they're figuring out now is their prime concern: how do we get our prime database to campaigns as expediently as possible and how do we get what campaigns are learning back to us so we can model on it and learn from it?" As one state party chairman put it: "They don't want people using rogue applications because that data won't get fed back into their file."

145

FOF ¶ 982.     On a March 26 conference call with state party officials, Preibus mentioned that states who were using unsanctioned vendors would have "problems," according to participants on the call. That comment, Shields said, was merely a description of technological problems that would ensue.

FOF ¶ 983.     The biggest tension is between the RNC and the Koch operation, largely because FreedomPartners' i360 national voter file is seen as a direct competitor to that of the RNC.

FOF ¶ 984.     i360 has been operating since 2009, building its capabilities in data analytics and modeling, refining its own voter file, and building mobile apps for volunteers going door to door. The results have not always been a success, but they have been at it longer.

FOF ¶ 985.     Shields said the two camps are trying to reach an agreement on how to work together.

FOF ¶ 986.     "I believe there is a desire in both organizations to get to a point where we share a lot of information and work together," Shields said.

FOF ¶ 987.     Officials at Freedom Partners, the Koch-affiliated organization that owns i360, declined to comment on the record about talks with the RNC.

FOF ¶ 988.     The senior RNC official admitted that it is still catching up to companies like i360 that began over the past year and a half to fill the vacuum that existed as the RNC slowly ramped up development of its own technology products. He said they do not fault state parties and campaigns that got a head start on conducting field and canvassing operations, at a time when "there were things [the RNC] couldn't do yet."

FOF ¶ 989.     Michael Beach, co-founder of Targeted Victory, a Republican digital firm, said the pieces are now in place, and that the RNC is on its way to "providing the basic operating system that everybody can build around and which allows everybody to communicate."

### § 67. Preibus Takes Credit for GOP Data Center (¶¶ 990-1003).

FOF ¶ 990.     Reince Preibus contributed an op/ed column on CNN.com about GOP Data Center. The column is as follows:

FOF ¶ 991.     "Aurora Ogg wakes up every day and goes to work with one mission: connecting people in her community with the Republican Party, so that in November they can be proud to cast a ballot for our candidates.

FOF ¶ 992.     "Aurora is the Asian Coalition regional director in Colorado. She's been on the ground since September of last year, earlier than field staffers like her are usually hired. And she wasn't alone.

FOF ¶ 993.     "Following the release of the *Growth and Opportunity Project* report -- a comprehensive post-2012 election review I commissioned -- the Republican National Committee committed to building a permanent, year-round ground game. We immediately began locating and hiring field staff all across the country.

FOF ¶ 994.   "Aurora has the full support of the RNC and our resources. Thanks to our multimillion-dollar investment in technology, and the private sector talent we've brought on board, she has at her fingertips a suite of tools that allow her to identify voters we need to target in her community.

FOF ¶ 995.   "The data she's plugged into is the best in politics. We've collected data from commercial and political organizations to make sure that we have the most current information needed to contact voters effectively. We've invested in new predictive analytics that are revolutionizing how our campaigns understand what matters to each individual voter."

FOF ¶ 996.   *Note that at no time does Preibus indicate data is collected by the one source that counts the most and undoubtedly the most reliable - the voter himself or herself.* Unlike all commercial products, including GOP Data Center, the Trust Property primary data source is the voter.

FOF ¶ 997.   "Not only are we making the data better, we are improving how other Republicans can access our data and provide data back to us. Our new voter relationship management tool, GOP Beacon, makes it easier for people to download and see the data. Our new connecting tool, or application programming interface, allows other committees, candidates and vendors to receive our data automatically and send data back to us in real time.

FOF ¶ 998.   "To ensure we recruit the best talent to develop the best tools, we launched a startup-style initiative within the RNC called Para Bellum Labs, and we opened a field office in Silicon Valley.

FOF ¶ 999.   "In addition to all these data resources, field staffers like Aurora are given a communications playbook with media lists, information on important surrogates, suggested events to attend and messaging on key issues, as well as access to media training, research and social media help.

FOF ¶ 1000.   "This isn't just one person's story. It's the story of our field staffers across the country – state directors, data directors, and Hispanic, black, and Asian-American engagement staffers. The RNC has also hired staff dedicated to engaging better with women, youth, people of faith and conservative allies and groups. We have hundreds of staff fanned out, especially in critical midterm states, supporting our candidates and growing our party. Today, 91% of our political staff is in the field.

FOF ¶ 1001.   "They support whole teams of precinct captains. We've recruited more than 12,000 captains nationwide. Those captains have teams of volunteers whose job it is to maintain lasting relationships with sets of people in their communities. They're listening to their concerns and making sure they hear about the issues they care about."

FOF ¶ 1002.   *Again, Preibus does not explain why the RNC has to recruit "precinct captions" when as a matter of law, there are precinct representatives that are elected in each of the nation's voting districts.*

FOF ¶ 1003.   "This is all done alongside our state parties and sister committees. That's why we've invested millions in our state parties to date.

147

### § 68. RNC Acquiesce GOP Data Center Privacy Breaches (¶¶ 1004-1024).

FOF ¶ 1004.  GOP Data Center committed a significant breach of privacy by a subcontractor exposing the RNC's top-secret voters files in a public server.

FOF ¶ 1005.  The following account is from the online computer news website, *Gizmo*, as reported by Dell Cameron and Kate Conger on June 19, 2017.

FOF ¶ 1006.  Political data gathered on more than 198 million U.S. citizens was exposed this month after Deep Root Analytics, a marketing firm contracted by the Republican National Committee stored internal documents on a publicly accessible Amazon server.

FOF ¶ 1007.  The data leak contains a wealth of personal information on roughly 61% of the U.S. population.

FOF ¶ 1008.  Along with home addresses, birth dates, and phone numbers, the records include advanced sentiment analyses used by political groups to predict where individual voters fall on political issues, as well as suspected religious affiliation and ethnicity. The data was amassed from a variety of sources, both legal and illegal.

FOF ¶ 1009.  Deep Root Analytics, a conservative data firm that identifies audiences for political ads, confirmed ownership of the data to the online Gizmodo news website. UpGuard cyber risk analyst Chris Vickery discovered Deep Root's data online last week. More than a terabyte was stored on the cloud server without the protection of a password and could be accessed by anyone who found the URL.

FOF ¶ 1010.  Many of the files did not originate at Deep Root, but are instead the aggregate of outside data firms and Republican super PACs, shedding light onto the increasingly advanced data ecosystem that helped propel President Donald Trump's slim margins in key swing states.

FOF ¶ 1011.  Although files possessed by Deep Root would be typical in any campaign, Republican or Democratic, experts say its exposure in a single open database raises significant privacy concerns.

FOF ¶ 1012.  "This is valuable for people who have nefarious purposes," Joseph Lorenzo Hall, the chief technologist at the Center for Democracy and Technology, said of the data. The RNC paid Deep Root $983,000 last year, according to Federal Election Commission reports, but its server contained records from a variety of other conservative sources paid millions more, including The Data Trust (also known as GOP Data Trust), the Republican party's primary voter file provider.

FOF ¶ 1013.  Data Trust received over $6.7 million from the RNC during the 2016 cycle, according to OpenSecrets.org, and its president, Johnny DeStefano, now serves as Trump's director of presidential personnel.

FOF ¶ 1014.  The Koch brothers' political group Americans for Prosperity, which had a data-swapping agreement with Data Trust during the 2016 election cycle, contributed heavily to the exposed files, as did the market research firm TargetPoint, whose co-founder previously served as director of Mitt Romney's strategy team.

148

FOF ¶ 1015.   (The Koch brothers also subsidized a data company known as i360, which began exchanging voter files with Data Trust in 2014.)

FOF ¶ 1016.   Furthermore, the files provided by Rove's American Crossroads contain strategic voter data used to target, among others, disaffected Democrats and undecideds in Nevada, New Hampshire, Ohio, and other key battleground states.

FOF ¶ 1017.   Deep Root further obtained hundreds of files (at least) from The Kantar Group, a leading media and market research company with offices in New York, Beijing, Moscow, and other international locations.

FOF ¶ 1018.   Each file offers rich details about political ads—estimated cost, audience demographics, reach, and more—by and about figures and groups spanning the political spectrum.

FOF ¶ 1019.   There are files on the Democratic Senatorial Campaign Committee, Planned Parenthood, and the American Civil Liberties Union, as well as files on every 2016 presidential candidate, Republicans included.

FOF ¶ 1020.   What's more, the Kantar files each contain video links to related political ads stored on Kantar's servers.

FOF ¶ 1021.   The details of voters' likely preferences for issues like stem cell research and gun control were likely drawn from a variety of sources according to a Democratic strategist who spoke with Gizmodo.

FOF ¶ 1022.   "Data like that would be a combination of polling data, real world data from door-knocking and phone-calling and other canvassing activities, coupled with modeling using the data we already have to extrapolate what the voters we don't know about would think," the strategist said.

FOF ¶ 1023.   "The campaigns that do it right combine all the available data together to make the most robust model for every single voter in the target universe."

FOF ¶ 1024.   In a statement, Deep Root founder Alex Lundry told Gizmodo, "We take full responsibility for this situation." He said the data included proprietary information as well as publicly available voter data provided by state government officials. "Since this event has come to our attention, we have updated the access settings and put protocols in place to prevent further access," Lundry said.

### § 69. RNC Maintains Secret Voter Files (¶¶ 1025-1041).

FOF ¶ 1025.   Deep Root's data sheds light onto the increasingly sophisticated data operation that has fed recent Republican campaigns and lays bare the intricate network of political organizations, PACs, and analysis firms that trade in bulk voter data. In an email to Gizmodo, Deep Root said that its voter models are used to enhance the understanding of TV viewership for political ad buyers. "The data accessed was not built for or used by any specific client," Lundry said. "It is our proprietary analysis to help inform local television ad buying."

FOF ¶ 1026.   However, the presence of data on the server from several political organizations, including TargetPoint and Data Trust, suggests that it was used for Republican

political campaigns. Deep Root also works primarily with GOP customers (although similar vendors, such as NationBuilder, service the Democrats as well).

FOF ¶ 1027.   Deep Root is one of three data firms hired by the Republican National Committee in the run-up to the 2016 presidential election. Founded by Lundry, a data scientist on the Jeb Bush and Mitt Romney campaigns, the firm was one of three analytics teams that worked on the Trump campaign following the party's national convention in the summer of 2016.

FOF ¶ 1028.   Lundry's work brought him into Trump's campaign war room, according to a post-election AdAge article that charted the GOP's 2016 data efforts.

FOF ¶ 1029.   Deep Root was hand-picked by the RNC's then-chief of staff, Katie Walsh, in September of last year and joined two other data shops—TargetPoint Consulting and Causeway Solutions—in the effort to win Trump the presidency.

FOF ¶ 1030.   Walsh, who now works for the nonprofit America First Policies after a brief stint in the White House, oversaw Trump's data operation in partnership with Brad Parscale, Trump's digital director. (Parscale did not respond to a request for comment before press time. Attempts to reach Walsh for comment were also unsuccessful.)

FOF ¶ 1031.   Walsh and Parscale focused their efforts on three categories of voters, AdAge reports: voters who might be predisposed to support Trump, Republican voters who were uncertain about Trump, and voters that were leaning toward Hillary Clinton but could be persuaded by Trump's message of changing up government-as-usual.

FOF ¶ 1032.   To appeal to the three crucial categories, it appears that Trump's team relied on voter data provided by Data Trust. Complete voter rolls for 2008 and 2012, as well as partial 2016 voter rolls for Florida and Ohio, apparently compiled by Data Trust are contained in the dataset exposed by Deep Root.

FOF ¶ 1033.   Data Trust acquires voter rolls from state officials and then standardizes the voter data to create a clean, manageable record of all registered US voters, a source familiar with the firm's operations told Gizmodo. Voter data itself is public record and therefore not particularly sensitive, the source added, but the tools Data Trust uses to standardize that data are considered proprietary. That data is then provided to political clients, including analytics firms like Deep Root. While Data Trust requires its clients to protect the data, it has to take clients at their word that industry-standard encryption and security protocols are in place.

FOF ¶ 1034.   TargetPoint and Causeway, the two firms employed by the RNC in addition to Deep Root, apparently layered their own analytics atop the information provided by Data Trust. TargetPoint conducted thousands of surveys per week in 22 states, according to AdAge, gauging voter sentiment on a variety of topics. While Causeway helped manage the data, Deep Root used it to perfect its TV advertising targets—producing voter turnout estimates by county and using that intelligence to target its ad buys.

FOF ¶ 1035.   A source with years of experience working on political campaign data operations told Gizmodo that the data exposed by Deep Root appeared to be customized for the RNC and had apparently been used to create models for turnout and voter preferences. Metadata in the files suggested that the database wasn't Deep Root's working copy, but rather a post-election version of its data, the source said, adding

that it was somewhat surprising the files hadn't been discarded.

FOF ¶ 1036.  Because the data from the 2008 and 2012 elections is outdated—the source compared it to the kind of address and phone data one could find on a "lousy internet lookup site"—it's not very valuable.

FOF ¶ 1037.  Even the 2016 data is quickly becoming stale. "This is a proprietary dataset based on a mix of public records, data from commercial providers, and a variety of predictive models of uncertain provenance and quality," the source said, adding: "Undoubtedly it took millions of dollars to produce."

FOF ¶ 1038.  Although basic voter information is public record, Deep Root's dataset contains a swirl of proprietary information from the RNC's data firms.

FOF ¶ 1039.  Many of the filenames indicate that they potentially contain market research on Democratic candidates and the independent expenditure committees that support them. (Up to two terabytes of data contained on the server was protected by permission settings.) One exposed folder is labeled "Exxon-Mobile" [sic] and contains spreadsheets apparently used to predict which voters support the oil and gas industry. Divided by state, the files include the voters' names and addresses, along with a unique RNC identification number assigned to every US citizen registered to vote. Each row indicates where voters likely fall on issues of interest to ExxonMobil, the country's biggest natural gas producer.

FOF ¶ 1040.  The data evaluates, for example, whether or not a specific voter believes drilling for fossil fuels is vital to US security.

FOF ¶ 1041.  It also predicts if the voter thinks the US should be moving away from fossil-fuel use. The ExxonMobil "national score" document alone contains data on 182,746,897 Americans spread across 19 fields.

### § 70. Prevailing Condemnation of RNC Political Technology (¶¶ 1042-1099).

FOF ¶ 1042.  Patrick O'Keefe, the Maryland State Republican Committee Executive Director, UF Political Comms Program Director, wrote the following post in *Political Moneyball* May 28, 2017 entitled "The Fight Over Political Data: RNC vs. i360 and the Unlock the VAN Movement."

FOF ¶ 1043.  There has been a feud brewing in the political industry regarding voter data over the past few years and it has continued to escalate. While the circumstances are a bit different on the left and the right, the fact remains the same: those who control the data, hold the power. This is a brief summary of the ongoing battles in the field, but for a longer history, I highly recommend the book "Prototype Politics: Technology-Intensive Campaigning and the Data of Democracy" by Daniel Kreiss.

FOF ¶ 1044.  Kreiss's book released last June looks back to 1998 to cover the history of the use of technology in campaigns.

FOF ¶ 1045.  Republicans: RNC (GOP Data Center) vs. i360, 2014 Election Cycle.

FOF ¶ 1046.  This ongoing battle has played out in the media over the past 4 years. i360 is a product of the Koch Network. Millions of dollars have been poured into i360 in an

151

aim to create the best voter contact platform in the world. i360's mantra is "Data is the difference" and they were built to correct the gaps seen between the RNC and DNC's data operations in 2012. i360 and similar products became popular in 2013 as the RNC was working to modernize their offerings. NationBuilder and others have looked to be complimentary pieces for the RNC and DNC, but i360 was unique in that it is a direct competitor to the RNC. Behind the scenes, the RNC and i360 tried to play nice. This was a mutually beneficial arrangement. The RNC gained the potential to collect all of the data being collected by i360 clients and i360 gained legitimacy. i360 tested and optimized their solution over the 2014 election cycle by campaigns that used the platform as well as their organizing groups like Americans for Prosperity. After that cycle, they had a bit of a "coming out party" in [a Dec. 8, 2014] *Politico* article.

FOF ¶ 1047.   2016 Election Cycle.

FOF ¶ 1048.   In 2015, the feud escalated as Chairman Reince Priebus looked to gain control over the RNC's data operation. Former RNC Chairman Reince Priebus believed the RNC needed to be the proper custodian over the party's master file and questioned the loyalty of the Koch brothers. The RNC didn't renew its deal with i360 and the RNC became concerned that the original agreement gave the Koch brothers too much control over the party.

FOF ¶ 1049.   The RNC's Chief of Staff Katie Walsh said in June 2015: "I think it's very dangerous and wrong to allow a group of very strong, well financed individuals who have no accountability to anyone to have control over who gets access to the data when, why and how."

FOF ¶ 1050.   Ultimately, it's clear that i360 was aiming to be the NGP VAN of the right and eliminate potential competition. It also wasn't helping that the RNC was facing headlines in the media like "Republicans lag behind on voter information." In 2015, i360 had a superior product and the RNC was in an awkward position.

FOF ¶ 1051.   Eventually both sides ended up coming to a compromise with a new contract, but it was clear that the war would continue. In the background, the RNC staffed up and built out their data operation.

FOF ¶ 1052.   A completely revamped version of GOP Data Center was launched in August 2015 and their idea of political data as a service went public. This solution was a game-changer. It began to bring parity between the RNC and i360. i360 still had the favored user interface that led to a more positive user experience, but it brought the RNC back into the game and less reliant on i360. The RNC began to view Data Center as the hub where all data would be plugged into through API's. Whether it be field, survey, donor information, voter scores, or digital efforts, their goal was focused on making sure the data was the best it could be. This was a dramatic shift from the approach of i360 or NGP VAN that sought to be the best a one-stop-shop. The RNC approached the situation with a capitalistic approach to data.

FOF ¶ 1053.   The Poli-Tech Battlefield on the Right.

FOF ¶ 1054.   Another interesting thing to note on this battle is that there are dozens of other companies in the space. NationBuilder is a key player that was used by Majority Leader Mitch McConnell in 2014 and by the Trump campaign to an extent in 2016.

My fellow UF advisory board member Ian Patrick Hines explained back in 2015 how NationBuilder could be used complimentary with the RNC data:

FOF ¶ 1055.   Other companies have approached their product placement in the same way.

FOF ¶ 1056.   Campaigns that use RNC data typically utilize a technology stack that includes, at a minimum, a walk and a call application. Companies like Advantage, FLS Connect, eCanvasser, FieldEdge, Polis, CallFire, CallHub, Crowdskout, and many others provide one or more of these functions for campaigns on the right. Beyond those though, there are also companies like L2 Political that provide data.

FOF ¶ 1057.   Recently, the Lincoln Network launched an "App Marketplace" that will provide real, unbiased poli-tech reviews.

FOF ¶ 1058.   Led by another of my fellow UF advisory board member Aaron Ginn, it will be exciting to see how the marketplace is opened up over the next two years.

FOF ¶ 1059.   What's not typically discussed publicly is the distinct advantage i360 and the RNC have in the marketplace.

FOF ¶ 1060.   Despite what they may say, it's virtually impossible for i360 to turn a profit based on what they're charging. Looking purely at their Open Secrets report referred to earlier, i360 is dramatically undercharging compared to competitors.

FOF ¶ 1061.   This is an intentional move to scoop up market share. With the backing of the Koch brothers, i360 has a luxury that many others do not.

FOF ¶ 1062.   Even compared to companies that only do a piece of the puzzle like Advantage or FLS Connect, i360 is competitively priced.

FOF ¶ 1063.   The RNC has a massive advantage by highly encouraging that their data should be used in conjunction with their field victory programs.

FOF ¶ 1064.   Certain vendors are "approved" by the RNC based on their capabilities, which helps those companies sell to campaigns.

FOF ¶ 1065.   Going forward, it's obvious that i360 will need to prove it's clearly better than the RNC due to the inherit advantages that come with working directly with the national party.

FOF ¶ 1066.   Democrats: Unlock the VAN Movement.

FOF ¶ 1067.   While the battle on the right has been going on for a long time, the battle on the left has only heated up recently. Back in the mid-2000's when Howard Dean was DNC Chairman, the DNC chose to hire a vendor to maintain a national database of Democratic voters. That company still has the contract and its name is NGP VAN.

FOF ¶ 1068.   Essentially, NGP VAN has a complete monopoly over data and technology on the left. This is largely because Democrats won in 2008 and 2012 and didn't have to worry about being questioned in the area.

FOF ¶ 1069.   Barack Obama's campaigns were heralded for their use of technology while

153

Republicans were chastised. Why worry about competition when NGP VAN was better than the rest?

FOF ¶ 1070.   This line of thinking has proven to be highly faulty. There were grumblings prior to the 2016 election. First, there was the DNC "Datagate" situation in December 2015. Long story short, a security lapse by NGP VAN led to Bernie Sanders staffers accessing proprietary data to the Hillary Clinton campaign. This led to the Sanders campaign having their access to VoteBuilder temporarily revoked and accusations lobbed from the Clinton campaign. Ultimately, it was a big black eye to the Democratic National Committee.

FOF ¶ 1071.   After this episode, vendors began to smell blood in the water. My friend Will Conway from NationBuilder wrote a post explaining why the NGP VAN model was highly problematic. In many ways, this could be considered the precursor to the "Unlock the VAN" movement.

FOF ¶ 1072.   Conway said: "The Bernie Sanders data fiasco exposed a long-standing problem with NGP VAN's model that sucks for democracy.

FOF ¶ 1073.   "In the middle of the mudslinging between Hillary Clinton, the DNC and Bernie Sanders is a basic truth: a piece of campaign technology broke because it's bad. The reason the software is bad is not because the developers at NGP VAN are in some way inferior — it's because there is no incentive to improve their product.

FOF ¶ 1074.   "Here's why: NGP VAN has a contract with the Democratic National Committee in which their customers' data is owned and retained by the DNC. In exchange, the DNC provides data to NGP VAN customers — those using NGP VAN get the data of every previous NGP VAN user and the DNC, which basically covers every Democrat to run for office in modern history.

FOF ¶ 1075.   The advantage for these campaigns is tangible immediately: oh look, here's everyone who voted for Barack Obama in 2012 in the 3rd Congressional District of Iowa. Here are the people we know who are education voters in New Hampshire, economy voters who vote in primaries in South Carolina, et cetera.

FOF ¶ 1076.   "The DNC has a crazy amount of information, and it gets better and better as time passes, because hundreds of Democratic campaigns across the country use NGP VAN to run campaigns on a daily basis. If one campaign discovers that John Doe moved to a new address, every Democratic campaign in the country knows immediately.

FOF ¶ 1077.   "But here's the problem: campaigns don't actually own the relationships they build in the software. The Democratic National Committee does. The deal struck with the DNC ensures an incredible competitive advantage for NGP VAN: use our software, or be cut off from all Democrats' data. Moreover, if you break our rules, we'll kick you off the platform and cut you off from your own data."

FOF ¶ 1078.   "On top of the issues at the top of the ticket, down ballot, state parties became very stingy about protecting incumbents and wouldn't provide data to primary challengers. As first reported on by *Campaigns and Elections*:

FOF ¶ 1079.   "New Jersey Democrat Alex Law, 25, said he wanted to go the partisan route when

154

it came to data, but he needed the state Democratic committee's approval to get access to NGP VAN at below market rates.

FOF ¶ 1080. "In late June 2015 as he geared up for his congressional run, Law requested NGP VAN access. But because he was challenging Rep. Donald Norcross, Law said the state committee deliberately tried to sabotage his campaign by not even responding to his request. In fact, it wasn't until mid July 2015 that he got a response — a huge period of time for a primary campaign."They couldn't give us access to even purchase SmartVAN without getting a 'no' from the state party, and the state party wouldn't even give them an answer until we forced them to give an answer," said Law.

FOF ¶ 1081. "Once NGP VAN received their "no" from the state party, Law said the company offered him access to SmartVAN, a slightly different version of VoteBuilder that was costlier. "I looked at it, and it made no sense," Law said.

FOF ¶ 1082. "Law's campaign decided to go with L2 instead. "The only other option than that was to go to the county clerk and request all the voter registrations and build a housing system that could do filtering," he said. "The data that you get from the county in New Jersey is almost [unusable]. It would have been extremely difficult."

FOF ¶ 1083. "Law, whose total budget was around $75,000, ultimately lost to Norcross, a former state senator, in the June 7 primary 70 to 30 percent. Law credits his 23,689-vote total as a first-time candidate to his data provider. "L2 gave us the base to create other tools that we needed for the campaign."

FOF ¶ 1084. "After Hillary Clinton's loss in 2016, vendors started to express louder concerns about NGP VAN.

FOF ¶ 1085. "Ad Astra Group, Aristotle, street Campaigns, eCanvasser, icitizen, iDONATEpro, Mosaic Strategies, NationBuilder, Organizer, Run for Office, SparkInfluence, Tectonica, and VoteRockit joined together to start a movement they call "Unlock the VAN." Together, they sent a letter to the Democratic National Committee with a message:

FOF ¶ 1086. "To the Democratic National Committee:

FOF ¶ 1087. "Empower Democratic candidates & committees with equal access to Democratic Party data regardless of which tools & technologies they choose to use.

FOF ¶ 1088. "Never before have so many Democrats stepped up to run for office. This wave of enthusiasm from new candidates all over the country is vital to democracy. "Every one of them deserves their fair shot. And to succeed, these candidates need great technology and access to critical data on their voters.

FOF ¶ 1089. "But for the last 10 years, one company has held a monopoly on control of the Democratic Party's voter data. That company, NGP VAN, uses its monopoly to deny candidates the opportunity to use tools that could give their campaigns the upper hand.

FOF ¶ 1090. "The Democratic National Committee's (DNC) exclusive relationship with this vendor leaves candidates with an impossible choice: access their own party's voter

155

data, or freely choose any technology they believe will help them win.

FOF ¶ 1091.   "When the DNC first negotiated this exclusive relationship, Voter Activation Network (VAN) — who'd later merge with another campaign tech company, NGP — was practically the only game in town.

FOF ¶ 1092.   "Times have changed, and so should the DNC's outdated support of tech monopoly. "We're in the midst of a civic tech renaissance. From real-time mobile canvassing apps like Organizer to political crowdfunding services like Crowdpac — startups are building new, affordable tools that could provide upstart Democrats a much-needed competitive edge.

FOF ¶ 1093.   "Sadly, if you're a candidate keen on using the data collected by Democratic campaigns before you — you won't get to take advantage of all this vibrant marketplace has to offer.

FOF ¶ 1094.   "The DNC says their data can live in VAN and VAN alone. And what does NGP VAN say?"If you are our direct competitor," don't even think about integrating with any of our products.

FOF ¶ 1095.   "This is what monopolies do.

FOF ¶ 1096.   "When big business can shut out competition," Senator Elizabeth Warren told a crowd last year, "entrepreneurs and small businesses are denied their shot at building something new and exciting … prices go up and quality suffers." "Lack of competition stifles innovation, both in candidates and in technology. And innovation is what Democrats need — now more than ever.

FOF ¶ 1097.   "With everything at the DNC now on the table, including "contracts with outside vendors," and the search for a new Chief Technology Officer just beginning, this is the time to start talking about unlocking the VAN.

FOF ¶ 1098.   "Let the DNC know you agree, not only in the spirit of competition and innovation — but in direct service to this surge of new candidates, the future of the Democratic Party." What's most interesting about the Unlock the VAN movement, is the companies are asking the DNC to do exactly what the RNC did two years ago. It's unclear if the movement will lead to any long-term changes, but it wouldn't be surprising to see the grassroots push new DNC Chairman Tom Perez into this direction.

FOF ¶ 1099.   Looking to the future for all sides, integration will be the key for any technology companies looking to make a splash. Campaigns can no longer afford to have siloed data.

### § 71. RNC Acquiescence of Cambridge Analytica (¶¶ 1100-1112).

FOF ¶ 1100.   Cambridge Analytica Ltd (CA) was a British political consulting firm which combined data mining, data brokerage, and data analysis with strategic communication for the electoral process.

FOF ¶ 1101.   It was started in 2013 as an offshoot of the SCL Group. The company was partly owned by the family of Robert Mercer, a GOP/conservative leading hedge-fund

       manager who supports many politically conservative causes.

FOF ¶ 1102.    The firm maintained offices in London, New York City, and Washington, DC. CEO Alexander Nix has said CA was involved in 44 US political races in 2014.

FOF ¶ 1103.    In 2015, it performed data analysis services for Ted Cruz's presidential campaign. In 2016, CA worked for Donald Trump's presidential campaign as well as the Leave.EU-campaign for the United Kingdom's referendum on European Union membership.

FOF ¶ 1104.    CA's role in those campaigns has been controversial and is the subject of ongoing criminal investigations in both countries.

FOF ¶ 1105.    Political scientists question CA's claims about the effectiveness of its methods of targeting voters.

FOF ¶ 1106.    In March 2018, multiple media outlets broke news of Cambridge Analytica's business practices. The *New York Times* and *The Observer* reported that the company had acquired and used personal data about Facebook users from an external researcher who had told Facebook he was collecting it for academic purposes. Shortly afterwards, BBC's Channel 4 News aired undercover investigative videos showing Nix boasting about using prostitutes, bribery sting operations, and honey traps to discredit politicians on whom it conducted opposition research, and saying that the company "ran all of (Donald Trump's) digital campaign." In response to the media reports, the Information Commissioner of the UK pursued a warrant to search the company's servers.[ Facebook banned Cambridge Analytica from advertising on its platform, saying that it had been deceived.

FOF ¶ 1107.    On 23 March 2018, the British High Court granted the Information Commissioner's Office a warrant to search Cambridge Analytica's London offices.

FOF ¶ 1108.    The personal data of approximately 87 million Facebook users were acquired via the 270,000 Facebook users who explicitly chose to share their data with the app "thisisyourdigitallife."

FOF ¶ 1109.    By giving this third-party app permission to acquire their data, back in 2015, this also gave the app access to information on the user's friends network; this resulted in the data of about 87 million users, the majority of whom had not explicitly given Cambridge Analytica permission to access their data, being collected.

FOF ¶ 1110.    The app developer breached Facebook's terms of service by giving the data to Cambridge Analytica.

FOF ¶ 1111.    On 1 May 2018, Cambridge Analytica and its parent company filed for insolvency proceedings and closed operations.

FOF ¶ 1112.    Alexander Taylor, a former director for Cambridge Analytica, was appointed director of Emerdata on 28 March 2018.

### § 72. Cambridge Analytica Also Promotes Voter Suppression (¶¶ 1113-1117).

FOF ¶ 1113.    According to CNN, the whistle blower whose disclosures about Cambridge

Analytica shook the tech world over questions about users' data privacy told Congress on Wednesday that the company engaged in efforts to discourage or suppress voting.

FOF ¶ 1114.   Christopher Wylie, a former Cambridge Analytica employee who blew the whistle on its alleged misuse of Facebook data, told the Senate Judiciary Committee that the company offered services to discourage voting from targeted sections of the American population.

FOF ¶ 1115.   "Mr. Bannon sees cultural warfare as the means to create enduring change in American politics. It was for this reason Mr. Bannon engaged SCL (Cambridge Analytica's parent company), a foreign military contractor, to build an arsenal of informational weapons he could deploy on the American population," Wylie claimed, referring to Trump's former top political adviser Steve Bannon.

FOF ¶ 1116.   Wylie did not provide specific evidence of voter suppression campaigns taking place in the US. But when asked by Sen. Chris Coons, D-Delaware, if one of Bannon's "goals was to suppress voting or discourage certain individuals in the US from voting," Wylie replied, "That was my understanding, yes."

FOF ¶ 1117.   After the hearing, Wylie told CNN that although he did not take part in voter suppression activities, he alleged that African-Americans were particular targets of Cambridge Analytica's "voter disengagement tactics," which he said were used to "discourage or demobilize certain types of people from voting," and that campaigns and political action committees requested voter suppression from Cambridge Analytica.

### § 73. RNC Support for Cambridge Analytica (¶¶ 1118-1122).

FOF ¶ 1118.   The following Republican campaigns employed Cambridge Analytica with the following amounts as reported to the FEC. Such does not include other payments.

FOF ¶ 1119.   Donald J. Trump, $5,912,500.

FOF ¶ 1120.   Sen. Ted Cruz (R-TX), $5,805,552.

FOF ¶ 1121.   Make America No. 1 PAC, $1.476,484.

FOF ¶ 1122.   John Bolton (now Trump's National Security Advisor) $1,532,300. Keep the Promise II, $570,000. Carson America, $438,065.

### § 74. DOJ, FBI Investigating Cambridge Analytica (¶¶ 1123-1124).

FOF ¶ 1123.   Matthew Rosenberg and Nicholas Confessore reported in the *New York Times* May 15, 2018 that the Justice Department and the F.B.I. are investigating Cambridge Analytica, and have sought to question former employees and banks that handled its business, according to an American official and other people familiar with the inquiry.

FOF ¶ 1124.   Prosecutors have questioned potential witnesses in recent weeks, telling them that there is an open investigation into Cambridge Analytica — which worked on President Trump's election and other Republican campaigns in 2016 — and

"associated U.S. persons."

## § 75. Russian Interfere in 2016 Election Benefits RNC (¶¶ 1125-1135).

FOF ¶ 1125.   The U.S. Department of Justice, Office of Special Counsel sought a true bill from a grand jury indicting certain Russian entities and nationals for interfering in the 2016 campaign.

FOF ¶ 1126.   The indictment, filed February 16, 2018 in Case 1:18-cr-00032-DLF in pertinent part, follows:

FOF ¶ 1127.   Defendant INTERNET RESEARCH AGENCY LLC ("ORGANIZATION") is a Russian organization engaged in operations to interfere with elections and political processes. Multiple Russian Nationals indicted by the Special Counsel worked in various capacities to carry out Defendant ORGANIZATION's interference operations targeting the United States.

FOF ¶ 1128.   Defendants, posing as U.S. persons and creating false U.S. personas, operated social media pages and groups designed to attract U.S. audiences. These groups and pages, which addressed divisive U.S. political and social issues, falsely claimed to be controlled by U.S. activists when, in fact, they were controlled by Defendants. Defendants also used the stolen identities of real U.S. persons to post on ORGANIZATION-controlled social media accounts. Over time, these social media accounts became Defendants' means to reach significant numbers of Americans for purposes of interfering with the U.S. political system, including the presidential election of 2016.

FOF ¶ 1129.   Certain Defendants traveled to the United States under false pretenses for the purpose of collecting intelligence to inform Defendants' operations. Defendants also procured and used computer infrastructure, based partly in the United States, to hide the Russian origin of their activities and to avoid detection by U.S. regulators and law enforcement.

FOF ¶ 1130.   Defendant ORGANIZATION had a strategic goal to sow discord in the U.S. political system, including the 2016 U.S. presidential election. Defendants posted derogatory information about a number of candidates, and by early to mid-2016, Defendants' operations included supporting the presidential campaign of then-candidate Donald J. Trump ("Trump Campaign") and disparaging Hillary Clinton.

FOF ¶ 1131.   Defendants made various expenditures to carry out those activities, including buying political advertisements on social media in the names of U.S. persons and entities.

FOF ¶ 1132.   Defendants also staged political rallies inside the United States, and while posing as U.S. grassroots entities and U.S. persons, and without revealing their Russian identities and ORGANIZATION affiliation, solicited and compensated real U.S. persons to promote or disparage candidates.

FOF ¶ 1133.   Some Defendants, posing as U.S. persons and without revealing their Russian association, communicated with unwitting individuals associated with the Trump Campaign and with other political activists to seek to coordinate political activities.

FOF ¶ 1134.   In order to carry out their activities to interfere in U.S. political and electoral

processes without detection of their Russian affiliation, Defendants conspired to obstruct the lawful functions of the United States government through fraud and deceit, including by making expenditures in connection with the 2016 U.S. presidential election without proper regulatory disclosure; failing to register as foreign agents carrying out political activities within the United States; and obtaining visas through false and fraudulent statements.

FOF ¶ 1135.   The indictment continues with specifics regarding each of the elements required under the multiple count indictment.

### § 76. RNC Knows It Could Prevent Russian Interference (¶¶ 1136-1141).

FOF ¶ 1136.   What the Special Counsel's indictment does not report, obviously being unaware, is that the RNC contributed tangentially to enabling the Russian defendants to interfere in the 2016 Election by its efforts to destroy the Trust.

FOF ¶ 1137.   Had not the RNC attempted to destroy the Trust, it would be highly improbable for the Russian defendants to successfully perpetrate its alleged criminal activities because the Trust Property's *MyVoterPage.com*™ would have deterred the Russians from attempting to invade Facebook because *MyVoterPage.com*™ would have been a singular and far superior resource to attack.

FOF ¶ 1138.   But any such Russian attack would have been immediately detected because of the precinct committee people "voter verification" process under IOP Rule 2(l) which provides in pertinent part:

FOF ¶ 1139.   "**Voter Validation.** — All voter files from VTBs shall be validated by individual voters who shall be granted access to the Trust Property solely for purposes of inspecting their own voter file upon payment of a minimal service fee of $2.50 or in the alternative, input their voter identification number, solely to constitute an initial firewall to prevent computer hacking or identity theft. At such time, the voter shall be required to create a password and PIN for future access. The only information which the voter is inspecting is public information, hence there is no opportunity greater or lesser than normal for identity theft. Once the voter inputs any original information to update his voter file, i.e., contact information, the Trust Property shall suspend such information and not append the voter file until the precinct committeeman or committee woman, or another authorized representative of the Qualified Beneficiary verifies the voter inputted the updated information by personal visit, telephone call or email."

FOF ¶ 1140.   Reince Preibus was at relevant times the RNC Chairman and had first-hand knowledge of the Trust's existence, although we find no evidence Preibus had sufficient working knowledge of the Trust to know *MyVoterPage.com*™would have deterred Russian interference.

FOF ¶ 1141.   However, RNC's in-house and retained counsel, specifically Jeffrey Goldstein, Esq., of McNelly/Goldstein, did have, or if they did not, should have sufficient working knowledge of the Trust to know *MyVoterPage.com*™ would have deterred Russian interference, as such would be information Goldstein would become aware of in the course of his committing a fraud on the court in the Philadelphia Orphans Court proceedings.

### § 77. RNC Usurps Elected Precinct Committee People (¶¶ 1142-1148).

FOF ¶ 1142.   As noted by *The Guardian* (of London): "Future elections must be fought online.

FOF ¶ 1143.   [Senator] Obama's masterful leveraging of web 2.0 platforms marks a major eruption in electoral politics – in America and elsewhere - as campaigning shifts from old-style political machines, focused on charming those at the top of organizations, towards the horizontal dynamics of online social networks."

FOF ¶ 1144.   As noted *supra*, ORCA was a centralized process operating exclusively on a top-bottom management scale which completely and deliberately bypassed elected precinct Republican committee people.

FOF ¶ 1145.   Moreover, ORCA ignored virtually every state law governing granting of poll watcher certificates.

FOF ¶ 1146.   As noted *supra*, RNC Database Central is provided only to Republican candidates, not to state, county and local party committees, and particularly not to elected precinct party representatives.

FOF ¶ 1147.   The RNC's denial of Database Central is merely one more indicator of the nationalization of the party proceeses and the RNC's superceding and usurping the powers and duties of local precinct party representatives.

FOF ¶ 1148.   It is unfathomable to believe that RNC and its Republican Curia cannot be aware of precinct party representatives, poll watchers and Election law provisions governing their election or appointment and powers and duties.

### § 78. State, Local GOP Suffer Loss of Adequate Funding (¶¶ 1149-1171).

FOF ¶ 1149.   National Institute on Money in State Politics explored the campaign finances of 100 state political party committees prior to passage of the Bipartisan Campaign Finance Reform Act (BCRA) (1999–2002) and post-BCRA (2003–2016) to understand more fully how donations evolved under the new federal laws.

FOF ¶ 1150.   "Analyses revealed that state political party committees' campaign finances were less influenced by soft money from national party committees (since that money was earmarked for federal races) than they were by state-based influences, such as campaign-finance regulations, redistricting, political cultures, and closely contested state races. Rather than "making up" for soft money donations post BCRA, the state political parties consistently relied on individual donors, business donors, labor unions, and even candidates.

FOF ¶ 1151.   "Individuals from outside the political party system have always been a solid source of funds for state party committees. After BCRA, this appeared to be more true than ever.

FOF ¶ 1152.   "The state parties have followed the "law of the vital few," courting a small number of wealthy donors for a disproportionally larger sum of money. State parties saw an increase in the prominence of large donors (those who gave more than $200,000) and a corresponding decrease in the participation of unitemized/small donors. Business donors remain the leading source of state party money, and their importance grew

161

considerably in the post-BCRA era of campaign finance.

FOF ¶ 1153.  "Similar to individual donors, the makeup of business donors has become more consolidated over time. In 2001–2002 about 11,000 business donors gave to state political parties. A decade after the peak year of 2001–2002, roughly 4,500 business donors were giving to state parties. In the latest election, it was less than 2,500. Meanwhile, the average given by these donors to all state parties per cycle was on the rise: going from around $12,500 in 2001–2002 to more than $23,500 10 years later and reaching $35,000 in 2013-2014.

FOF ¶ 1154.  "In the past 18 years, labor unions have consistently represented a small proportion of contributions to state parties, providing 3 percent to 13 percent of the total raised per cycle.

FOF ¶ 1155.  "Contributions from ideology and single issue organizations have been on the rise. These donors averaged nearly $12 million per cycle from 2004 to 2016, more than double the $5 million per cycle, 1999–2002.

FOF ¶ 1156.  "State party independent spending fluctuated over the years, but independent spending by national state-focused organizations and generic partisan spenders skyrocketed, from $26.7 million in 2012 and $32.8 million in 2014.

FOF ¶ 1157.  "The Republican Governors Association alone spent nearly $21 million, more than triple the total spent by all Republican Party committees combined.

FOF ¶ 1158.  "Funding the state political parties was greatly influenced by varying state laws that governed who could give and how much. In those states where donors were unconstrained by contribution limits, the state parties relied heavily on business donors. Conversely, in the states where corporations were banned or limited, parties relied heavily on other party committees."

FOF ¶ 1159.  Raymond J. La Raja, in *State Political Parties After BRCA* that: "By changing the federal campaign finance rules, BCRA should inaugurate a wave of experimentation among party committees that has not been seen since the last set of major reforms in 1974. In particular, parties in the states will be influenced by new rules on committee transfers and federal election activity that apply directly to them. It is likely that party operatives will seek innovative ways to minimize constraints these rules impose on state and local election activity.

FOF ¶ 1160.  "But parties will also be influenced indirectly by the behavior of groups competing at the national level in federal elections, learning new campaign strategies from Washington-based groups that are compelled by BCRA to change more fundamentally than actors in the states.

FOF ¶ 1161.  Perhaps the most lasting influence of BCRA will be its effect on intraparty relations. BCRA tries hard to make the lines more clear between money that is used in federal and state elections. The effort to do this will make it harder for parties to use nonfederal funds that help federal candidates, which means that supporters of BCRA will have achieved a chief goal of the legislation.

FOF ¶ 1162.  "But the bright lines will also diminish the incentives for levels of party to work together, and reduce the efforts of state and local parties on behalf of an entire party

ticket. Instead, they will focus on the state elections. BCRA, therefore, should weaken the intraparty links among candidates and levels of party.

FOF ¶ 1163.   "By pushing fund-raising and the spending of soft money below the level of the national committees, BCRA should trigger greater decentralization of the party structure and encourage differentiation among state and local committees. Some parties in the states may thrive in the manner reformers hoped for, by focusing on intensive grassroots efforts to win voter support. BCRA, however, will probably not spur greater party activity where parties are currently weak and may, in fact, hurt such committees, since they will no longer receive subsidies from the national committees or, in some cases, the state committee. Generally, parties in the larger states will need to adjust more under the new rules than those in the smaller states. Parties in larger states tend to rely on bigger campaign contributions—often in excess of BCRA's $10,000 limits on soft money—to pay for voter contact activities. Much of this activity will now need to be funded with hard money and Levin funds.

FOF ¶ 1164.   "Instead of strong ties between national and state committees, we are likely to see more fluid and informal arrangements among committees and candidates. The restriction on raising soft money in $10,000 increments will encourage partisans to set up committees wherever there is a tight contest. We can expect more local parties in the high growth suburban areas of the country where many crucial ''swing'' voters reside. But these committees may come and go, depending on the importance of a federal election. Those that endure may end up having minimal ties to the state party. Instead, these local ''machines'' in key congressional districts may well exploit the Levin fund provisions and increased hard money contributions to conduct targeted federal election activity.

FOF ¶ 1165.   "In some instances, the national committees may choose to avoid working with state organizations altogether, since they will lack soft money to influence the direction of state party activity. National party organizations may even actively discourage state and local organizations from participating in federal elections, because such activity could prevent the national committees from running independent ads. One provision in BCRA declares that the parties may pursue either coordinated or independent expenditures, but not both.

FOF ¶ 1166.   "Federal candidates may also loosen their ties with state parties, because these organizations are less useful to them in their campaigns. At the same time, the state parties will have less use for federal candidates who can no longer solicit funds on behalf of the party. Some parties will continue to take advantage of the star power of federal officeholders to raise money and stay within the bounds of the law.

FOF ¶ 1167.   "On the other hand, the incentive to help the state party is diminished if the federal candidate is in a tough race and does not want the opposition to stir up the notion that he or she is involved in raising soft money. The cumulative effect of provisions to keep federal candidates away from nonfederal money is to diminish the ties between federal candidates and the state and local party organizations.

FOF ¶ 1168.   "This division elevates the importance of governors and state legislative leaders within the organization. While BCRA reverses a trend toward party centralization, it actually accelerates some patterns we saw before the law was passed. It puts more emphasis on voter contacts and encourages greater participation in campaigns among interest groups. The irony of the latter trend is that the party and its candidates

163

actually may end up relying even more on interest groups, although on a narrower collection that has the capacity to design and implement campaigns, usually around single issues. In subsequent elections campaign themes may appear more ideological, creating sharper distinctions between the parties on a variety of issues."

FOF ¶ 1169.   An opposing point of view comes from University of Connecticut's Sarah M. Morehouse, who prepared a thesis for presentation for the 2000 Annual Meeting of the American Political Science Association, August 31-September 3, 2000. She posits that in examining state finance reports from political parties in 15 states compared to their reports to the FEC in 1996 and 1998, including both presidential and gubernatorial election cycles in the 15 states and 30 state parties that

(1) "State parties raise, on average between 70% to 82% of all federal (hard) money raised for their state; and

(2) "40% to 60% of all non-federal (soft) money raised as well.

(3) "They contribute, on average, nearly half of all party money raised within their borders in a presidential election year and 90% of all money in mid-term election years. In view of this evidence, it is clear that state parties are not dependent upon the national parties but have maintained their autonomy as they become more professionalized and 'parties in service.'"

FOF ¶ 1170.   What we observe is that FEC initially reported Levin Fund campaign contributions as a separate report. This practice is no longer.

FOF ¶ 1171.   We draw the reasonable inference from both the FEC's discontinuance of reporting Levin Fund campaign contributions, along with the antidotal evidence from state and county political parties that the accounting and reporting required for Levin Fund campaign contributions far outweighs any benefit of raising the funds. That despite all good intentions of Sen. Carl Levin (D-MI) as the maker of the amendment, Levin Fund campaign contributions is a BCRA provision that does not work.

## § 79. RNC Circumvents Consent Decree to Suppress Voters (¶¶ 1172-1179).

FOF ¶ 1172.   The DNC and the RNC agreed to a Consent Decree which was entered in 1982. The Decree was the result of the settlement of a lawsuit which claimed that, in connection with the 1981 New Jersey Gubernatorial election, the RNC and the New Jersey Republican State Committee attempted to intimidate the minority voters, in violation of the Voting Rights Act, 42 U.S.C. §§ 1971, *et seq. Democratic Nat'l Comm., v. Republican Nat'l Comm.*, 671 F.Supp.2d 575, 579 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012), *cert. denied*, 568 U.S. 1138 (2013).

FOF ¶ 1173.   Specifically, the RNC sent sample ballots to areas where a large portion of the voters were ethnic minorities, then asked that the name of each voter whose ballot was returned as undeliverable be removed from New Jersey's voter rolls.

FOF ¶ 1174.   In addition, in an alleged effort of intimidation, the RNC hired off-duty law enforcement officers to patrol polling places in minority precincts. The officers wore armbands that read: "National Ballot Security Task Force," and some carried two-way radios and firearms.

164

FOF ¶ 1175.   The Consent Decree was filed on November 1, 1982.

FOF ¶ 1176.   Section 2 of the Consent Decree set forth the activities of the RNC that were required or prohibited by the agreement. Among other things, the RNC agreed that it would it would "in the future, in all states and territories of the United States": (a) comply with all applicable state and Federal laws protecting the rights of duly qualified citizens to vote for the candidate(s) of their choice." The balance of Section 2 of the Consent Decree dealt with specific conduct the RNC was employing to intimidate minority voters, particularly African-Americans.

FOF ¶ 1177.   It is well settled that since the 1930s election of Franklin D. Roosevelt, African-American voters, who historically registered and voted Republican, now almost universally register and vote Democratic.

FOF ¶ 1178.   At the time, the DNC was unaware of the Trust, as it was still functioning as the Republican Leadership Trust and had not yet undergo administrative deviation to become bipartisan per the PA Attorney General's guidance.

FOF ¶ 1179.   But the RNC was obviously cognizant of the Trust and its potential to increase voter turnout by the generally accepted 7.5% increase in voter turnout (TLI). Accordingly, the RNC committed breach of contract by concealing from the DNC the Trust's existence and benefit to the DNC to increase voter turnout, particularly among minority voter groups.

### § 80. Denying DNC Use of Trust Res Why Clinton Lost  (¶¶ 1180-1195).

FOF ¶ 1180.   The RNC's attempt to destroy the Trust and deny its charitable benefits to the public pointedly resulted in Hillary Rodham Clinton's 2016 loss to Donald Trump.

FOF ¶ 1181.   By denying the Trust Property to others, the RNC has to its own benefit, prevented increased voter turnout, by at least 7.5%, particularly among minority voter populations.

FOF ¶ 1182.   According to the final tallies, Trump won Pennsylvania by 0.7% (44,292 votes), Wisconsin by 0.7% (22,748 votes), Michigan by 0.2% (10,704 votes). If Clinton had won all three states, by increasing minority voter turnout in Philadelphia (PA) down 14.5% from 2012. Milwaukee (WI), down 16.% on average and Detroit (MI), down 14%, she would have won the Electoral College 278 to 260.

FOF ¶ 1183.   This is notwithstanding that Clinton paid $21.64 per vote while Trump paid $15.20 per vote, based in large part of his campaign reliance on earned media generated by his non-traditional antics.

FOF ¶ 1184.   Of the more than 120 million votes cast in the 2016 election, 107,000 votes in three states effectively decided the election.

FOF ¶ 1185.   Clinton won decisively in 18 states and D.C., netting her 222 electoral votes. Many of these states are traditional Democratic strongholds that are densely populated and along the coasts.

FOF ¶ 1186.   Trump won convincingly in 26 states, collecting 227 electoral votes. Most of these states usually vote Republican, except Iowa and Ohio, which voted for Obama in

2008 and 2012.

FOF ¶ 1187.   These six states were won by margins of less than 2 percent, the following won by Trump: Michigan, Wisconsin, Pennsylvania, Florida, These four states won by Trump were all won by Obama in 2012. Pennsylvania and Michigan had not voted for a Republican president since voting for George H.W. Bush in 1988. Wisconsin had not gone Republican since 1984, but for 27,257 votes. If the DNC had the Trust Property in 2014, it would have assured Hillary Rodham Clinton's victory with 1,136,253 additional votes in Florida, Georgia Michigan, North Carolina, Pennsylvania and Wisconsin, by 333 Electoral Votes to Trump's 227, instead of the actual 227 to 304 Electoral College final. The MOV (Margin of Victory) of the Top 10 states, in order of MOV, as follows: Michigan 0.3%. Trump 47.6 %, Clinton 47.3 %. Difference: 13,080 votes. New Hampshire 0.4 %, Clinton 47.6 %, Trump 47.2 %. Difference: 2,701 votes. Wisconsin 1 %. Trump 47.9 %, Clinton 46.9 %. Difference: 27,257 votes. Pennsylvania 1.2 %. Trump 48.8 %, Clinton 47.6 %. Difference: 68,236 votes. Florida 1.2 %. Trump 49 %, Clinton 47.8 %. Difference: 114,455 votes. Minnesota 1.5 %. Clinton 46.4 %, Trump 44.9 %. Difference: 44,470 votes. Nevada 2.4 %. Clinton 47.9 %, Trump 45.5 %. Difference: 26,434 votes. Maine 2.7 %. Clinton 47.9 %, Trump 45.2 %. Difference: 19,995 votes. North Carolina 3.8 %. Trump 49.9 %, Clinton 46.1 %. Difference: 177,009 votes. Arizona 3.9 %. Trump 49.3 %, Clinton 45.4 %. Difference: 91,682 votes.

FOF ¶ 1188.   The 2016 election is only the fourth time in history that a candidate won the popular vote but lost the Electoral vote. They were John Quincy Adams in 1824, Rutherford Hayes in 1876, Benjamin Harrison in 1888, George W. Bush in 2000 and now Trump in 2016.

FOF ¶ 1189.   Because Michigan, Wisconsin and Pennsylvania account for 46 electoral votes, had Clinton had won these states, she could have sealed the presidency with 274 total electoral votes.

FOF ¶ 1190.   In other words, the 2016 election was effectively decided by 107,000 people in these three states, which accounts to 0.09% of all votes cast in the 2016 election.

FOF ¶ 1191.   Had the DNC employed the Trust Property in 2016, she would have obtained 117,114 additional votes in Michigan, 103,305 additional votes in Wisconsin, and 213,352 additional votes in Pennsylvania.

FOF ¶ 1192.   Only three Democrats knew of the Trust, DNC general counsel Robert Bauer, DNC local counsel Rajiv Parikh, Esq., and Philadelphia City Democratic Chairman U.S. Rep. Robert A. Brady.

FOF ¶ 1193.   According to Brady, despite his repeated attempts, then DNC Chairwoman Debbie Wasserman Schultz was not made aware of the Trust. Then RNC Chairman Reince Preibus, on the other hand, had full working knowledge of the trust.

FOF ¶ 1194.   Bauer's knowledge of the Trust arose from his imposing the requirement that in 2009, the Trust Agreement at ¶ 8(F) be amended to avoid the RNC's liability from Res. 2009-23A as follows: "No national, state, county, municipal, ward, district and local committees of the Democratic or Republican Party as is or as a Qualified Beneficiary or any elected member therein shall be liable for and are fully indemnified and held harmless for any expense of distribution and for the

166

administration of the Trust, 20 Pa.C.S. § 7779, or for any advances heretofore or hereinafter made by the Trustee under 20 Pa.C.S. §§ 7769, 7780.6(a)(7), except for any surcharge assessed under subparagraph (E) in accordance with all due process."

FOF ¶ 1195.   Perkins Coie, as counsel to the DNC and the DNC nonetheless were and remain obliged to perform such appropriate due diligence as to satisfy the Best Judgment Rule. In ascertaining whether Perkins Coie's absence in protecting the DNC's interests, including its failure to appear at the hearings relative this Award, must be evaluated in conjunction with the DNC's acts and omissions as Perkins Coie's client.*Cf. Pioneer Investment Services Company v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 385 (1993). The factors which we must consider are: including: (1) whether granting the delay will prejudice the RNC; (2) the length of the delay and its impact on efficient administration of the Trust generally and specifically this Arbitration proceeding; (3) whether the delay was beyond the reasonable control of the person whose duty it was to perform; (4) whether the DNC acted in good faith; and (5) whether the DC should be penalized for their counsel's mistake or neglect."

(1)   We find there was no prejudice to the RNC as its claims and defenses relate to the administration of the Trust, not to any conduct of the DNC.

(2)   As evidenced above, we find that Perkins Coie has prejudiced administration of the Trust at the expense of the DNC and all other Qualified Beneficiaries in that for want of the Trust Property, Mrs. Clinton lost the 2016 election.

(3)   What weighs most heavily is that Perkins Coie's acts and omissions is beyond the reasonable control of any one attorney within Perkins Coie whose duty it would be to adequately represent the DNC's best interests, as it is initially the client's responsibility as principal to direct counsel being the agent. Outside of Attorney Bauer, the only DNC official whom the Trust has successfully interacted with is the current Associate Chairman and Counselor Jaime Harrison, Esq. , the former South Carolina Democratic Chairman. We gather that Harrison is an ad hoc DNC officer and not employed full-time and not empowered with a comprehensive portfolio.

(4)   Harrison has acted in good faith in promising his attention to directing Perkins Coie, but we would be abusing our discretion if we didn't find that given the extent to which the RNC has destroyed the Trust, the DNC would not give the Trust any priority as there is no service immediately available to deliver to the DNC. The DNC's officers like all public figures, suffers from the pressure of the immediate, and can only be concerned with resources readily available at their disposal, not a resource which is prospective. Any absence of good faith on the DNC is directly attribute to the bad faith of the RNC.

(5)   The law prohibits us from penalizing the DNC for Perkins Coie's neglect.

### § 81. RNC Voter Suppression and Destroying Trust Elects Trump (¶¶ 1196-1258).

FOF ¶ 1196.   A record 137.5 million Americans voted in the 2016 presidential election, according to new data from the U.S. Census Bureau. Overall voter turnout – defined as the share of adult U.S. citizens who cast ballots – was 61.4% in 2016, a share similar to 2012 but below the 63.6% who say they voted in 2008. However, the U.S. Census

Bureau calculated that 35.4 percent of eligible citizens were not registered to vote in 2014, as reported in "Who Votes? Congressional Elections and the American Electorate: 1978-2014," July 16, 2015.

FOF ¶ 1197.   The two parties are increasingly focusing their attention on the small handful of states they see as competitive in presidential elections. More than half of the campaign stops Clinton and Trump made between July 19and Nov. 7, 2016, — 57% — were in just four states: Florida, North Carolina, Ohio and Pennsylvania.

FOF ¶ 1198.   And the campaigns spent 71% of their money in those four states, which all went for Trump on Election Day.

FOF ¶ 1199.   Just 5% of the campaign stops made by the two candidates and 1% of the total spending were in non-battleground states.

FOF ¶ 1200.   As noted above, Hillary Rodham Clinton lost the 2016 Presidential election because she did not avail herself to the Trust Property and because of ongoing voter suppression.

FOF ¶ 1201.   Only 33 races for seats in the House of Representatives, less than 10% , were decided by 10 points or less.

FOF ¶ 1202.   Voter turnout in 2016 was the second-highest in the past half-century, after the 62.2% who turned out in 2008. However, upon closer examination, this assertion is misleading in that classes of voters who traditionally do not cast ballots did so, while those who traditionally do cast votes, did not.

FOF ¶ 1203.   Moreover, by comparison voter turnout routinely topped 62% in all three presidential contests held in the 1960s.

FOF ¶ 1204.   A number of long-standing trends in presidential elections either reversed or stalled in 2016, as black voter turnout decreased, white turnout increased and the nonwhite share of the U.S. electorate remained flat since the 2012 election.

FOF ¶ 1205.   The black voter turnout rate declined for the first time in 20 years in a presidential election, falling to 59.6% in 2016 after reaching a record-high 66.6% in 2012.

FOF ¶ 1206.   The 7-percentage-point decline from the previous presidential election is the largest on record for blacks. (It's also the largest percentage-point decline among any racial or ethnic group since white voter turnout dropped from 70.2% in 1992 to 60.7% in 1996.)

FOF ¶ 1207.   The number of black voters also declined, falling by about 765,000 to 16.4 million in 2016, representing a sharp reversal from 2012. With Barack Obama on the ballot that year, the black voter turnout rate surpassed that of whites for the first time. Among whites, the 65.3% turnout rate in 2016 represented a slight increase from 64.1% in 2012.

FOF ¶ 1208.   The Latino voter turnout rate held steady at 47.6% in 2016, compared with 48.0% in 2012. Overall turnout remained flat despite expectations heading into Election Day of a long-awaited, historic surge in Latino voters.

FOF ¶ 1209.    Due largely to demographic growth, the number of Latino voters grew to a record 12.7 million in 2016, up from 11.2 million in 2012.

FOF ¶ 1210.    Even so, the number of Latino nonvoters – those eligible to vote who do not cast a ballot, or 14 million in 2016 – was larger than the number of Latino voters, a trend that extends back to each presidential election since 1996.

FOF ¶ 1211.    Meanwhile, the Asian voter turnout rate increased to 49.3% in 2016, up from 46.9% in 2012 and surpassing Hispanics for the first time since 1996. Asians continue to represent a smaller share of voters than Hispanics.

FOF ¶ 1212.    Overall, about 5 million Asians voted in 2016, up from 3.8 million in 2012.

FOF ¶ 1213.    The number of naturalized-citizen voters reached 10.8 million in 2016, up from 9.3 million in 2012.

FOF ¶ 1214.    In a year when immigration played a central role in the presidential campaign, turnout among naturalized-citizen voters (those who were immigrants born in another country who have naturalized to become U.S. citizens) was 54.3%, up from 53.6% in 2012.

FOF ¶ 1215.    Overall, the voter turnout rate among foreign-born citizens trailed that of U.S.-born voters, who had a 62.1% turnout rate in 2016.

FOF ¶ 1216.    But among Asians and Hispanics – the nation's two largest immigrant groups – the pattern was reversed. In 2016, turnout among Asian naturalized citizens was 51.9% compared with 44.9% for U.S.-born Asians.

FOF ¶ 1217.    Among Hispanics, naturalized-citizen turnout was 53.4%, higher than the 45.5% turnout for U.S.-born Hispanics. Blacks, Hispanics, Asians and other racial or ethnic minorities accounted for 26.7% of voters in 2016, a share unchanged from 2012.

FOF ¶ 1218.    Leading up to the election, the overall eligible voting population was the most racially and ethnically diverse ever.

FOF ¶ 1219.    However, whites made up 73.3% of voters in 2016, a share unchanged from 2012, when they accounted for 73.7%.

FOF ¶ 1220.    Meanwhile, blacks made up 11.9% of voters in 2016, down from 12.9% in 2012 – the first time since 2004 that blacks have declined as a share of voters.

FOF ¶ 1221.    Hispanics have accounted for a growing share of the electorate for decades, and this trend continued in 2016, when they made up 9.2% of voters, up from 8.4% in 2012. Asians made up 3.6% of all voters in 2016, up from 2.8% in 2012.

FOF ¶ 1222.    The voter turnout rate increased among Millennials and those in Generation X. Millennials (those ages 18 to 35 in 2016) had a 49.4% voter turnout rate in 2016, up from 46.4% in 2012 when they were ages 18 to 31.

FOF ¶ 1223.    Their turnout rate increased across racial and ethnic groups, with the exception of black millennials, 49.4% of whom turned out in 2016, compared with 55.0% in 2012.

169

FOF ¶ 1224.   This increase in the millennial voter turnout rate is not only because the generation has grown older (older voters vote at higher rates than younger voters), but also due to a higher turnout rate among its youngest members: 43.0% of 18 to 24 year olds voted in 2016, up from 41.2%, in 2012. Generation X (those ages 36 to 51 in 2016) turnout was 62.6%, up from 61.0% in 2012.

FOF ¶ 1225.   By contrast, the voter turnout rate among older generations was flat.

FOF ¶ 1226.   Turnout for Baby Boomers (those ages 52 to 70) was 68.7% in 2016, compared with 68.9% in 2012, while among the Silent and Greatest generations (those ages 71 and older), it was 70.1% in 2016, compared with 71.8% in 2012.

FOF ¶ 1227.   The voter turnout rate among women was 63.3% in 2016, mostly unchanged from 63.7% in 2012.

FOF ¶ 1228.   The rate increased among white women, to 66.8% in 2016 from 65.6% in 2012.

FOF ¶ 1229.   But it decreased among black women (64.1% in 2016 versus 70.7% in 2012).

FOF ¶ 1230.   Among Hispanic women, the turnout rate stayed flat: 50% in 2016, compared with 49.8% in 2012. Meanwhile, among men, the voter turnout rate stayed flat (59.3% in 2016 versus 59.7% in 2012), trailing the rate among women.

FOF ¶ 1231.   Utilization of the Trust Property would have increased voter turnout across the board by an average 7.5%.

FOF ¶ 1232.   Ironically, despite its reputed prowess, President Obama's 2012 campaign generated only a 4.9% increase in voter turnout, whereas had the DNC or state and local Qualified Beneficiaries employed the Trust Property, Democrats would have realized voter turnout of 7.1% to 7.5%.

FOF ¶ 1233.   Although President Obama was easily re-elected, the Democrats forfeited any chance to regain control of the U.S. House, by winning the required 25 seats.

FOF ¶ 1234.   There were 24 House seats where one party won the Presidency, the other the House election.

FOF ¶ 1235.   30 Congressional races had a margin of victory (MOV) of less than 5%, which 18 were Democratic winners, but which 12 seats were won by Republicans. 33 races had a MOV between 5% and 10%, which 15 were Democratic winners while 18 were won by the GOP.

FOF ¶ 1236.   The Democrats were within the margin of error, with five to spare.

FOF ¶ 1237.   While problematic to analyze nationwide, antidotal data clearly suggests moderate Republican voter turnout declined in the 2016 Presidential election. However, per the Pew Charitable Trust research that 33% of college-degree persons are Republicans, and the U.S. Census Bureau last projects that 212,132,000 or 42.3% of the U.S. adult population earned an associate or bachelor's degree, the total number of college-educated Republicans would be 17,969,697 voters, give or take, based on the Census Bureau projecting that only 64.6% of VAP will actually register to vote. We find that the RNC's usurpation of precinct committee people by denying them

the authority to maintain strike lists and whip up absent voters by using the Trust Property's *Election Day Whip*™ module, equates to 1,347,727 college-educated Republicans did not vote. Had these voters cast their ballots, there is absolutely no assurance they would have towed the party line, as we know from Treadway's Election analysis, statistically 20% of registered Republican voters will split their tickets, as compared to 40% of Democratic and Independent registered voters. Jack Treadway, *Elections in Pennsylvania, A Century of Partisan Conflict in the Keystone State*, Penn State Univ (2005).

FOF ¶ 1238.    In Philadelphia's four suburban or collar counties of Bucks, Chester, Delaware and Montgomery Counties, voter registration is relative parity between Democrats and Republicans, although historically each of these counties were solid Republicans. Nonetheless, the Republicans elected from these collar counties were moderates and sometimes, borderline liberal, e.g. U.S. Rep. Edward G. Biester (1967-1977) or State Sen. Edward L. Howard (1971-1986). Delaware County provided two PA Senate GOP floor leaders, Joseph Loeper (1989-2000) and Dominic F. Pileggi (2006-2014). Suburban Republican legislators, Federal and state have always been regarded as both independent of party influences, i.e., State Rep. Benjamin H. Wilson (1969-1988) and pragmatic, i.e. U.S. Sen. Richard Schweiker (1969-1981).

FOF ¶ 1239.    Bucks County in particular, is a nationally regarded bellwether Congressional District.

FOF ¶ 1240.    Combined, the collar counties voted more Democratic than they did in 2012 and sent almost as many voters to the polls (about 1.2 million on Tuesday and in 2012). Trump however, got a smaller percentage of the vote there than Romney, McCain or Bush, despite no substantive change in GOP voter registration from 2008 through 2016.

FOF ¶ 1241.    Bucks County demonstrates the shifts that have taken place in just the past decade. According to City & State, the statewide political website site:

FOF ¶ 1242.    "As recently as 2008, for example, Barack Obama was winning areas in Upper Bucks like Quakertown and Perkasie during the presidential election.

FOF ¶ 1243.    "In 2012, President Obama was able to narrowly hold on in Bucks by running up the margins in the bottom portion of the county.

FOF ¶ 1244.    "Four years later, Hillary Clinton also barely won Bucks – but with a different coalition. Towns bordering Northeast Philadelphia such as Bensalem and Croydon turned red while wealthier areas like Lower Makefield went blue.

FOF ¶ 1245.    "This may be an example of the educational divide analysts have witnessed develop since the rise of Donald Trump." The *Atlantic* further described how moderate Republicans did not support Trump, although demonstrating this as an education divide." Per the Pew Charitable Trust research that 33% of college-degree persons are Republicans, and the U.S. Census Bureau last projects that 212,132,000 or 42.3% of the U.S. adult population earned an associate or bachelor's degree, the total number of college-educated Republicans would be 27,816.869 voters, give or take.

FOF ¶ 1246.    In an article by Andrew McGill posted Nov. 27, 2016, entitled "America's Educational Divide Put Trump in the White House. Even controlling for race and

income, the concentration of college degrees was the strongest indicator of whether a county would back the Republican." "Economic discontent defined this election, and a populist won it. But bare economics do not appear to have played a leading role in how voters cast their ballots. The proportion of people who held a bachelor's degree or higher was the primary correlate in how a county voted, far more than how much money the average towns person made, or how many had lost a job.

FOF ¶ 1247.  "Education is tricky, because it's tied up with so many other things. College graduates are generally more liberal; they're also more insulated against unemployment and outsourcing than your average blue-collar factory worker (though that certainly could change). And, of course, there's the ever-widening income gap between college graduates and everyone else. What looks like a strong correlation between higher education and opposition to Trump might just be a proxy for a hidden economic variable.

FOF ¶ 1248.  "But if that's the case, it's not a simple connection. The education gap persists even when controlling for a county's median income, its industrial base, and whether it has lost local manufacturing jobs. All those factors predict support for Trump, but not to the degree that education does. Neither does population density, a decent indicator for whether voters live in a rural or urban area. * * *.

FOF ¶ 1249.  The Republican nominee did worse in communities with strong minority populations (including a disappointing turnout among Asian voters, who are typically sympathetic to the GOP). Conversely, his support shot up in counties where very few residents have left their home state.

FOF ¶ 1250.  Polling before the election suggested Trump voters were more likely to have remained in the communities where they were born; his electoral returns largely held that up. He also fared better in regions that have seen a recent influx of Hispanics, where there were few before.

FOF ¶ 1251.  "Read one way, these figures support the white anxiety theory—that white Americans saw their way of life changing along racial lines and decided to try their own hand at identity politics. But consider that Great Britain saw nearly the same voting patterns earlier this year in the Brexit referendum, with education playing the strongest role in whether a region voted leave or remain in the European Union. The United Kingdom has racial politics, too, but they're different than America's. Indeed, that contest centered on how closely the U.K. wanted to knit itself into the larger world, a question the U.S. is grappling with right now as well.

FOF ¶ 1252.  "That presents a less simplistic explanation: Trump won not solely because of economics, race, or globalization, but by some subtle interplay between the three.

FOF ¶ 1253.   Counties with well-educated residents consistently broke against Trump even when they weren't particularly wealthy, as Nate Silver recently noted was the case with his hometown in Michigan.

FOF ¶ 1254.  They voted Democratic even when surrounded by relatively red-leaning neighbors (see Harrisonburg, Virginia, or Asheville, North Carolina).

FOF ¶ 1255.  Some of the counties hosted college towns, distorting their overall demographics, but not all of them. Something about living in a better-educated area made people favor

172

Clinton, and it didn't have as much to do with money as widely suggested."

FOF ¶ 1256.   The RNC, as any political entity, understands that partisans' TLI (Turnout Loyalty Index) is always superior to inactive party voters' TLI.

FOF ¶ 1257.   In 2016, the RNC and its "allied and friends" as defined by the March 18, 2013 *Growth and Opportunity Project* report, concentrated on getting GOP/Tea Party partisans to the polls, which could be done without grassroots mobilization.

FOF ¶ 1258.   Getting the balance of Republican voters to the polls, however, requires the traditional strike list/vote whipping that can only be done by precinct committee people, the institution which the RNC has decimated since the late 1980s, as discussed more fully *infra.*

### § 82. Trump Election Result of Total Institutional Meltdown (¶¶ 1259-1269).

FOF ¶ 1259.   Donald Trump was elected due to a total institutional meltdown of not only the RNC and the DNC, but also the media.

FOF ¶ 1260.   Trump is the first person elected President without any prior public service, be it elected office, civil service, or military service.

FOF ¶ 1261.   Prior U.S. Presidents who are poorly ranked by historians, e.g., Arthur M. Schlesinger Sr.  In 1948, the Siena Research Institute of Siena College conducting surveys in 1982, 1990, 1994, 2002 and 2010, nonetheless had some notable successes prior to ascending to the Presidency:

    (1)   John Quincy Adams served as minister and ambassador to foreign nations, and treaty negotiator, Secretary of State, a U.S. Senator, and the sixth President of the United States from 1825 to 1829, and later distinguished himself as a U.S. Representative.

    (2)   John Tyler served as a Virginia state legislator, governor, U.S. representative, and U.S. senator before ascending to the office as the 10th President upon the death of William Henry Harrison.

    (3)   Millard Fillmore read for the bar, was prominent in the Buffalo area as an attorney and politician, was elected to the New York Assembly, Comptroller General and to the U.S. House of Representatives, serving as Ways and Means Chairman, and Comptroller General of New York, before becoming 13th President upon the death of Zachary Taylor.

    (4)   Franklin Pierce was a successful attorney, served in the U.S. House and U.S. Senate before becoming the 14th President.

    (5)   James Buchanan was the 17th United States Secretary of State and had served in the Senate and House of Representatives, and as Ambassador to Russia and United Kingdom before becoming the 15th President.

    (6)   Andrew Johnson served as alderman and mayor, state representative, state senate and the U.S. House, and U.S. Senate before picked as Lincoln's running mater, becoming the 17th President.

(7)   Warren G. Harding was a successful newspaper publisher, Ohio State Senator and Lt. Governor, and U.S. Senator before being elected 29th President.

FOF ¶ 1262.   It is universally accepted as evidenced by most state and county party committees, to endorse a candidate prior to the party's primary.

FOF ¶ 1263.   The RNC does so *sub silento* with an incumbent Republican President.

FOF ¶ 1264.   Curly Haugland suggested to us that the RNC should endorse candidates for President, but never followed through with an informal grievance pursuant to IOP Rule 4(d).

FOF ¶ 1265.   Many highly qualified candidates ran for the GOP Presidential nomination in 2016, notably former FL Governor Jeb Bush and Ohio Governor John Kasich. Sen. Marco Rubio (R-FL) and Sen. Ted Cruz (R-TX) and NJ Gov. Chris Christie were second-tier candidates.

FOF ¶ 1266.   However, Donald Trump, by virtue of his eccentricity and unconventionality, earned substantial earned media (press coverage), which no amount of TV advertising was able to overcome.

FOF ¶ 1267.   The national media coverage of Trump, in pursuit of their ratings and circulation, in conjunction with the extreme conservative vote, was primarily responsible for electing him.

FOF ¶ 1268.   The RNC had the responsibility to assure that only qualified candidates run and thereafter secure the party's nomination for President.

FOF ¶ 1269.   Endorsement of a Republican in the Presidential primary is not new, given that in the 19th century and well into the 20th century, Republican "bosses" (nowadays styled as the Party Elite) virtually endorsed candidates for President. The only difference between a formal endorsement and historical conduct is the degree of transparency.

### § 83. RNC Voter Suppression Increases Polarization (¶¶ 1270-1272).

FOF ¶ 1270.   *Voter Turnout Precipitously Declines.* Data demonstrates voter turnout has precipitously declined in all combined general and municipal elections. For example, in Pennsylvania the GOP's TLI (Turnout Loyalty Index) plummeted from 82.5% to 49.5% . *See e.g.,* Jack Treadway, *Elections in Pennsylvania, A Century of Partisan Conflict in the Keystone State*, Penn State Univ (2005).

FOF ¶ 1271.   The 2014 Non-Presidential Election voter turnout was the lowest since World War I.

FOF ¶ 1272.   In the immediate past 2018 Primary, Philadelphia's voter turnout was only 17%, notwithstanding the national belief that Democrats are energized to turnout because of Trump.

### § 84. Cost to GOP for RNC to Abandon Trust Property (¶ 1273).

FOF ¶ 1273.   The RNC in the year it choose in to abandon the Trust Property it equitably owns, responded to the Democrats' technological superiority by spending (with the NRCC

and NRSC) approximately $33 million (24% of its total expenditures) or 159% what DNC, DCCC and DSCC spent on consultants. While the GOP spent $9.8 million on list management, 5 to 1 what Democrats spent, Democrats outspent GOP almost 2 to 1, $51.9 million to $27.7 million on Internet technology, grassroots and telemarketing. The GOP retained not one industry-recognized ASP (Applied Service Provider); while the Democrats retained 6 such ASPs.

### § 85. RNC Judicial Admissions re Its Internet Failures (¶¶ 1274-1276).

FOF ¶ 1274.   In the RNC's last but failed attempt to overturn BCRA, it admitted the following:

FOF ¶ 1275.   "The RNC plans to use funds from the State Elections Accounts to make direct contributions to state and local candidates. * * * We are merely looking to compete on an equal playing field in these states." Affidavit of Richard Clinton Beeson, RNC Political Director, ¶ 6 (Jan. 26, 2009).

FOF ¶ 1276.   "As a party, the RNC has lived under BCRA for three cycles. The potential problems that the RNC identified its briefs to the McConnell Court are even more acute than anticipated. For example the rise of 527s (and the resulting failure of the FEC to regulate) has left the RNC at a fundraising disadvantage for a host of its activities. *Similarly, the RNC has been negatively affected by the explosion of [I]nternet fundraising, barriers to collaborative relationships between national party and state parties, and inequality of restrictions on a party's ability to raise and spend funds.*" Affidavit of Richard Clinton Beeson, RNC Political Director, ¶ 21 (Jan. 26 2009) (emphasis added).

### § 86. RNC Increases Dependence on Large Donors (¶¶ 1277-1324).

FOF ¶ 1277.   One lesson of the 2014 election cycle was that more money came from fewer people. Basically "One Percent of the One Percent of Americans" — the top 31,000 or so donors, roughly equal to one percent of one percent of the U.S. population over the last three elections.

FOF ¶ 1278.   Because of the demographics of the "One Percent of the One Percent," coupled with the Supreme Court's *Citizens United* ruling, its dominance and conservative leaning bent benefit the RNC over the DNC.

FOF ¶ 1279.   Data shows even within the top .01 percent, the donors at the very peak are contributing more and more of the money.

FOF ¶ 1280.   Data was analyzed by the Center for Responsive Politics and the Sunlight Foundation.

FOF ¶ 1281.   In 2014, the top .01 percent accounted for just more than $1 billion worth of donations, up from $732.7 million in the previous midterm in 2010.

FOF ¶ 1282.   The 61% increase far exceeds the rate of inflation or the increase in the election's total cost, meaning this top group of donors assumed a far greater role in financing the most recent election than the previous midterm.

FOF ¶ 1283.   According to OpenSecrets.org data, all donors in the 2010 election gave roughly $3.48 billion, of which the top 32,000 or so paid for about 20 percent.

FOF ¶ 1284.   In 2014, all donors chipped in $4.01 billion; the top One Percent of the One Percenters accounted for about 28.6 percent of that.

FOF ¶ 1285.   Even among the top .01 percent, there is a perceptible trend toward the biggest donors shouldering more and more of the cost.

FOF ¶ 1286.   In 2010, it took at least $8,200 in donations reported to the Federal Election Commission to land in this exalted club.

FOF ¶ 1287.   In 2014, the entry fee was $8,810 — an increase smaller than the rate of inflation, meaning that it was easier to get into the top .01 percent in 2014.

FOF ¶ 1288.   Similarly, the median donation from this group in 2010 was $13,500, while in 2014 it was up to $14,850, resulting in the top .01 percent gave $447 million more in 2014. The most generous donors among the top 32,000 or so who make up the .01 percent gave more in 2014 than in 2010.

FOF ¶ 1289.   The median donation for the top third of this group — roughly 10,400 donors each cycle — in 2014 was $37,600, up $5,100 from the same group in 2010.

FOF ¶ 1290.   In 2010, that group of top 10,400 or so donors gave $488.4 million, or about 56 percent of the total donated by the .01 percent.

FOF ¶ 1291.   By 2014, the top 10,400 donors gave nearly twice as much — $911.1 million, or roughly 86.5 percent of the donations from the larger group.

FOF ¶ 1292.   Data suggests that even within the top .01 percent, there is apparently an elite set of donors pulling away from the pack.

FOF ¶ 1293.   The .01 percent includes wealthy individuals from both ends of the political spectrum, but there are relatively few in between and the numbers at the extremes are growing. And more of this money is coming from the right.

FOF ¶ 1294.   The vast majority of donors in this demographic gave overwhelmingly, if not entirely, to one side or the other.

FOF ¶ 1295.   In 2010, there were 12,178 donors in the .01 percent who gave no money to Democratic or liberal recipients at the federal level, and a similar 12,782 who gave no money to Republican or conservative causes.

FOF ¶ 1296.   In 2012, a presidential year, there were suddenly 14,672 donors who gave to no Democratic or liberal recipients, and only 10,672 who gave to no Republican or conservative ones.

FOF ¶ 1297.   By 2014, the trend toward greater partisanship had solidified, though the conservatives dominated — a full 15,147 (or almost half of the .01 percent) gave no money to Democrats or liberals, while 13,333 gave nothing to any Republicans or conservatives.

FOF ¶ 1298.   There were just 174 donors among the 32,000 in 2014 who gave equally to both sides — one less than in 2010.

FOF ¶ 1299.  And the biggest donor who gave to both sides in 2014 was only the 980th largest donor overall. The big money clearly lands on the extremes of the spectrum. Overall, donations from the top donors numbering .01 percent of the population have moved from favoring Democrats and liberals to favoring Republicans and conservatives.

FOF ¶ 1300.  In 2010, 45.1% of donations from this set went to Democratic or liberal recipients, more than the 42.7 % that went to Republican or conservative recipients.

FOF ¶ 1301.  In 2012, the equation changed dramatically, with just 36.5% of the group's money going to the left and 59.7% going to the right.

FOF ¶ 1302.  By 2014, the .01% were slightly more interested in liberal recipients than they'd been in the presidential cycle, as 42.7% of donations from these elite donors went to liberals while 46.8% went to conservatives, almost exactly flipped from the picture in 2010.

FOF ¶ 1303.  While data is still being crunched for 2016, Open Secrets reports that only 0.25% of donors gave 67.6% of all campaign contributions in 2016.

FOF ¶ 1304.  Only 866 donors contributed more than $100,000 and 30% or $92.3 million went to the GOP, 19% or $57.9 million went to Democratic candidates.

FOF ¶ 1305.  Hillary Clinton has raised a higher percentage of her campaign funds from women than any major party presidential candidate in recent history. She's also raised a higher total in contributions from women than any other candidate at this point in the cycle.

FOF ¶ 1306.  And Donald Trump has the dubious honor of achieving the exact opposite: He has raised less from women than any prior presidential candidate.

FOF ¶ 1307.  Ironically, of the top ten individual contributors in 2016, the majority, six, were only Democratic contributors, as follows:

FOF ¶ 1308.  Uihlein, Richard & Elizabeth, Lake Forest, IL $25,829,400 to Republicans.

FOF ¶ 1309.  Steyer, Thomas & F. & Kathryn Ann, San Francisco, CA $16,006,456 to Democrats.

FOF ¶ 1310.  Sussman, S. Donald, Ft Lauderdale, FL $8,328,900 to Democrats.

FOF ¶ 1311.  Soros, George, New York, NY $7,695,036 $4,851,400 to Democrats.

FOF ¶ 1312.  Marcus, Bernard & Billi Wilma, Atlanta, GA $5,798,375 to Republicans.

FOF ¶ 1313.  Eychaner, Fred, Chicago, IL          $4,830,700 to Democrats.

FOF ¶ 1314.  Marcus, George M. & Judith, Palo Alto, CA $4,273,025 to Democrats.

FOF ¶ 1315.  Mercer, Robert L. & Diana, East Setauket, NY $4,073,400 to Republicans.

FOF ¶ 1316.  Laufer, Henry B. & Marsha Z., Lantana, FL $3,570,749 to Democrats.

FOF ¶ 1317.  Cohen, Steven A. Greenwich, CT, $3,365,800 to Republicans.

177

FOF ¶ 1318.   All told, 61 of the top 100 individual donors in 2018 gave exclusively to Republican and/or conservative causes.

FOF ¶ 1319.   In 2016, the average U.S. House Winner Spent $1,495,633, the average U.S. Senate winner, $12,159,217 The average U.S. House loser spent t $354,116, on the Senate side, $5,796,020. The most expensive campaigns were $13,393,344 for U.S. Rep. Paul Ryan (R-WI) and $30,910,557 for U.S. Sen. Pat Toomey (R-PA).

FOF ¶ 1320.   The lease expensive campaigns were U.S. Rep. Val Demings (D-Fla) who spent $11,688 and $2,786,736 for U.S. Sen. John Hoeven (R-ND).

FOF ¶ 1321.   Number of Incumbents Seeking Reelection were 393 in the U.S. House, 29 in the U.S. Senate.

FOF ¶ 1322.   Number of Incumbents reelected were 380 in the House, representing 97% incumbent retention rate, and 27 in the Senate, representing a 93% retention rate. Number of Close Races (winning margin less than 10%) were 44 in the House, 9 in the Senate.

FOF ¶ 1323.   The average Winner's Vote Percentage was 66% in the House, 57% in the Senate. Average Winner's Receipts from PACs was $737,982 in the House, $2,871,655 in the Senate.

FOF ¶ 1324.   Most Receipts from PACs was U.S. Rep. Kevin McCarthy (R-CA) $3,279,747and $5,877,951 for U.S. Sen. Pat Toomey (R-PA).

### § 87. RNC Impairs Two-Party System Viability (¶¶ 1325-1343).

FOF ¶ 1325.   The simplest measure of the party strength in a state's (VEP) voting eligible population is the breakdown-by-party totals from its voter registration figures wqhich are obtained from the websites of the Secretaries of State or the Boards of Elections of the respective states.

FOF ¶ 1326.   As of 2018, 28 states and the District of Columbia allow registered voters to indicate a party preference when registering to vote.

FOF ¶ 1327.   The following 22 states (mostly in the South and the Midwest) do not provide for party preferences in voter registration: Alabama, Arkansas, Georgia, Hawaii, Idaho, Illinois, Indiana, Michigan, Minnesota, Mississippi, Missouri, Montana, North Dakota, Ohio, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington and Wisconsin.

FOF ¶ 1328.   The partisan breakdown demographics which are analyzed by us are obtained from that the respective states' party registration figures as where indicated.

(1) Alabama - Republican 49%-35%

(2) Alaska - Republican 26.7% - 13.8%

(3) Arizona - Republican 34.4 - 28.9%

(4) Arkansas - Republican 44% - 27%

(5)  California - *Democratic* 43.3% - 28.1%

(6)  Colorado - Republican 32.9% - 30.9%

(7)  Connecticut - *Democratic* 36.4% -20.8%

(8)  Delaware - *Democratic* 47.5% - 28.0%

(9)  District of Columbia

(10)  Florida - *Democratic* 38.8% - 35.0%

(11)  Georgia - Republican 43% - 39%

(12)  Hawaii - *Democratic* 49% - 35%

(13)  Idaho - Republican 52% -27%

(14)  Illinois - *Democratic* 47% - 35%

(15)  Indiana - Republican 44% - 37%

(16)  Iowa - Republican 32.0% - 31.1%

(17)  Kansas - Republican 44.1% - 24.3%

(18)  Kentucky - *Democratic* 53.4% - 38.8%

(19)  Louisiana - *Democratic* 46.8% - 27.7%

(20)  Maine - *Democratic* 31.9% - 27.1%

(21)  Maryland - *Democratic* 54.9% - 25.7%

(22)  Massachusetts - *Democratic* 35.3% - 10.9%

(23)  Michigan - *Democratic* 44% -37%

(24)  Minnesota - *Democratic* 44% - 39%

(25)  Mississippi - Republican 46% - 38%

(26)  Missouri - Republican 46% - 38 %

(27)  Montana - Republican 51% -33%

(28)  Nebraska - Republican 48.3% - 30.9%

(29)  Nevada - *Democratic* 39.7% -34.6%

(30)  New Hampshire - Republican 30.1% -27.2%

179

(31)  New Jersey - *Democratic* 32.7% - 19.7%

(32)  New Mexico - *Democratic* 46.6% -31.2%

(33)  New York -*Democratic* 49.4% - 23.9%

(34)  North Carolina - *Democratic* 41.7% -30.4%

(35)  North Dakota - Republican 47% - 36%

(36)  Ohio - Republican 42% - 42%

(37)  Oklahoma - Republican 46.8% - 38.2%

(38)  Oregon -*Democratic* 37.8% - 29.9%

(39)  Pennsylvania - *Democratic* 49.5% - 36.7%

(40)  Rhode Island - *Democratic* 41.4% - 10.9%

(41)  South Carolina - Republican 44% - 29%

(42)  South Dakota - Republican 46.2% - 33.8%

(43)  Tennessee - Republican 27% - 35%

(44)  Texas - Republican 41% - 37%

(45)  Utah - Republican 59% - 26%

(46)  Vermont - *Democratic* 47% - 31%

(47)  Virginia - Republican 42% - 40%

(48)  Washington -*Democratic* 45% - 37%

(49)  West Virginia - *Democratic* 49.4% - 28.9%

(50)  Wisconsin -*Democratic* 43% - 41%

(51)  Wyoming - Republican 66.7% - 19.8%

FOF ¶ 1329.  Only Wyoming has a majority of registered voters identifying themselves as Republicans; two states have a majority of registered voters identifying themselves as Democrats: Maryland and Kentucky.

FOF ¶ 1330.  Since 2010, Louisiana, Pennsylvania and West Virginia have all seen their Democratic-majority registrations slip to just Democratic-pluralities.

FOF ¶ 1331.  For those states that do not allow for registration by party, Gallup's annual polling of voter party identification by state is the next best metric of party strength in the U.S. states.

180

FOF ¶ 1332.   Historically, any time a party suffered a Congressional turnover percentage loss greater than 13% it took 12 years to recover. Yet today after it suffered in 2006 such a loss, the GOP in 2018 controls:

(1)   The Presidency 306 electoral votes to 232.

(2)   The U.S. Senate 51 seats to 47 (48) seats (two Independents also caucus with the Democrats).

(3)   The U.S. House 239 seats to 191 seats with five vacancies.

(4)   Governor's offices 34-15 with one independent.

(5)   State Senate Chambers 35-12-3 (The New York State Senate currently operate under a coalition between majority Republicans and independent Democrats. Connecticut Senate is tied. Nebraska is unicameral and nonpartisan).

(6)   State House Chambers 31-17-1 (The Alaska State House currently operates under a coalition of Democrats, Republicans and independents).

FOF ¶ 1333.   Justice O'Connor speaking first *Davis v. Bandemer*, 478 U.S. 109, 145 (1986) (O'Connor, J. concurring) stated: "There can be little doubt that the emergence of a strong and stable two-party system in this country has contributed enormously to sound and effective government. The preservation and health of our political institutions . . . depends to no small extent on the continued vitality of our two-party system, which permits both stability and measured change." The Court later adopted Justice O'Connor's observations in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367 (1997).

(1)   The reasoning behind this is that political parties are an essential component of the government's checks and balance system, representing polar views as either the Hamiltonian (centralized) government or the Jeffersonian (decentralized) government. *See* Theodore J. Lowi, *Party, Policy, and the Constitution in America*, in William N. Chambers and W. Dean Burnham, *The American Party Systems* 238-76 (2d ed. 1975).

(2)   The Supreme Court reiterated in *Storer v. Brown*, 415 U.S. 724, 736 (1974) that "splintered parties and unrestrained factionalism may do significant damage to the fabric of government."

(3)   Debate over public policies is merely striking the proper balance between the Hamiltonian and Jeffersonian poles. "Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms." *Williams v. Rhodes*, 393 U.S. 23, 32 (1968).

(4)   There is substantial state interest in encouraging compromise and political stability by promoting the two party system. *Storer v. Brown*, 415 U.S. at 729.

(5)   This is because of right of qualified voters, regardless of their political persuasion, to cast their votes effectively. *Williams v. Rhodes*, 393 U.S. at 30.

(6)   "No right is more precious in a free country than that of having a voice in the

election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

FOF ¶ 1334.   As expressed in an April 27, 2012 *Washington Post* op/ed piece by Thomas E. Mann and Norman J. Ornstein: "The GOP has become an insurgent outlier in American politics. It is ideologically extreme; scornful of compromise; unmoved by conventional understanding of facts, evidence and science; and dismissive of the legitimacy of its political opposition."

FOF ¶ 1335.   "When one party moves this far from the mainstream, it makes it nearly impossible for the political system to deal constructively with the country's challenges." *Id.*

FOF ¶ 1336.   "It is clear that the center of gravity in the Republican Party has shifted sharply to the right. Its once-legendary moderate and center-right legislators in the House and the Senate — think Bob Michel, Mickey Edwards, John Danforth, Chuck Hagel — are virtually extinct." Today, you can replace the aforementioned names with Charlie Dent, John McCain and even Lindsay Graham.

FOF ¶ 1337.   "The post-McGovern Democratic Party, by contrast, while losing the bulk of its conservative Dixiecrat contingent in the decades after the civil rights revolution, has retained a more diverse base. Since the Clinton presidency, it has hewed to the center-left on issues from welfare reform to fiscal policy. While the Democrats may have moved from their 40-yard line to their 25, the Republicans have gone from their 40 to somewhere behind their goal post." Mann and Ornstein, *Id.*

FOF ¶ 1338.   "Today, thanks to the GOP, compromise has gone out the window in Washington. In the first two years of the Obama administration, nearly every presidential initiative met with vehement, rancorous and unanimous Republican opposition in the House and the Senate, followed by efforts to delegitimize the results and repeal the policies." *Id.*

FOF ¶ 1339.   "The filibuster, once relegated to a handful of major national issues in a given Congress, became a routine weapon of obstruction, applied even to widely supported bills or presidential nominations. And Republicans in the Senate have abused the confirmation process to block any and every nominee to posts such as the head of the Consumer Financial Protection Bureau [and even a Supreme Court Justice] solely to keep laws that were legitimately enacted from being implemented." *Id.*

FOF ¶ 1340.   Former U.S. Senator Chuck Hagel (R-Nebraska) called the GOP "irresponsible" in an interview with the *Financial Times* (Sept. 1, 2011), at the height of the debt-ceiling battle. "I think the Republican Party is captive to political movements that are very ideological, that are very narrow," he said. "I've never seen so much intolerance as I see today in American politics."

FOF ¶ 1341.   Many more Republican legislators and political leaders fully concur, but do not speak aloud for fear of retribution as articulated by Freeman.

FOF ¶ 1342.   These forms of punishment is usually excommunication and ostracization from the party hierarchy, which includes full loss of access to the policy-making leaders, otherwise necessary to provide input (as GOP leaders limit policy-making decisions to themselves). Nowadays, it also means denying campaign funding and support and

182

in increasingly frequent instances, finding party primary opponents, usually of more strident conservative viewpoints

FOF ¶ 1343.   The overall situation regarding the Republican Party is perhaps best described by Arizona's two U.S. Senators, the late John McCain and Jeff Flake, whose floor speeches (the former October 24, 2017 and the latter July 25, 2017) are as follows:

"Mr. FLAKE: At a moment when it seems that our democracy is more defined by our discord and our dysfunction than by our own values and principles, let me begin by noting the somewhat obvious point that these offices that we hold are not ours indefinitely. We are not here simply to mark time. Sustained incumbency is certainly not the point of seeking office and there are times when we must risk our careers in favor of our principles. Now is such a time.

"It must also be said that I rise today with no small measure of regret. Regret because of the state of our disunion. Regret because of the disrepair and destructiveness of our politics. Regret because of the indecency of our discourse. Regret because of the coarseness of our leadership.

"Regret for the compromise of our moral authority, and by our, I mean all of our complicity in this alarming and dangerous state of affairs. It is time for our complicity and our accommodation of the unacceptable to end. In this century, a new phrase has entered the language to describe the accommodation of a new and undesirable order, that phrase being the new normal.

"But we must never adjust to the present coarseness of our national dialogue with the tone set up at the top. We must never regard as normal the regular and casual undermining of our democratic norms and ideals. We must never meekly accept the daily sundering of our country. The personal attacks, the threats against principles, freedoms and institution, the flagrant disregard for truth and decency.

"The reckless provocations, most often for the pettiest and most personal reasons, reasons having nothing whatsoever to do with the fortunes of the people that we have been elected to serve. None of these appalling features of our current politics should ever be regarded as normal. We must never allow ourselves to lapse into thinking that that is just the way things are now.

"If we simply become inured to this condition, thinking that it is just politics as usual, then heaven help us. Without fear of the consequences and without consideration of the rules of what is politically safe or palatable, we must stop pretending that the degradation of our politics and the conduct of some in our executive branch are normal. They are not normal. Reckless, outrageous and undignified behavior has become excused and countenanced as telling it like it is when it is actually just reckless, outrageous and undignified.

"And when such behavior emanates from the top of our government, it is something else. It is dangerous to a democracy. Such behavior does not project strength because our strength comes from our values. It instead projects a corruption of the spirit and weakness. It is often said that children are watching. Well, they are. And what are we going to do about that? When the next generation asks us, 'Why didn't you do something? Why didn't you speak up?'

What are we going to say?

"Mr. President, I rise today to say: enough. We must dedicate ourselves to making sure that the anomalous never becomes the normal. With respect and humility, I must say that we have fooled ourselves for long enough that a pivot to governing is right around the corner, a return to civility and stability right behind it. We know better than that. By now, we all know better than that. Here today I stand to say that we would be better served — we would better serve the country — by better fulfilling our obligations under the Constitution by adhering to our Article 1 — "old normal," Mr. Madison's doctrine of separation of powers. This genius innovation which affirms Madison's status as a true visionary — and for which Madison argued in Federalist 51 — held that the equal branches of our government would balance and counteract with each other, if necessary. "Ambition counteracts ambition," he wrote. But what happens if ambition fails to counteract ambition? What happens if stability fails to assert itself in the face of chaos and instability? If decency fails to call out indecency? Were the shoe on the other foot, we Republicans — would we Republicans meekly accept such behavior on display from dominant Democrats?

"Of course, we wouldn't, and we would be wrong if we did. When we remain silent and fail to act, when we know that silence and inaction is the wrong thing to do because of political considerations, because we might make enemies, because we might alienate the base, because we might provoke a primary challenge, because ad infinitum, ad nauseam, when we succumb to those considerations in spite of what should be greater considerations and imperatives in defense of our institutions and our liberty, we dishonor our principles and forsake our obligations. Those things are far more important than politics.

"Now, I'm aware that more politically savvy people than I will caution against such talk. I'm aware that there's a segment of my party that believes that anything short of complete and unquestioning loyalty to a president who belongs to my party is unacceptable and suspect. If I have been critical, it is not because I relish criticizing the behavior of the president of the United States. If I have been critical, it is because I believe it is my obligation to do so. And as a matter and duty of conscience, the notion that one should stay silent — and as the norms and values that keep America strong are undermined and as the alliances and agreements that ensure the stability of the entire world are routinely threatened by the level of thought that goes into 140 characters — the notion that we should say or do nothing in the face of such mercurial behavior is ahistoric and, I believe, profoundly misguided. A president, a Republican president named Roosevelt, had this to say about the president and a citizen's relationship to the office: "The president is merely the most important among a large number of public servants. He should be supported or opposed exactly to the degree which is warranted by his good conduct or bad conduct, his efficiency or inefficiency in rendering loyal, able and disinterested service to the nation as a whole."

"He continued: "Therefore, it is absolutely necessary that there should be — that there should be a full liberty to tell the truth about his acts and this means that it is exactly as necessary to blame him when he does wrong as to praise him when he does right. Any other attitude in an American citizen is both base and

184

servile." President Roosevelt continued, "To announce that there must be no criticism of the president or that we are to stand by a president, right or wrong, is not only unpatriotic and servile, but is morally treasonable to the American public."Acting on conscience and principle in a manner — is the manner — in which we express our moral selves and as such, loyalty to conscience and principle should supersede loyalty to any man or party. We can all be forgiven for failing in that measure from time to time. I certainly put myself at the top of the list of those who fall short in this regard. I am holier than none.

"But too often we rush to salvage principle — not to salvage principle, but to forgive and excuse our failures so that we might accommodate them and go right on failing until the accommodation itself becomes our principle. In that way and over time, we can justify almost any behavior and sacrifice any principle. I am afraid that this is where we now find ourselves.When a leader correctly identifies real hurt and insecurity in our country, and instead of addressing it, goes to look for someone to blame, there is perhaps nothing more devastating to a pluralistic society. Leadership knows that most often a good place to start in assigning blame is to look somewhat closer to home. Leadership knows where the buck stops.

"Humility helps, character counts. Leadership does not knowingly encourage or feed ugly or debased appetites in us. Leadership lives by the American creed, "E pluribus unum." From many one. American leadership looks to the world and just as Lincoln did, sees the family of man. Humanity is not a zero sum game. When we have been at our most prosperous, we have been at our most principled, and when we do well, the rest of the world does well.

"These articles of civic faith have been critical to the American identity for as long as we have been alive. They are our birthright and our obligation. We must guard them jealously and pass them on for as long as the calendar has days. To betray them or to be unserious in their defense is a betrayal of the fundamental obligations of American leadership and to behave as if they don't matter is simply not who we are.Now the efficacy of American leadership around the globe has come into question. When the United States emerged from World War II, we contributed about half of the world's economic activity. It would have been easy to secure our dominance keeping those countries who had been defeated or greatly weakened during the war in their place. We didn't do that. It would have been easy to focus inward.

"We resisted those impulses. Instead, we financed reconstruction of shattered countries and created international organizations and institutions that have helped provide security and foster prosperity around the world for more than 70 years.Now it seems that we, the architects of this visionary rules-based world order that has brought so much freedom and prosperity, are the ones most eager to abandon it. The implications of this abandonment are profound and the beneficiaries of this rather radical departure in the American approach to the world are the ideological enemies of our values. Despotism loves a vacuum and our allies are now looking elsewhere for leadership. Why are they doing this? None of this is normal.

"And what do we, as United States senators, have to say about it? The principles that underlie our politics, the values of our founding, are too vital to our identity

185

and to our survival to allow them to be compromised by the requirements of politics because politics can make us silent when we should speak and silence can equal complicity. I have children and grandchildren to answer to.And so, Mr. President, I will not be complicit or silent. I've decided that I would be better able to represent the people of Arizona and to better serve my country and my conscience by freeing myself of the political consideration that consumed far too much bandwidth and would cause me to compromise far too many principles.

"To that end, I'm announcing today that my service in the Senate will conclude at the end of my term in early January 2019. It is clear at this moment that a traditional conservative, who believes in limited government and free markets, who is devoted to free trade, who is pro-immigration, has a narrower and narrower path to nomination in the Republican Party, the party that has so long defined itself by its belief in those things.

"It is also clear to me for the moment that we have given in or given up on the core principles in favor of a more viscerally satisfying anger and resentment. To be clear, the anger and resentment that the people feel at the royal mess that we've created are justified. But anger and resentment are not a governing philosophy.

"There is an undeniable potency to a populist appeal by mischaracterizing or misunderstanding our problems and giving in to the impulse to scapegoat and belittle — the impulse to scapegoat and belittle threatens to turn us into a fearful, backward-looking people. In the case of the Republican Party, those things also threaten to turn us into a fearful, backward-looking minority party.

"We were not made great as a country by indulging in or even exalting our worst impulses, turning against ourselves, glorifying in the things that divide us, and calling fake things true and true things fake. And we did not become the beacon of freedom in the darkest corners of the world by flouting our institutions and failing to understand just how hard-won and vulnerable they are.This spell will eventually break. That is my belief. We will return to ourselves once more, and I say the sooner the better. Because we have a healthy government, we must also have healthy and functioning parties. We must respect each other again in an atmosphere of shared facts and shared values, comity and good faith. We must argue our positions fervently and never be afraid to compromise. We must assume the best of our fellow man, and always look for the good.

"Until that day comes, we must be unafraid to stand up and speak out as if our country depends on it, because it does. I plan to spend the remaining 14 months of my Senate term doing just that.

"Mr. President, the graveyard is full of indispensable men and women. None of us here is indispensable nor were even the great figures of history who toiled at these very desks, in this very chamber, to shape the country that we have inherited. What is indispensable are the values that they consecrated in Philadelphia and in this place, values which have endured and will endure for so long as men and women wish to remain free.

"What is indispensable is what we do here in defense of those values. A political career does not mean much if we are complicit in undermining these values. I thank my colleagues for indulging me here today.I will close by borrowing the words of President Lincoln, who knew more about healthy enmity and preserving our founding values than any other American who has ever lived. His words from his first inaugural were a prayer in his time and are now no less in ours."We are not enemies, but friends. We must not be enemies. Though passion may have strained, it must not break the bonds of our affection. The mystic chords of memory will swell when again touched, as surely as they will be, by the better angels of our nature."Thank you, Mr. President. I yield the floor."

Mr. McCAIN: "Mr. President: I've stood in this place many times and addressed as president many presiding officers. I have been so addressed when I have sat in that chair, as close as I will ever be to a presidency.

"It is an honorific we're almost indifferent to, isn't it. In truth, presiding over the Senate can be a nuisance, a bit of a ceremonial bore, and it is usually relegated to the more junior members of the majority.

"But as I stand here today – looking a little worse for wear I'm sure – I have a refreshed appreciation for the protocols and customs of this body, and for the other ninety-nine privileged souls who have been elected to this Senate.

"I have been a member of the United States Senate for thirty years.  I had another long, if not as long, career before I arrived here, another profession that was profoundly rewarding, and in which I had experiences and friendships that I revere. But make no mistake, my service here is the most important job I have had in my life. And I am so grateful to the people of Arizona for the privilege – for the honor – of serving here and the opportunities it gives me to play a small role in the history of the country I love.

"I've known and admired men and women in the Senate who played much more than a small role in our history, true statesmen, giants of American politics. They came from both parties, and from various backgrounds. Their ambitions were frequently in conflict. They held different views on the issues of the day. And they often had very serious disagreements about how best to serve the national interest.

"But they knew that however sharp and heartfelt their disputes, however keen their ambitions, they had an obligation to work collaboratively to ensure the Senate discharged its constitutional responsibilities effectively.  Our responsibilities are important, vitally important, to the continued success of our Republic. And our arcane rules and customs are deliberately intended to require broad cooperation to function well at all. The most revered members of this institution accepted the necessity of compromise in order to make incremental progress on solving America's problems and to defend her from her adversaries.

"That principled mindset, and the service of our predecessors who possessed it, come to mind when I hear the Senate referred to as the world's greatest deliberative body. I'm not sure we can claim that distinction with a straight face today.

187

"I'm sure it wasn't always deserved in previous eras either. But I'm sure there have been times when it was, and I was privileged to witness some of those occasions.

"Our deliberations today – not just our debates, but the exercise of all our responsibilities – authorizing government policies, appropriating the funds to implement them, exercising our advice and consent role – are often lively and interesting. They can be sincere and principled. But they are more partisan, more tribal more of the time than any other time I remember. Our deliberations can still be important and useful, but I think we'd all agree they haven't been overburdened by greatness lately. And right now they aren't producing much for the American people.

"Both sides have let this happen. Let's leave the history of who shot first to the historians. I suspect they'll find we all conspired in our decline – either by deliberate actions or neglect. We've all played some role in it. Certainly I have. Sometimes, I've let my passion rule my reason. Sometimes, I made it harder to find common ground because of something harsh I said to a colleague. Sometimes, I wanted to win more for the sake of winning than to achieve a contested policy.

"Incremental progress, compromises that each side criticize but also accept, just plain muddling through to chip away at problems and keep our enemies from doing their worst isn't glamorous or exciting. It doesn't feel like a political triumph. But it's usually the most we can expect from our system of government, operating in a country as diverse and quarrelsome and free as ours.

"Considering the injustice and cruelties inflicted by autocratic governments, and how corruptible human nature can be, the problem solving our system does make possible, the fitful progress it produces, and the liberty and justice it preserves, is a magnificent achievement.

"Our system doesn't depend on our nobility. It accounts for our imperfections, and gives an order to our individual strivings that has helped make ours the most powerful and prosperous society on earth.  It is our responsibility to preserve that, even when it requires us to do something less satisfying than 'winning.' Even when we must give a little to get a little. Even when our efforts manage just three yards and a cloud of dust, while critics on both sides denounce us for timidity, for our failure to 'triumph.'

"I hope we can again rely on humility, on our need to cooperate, on our dependence on each other to learn how to trust each other again and by so doing better serve the people who elected us. Stop listening to the bombastic loudmouths on the radio and television and the Internet. To hell with them. They don't want anything done for the public good. Our incapacity is their livelihood.

"Let's trust each other. Let's return to regular order. We've been spinning our wheels on too many important issues because we keep trying to find a way to win without help from across the aisle. That's an approach that's been employed by both sides, mandating legislation from the top down, without any support from the other side, with all the parliamentary maneuvers that requires.

"We're getting nothing done. All we've really done this year is confirm Neil

188

Gorsuch to the Supreme Court. Our healthcare insurance system is a mess. We all know it, those who support Obamacare and those who oppose it. Something has to be done. We Republicans have looked for a way to end it and replace it with something else without paying a terrible political price. We haven't found it yet, and I'm not sure we will. All we've managed to do is make more popular a policy that wasn't very popular when we started trying to get rid of it.

"I voted for the motion to proceed to allow debate to continue and amendments to be offered. I will not vote for the bill as it is today. It's a shell of a bill right now. We all know that. I have changes urged by my state's governor that will have to be included to earn my support for final passage of any bill. I know many of you will have to see the bill changed substantially for you to support it.

"We've tried to do this by coming up with a proposal behind closed doors in consultation with the administration, then springing it on skeptical members, trying to convince them it's better than nothing, asking us to swallow our doubts and force it past a unified opposition. I don't think that is going to work in the end. And it probably shouldn't.

"The Obama administration and congressional Democrats shouldn't have forced through Congress without any opposition support a social and economic change as massive as Obamacare. And we shouldn't do the same with ours.

"Why don't we try the old way of legislating in the Senate, the way our rules and customs encourage us to act. If this process ends in failure, which seem likely, then let's return to regular order.

"Let the Health, Education, Labor, and Pensions Committee under Chairman Alexander and Ranking Member Murray hold hearings, try to report a bill out of committee with contributions from both sides. Then bring it to the floor for amendment and debate, and see if we can pass something that will be imperfect, full of compromises, and not very pleasing to implacable partisans on either side, but that might provide workable solutions to problems Americans are struggling with today.

"What have we to lose by trying to work together to find those solutions? We're not getting much done apart. I don't think any of us feels very proud of our incapacity. Merely preventing your political opponents from doing what they want isn't the most inspiring work. There's greater satisfaction in respecting our differences, but not letting them prevent agreements that don't require abandonment of core principles, agreements made in good faith that help improve lives and protect the American people.

"The Senate is capable of that. We know that. We've seen it before. I've seen it happen many times. And the times when I was involved even in a modest way with working out a bipartisan response to a national problem or threat are the proudest moments of my career, and by far the most satisfying.

"This place is important. The work we do is important. Our strange rules and seemingly eccentric practices that slow our proceedings and insist on our cooperation are important. Our founders envisioned the Senate as the more deliberative, careful body that operates at a greater distance than the other body

from the public passions of the hour.

"We are an important check on the powers of the Executive. Our consent is necessary for the President to appoint jurists and powerful government officials and in many respects to conduct foreign policy. Whether or not we are of the same party, we are not the President's subordinates. We are his equal!

"As his responsibilities are onerous, many and powerful, so are ours.  And we play a vital role in shaping and directing the judiciary, the military, and the cabinet, in planning and supporting foreign and domestic policies. Our success in meeting all these awesome constitutional obligations depends on cooperation among ourselves.

"The success of the Senate is important to the continued success of America. This country – this big, boisterous, brawling, intemperate, restless, striving, daring, beautiful, bountiful, brave, good and magnificent country – needs us to help it thrive. That responsibility is more important than any of our personal interests or political affiliations.

"We are the servants of a great nation, 'a nation conceived in liberty and dedicated to the proposition that all men are created equal.' More people have lived free and prosperous lives here than in any other nation. We have acquired unprecedented wealth and power because of our governing principles, and because our government defended those principles.

"America has made a greater contribution than any other nation to an international order that has liberated more people from tyranny and poverty than ever before in history. We have been the greatest example, the greatest supporter and the greatest defender of that order. We aren't afraid. We don't covet other people's land and wealth. We don't hide behind walls. We breach them. We are a blessing to humanity.

"What greater cause could we hope to serve than helping keep America the strong, aspiring, inspirational beacon of liberty and defender of the dignity of all human beings and their right to freedom and equal justice? That is the cause that binds us and is so much more powerful and worthy than the small differences that divide us.

"What a great honor and extraordinary opportunity it is to serve in this body.

"It's a privilege to serve with all of you. I mean it. Many of you have reached out in the last few days with your concern and your prayers, and it means a lot to me. It really does. I've had so many people say such nice things about me recently that I think some of you must have me confused with someone else. I appreciate it though, every word, even if much of it isn't deserved.

"I'll be here for a few days, I hope managing the floor debate on the defense authorization bill, which, I'm proud to say is again a product of bipartisan cooperation and trust among the members of the Senate Armed Services Committee.

"After that, I'm going home for a while to treat my illness. I have every intention of returning here and giving many of you cause to regret all the nice

190

things you said about me. And, I hope, to impress on you again that it is an honor to serve the American people in your company.

"Thank you, fellow senators."

### § 88. RNC Voter Suppression Promotes Public Corruption (¶¶ 1344-1349).

FOF ¶ 1344.   U.S. Constitution, Article VI, clause 3 requires that: "The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States."

FOF ¶ 1345.   5 U.S.C. §3331, relating to "Oath of office" requires that "An individual, except the President, elected or appointed to an office of honor or profit in the civil service or uniformed services, shall take the following oath: "I, AB, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God." This section does not affect other oaths required by law. (Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 424.).

FOF ¶ 1346.   Protecting First Amendment rights is charitable, to prevent corruption since "when election crime exists, public corruption of some form is also usually present. This is so because virtually all election crime is driven by a motive to control governmental power for some corrupt purpose. * * * Most election fraud aims at ensuring that important elected positions are occupied by "friendly" candidates. It occurs most often when the financial stakes involved in who controls public offices are great * *or when illicit activities are being conducted that require protection from official scrutiny." Craig C. Donsanto and Nancy L. Simmons, U.S. Dept. of Justice, *Federal Prosecution of Election Offenses* 2 (7th ed. 2007).

FOF ¶ 1347.   42 U.S.C. 1971(b) now recodified at 52 U.S.C. § 10101(b) "requires proof of two ultimate facts: (1) that there was an intimidation, threat, or coercion, or an attempt to intimidate, threaten or coerce, and (2) that the intimidation was for the purpose of interfering with the right to vote." *United States v. McLeod*, 385 F. 2d 734, 740 (5th Cir. 1967), quoting *United States v. Board of Educ. of Greene County, Mississippi*, 332 F.2d 40, 46 (5th Cir. 1964) (concurring opinion). Acts otherwise legal may violate the statute if they have the proscribed effect and purpose." *United States v. McLeod*, 385 F. 2d 734, 740 (5th Cir. 1967) See also Note, *Private Economic Coercion and the Civil Rights Act of 1957*, 71 Yale L.J. 537 (1962).

FOF ¶ 1348.   While the Civil Rights Act of 1957 was primarily to combat Southern States' racial discrimination, it is not so limited. Chester J. Antieau, *Federal Civil Rights Acts, Civil Practice* (2d ed.1980) § 2 ("According to the language of subsection (a)(1) of § 1971 the right to vote is acknowledged to 'all *citizens*' of the United States who are otherwise qualified to vote,' but subsection (b) protects any '*person*' from intimidation") (emphasis original) and § 3 ("By the very language of § 1971(b), *anyone* who threats, intimidates, coerces or attempts the same is sueable 'whether acting under color of law or otherwise.' Private parties have been held to be proper defendants under § 1971, as amended") (emphasis added) citing *United States v.*

*Katzenbach v. Original Knights of the Klu Klux Klan*, 250 F.Supp. 330 (E.D.La. 1965). And see also Donsanto and Simmons *supra* at 21 ("Many of the Enforcement Acts had broad jurisdictional predicates that allowed them to be applied to a wide variety of corrupt election practices as long as a federal candidate was on the ballot").

FOF ¶ 1349.   Accordingly, any form of "ballot security" or similar euphuisms by the RNC, given the fact pattern the RNC admitted in the U.S. District Court for District of New Jersey proceedings is prima facie a criminal act in violation of the Civil Rights Act of 1957.  Lisa Lerer writes for the *New York Times* the following article "How to Report Voter Intimidation, and How to Spot It" posted November 2, 2018.

"Voter intimidation can include aggressive questioning about people's qualifications to vote, including their citizenship status, criminal record or residency requirements. * * *

"Anyone who tries to "intimidate, threaten, or coerce" individuals to interfere with their right to vote can face up to a year in prison under the federal law against voter intimidation. And such intimidation can take many forms.

"It's a lot easier to explain what it is by general examples, because it's pretty amorphous," said Sophia Lin Lakin, a lawyer with the American Civil Liberties Union's Voting Rights Project. "There's not a lot of specific case law around this."

"According to Ms. Lakin, intimidation can include aggressive questioning about people's qualifications to vote, including their citizenship status, criminal record or residency requirements.

"Spreading false information or posing as an election official can also cross the line, she said, as can unreasonable requests for forms of identification that aren't required by law.

"Intimidation can also include "questioning, challenging, photographing or videotaping" a person at a polling site, "especially under the guise of uncovering illegal voting," according to the office of the United States attorney in Arizona.

**Who is susceptible?**

"Voting rights advocates worry that certain groups are more likely than others to face intimidation.

"Nonnative English speakers, for example, are frequently reported by people who prejudiciously assume them to be noncitizens, Ms. Lakin said. Such voters are allowed to bring translators into the voting booth as long as the translators do not employ the voters or represent them in a union.

"Voters in jurisdictions with close races may also be more likely to encounter intimidation, she said. That goes as well for people of color, particularly those in areas with a history of intimidation and discrimination against nonwhite voters.

**Who can challenge a voter's qualifications?**

"Although intimidation is prohibited, voters may still find their qualifications challenged by certified poll monitors in some states.

"The monitors are typically allowed inside the polling place, but their presence is often regulated with rules governing their training, numbers and authority, according to the A.C.L.U. In many states, they may inspect polling books and challenge the qualifications of voters, but with limits.

"The monitors are usually kept at a distance from the voting booth and are not allowed to interact directly with voters.

"More generally, nearly every state empowers private citizens to challenge voter eligibility on or before Election Day, according to the Brennan Center for Justice at the New York University School of Law. What should you do if your eligibility is challenged?

"In many states, voters whose qualifications are challenged may still cast regular ballots if they give a sworn statement to a poll worker that they meet the qualifications, according to the A.C.L.U. In virtually all cases, voters may also request a provisional ballot. How should you deal with intimidation if it occurs?

"Anyone threatened with violence should call 911. Poll workers, the local authorities and local and state election officials may also be able to help immediately address intimidation, provided they are not culpable themselves.

"While the federal government is not the ally of voting rights advocates that it was during the Obama administration, individuals may report intimidation by filing voting complaints with the Justice Department's Civil Rights Division by calling 800-253-3931, emailing voting.section@usdoj.gov or by submitting an online form. The Justic Department is also proactively monitoring elections in 35 jurisdictions in 19 states.

"Voters can also report intimidation and get advice from a series of numbers associated with the nonpartisan Election Protection coalition. The main number, 866-OUR-VOTE, is administered by the Lawyers' Committee for Civil Rights Under Law. The coalition also has lines available for Spanish-speaking, Arabic-speaking and Asian-American voters."

### § 89. Trump's Pathological Lying Violate Oath of Office (¶¶ 1350-1373).

FOF ¶ 1350.  Demonstration of intolerance for integrity and embracement of political corruption is demonstrated by Donald Trump.

FOF ¶ 1351.  In the 466 days since he took the oath of office, Trump has made 3,001 false or misleading claims, according to the online The Fact Checker's database that analyzes, categorizes and tracks every suspect statement uttered by Trump. That's an average of nearly 6.5 claims a day.

FOF ¶ 1352.  When The Fact Checker first started its project for Trump's first 100 days, he averaged 4.9 claims a day. This average number of claims has been creeping up. Trump has a proclivity to repeat, over and over, many of his false or misleading

statements.

FOF ¶ 1353.   Fact Checker counted at least 113 claims that the president has repeated at least three times, some with breathtaking frequency.

FOF ¶ 1354.   The Brookings Institute notes historically that "most modern presidents have told lies for a variety of reasons, from legitimate lies concerning national security, to trivial misstatements, to shading the truth, to avoiding embarrassment, to serious lies of policy deception. However, when a president continues to insist that his previous false statements are true, the institutions of government become corroded and democracy is undermined." In addition to Fact Checker, the *New York Times* and the *Washington Post* also keep account of Trump's lies.

FOF ¶ 1355.   "But aside from volume, Trump's lies differed significantly from those of previous presidents. Some of his most frequent lies are bragging about his achievements in ways that are demonstrably untrue and contrary to well-known and accepted facts. For example Trump claimed that he had his picture on the cover of *Time* Magazine more than any other person; that he signed more bills than any other president in his first six months in office; that the crowd at his inauguration was larger than Obama's; that he had the largest number of electoral votes since Reagan."

FOF ¶ 1356.   We concur with James P. Pfiffner, University Professor in the Schar School of Policy and Government at George Mason University, who wrote for the Brookings Institute April 13, 2018, that Trump's "lies undermine public confidence in President Trump and American government, increasing public cynicism." Brookings Institute, *id.* "But these falsehoods, as bad as they are, are not as insidious as the repetition of false statements with important political and policy implications." *Id.*

FOF ¶ 1357.   "Whether consciously intended or not, Trump's policy and political lies can have a significant impact on public opinion, particularly with those who are favorably disposed toward him." *Id.*

FOF ¶ 1358.   "Systematic research in psychology and political science has demonstrated that once "misinformation" is initially encoded in a person's mind, it is very difficult to change perceptions through credible corrections. In fact, attempted corrections often reinforce the initial misinformation." *Id.*

FOF ¶ 1359.   This crisis is exacerbated by the fact that the extremists supporting Trump rely on media entertainment outlets, such as "Fox & Friends" that serve as an "echo-chamber" for Trump's lies.

FOF ¶ 1360.   More news today is segmented into silos, than for example, during the Watergate crisis, hence we today do not have the institutional safety net which existed in the 1970s.

FOF ¶ 1361.   Trump's insistence on the truth of his lies and deceptions is nothing more than a form of bullying, demonstrating he can exert power over others simply by lying.

FOF ¶ 1362.   The Brookings Institute labels this insistence on lying as the Humpty Dumpty syndrome, per Lewis Carroll's story, *Through the Looking Glass*. (Humpty Dumpty: "When I use a word, it means just what I choose it to mean—neither more nor less." Alice: "The question is whether you can make words mean so many different things." Humpty Dumpty: "The question is which is to be master—that's all.").

194

FOF ¶ 1363.   We prefer to label this as Kayfabe, which in Vaudeville promotions of what is mistakenly referred to as "professional wrestling," is the portrayal of staged events within the industry as "real" or "true." specifically the portrayal of competition, rivalries, and relationships between participants as being genuine and not of a staged or predetermined nature of any kind. In other words, the convention of presenting staged performances as genuine or authentic.

FOF ¶ 1364.   Trump is intimately familiar with Kayfabe, as he is closely aligned with the lead vaudeville promoter, Vince McMahon, and even nominated McMahon's wife as Administrator of the Small Business Administration, after being rejected twice by Connecticut voters for the U.S. Senate.

FOF ¶ 1365.   As the Brookings Institute properly warns: "Trump's refusal to admit the truth of widely accepted facts corrodes political discourse and is consistent with the practice of many authoritarian leaders. The assertion of the power to define reality is destructive of democratic governance, in part because many people believe him and are not amenable to contrary evidence." *Id.*

FOF ¶ 1366.   "Even though his narcissistic lies are detrimental to the democratic process, Trump's continued adherence to demonstrably false statements about politics and policy strikes at the very heart of democracy and the whole project of enlightenment epistemology. If there are no agreed upon facts, then it becomes impossible for people to make judgments about their government or hold it accountable." *Id.*

FOF ¶ 1367.   Harvard Professors Steven Levitsky and Daniel Ziblatt, who are renown political scientists specializing in how democracies decay and die, have compiled in *How Democracies Die* (2018) four warning signs to determine if a political leader is a dangerous authoritarian:

FOF ¶ 1368.   The leader shows only a weak commitment to democratic rules.

FOF ¶ 1369.   He or she denies the legitimacy of opponents. He or she tolerates violence.

FOF ¶ 1370.   He or she shows some willingness to curb civil liberties or the media.

FOF ¶ 1371.   "With the exception of Richard Nixon, no major-party presidential candidate met even one of these four criteria over the last century." *Id* However, "Donald Trump met them all." *Id.*

FOF ¶ 1372.   As Professors Levitsky and Ziblatt note the public presumes the threat to democracies comes from coups or violent revolutions, but the reality is, as proven time after time in the past several years, democracies are more likely to die "at the hands of insiders who gain power initially through elections. That's what happened, to one degree or another, in Russia, the Philippines, Turkey, Venezuela, Ecuador, Hungary, Nicaragua, Sri Lanka, Ukraine, Poland and Peru."

FOF ¶ 1373.   "Trump, the chipping away at the integrity of our institutions and norms does worry me. Levitsky and Ziblatt warn of the unraveling of democratic norms —norms such as treating the other side as rivals rather than as enemies, condemning violence and bigotry, and so on. This unraveling was underway long before Trump (Newt Gingrich nudged it along in the 1990s), but Trump accelerated it," asserts Nicholas Kristof January 10, 2018 in the *New York Times*.

195

### § 90. GOP Acquiescence of Trump's Crimes Proves Freeman (¶ 1374).

FOF ¶ 1374.   The adamant failure of GOP House Speaker Paul Ryan or Senate Republican Leader Mitch McConnell's acquiescence of Trump's mendacity merely confirms what Professor Freeman argues, that all Republicans are lickspittle, being fully obsequious to Trump and his handlers.

### § 91. Historical Trends Suggest Future GOP Marginality (¶¶ 1375-1432).

FOF ¶ 1375.   Professors Burnham, Sandquist and Weed provide insight as to the collapse of the Republican Party starting in 1932:

FOF ¶ 1376.   "The dominant paradigm in theories of party competition is the Downsian model [Anthony Downs, *An Economic Theory of Democracy* (1957) that] formulates explanations for party behavior that can be used to predict party responses to the conditions of partisan realignment. He sees political parties as groups of rational individuals seeking to advance private ends by influencing the policy-making process. To maximize election gains, a party would alter its appeals in response to changes in policy preferences by the electorate. Downs's assumption is that parties are rational actors, designing electoral strategies to maximize electoral gains.

FOF ¶ 1377.   Historically based descriptions of party behavior during the early stages of realignment contrast with the Downsian view. Realignment theorists, [i.e. Walter Dean Burnham, *Critical Elections and the Mainsprings of American Politics* 7 (1969); James L. Sundquist, *Dynamics of the Party System: Alignment and Realignment of Political Parties in the United States* 290 (1973)] have observed increased ideological polarization between major parties during periods of partisan realignment.

FOF ¶ 1378.   During such periods, they observe that the movement of the minority party to a position of polar opposition to the innovations of the majority party has been an essential step in the successful consummation of political realignment. For Downs, this movement would seem to be irrational.

FOF ¶ 1379.   The strict logic of party competition should lead parties to give up more and more of their own preferences in order to maximize their electoral strength. In short, rapid convergence should occur. * * * The behavior of the Republican party in the 1930s [contradicts Downs because w]hen confronted with a nationwide surge to the left during the period from 1930 through 1936, the Republicans [didn't] move[ ] to the political left, or at least much closer to the center, in order to maximize vote-gathering capacity.

FOF ¶ 1380.   Instead, [the dominant factions of] the party had moved from an unwillingness to criticize many New Deal measures to the view that the party's most advantageous electoral course was not convergence, but ideological criticism of the New Deal. The effect of this was to minimize electoral appeal and doom the Republicans to a minority status that even now has not been wholly overcome Clyde D. Wee, *What Happened to the Republicans in the 1930s: Minority Party Dynamics during Political Realignment*, POLITY, Vol. 22, No. 1 (Autumn, 1989) at 5-6.

FOF ¶ 1381.   The political realignment of the 1930s produced a particularly acute polarization of activists and interest groups between the two major parties. The effect of such elite polarization during periods of accelerated social change is accorded minimal

attention in rational party models, yet forms an indispensable component of an explanation of party dynamics during the New Deal period. *Id.* at 22.

FOF ¶ 1382.  *Contemporary Commentators Concur.* Bruce Bartlett, a leading economist wrote in *Forbes* that: "[When] Democrats finally accepted that applying ideological litmus tests [were] self-defeating [they recaptured the White House and Congress]. If some moderate or conservative wanted to run in a district that would only elect a moderate or conservative, then it was stupid to insist that they endorse every liberal item in the Democratic agenda. Moderates and conservatives were permitted to dissent from the party line on issues such as gun control if that was what it took to win.

FOF ¶ 1383.  "This "big tent" approach was highly successful and greatly helped Democrats retake control of Congress in 2006. What probably hurt congressional Republicans the most, however, was their down-the-line support for every action by George W. Bush, no matter how ill-conceived, poorly implemented or at odds with the party's basic philosophy.

FOF ¶ 1384.  As a consequence, the Republican brand was destroyed.

FOF ¶ 1385.  The party is now widely viewed as corrupt, incompetent, ideologically rigid and out of step with the American mainstream.

FOF ¶ 1386.  Academics have long suggested that the GOP should be engaging in self-examination, developing an agenda that addresses the real problems faced by Americans and reaching out to the millions of voters who have left the GOP in recent years.

FOF ¶ 1387.  "Instead, Republicans are pushing out the last of the party's moderates as if that will somehow make them more popular with the very moderates whose votes are essential if they are to regain power. I think Republicans desperately need a group that will do for them what the DLC did for the Democrats. Unfortunately, I see no such organization or any resources available for those that might start one. Those with such resources are either turned off by Republican pandering to its right wing and have left the party or they agree with it. Either way, *no one in the Republican Party seems to have any interest in victory, and they prefer to wear defeat as some kind of badge of honor*. Eventually, Republicans will tire of being out of power just as Democrats did, and they will do what it takes to win." Bruce Bartlett, "The Dismal Future of the GOP," *Forbes* (June 1, 2009).

FOF ¶ 1388.  *Resisting Web 2.0*. While Freeman could not possibly anticipate in 1988 the advent of the Internet and its powerful social-networking components, she did adequately forecast the GOP's inevitable response to Web 2.0 and the resulting consequences. "Should the Republican party strengthen itself to the point of becoming the majority party it will attract many newcomers, including organized groups who have not previously thought it worth their time to join. It will discover that the price of success is that everyone wants a share, even when they have not made a contribution. Coping with increased demands, rapid expansion, and inadequate assimilation has destroyed many developing organizations. Styles and approaches to problems that are compatible with being a minority faction or underdog are not appropriate to being a majority party. Whether the party can anticipate and prepare for these problems sufficiently to preclude them, remains to be seen." *Id.* at 356.

FOF ¶ 1389.  *GOP Losing Favor with Voters as Demonstrated by Registration.* According to the

197

Pew Charitable Trust: "One of the more interesting changes in U.S. politics in recent years has been the increasingly parliamentary nature of voting behavior. Fewer people are straying beyond their party affiliations, we are seeing more straight-ticket voting, and the characteristics of individual candidates mean less than ever."  In a pre-2016 Election analysis, the Pew Charitable Trust found:

(1)    "The fundamental demographic changes taking place in the country – an aging population, growing racial and ethnic diversity and rising levels of education – have reshaped both party coalitions. But these changes, coupled with patterns of partisan affiliation among demographic groups, have influenced the composition of the two parties in different ways. The Democratic Party is becoming less white, less religious and better-educated at a faster rate than the country as a whole, while aging at a slower rate. Within the GOP the pattern is the reverse: Republican voters are becoming more diverse, better-educated and less religious at a slower rate than the country generally, while the age profile of the GOP is growing older more quickly than that of the country.

(2)    "The Republican Party – once more youthful than the Democratic Party – has aged rapidly over the past 24 years. In 1992, far more GOP voters were under the age of 50 (61%) than age 50 and older (38%). Today, fully 58% of Republican voters are 50 and older while the share under 50 has declined to 41%. Among Democratic voters, 48% are 50 and older, while 51% are under 50. The rate of aging within the Democratic Party since 1992 (when 57% were under 50 and 42% were 50 and older) has been much less steep than that seen within the GOP.

(3)    "Americans overall are better educated than they were a quarter-century ago, and this change also has had a profound impact on the composition of the two parties. The share of voters who have a college degree or more education has increased by 10 percentage points since 1992, from 23% to 33%. Better-educated voters are increasingly identifying as Democrats and expressing liberal attitudes across a range of issues.

(4)    "Since 1992, the share of Democratic and Democratic-leaning registered voters with at least a college degree has increased sharply, from 21% to 37%. Among Republicans, 31% have at least a college degree, up only slightly from 28% in 1992. As a consequence, a greater proportion of Democrats than Republicans now have a college degree or more education.

(5)    "The Republican Party has been able to offset Democratic trends in affiliation among many growing demographic groups by improving its standing among older voters – who also make up a larger share of the electorate today – as well as among white voters, men and those with lower levels of education. This has been especially apparent during Barack Obama's presidency.

(6)    "Both groups of older voters are now more Republican than eight years ago. Today, voters 50-64 tilt Republican (48% identify with the GOP or lean Republican, while 46% identify with the Democratic Party or lean Democratic). Republicans hold a wide, 51% to 42% lead among voters 65 and older – an edge that is nine points greater than it was in 2008.

(7)    "White voters – who were roughly divided in their partisan leanings eight years ago – are now much more likely to identify as Republican or lean Republican

(54%) than to say they identify as Democrats or lean Democratic (39%).

(8)     "And voters with no college experience – long a reliably Democratic bloc – are now split in their partisan preferences: 46% identify as Republican or lean Republican, while an identical 46% identify as Democrats or lean Democratic.

(9)     "Some of the sharpest movement toward the GOP has come among less educated and older whites. Whites with no college experience have become 14 points more likely to affiliate with the GOP since 2008, including a six-point shift over the last four years.

(10)    "White voters age 65 and older are now 13 points more likely to identify as Republican or lean Republican than they were "eight years ago.

(11)    "While the GOP has made gains overall and among key groups, there is no sign that Democratic affiliation is waning among the party's core constituents. College graduates, blacks and Hispanics are as likely to identify as Democrats or lean Democratic today as they were four or eight years ago.

(12)    "And while older voters have moved increasingly toward the GOP in the Obama era, young voters remain overwhelmingly Democratic in their partisan affiliation. Today, nearly six in-ten voters younger than 30 identify as Democrats or lean Democratic (59%), which is little changed from 2008 (60%)."

FOF ¶ 1390.    As we previously quoted Thomas E. Mann and Norman J. Ornstein: "The GOP has become an insurgent outlier in American politics. It is ideologically extreme; scornful of compromise; unmoved by conventional understanding of facts, evidence and science; and dismissive of the legitimacy of its political opposition."

FOF ¶ 1391.    When one party moves this far from the mainstream, it makes it nearly impossible for the political system to deal constructively with the country's challenges.

FOF ¶ 1392.    The RNC's self-demise is evident in two recent primaries, where a white supremacist Corey Steward, won the Republican nomination for the U.S. Senate, while U.S. Rep. Mark Stanford, the former governor of South Carolina, was ousted by a Trump supporter, notwithstanding his own personal baggage. As the *New York Times* put it, "Both results illustrated that fealty to Mr. Trump is paramount on the right."

FOF ¶ 1393.    The RNC is facilitating the transformation of the Republican Party from a principled political entity to merely a Trump cult, with no more adherence to principle than, for example Rev. Jim Jones, who led a mass suicide November 18, 1978 in Jonestown, Guyana; or the Charles Manson criminal cult.

FOF ¶ 1394.    The RNC is likewise facilitating it's self-immolation while Trump is destabilizing the Presidency. Using Trump's own parlance, he is a "Fake President." However amusing his antics may be, his stewardship of the Presidency is not.

FOF ¶ 1395.    Academics and non-partisan political observers have enumerated multiple warning signs of "dictatorship." Summed up, these warning signs are as follows:

(1)     Systematic efforts to intimidate the media.

199

    (2)    Building an official cult-based media network.

    (3)    Politicizing the civil service, military, National Guard, or the domestic security agencies.

    (4)    Using government surveillance against domestic political opponents.

    (5)    Using state power to reward corporate backers and punish opponents.

    (6)    Stacking the Supreme Court and Judicial Branch.

    (7)    Enforcing the law for only one side.

    (8)    Rigging the political system.

    (9)    Fearmongering/ appealing to racial and/or xenophobia.

    (10)  Demonizing/ delegitimizing the political opposition.

FOF ¶ 1396.    Harvard Professors Steven Levitsky and Daniel Ziblatt in their new treatise *How Democracies Die*, break it down into four points:

    (1)    The leader shows only a weak commitment to democratic rules.

    (2)    He denies the legitimacy of opponents.

    (3)    He tolerates violence.

    (4)    He shows some willingness to curb civil liberties or the media.

FOF ¶ 1397.    The assessment about Trump's danger is adequately summed by former Secretary of State Madeline Albright in an April 6, 2018 *New York Times* op/ed article.

FOF ¶ 1398.    "On April 28, 1945 — 73 years ago — Italians hung the corpse of their former dictator Benito Mussolini upside down next to a gas station in Milan. Two days later, Adolf Hitler committed suicide in his bunker beneath the streets of war-ravaged Berlin. Fascism, it appeared, was dead.

FOF ¶ 1399.    "To guard against a recurrence, the survivors of war and the Holocaust joined forces to create the United Nations, forge global financial institutions and — through the Universal Declaration of Human Rights — strengthen the rule of law. In 1989, the Berlin Wall came down and the honor roll of elected governments swelled not only in Central Europe, but also Latin America, Africa and Asia. Almost everywhere, it seemed, dictators were out and democrats were in. Freedom was ascendant.

FOF ¶ 1400.    "Today, we are in a new era, testing whether the democratic banner can remain aloft amid terrorism, sectarian conflicts, vulnerable borders, rogue social media and the cynical schemes of ambitious men. The answer is not self-evident. We may be encouraged that most people in most countries still want to live freely and in peace, but there is no ignoring the storm clouds that have gathered. In fact, fascism — and the tendencies that lead toward fascism — pose a more serious threat now than at any time since the end of World War II.

FOF ¶ 1401.   "Warning signs include the relentless grab for more authority by governing parties in Hungary, the Philippines, Poland and Turkey — all United States allies. The raw anger that feeds fascism is evident across the Atlantic in the growth of nativist movements opposed to the idea of a united Europe, including in Germany, where the right-wing Alternative für Deutschland has emerged as the principal opposition party. The danger of despotism is on display in the Russia of Vladimir Putin — invader of Ukraine, meddler in foreign democracies, accused political assassin, brazen liar and proud son of the K.G.B. Putin has just been re-elected to a new six-year term, while in Venezuela, Nicolás Maduro, a ruthless ideologue, is poised to triumph in sham balloting next month. In China, Xi Jinping has persuaded a docile National People's Congress to lift the constitutional limit on his tenure in power.

FOF ¶ 1402.   "[T]he possibility that fascism will be accorded a fresh chance to strut around the world stage is enhanced by the volatile presidency of Donald Trump."

FOF ¶ 1403.   Trump's attack on the Press, is equally disturbing. As reported by *Politico*'s Michael Grunwald

FOF ¶ 1404.   "President Donald Trump's attacks on the mainstream media may be rooted in statistical reality: An extensive review of subscription data and election results shows that Trump outperformed the previous Republican nominee, Mitt Romney, in counties with the lowest numbers of news subscribers, but didn't do nearly as well in areas with heavier circulation.

FOF ¶ 1405.   "POLITICO's findings — which put Trump's escalating attacks on the media in a new context — were drawn from a comparison of election results and subscription information from the Alliance for Audited Media, an industry group that verifies print and digital circulation for advertisers. The findings cover more than 1,000 mainstream news publications in more than 2,900 counties out of 3,100 nationwide from every state except Alaska, which does not hold elections at the county level.

FOF ¶ 1406.   "The results show a clear correlation between low subscription rates and Trump's success in the 2016 election, both against Hillary Clinton and when compared to Romney in 2012. Those links were statistically significant even when accounting for other factors that likely influenced voter choices, such as college education and employment, suggesting that the decline of local media sources by itself may have played a role in the election results.

FOF ¶ 1407.   "That gives new force to the widely voiced concerns of news-industry professionals and academicians about Trump's ability to make bold assertions about crime rates, unemployment and other verifiable facts without any independent checks. Those concerns, which initially were raised during the campaign, were largely based on anecdotes and observations. POLITICO's analysis suggests that Trump did, indeed, do worse overall in places where independent media could check his claims.

FOF ¶ 1408.   Nicholas Kristof wrote in the January 10, 2018 *New York Times* that "Two political scientists specializing in how democracies decay and die have compiled four warning signs to determine if a political leader is a dangerous authoritarian:

FOF ¶ 1409.   1. The leader shows only a weak commitment to democratic rules. 2. He or she denies the legitimacy of opponents. 3. He or she tolerates violence. 4. He or she shows some willingness to curb civil liberties or the media.

FOF ¶ 1410.   "A politician who meets even one of these criteria is cause for concern," Steven Levitsky and Daniel Ziblatt, both professors at Harvard, write in their important new book, "How Democracies Die," which will be released next week.

FOF ¶ 1411.   "With the exception of Richard Nixon, no major-party presidential candidate met even one of these four criteria over the last century," they say, which sounds reassuring. Unfortunately, they have one update: "Donald Trump met them all."

FOF ¶ 1412.   "We tend to assume that the threat to democracies comes from coups or violent revolutions, but the authors say that in modern times, democracies are more likely to wither at the hands of insiders who gain power initially through elections. That's what happened, to one degree or another, in Russia, the Philippines, Turkey, Venezuela, Ecuador, Hungary, Nicaragua, Sri Lanka, Ukraine, Poland and Peru.

FOF ¶ 1413.   Venezuela was a relatively prosperous democracy, for example, when the populist demagogue Hugo Chávez tapped the frustrations of ordinary citizens to be elected president in 1998.

FOF ¶ 1414.   A survey that year found that the Venezuelan public overwhelmingly believed that "democracy is always the best form of government," with only one-quarter saying that authoritarianism is sometimes preferable. Yet against their will, Venezuelans slid into autocracy.

FOF ¶ 1415.   "This is how democracies now die," Levitsky and Ziblatt write. "Democratic backsliding today begins at the ballot box."

FOF ¶ 1416.   Likewise, the authors say, no more than 2 percent of Germans or Italians joined the Nazi or Fascist Parties before they gained power, and early on there doesn't seem to have been clear majority support for authoritarianism in either Germany or Italy. But both Hitler and Mussolini were shrewd demagogues who benefited from the blindness of political insiders who accommodated them.

FOF ¶ 1417.   Let me say right here that I don't for a moment think the United States will follow the path of Venezuela, Germany or Italy. Yes, I do see in Trump these authoritarian tendencies — plus a troubling fondness for other authoritarians, like Vladimir Putin in Russia and Rodrigo Duterte in the Philippines — but I'm confident our institutions are stronger than Trump.

FOF ¶ 1418.   It's true that he has tried to undermine institutions and referees of our political system: judges, the Justice Department, law enforcement agencies like the F.B.I., the intelligence community, the news media, the opposition party and Congress. But to his great frustration, American institutions have mostly passed the stress test with flying colors.

FOF ¶ 1419.   "President Trump followed the electoral authoritarian script during his first year," Levitsky and Ziblatt conclude. "He made efforts to capture the referees, sideline the key players who might halt him, and tilt the playing field. But the president has talked more than he has acted, and his most notorious threats have not been realized. … Little actual backsliding occurred in 2017."

FOF ¶ 1420.   That seems right to me: The system worked. And yet.

FOF ¶ 1421.   "For all my confidence that our institutions will trump Trump, the chipping away at

the integrity of our institutions and norms does worry me. Levitsky and Ziblatt warn of the unraveling of democratic norms — norms such as treating the other side as rivals rather than as enemies, condemning violence and bigotry, and so on. This unraveling was underway long before Trump (Newt Gingrich nudged it along in the 1990s), but Trump accelerated it.

FOF ¶ 1422.   "It matters when Trump denounces the "deep state Justice Department," calls Hillary Clinton a "criminal" and urges "jail" for Huma Abedin, denounces journalists as the "enemy of the American people" and promises to pay the legal fees of supporters who "beat the crap" out of protesters. With such bombast, Trump is beating the crap out of American norms.

FOF ¶ 1423.   I asked the authors how we citizens can most effectively resist an authoritarian president. The answer, they said, is not for Trump opponents to demonize the other side or to adopt scorched-earth tactics, for this can result in "a death spiral in which rule-breaking becomes pandemic." It's also not terribly effective, as we've seen in Venezuela.

FOF ¶ 1424.   Rather, they suggested protesting vigorously — but above all, in defense of rights and institutions, not just against the ruler. They emphasized that it's critical to build coalitions, even if that means making painful compromises, so that protests are very broadly based.

FOF ¶ 1425.   "If these actions are limited to blue-state progressives, the risk of failure and/or deeper polarization is very high," Levitsky told me in an interview. "Extraordinary measures are sometimes necessary to defend democracy, but they should rest on extraordinary coalitions — coalitions that include business leaders, religious leaders and crucially, as many conservatives and Republicans as possible."

FOF ¶ 1426.   *Congressional Roll Call* in a June 13, 2018 analysis by veteran observer John T. Bennett, likewise notes how Trump is not merely transforming, but denigrating the once inviolate office of the Presidency. "This White House certainly hasn't done things with the basic level of grace and dignity we're used to," Grumet said. "Whatever you feel about Ronald Reagan or George W. Bush or Bill Clinton or Barack Obama, there was a sense the presidency was a real jewel the nation shared together and should be treated as such."

FOF ¶ 1427.   "Barbara Perry, presidential studies director at the University of Virginia's Miller Center, says Trump has put "the presidency at a crossroads," adding: "One on hand, there's pulling out of all kinds of international agreements and shaking up Washington — things he promised to do. On the other hand, a lot of the things this president has done is like driving the Constitution and laws into a ditch."

FOF ¶ 1428.   "He does these kinds of things every day. I hope we never get used to it," Cardin said. "I really do believe that President Trump represents an aberration of the temperament, quality and concerns of someone who will occupy the office next, whether that be a Democrat or a Republican. I hope this is just something we have to live through, but it does not have a permanent impact on the conduct of every president of the United States."

FOF ¶ 1429.   Demonstrative of Trump's disregard for the rule of law is evidenced by the New York State Attorney General suing Trump, his adult children and the Donald J. Trump Foundation and its directors, accusing the charity of unlawfully coordinating

with Mr. Trump's presidential campaign.

FOF ¶ 1430. The lawsuit also accuses Mr. Trump of using the foundation's charitable assets to pay his legal bills and promote Trump businesses. The attorney general's office seeks to dissolve the foundation and asks for $2.8 million in restitution.

FOF ¶ 1431. "As our investigation reveals, the Trump Foundation was little more than a checkbook for payments from Mr. Trump or his businesses to nonprofits, regardless of their purpose or legality," state Attorney General Barbara Underwood said in a statement. "This is not how private foundations should function and my office intends to hold the Foundation and its directors accountable for its misuse of charitable assets."

FOF ¶ 1432. The Verified Petition's opening statement asserts: "For more than a decade, the Donald J. Trump Foundation has operated in persistent violation of state and federal law governing New York State charities. This pattern of illegal conduct by the Foundation and its board members includes improper and extensive political activity, repeated and willful self-dealing transactions, and failure to follow basic fiduciary obligations or to implement even elementary corporate formalities required by law."

### § 92. RNC's Consciousness of Guilt (¶¶ 1433-1458).

FOF ¶ 1433. "Consciousness of guilt evidence . . . , including . . . destruction or concealment of evidence[,]" is significant because 'the particular behavior provides clues to the [actor's] state of mind[.]' *Decker v. State*, 408 Md. 631, 640, 641, 971 A.2d 268, 274 (2009).

FOF ¶ 1434. This is hardly a novel concept; numerous commentators have expressed similar sentiments. Wigmore, for example, has explained the significance of the destruction of evidence as follows:

FOF ¶ 1435. "It has always been understood — the inference, indeed, is one of the simplest in human experience — that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause." 2 John Henry Wigmore, *Evidence in Trials at Common Law* § 278 (Chadbourn rev. 1979).

FOF ¶ 1436. Former Los Angeles Police Detective Clark Baker posted online his analysis of consciousness of guilt. "These behavioral attributes [regarding consciousness of guilt of criminal defendants] apply to individuals, corporations and governments." "For example, no one expects the National Aeronautics and Space Administration (NASA) to dedicate millions of dollars to discredit flat-earthers. NASA does not dispatch its CEO or chief engineers to defend itself from them, nor does it pressure news agencies to spike stories and interviews of those who question the curvature of the Earth. Credible agencies invite inquiry. At the same time, individuals and agencies that assign millions of dollars to use pressure, intimidation and character assassination to defend their research, policies and procedures should be viewed with the same skepticism that Americans share for OJ Simpson and Casey Anthony – and for the same reasons."

FOF ¶ 1437.   Given, particularly in regard to the RNC's commission of fraud on the court, it is proper to evoke *Falsus in Uno, Falsus in Omnibus* (False in One, False in All) regarding the credibility of the RNC's acts overall.

FOF ¶ 1438.   Without going into extensive detail, the matter relating to the fraud on the court arising out of the misconduct of both RNC counsel and the original Chancellor sitting in the first award confirmation matter, suffice it to say the Chancellor's failure was his violation of *Secundum allegata et probata*. The Chancellor, aided by RNC Counsel made up fictional facts to justify his decision to deny confirmation, all without *first*, the RNC answering the petition to confirm or deny the petition's allegata, thus the issues were never joined, and secondly, finding facts without holding a hearing, admitting evidence or hearing witnesses by testimony or affidavit. The Chancellor denied the Trustee, the Settlor and even the Attorney General of Pennsylvania multiple evidentiary presumptions in order to fix the verdict in favor of the RNC. These presumptions include the following:

(a)   The Return of Service evokes the Presumption of Receipt, which was not rebutted by the RNC. *Higgens Lumber Co. v. Marucca*, 159 Pa.Super. 405, 407, 48 A.2d 48, 49 (1946). That service was by certified mail, return receipt on both RNC headquarters and the law office of the RNC chairman, "presumes conclusively that the person to whom it was addressed actually received it." *In re Anderson*, 372 Pa. 351, 353, 93 A.2d 480, 481 (1953).

(b)   It is presumed that each of the Trustees obeys the law and performs his legal duties and obligations thereunder. *Waters v. New Amsterdam Cas. Co.*, 393 Pa. 247, 254, 144 A.2d 354, 357 (1958). Unless the presumption of regularity is rebutted, it is conclusive. *Kennedy v. Upper Milford Twp. Zoning Hearing Board*, 575 Pa. 105, 135, 834 A. 2d 1104, 1123 (2003).

(c)   It is presumed each of the co-Trustees properly performed their duties as arbitrator. *Foley Bros., Inc. v. Commonwealth*, 400 Pa. 584, 592, 163 A.2d 80, 85 (1960).

(d)   It is presumed RNC and its counsel know terms of the Trust Agreement. *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983); *Estate of Brant*, 463 Pa. 230, 235, 344 A.2d 806, 809 (1975); *Montgomery v. Levy*, 406 Pa. 547, 550, 177 A.2d 448, 450 (1962).

(e)   It is presumed the RNC (and counsel) presumed to know Trustee's legal powers and authority. *Delaware Valley Factors, Inc. v. Ronca*, 442 Pa.Super 609, 612, 660 A.2d 623, 625 (1995); *Will v. Killmer*, 39 Pa. D. & C. 3d 627, 630 (Bucks Co. C.P. 1986).

(f)   It is presumed that the Attorney General, in performing his duties pursuant to his power as *parens patriae*, in supervising charitable trusts, *In re Estate of Pruner*, 390 Pa. 529, 531, 136 A.2d 107, 109 (1957), representing general public, *Commonwealth v. Barnes Foundation*, 398 Pa. 458, 159 A.2d 500 (1960), in accordance with her duties of acting for the public good, she acts only in the public interest, and reaches her decisions in a legal way after proper investigation. *Wilson v. City of New Castle*, 301 Pa. 358, 365, 152 A. 102, 104 (1930).

FOF ¶ 1439.   Moreover, an actor's silence in the face of accusation by someone other than a law

enforcement officer may be admissible as an adoptive admission if the statement was made in the actor's presence, the actor heard and understood the statement, the circumstances called for a denial, the actor the opportunity to deny the statement, and the actor did not.

FOF ¶ 1440.   Repeatedly, in our legal papers the RNC and its counsel have been accused of committing a fraud on the court, yet at no time has the RNC counsel denied or refuted such allegations.

FOF ¶ 1441.   Repeatedly, in our legal papers, the RNC and its counsel have been directed to specific falsehoods of material fact which they have made, yet at no time has the RNC Counsel denied or refused such falsehoods.

FOF ¶ 1442.   In our legal papers in the U.S. District Court for the District of Columbia, we accused the RNC counsel of acting without authority by the RNC, yet at no time has the RNC Counsel denied or refused such charge.

FOF ¶ 1443.   In the same legal papers, we furthermore accused the RNC counsel of suffering a conflict of interest in representing the RNC while representing the PA State Republican Committee, in violation of Pa. Rules of Professional Conduct Rule 1.7(a), yet at no time has the RNC Counsel denied or refused such charge.

FOF ¶ 1444.   Pa. Rules of Professional Conduct Rule 1.7(a) states that an irrevocable conflict of interest occurs when (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer. The conflict of interest cannot be waived by either the RNC or the PA State Republican Committee because under Pa. RPC 7.1(b)(3) the representation involves assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

FOF ¶ 1445.   Additionally, consciousness of guilt is evidenced by the party's efforts to setup strawman arguments so as to divert attention from the merits. *Commonwealth v. Pestinikas*, 421 Pa. Super. 371, 387, 617 A.2d 1339, 1348 (Pa.Super. 1992) ("[E]vidence of the misconduct of a party in connection with the trial is admissible as tending to show that the party guilty of the misconduct is unwilling to rely on the truth of his cause, or is conscious that it is an unjust one"); see also Leonard Packel and Anne Poulin, *Pennsylvania Evidence*, Ch. IV, § 423 (1987) at p. 277, quoting *McHugh v. McHugh*, 186 Pa. 197, 203, 40 A. 410, 412 (1898).  In *Pestinikas*, evidence defendants sought to exert political pressure to influence judicial proceedings was held to be admissible as consciousness of guilt.

FOF ¶ 1446.   The Attorney General of Pennsylvania informed the Trustee that RNC Counsel was attempting to put the Trustee in false light, if not outright slander, by significantly mischaracterizing and misrepresenting that the Trustee, initially as a journalist, and later as a public officeholder, was victimized by two Bad Faith Prosecutions, both which have been proven either by documentary evidence constituting admission of an elected District Attorney and other constituting judicial admission by an assistant District Attorney by failing to file a habeas answer when ordered by the Federal court.

FOF ¶ 1447.   A Bad Faith Prosecution, as distinguished from a Selective Prosecution, is a prosecution brought in bad faith and with no expectation of obtaining a valid

conviction. *Dowbrowski v. Pfister*, 380 U.S. 479, 485-487 (1965); *Shaw v. Garrison*, 467 F.2d 113, 122 (5th Cir. 1972), *cert. denied*, 409 U.S. 1024; *Duncan v. Perez*, 445 F.2d 557 (5th Cir. 1971), *cert. denied*, 404 U.S. 940; *Wilson v. Thompson*, 593 F.2d 1375 (5th Cir. 1979); *Fitzgerald v. Peek*, 636 F.2d 943 (5th Cir. 1981); *Lewellen v. Raff*, 843 F.2d 1103 (8th Cir. 1988).

FOF ¶ 1448.  Bad Faith Prosecutions were principal tools used within the Deep South to harass civil rights advocates, but was long an unique attribute of Pennsylvania jurisprudence since the Molly McGuires.

FOF ¶ 1449.  In the first Bad Faith Prosecution, the Trustee, then a working journalist and working with the local newspaper trade unions to launch competition to the existing York, Pennsylvania newspapers operating under a Joint Operating Agreement, was informed by a local Democratic Party activist of an ongoing fraud against the United States in converting Urban Development Action ("UDAG") grants. Local GOP and business leaders would setup a strawman to acquire downtown York, PA real estate with UDAG funds, then default which the GOP and business leaders would acquire through a Sheriff's sale at fire prices, all without paying back the UDAG loans.

FOF ¶ 1450.  The local GOP leaders, conspiring with the Common Pleas Court President Judge Joseph Erb, a York Co Assistant District Attorney Gerald Lord, and the York Co. Chief Public Defender R. Bruce Evanick, brought a bad check charge against the Trustee, notwithstanding the York Co. District Attorney, H. Stanley Rebert conceding to York Co. Commissioner Chairman Charles Stein that no check existed. Lord suborned perjury of the Trustee's business partner which he admitted to Rebert, and also forged the Trustee's signature on a USPS certified mail receipt form to satisfy the elements of the charge in the first bad check case docketed at  2346 CA 1990 (Erb, J.). In the second charge, 165 CA 1991 (Buckingham, J.) Erb coerced the Trustee into a guilty plea after being advised by Assistant Public Defender Jeffrey Marshal, that a guilty plea was appealable and ("the Second Bad Check Charge")

FOF ¶ 1451.  The aforementioned York County criminal charges and judgment were set aside by the Dauphin County Court of Common Pleas in *In re Appointment of Constable for Fourth Ward of City of Harrisburg,* 2-3 M.D. 1997, and allowed the Trustee to hold public office. Otherwise, Wirs could not have held public office, as the PA State Constitution, Art. II, § 7 ("No person hereafter convicted of embezzlement of public moneys, bribery, perjury or other infamous crime, shall be eligible to the General Assembly, or capable of holding any office of trust or profit in this Commonwealth").

FOF ¶ 1452.  However, as the State Constable for the 4th Ward of the City of Harrisburg, the Trustee discovered and attempted to undo usurpation of the constable's statutory duties by then Harrisburg Mayor Stephen Reed.

FOF ¶ 1453.  Reed or his confederates prevailed upon the Dauphin County DA to bring theft of deception charges under 18 Pa.C.S. § 3922, against the Trustee on the basis of incurring obligations on credit without the ability to pay, notwithstanding at all times, the Trustee, as the duly elected Constable was entitled to compensation under the Constable Fee Bill, 42 Pa.C.S. 2950 (now recodified at 44 Pa.C.S. 7161) to perform statutorily mandated judicial functions, 13 P.S. § 40 (now recodified at 44 Pa.C.S. § 7151) which provides  "Constables *shall* perform all duties authorized or imposed on them by statute." (Emphasis added).

FOF ¶ 1454.  At no time throughout these proceedings did the Dauphin County DA, or the courts

for that matter, answered the question posted by leading Harrisburg legal scholar and a former, long-termed Deputy Attorney General Edgar R. Casper (who at the time was serving as Wirs' solicitor) as to "how could the Commonwealth prosecute a public official for incurring obligations on the reasonable expectation of earning fees from performing public duties which the law commands and for which he was trained and certified to perform?"

FOF ¶ 1455. The Dauphin DA even charged Wirs with carrying a firearm without a license, 18 Pa.C.S. § 6006(a) notwithstanding the statute at 6006(b) clearly states: "The provisions of subsection (a) shall not apply to: (1) *Constables*, sheriffs, prison or jail wardens, or their deputies, policemen of this Commonwealth or its political subdivisions, or other law-enforcement officers." (Emphasis added).

FOF ¶ 1456. The Trustee's counsel, Allen C. Welsh, abandoned Wirs in the middle of trial, when the Assistant Dauphin Co. DA Thomas Rozman, ambushed Wirs with concealed purported Prior Bad Acts examples, despite such ambush being blatantly prohibited by Pa.R.Crim.P. 573(B)(1); see *Commonwealth v. Hanford*, 937 A.2d 1094, 1100 (Pa.Super. 2007); *Commonwealth v. Thiel*, 323 Pa.Super. 92, 470 A.2d 145, 148 (1983). "The Rule implements the overall policy of the discovery rules aimed at preventing "trial by ambush" and the use of 'last minute disclosures' to try cases, *Commonwealth v. Shelton*, 536 Pa. 559, 640 A.2d 892, 895 (1994), as such tactics have been declared fundamentally unfair. *Commonwealth v. Moose*, 529 Pa. 218, 602 A.2d 1265, 1274 (1992)." *Commonwealth v. Hanford*, 937 A.2d at 1100.

FOF ¶ 1457. Ironically, soon after this case, Rozman was dismissed due to mental illness after admitting he was receiving "trial strategy" from messages transmitted through his dental work.

FOF ¶ 1458. Reed who became the longest-serving mayor of Harrisburg, PA, re-elected to seven four-year terms, serving from 1982 to 2010, faced charges on nearly 500 counts of theft, fraud and corruption. Reed pled guilty to 20 charges and was sentenced to probation and a fine, but no jail time, due in significant part most of the counts were past the statutes of limitations and because of Reed's declining health.

### § 93. Trust Promotes Ethical Standards of Conduct (¶¶ 1459-1481).

FOF ¶ 1459. The Trust was established to protect civil rights secured by law.

FOF ¶ 1460. It is the civil right of all Americans to participate in the nomination and elections of candidates for public and party office.

FOF ¶ 1461. Election of candidates for party office is a state action, when any of the governmental electoral process is employed, such as voting in a regularly scheduled primary, or which powers and duties are provided by statute, at the exclusion of the public generally, such as designation of poll watchers or casting votes for endorsement of candidates for public office.

FOF ¶ 1462. Political participation in the nomination and election of candidates for public and party office is done by campaigns.

FOF ¶ 1463. Campaigns are divided into four components, commonly referred to as CIIM, the acronym for Connect, Inform, Involve and Mobilize.

FOF ¶ 1464. The National Political Parties (the DNC and the RNC) are, for federal nominees for

208

public office, or endorsed federal candidates for nomination for public office, are responsible to Connect and Inform, which is done primarily by advertising on TV, radio, print and online.

FOF ¶ 1465.   The National Political Parties (the DNC and the RNC) share with their respective state and county political party committees, responsibility for federal nominees for public office, or endorsed federal candidates for nomination for public office, to Involve voters on behalf of such candidates, such as campaign rallies and fundraising events.

FOF ¶ 1466.   The National Political Parties (the DNC and the RNC) are not only not responsible for mobilization, such as voter registration and GOTV, the acronym for Get-Out-the-Vote, but are expressed prohibited by FECA from engaging in Mobilization when not paid for by hard money campaign contributions.

FOF ¶ 1467.   Mobilization is best expressed by what the Trust defines as the Lincoln Rule, extracted from the Campaign Circular from Whig Committee, *Illinois State Register* (Feb. 21, 1840), Collected Works of Abraham Lincoln, Vol. I., which provides that "the only way you win elections is by getting more of your supporters to the polls than your opponents . . . divide the county into small districts and appoint in each a subcommittee . . . make a perfect list of voters and ascertain with certainty for whom they will vote. . . and on election day see that every Whig is brought to the polls"). Implementation of the Lincoln Rule is why political parties have precinct party representatives, commonly known as committeemen and committeewomen.

FOF ¶ 1468.   In other words, precinct party representatives are Election Day party whips, the term exploited from the name of the rider responsible for hearing hound dogs during a fox chase.

FOF ¶ 1469.   Legislatures during the Progressive Era enlarged the powers and duties of precinct party representatives by having them elected by the registered voters within their precinct, thus assuring that the precinct party representatives represent those whom elect them, not the party officers, the "bosses" who supervised the precinct party representatives.

FOF ¶ 1470.   Precinct party representatives used to employ paper records, what was commonly referred to as "strike lists," to record those party electors who cast their ballots to ascertain those electors who had not yet arrived at the polls to cast their ballots. It was common for the committeewoman to have a shoe box containing index cards for each voter, checking off those who had arrived.

FOF ¶ 1471.   The Trust Property merely "computerize" this Election Day whip process, putting what were index cards in the shoe box into an online application ("app"). The brand name of the Trust Property is *We the People Today*™.

FOF ¶ 1472.   The brand name of the Election Day component of the Trust Property is *Election Day Whip*™.

FOF ¶ 1473.   The brand name of the voter input component of the Trust Property is *MyVoterPage*™ and the online portal is *MyVoterPage.com*.

FOF ¶ 1474.   Both National Political Parties (the DNC and the RNC) as well as various Federal campaign committees and commercial vendors to abovementioned possess and maintain digital voter files, which are basic HAVA voter records (showing name,

address, age, gender, and voting history) enhanced with micro-targeting data (showing i.e., phone numbers, civic entity affiliations, and consumer preferences). These "HAVA enhanced voter files" however are proprietary, and therefore are maintain *in camera*, that is to say, they are secret files.

FOF ¶ 1475.    Voters have no means to ascertain the content of these HAVA enhanced voter files and to correct erroneous information or remove information (such as cell phones) which the voter perceives to constitute an invasion of privacy.

FOF ¶ 1476.    The Trust Property, specifically *MyVoterPage*™ overcomes these issues by making HAVA enhanced voter files public accessible for all voters online through the *MyVoterPage.com* portal, so that voters and not the DNC or RNC or commercial vendors, commands control over such data.

FOF ¶ 1477.    Precinct party representatives download the contact data from *MyVoterPage* to the *Election Day Whip*™ to enable them to GOTV, that is to whip voters from within their party to the polls to cast their ballots.

FOF ¶ 1478.    Unlike commercial software programs which erroneously call themselves GOTV software, most likely in violation of the Lanham Act, *Election Day Whip* utilizes realtime Election Day data identifying which voters have arrived at the polls to cast their ballots versus those voters still outstanding, by enabling the precinct party representatives, or their designated poll watchers, to electronically check off those voters who have cast their ballots, as announced or record by the precinct Election Board.

FOF ¶ 1479.    It is this feature of *Election Day Whip* which implements the Lincoln Rule. Enforcement of the right of precinct party representatives to whip votes on Election Day is part of the First Amendment right of political association, because if the election is not won, the party's philosophy of government (the party's platform) and legislative/ executive ideas cannot be implemented.

FOF ¶ 1480.    Enforcement of the right of voters to communicate and direct their precinct party representatives on how to represent the voters, i.e., in matters regarding endorsements and drafting of party platforms, is part of the First Amendment right of political association, as the parties are not independent entities, but manifestations of the will of the voters enrolled in such parties.

FOF ¶ 1481.    The Trust was established and the Trust Property exists to enforce these two particular factors of the First Amendment right of political association. Interference by either or both the DNC and the RNC of the Trustee's providing the *We the People* online SAS platform impairs upon and impedes the Trustee's administration of the Trust and protection of the Trust Property.

### § 94. RNC Constitutes Immediate and Irreparable Injury (¶¶ 1482-1489).

FOF ¶ 1482.    We cannot issue temporary restraining relief unless we find immediate and irreparable injury.

FOF ¶ 1483.    For almost eight years, the RNC has fought tooth and nail to destroy the Trust once it discovered that the Trust's charitable purpose of protecting civil rights secured by law is directed toward the RNC's own malfeasance in committing voter suppression and usurping state and local party committees so it can control "soft money" campaign contributions.

FOF ¶ 1484.   The RNC commits its malfeasance by intimidation, threats, coercion, or attempts thereto for the purpose of interfering with the right of voters, most notably constituencies not inclined to vote Republican and, of those who are Republican, are not obsequious and lickspittle to the RNC Curia.

FOF ¶ 1485.   It is well-established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

FOF ¶ 1486.   But the assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits. *Hohe v. Casey*, 868 F.2d 69, 72-73 (3rd Cir. 1981).

FOF ¶ 1487.   Rather, the Grievant must show "a chilling effect on free expression." *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965). It is "purposeful unconstitutional [government] suppression of speech [which] constitutes irreparable harm for preliminary injunction purposes." *Hohe,* 869 F.3d at 73, citing *Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir.1984).

FOF ¶ 1488.   Accordingly, it is the "direct penalization, as opposed to incidental inhibition, of First Amendment rights [which] constitutes irreparable injury." *Hohe*, 869 F.3d at 73 citing *Cats v. Oldham*, 707 F.2d 1176, 1188 (11th Cir.1983).

FOF ¶ 1489.   The RNC's ongoing customs and usage of intimidation, threats, and coercion are intended and are specifically devised to chill opposition and to induce obsequious compliance from oleaginous subordinates.

## § 95. Summary of Findings of Fact (¶¶ 1490-1501).

FOF ¶ 1490.   For the reader's convenience, we summarize the aforementioned Findings.

FOF ¶ 1491.   While historically, national political parties limited themselves to presidential nominating conventions and campaigns, the RNC began a nationalization of the three-tier political structure of national, state and local party committees under post Watergate Era RNC Chairman William Brock (1977-1981).

FOF ¶ 1492.   The RNC's nationalization of the political process is induced by both Elazar's U.S. political cultures, specifically the "I" culture exploiting political office for self aggrandizement, and Freeman's identification of the GOP top-bottom internal culture that requires obsequious to leadership in turn for acceptance and support.

FOF ¶ 1493.   The RNC's nationalization accelerated upon enactment of the Bipartisan Campaign Reform Act, commonly known as McCain-Feingold, which prohibited the RNC from raising campaign funds for generic political activity ("soft money").

FOF ¶ 1494.   The RNC formalized its usurpation of the nation's 365,858 elected precinct party committee people from 182,851 voting districts in its March 18, 2013 *Growth and Opportunity Project* Report, calling elected precinct committee people "old fashioned" delegated their duties and functionality to professionals and third-party groups, such as the Tea Party.

FOF ¶ 1495.   The *Growth and Opportunity Project* Report not only accelerated the RNC's suppression of African-American and other minority voters, but now includes

moderate, college-educated Republicans, such efforts shows no sign of abatement.

FOF ¶ 1496. McCain-Feingold drove the RNC further into indebtedness of large, "super-donors" who contribute primarily, if not solely, to obtain access to public officials (in lieu of mega-donors or small donors who contribute to promote political affinity).

FOF ¶ 1497. The RNC necessity to raise ever-increasing sums of campaign money is driven by establishment of a new form of political patronage, campaign consultants and political operatives, who exploit time-driven market psychology of election dates, to enrich themselves while providing political parties and candidate campaigns with useless services.

FOF ¶ 1498. These "Super Agents" have so dominated the RNC, that they are actual decision makers, relegating voting RNC members as surplusage, hence our moniker for them as the "Republican Curia."

FOF ¶ 1499. It is the Republican Curia, and not individual voting RNC Members, who sought and continue to seek to destroy the Trust, as delivery of the Trust Property's benefits is a direct threat to the Republican Curia's parasitic livelihood of exploiting the RNC, state and local Republican committees, and candidates.

FOF ¶ 1500. The Republican Curia's conscientious of guilt is evident by its commission of a fraud on the court in furtherance of its effort to destroy the Trust.

FOF ¶ 1501. The Trust Property is not duplicated by or competes against any existing political technology utilized by either the DNC or RNC, as the Trust Property is interactive Web 2.0 technology, all existing political technology, e.g. DNC's NNP-VAN or RNC's Data Center, is antiquated Web 1.0 tools.

### § 96. Total Number of Potential Voter Suppression (¶ 1502-1532).

FOF ¶ 1502. The Respondent Republican National Committee will be responsible for suppressing a minimum of 13,619,419 to 14,386,710 U.S voters on November 6, 2018, of which 5,842,821 to 6,171,994 will be registered Democrats or voters in non-party enrollment states who generally vote Democratic; 5,273,182 to 5,570,263 will be Republicans, 2,279,315 to 2,407,727 will be Independent or No Party voters. From 1,262,360 to 1,333,478 African-American voter turnout will be suppressed, 909,510 to 960,750 Hispanic-American voters and 328,020 to 346,500 Asian-American voter turnout will be suppressed by the RNC. The table below reflects the impact by state:

TABLE NO. 2 NUMBER OF VOTERS NOT CASTING BALLOTS DUE TO RNC SUPPRESSION

| | | Total | Democratic | Republican | Independent | Other | African-A | Latino-A | Asian-A |
|---|---|---|---|---|---|---|---|---|---|
| Alabama | AL | 207,571 | 75,141 | 132,015 | 415 | 0 | 8,202 | 1,207 | 1,207 |
| Alaska | AK | 38,469 | 5,315 | 9,913 | 21,255 | 1,986 | 639 | 852 | 568 |
| Arizona | AZ | 256,337 | 77,412 | 89,389 | 86,849 | 2,688 | 8,520 | 48,777 | 2,769 |
| Arkansas | AR | 124,354 | 5,807 | 112,165 | 29 | 1,986 | 13,064 | 1,420 | 568 |
| California | CA | 1,350,663 | 599,117 | 338,620 | 344,550 | 68,375 | 74,053 | 233,874 | 115,588 |
| Colorado | CO | 234,872 | 72,670 | 71,325 | 86,682 | 4,196 | 5,325 | 22,791 | 3,408 |
| Connecticut | CT | 150,269 | 54,770 | 32,207 | 61,185 | 2,106 | 8,591 | 8,236 | 2,840 |
| Delaware | DE | 49,159 | 23,208 | 13,697 | 11,345 | 0 | 6,461 | 994 | 284 |
| District of Columbia | DC | 34,154 | 25,966 | 2,101 | 5,631 | 456 | 11,644 | 1,349 | 355 |

212

| State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Florida | FL | 914,196 | 339,103 | 322,882 | 246,561 | 5,651 | 96,418 | 106,003 | 13,064 |
| Georgia | GA | 451,337 | 238,306 | 202,199 | 10,832 | 0 | 135,055 | 7,029 | 7,668 |
| Hawaii | HI | 53,244 | 26,090 | 19,541 | 5,857 | 0 | 568 | 2,201 | 16,188 |
| Idaho | ID | 57,900 | 6,653 | 29,852 | 20,709 | 685 | 71 | 1,633 | 284 |
| Illinois | IL | 569,230 | 286,323 | 265,261 | 17,646 | 0 | 54,528 | 29,110 | 11,857 |
| Indiana | IN | 342,876 | 159,780 | 169,724 | 13,372 | 0 | 16,046 | 5,538 | 284 |
| Iowa | IA | 139,354 | 43,906 | 45,641 | 49,327 | 978 | 2,201 | 1,491 | 1,207 |
| Kansas | KS | 129,073 | 31,969 | 57,362 | 38,638 | 1,104 | 5,183 | 4,970 | 2,130 |
| Kentucky | KY | 239,438 | 119,557 | 99,326 | 19,770 | 786 | 13,064 | 2,414 | 1,633 |
| Louisiana | LA | 209,952 | 91,331 | 63,639 | 54,982 | 0 | 51,759 | 284 | 213 |
| Maine | ME | 73,143 | 23,316 | 19,608 | 26,726 | 3,494 | 355 | 284 | 142 |
| Maryland | MD | 279,153 | 152,641 | 71,693 | 50,368 | 4,450 | 60,776 | 8,520 | 9,585 |
| Massachusetts | MA | 318,566 | 108,408 | 34,026 | 172,174 | 3,959 | 10,011 | 11,005 | 6,035 |
| Michigan | MI | 346,098 | 188,969 | 142,938 | 14,190 | 0 | 48,635 | 12,709 | 6,106 |
| Minnesota | MN | 230,529 | 115,495 | 102,586 | 12,449 | 0 | 5,893 | 3,408 | 2,414 |
| Mississippi | MS | 115,588 | 76,982 | 37,104 | 1,503 | 0 | 45,369 | 1,207 | 355 |
| Missouri | MO | 277,894 | 142,004 | 126,442 | 9,448 | 0 | 23,075 | 1,988 | 2,769 |
| Montana | MT | 49,728 | 24,964 | 23,074 | 1,691 | 0 | 213 | 781 | 142 |
| Nebraska | NE | 85,163 | 25,254 | 40,995 | 17,956 | 958 | 2,556 | 1,846 | 213 |
| Nevada | NV | 103,790 | 39,914 | 40,995 | 17,956 | 958 | 8,804 | 13,419 | 3,479 |
| New Hampshire | NH | 68,226 | 18,974 | 20,891 | 28,346 | 15 | 497 | 1,065 | 497 |
| New Jersey | NJ | 414,295 | 154,709 | 90,012 | 166,716 | 2,857 | 35,216 | 35,287 | 16,046 |
| New Mexico | NM | 87,987 | 40,364 | 26,846 | 19,218 | 1,558 | 1,988 | 21,442 | 923 |
| New York | NY | 802,545 | 399,149 | 158,496 | 169,508 | 46,992 | 98,335 | 70,645 | 25,986 |
| North Carolina | NC | 494,095 | 188,823 | 148,094 | 154,618 | 2,559 | 73,840 | 7,597 | 4,189 |
| North Dakota | ND | 38,561 | 11,230 | 18,166 | 8,941 | 223 | 142 | 355 | 71 |
| Ohio | OH | 558,133 | 282,973 | 266,229 | 8,930 | 0 | 48,280 | 6,603 | 4,970 |
| Oklahoma | OK | 143,147 | 54,654 | 66,926 | 21,220 | 348 | 6,816 | 5,964 | 1,207 |
| Oregon | OR | 190,397 | 67,887 | 49,708 | 59,775 | 13,035 | 2,059 | 7,526 | 3,337 |
| Pennsylvania | PA | 600,665 | 287,048 | 229,160 | 79,064 | 3,972 | 34,932 | 18,460 | 6,603 |
| Rhode Island | RI | 49,705 | 20,356 | 5,966 | 23,216 | 168 | 1,988 | 1,562 | 71 |
| South Carolina | SC | 223,154 | 92,386 | 124,743 | 6,025 | 0 | 45,440 | 3,408 | 1,278 |
| South Dakota | SD | 37,816 | 11,098 | 17,144 | 8,651 | 212 | 355 | 213 | 0 |
| Tennessee | TN | 253,105 | 57,708 | 177,933 | 17,464 | 0 | 33,583 | 2,982 | 1,491 |
| Texas | TX | 1,082,717 | 421,177 | 642,051 | 19,489 | 0 | 94,714 | 160,105 | 18,389 |
| Utah | UT | 93,447 | 11,352 | 45,728 | 33,324 | 3,044 | 426 | 3,976 | 923 |
| Vermont | VT | 33,485 | 15,537 | 15,102 | 2,846 | 0 | 142 | 142 | 0 |
| Virginia | VA | 392,612 | 211,618 | 176,675 | 4,319 | 0 | 50,552 | 7,952 | 14,839 |
| Washington | WA | 303,782 | 165,257 | 138,524 | 0 | 0 | 5,254 | 11,999 | 11,431 |
| West Virginia | WV | 87,458 | 37,185 | 28,052 | 19,186 | 3,035 | 1,207 | 781 | 284 |

213

| Wisconsin | WI | 213,288 | 109,630 | 97,899 | 5,759 | 0 | 9,159 | 5,467 | 2,130 |
| Wyoming | WY | 18,697 | 3,336 | 12,518 | 2,605 | 239 | 355 | 639 | 0 |
| | | 13,619,419 | 5,842,821 | 5,273,182 | 2,279,315 | 183,074 | 1,262,360 | 909,510 | 328,020 |

FOF ¶ 1503.  Our primary source for voter registration data is the University of Virginia Center for Politics *Sabato's Crystal Ball* July 12, 2018 post by Rhodes Cook, senior columnist.

FOF ¶ 1504.  The following states do not register voters by party registration: Alabama, Georgia, Indiana, Illinois, Minnesota, Mississippi, Missouri, Montana, Ohio, South Carolina, Tennessee, Texas, Vermont, Virginia, Washington, and Wisconsin. North Dakota does not register voters at all. Party registration in these states are based on either cumulative or recent election results for governor and other statewide offices, but not presidential elections, nor any election results from the 2016 Presidential election.

FOF ¶ 1505.  Alabama records voters as active and inactive and reports both active voters and total (active and inactive) voters. The former number is utilized, as our primary source, because most states report voter registration to consist of all who are registered within the HAVA time frames, including those who cast ballots (active). Alabama party registration estimates is based on 2014 gubernatorial election results of 63.6% Republican, 36.2% Democratic.

FOF ¶ 1506.  Georgia party registration estimates is based on 2014 gubernatorial election results of 52.8% Republican, 44.8% Democratic.

FOF ¶ 1507.  Hawaii party registration estimates is based on 2014 gubernatorial election results of 49.0% Democratic, 36.7% Republican, and 11.6% independent.

FOF ¶ 1508.  Illinois party registration estimates is based on 2014 gubernatorial election results of 50.3% Republican, 46.4% Democratic.

FOF ¶ 1509.  Indiana party registration estimates is based on 2012 gubernatorial election results of 49.5% Republican, 46.6% Democratic.

FOF ¶ 1510.  Michigan party registration estimates is based on 2014 U.S. Senate election results of 54.6% Democratic, 41.3% Republican.

FOF ¶ 1511.  Minnesota party registration estimates is based on 2014 gubernatorial election results of 50.1% DFL, 44.5% Republican.

FOF ¶ 1512.  Mississippi party registration estimates is based on 2015 gubernatorial election results of 66.6% Republican, 32.1% Democratic. Voter registration is from U.S. Census Bureau for 2014.

FOF ¶ 1513.  Missouri party registration estimates is based on 2016 gubernatorial election results of 51.1% Republican, 45.5% Democratic, which was the most narrow of all statewide election results in 2016. Voter registration is from U.S. Census Bureau for 2014, showing a significant decline from the State's own website of which the last year reported for 2012.

FOF ¶ 1514.  Montana party registration estimates is based on 2016 gubernatorial election results of 50.2% Democratic, 46.4% Republican.

214

FOF ¶ 1515.  North Dakota party registration estimates is based on 2016 gubernatorial election results of 76.5% Republican, 19.4% Democratic. Although North Dakota allows Election Day voter registration, the state website does report party registration. The South Dakota Democratic Party has opened their primary election up for all voters registered as independent/no party affiliation to vote in their primary. Voters registered in the "other" category are not allowed to vote in the SD Democratic Party primary.

FOF ¶ 1516.  Ohio party registration estimates is based on the combination of 2012 Presidential and U.S. Senate election results of 50.7% Democratic, 47.7% Republican.

FOF ¶ 1517.  South Carolina party registration estimates is based on 2014 gubernatorial election results of 55.9% Republican, 41.4% Democratic.

FOF ¶ 1518.  Tennessee party registration estimates is based on 2016 gubernatorial election results of 70.3% Republican, 22.8% Democratic.

FOF ¶ 1519.  Texas party registration estimates is based on 2014 gubernatorial election results of 59.3% Republican, 38.9% Democratic.

FOF ¶ 1520.  Vermont party registration estimates is based on 2014 gubernatorial election results of 46.4% Democratic, 45.1% Republican.

FOF ¶ 1521.  Virginia party registration estimates is based on 2017 gubernatorial election results of 53.9% Democratic, 45.0% Republican.

FOF ¶ 1522.  Washington party registration estimates is based on 2016 gubernatorial election results of 54.4% Democratic, 45.6% Republican.

FOF ¶ 1523.  Wisconsin party registration estimates is based on 2014 U.S. Senate election results of 51.4% Democratic, 45.9% Republican.

FOF ¶ 1524.  The voter suppression analysis is 7.1% to 7.5% of total voter registration by total number of registrants, by party enrollment (or in those states lacking enrollment, by estimate based on historical election results) and by ancestry, as reported either by the state elections authority or the U.S. Census Bureau. As reported by Yale University's Donald P. Green and Alan S. Gerber, "the rule of thumb, one additional vote is cast from each 14 people contacted. Alan B. Krueger, "Turning Out the Vote," *The New York Times,* October 14, 2004.

FOF ¶ 1525.  The aforementioned percentage is the generally accepted increase in voter turnout resulting from Election Day voter mobilization, which is the primary responsibility of elected precinct party representatives (committee people). The RNC is exclusively responsible for denying the 365,642 committee people of each party the Trust Res which is required to be provided free of cost.

FOF ¶ 1526.  Studies confirming the voter turnout increase by Election Day voter mobilization as reported by Green and Gerber in their analysis *Get Out the Vote! How to Increase Voter Turnout* (Washington: Brookings Institution Press, 2004); and see also Allison Dale and Aaron Strauss, "Don't Forget to Vote: Text Message Reminders as a Mobilization Tool," THE JOURNAL OF POLITICS, Vol. 65, No. 4, November 2003, Pp. 1083–1096; Donald P. Green, Alan S. Gerber and David W. Nickerson, *Getting Out the Vote in Local Elections: Results from in Door-to-Door Canvassing Experiments*, AMERICAN JOURNAL OF POLITICAL SCIENCE 53 (4) (2009) pp. 787–804;

FOF ¶ 1527.   These studies state nothing new, as studies by Professor Harold F. Gosnell in *Getting-Out-The-Vote: An Experiment in the Stimulation of Voting*. Chicago: University of Chicago Press (1927), first empirically established the importance of voter mobilization.

FOF ¶ 1528.   All these studies confirm what Abraham Lincoln first articulated in the *Whig Party* election plan in 1840, you have to contact voters to get them to the polls.

FOF ¶ 1529.   The above data does not reflect the additional voter suppression efforts which the RNC has implicitly advocated through legislative enactment. As reported by the Brennan Center, that in "2018, voters in at least eight states will face more stringent voting laws than they did in the last federal election. These restrictions are a continuation of a trend, beginning in 2011, of states passing laws making it harder to vote. Overall, voters in 23 states will face tougher restrictions than they did in 2010. Lawsuits and legal campaigns have in some cases mitigated a number of the most pernicious new laws, and future court decisions could still impact the voting landscape before November. Regardless, more voters in more states will face unnecessary hurdles to casting a ballot this fall."

FOF ¶ 1530.   This includes over 6 million voters, generally of African-American ancestry disenfranchised because of felon bar laws.

FOF ¶ 1531.   This includes 909,540 eligible voters being disqualified by the GOP's push for "perfect matching," based on Princeton University's mathematical analysis as reported by Ted Enamorado, "Georgia's 'exact match' law could potentially harm many eligible voters," *The Washington Post,* October 20 2018.

FOF ¶ 1532.   In conclusion: "For the nation's democracy to function properly and for government to provide fair representation, all eligible Americans must have the opportunity to vote—and be encouraged to do so. Our collective self-rule is established and fostered through free, fair, accessible, and secure elections through which the voice of every eligible American is heard." Danielle Root and Liz Kennedy, Increasing Voter Participation in America, Center for American Politics post July 11, 2018.

## § 97. Computation of Damages (¶ 1533-1556).

FOF ¶ 1533.   The Trustee is limited by law to impose a surcharge equal to the sum required to restore the Trust Corpus and otherwise make the Trust whole. It is black letter that a surcharge is not punitive, but limited only to those expenses required to restore the Trust.

FOF ¶ 1534.   The Trustee, as required by law and Orphans Court rule, issues twice a year files the Report of Trust Assets and Liabilities pursuant to 20 Pa.C.S. § 7780.3(i)(5) and the Internal Revenue Code, 20 U.S.C. § 6033(d). The facts below are extracted from the Trustee's July 1, 2018 Report of Trust Assets and Liabilities.

FOF ¶ 1535.   *Trustee's Compensation.* The Trustee is due compensation as authorized pursuant to 20 Pa.C.S. § 7778, Trust Agreement at ¶ 19. The Trustee's annual compensation, including 30% for benefits and taxes from January 1, 2018 through end of year is $242,000.

FOF ¶ 1536.   *Additional employee compensation.* Compensation for an administrative assistant to the Trustee and for editorial staff to compile content for *Poor Richard* are set at salary plus 30% for benefits and taxes are currently set at $380,000.

FOF ¶ 1537.   *Legal Fees.* Attorney's fees are general counsel are authorized pursuant to 20 Pa.C.S. § 7777(a); Trust Agreement ¶ 20 and are set at a flat rate of $250,000. Attorney's fees for special counsel are authorized pursuant to 20 Pa.C.S. §§ 7771, 7772, 7774, 7777(a), 7780.6(a)(4); Trust Agreement ¶ 20 and set at $242,000.

FOF ¶ 1538.   *Accounting and Independent Auditor Fees.* Accounting fees (Treasurer) William P. St. Clair, CPA and auditing fees (Independent Auditor) Eisner Amper are pursuant to 20 Pa.C.S. § 7777(a); Trust Agreement ¶ 20 at a flat rate of $50,000.

FOF ¶ 1539.   *Trust Property.* The annual servicing expenses for National Conference Call incurred by Tele-Town Hall, LLC is pursuant to 20 Pa.C.S. §§ 7774, 7775; Trust Agreement ¶ 5, IOP Rule 7(e)-(j) and currently is set at $386,400.00. The National Conference Calls are a revenue-generating service supplementing the Trust Property.

FOF ¶ 1540.   *Office Rent.* Office rent is authorized pursuant to 20 Pa.C.S. § 7775; Trust Agreement ¶ 26 and is currently estimated at $15,000 a year. However this estimate may increase due to enlargement of the Trust Res by addition of *Poor Richard*.

FOF ¶ 1541.   *Public Relations and Promotion, 5% Payout Rule.* Public relations, promotion, and advertising also includes contributions to other 501(c)(3) organizations required by Section 4947(a)(1) of Internal Revenue Code and accompanying IRS regulations and is authorized pursuant to 20 Pa.C.S. § 7775; Trust Agreement ¶ ¶ 15,19; IRC 4947(a)(1). Currently the Report lists these expenditures as separate line items at $2,500,000 and $4,625,299.95 which is equal to five percent of Trust assets.

FOF ¶ 1542.   *Trust Property.* Software Development (reprogramming code for *We the People Today*™ software for appointed agents, Political Technology, LLC, Pittsburgh, PA; Aristotle International, Inc., Atlanta, GA and 11Online, Albuquerque, NM is authorized pursuant to 20 Pa.C.S. §§ 7771, 7775; Trust Agreement ¶ ¶ 2, 8, 22; IOP Rule 2 and is currently set at $655,000. This line item does not include generation of the House List, but costs may exceed estimate as appearing in the latest Report.

FOF ¶ 1543.   *Trust Property.* Software Development of the House List (list compilation and management of HAVA voter files into *We the People Today*™ software is authorized pursuant to 20 Pa.C.S. §§ 7771, 7775; Trust Agreement ¶ ¶ 2, 8, 22; IOP Rule 2, is currently projected at $385,866.60, but costs may exceed estimate as appearing in the latest Report

FOF ¶ 1544.   The current sum required for operating expenses as described above and which is required to be satisfied by the Surcharged assessed by this Award is at $14,077,966.55 as of the latest Report.

FOF ¶ 1545.   Said amount is to be deposited in the Trust Administration Account as required by IOP Rule 5(b).

FOF ¶ 1546.   Liabilities which are required to be satisfied by the Surcharged assessed by this Award is set at $165,211,423.32. Liabilities include compensation in arrears for the Trustee and now Senior Trustees (the former two other co-trustees), attorney's fees, accountant's fees, setup expenses included by multiple vendors. The Trustee's outstanding compensation is currently $3,235,540.00. Said compensation is defined as an advance by the Trustee to the Trust which is required to be satisfied with interest pursuant to 20 Pa.C.S. §§ 7769(a)-(b), 7772(h)(5), 7780.6(a)(7); Trust Agreement ¶ 19.

FOF ¶ 1547. Said amount is to be deposited in the Trust Administration Account as required by IOP Rule 5(b).

FOF ¶ 1548. Liabilities include legal fees incurred by the Trust for itself and related 501(c)(3) projects undertaken by the Trust as required under IRC 4947(a)(1) in arrears plus 6% legal interest as follows: Obermayer Redmann ($93,250.00); Mayer Brown ($154,854,06); Cozen O'Connor ($12,264.42) Elliot Greenleaf ($69,640.39); Lamb McErlane ($115,323.02); SNR Denton ($134,889.34); Lawrence M. Otter ($5,725.00); J. Matthew Wolfe ($29,913.26) Westlaw ($10,597.00).

FOF ¶ 1549. Liabilities include IRC § 4947(a)(1) contributions which are in arrears plus 6% legal interest, as required under 26 U.S.C. (IRC) § 4947(a)(1) and as of the last Report, now stands at $155,826,281.31.

FOF ¶ 1550. A complete listing of liabilities is available in the Report.

FOF ¶ 1551. Reserves for administration of the Trust is required by the Trust Agreement ¶ 22(E) and IOP Rule 5(c) which as of the last Report is $81,811,665.50. Reserves are required to be equal to expenses incurred to administrated the Trust for a sum not less than ten years.

FOF ¶ 1552. The Award calls for assessment of a Supplemental Surcharge for each week state and county Qualified Beneficiaries (state, county and local Democratic and Republican Committees) are denied benefit of raising Levin Fund contributions.

FOF ¶ 1553. The Trustee is authorized by IOP Rule 5(d) to setup escrow accounts for campaign contribution and Levin Fund contribution escrow Accounts for Qualified Beneficiaries all which shall applied by the Trustee as governed under FECA as amended by Title I of the Bipartisan Campaign Finance Reform Act of 2002 ("BCRA"), P.L. 107-155, pursuant to regulations promulgated under 11 CFR Part 300.

FOF ¶ 1554. These Escrow Accounts are merely established by the Trustee solely in the capacity as a conduit. 2 U.S.C. § 441a(a)(8) and to which the Trustee exercises no control or discretion as to the designated political party or candidate campaign committee for receipt of Levin Fund contributions.

FOF ¶ 1555. The Trustee is authorized to process all such earmarked contributions raised as Non-Federal campaign or Levin Fund contributions as a conduit pursuant to 11 CFR 110.6 and 102.8 and *see also* AO 2006-30 (*ActBlue*) and AO 2003-23 (*WE LEAD*) to assure compliance with FECA. 11 CFR 300.31(f) and *cf.* 11 CFR 300.31(g).

FOF ¶ 1556. All monies raised primarily through *MyVoterPage.com*™ are to be electronically transferred to the appropriate Non-Federal campaign or Levin Fund account as rapidly as possible. For purposes of compliance with 11 CFR 300.32(a), the Solicitation & Acceptance for Levin Fund contributions must be made by the appropriate county, district, ward or local committee.

### § 98. Computation of Attorney Fees (¶ 1557-1560).

FOF ¶ 1557. Attorney fees regarding enforcement of judgment is predicated on a sliding scale originally published but later withdrawn by the Pennsylvania Attorney General, but in the interim adopted by Pennsylvania Orphans Courts. *In re Johnson Estate*, 4 Fiduc. Rep.2d 6, 8 (Chester O.C. 1983) (Judge Wood adopting fee schedule adopted

by Attorney General); *In re Loutsion Estate*, 4 Fiduc. Rep.2d 224, 232 & n.3 (Washington Co. O.C. 1984) (5% up $100,000, 4% up to $250,000, 3% up to $500,000, 2.5% up to $1,000,000 and 2% on the balance); But see criticism in *Nix Estate*, 8 Fid.Rep.2d 179 (O.C. Chester 1988) (Editor's note); 5A Remick's Pennsylvania Orphans Court Practice § 39:10 (Supp. 1997) *Preston Estate*, 558 Pa.Super. 48, 560 A.2d 160 (1989) (egregious error to rely on sliding scale rate without determining reasonableness); but see *Carr Estate*, 22 Fid.Rep.2d 364 (O.C. Mont. 2002); *Fesse Estate*, 21 Fid.Rep.2d 317 (O.C. Mont. 2001); *Bailey Estate*, 10 Fid.Rep.2d 55 (O.C. Chester 1990); *Pedrick Estate*, 19 Pa. D&C.4th 360, 13 Fid.Rep.2d 240 (O.C. York 1993).

FOF ¶ 1558.  Based on the aforementioned sliding scale, attorney fees regarding enforcement of judgment is as follows relative the Surcharge.

| | | |
|---|---|---|
| 5.0% | $5,000 | Up to $100000 |
| 4.0% | $4,000 | $100000 to $200000 |
| 3.0% | $24,000 | $200000 to $1 million |
| 2.0% | $20,000 | $1 million to $2 million |
| 1.5% | $15,000 | $2 million to $3 million |
| 1.0% | $10,000 | $3 million to $4 million |
| 0.5% | $5,000 | $4 million to $5 million |
| 0.25% | $781,728.77 | $5 million plus |

FOF¶ 1559.  The aforementioned does not include the Supplemental Surcharge being ordered, but will be added to the 0.25% percentile.

FOF ¶ 1560.  All attorney's fees and court costs are subject to review by the Court which may at its sole discretion revise downward the lodestar.

## B. DISCUSSION.
### I. Trust's Legitimate Charitable Purpose.
### (1) RNC Doesn't Want a Watchdog Who Bites

It is proper for us to go through the various points of law which the RNC should have raised in the arbitration proceeding before us, and will attempt to raise in any subsequent FAA proceeding. But such doesn't explain the *motive* behind this protracted controversy. The truth of the matter is that RNC doesn't want a watchdog examining everything they do.

One of the first things students learn in Law 101 is that no law is self-enforcing. When you come to a stop sign at the intersection in the middle of the night, you don't stop because the stop sign gets off its metal post and stands in the middle of the intersection. You stop because you instantaneously do a mental cost/benefit ratio and conclude it more beneficial to simply obey the law.

For the RNC and its political operatives, the cost of violating the multiple Civil Rights and voting laws has been far less than the benefit of obeying them. The RNC is the head of one of the two major political parties. Who's going to stop them? The League of Women Voters? The Brennan Center for Justice? Campaign Legal Center?

219

Dr. Templeton and the original trustees, elected to utilize the trust organizational form for a purpose, that it was fully understood that the RNC would resist reform at every turn; and the only vehicle sufficiently legally competent to overcome the RNC's resistance to reform was a charitable trust.

Reform advocacy has always been a traditional charitable trust function, Note, *Charitable Trusts for Political Purposes*, 37 VIRGINIA L.REV 988, 989 (1951 which the law requires courts to protect. *Taylor v. Hoag*, 278 Pa. 194, 197, 116 A. 826, 827 (1922); ("anything that tends to promote the well-doing and well-being of social man * * * or advancement of the public good, is a public charity * * * [even if] its object is to promote improvements in the structure and methods of government, with a view to efficiency and popular control and to use all lawful means to increase the knowledge of citizens on governmental and political questions"); *Lewis' Estate*, 152 Pa.477, 25 A. 878 (1893) (trust held charitable when it required use of all lawful means to prevent discrimination). This rule comes down from English law, see e.g., *In re Foreaux*, 2 Ch. 501 (1895); *Armstrong v. Reeves*, 25 L.R. Ir. 325 (1890) (trusts advocating abolishing acts of Parliament held charitable); *Farewell v. Farewell*, 22 O.R. 573 (1892) (trust to abolish alcohol manufacturing held charitable).

In addition to electoral reform in *Taylor v. Hoag*, 273 Pa. at 197, 116 A. at 827 (upholding as charitable, a trust to promote improvements in the structure and methods of government with special reference to the initiative, referendum, and recall, and to ballot reform), courts have recognized charitable trusts established for suppression of political corruption, *International Reform Federation v. District Unemployment Compensation Board*, 76 U.S.App.D.C. 282, 131 F.2d 337 (1942), *cert. denied* 317 U.S. 693; protecting the First Amendment right to assure electors "vote more intelligently and efficiently," *Collier v. Lindley*, 203 Cal. 641, 266 P. 526 (1928); protecting civil rights for persons of the Jewish faith, *In re Estate of Murphy*, 7 Ca1.2d 712, 715, 62 P.2d 374 (1936) (trust for the promotion of political purposes was eleemosynary and charitable); *Estate of Peck,* 168 Cal. App. 2d 25, 28, 335 P.2d 185 (1959) ("a trust with the object of creating a more enlightened public opinion and a bequest to an organization with political purposes have been held to be valid charitable trusts in this state"); and for African-Americans, *Lewis' Estate*, 152 Pa.477, 25 A. 878 (1893); promoting women's suffrage, *Garrison v. Little*, 75 Ill. App. 402 (1898); to teach socialism, *Peth et ux. v. Spear et. al.*, 63 Wash. 291, 115 Pac. 164 (1911); advocate tax reform, *George. v. Braddock*, 45 N.J. Eq. 757, 18 A.881 (1917); prohibition of liquor sales, *Girard Trust Co. v. Commissioner*, 122 F.2d 108 (3d Cir. 1941); *Sherman v. Congregational Home Missionary Soc'y*, 176 Mass. 349, 57 N.E. 702 (1900); *Bowditch v. Attorney General*, 241 Mass. 168, 134 N.E. 796, 28 A.L.R. 713 (1922); *Buell v. Gardner*, 83 Misc. 513, 144 N.Y.S. 945 (1915); *Harrington v. Pier*, 105 Wis. 485, 82 N.W. 345, 50 L.R.A. 307, 76 Am. St.Rep. 924 (1911); *Haines v. Allen*, 78 Ind. 100, 41 Am.Rep. 555; and abolishment of slavery. *Jackson v. Phillips*, 96 Mass. (14 Allen) 539 (1867).

More importantly, charitable trusts historically performed a role of aiding government in performing its functions. Note, 37 Vir.L.Rev. at 988-989 (a trust "to aid any particular governmental department in performing its functions" is a charitable trust). The Republican Curia's visceral objection pointedly is this Trust specifically aids the U.S. Government in enforcement of the Civil Rights Act of 1957, a charitable function expressly recognized by Treasury regulations. 26 CFR § 1.501(c)(3)-1(d)(2) ("term charitable is used in section 501(c)(3)...includes... organizations designed to ... (iii) to defend ... civil rights secured by law..."). That the GOP cannot exert "influence" over the Trust as it does over the U.S. Dept. of Justice's Civil Rights Unit is a thorn in the paw.

As a result, charitable trusts are "favorites of the law,"*In re Estate of Pruner*, 400 Pa. 629, 634, 62 A.2d 626, 629 (1960); *Girard College Trusteeship*, 391 Pa. 434, 448, 138 A. 2d 844 (1958), "given preferential treatment because they provide a benefit to society," *Bob Jones Univ. v. United States,* 461 U.S. 574, 589 (1983), by "extend[ing] to the poor as well as to the rich," *Perin v. Carey*, 65 U.S. (24 How.) 456, 506 (1860), because it provides the general public "with resources that would not otherwise be within their financial reach" that which the public otherwise cannot provide for itself. *Unionville-Chadds Ford School District v. Chester Co. Board of Assessment Appeals*, 552 Pa. 212,

220, 714 A.2d 397, 400 (1998). Trusts are exempt from certain taxes as "the Government is compensated for the loss of revenue by its relief from financial burdens which would otherwise have to be met by appropriations from other public funds, and by the benefits resulting from the promotion of the general welfare." *Bob Jones Univ. v. United States*, 461 U.S. at 590 quoting H.R.Rep. No. 1860, 75th Cong. (1938).

Protecting First Amendment rights is charitable, to prevent corruption since "when election crime exists, public corruption of some form is also usually present. This is so because virtually all election crime is driven by a motive to control governmental power for some corrupt purpose. * * * Most election fraud aims at ensuring that important elected positions are occupied by "friendly" candidates. It occurs most often when the financial stakes involved in who controls public offices are great * * * or when illicit activities are being conducted that require protection from official scrutiny." Craig C. Donsanto and Nancy L. Simmons, U.S. Dept. of Justice, *Federal Prosecution of Election Offenses* 2 (8th ed. 2014).

42 U.S.C. 1971(b) now recodified at 52 U.S.C. § 10101(b)(b) "requires proof of two ultimate facts: (1) that there was an intimidation, threat, or coercion, or an attempt to intimidate, threaten or coerce, and (2) that the intimidation was for the purpose of interfering with the right to vote." *United States v. McLeod*, 385 F. 2d 734, 740 (5th Cir. 1967), quoting *United States v. Board of Educ. of Greene County, Mississippi*, 332 F.2d 40, 46 (5th Cir. 1964) (concurring opinion). Acts otherwise legal may violate the statute if they have the proscribed effect and purpose." *United States v. McLeod*, 385 F. 2d 734, 740 (5th Cir. 1967) See also Note, *Private Economic Coercion and the Civil Rights Act of 1957*, 71 Yale L.J. 537 (1962).

While the Civil Rights Act of 1957 was primarily enacted to combat Southern States' racial discrimination, it is not so limited. Chester J. Antieau, *Federal Civil Rights Acts, Civil Practice* (2d ed.1980) § 2 ("According to the language of subsection (a)(1) of § 1971 the right to vote is acknowledged to 'all *citizens*' of the United States who are otherwise qualified to vote,' but subsection (b) protects any '*person*' from intimidation") (emphasis original) and § 3 ("By the very language of § 1971(b), *anyone* who threats, intimidates, coerces or attempts the same is suable 'whether acting under color of law or otherwise.' Private parties have been held to be proper defendants under § 1971, as amended") (emphasis added) citing *United States v. Katzenbach v. Original Knights of the Klu Klux Klan*, 250 F.Supp. 330 (E.D.La. 1965). And see also Donsanto and Simmons *supra* at 21 ("Many of the Enforcement Acts had broad jurisdictional predicates that allowed them to be applied to a wide variety of corrupt election practices as long as a federal candidate was on the ballot").

It is this scrutiny which a charitable trust provides, because quite simply, the Federal Government can't. And unlike nonprofit corporations which can simply bark, a charitable trust can bite. And that's the motive behind the RNC's opposition to the Trust.

## II. Trustee's Authority to Arbitrate.
### (1) Authorize for Trustee to Arbitrate Now Statutory.
Arbitration cannot take place in the absence of an agreement to arbitrate. Originally, courts possessed the plenary power to decide the gateway question of a dispute's arbitrability—i.e., whether [the parties] agreed to arbitrate the merits. *First Options of Chicago., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995).

Under *First Options*, when a party calls upon a court to decide a dispute's arbitrability, the court must determine whether the dispute falls within the ambit of the parties' agreement to arbitrate. Arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration. *Id.*, 514 U.S. at 943.

221

However, we find that the Uniform Trust Code, adopted with minor modifications in Pennsylvania as the PA Uniform Trust Act, overturns *First Options*. The Uniform Trust Act at UTC § 816(23) and PA Uniform Trust Act (PA UTA) at 20 Pa.C.S. § 7780.6(a)(3) expressly gives us the authority to employ alternate dispute resolution to resolve matters of interpretation of the Trust Agreement and administration of the Trust.

20 Pa.C.S. § 7780.6. Illustrative powers of trustee.
Listing.– The powers which a trustee may exercise pursuant to section 7780.5 (relating to powers of trustees - UTC 815) include the following powers:
* * *
To resolve a dispute regarding the interpretation of the trust or the administration of the trust by mediation, arbitration or other alternative dispute resolution procedures.

And see also UTC § 816(23);
SECTION 816. SPECIFIC POWERS OF TRUSTEE. Without limiting the authority conferred by Section 815, a trustee may:
* * *
resolve a dispute concerning the interpretation of the trust or its administration by mediation, arbitration, or other procedure for alternative dispute resolution;

Such is clearly the intent of the draftsmen of the Uniform Trust Code, the National Conference of Commissioners on Uniform State Laws (now the Uniform Law Commission):
"Paragraph (23) authorizes a trustee to resolve disputes through mediation, arbitration or other methods of alternate dispute resolution. The drafters of this Code encourage the use of such alternate methods for resolving disputes. Arbitration is a form of nonjudicial settlement agreement authorized by Section 111. In representing beneficiaries and others in connection with arbitration or in approving settlements obtained through mediation or other methods of ADR, the representation principles of Article 3 may be applied. Settlors wishing to encourage use of alternate dispute resolution may draft to provide it. For sample language, see American Arbitration Association, Arbitration Rules for Wills and Trusts (1995)."

Even if *First Option* remains good law, and requires the party contending that an arbitrator has authority to decide arbitrability bears the burden of demonstrating clearly and unmistakably that the parties agreed to have the arbitrator decide that threshold question, see e.g., *ConocoPhillips, Inc. v. Local 13-0555 United Steelworkers Int'l Union*, 741 F.3d 627, 630 (5th Cir.2014) that burden is satisfied by UTC § 816(23) and PA UTA 20 Pa.C.S. § 7780.6(a)(3).

**(2) Trust Agreement ¶ 8(E) Clear and Unmistakable Agreement.**
Equally important, the "clear and unmistakable arbitrarity agreement" requirement imposed by *First Option* is satisfied by the Trust Agreement's ¶ 8(E) following the NCCUSL comment under UTC § 816(23) by clearly and unmistakably providing *first,* what disputes are to be resolved, and *secondly*, how they will be resolved.

The Trust Agreement, at ¶8(E) provides:
"(E) *Alternative Dispute Resolution, Surcharge for Breach of Fiduciary Duty, Impoundment*. (1) Any Qualified Beneficiary and all elected members therein or any candidate or nominee, or any Current Beneficiary who shall abridge, interfere or obstruct the rights of any other Beneficiary, shall be liable, jointly and severally, for damages limited to the loss incurred by the injured Qualified or Current Beneficiary or class of Qualified or Current Beneficiaries caused by such breach, the sum the Trustee shall impound from proceeds generated by the Trust Property, in addition to any other remedy under law.
(2) The Trustee, pursuant to his authority under 20 Pa.C.S. § 7780.6(a)(3), shall arbitrate the dispute between the Qualified or Current Beneficiaries pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and the Pennsylvania Uniform Arbitration Act, 42 Pa.C.S. §§ 7341-7342,

222

and after a due process hearing, issue an arbitration award which may be confirmed and entered as judgment in any court having jurisdiction thereof, including the jurisdiction of any U.S. District Court in which the respondent beneficiary may be found.

(3) Any surcharge levied by an arbitration award shall limited to actual damages, including any advances or liens against the Trust made pursuant to 20 Pa.C.S. §§ 7769(b), 7772(h), 7780.6(a)(7) and any reserves required by ¶ 8(C) and ¶ 15(D) of this Trust Agreement, and all reasonable attorney fees and court expenses.

(4) Any advance by any co-beneficiary equal to the surcharge levied by an arbitration award shall reimbursed by all remaining beneficiaries until the respondent satisfies the surcharge or sufficient sums are impounded by the Trustee."

As was stated in *Gold Reserve v. Bolivarian Republic of Venezuela*, 146 F.Supp.3d 112, 121 (D.D.C. 2015):

"In cases where both parties have clearly and unmistakably delegated the question of arbitrability to the arbitrator, a court 'should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances.' *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). Indeed, at least one circuit has held that where the parties 'clearly and unmistakably agreed to arbitrate issues of arbitrability,' the party resisting confirmation of the award 'is not entitled to an independent judicial redetermination of that same question.' *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 74 (2d Cir.2012). To the extent that the parties here have 'clearly and unmistakably' agreed to arbitrate arbitrability, then, this Court must give substantial deference to that decision."

And if there remains any doubt, the law is that courts should prefer an interpretation that makes a contract lawful. *Cole v. Burns International Security Service*, 323 U.S. App. D.C. 133, 105 F.3d 1465, 1485-1486 (1997); *Fontana v. White*, 334 F.3d 80, 85 (D.C. Cir. 2003).

### (3) Trust More Competent under Law of Shop.

*Gold Reserve* further provides one additional grounds in support of arbitrarity, as to who decides what constitutes "interpretation of the Trust Agreement and administration of the trust." "There is a reason why federal courts grant substantial deference to the evidentiary findings of arbitral tribunals: these bodies have greater resources, expertise, and access to evidence in order to develop factual findings, and federal courts are poorly situated to second-guess their conclusions." *Id.* 146 F. Supp. 3d at 130.

The "courts cannot ignore the fact that 'a principal attraction of arbitration is the expertise of those who decide the controversy. Expertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it, and the dividing line between innocuous and suspect relationships is not always easy to draw.'" *Sanford Home for Adults v. LOCAL 6, IFHP*, 665 F. Supp. 312, 319 (S.D.N.Y. 1987) quoting *Andros Compania Maritima v. Marc Rich & Co., A.G.*, 579 F.2d 691, 701 (2d Cir.1978).

In other words, no one knows the Trust Agreement better than those charged with effectuating its charitable purpose, which instantly, is the protection of civil rights secured by law that of the First Amendment right of political association. We know, more so than any court, how the Trust Property is to be administered and to what charitable ends it is to provide. See also *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 150 (1968) (White, J.,concurring) ("It is often because [arbitrators] are men of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function")

Equally important, we possess expertise which Courts likewise do not possess, instantly political science. A normal person would read the March 19, 2013 *Growth and Opportunity Project* Report, and not having know what multiple professors of political science and law have opined, would be clueless as to the significance of what they were reading. A regular reader would likewise miss the

racial euphemisms, commonly referred as "dog whistles," throughout the Respondent's text. He would not understand why "mutual respect" is held as an egregiously condescending racial euphemism by African-American voters.

As we discuss more fully below, because violations of the Civil Rights Act of 1957 also violate the Trust Agreement, ¶ 2(A). ¶ 8(A), ¶ 8(B)(1)-(2), ¶ 30(L) and ¶30(M), thus a violation of Federal law is simultaneously a breach of fiduciary duty under the Trust Agreement. And a breach of fiduciary duty in violating the terms and conditions of the Trust Agreement constitutes an interpretation of that Trust Agreement, which both the UTC § 816(23) and the PA UTA 20 Pa.C.S. § 7780.6(a)(3) reserves solely to us. And to that end, the law requires that we are afforded great difference in the exercise of our discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989).

### III. Procedure Governing Arbitration.
#### (1) Authority for Arbitral Summary Disposition

As there is no genuine dispute of material facts, we treat this grievance in the same manner a court treats judgment on the pleadings, granted only when the moving party is entitled to judgment as a matter of law. *Giddings v. Tartler*, 130 Pa.Cmwlth. 175, 177, 567 A.2d 766, 767 (1989). A motion for judgment on pleadings under Fed.R.Civ. Rule 12(c) requires the court to "accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the plaintiff." *Turbe v. Gov't of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991). The motion can be granted "only if no relief could be granted under any set of facts that could be proved." *Id*. We confine ourselves to our equivalent of pleadings, which is the grievance filed by the Grievant, and if filed by the respondent, the answer, reply to new matter and any documents or exhibits properly attached to them. *Kelly v. Nationwide Ins. Co.*, 414 Pa.Super. 6, 10, 606 A.2d 470, 471 (1992).

#### (2) Generally No Arbitration Hearing Require.

There is no requirement for an arbitration hearing *per se*, because arbitration can be summarily decided, as is fully permissible by law. See e.g. *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997); *Robbins v. Day*, 954 F. 2d 679, 685 (11th Cir. 1992) *cert. denied* 506 U.S. 870 (arbitration may proceed "with only a summary hearing and with restricted inquiry into factual issues"); *Sherrock Bros. Inc. v. DaimlerChrysler Motors Co., LLC*, 465 F. Supp. 2d 384 (M.D.Pa. *affirmed* 2008 WL 63300 (3rd Cir. Jan. 7, 2008) disagreeing with *Chem-Met v. Metaland International, Inc.*, 1998 WL 35272368 (D.D.C. 1998) (Flannery, J.) superceded by the Revised Uniform Arbitration Act and AAA rules, which unquestionably allows for summary disposition.

#### (3) Fed.R.Civ.P Rule 65 Requires Hearing.

Nonetheless, having been fooled once, we will not be fooled again and noticed all parties of the June 4, 2018 hearing as required under Fed.R.Civ.P. Rule 65(b)(2), as we issued a TRO which must expire at time of the hearing, not to exceed 14 days. Thus, we properly exercised our discretion in mandating a hearing even when there is no material facts in dispute.

#### (4) Claims and Defenses Waived if Not Made in Hearing.

Respondent was put on full notice that it was required to make all claims and defenses in the June 4, 2018 hearing, otherwise all such claims and defenses are waived. *Foulger–Pratt Residential Contracting, LLC v. Madrigal Condos., LLC*, 779 F.Supp.2d 100, 115 (D.D.C.2011) *appeal dismissed* 2011 WL 3241465 (D.C. Cir. 2011).

The RNC moreover waives arbitrability challenge and forfeits the right to attack our authority to sit as arbitrators, because the RNC did not appear at the June 4, 2018 hearing and raise the issue before us. *Howard Univ. v. Metro. Campus Police Officer's Union*, 379 U.S.App.D.C. 282, 512 F.3d 716, 720–721 (D.C.Cir.2008); *Nuyen v. Hong Thai Ly*, 74 F.Supp.3d 474, 480 (D.D.C. 2014). We expressly ordered Respondent to put forth any argument regarding arbitrability, being the first matter we were to hear in the June 4, 2018 hearing.

### (5) Hearing in *Absentia* Authorized When RNC Fails to Appear.

Respondent was put on full notice that the hearing will proceed in *absentia* if it failed to appear personally or by its counsel. Just because the RNC elects to abstain itself, such does not defeat the arbitration. *US Claims, Inc. v. Dougherty*, 914 A.2d 874, 879 (Pa.Super.2006) *appeal denied* 593 Pa. 729, 928 A.2d 1291 (2007) (failure to appear at the arbitration because a party felt that the arbitrator had no jurisdiction, was frivolous because a litigant "was put on sufficient notice" of the arbitration). The RNC "cannot be allowed to circumvent arbitration through *absentia*." *Shamah v. Schweiger*, 21 F.Supp.2d 208, 214 (E.D.N.Y 1998). The RNC's will not be prejudiced by the Trustee proceeding *in absentia*, because the RNC cannot deny that it had due notice. Arbitrators are customarily authorized to proceed *in absentia*. See AAA R-31(relating to Arbitration in the Absence of a Party or Representative).

### (6) Trustee's Authority to Issue Injunctive Relief.

Arbitrators' authority to issue injunctive relief is well settled. Stephen P. Bedell, & Louis K. Ebling, *Equitable Relief in Arbitration: A Survey of American Case Law*, 20 LOY.U.CHI.L.J. 39 (1988); Phillip E. Stebbins, *Arbitrator's Authority to Issue Injunctive Relief under the New York Anti-Injunction Act*, 19 OHIO S.L.J STATE LAW JOURNAL 754 (1958). One of the world's largest arbitration bodies, the Court for Arbitration of Sport ("CAS") routinely issues injunctive relief, including temporary restraining orders under its procedural rule R31.

Bedell and Ebling note that:
> "The general rule is that the arbitrator's power is derived solely from the language and intent of the arbitration agreement. When an arbitration agreement is drafted broadly, the arbitrator has the inherent authority to award all forms of legal and equitable relief * * *. This is particularly true where the arbitration agreement incorporates by reference the Commercial Rules of the American Arbitration Association. The Commercial Rules expressly grant the arbitrator broad authority to award legal and equitable relief."

The Trust Agreement does not adopt the AAA Commercial Arbitration Rules, instead it adopts the Federal Rules of Civil Procedure, which obviously does provide for granting equitable relief as does the AAA Commercial Arbitration Rules.[3]

The seminal authority cited by the commentators is *Sperry International Trade, Inc. v. Government of Israel*, 532 F. Supp. 901 (S.D.N.Y.), *affirmed*, 689 F.2d 301 (2d Cir. 1982), *later proceeding*, 602 F. Supp 1440 (S.D.N.Y. 1985), recognizing "[a]n arbitration panel may grant equitable relief that a Court could not." *Id.*532 F.Supp. at 905. Multiple courts recognize that arbitrators have broad discretion in fashioning a remedy for the injustice which is found to have occurred. *Baltimore County v. Mayor & City Council of Baltimore*, 329 Md. 692, 621 A.2d 864 (1993).

As the California Supreme Court explained in *Advanced Micro Devices, Inc. v. Intel Corp.*, 9 Cal.4th 362, 885 P. 2d 994, 36 Cal. Rptr.2d 581 (1994):
> "The choice of remedy, then, may at times call on any decisionmaker's flexibility, creativity and sense of fairness. In private arbitrations, the parties have bargained for the relatively free exercise of those faculties. Arbitrators, unless specifically restricted by the agreement to following legal rules, 'may base their decision upon broad principles of justice and

---

[3] See e.g., AAA R-31: "Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. * * *." principles of dry law, but may decide on principles of equity and good conscience, and make their award *ex aequo et bono* [according to what is just and good].' Were courts to reevaluate independently the merits of a particular remedy, the parties' contractual expectation of a decision according to the arbitrators' best judgment would be defeated." *Id.* 9 Cal.4th at pp. 374-375 (citations omitted).

225

equity....'"

Vice Chancellor Lester sitting in the Delaware Chancery Court provides an equally important analysis in *LG Elecs., Inc. v. Interdigital Commc'ns, Inc.*, 98 A.3d 135, 140-146 (Del. Ch., 2014) provides a comprehensive narrative of the law regarding arbitrators granting injunctive relief dating back to Blackstone. The court concludes:

> "The version of [arbitration] rules in effect at the time [of the disputed] Agreement was executed distinguished between an arbitrator who applies "the substantive law(s) or rules of law ... applicable to the dispute" and an arbitrator who reaches a decision as an "amiable *compositeur* or *ex aequo et bono*." In arbitration lingo, these are very different concepts. "Arbitrators at law" are those who apply the legal precedent of a particular legal system as a court would. An arbitrator acting as an "amiable *compositeur* or *ex aequo et bono*" is free to resolve the dispute by applying broader principles of fairness, largely without reference to the law of a particular legal system.
>
> * * *
>
> "The role of an amiable *compositeur* or an arbitrator acting does not resemble a modern court of equity. "Whereas decisions in equity are deemed to be ... part of the law, decisions *ex aequo et bono* are imputed to an extra-legal realm." Leon Trakman, *Ex Aequo et Bono: Demystifying an Ancient Concept*, 8 CHI.J.INT'LL. 621, 627 (2008). "The rationale behind this distinction is that adjudicators *ex aequo et bono* may 'fill gaps' in the law based on principles of equity, but not based on notions of fairness that are not reduced to legal principles and rules of law." *Id.* "Whereas equity is part of an applicable legal system, notions of equality associated with *ex aequo et bono* are deemed to reside in a moral, social, or political realm that is external to the law." roles appear to envision a degree of discretion and ability to depart from legal precedent and doctrine far beyond anything that an American court would regard as permissible, even a true court of equity like the Delaware Court of Chancery or a federal court wielding the full panoply of its equitable authority."

`

### (7) Judicial Notice of Matters of Public Record.

We may take judicial notice of matters of public record not incorporated, or referenced. See Fed. R. Evid. 201; *Huntt v. Government of the Virgin Islands*, 339 F.2d 309, 310 (3d Cir. 1964); 21 Wright & Miller, Federal Practice and Procedure § 5016, at p. 505 (1977 & Supp. 1998).

### (8) No Bar Under Political Question Doctrine.

Prudence dictates that we ask whether judicial intervention is permitted due to the Political Question doctrine. *See e.g.*, Jonathan R. Siegel, Political Questions and Political Remedies, Bruce E Cain & N. Sabbah, eds., *The Political Question Doctrine and the Supreme Court of the United States*, 241-268 (2007); Rachel Barkow, *More Supreme than Court? The Fall of the Political Question Doctrine and the Rise of Judicial Supremacy*, 102 COLUM. L. REV. 237, 329 (2002); J. Peter Mulhern, *In Defense of the Political Question Doctrine*, 137 U. PA. L. REV. 97, 156–62 (1988); Louis Henkin, *Is There a Political Question Doctrine?* 85 YALE L.J. 597, 622 (1976).

American political parties have always occupied a gray area of constitutional law because of their dual public-private nature. Robert Wigton, *American Political Parties under the First Amendment*, 7 J.L. & Poly 411 (1999). Parties are analogous to public utilities, some of their activities are public others are private. Leon Epstein, *Political Parties in the American Mold* 9-39 (1986). Parties provide quasi-governmental functions, Wigton, at 413-414, and constitute a form of checks and balances, Theodore J. Lowi, *Party, Policy, and the Constitution in America*, in William N. Chambers and W. Dean Burnham, *The American Party Systems* 238-76 (2d ed. 1975).

"Political parties are part of the informal constitution- institutions that fill in the implied functions that arise out of the formal electoral structure. Political parties are no accident. They derive from the need to organize efforts to solicit voter support for candidates and to coordinate legislative action

around a common program. They exist in a no-man's land between the public and private sectors: the party as government (for example, elected officials) in the former and the party as organization (such as activists and party officials) in the latter." Bruce E. Cain, *Party Autonomy and Two-party Electoral Competition*, 149 Univ. Pa. L. Rev. 793, 806-807 (2001).

Critical to any legal analysis is that authorities now distinguish parties are composed of three parts: "party organization" encompassing active members; "party-in-the-electorate" composed of the rank-and-file membership; and "party-in-government" made up of the party's elected and appointed officeholders. V.O. Key, Jr., *Politics, Parties, and Pressure Groups* 211-212 (5th ed. 1964); Frank J. Sorauf, *Party Politics in America*, 197 (1968); Aldrich, *supra* at 7, 12-14. We follow, as most Federal decisions already recognize, this trichotomy. Wigton at 420.

Because this matter is not limited to the associational or "private" component of party behavior, i.e., selection of party leaders, matters concerning party activists and vital to the preservation of party independence, *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214 (1989); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986), judicial intervention is not discouraged.

Instead, this matter is within the trichotomy's second part, where courts are required to balance "the virtues of maintaining independent political parties while simultaneously subjecting them to some degree of public supervision when they perform important governmental functions." Wigton at 416. We believe *Bentman v. Seventh Democratic Ward Exec. Comm.*, 421 Pa. 188, 218 A.2d 261 (1966), holding judicial interference with party's internal organization is justifiable if such directly affects the party's performance of a public function and the public interest, restricted to controversies where issue raised bears a direct and substantial relationship to performance of party's public functions, is on point.

This is because this matter falls squarely under the "party-in-the-electorate" as the Trust Purpose, Trust Agreement, Art I, ¶ 2, is to protect the right of registered voters to meaningfully participate in their chosen political parties. Party's interaction with the general public goes to the party's public function, since voters are whom the party is to represent.

Wigton urges courts to apply to second trichotomy cases the standard *Anderson v. Celebrezze* 460 U.S. 780, 787-90 (1983) applied to determining minor party ballot access. Wigton at 443. Strict scrutiny is applied only if it is first determined that protected rights are "severely burdened," otherwise the party's interests is balanced against the interests of the state. *Anderson*, at 787; *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992); *Tashjian.*, 479 U.S. at 213-214.

Even if the RNC argues the compelling interest standard under *Storer v. Brown*, 415 U.S. 724, 729-30 (1974) (state must demonstrate compelling interest in order to burden party's First Amendment associational rights) is applicable, such still does not bar judicial intervention under the Political Question doctrine, as this matter vindicates not only Pennsylvania fiduciary law, but the constitutional principles under *Associated Press v. United States*, 326 U.S. 1 (1945); *Reynolds v. Sims*, 377 U.S. 533 (1964); and *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748 (1976), both which are unquestionably compelling state interests.

RNC will argue we have no business interfering with the RNC's internal affairs due to *Lopez-Torres v. New York State Board of Elections*, 552 U.S. 196 (2008). Such argument is misplaced. Speaking for the court, Justice Scalia rejected the claims of New York judicial candidates of a reform faction of the local Democratic committee, on the premise that individuals' First Amendment associational rights is not the same as the First Amendment rights conferred on political parties. The Court boiled down the reform candidates' argument not so much as the constitutionally protected right to run for office, but a "fair shot" in running for office, which is not constitutionally protected, provided that there was "adequate opportunity" for all to run. *Id.* 128 S. Ct. at 798-800.

Justice Scalia in essence asserted that Federal Courts will "not enter the morass" over the undisputed one-party entrenchment *when* such is the result of the electoral process. Both Justices Stevens and Souter concurred with the caveat that *Lopez-Torres* was not to be read to endorse the one-party entrenchment. Moreover, Justice Kennedy wrote in concurring in judgment, which Justice Breyer joined, that the analysis would have different for New York's alternative petition process affording the "adequate opportunity." *Id.* 128 S. Ct. at 801. Justice Scalia's opinion is all the more instructive in that "the States can, within limits. . . discourage party monopoly." *Id.* Justice Scalia was under no compulsion to add this observation.

Justice Scalia at no time repudiates *Kusper*, a point which Justice Kennedy emphasizes, and which is why *Lopez-Torres* does not control. *Kusper* protects a person's constitutional right to associate with the political party of one's choice. 414 U.S. at 58. The Trust does not violate the RNC's right to limit membership and to choose candidates that will best represent the party's political platform. *LaFollette*, 450 U.S. at 122; *California Democratic Party v. Jones*, 530 U.S. 567, 574-575 (2000).

Instead, the Trust's activities is grounded exclusively in the constitutional right "to engage in association for the advancement of beliefs and ideas" *NAACP v. Patterson*, 357 U. S. 449, 460 (1958), because "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," *id.* and see also *Tashijian v. Republican Party of Conn.*, 479 U.S. at 216 (O'Connor, J., concurring) ("To have a meaningful voice in this process, the individual voter must join together with like-minded others at the polls"). Nothing within *Lopez-Torres* implies voters should be prevented seeking to cure "party monopoly" by i.e., utilizing Pennsylvania's trust laws, to create a means to pursue such laudable goals. In any respect, nothing within this dispute arises from the electoral process. To the contrary, since the Trust Purpose to prevent the abuse condemned by *Reynolds v. Sims*, 377 U.S. 533, 555 (1964), it is the Trust, not the RNC, who is protecting the electoral process. *Lopez-Torres* likewise does not undermine *McConnell*'s explicit understanding about party bossism and its reliance on super-donors purchasing access and influence chills the very First Amendment rights the Trust seeks to protect.

Also, *Lopez-Torres* does not overturn *Republican Party of Minnesota v. White*, 536 U.S. 765, 788 (2002), also written by Justice Scalia, that whatever participatory role is provided by law as part of the electoral process, such participants must not be denied "the First Amendment rights that attach to their roles."

### (9) Election Crimes, Fraud on Court Rebuts Evidentiary Presumption.

As we find Respondent has committed election crimes and a fraud on the court, such evidence is used against the Respondent to rebut the presumption that public officials act for the public good and that their decisions reached in a legal way after an investigation. *Wilson v. City of New Castle*, 301 Pa. 358, 365, 152 A. 102, 104 (1930); *A Pickett Construction, Inc. v. Luzerne Co. Convention Authority,* 738 A.2d 20, 24 (Pa.Cmwlth. 1999). The heavy burden of proof to overturn this presumption rests solely on the Grievant, and we only can interfere with this presumption "when it is made apparent this discretion has been abused." *Wilson*, 301 Pa. At 365, 152 A. at 104; *A. Pickett*, 738 A.2d at 24.

"[W]hen election crime exists, public corruption of some form is also usually present. This is so because virtually all election crime is driven by a motive to control governmental power for some corrupt purpose. * * * Most election fraud aims at ensuring that important elected positions are occupied by "friendly" candidates. It occurs most often when the financial stakes involved in who controls public offices are great * * * or when illicit activities are being conducted that require protection from official scrutiny." Craig C. Donsanto and Nancy L. Simmons, U.S. Dept. of Justice, *Federal Prosecution of Election Offenses* 2 (7th ed. 2007).

### (10) Evoking *Res Ipsa Loquitur*.

We may also evoke *res ipsa loquitur*, that the elements of duty of care, breach and causation are

inferred from an injury that does not ordinarily occur without violating such duty of care. While normally applied to torts regarding accidents and personal injury, the rule is now applied in enforcement of civil rights. It comes in via the pretext analysis.

The Restatement (Third) of Torts provides that:

"[R]es ipsa loquitur is circumstantial evidence of a quite distinctive form. The doctrine implies that the court does not know, and cannot find out, what actually happened in the individual case. Instead, the finding of likely negligence is derived from knowledge of the causes of the type or category of accidents involved.

Differently stated, *res ipsa* permits the fact finder to infer or presume a breach by the defendant(s) when the plaintiff has difficulty producing evidence of a specific act or acts by the defendant(s) that constitute a breach of the standard of care, which regrettably is a common occurrence in enforcement of civil rights, as public officials possess unique powers to conceal their wrongdoing.

Other courts and authorities include another element: that evidence of the cause of the injury is more accessible to the defendant than the plaintiff. See William L. Prosser, *The Procedural Effect of Res Ipsa Loquitur*, 20 MINN. L. REV. 241, 260 (1936). We find support that this principle is derived from the common evidentiary rule that burden of proof and/or persuasion will be against the party who possesses, or otherwise should have possessed the evidence that would prove or disprove a contention. This is because it is well settled that egregiousness is the hallmark of probability in committing political corruption simply because of the general public's unwillingness to accept such reality. *Foley v. City of Lowell, Mass.*, 948 F.2d 10, 15 (1st Cir. 1991). Institutional disbelief is not uncommon. See e.g., *Jennings v. Shuman*, 567 F.2d 1213 (3d Cir. 1977). It is known as normalcy bias and also referred to as analysis paralysis and the ostrich effect. See generally, Paul Peretz, ed., *The Politics of American Economic Policy Making* 249 (2d ed. 1996). *Res ipsa loquitur* enables the fact finder to bypass such cognitive biases and heuristics that impose evidentiary barriers.

### (11) Claim or Issue Preclusion No Bar to Ongoing Acts.

RNC's defenses regarding *res judicata* and collateral estoppel must first be raised before us. *National Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129, 135-136 (2d Cir. 1996); *Chiron Corp. v. Ortho Diagnostic Systems*, 207 F.3d 1126, 1128 (9th Cir. 2000); *Williams v. Atl. Specialty Ins. Co.*, No. CV-18-00061-TUC-DCB (D. Ariz. May. 2, 2018).[4] "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Courts "ordinarily will not except a controversy from coverage of a valid arbitration. Accordingly, when this Award comes up for confirmation, the RNC cannot raise *res judicata* or collateral estoppel to oppose confirmation. *New York Hotel and Motel Trades v. Hotel St. George*, 988 F. Supp. 770, 776 (S.D.N.Y. 1997).

But the RNC, by abstaining itself, has not, therefore, all such defenses under *res judicata* and collateral estoppel are waived. Nonetheless, we memorialize for the record that neither bar this proceeding.

For *res judicata* ("claim preclusion") to be binding, several factors must be met: (1) identity in the thing at suit; (2) identity of the cause at suit; (3) identity of the parties to the action; identity in the designation of the parties involved; (4) whether the judgment was final; (5) whether the parties were given full and fair opportunity to be heard on the issue. Regarding designation of the parties

---

4

involved, a person may be involved in an action while filling a given office (e.g. as the agent of another), and may subsequently initiate the same action in a differing capacity (e.g. as his own agent). In that case *res judicata* would not be available as a defense unless the defendant could show that the differing designations were not legitimate and sufficient.

Collateral estoppel (issue preclusion") prevents a person from relitigating an issue. "[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision ... preclude[s] relitigation of the issue in a suit on a different cause of action involving a party to the first case."

Collateral estoppel arises when the claim (cause of action) at the bar has not been litigated, but the exact issue that is now before the court has been raised and litigated in an earlier action or proceeding. Collateral estoppel is a bit different than res judicata, although the rationale is the same – it is a tool to prevent re-litigation of issues already litigated. See *United States v. Wells*, 347 F.3d 280, 285 (8th Cir. 2003).

The requirements that must be satisfied before collateral estoppel is applied are similar to those for *res judicata,* but there are differences. First, the issues in the first and second litigation must be identical and must have been before a court. Second, the issue must have been actually litigated. Third, a final judgment must have been rendered, ultimately deciding the issue in question.

In most cases, the identity of the parties, or those in privity to the original parties, must be the same as in the first action. As we found that the litigation in the New Jersey Federal Court dealt with the RNC's explicit voter suppression activities, and not its overall strategy of intimidation, threats and coercion of both voters as a class, and their elected precinct party representatives, in violation of the Civil Rights Act of 1957, we hold that neither *res judicata* or collateral estoppel apply.

Whether *res judicata* is applicable to the RNC's misconduct prior to 2009 is a question bot not before us, as the Superior Court made clear, it was our arbitral process which was questioned, not the RNC's misconduct. And relative to the U.S. District Court's decision in the 1982 case, we are required to hold *res judicata* and collateral estoppel prevents relitigation of the DNC's claims prior to 1982.

That issue, however, cannot frustrate the DNC's current effort entirely. As the DNC avers, the RNC's allegedly voter suppression continues. Since the DNC's action obviously could not have asserted claims based on facts that were not yet in existence, dismissal of that action cannot be *res judicata* of the DNC's complaint respecting the RNC voter suppression from 1980 until present. *Page v. United States*, 234 U.S.App.D.C. 332, 335-336, 729 F. 2d 818, 821-820 (1984). Any prior judgment issued by confirmation courts were intended to shield the RNC from relitigating prior disputes, not enable the RNC to engage in future bad acts with impunity. *Lindsey v. District of Columbia*, 609 F.Supp.2d 71, 79 (D.D.C. 2009). *See*, e.g., *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 327-328 (1955) (prior adjudication does not bar similar action based on subsequent acts even if both suits involve "essentially the same course of wrongful conduct"); *accord*, *Exhibitors Poster Exchange, Inc. v. National Screen Serv. Corp.*, 421 F.2d 1313, 1318 (5th Cir.1970), *cert. denied*, 400 U.S. 991 (1971); *Cream Top Creamery v. Dean Milk Co.*, 383 F.2d 358, 363 (6th Cir.1967). Nor are the parties collaterally estopped from pressing the RNC's misconduct theories in this new action. The only issue not open is whether pre-1972 claims are time-barred. See generally *Allen v. McCurry*, 449 U.S. 90, 94 (1980); *Montana v. United States*, 440 U.S. 147, 153 (1979).

### (12) Prior Award No Bar under *Res Judicata* or Collateral Estoppel.

The RNC may also argue that the court's refusal to confirm our prior arbitration awards constitutes *res judicata* and/or collateral estoppel, and of course the RNC will be wrong (again). The Pennsylvania Superior Court, citing *Chervenak, Keane & Co., Inc. v. Hotel Rittenhouse Assocs,Inc.*, 477 A.2d 482, 485 (Pa.Super. 1984), specifically held that the "[a]n 'irregularity' that requires

reversal of a common-law arbitration award refers to the process employed in reaching the results of the arbitration, not to the result itself." *In re Roosevelt-Bentman Trust*, 2016 WL 783628 (Feb. 29, 2016) at *3. At all times the dispute in both the state and Federal courts was our summary disposition of the case without a hearing. All of the false misrepresentations invented by Common Pleas Court Judge Matthew Carrafiello being indited by the Respondent's fraud on the court was *obiter dicta*, let alone being made out of whole cloth.

### (13) Prior Court Ruling No Bar under *Res Judicata*.

Likewise, neither *res judicata* or collateral estoppel, or for that matter, law of the case, likewise is inapplicable. The Federal Court was applying the Voting Rights Act ("VRA") of 1965. This Award does not consider the VRA, it is applying the Civil Rights Act ("CRA") of 1957

The VRA was enacted by Congress specifically to provide additional resources for the Justice Department to combat the pervasive effect of Jim Crowism in frustrating African-American voter registration. Congress enacted the VRA of 1965 for the broad remedial purpose of "rid[ding] the country of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966). "The preamble to the Voting Rights Act of 1965 establishes that the central purpose of the Act is '[t]o enforce the fifteenth amendment to the Constitution of the United States.'" *Chisom v. Roemer*, 501 U.S. 380, 383 (1991). Section 2 of the VRA is pointedly viewed largely as a restatement of the Fifteenth Amendment. See H.R. Rep. No. 439, 89th Cong., 1st Sess., 23 (1965), U.S. Code Cong. Admin. News 1965, pp. 2437, 2454. *Chisom*, 501 U.S. at 392.

Enactment of the VRA of 1965 was among the last of multiple Congressional attempts to enforce voting rights of minority Americans, *starting* with the CRA of 1957. *See* 13D Wright & Miller, Federal Practice & Procedure § 3576 (3d ed.) (citing 42 U.S.C. § 1971 [now recodified at 52 U.S.C. § 10101] as part of comprehensive legislation "to provide effective remedies against discrimination in the conduct of elections" that began "with the Civil Rights Act of 1957, and with broadening amendments in 1960, 1964, 1965, and 1970") as cited in *Delegates to the Republican Nat'l Convention v. Republican Nat'l Comm.*, No. SACV 12-00927 DOC(JPRx), 2012 WL 3239903 (C.D.Cal. Aug, 7, 2012).

More importantly, the VRA of 1965 "prescribes remedies ... which go into effect without any need for prior adjudication." as the means to circumvent the case-by-case litigation to enforce civil rights that is the primary means of CRA of 1957 and subsequent civil rights legislation. *Shelby County v. Holder*, 400 U.S. App. D.C. 367, 679 F.3d 848 (2012) *rev. on other grounds* 570 U.S. ___, citing *South Carolina v. Katzenbach*, 383 U.S. 301, 327-328 (1966).

It is generally regarded the CRA of 1957, being the first federal civil rights legislation passed by the United States Congress since the Civil Rights Act of 1875. Its purpose was to show the federal government's support for racial equality after the US Supreme Court's landmark decision in *Brown v. Board of Education of Topeka* 347 U.S. 483 (1954). Among its provisions was establishment of the Civil Rights Commission, amendment of the CRA of 1875, then 42 U.S.C. § 1971(b), was by Section 131 of the Act.

The first subsection of the CRA, 52 § 10101(a) (formerly 42 U.S.C. § 1971(a)), guarantees the right to vote free from racial discrimination; the second, 52 U.S.C. § 10101(b) (formerly 42 U.S.C. § 1971(b)), makes it unlawful to "intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote." *Fenton v. Dudley*, 761 F.3d 770, 776 (7th Cir. 2014) discussing *City of Greenwood v. Peacock*, 384 U.S. 808 (1966) ("The *Peacock* defendants, remember, were arrested while registering others to vote, not while voting or attempt to vote themselves"). More importantly, as noted in *United States v. Original Knights of the Ku Klux Klan*, 250 F. Supp. 330, 346-347 (E.D. La. 1965) Section (b) "is not limited to physical acts or to direct interference with the act of voting but applies to — 'any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) [now recodified as

231

subsection (a)] * * *.'"

More importantly, Circuit Judge John Minor Wisdom (a Republican) citing Note, Beatty, *Private Economic Coercion and the Civil Rights Act of 1957*, 71 YALE L.JOUR. 536, 543 (1962):

> 'The Circuit Court's construction of the 1957 act to apply to economic coercion in general and to economic coercion involving contract and property rights in particular seems correct. In requesting legislation to protect voting rights,

> President Eisenhower noted: 'It is disturbing that in some localities allegations persist that Negro citizens are being deprived of their right to vote and are likewise being subjected to unwarranted economic pressures.

> Senator [Paul H.] Douglas [D-IL], a sponsor of the bill, asserted that the legislation was directed at denials of voting rights `by economic pressure' as well as by other means. And Representative [Emanuel] Celler [D-NY], a House sponsor, indicated that if `the milk dealer, the coal dealer, the butcher, the baker and the candlestick maker * * * agree * * * to boycott' persons who try to vote, the agreement would violate the proposed law.'"

We conclude that the cause of action under VRA of 1965 is more specific in the elements and burden of proof regarding voter registration and election conduct, whereas the CRA of 1957 is broader in its scope, and specifically Section 10101(b) deals not only with official actions, but overt and convert private actions. Accordingly, a cause of action under VRA of 1965 is different than a cause of action under CRA of 1957, and their burdens of proof substantially different. Thus *res judicata* cannot apply.

### (14) Consent Decree's Paragraph 4 No Defense.

The RNC may argue that it has no right of control over state, county and local party committees, a contention which the Federal Court found because the language of the 1982 Consent Degree general provision controlling the RNC and its "agents, servants, and employees, whether acting directly or indirectly through other party committees" was negated by subsequent language that the RNC did not have a "right of control over other state party committees, county committees, or other national, state and local political organizations of the same party, and their agents, servants and employees." *Democratic National Committee v. Republican National Committee*, 2016 WL 6584915 (Nov. 5, 2016) at * 15.

However, the Court missed a critical adjective in reading the Consent Decree's Paragraph 4, which actually read "that the RNC and the [New Jersey State Republican Committee] have no *present* right of control over other state party committees, county committees, or other national state, and local political organizations of the same party, and their agents, servants and employees."

Paragraph 4 was written in 1982, when Ronald Reagan was President and well before McCain--Feingold divorced the national political parties from "soft money" and *Citizens United* gave rise to Dark Money organizations pouring untold millions into Federal campaigns, and the worsening and more venomous polarization of our political environment. More important, the terminology "political technology" was foreign to all political participants in 1982. Public access to the Internet didn't exist and Facebook founder Mort Zuckerberg wasn't even born. In fact, viewed from the perceptive of political science, 1982 and today are as different as night and day.

While most authorities agree the RNC's nationalization of the party was well known to political scientists, it was not so obvious to attorneys and judges. The RNC's nationalization of the GOP didn't spill over into the courts until after the RNC's efforts to overturn the McCain-Feingold's soft money ban. Thus, we conclude that the facts have superceded the precedent, and thus the law which arises out of the New Jersey Federal Court decision, is no longer binding, because the facts today are different from the facts in 1982.

Finding no bar to adjudicate, we now proceed to the merits.

## IV. RNC Strawman Objections to Arbitrariy Frivolous.
### (1) RNC's Strawman Objections is Vexatious, Consuming Scare Resources.

The RNC interposes bizarre, fanciful and whimsical strawman arguments which courts universally condemn. *See e.g. Parasco v. Pacific Indemnity Co*, 870 F.Supp. 644, 646 n. 1 (E.D.Pa. 1994) (court view's counsel failure to determine validity of premises argued with "extreme disfavor"); *Napier v. Unidentified Federal Agents*, 855 F.2d 1080, 1091 (3d Cir. 1988) (court objects to "hollow platitude which has no relevance to the facts"); Joseph Lawless *Sanctions the Federal Law of Litigation Abuse* 169 (3d ed. 2000) ("A baseless statement or deliberate misstatement may not be presented as fact").

Litigation spawned by frivolity "bearing no relation to the proper administration of trusts, dissipates trust assets, unduly burdens the judicial process, and unnecessarily delays other litigants from their day in court." *In re Estate of Coleman*, 456 Pa. 163, 167, 317 A.2d 631, 633 (1974). Time, expense, and effort involved in achieving judicial resolution of a controversy is already substantial. To permit or encourage the litigation of irrelevant trust notions not only diverts trust assets from charities, but also frustrates the Commonwealth's policy favoring the prompt, orderly, and efficient administration of trusts. *Id.*, 456 Pa. at 167, 317 A.2d at 633.

That the RNC's objections are artificial and self-constructed, constitute the technique often referred to as the irrelevant conclusion or *ignoratio elenchi*: the material fallacy of attacking something not asserted. In the vernacular, this is known as a strawman. *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1009 (3d Cir. 1984) (Aldisert, J., concurring). Such fallacy, in legal reasoning is a type of argument that superficially appears to be correct, but upon examination, is not so, as the proponent has mischaracterized the proposition. Ruggero J. Aldisert, *Logic for Lawyers* 169 (3d ed. 1997); Pierre Schlag and David Skover, *Tactics of Legal Reasoning* 22 (1986). While the reasonable inference to draw from the RNC's reliance on immaterial fallacies is obvious, avoidance, *Estate of Calloway v. Marvel Entertainment Group*, 9 F.3d 237, 241 (2d Cir. 1993), the fact remains that legal reasoning requires that conclusions not be assumed, but derived from the premises. *Id.* at 170. All premises must be derived from either an empirical basis, authority (i.e. of law), evaluative judgment (i.e., a political, moral or aesthetic judgment or viewpoint), or hypothesis. Schlag and Skover, *supra*, at 11-12. Each of the RNC's ambiguous, conclusory and vague objections all have one thing in common, no factual premises or legal basis.

In *Matthews v. Freedman*, 128 F.R.D. 194 (E.D.Pa. 1989), the court adopted the benchmarks defined by E.D. Cavanaugh, *Developing Standards under Amended Rule 11 of the Federal Rules of Civil Procedure,* 14 HOFSTRA L.REV. 499 (1986) to determine an attorney's argument satisfies Fed.R.Civ.P Rule 11's "well-grounded in law" requirement.

For a legal argument to be "clearly reasonable" it has to be: (1) based on plain meaning of statutes or Supreme Court decisions; (2) based on caselaw from within circuit; (3) circuit caselaw is unsettled, but caselaw from another circuit or district supports argument; (4) circuit caselaw is contrary to argument, but another circuit supports it; (5) plausible argument in case of first impression; argument counter to established caselaw, but compelling facts or values suggest re-examination of settled precedent; or settled precedent is factually distinguishable, and argument meets one of the other standards above.

For a legal argument to be "presumptively reasonable" it must be based on: (1) novel (plausible) theories based on analogies to unrelated areas of law; or (B) plausible theories in a complicated area of the law.

A legal argument is "presumptively unreasonable" if it is founded on: (1) farfetched analogies that imply an improper purpose; or (2) misrepresentations of governing law that suggest an intention to

mislead the court.

A legal argument as "clearly unreasonable" when it is based on: (1) fatal, irremediable defect on face of pleading; *settled law opposes argument and counsel does not confront or attempt to distinguish adverse authority;* or *argument consists of dubious legal propositions unsupported by legal research.* 128 F.R.D. at 200 (emphasis original) citing 14 Hofstra L.rev. at 538, 544–545.

Every legal argument raised by RNC counsel has been "clearly unreasonable" not being predicated on a single material fact, but made out of whole cloth. That our courts are susceptible to such nonsense does not reflect well on our judicial processes.

### (2) Arbitration is a Matter of Contract.

Arbitration is a matter of contract, the parties agreeing to alternate dispute resolution. 9 U.S.C. § 2; *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008) ("[FAA] makes contracts to arbitrate 'valid, irrevocable and enforceable' so long as they involves 'commerce'").

Courts must rigorously enforce arbitration agreements according to their terms, including terms that specify with whom the parties choose to arbitrate their disputes, and the rules under which that arbitration will be conducted. 9 U.S.C § 2; *American Exp. Co. v. Italian Colors Restaurant*, 570 U.S. 228, 232-233 (2013).

Arbitration is suppose to be a quicker and easier method of obtaining justice, *Emporium Area Joint School Authority v. Anundson Const. & Bldg. Supply Co.*, 402 Pa 18, 166 A.2d 269 (1960), but still is a solemn and serious undertaking for the attainment of justice, and when parties agree to settle by arbitration all differences that may arise between them, they are bound by their commitment as much as if they entered into a stipulation in court. *McKenna v. North Strabane Twp.*, 700 A.2d 577, 580 (Pa.Cmwlth 1997) quoting *Chester City School Authority v. Aberthaw Construction Co.*, 460 Pa. 343, 353, 333 A.2d 758, 763 (1975). The Pennsylvania Supreme Court has repeatedly stated that public policy favors arbitration. *Mendelson v. Shrager*, 432 Pa. 383, 248 A.2d 234 (1968); *Flightways Corp. v. Keystone Helicopter Corp.*, 459 Pa. 660, 331 A.2d 184 (1975).

The Trust Agreement is the contract which at ¶ 8(E)(1)-(4) requires alternate dispute resolution first by mediation, and if that fails, the Trustee being a neutral sits as arbitrator to resolve dispute among the co-beneficiaries. 20 Pa.C.S. §§ 7705(a) (Trust provisions control when not contrary to mandatory rules), 7780.6(a)(2) ([Trustee has the power] To resolve a dispute regarding the interpretation of the trust or the administration of the trust by mediation, arbitration or other alternative dispute resolution procedures).

### (3) Trustee Has Authority to Sit as Arbitrator.

The laws in force are part of the trust and have the same effect as if incorporated in the trust instrument. *In re Pew's Estate*, 411 Pa. 96, 107, 191 A.2d 399, 405-06 (1963). The PA Uniform Trust Act authorizes a trustee to resolve disputes over interpretation of the trust or the administration of the trust by mediation or arbitration or other alternative dispute resolution procedures. 20 Pa.C.S. § 7780.6(a)(3); 7C Uniform Law Commission Trust Code § 816 Comment at p. 632 (provision is to encourage use of alternate dispute resolution).

It is not uncommon for trustees to act as arbitrators. *See* e.g., *Parsons v. Power Mountain Coal Co*., 604 F. 3d 177, 183 (4th Cir. 2010) (dismissing claim that union health fund trustees were not neutral arbitrators because settlor approved the provision) and is a long well established in common law. 94 *Journal of the House of Lords* 149 (1862); F. Morley, I *Unemployment insurance in the United States. Editorial research reports* (Washington, DC: CQ Press. 1926), but at all times is a neutral as the dispute is between the co-beneficiaries. *Re Trust of David H. Keiser,* 392 Pa.Super. 146, 150 & n.2, 572 A.2d 734, 736 & n.2 (1990). As noted *supra*, trustee-arbitrators are usually found in

union pension trusts, see e.g. *Freeman v. Vivacolor, Inc.*, 2004 WL 2884429 (D.D.C.) (Nov. 1, 2004) (KOLLAR-KOTELLY, J.).

Nonethtless, Trustee-Arbitrators must comport with the rule of equity, William B. Rubenstein, *The Concept of Equality in Civil Practice*, 23 CARDOZO L. REV. 1865 1901 n. 141 (2002) citing *McConnell v. Howard Univ.*, 260 U.S.App.D.C. 192, 818 F.2d 58, 68 (1987). The Trustee satisfies this requirement as under the PA Uniform Trust Act, he is mandated to be impartial. 20 Pa.C.S. § 7773, and is regarded as a neutral in disputes among beneficiaries. *In re Trust of Keiser,* 392 Pa.Super. 146, 150 & n.2, 572 A.2d 734, 736 & n.2 (1990).

### (4) RNC Not Required to be Signatory to be Bound to Trust.

Arbitration is "a creature of contract [governed] by state law" and "even a nonsignatory may be bound to arbitrate" under multiple common law principles under contract and agency law. *Arthur Andersen, LLP v. Carlisle*, 556 U.S. 624, 631 (2009). "The Supreme Court has ruled that state contract law governs the ability of nonsignatories to enforce arbitration provisions." *Donaldson Company, Inc. v. Burroughs Diesel, Inc.*, 581 F. 3rd 726, 732 (8th Cir. 2009) citing *Arthur Andersen, LLP v. Carlisle*, 556 U.S. at 631 (observing that "traditional principles of state law allow a contract to be enforced by or against non-parties to the contract through ... third-party beneficiary theories ... and estoppel"). And see also *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 255 (5th Cir. 2014) (same). The Court which this award is to be confirmed has followed *Carlisle* in *Signature Tech. Solutions v. Incapsulate, LLC*, 58 F.Supp. 3d 72, 80 (D.D.C. 2014) (WALTON, J.); *Tower Ins. Co. v. Davis*, 967 F. Supp. 2d 72, 79 (D.D.C. 2013) and in *Oehme, van Sweden & Assoc., Inc. v. Maypaul Trading & Svcs., Ltd.*, 902 F.Supp.2d 87, 97 (D.D.C.2012) both holding that "A nonsignatory to an arbitration agreement may be bound by that agreement under traditional principles of contract and agency law ... [including] third-party beneficiary"). *Incapsulate*, 58 F.Supp.3d at 85; *Maypaul Trading*, 902 F.Supp.2d at 97. Pennsylvania courts likewise have followed *Carlise*. See *Provenzano v. Ohio Valley Gen. Hosp.* 121 A.3d 1085, 1097 (Pa.Super. 2015). There are five such theories: '1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Merrill Lynch Inv. Managers v. Opibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)).

The contract principle instantly applicable is the Direct Benefits Estoppel. *Estate of Bodger,* 130 Cal.App.2d 416, 424–425, 279 P.2d 61 (1955) (a trust is a third party beneficiary contract); *Suh v. Superior Court*, 181 Cal.App.4th 1504, 1513, 105 Cal.Rptr.3d 585 (2010) (nonsignatories to an arbitration agreement may be bound by the agreement by equitable estoppel or on a third party beneficiary contract theory).

Moreover, "[s]ignatures are not dispositive evidence of contractual intent . . . As a general rule, signatures are not required for a binding contract unless such signing is expressly required by law or by the intent of the parties." *American Eagle Outfitters v. Lyle Scott Ltd.*, 584 F.3d 575, 584 (3d Cir. 2009) (quoting *Shovel Transfer Storage, Inc., v. Pa. Liquor Control Bd.*, 559 Pa. 56, 63, 739 A.2d 133, 136 (1999).

It is noteworthy that the FAA does not require that the arbitration agreement be signed by all parties; it only requires that the arbitration clause be "written." 9 U.S.C. §§ 2 and 4; *Marino v. Dillard's Inc.*, 413 F.3d 530, 532 (5th Cir. 2005) (holding that, under FAA, arbitration agreements need only be written, not signed). Courts have routinely enforced unsigned arbitration agreements when the parties have otherwise manifested their intent to be bound by them. See *Marino*, 413 F.3d at 533.

### (5) RNC Has Exploited Trust Agreement to Receive Direct Benefits.

"Direct-benefit estoppel 'involve[s] non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract.'" *Thomas -CSF, S.A. v American Arbitration Assoc.*,

235

64 F.3d 773, 778 (2nd Cir. 1995) and see also *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 199-200 (3d Cir. 2001); *MAG Portfolio Consultant, GmbH v Merlin Biomed Group LLC*, 268 F.3d 58, 61 (2d Cir. 2001) ("Under the estoppel theory, a company 'knowingly exploiting (an) agreement (with an arbitration clause can be) estopped from avoiding arbitration despite having never signed the agreement'"); *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 361-362 (5th Cir. 2003); *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517-18 (5th Cir. 2006); see also *Friedman v. Yula*, 679 F. Supp. 2d 617, 628 (E.D. Pa. 2010); *Matter of Belzberg v. Verus Investments*, 21 N.Y.3d 626, 999 N.E.2d 1130, 977 N.Y.S.2d 685 (2013); *Rachal v. Reitz*, 56 Tex. Sup. Ct. J. 530, 403 S.W.3d 840, 847-848 (2013); *Schoneberger v. Oelze*, 208 Ariz. 591, 96 P.3d 1078, 1081 (Az.App. 2004) (a nonsignatory may be barred from avoiding arbitration if he has claimed or received some direct benefit from the agreement containing the arbitration clause).[5] "The policy driving this theory is that a non-signatory should be prevented from embracing a contract and then turning its back on those portions of the contract which it finds distasteful." *In re Kaiser Group International, Inc.,* 307 B.R. 449, 456 (D.Del. 2004) citing *DuPont*, 269 F.3d at 199. And see Michael Tipton, *Can You Trust Your Trust?: Analyzing the Decision and Implications of Rachal v. Reitz on Arbitration Provisions in Trust Agreements*, 48 AKRON L. REV. 979 (2015).

A "nonsignatory is estopped from refusing to comply with an arbitration clause 'when it receives a "direct benefit" from a contract containing an arbitration clause.'" *Inter. Paper v. Schwabedissen Maschinen & Anlagen*, 206 F. 3d 411, 418 (4th Cir. 2000) quoting *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir.1999); and see also *Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060, 1064 (2d Cir.1993) (A nonsignatory is bound to arbitrate when it knew of the arbitration agreement and "knowingly accepted the benefits of" that agreement).

"It is well established that the beneficiary of a gift, if accepted, cannot object to the form of the gift." *American Federation, Grain v. Int'l Multifoods*, 116 F.3d 976, 981 (2d Cir. 1997); *Certain Underwriters at Lloyd's, London v. AT&T, Corp.*, 142 AD 3d 921, 37 N.Y.S.3d 886 (1st Dep. 2016). as "It is always important to recall that a trust is, after all, a gift, and those who accept the gift are bound by the conditions imposed." *In re Pruner's Estate*, 400 Pa. 629, 636, 162 A.2d 626, 630 (1960). To the contrary, assent is a matter of course unless the beneficiary purposely disclaims its interest in the trust. Restatement Third on Trusts § 14; *In re Tunnell's Estate*, 325 Pa. 554, 560, 190 A. 906, 907 (1937).

As noted above, "[t]he policy driving this theory is that a non-signatory should be prevented from embracing a contract and then turning its back on those portions of the contract which it finds distasteful." *In re Kaiser Group International, Inc.,* 307 B.R. at 456 citing *DuPont*, 269 F.3d at 199. "The guiding principle is whether the benefit gained by the nonsignatory is one that can be traced directly to the agreement containing the arbitration clause."*Matter of Belzberg*, 21 N.Y.3d at 633, 999 N.E.2d at 1136.

Since the benefits of the Trust can only flow from the Agreement which creates the Trust's benefits, and because the Trust's charitable purposes must, as a matter of law, benefit all voters, the RNC cannot dispute it obtains direct benefits from the Trust Res providing increased voter turnout at the

---

[5] Although in the case at bar, *Schoneberger* held that an inter vivos trust was not a contract, the courts recognize that dicta in *Schoneberger* indicated that if direct benefits existed for nonsignatories, the court would have held arbitration binding. *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d at 261-262 ("Nevertheless, the *Schoneberger* court appeared inclined to accept an arbitration-by-estoppel theory even though it did not so hold. Given this, it seems likely that Arizona courts would recognize arbitration by estoppel under different facts from those presented in *Schoneberger*").

236

polls. *Meyer v. Grant*, 486 U.S. 414, 424 (1988) (recognizing direct voter conduct most economic and efficient means of electioneering); *McConnell v. FEC*, 540 U.S. 93, 167-168 (2003) ("candidates reap substantial rewards from any efforts that increase the number of like-minded registered voters who actually go to the polls"). More importantly, the RNC not only directly exploited the Trust Agreement, but by engaging in the mediation, specifically exploited ¶ 8(E) concerning the ADR provisions of the Trust Agreement. This is in addition to the other benefits provided by the Trust that the RNC and Republicans across the nation have availed themselves, such as using the Trust's model codes and advisory ethics opinions. See e.g., *Scarnati v. Wolf*, __Pa. ___, 173 A.3d 1110 (2017) (State Supreme Court adopting Trust's rationale in *In re July 10, 2014 Veto Message of Gov.Thomas Corbett, of HB 278, PN 3930 (Fiscal Code) on Inquiry of PA Senate Majority Caucus*, Resolution No. 2014-11 (MUR 2014-2).

### (6) By Not Disclaiming, RNC Assents to Arbitration Provision.

Moreover, as discussed *infra*, the RNC's failure since 2007 to disclaim its interest in the trust is evidence of its assent to the Trust Agreement's arbitration provisions. See David Horton *The Federal Arbitration Act and Testamentary Instruments*, 90 N.C.L.REV.1027, 1060-1062, 1064-1065 (2012), citing *D'Angelo v. Bob Hastings Oldsmobile, Inc.*, 89 A.D.2d 785, 786, 453 N.Y.S.2d 503, 504 (4th Dept. 1982) following *Miller v Schloss*, 218 N.Y. 400, 407, 113 N.E. 337 (1916).

> "Likewise, when beneficiaries inherit under an estate plan, they forge a contract-like link with the testator or settlor. For one, beneficiaries usually enjoy several months to decide whether to disclaim a bequest. In addition, beneficiaries remain free to challenge the validity of a will or trust--conduct that is incompatible with the idea that they have consented to the instrument. Thus, beneficiaries have the opportunity to opt out of the arrangement proposed by the testator or settlor. As in the expired contract cases, when they do not do so, their "assent [to arbitrate] may fairly be inferred." The nineteenth century opinions that analogized arbitration clauses in estate plans to conditional gifts are instructive. As these courts recognized, a will or trust with an arbitration clause puts beneficiaries to an election: either renounce the gift or take it subject to the strings attached. This choice is indistinguishable from an offer to enter into a contract. For instance, as the Supreme Court of Appeals of West Virginia explained, a testamentary instrument may not formally be "an agreement between two or more contracting parties, but it is certainly no less binding upon the parties who take a benefit under it than if they had contracted with the testator for that benefit.

> "In sum, wills and trusts can serve as the springboard for agreements to arbitrate. To be sure, estate plans do not involve bargaining; likewise, executors, trustees, and beneficiaries assent to the instrument by failing to denounce it, rather than by affirmatively selecting its provisions. Yet courts routinely enforce adhesive consumer and employment contracts under precisely those conditions. Thus, by accepting benefits--fees or property--under a will or trust that contains an arbitration clause, executors, trustees, and beneficiaries fall within the FAA's coverage." *Id.* 90 N.C.L.REV. at 1064-1065

### (7) RNC Presumed to Accept Interest in Trust, Prior Consent Not Required.

The RNC has continuously asserted it was never noticed and solicited consent for the Trust to be created. However, a beneficiary is not required to be noticed. It is the Settlor (the late Dr. John Templeton, Jr.) who proffers the gift and he is not required to notice the beneficiary beforehand. *In re Tunnell's Estate*, 325 Pa. 554, 560, 190 A. 906, 907 (1937); Restatement Third on Trusts § 14 (A trust can be created without notice to or acceptance by any beneficiary or trustee). "It is always important to recall that a trust is, after all, a gift, and those who accept the gift are bound by the conditions imposed." *In re Pruner's Estate*, 400 Pa. 629, 636, 162 A.2d 626, 630 (1960).

It is legally presumed a beneficiary accepts its interest arising out the benefit inuring to the beneficiary. *Roop v. Greenfield*, 352 Pa. 232, 235-236, 42 A.2d 614, 615-616 (1945). The burden of proof to rebut the presumption is on the RNC. *Id.* 352 Pa. at 236, 42 A.2d at 616. Courts in other

states in accord. See e.g. *McKinstry v. Russell*, 114 Ind.App. 27, 44, 49 N.E. 349, 356 (1943) (although a beneficiary has the right to reject a gift, if he fails to do so within a reasonable time, the presumption the beneficiary accepted the gift becomes conclusive). Moreover, the RNC "cannot object to the form of the gift," *American Fed. Grain v. Int'l Multifoods*, 116 F.3d 976, 981 (2d Cir. 1997), because "those who accept the gift are bound by the conditions imposed." *In re Pruner's Estate*, 400 Pa. 629, 636, 162 A.2d 626, 630 (1960).

## (8) RNC Has Never Officially Disclaimed Its Interest.

We have always been amused by then RNC Assistant Chief Counsel Heather Sidwell's proposal to lock the barn door after the horse escapes. She demanded of both us and the Attorney General as to the proper procedures to disclaim the RNC's interest in the trust, 20 Pa.C.S. § 6201-6207, despite such information readily available via Westlaw. It is plain that a disclaimer must be delivered to us. 20 Pa.C.S. § 6204(b). A disclaimer must be in writing. 20 Pa.C.S. § 6201. A disclaimer must be express and unconditional, 20 Pa.C.S. § 6201(1)-(2); 11 Am.Jur. Prof. 2d 1 § 8, and is not effective if it is equivocal, unclear or ambiguous. *Garfield v. White*, 326 Mass. 20, 27, 90 N.E.2d 890, 895 (1963); and see also Restatement (Second) Trusts § 36, comment c; Bogert § 171 (2d ed). Moreover, disclaiming everything without definition is not acceptable. *Whitney v. Faulkner*, 95 P.3d 270, 273 (Utah 2004) see also Bogert at § 170.

Proof of disclaimer is always on the beneficiary. *Roop*, 352 Pa. at 236, 42 A.2d at 616; *Re Estate of Pellicer*, 118 So.2d 59, 60 (Fla.App. 1960); Bogert § 170 ("Since acceptance is typical, a claim of disclaimer must be supported by clear evidence"). Additionally, a disclaimer cannot be the result of undue influence or fraud. *Larson v. Smith*, 18 Wis.2d 366, 375, 118 N.W.2d 890, 895 (1963).

And finally, a disclaimer must be signed by the disclaimant, 20 Pa.C.S. § 6201. In *Daniel v. United Nat. Bank*, 202 W.Va. 648, 653, 505 S.E.2d 711, 715 (1998) the court held that a letter signed by disclaimant's attorney does not comply with W.Va.Code § 42–6–4, the state's adoption of the Uniform Disclaimer of Property Interests Act. This requirement is imposed by the D.C. Uniform Disclaimer of Property Interests Act, D C. Code § 19-1505(c)(1)(D) containing the same requirement ("Be signed by the person making the disclaimer") as does the PA version at 20 Pa.C.S. § 6201 ("be signed by the disclaimant"). FOF ¶ 1204.

There has been no formal associational act by the RNC membership at large, or by its executive committee directing a written disclaimer be effectuated. Any assertions by the RNC relative FECA provisions is beside the point, as we are talking about disclaimers of property interests, which is indefinite and permanent, not campaign contributions, which are transitory. We find no authority that would contradict our holding that FECA has no applicably to and does not preempt rights and responsibilities under Chapter 62 of the PEF Code. *See e.g. Karl Rove & Co. v Thornburgh*, 39 F.3d 1273, 1280-1283 (5th Cir. 1994) (FECA does not preempt state contract or common law).

We also note we find no provision of the *Rules of the Republican Party* that authorizes any individual staff employee or counsel to act in any manner that binds an association to a decision which only the association itself is recognized under law to partake. See e.g. *Rules of Republican Party*, Rule 6(b) ("The Executive Committee may exercise all the executive and administrative functions required of the Republican National Committee between meetings of the Republican National Committee [except for various limitations]").

## (9) RNC Estopped from Disclaiming Its Interest.

But in any respect, the train has already pulled out of station, as the RNC has created its own bar to disclaimer. 20 Pa.C.S. § 6206(a)(4) and (c). As the PA Joint Govt. Commission comment to 20 Pa.C.S. § 6206(c) provides: "Since this chapter has no mandatory time limit for disclaimer, a strict attitude is adopted toward partial acceptance after the grace period has elapsed. This subsection provides that any acceptance of the part of a single gift after that period results in the acceptance of the whole gift."

Throughout all of 2008 and well into 2009, we dealt with learned attorneys, who "reasonably should know" to inquire into the matter in question. ABA RPC 1.0 and 1.1, comment [2]. See Geoffrey C. Hazard, W. William Hodes, Peter R. Jarvis, *The Law of Lawyering* § 3.2 (3d ed. 2009) ("lack of legal knowledge and skill almost always results from a failure to seek it. Every lawyer who has been admitted to practice is capable of competence"); *ABA Standards for Imposing Legal Sanctions,* Std. 4.5.3 and 4.5.4 (reprimand when lawyer demonstrates failure to understand relevant legal doctrines or is negligent in determining whether he is incompetent).

The facts clearly establish a bar under 20 Pa.C.S. § 6206(a)(4) regarding "[a] representation that the interest has been or will be accepted to a person who relied thereon to his detriment." Just one of many examples is New Jersey RNC Committeeman and RNC Rules Chairman David Norcross, an attorney of exemplary standing and experience relayed various information as we have noted in our findings of fact, throughout all of 2008. Mr. Norcross in 2009 referred us specifically to Mr. Blake Hall, who at the time was RNC General Counsel. Mr. Hall had our repeated requests for submission to the RNC Winter Meeting Agenda for nomination of successor trustees.

Each of these attorneys would fully be cognizant of their responsibility under 20 Pa.C.S. § 6206(a)(4) that "[a] representation that the [equitable interest] has been or will be accepted" to us, in our official capacity as trustee, for which we relied upon to the detriment of the Trust, incurring additional liens on the Trust Property, 20 Pa.C.S. § 7769, 7780.6(a)(7). "An acceptance may be express or may be inferred from actions of the person entitled to receive an interest * * *." 20 Pa.C.S. §6206(a). See generally *In re Borsch's Estate*, 362 Pa. 581, 589-590, 67 A.2d 119, 123 (1949) (beneficiary cannot accept then disclaim interest).

Of course, the icing on the cake is the RNC's $20 million pledge made to co-trustee Hess by Messrs. Preibus and Marsh, and the fact that one of the three co-trustees, H. Paul Senft, Jr., was a member of the RNC. *See* e.g. *Cerf v. Commissioner of Internal Revenue*, 141 F.2d 564, 566 (3rd Cir. 1944) (taxpayer did not disclaim interest in legacy when acquiescence is shown by becoming a trustee).

**(10) RNC's Disclaimer Prohibited by Statutes of Elizabeth.**

From the outset, it is noted that a trust is not an independent entity, but "a fiduciary relationship created by a donor ("settlor") to transfer property ("trust property") to a third party ("trustee") to hold for the benefit of the recipient ("beneficiary"). *Buchanan v. Brentwood Federal Savings & Loan Association*, 457 Pa. 135, 143, 320 A.2d 117, 122 (1974). Trusts are classified as operative ("active") or impassive ("dry"). While only 2% of all charities are trusts, the trust is chosen for substantial legal protection to assure the charitable purpose is enforced, Darren B. Moore, *Who Would Have Thought: Charitable Trusts as a Viable Entity*, State Bar of Texas 7 (2012), including The Charitable Uses Act of 1601 (43 Eliz I, c.4) (Statute of Elizabeth) (1601), 1 Pa.C.S. § 1503(a) and 20 Pa.C.S. § 7706, being exempt from the rule against perpetuities. 20 Pa.C.S. § 6104(b).

The Trust is obviously a charitable trust. Originally named after two seminal state supreme court decisions: New York's *In re Application of Roosevelt*, 9 Misc.2d 205, 160 N.Y.S.2d 747, 749-750 (New York Co.), *affirmed*, 3 A.D. 988, 163 N.Y.S.2d 403 (1st Dept. 1957), *affirmed*, 4 N.Y.2d 19, 171 N.Y.S.2d 841, 148 N.E.2d 895 (1958); and Pennsylvania's *Bentman v. Seventh Democratic Ward Exec. Committee*, 421 Pa. 188, 218 A.2d 261 (1966), the Trust is a charitable trust, *Taylor v. Hoag*, 278 Pa. 194, 116 A. 826 (1922); Note, *Charitable Trusts for Political Purposes*, 37 VIRGINIA L.REV 988 (1951); Restatement (Second) Trusts § 374 comment j; Bogart & Bogert, BOGART ON TRUSTS & TRUSTEES (2d ed.1964) § 378 ("Bogert"); 4 Scott, SCOTT ON TRUSTS (2d ed.1956) §374.4 ("Scott"); Louis Bartlett, *Charitable Trusts to Effect Changes in the Law*, 16 CAL. REV. 478 (1928), enforcing existing civil rights secured by law, a charitable activity, 26 CFR § 1.501(c)(3)-1(d)(2) ("term charitable is used in section 501(c)(3)...includes...organizations designed to ... (iii) to defend ... civil rights secured by law...") that being Voters' First Amendment right to participate in the political process, *Collier v. Lindley*, 203 Cal. 641, 266 P. 526 (1928); Bartlett, *supra* n. 4, 12, 16 CAL. L. REV. 478.

239

"It is a basic tenet of the law of charitable trusts that beneficial charitable trust interests are inalienable." *In re Bishop College*, 151 B.R. 394, 399 (Bkrtcy.N.D.Tex. 1993). But in any respects, the RNC cannot disclaim its interests in a *charitable* trust, as noted by Bogert the RNC (and also the DNC) as "qualified beneficiaries" are merely conduits which the Trust's charitable benefits flow through to the general public - the true beneficiaries. *In re Trust of Brooke*, 82 Ohio St. 3d 553,561, 697 N.E.2d 191, 197 (1998); Bogert at §§ 323-363. "Individuals or classes of persons may be named merely for the purpose of showing the conduit through which the settlor expects the public benefits to flow." Bogert at § 323. The interests in the Trust are not the RNC's but that of the general public, and the RNC has no right to disavow another party's interest. RNC is in reality, a sub-trustee. Bogert at § 167 (in reality not a beneficiary of the trust, but instead a sub-trustee [as] the gift is for the benefit of the public or some substantial class thereof").

### (11) Equitable Estoppel Evoked due Agents' *Ultra Vires*.

Additionally, the RNC is equitably estopped due to agents' apparent *ultra vires*, appearing in court making assertions regarding disclaimer, etc., without the RNC's express authorization. Given that the RNC has never held a vote to disclaim its interests in the Trust as required by the D.C. Unincorporated Association Law, D.C. Code § 29-1112(a)(4) and the D.C. Uniform Disclaimer of Property Interests, D.C. Code § 19-1505(c)(1)(D), assuming *arguendo*, it could do so, *Green v. Connally*, 330 F.Supp. 1150, 1157 (D.D.C. 1971) (three judge panel) we have yet to see evidence that RNC counsel is authorized to undertake any acts relative to prior arbitration proceedings or this one. An attorney "has no 'inherent power' to dispose of his client's property or legal right, but must obtain special authority. *First American Title Ins. Co. v. DJ Mortg., LLC*, 328 Ga.App. 249, 254, 761 S.E.2d 811, 816 (2014).

## V. RNC's Agents Shirking Violates Trust Agreement.
### (1) Republican Curia Self-Serving Interests.

The RNC's institutional problems (on top of its public policy and political issues, all which not legally germane to this discussion) is severally complicated by the manifestly self-serving interests of the cottage industry of campaign consultants and operatives which we style as the Republican Curia, the modern day equivalent of the old party machines' spoil system of political patronage.

Freeman first noticed, Conway and now almost all other academics confirm the powerful influence this Republican Curia exerts on the RNC, which in every campaign cycle, consumes initially 25% and now up to 50% of Federal campaign budgets.

And as Esptein pointedly notes, no one inside the RNC has even inclination to control these professionals. *Id.* at 237-237. Professors Longley and Kayden concur. (That fact that academics actually study the existence of this Republican Curia alone should be alarming to Republicans). Conway asserts that candidates dare not challenge the Republican Curia because they are so dependent on it. *Id.* at 14.

As discussed below, the Republican Curia first and foremost, want to be paid. The presence of the Republican Curia is what political scientists call "cadre" parties, that is, political organizations controlled by relatively small groups of activists, including officeholders elected under the parties' banners, party officials *and their paid consultants*, who market their candidates to a mostly disengaged electorate. See generally, E.E. Schatt Schneider, *Party Government* 53 (1942) ("Whatever else parties may be they are not associations of the voters who support candidates") as quoted in Nancy L. Rosenblum, *Political Parties as Membership Groups*, 100 COLUM.L.REV. 813, 819 (2000); Denise L. Baer & David A. Bositis, *Elite Cadres and Party Coalitions: Representing the Public in Party Politics* (1988) (discussing the changing dynamics within party elites and between those elites and the electorate) (cited in Daniel Hays Lowenstein, *Associational Rights of Major Political Parties: A Skeptical Inquiry*, 71 TEX. L. REV. 1741, 1766 n.90 (1993)); Samuel Issacharoff, *Private Parties With Public Purposes: Political Parties, Associational Freedoms, and Partisan Competition*, 101 COLUM. L. REV. 274, 301 (2001). And see also Bruce E. Cain, *Party*

*Autonomy and Two-Party Electoral Competition*, 149 UNIV.OF PA. L. REV. 793 (2001); Stephen Breyer, *Our Democratic Constitution*, 77 N.Y.U. L. REV. 245, 253 (2002).

### (2) RNC Members as Principals Liable for Agents Malfeasance.

The Republican Curia's conduct still binds the RNC Members, which instantly has altered the latter's legal relationships and significantly impairs, disclaims and alienates the RNC's equitable interests. We find each of the Super Agents exceed their contractor/employee authority. *Passarelli v. Shields*, 191 Pa.Super. 194, 156 A.2d 343, 347 (1959) (third party must exercise due diligence where "according to the ordinary experience and habits of mankind," it is unusual for agent "to have authority of a particular kind"); and see e.g., *Harkinson v. Pa. Co. for Insurances on Lives and Granting Annuities*, 329 Pa. 209, 198 A. 11 (1938) (agent's authority to collect rent from tenants does not either justify the inference that the agent otherwise has authority deal with tenants).

This is because common sense dictates that a nonmember of a nonprofit organization has no authority to disclaim or alienate the principal's equitable interests in a trust, only the principal itself, the RNC members, can do such. *Fierst v. Commonwealth Land Title Ins. Co.* 499 Pa. 68, 74, 451 A.2d 674, 677 (1982) (agent's authority is questionable when limitations on exercise of authority are prescribed by construction of law, which are to be strictly construed).

Thus, it is black letter law that "a principal is liable to third parties for the frauds, deceits, concealment, misrepresentations, torts, negligence and other malfeasances or misfeasance of [its] agent committed in the course of [its] employment, even though the principal did not authorize, justify, participate in, or know of such misconduct, or even if [she] forbade the acts or disapproved of them, as long as they occurred within the agent's scope of employment." *Aiello v. Ed Saxe Real Estate, Inc.*, 508 Pa. 553, 559, 562, 499 A.2d 282, 285, 287 (1985) citing e.g., Restatement (Second) of Agency, §§ 257, 258.

"This rule of liability is not based upon any presumed authority in the agent to do the acts, but on the ground of public policy, that it is more reasonable than when one of two innocent persons must suffer from the wrongful act of a third person, that the principal who has placed the agent in the position of trust and confidence should suffer, rather than an innocent stranger." Id.

### (3) GOP Staff's Intractability Not Comporting to Party Objectives.

We should also assert that the RNC's intractability and tergiversation is simply not in keeping with its duties. *Cf. In re Avellino*, 547 Pa. 398, 400, 690 A.2d 1144, 1145 (1997) (intractable stance not tolerable given fact litigant was a judge whose professional station and temperament required better).

## VI. RNC's Agents Shirking Cannot Injure Co-Beneficiaries.
### (1) RNC Cannot Block Co-Beneficiaries' Access to Trust.

As the Attorney General properly notes, there is nothing within the law that *compels* the RNC to utilize the Trust Property. In fact, the DNC would be quite happy if the RNC continue to organize circular firing squads in denying itself the Trust Property.

But this misses the point. What the RNC *cannot* do is deny everyone access to the Trust. As noted by Bogert, the RNC (and also the DNC) as "qualified beneficiaries" are merely conduits which the Trust's charitable benefits flow through to the general public - the true beneficiaries. *In re Trust of Brooke*, 82 Ohio St. 3d 553, 561, 697 N.E.2d 191, 197 (1998); Bogert at §§ 323-363. "Individuals or classes of persons may be named merely for the purpose of showing the conduit through which the settlor expects the public benefits to flow." Bogert at § 323. This is the crux of the RNC's breach of trust.

### (2) Co-Beneficiaries Have Fiduciary Duty to Each Other.

And this breach of trust the RNC commits is the violation of ancient rule that "community of

interests produces community of duty [as it] is the duty of all deal candidly and benevolently with each other and cause no harm to their joint interests." *DePlaine's Estate*, 185 Pa. 332, 334-335, 39 A.2d 947, 948 (1898). And see *Coar v. Kaimir*, 990 F.2d 1413, 1418 (3d Cir. 1993) (co-beneficiary has fiduciary duty to co-beneficiaries); *Capital Investors Co. v. Devers*, 360 F.2d 462, 465-466 (4th Cir. 1966) (co-beneficiaries cannot act in derogation of fellow co-beneficiaries); *Fresh Kist Produce, LLC v. Choi Corp, Inc.*, 223 F.Supp.2d 1, 8 (D.D.C. 2002) *amended* 251 F.Supp. 138 (under trust law, co-beneficiaries are in a fiduciary relationship with each other so that one beneficiary may not secretly secure for himself a special advantage in the trust administration); *Christman v. Seymour*, 145 Ariz. 200, 202, 700 P.2d 898, 900 (1985) (defendant concedes that as a beneficiary of trust he owes duty to the other beneficiaries); *McMillen v. Olmstead*, 85 Cal.App. 656, 664, 259 P. 1104, 1107 (1927) ("where there is community of interest, there is also a community of duty"); *Spencer v. Harris*, 70 Wyo. 505, 516, 252 P.2d 115, 118 (1953) (co-beneficiaries are in fiduciary relationship to each other); *Fishman v. Saligan*, 64 Pa.D.&C. 325, 329 (Phila C.P. 1948) (following *DePlaine's Estate)*; Bogert § 191 (2d ed. Rev.) at p. 478-484; IV Scott § 25.3 (5th ed.) at p. 1866.

It is always important to recall that a trust is, after all, a gift, and those who accept the gift are bound by the conditions imposed. *In re Pruner's Estate*, 400 Pa. 629, 636, 162 A.2d 626, 630 (1960) quoting *Pennsylvania Horticultural Society v. Craig*, 240 Pa. 137, 148, 87 A. 678, 682 (1913).

### (3) RNC Has Confidential Relationship with State, Local Parties.

RNC's fiduciary duty arises because the RNC has a confidential relationship with each state, county and local Republican Committee, and by extension all registered voters. *Basile v. H&R Block, Inc.*, 777 A.2d 95, 101 (Pa.Super. 2001), as "there is trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other." *Id.* at 101, quoting *In re Estate of Scott*, 455 Pa. 429, 432, 316 A.2d 883, 995 (1974).

A confidential relationship exists where the parties do not deal on equal terms, "but, on the one side there is an overmastering influence, or on the other, weakness, dependence or trust, justifiably reposed." *Id.* (quoting *Frowen v. Blank*, 293 Pa. 137, 145-46, 425 A.2d 412, 416-17 (1981). "[T]he party in whom the trust and confidence are reposed must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage." *Id.* (quoting *Young v. Kaye*, 443 Pa. 335, 342, 279 A.2d 759, 763 (1971). As a consequence of the superior party's heightened state of duty "normal arm's length bargaining is not assumed." *Frowen*, 425 A.2d at 416. "This is so because the presence of a confidential relationship negates the assumption that each party is acting in his own best interest." *Id.*

A formal relationship is not required, as a "confidential relationship and the resulting fiduciary duty may attach 'wherever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Basile*, 777 A.2d at 102 quoting *Brooks v. Conston*, 356 Pa. 69, 51 A.2d 684, 688 (1947)."It is not restricted to any specific association of persons nor confined to technical cases of fiduciary relationship but is deemed to exist whenever the relative position of the parties is such that one has power and means to take advantage of or exercise undue influence over the other." *Young v. Kaye*, 443 Pa. at 343-343, 279 A.2d at 732 (citations omitted).

Academic authority universally agrees that nationalization of the RNC with its concentration of resources to be dispensed to the state and local parties, has resulted in the rapid atrophy of those very same state and local parties, that most of the latter are now in the state of *deterior condicio*.

And we can't stray from the primary reason behind the RNC's corporate styled, top-bottom command structure is quite simply because of its access to money. Freeman, *supra*; James A. Wilson, *The Amateur Democrat*, Univ. of Chicago Press 186-188 (1966). Because of its centralized command structure, state and county Republican committees are forced to place their trust in the RNC for fund-raising and assistance. RNC openly concede this, per its repeated Quixotic challenges

to overturn BCRA. The RNC's implicit admission *it* must establish "*state*" accounts to raise campaign contributions for state GOP committees *is* because they are unable to raise sufficient funds themselves. *RNC et al. v. FEC*, 1:08-CV01953 (D.D.C.) Complaint ¶ 16-22.

### (4) RNC Has Confidential Relationship with Voters, Officeholders.

As Issacharoff and Ortiz clearly pronounce, the political party serves a critical, if not unique role as an intermediary between the voters and their elected officeholders. The party is a filter by which processes complex issues into manageable components for voter identification, for example, by compiling all of a Congressman's votes and labeling them as whether he is voting consonant with the party principles. Issacharoff and Ortiz, *Governing Through Intermediaries*, 85 VIRGINIA LAW REV. at 1649-1650.

The purpose of a party is to win elections. *Madole v. Barnes*, 20 N.Y.2d 169, 282 N.Y.S.2d 225, 229 N.E.2d 20 (1967); *Ingersoll v. Curran*, 188 Misc. 1003, 70 N.Y.S.2d 435, 437 (Sup. N.Y. Co., 1947) *affirmed* 297 N.Y. 522, 74 N.E.2d 465 (1947). Party officials (and their proxies) are to act as representatives of the voters who elect them. *In re Application of Roosevelt*, 9 Misc.2d 205, 160 N.Y.S.2d 747, 749-750 (Sup.Ct.), *affirmed* 3 A.D. 988, 163 N.Y.S.2d 403 (1st Dep't 1957), *affirmed* 4 N.Y.2d 19, 171 N.Y.S.2d 841, 148 N.E.2d 895 (1958). The primary function of any political party committee is "the promotion of [the party's] candidates *and* policies." *Seergy v. Kings County Republican County Committee*, 459 F.2d 308, 310 (2d Cir. 1972) (emphasis added).

However, a political party is something more than a medium for nomination or election to public office, the formulation of party principles and politics is a duty, which if political parties are to continue to serve their historic functions in the scheme of the democratic process, transcends the mere purpose to elect particular candidates to public office. *Ingersoll v. Heffernan*, 188 Misc. 1047, 71 N.Y.S.2d 687, 690 (Sup. N.Y.Co. 1947) *affirmed without opinion*, 297 N.Y. 524, 74 N.E.2d 466 (1947). A responsible political party assures that "[a] strong and stable two-party system contributes to sound and effective government. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367 (1997).  See also *Rutan v. Republican Party of Ill.*, 497 U. S. 62, 107 (1990) (Scalia, J., dissenting) ("The stabilizing effects of such a [two-party] system are obvious"); *Davis v. Bandemer*, 478 U. S. 109, 144-145 (1986) (O'Connor, J., concurring) ("There can be little doubt that the emergence of a strong and stable two-party system in this country has contributed enormously to sound and effective government"); *Branti v. Finkel*, 445 U. S. 507, 532 (1980) (Powell, J., dissenting) ("Broad-based political parties supply an essential coherence and flexibility to the American political scene").

 While a party officeholder does not rank with a public officeholder, i.e.  is one who elected to perform duties of grave and important character, and which involve some function of government, for a definite term in a manner provided by law, and exercised for the benefit of the public for a fixed compensation or emolument by fees paid out of the public treasury. *Vega v. Borough of Burgettstown*, 394 Pa. 406, 412, 147 A.2d 620, 623 (1958), it is still protected as an expression protected by the First Amendment, *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *Commonwealth ex rel. Toole v. Tanoshak*, 464 Pa. 239, 242, 346 A.2d 304, 306 (1975); but whomever voters elect is assumed not surplusage because the only way for voters to "impose their will . . . is to elect representatives . . . who will officially register that will." *Derringe v. Donovan*, 308 Pa. 469, 473-477, 162 A. 439, 441 (1932).

 When, as we find, the RNC now openly seeks to usurp the voters' *elected* party representatives in favor of paid professionals and third-party volunteers, this is usurpation of the *elected* party representatives powers and duties. *Ammond v. McGahn*, 390 F.Supp. 655, 660 (D.N.J. 1975) *rev. on other grounds*, 532 F.2d 325 (1976).

### (5) RNC Breaches Each Element of Fiduciary Duty.

Once proof of a confidential relationship is sufficient, the burden shifts to the RNC to prove it does

not violate its fiduciary duty. *Estate of Clark (2)*, 467 Pa. 628, 634, 359 A.2d 777, 781 (1976); *Kees v. Green*, 365 Pa. 368, 375, 75 A.2d 602, 605 (1950). We hold the record does not sustain such proof. In Pennsylvania, "a fiduciary obligation includes both a duty of care and a duty of loyalty." *Anchel v. Shea*, 762 A.2d 346, 356-357 (Pa.Super. 2000) (citing 15 Pa.C.S. S 1712(a)). In pursuing his duties, the fiduciary must act with the utmost good faith in the furtherance and advancement of the interests of his principal. *McDermott v. Party City Corp.*, 11 F.Supp.2d 612, 626-627 (E.D. Pa. 1998) (quoting *Garbish v. Malvern Fed. Sav. & Loan Assoc.*, 517 A.2d 547, 553-54 (Pa. Super. 1986) (further citation omitted).

Determination of what these interests are and of the appropriateness of the actions is a question of fact. See e.g., *Selheimer v. Manganese Corp.*, 423 Pa. 563, 581, 224 A.2d 634, 644 (1966) ("(W)hat may be negligence [on behalf of a corporate fiduciary' in one case may not be want of ordinary care in another, and the question of negligence is therefore ultimately a question of fact, to be determined under all the circumstances") (citation and internal quotation marks omitted); *In re Main Inc.*, 239 B.R. 281, 289 (Bank.E.D.Pa. 1999) (citing *Pepper v. Litton*, 308 U.S. 295, 306 (1939) (rigorous scrutiny applied to actions of fiduciary)). The fiduciary duty particularly imposed on the RNC officers and members is to perform in a manner the officer or member reasonably believes to be in the best interests of the RNC. *Gruenwald v. Advanced Computer Applications, Inc.*, 730 A.2d 1004, 1013 (Pa.Super. 1999).

In order to recover for breach of fiduciary duty, the complaining party must show they were injured and that the injury came as a result of the breach. See *McDermott*,11 F.Supp. 2d at 626 n.18. Intent is not an element. *In re Main, Inc.*, 239 B.R. at 291 (quoting *Seaboard Indus. v. Monaco*, 442 Pa. 256, 263, 276 A.2d 305, 309 (1971)). The demonstration of disobedience of an organization's own charter or bylaws constitutes a breach of fiduciary duty as a matter of law. *In re Church of St. James the Less*, 2003 WL 2205337 (Phila. O.C. 2003) (O'Keefe J.), *affirmed* 833 A.2d 319 (Pa.Cmwlth. 2003) *affirmed in part, rev. in part*, 585 Pa. 428, 888 A. 2d 785 citing *SICPA Holdings S.A. v. Optical Coating Lab., Inc.*, C.A. No. 15129, 1997 Del. Ch. LEXIS 1 at *15 (Del. Ch. January 6, 1997) (noting that lack of authority to undertake an action implicates fiduciary duties).

In a detailed analysis in an analogous case (concerning whether breach of fiduciary duty can be alleged against priests by parishioners), Judge Richard Caputo, acknowledging while some courts held that the First Amendment constitutes an insuperable bar against such claims because the judicial inquiry would be required to delve into the religious beliefs that gave rise to confidential relationships, nonetheless concluded that the Pennsylvania courts would hold that there would be no First Amendment concerns, as the fact inquiry was limited to whether there existed a confidential relationship, not why. *Doe v Liberatore*, 478 F.Supp.2d 742, 770-883 (M.D.Pa. 2007). Instantly, this matter does not inquire into GOP policies, platform, or campaign strategies. It is limited solely whether the RNC has a confidential relationship with its subordinate party committees, not why.

### (6) RNC Violates its Fiduciary Duty under Business Judgment Rule.

The RNC violates its fiduciary duty by violating the associational equivalent of what the law calls the Business Judgement rule. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (under business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company"). We find absolutely no evidence whatsoever that anyone within the RNC is acting on an informed basis. RNC repeatedly demonstrates its absence of operating on an informed basis by constantly viewing the Trust as a vendor.

We see no evidence whatsoever that any staff or counsel within the RNC understands that the RNC is a beneficial owner, despite repeated exhortations from Senior Trustee SENFT to that effect. We also see no evidence whatsoever that any staff or counsel within the RNC understands that we, as Trustees, act solely in the best interests of the RNC and all other beneficiaries

We also strongly suspect that individual financial interests are extensively intertwined with the decision-making process. We take note of then candidate Michael Steele's campaign promise that he will award RNC contracts on merits, not on personal connections. Michael Steele, *Blueprint for Tomorrow*, 6 (2009) ("Contracts will be awarded on merit, staff and their family will not benefit beyond their salaries; and we will never pay more than what other clients pay for the same services").

Yet, unlike the machine politics of old with a readily identifiable Simon Cameron or Bois Penrose, the silent Republican Curia of approximately 600 attorneys, consultants and operatives rise like the gray dew of the morn from inside-the-Beltway "Bottom Foggy" swamps of Washington, with their unquenchable appetite for top-dollar fees to devour now up to 50% of the RNC's biannual budget. *See* e.g., Sandy Bergo, Agustín Armendariz and John Perry, *A Wealth of Advice*, Center for Public Integrity (2005). Why should the RNC use its own state-of-art software provided by a Trust, when it can pay $10 million to a politically connected firm for obsolete data compiled in India?

### (7) RNC Violates its Fiduciary Duty as Co-Beneficiary.

It is clear from the facts, the RNC violates its fiduciary duty as a co-beneficiary, by not merely failing, but outright refusing to "deal candidly and benevolently with each other and cause no harm to their joint interests." *DePlaine's Estate*, 185 Pa. at 334-335, 39 A.2d at 948;. see also *Coar v. Kaimir*, 990 F.2d at 1418; (co-beneficiary has fiduciary duty to co-beneficiaries); *Capital Investors Co. v. Devers*, 360 F.2d at 465-466 (co-beneficiaries cannot act in derogation of fellow co-beneficiaries); *McMillen v. Olmstead*, 85 Cal.App. at 664, 259 P. at 1107 ("where there is community of interest, there is also a community of duty"); Bogert §191 (2d ed. rev.) at p. 478-484; Scott § 25.3 (5th ed.) at p. 1866.

Unlike all other party affairs (where the RNC is the superior entity at the top of the organizational chart) under trust law, the RNC stands no greater (or lesser) than any other co-beneficiary, as all co-beneficiaries are equal and treated impartially. 20 Pa.C.S. § 7773; *Estate of Pew*, 440 Pa. Super. 195, 237, 655 A.2d 521, 542 (1994); *Snyder v. Dep't of Public Welfare*, 528 Pa. 491, 498 & n.7, 598 A.2d 1283, 1287 & n.7 (1981) (beneficiaries must be treated impartially); *Shaak v. Pennsylvania Dep't of Public Welfare*, 561 Pa. 12, 747 A.2d 883, 886 (2000) (when "there is more than one beneficiary of the trust, the trustee is under a duty, in administering the trust, to deal impartially with the several beneficiaries. *MacGregor v. Wall*, 75 Pa. D & C. 2d 425, 428 (Bucks Co. O.C.. 1976) (citing *Bolton v. Stillwagon*, 410 Pa. 618, 190 A.2d 105 (1963)"); Restatement Second, Trusts, §§ 170, 183.

"This right, or duty, is implicit in the principle that a trustee or other fiduciary is obligated to treat its clients/beneficiaries impartially. *Summers v. State Street Bank & Trust Co.*, 104 F.3d 105, 108 (7th Cir.1997); *Fogelin v. Nordbloom*, 402 Mass. 218, 521 N.E.2d 1007, 1011 (Mass.1988); *Estate of Pew*, 440 Pa.Super. at 237, 655 A.2d at 542;; *Northern Trust Co. v. Heuer*, 202 Ill.App.3d 1066, 148 Ill.Dec. 364, 560 N.E.2d 961, 964 (Ill.App.1990), Restatement (Second) of Trusts, supra, sec. 183; Scott § 183." *First National Bank of Chicago v. A.M. Castle & Co. Employee Trust*, 180 F.3d 814 (7th Cir. 1999).

Because of its confidential relationship, the state and county Republican committees repose their trust in the RNC and expect that the RNC would disseminate valuable resources back to them. As White and Shea paints the picture, the state committees are merely franchise dealerships to the parent corporation.

### VII. Constitutional Violations From RNC's Agents Shirking.
### (1) RNC's Breach Arises to Violation of Constitutional Principles.

But the RNC is not satisfied in violating the common law of trusts in existence since the Statutes of Charitable Use, 43 Eliz. I. C. 4 (1604) , it must also impugn the First and Fourteenth Amendments to the U.S. Constitution by diluting and diminishing the rights of every registered Republican voter who elects precinct Republican committee people, and to add salt to the wound, abridge everyone

245

else's First Amendment right that the RNC cherishes for itself.

### (2) Importance of First Amendment Right of Political Association.

A "political party" is an organized group of the electorate that attempts to control the government through the election of its candidates to office. *Madole v. Barnes*, 20 N.Y.2d 169, 282 N.Y.S.2d 225, 229 N.E.2d 20 (1967). It is a voluntary organization of people who believe generally in the principles enunciated and the candidates offered to the people by the party of their choice. *Ingersoll v. Curran*, 188 Misc. 1003, 1005, 70 N.Y.S.2d 435, 437 (Sup. N.Y. Co., 1947) *affirmed* 297 N.Y. 522, 74 N.E.2d 465 (1947). However, a political party is something more than a medium for nomination or election to public office, the formulation of party principles and politics is a duty, which if political parties are to continue to serve their historic functions in the scheme of the democratic process, transcends the mere purpose to elect particular candidates to public office. *Ingersoll v. Heffernan*, 188 Misc. 1047, 1051, 71 N.Y.S.2d 687, 690 (Sup. N.Y.Co. 1947) *affirmed without opinion*, 297 N.Y. 524, 74 N.E.2d 466 (1947).

Voters' right of association with those who share political views, *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69 (1990), specifically extends to a political party. *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973). The First Amendment's objective of promoting uninhibited, robust, and wide open public debate, *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), is uniquely served by political parties, *Democratic Party v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 122 (1981), attempting to control government through electing candidates sharing common beliefs. *Eu v. San Francisco Co. Democratic Central Comm.*, 489 U.S. 214, 223 (1989). It is now without dispute that "debate on the qualifications of candidates [is] integral to the operation of the system of government established by our Constitution." *Buckley v. Valeo*, 424 U. S. 1, 14 (1976); see also *NAACP v. Claiborne Hardware Co.*, 458 U. S. 886, 913 (1982); *Carey v. Brown*, 447 U. S. 455, 447 U. S. 467 (1980); *Garrison v. Louisiana*, 379 U. S. 64, 74-75 (1964).

The First Amendment "has its fullest and most urgent application" to speech uttered during a campaign for political office. *Monitor Patriot Co. v. Roy*, 401 U. S. 265, 272 (1971); see also *Mills v. Alabama*, 384 U. S. 214, 218 (1966). Free discussion about candidates for public office is no less critical before a primary than before a general election. *Cf. Storer v. Brown*, 415 U. S. 724, 735 (1974); *Smith v. Allwright*, 321 U. S. 649, 666 (1944); *United States v. Classic*, 313 U. S. 299, 314 (1941). In both instances, the "election campaign is a means of disseminating ideas as well as attaining political office." *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U. S. 173, 186 (1979).

Accordingly, it should come as no surprise that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments. *Tashjian*, 479 U.S. at 214 ; see also *Elrod v. Burns*, 427 U. S. 347, 357 (1976). Freedom of association means an individual voter has the right to associate with the political party of her choice, *Tashijian*, 479 U. S. at 214 (quoting *Kusper, supra*, at 414 U.S. 57), as well as a political party has a right to "identify the people who constitute the association," *Tashijian*, 479 U. S. at 214 (quoting *Democratic Party of United States v. Wisconsin ex rel. La Follette*, 450 U. S. 107, 122 (1981)); *cf. NAACP v. Alabama ex rel. Patterson*, 357 U. S. 449, 460-462 (1958), and to select a "standard-bearer who best represents the party's ideologies and preferences." *Ripon Society, Inc. v. National Republican Party*, 173 U.S.App.D.C. 350, 384, 525 F.2d 567, 601 (1975) (Tamm, J., concurring in result), *cert. denied*,424 U.S. 933 (1976).

### (3) RNC Violates *Associated Press* and *Thornhill* to Avoid Public Scrutiny.

But such First Amendment rights does not include the right to deny the same right to others. *Associated Press v. United States*, 326 U.S. 1, 7, 20 (1945). "It would be strange indeed however if the grave concern [   ] which prompted adoption of the First Amendment should be read as a command that the government was without power to protect that freedom. * * * Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental

combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom." *Id.* 326 U.S. at 20.

What Conway, Freeman, and Shea, just three of the multiple political scientists all assert, the RNC seeks to control the marketing message without public scrutiny or vetting, because if its contrived and formulated message was exposed to deliberation, it would fail. FOF ¶¶ 148, 149, 152-156, 176-178, 188, 192, 205-209, 234, 551-553,1376-1432. But

> "The safeguarding of these rights to the ends that men may speak as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion is essential to free government. Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth. Noxious doctrines in those fields may be refuted and their evil averted by the courageous exercise of the right of free discussion. Abridgment of freedom of speech and of the press, however, impairs those opportunities for public education that are essential to effective exercise of the power of correcting error through the processes of popular government." *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940).

We hold that the RNC simply has no business to deny everyone else the very same First Amendment rights it exercises, solely to conceal the fallacies which the RNC promotes. This is because First Amendment freedoms are inherently "delicate and vulnerable, as well as supremely precious in our society" *NAACP v. Button*, 371 U.S. 415, 432-433 (1963), it is absolute "the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969), thus it is critical to assure "the circulation of information to which the public is entitled in virtue of the constitutional guaranties." *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936). To the extent political debate "becomes fearful and inhibited, to the extent the accuracy, effectiveness, and thoroughness of such coverage is undermined, the social values protected by the First Amendment suffer abridgment." *Herbert v. Lando*, 441 U.S. 153, 194 (1979). Accordingly, only the broadest protection of the First Amendment "assures the maintenance of our political system and an open society." *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967).

And this is exactly what it has done to the approximate 389,000 Republican precinct committeepeople and another 389,000 Democratic precinct committeepeople throughout the nation. It knows due to its confidential relationship, that local Republican committees cannot afford by themselves the social networking resources equal to that of MoveOn or ActBlue, due to the expense of constructing the House List. The RNC purposely denies the very resource that local committee people need, but can't afford, all because of the RNC's perceived loss of control of the party messaging. The facts here eerily parallel *Associated Press*.

### (4) RNC Violates *Reynolds v. Sims*.

The RNC's *Associated Press*/ *Thornhill* violation leads to the next point, in that denying the precinct committee people the resource to socially network with their voters, so that the RNC can singularly control the GOP's messaging, the RNC is superceding and usurping the powers and duties of these *elected* precinct committee people. First and foremost, the Supreme Court has long observed that the right to vote is "fundamental" because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

In *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) the Supreme Court found: "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." The *Reynolds* court noted that the Federally protected right suffers substantial dilution . . . (where a) favored group has full voting strength . . . (and) (t)he group not in favor have their votes discounted." *Id.* at 555 n. 29, quoting *South v. Peters*, 339 U.S. 276, 297 (195) (Douglas, J., dissenting).

In *Ammond v. McGahn*, 390 F.Supp. 655, 660 (D.N.J. 1975) *rev. on other grounds*, 532 F.2d 325 (1976), the New Jersey Senate Republican caucus had stripped a dissident state senator her right to participate in the Republican caucus. The court asserted:

> "No elected representative of the people may be barred from participation in the forum to which he or she was elected [without due process]. The action by the Caucus in denying Senator Ammond the opportunity to attend its deliberations deprived her constituents the Equal Protection of the law. In effect, the action by the Caucus created two classes of voters. One class consists of those citizens whose Senators could effectively participate fully in the legislative process and another class whose Senator could participated only to a limited degree. As the Supreme Court has indicated ' . . . [T]he right of suffrage can be denied by a debasement and dilution of the weight of a citizen's vote as effectively as by wholly prohibiting the free exercise of the franchise.' *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). While it is true that Senator Ammond was not barred from voting on the floor of the New Jersey Senate, her exclusion from the Caucus could vastly diminish her efficacy as an elected representative." *Id.* 390 F.Supp. at 660.

While obviously, a precinct committee person does not rise to the gravitas of a state senator, nonetheless, the precinct committee person is embodied with a duty of representation. As our Supreme Court stated in *Bentman*,

> "[Election to membership of a political party] committee, a status now legally recognized, is an important right and privilege not only to the person elected but also to the voters who elected such person to act as their representatives on the committee. *Id.*, 421 Pa. at 213, 218 A.2d at 269.

That the precinct committeeman is embodied with a duty of representation is found by other courts. *Application of Roosevelt*, 9 Misc.2d 205, 208, 106 N.Y.S.2d 747, 749-750 (N.Y.Sp. Term. 1957) *affirmed* 3. A.D.2d 988, 163 N.Y.S.2d 403 (1st Dept. 1957) *affirmed* 4 N.Y.2d 19, 171 N.Y.S.2d 841, 148 N.E.2d 895 (1958), accord, *Bontempo v. Carey*, 64 N.J.Super. 51, 57, 165 A.2d 222, 225 (Law. Div. 1960). As *Bentman*, quoting *People ex rel. Coffey v. Democratic General Committee*, 164 N.Y. 335, 341-342, 58 N.E. 124, 126 (1900):

> 'The dominant idea pervading the [law governing election of party members] is the absolute assurance to the citizen that his wish as to the conduct of the affairs of his party may be expressed through his ballot, and thus given effect, whether it be in accord with the wishes of the leaders of his party or not, and that thus shall be put in effective operation, in the primaries, the underlying principle of democracy, which makes the will of an unfettered majority controlling. In other words, the scheme is to permit the voters to construct the organization from the bottom upwards, instead of permitting leaders to construct it from the top downwards." *Id.* 421 Pa. at 198-199, 218 A.2d at 267.

Chief Judge Alvin Parker of the New York Court of Appeals further explained, such laws were specifically designed to constrain the "not unnatural desire" of party majorities to "perpetuate their power" at the expense of ordinary voting members of the party whose "views were not congenial to the majority." 164 N.Y. at 341, 58 N.E. at 125-126. In accord is the Missouri Supreme Court in *State ex rel. Guior and Miles*, 210 Mo. 127, 156, 109 S.W. 593, 603 (1908), that state regulation was justified "to prevent factional oppressions and outrages in politics, and to lift party management to a plane where it will assist, rather than hinder, the expression of the will of the people" See also Adam Winkler, *Voters' Rights and Parties' Wrongs: Early Political Party Regulation in the State Courts, 1886-1915*, 100 COLUM. L. REV. 873, 879-880, 889 (2000); Samuel Issacharoff, *Private Parties with Public Purposes: Political Parties, Associational Freedoms, and Partisan Competition*, 101 COLUM. L. REV. 274 (2001).

In this context, a party office is no different than a public office. *Noonan v. Walsh*, 364 Mo. 1169, 1170, 273 S.W.2d 195, 196 (1954). Post-*Bentman* arguments that party officials are of no public importance, their election merely a state-extended courtesy, have been soundly rejected. *Santimyer*

*v. Westmoreland Co. Board of Elections*, 9 Pa. D. & C.3d 303, 305-306 (Westmoreland C.P. 1978).

 It also noteworthy that unlike a normal nonprofit association member, party committee people face election, many times with opposition. If this was not the case, parties would simply appoint agents to do the principal's bidding. To this extent, parties parallel state agencies, not voluntary associations. *Smith v. Allwright*, 321 U.S. 649, 663 (1944).

 Moreover, in that "debate on the qualifications of candidates is at the core of our electoral process and of the First Amendment freedoms," *Republican Party of Minnesota v. White*, 536 U.S. 765, 781-782 (2002), should that debate, as the RNC would have us believe, preclude the Republican committee people, the very persons whom Republican voters elect to participate in the nominating process? As observed in *Ripon Society v. National Republican Party*, 173 U.S.App.D.C. 331, 525 F.2d 548, 559-560 (1975):
> "The right to an equal vote serves to prevent an entrenchment of any one group of interests to the exclusion of others, even if freely chosen in the most democratic fashion, because such an entrenchment in the very process of political choice is contrary to the democratic ideal."

 Participatory politics is all the critical as more than any other political phenomenon, incumbents' capture of political institutions through the manipulation of the rules of the electoral game. See Samuel Issacharoff & Richard H. Pildes, *Politics as Markets*, 50 STAN. L. REV. 643 (1998); Richard H. Pildes, *The Constitutionalization of Democratic Politics*, 118 HARV. L. REV. 25 (2004); *U.S. v. Carolene Products*, 304 U.S. 144, 152 n.4 (1938); John Hart Ely, *Democracy and Distrust* (1981). Authorities long espouse increased public participation. Samuel Issacharoff, *Collateral Damage: The Endangered Center in American Politics*, 46 WM.&MARYL.REV. 415 (2004). "To serve their purposes effectively, parties must have long-run organizational and political goals--unlike PACs and the campaign organizations of individual candidates. In contrast to most interest and advocacy groups, parties must continuously seek to establish contact with the electorate in a fashion that elicits participation on a large scale." Nancy L. Rosenblum, *Primus Inter Pares: Political Parties and Civil Society*, 75 CHI.-KENT L. REV. 493, 513 (2000).

 Legally speaking, the RNC is not and should never be in the business of discouraging voter participation.
> "[By voting], the individual says essentially, 'I am a member of the American community.' Through participation itself, the voter expresses an identification with the greater community and reveals her attachments to and associations with it. In this way, the act of voting is the individual's alignment to the greater society; it is the method by which the individual 'signs' her name to the social contract and becomes herself part of the collective self consciousness." Adam Winkler, *Expressive Voting*, 68 N.Y.U. L. REV. 330, 368 (1993) As U.S. Rep. Stony Hoyer (D-MD) noted: "One of our most profound accomplishments since the founding of the United States is the progressive broadening of the [right to vote] * * * We have also learned that, as more adult citizens become full participants in our polity, the democratic process is enriched for all. H.R. Rep. No. 107-329, pt. 1, at 79 (2001)."

 The law is that whoever voters elect are presumed not to be surplusage, as such is the primary means for voters to exert their will. *Derringe v. Donovan*, 308 Pa. 469, 473-477, 162 A. 439, 441 (1932); *Bentman,*421 Pa. at 198-199, 218 A.2d at 267. The political parties have no existence of their own, as they are manifestations of their members who choose to associate. *Campbell v. Bysiewicz*, 242 F.Supp.2d 164, 175 (D.Conn. 2003).

 The renowned Justice Musmanno, writing in *Smith v. Gallagher*, 408 Pa. 551, 185 A.2d 135 (1962) *overruled on other grounds* 487 Pa. 438, 409 A.2d 848 (1979), about a judge who single-handily "appointed" a special prosecutor to replace the elected district attorney, held that no one authority may remove an elected officeholder of its own volition, nor may it, by appointing someone else to act in his place, accomplish the same result of removal, 408 Pa. at 585, 185 A.2d at 152, because

such

"... aside from its illegality, [is] a blow at self-government and an infringement of the rights of the people. No amount of good intention . . . no amount of good will or even assumption of doing one's duty, can justify so autocratic, unwarranted, and illegal a procedure. Americans do not take kindly to despotism whether it wear the cloak of officialdom or thunders at the door at night." *Id.* at 587, 185 A.2d at 153.

Former RNC Chairman Paul Laxalt asserted "There is no substitute for that willing, effective precinct worker." Burrell, *supra.* If the RNC chooses to abandon this sound principle, the consequences is on the RNC. It should be remembered, the voters elect their committee people, not the Republican Curia.

### (5) RNC Violates *Virginia Pharmacy* to Suppress Negative Coverage.

Because we find that the RNC is incapable, by assembling the critical mass necessary to effectuate Web 2.0 social networking, to serve as the proper intermediary through the Web 2.0 realm (as compared to the more traditional media realm), we must also conclude the RNC is violating *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748 (1976). Just as the First Amendment grants the RNC the right to communicate, it also grants the recipient of what the RNC desires to express, the right to receive that communication. The First Amendment right attaches to the communication, as well as the author. 425 U.S. at 756. While the RNC communicates via newspapers, television, cable, robo-calls and direct mail, voters do not rely only on those mediums, but now also the Internet. The Pew Center now clearly demonstrates that a majority of voters receive information via the Internet. The RNC offers no rationale as to why it must, should or even desire to want to preclude voters who rely on the Internet for political news and information.

The intent to violate arises by the fact that just as the RNC must pay the price to run television advertising, it must also pay the price to communicate on the Internet. The former is obviously a simple cost, paying the sum charged by the networks. The latter is a completely different price, you have to open up and engage in two-way communications. Web 2.0 political communication requires interaction. It requires that you listen just as much (if not more) as you talk. The RNC violates *Virginia Pharmacy* because it deliberately excludes the Internet portion of the general public from political discussion, because the RNC does not want to give the arbitrary control of the message, Freeman, *supra*, online, which is otherwise required to successfully communicate via the Internet.

### (6) RNC's Seeking Soft Money Control to Overcome Unpopularity.

What then is the RNC's problem? Simple. The RNC does not like watchdogs promoting transparency. This dispute, as Freeman puts it, is about the "nationalization" of control to simply change the message, "[The GOP's] response to any public distaste toward its programs is to change their image so as to better sell the Party to the public rather than to change the programs themselves." *Id.* And according to Freeman, the RNC's inability to change its program, versus its message, is due the party's "siege mentality,"which the RNC implicitly admitted in Federal court. Affidavit of Richard Clinton Beeson, RNC Political Director, ¶ 6 (Jan. 26, 2009).

Because the RNC is dependent on an ever dwindling pool of large contributors, being unable to generate widespread general support, the RNC, instead of enlarging the pool of contributors, *McConnell*, 540 U.S. at 144, is begging to throw-out BCRA, because the law (and not the RNC itself) is the "problem." The RNC aggressively resorts to defending its's rapidly diminishing resources, which as Professor Neale pointedly observes, is among the most prevailing justifications for adaptive objections. *See e.g.*, Margaret A. Neale, *Are You Giving Away the Store? Strategies for Savvy Negotiation*, STANFORD SOC. INNOVATION REV.34 (Winter 2004). Put it another way, the RNC wants to fight over who gets what share of the pie on the table, instead of the more intelligent option of going back to the kitchen to bake more pies. And the RNC has judicially admitted this, asserting it needed to setup "State Elections Accounts" because "the RNC has been negatively affected by the explosion of [I]nternet fundraising, barriers to collaborative relationships between

national party and state parties, and inequality of restrictions on a party's ability to raise and spend funds." Beeson Affidavit at ¶ 21 (emphasis added).

The obvious question is *why* is RNC "negatively affected by the explosion of Internet fundraising, barriers to collaborative relationships between national party and state parties, and inequality of restrictions on a party's ability to raise and spend funds?" Isn't the Trust Property the very means for the RNC (as well as the DNC and all other 527 entities) to participate in the "explosion of Internet fundraising?"

The obvious answer is that the RNC is unwilling to heed Saul Anzis's admonition that: "The open Internet is antithetical to the hierarchical, top-down model. . . the Washington-centered model of campaign committees and big-money fund-raisers and media buys is [and probably has already collapsed]. And the Republican Party needs to embrace that change." The RNC does not want to abandon the control flowing from its "nationalization"of party functions. White & Shea, Conway, Rae, *supra*. It does not want to abandon its ability to control the Party's image messaging. Freeman. The Internet plain and simple, disrupts the GOP's homogeneity. Freeman, *supra* at 349-350. The Trust is a threat to the RNC's plan to restore to itself the ability to raise soft money and the power it represents.

### (7) Voters First Amendment Rights Require Protection.

The purpose of a charitable trust is to provide "the general public with resources that would not otherwise be within their financial reach." *Unionville-Chadds Ford School District v. Chester Co. Board of Assessment Appeals*, 552 Pa. 212, 220, 714 A.2d 397, 400 (1998). It is in the pubic interest that the voters' right to vote, and particularly their control over their political parties, without intimidation or coercion as guaranteed by the Civil Rights Act of 1957, 52 U.S.C. § 10101(b) be enforced by delivery of the Trust's property and fulfillment of the Trust's charitable purposes. *Associated Press v. United States*, 326 U.S. 1, 7, 20 (1945) (First Amendment rights does not include the right to deny the same right to others); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise").

Seeking "improvements in the direct, popular nomination and election of public officials enabling the electorate to vote more intelligently and efficiently" has long been a charitable purpose. *Collier v. Lindley*, 203 Cal. 641, 645-646, 649-652, 266 P. 526, 527, 528-529 (1928); George A. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 378. RNC political operatives suppressing voter turnout is immediate and irreparable loss of the voters' First Amendment rights. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

"There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments." *NAACP v. Button*, 371 U. S. 415, 430 (1963). The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom. *Kusper v. Pontikes*, 414 U. S. 51, 56-57 (1973). Voters are not subordinate to their political parties, it is the parties which are subordinate to the voters. *Campbell v. Bysiewicz*, 242 F.Supp.2d at 175 (political parties have no existence of their own, as they are manifestations of their members who choose to associate).

This is because the First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas. *Colorado Republican Federal Campaign Comm. v. Federal Election Commission*, 518 U. S. 604, 616 (1996) ("The independent expression of a political party's views is 'core' First Amendment activity no less than is the independent expression of individuals, candidates, or other political committees"); *Norman v. Reed*, 502 U. S. 279, 288 (1992) ("constitutional right of citizens to create and develop new political parties . . . advances the constitutional interest of like-minded voters to gather in pursuit of common

251

political ends"); *Tashjian v. Republican Party of Conn.*, 479 U. S. 208, 214 (1986).

## (8) RNC No Longer a Political Party per se, but Only a PAC.

As we have stated, political parties have no existence of their own, as they are manifestations of their members who choose to associate. *Campbell v. Bysiewicz*, 242 F.Supp.2d at 175. Because most party officials are elected, they no less than public officials, represent voters, *Roosevelt*, 9 Misc.2d at 208, 106 N.Y.S.2d at 749-750. Accord, *Bontempo v. Carey*, 64 N.J.Super. 51, 57, 165 A.2d 222, 225 (Law. Div. 1960). as a Progressive Era court asserted, such election is "to lift party management to a plane where it will assist, rather than hinder, the expression of the will of the people" *State ex rel. Guior and Miles*, 210 Mo. 127, 156, 109 S.W. 593, 603 (1908).

Of course, this isn't the first time our political parties have been hijacked. Historically, there was the Democrat's William H. ("Boss") Tweed and the GOP's Bois Penrose, among a long litany of party bosses. But at least, these party bosses is the result of the electoral process. *Lopez-Torres*, 552 U.S. 196. Today, the national political parties are dominated by Super Agent professionals who as repeatedly asserted by academics, have no allegiance, let alone much affinity to party policies and principles, only to secure elections for their clients in furtherance of their own influence-peddling access.

While political parties and their members have a First Amendment right to association which includes the "right to exclude" people from membership or leadership roles in the party in certain circumstances. *California Democratic Party v. Jones*, 530 U.S. at 574 ("[A] corollary of the right to associate is the right not to associate"); *Lopez-Torres*, 552 U.S. at 202; *Democratic Party of United States v. Wisconsin*, 450 U.S. at 121, is limited solely to assure this right is evoked to "choose a candidate-selection process that will in [the party's] view produce the nominee who best represents its political platform." *Lopez Torres*, 552 U.S. at 202. It also "encompasses a political party's decisions about the identity of, and the process for electing, its leaders." *Eu*, 489 U.S. at 224, 229 ("Freedom of association means . . . that a political party has a right to identify the people who constitute the association . . . and to select a standard bearer who best represents the party's ideologies and preferences") (quotation marks and citations omitted).

However, this "right to associate nor the right to participate in political activities is [not] absolute." *Democratic Party of United States v. Wisconsin*, 450 U.S. at 124. For example, a political party's right to exclude does not protect a party's demand of ideological fealty from its members where such a demand violates other constitutional rights, such as the Fifteenth Amendment. See *Baskin v. Brown*, 174 F.2d 391, 392 (4th Cir. 1949) (holding that political party's rules, including rule in which "voting in the primaries was conditioned upon the voter [ ] taking an oath that he believed in social and educational separation of the races," violated the Fifteenth Amendment); *Morse v. Republican Party of Virginia*, 517 U.S. 186, 200 n.17, 228-29 (1996) (citing *Baskin v. Brown* favorably as "in accord with the commands of the Fifteenth Amendment and the laws passed pursuant to it"); *Lopez Torres*, 552 U.S. at 203 ("These [associational] rights are circumscribed, however, when . . ., for example, the party's racially discriminatory action may become state action that violates the Fifteenth Amendment").

Multiple Civil Rights and Voting Rights Acts are enacted under Congress' "power to enforce the provisions of the Fifteenth Amendment." *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997); *Shelby County, Ala. v. Holder*, 679 F.3d 848, 864 (D.C. Cir. 2012) ("[W]hen reauthorizing the [Voting Rights] Act in 2006, Congress expressly invoked its enforcement authority under both the Fourteenth and Fifteenth Amendments"). "[W]hen Congress seeks to combat racial discrimination in voting—protecting both the right to be free from discrimination based on race and the right to be free from discrimination in voting, two rights subject to heightened scrutiny—it acts at the apex of its power." *Shelby County*, 679 F.3d at 860; see also *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) ("Legislation which deters or remedies constitutional violations can fall within the sweep of

Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional"). Thus, a political parties' First Amendment right has never be elevated about enforcement of Congressional civil and voting rights legislation. See *Morse v. Republican Party of Virginia*, 517 U.S. 186, 214-215, 228 (1996) (rejecting political party's argument that its First Amendment right to exclude trumped 42 U.S.C. § 1973c, a different section of the Voting Rights Act not at issue in this case.).

 Furthermore, election laws often impose "some burden" on a First Amendment right to associate. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). The level of scrutiny with which a court reviews the challenged law depends on its effect upon the First Amendment right. See *id.* at 434. Indeed, in *Lopez Torres*, the Supreme Court observed that "the State can require" and courts have previously "permitted States to [undermine] 'party bosses' by requiring party-candidate selection through processes more favorable to insurgents." See *Lopez Torres*, 552 U.S. at 205. In addition, the Supreme Court has rejected a political party's argument that its First Amendment right to exclude allowed it to condition delegate status on payment of a $45 fee in violation of 42 U.S.C. § 1973c, a related section of the Voting Rights Act not at issue here. *Morse*, 517 U.S. at 214-215, 228.

### (9) Lack Democratic Transparency Violates Civil Rights Act.

 Because political parties have no existence of their own, as they are manifestations of their members who choose to associate. *Campbell v. Bysiewicz*, 242 F.Supp.2d at 175, it follows that political parties must have an internal democratic process to implement policies, adopt platforms, and most importantly, nominate candidates.

 While the RNC remains a political party as defined by FECA, 52 U.S.C. § 30101(16) as being an organization which nominates candidates "whose name appears on the election ballot as the candidate of such association, committee, or organization," under decisional law, a political party is much more.  It is an organization composed of persons holding similar beliefs on certain public questions who strive to gain control of the government in order to put their beliefs into effect, which is done through the election of its candidates to office. *Madole v. Barnes*, 20 N.Y.2d 169, 282 N.Y.S.2d 225, 229 N.E.2d 20 (1967). It is a voluntary organization of people who believe generally in the principles enunciated and the candidates offered to the people by the party of their choice. *Ingersoll v. Curran*, 188 Misc. 1003, 70 N.Y.S.2d 435, 437 (Sup. N.Y. Co., 1947) *affirmed* 297 N.Y. 522, 74 N.E.2d 465 (1947). The primary function of a political party is to support both candidates and policies, for why otherwise distinguish one candidate from another. *Seergy v. Kings County Republican County Committee*, 459 F.2d 308, 310 (2d Cir. 1972). Thus, a political party is something more than a medium for nomination or election to public office' the formulation of party principles and politics is a duty, which if political parties are to continue to serve their historic functions in the scheme of the democratic process, transcends the mere purpose to elect particular candidates to public office. *Ingersoll v. Heffernan*, 188 Misc. 1047, 71 N.Y.S.2d 687, 690 (Sup. N.Y.Co. 1947) *affirmed without opinion*, 297 N.Y. 524, 74 N.E.2d 466 (1947).

 Indeed, the "whole purpose of the Election Law and of the Constitution under which it is enacted, is that, within reasonable bounds and regulations, all voters shall, so far as the law provides, have equal, easy and unrestricted opportunities to declare their choice for each office." *Matter of Yevoli v. Cristenfeld*, 37 A.D.2d 153, 155, 322 N.Y.S.2d 750, (2d Dept. 1971) *reversed on other grounds*, 29 N.Y.2d 591, 272 N.E.2d 898, 324 N.Y.S.2d 317 (1971).

 As Justice O'Connor first stated in *Davis v. Bandemer*, 478 U.S. 109, 145 (1986) (O'Connor, J. concurring), later reiterated as the court opinion in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367 (1997) "There can be little doubt that the emergence of a strong and stable two-party system in this country has contributed enormously to sound and effective government. The preservation and health of our political institutions . . . depends to no small extent on the continued vitality of our two-party system, which permits both stability and measured change." Moreover, courts have held that the state's interest in the stability of its political systems permits it "to enact

reasonable election regulations that may, in practice, favor the traditional two-party system." *Timmons*, 520 U.S. at 367, as cited by *McDonald v. Grand Traverse Cty. Election Comm'n*, 255 Mich. App. 674, 662 NW 2d 804, 814 (2003). "The entire political process depends largely upon the satisfactory operation of these institutions..." *Rosario v. Rockefeller*, 458 F.2d 649, 652 (1972) *affirmed* 410 U.S. 752 (1973) and see *Branti v. Finkel*, 445 U. S. 507, 532 (1980) (Powell, J., dissenting) ("Broad-based political parties supply an essential coherence and flexibility to the American political scene").

 Given then, that elected party representatives are trustees representing their constituents, *Roosevelt*, 9 Misc.2d at 208, 106 N.Y.S.2d at 749-750; accord, *Bontempo v. Carey*, 64 N.J.Super. 51, 57, 165 A.2d 222, 225 (Law. Div. 1960), and moreover, are not merely private voluntary associations, but because in many states, they are creatures of the Election Code, are an agency of the state. *Smith v. Allwright*, 321 U.S. 649, 663 (1944), there must be a democratic process to first assure such representatives upon election, are in fact, representing those who elected them. *Bentman v. Seventh Democratic Ward Exec. Committee*, 421 Pa. at 198-199, 218 A.2d at 267 quoting Chief Judge Alvin Parker in *People ex rel. Coffey v. Democratic General Committee*, 164 N.Y. 335, 341-342, 58 N.E. 124, 126 (1900):

> "The dominant idea pervading the entire [Election Code provision for election of party representatives] is the absolute assurance to the citizen that his wish as to the conduct of the affairs of his party may be expressed through his ballot, and thus given effect, whether it be in accord with the wishes of the leaders of his party or not, and that thus shall be put in effective operation, in the primaries, the underlying principle of democracy, which makes the will of an unfettered majority controlling. In other words, the scheme is to permit the voters to construct the organization from the bottom upwards, instead of permitting leaders to construct it from the top downwards."

 Any absence of this democratic process defeats the very purpose for which a political party must function in order to represent those who choose to affiliate with that party by enrollment. While the RNC may be complying with the letter of the law, it is absolutely violating the spirit.

 Judicial intervention is therefore not only permitted by law, but is mandated, to protect the voters' rights which are created by statute. *Bentman*, 421 Pa. at 196-197, 218 A.2d at 266:

> "Judicial interference, even with the internal organization of a political party, is justifiable if such internal organization may directly affect the performance of a public function and the public interest. The invocation of judicial interference in this area must be restricted or circumscribed; judicial intervention must be limited to controversies where the issue raised bears a Direct and Substantial relationship to the performance of Public functions by the political party."

### (10) Intimidation, Threats and Coercion Violates Civil Rights Act.

 The court in *Delegates to the Republican National Convention v. RNC*, *supra* at 2012 WL 3239903 (C.D.Ca. August 7, 2012) surveyed the Civil Rights Act and found a dearth of caselaw defining "intimidation, threats and coercion." The court warned however, its holding was extremely narrow, suggesting that the examples that arose out of the 1960s where the Civil Rights Act was enforced against whites using violence to terrorize black voters were too antiquated in today's political environment.

 We concur, and believe "intimidation, threats and coercion" should be construed by their plain dictionary meanings and not be limited to the specific evils which the Congressional enactment was to remedy, as hooded whites banishing rope nooses have been replaced by more subtle, but no less means of violating civil rights.

 We hold that "intimidation, threats and coercion" relative African-Americans, Hispanics and other voter blocs, includes being condescending, patronizing and supercilious is no less intimidating than

demanding to yield a bus seat. Treating anyone less than an equal is intimidation, pure and simple. It is also a subtle but effective means of coercion as history in the anti-bellum South has long taught us. The March 18, 2013 *Growth and Opportunity Project* report is unquestionably among the most blatant expressions of implied racism we have ever encountered from a post 1960's era political party. The entire report was solely on how to market the Republican message to constituencies obviously not favorably disposed to the GOP, without ever asking as to why such voter blocs were disinclined to vote Republican in the first place. Not once was there a suggestion of dialogue, as in two-way communications to air grievances and engage in the robust debate the First Amendment guarantees.

We also hold that relative to subordinate Republican Party representatives, the Merriam-Webster definition of "coercion" is likewise not confined to use of force or threats, but is any act employed to *compel* an act or choice. The law more accurately defines coercion as the use of express or implied threats of violence or reprisal (as discharge from employment) or other intimidating behavior that puts a person in immediate fear of the consequences in order to compel that person to act against his or her will.

A supercilious and unctuousness conduct that demands absolute obsequiousness and is designed reduce volunteer party activists to lickspittles, is coercion. This is "psychological coercion," the threatened injury regards the victim's relationships with other people by employing fear, obligation and guilt, as Freeman documents. "If you want to get along, go along" is the mantra of the modern day Republican Party that not even Goldwater or Rockefeller partisans would recognize, let alone Eisenhower and Taft supporters.

Coercion involves another legal term of art, improper influence, which is defined as that deprives a person of freedom of choice or substitutes another's choice or desire for the person's own. *In re Ziel Estate*, 467 Pa. 540, 541, 359 A.2d 728, 733 (1976). Most academic authorities hold that coercion is the polar opposite of freedom. K. L. Bhatia, *Textbook on Legal Language and Legal Writing*, Universal Law Publishing (2010).

Because the RNC usurps precinct committee people of their very purpose of being elected, demanding obsequiousness as the price of inclusion in party affairs so as to silence any dissent or opposition is coercion. *Ammond v. McGahn*, 390 F.Supp. 655, 660 (D.N.J. 1975) *rev. on other grounds*, 532 F.2d 325 (1976).

**(11) Usurpation of Precinct Representatives is Voter Suppression.**
Because as found in *Meyer v. Grant*, 486 U.S. 414, 424 (1988) that the most efficient, economical and efficient form of democratic participation is direct voter dialogue, it must follow that to diminish direct voter dialogue is by itself, another form of voter suppression. Voters are naturally going to be more responsive to and attentive to the advice rendered by their locally elected precinct committee member, who is also one of their neighbors, and most likely already a well known civic leader; than a "fly-by" professional political operative or PAC/527 participant, even if a volunteer.

Moreover, usurpation of elected party representatives effectuates the RNC's racial discriminatory practices, since by law, precinct committee people must be elected in each voting district, including those in inner-urban neighborhoods which predominantly are black or Hispanic.

Finally, it is the job of precinct committee people to whip up votes on Election Day. They maintain the strike lists which is now the *Election Whip*™ module of the Trust Property, they appoint or designate the poll watchers for appointment by Election authorities, they drive voters to the polls, they pass out the sample ballots, and they are the ones manning each of the nation's 182,851 voting districts.

Thus, removing precinct committee people by usurping their powers and duties is a *de facto* form

255

of voter suppression, representing as much as 7.5% decrease in voter turnout. *Reynolds v. Sims*, 377 U.S. at 555-568 ("right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise"); see also *United States v. Classic*, 313 U.S. 299 (1941) (voters have the constitutional right to have their ballots cast and counted); *Baker v. Carr*, 369 U.S. 186, 208 (1962) ("A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution").

As a practical effect, usurping precinct committee people drives away the moderate GOP voters, since they are being chilled to participate in GOP politics by loss of their voice inside the party. Thus, all that is left within the Republican Party are the strident partisans expressing extremist viewpoints further accelerating voter suppression of moderate voters.

### (12) RNC Careering to Becoming Criminal Enterprise.

Every Federal Circuit Court of Appeals ruling on the issue has held that governmental agencies should be considered "enterprises" for the purposes of racketeering statutes. See, e.g., *United States v. Angelilli*, 660 F.2d 23, 31 (2d Cir. 1981) (holding that state civil court is an enterprise for RICO purposes); *United States v. Long*, 651 F.2d 239, 241 (4th Cir. 1981) (holding that state senate is an enterprise for RICO purposes); *United States v. Thompson*, 685 F.2d 993 (6th Cir. 1982) (en banc) reversing  669 F.2d 1143 (6th Cir. 1982); *United States v. Clark*, 646 F.2d 1259, 1264 (8th Cir. 1981) (holding that office of county judge is an enterprise for RICO purposes); *United States v. Grzywacz*, 603 F.2d 682, 686 (7th Cir. 1979) (holding that city police department is an enterprise for RICO purposes); *United States v. Frumento*, 563 F.2d 1083, 1092 (3d Cir. 1977) (holding that state tax bureau is an enterprise for RICO purposes); *United States v. Ohlson*, 552 F.2d 1347, 1350 n. 3 (9th Cir. 1977) (Per Curiam) (affirming racketeering conviction in which state bureau of narcotic enforcement is identified as RICO enterprise); *United States v. Brown*, 555 F.2d 407, 416 (5th Cir. 1977) (holding that city police department is an enterprise for RICO purposes). If governmental agencies may be considered "enterprises" for the purposes of the Racketeering Act, then it follows that political parties may also be considered as criminal enterprises.

Noted attorney and conservative commentator Erick Erickson, in reporting on the RNC's former Project OCRA scandal, concluded that the Republican Party was being "bled to death by charlatan consultants making millions off the party, its donors, and the grassroots." *See* Erick Erickson, "The Incestuous Bleeding of the Republican Party," Redstate.com blog (Nov. 28, 2012).

Donsanto and Simmons have noted that depending on the circuits, the "Salary Theory" under the Mail and Wire Fraud statutes, 18 U.S.C. §§ 1341, 1343, should be employed to prosecute corrupt political figures. Craig C. Donsanto, Nancy N. Simmons, *Federal Prosecution of Election Offenses* (8th ed. Dec.2017) at p. 25-26. *Compare United States v. Ratcliff*, 488 F.3d 639, 647 (5th Cir. 2007) (candidate lied to election ethics board about illegal campaign loans), *United States v. Turner*, 459 F.3d 775, 784–90 (6th Cir. 2006) (defendant fraudulently concealed illegal contributions and bribed voters to vote for candidate), *Westchester Cnty. Indep. Party v. Astorino*, No. 13–CV–7737(KMK), 2015 WL 5883718, at *11–12 (S.D.N.Y. Oct. 8, 2015) (holding that "a person who has committed election fraud in order to obtain the normal salary given to the person holding that elected office has not committed money or property fraud, because the victim the government – has not  been deprived either of any money or property or the choice in how to spend the money"), *and United States v. George*, No. 86–CR–123, 1987 WL 48848, at *2 (W.D. Ky. Oct. 20, 1987) (similar), *with United States v. Schermerhorn*, 713 F. Supp. 88, 92 (S.D.N.Y. 1989) (scheme to conceal that state senate candidate was being financed by organized crime in violation of state campaign financing laws held actionable under the salary theory), *United States v. Webb*, 689 F. Supp. 703 (W.D. Ky. 1988) (scheme to fraudulently elect sheriff by procuring false absentee ballots held actionable under the salary theory), *and United States v. Ingber*, Cr. No. 86-1402 (2d Cir. Feb. 4, 1987) (unpublished), *quoted in Ingber v. Enzor*, 664 F. Supp. 814, 815–16 (S.D.N.Y. 1987) (*habeas* opinion).

## VIII. Trustee's Duty to Award Relief *Ex Aequo et Bono*.
### (1) Effectuating Remedy by Surcharge and Impoundment.

Our Findings of Fact clearly demonstrate the RNC's tortious conduct. A person's noncompliance with the law is an unforeseeable occurrence, since one presumes persons will comply with the law. *E.g. United States v. Washington*, 233 F.2d 811 (9th Cir. 1956) (In the absence of evidence to the contrary, it is presumed the ordinary course of business is followed and that the law is obeyed); *Athens Roller Mills, Inc. v. Commissioner*, 136 F.2d 125 (6th Cir. 1943) (presumption that every person has performed a duty enjoined by law or contract); *Mullins v. DeSoto Securities Co.*, 56 F.Supp. 907 (E.D.La 1944) *affirmed* 149 F.2d 864 (corporate officers and directors are presumed to know everything about the corporate affairs that they could have learned by exercising reasonable care); *Laidley v. Rowe*, 275 Pa. 389, 119 A. 474 (1923) (One is presumed to know what a reasonable person ought to know, from facts brought to his attention; from whatever proper inquiry would disclose).

Our task is to fashion an enforceable remedy that is in the best interest of all beneficiaries, 20 Pa.C.S. § 7772(a), both Democratic and Republican, national, state and local, which is prudent, 20 Pa.C.S. § 7774, and which will incur only costs that are reasonable in relation to the Trust Property, and the Trust Purpose. 20 Pa.C.S. § 7775.

### (2) Trustee's Exercise of Discretion Not to be Disturbed.

The law provides that the courts will not disturb a trustee's discretionary powers unless trustee abuses that discretion through dishonesty, improper motive, failing to use his judgment or acting beyond the bounds of reasonable judgment. *In Re Estate of Feinstein*, 364 Pa.Super. 221, 227, 527 A.2d 1034, 1037 (1987). As stated in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989), "[t]rust principles make a deferential standard of review appropriate," (citing Restatement §187 (abuse-of-discretion standard). Bogert, §560. *In re Scheidmantel (In re Sky Trust)*, 868 A.2d 464, 481 (Pa.Super. 2005) (Pennsylvania follows the view of the Restatement of Trusts that when discretion is conferred upon a trustee with respect to the exercise of power, its exercise is not subject to control by the courts, except to prevent an abuse by the trustee of his discretion).

### (3) Authority to Enforce Pledge to Charity.

Notwithstanding the RNC's illicit motives, the *actus reus* is that the RNC reneged on its February 26, 2009 pledge of $20 million to the Trust. Had it not been for this pledge, the RNC would be fully authorized to walk away from its interests in the Trust and, as repeatedly asserted by the Attorney General, exercise its right not to avail itself of the Trust's benefits (although as extensively noted, while the RNC still cannot deny Trust Property usage to all other co-beneficiaries).

In *Jewish Federation v. Barondess*, 234 N.J. Super. 526, 527-529, 560 A.2d 1353 (1989) it was held that the great bulk of the jurisdictions hold that a charitable pledge constitutes an enforceable contract. See generally Restatement (Second) of Contracts, § 90 (1981) and see also Annotation, "Consideration for subscription agreements." 115 A.L.R. 589 (1938). In *Brownfield Estate v. St. Vincent Archabbey*, 28 Fiduc. Rep.2d 231 (Westmoreland Co. 2008) the court ordered the fulfillment of the pledge in addition to the payment of specific bequests in the will. In *Allentown Ahead Fund v. Kraynick*, 65 Pa. D. & C.2d 611 (Lehigh Co. 1974) a demurrer was overruled on a complaint to enforce a charitable pledge. The court noted that despite the fact that "a subscription is not a gift but it is a promise to contribute money or property generally for a charitable purpose. If the promise is valid and sufficient, if it is accepted, and if this is supported by consideration, a binding contract is made. See, generally, 35 Pennsylvania Law Encyc. 322, §1, *et seq*." Citing *Presbyterian Board of Foreign Missions v. Smith*, 209 Pa. 361, 58 A. 689 (1904), the court found that requisite consideration may consist of similar promises of others or of acts done by the promisee in reliance on the promise.

Likewise, in the Restatement, the authors state: American courts have traditionally favored charitable subscriptions ... and have found consideration in many cases where the element of

exchange was doubtful or non-existent. [Restatement (Second) of Contracts, Section 90, Comment f (1981).] The *Barondess* court, citing *More Game Birds in America, Inc. v. Boettger*, 125 N.J.L. 97, 100-101 (E. & A. 1942), found that the real basis for enforcing a charitable subscription is one of public policy, that enforcement of a charitable subscription is a desirable social goal. Moreover, there is a practical reason for enforcing charitable subscriptions: "Lightly to withhold judicial sanction from such obligations would be to destroy millions of assets of the most beneficent institutions in our land, and to render such institutions helpless to carry out the purposes of their organization. *More Game Birds In America Inc. Boetteger*, 125 N.J.L. at 100-101.

Commentators find that courts generally insist of satisfaction of the pledge to charitable organizations, versus damages arising from reliance on such pledges. Edward Yorio and Steve Thel, *The Promissory Basis of Section 90*, 101 YALE L.J. 111 (1991). Such court decisions are predicated on Restatement (Second) Contracts § 90. Likewise, in ALI *Restatement of the Law of Nonprofit Organizations*, Tentative Draft No. 2, it is provided that:

> "A donor is presumed to intend that a promise to give is binding in any of the following circumstances —
>
> The promise is in writing and does not negate intent of enforceability;
>
> The donor, at the time of the promise, served on the governing board or as an officer of the charity;
>
> The charity reasonably relied on the donor's promise; or
>
> The promise induced one or more others to give to the charity."

At bar, ALI conditions Number 3 and Number 4 are applicable.

Additionally, it is held that as a Trustee, I would be liable for breach of trust if we did not enforce a subscription. Mary Frances Budig; Gordon T. Butler; Lynne M. Murphy, *Pledges to Nonprofit Organizations: Are They Enforceable and Must They Be Enforced*, 27 U.S.F. L.REV. 47, 86-89 (1992).

### (4) Authority to Set Aside Reserves to Prevent Deficiencies.

We are authorized to carry out the provisions under IOP Rule 10(e) by establishing and maintaining reserves to prevent deficiencies. *In re Sonnott's Estate*, 310 Pa. 463, 466, 165 A. 244, 245 (1933); *In re Sternberger's Estate*, 121 Pa.Super. 50, 53, 182 A. 723, 725 (1936); *In re Smith's Estate*, 385 Pa. 416, 419, 123 A.2d 623, 624-625 (1950). It is solely within our discretion to assure adequate funds in reserve for ten years, and to replenish such funds when drawn upon, so that in effect, ten years of funds for the administration of the trust is always on hand.

### (5) Authority to Assess Surcharge for Damages.

That we may hold the RNC liable for damages to its co-beneficiaries is well settled. Restatement (Third) Trusts § 104(1)(c) ("Liability of Beneficiary to Trust") and comment f ("the beneficiary is personally liable to the trust for all or part of the loss..."). See also Austin W. Scott, William F. Fratcher & Mark L. Ascher, *Scott and Ascher on Trusts* §§ 22.6, 25.1-25.3 (5th ed. 2007); George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 191 (Rev. 2d ed. 1979); id. § 814 (Rev. 2d ed. 1981); and Amy M. Hess, George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 718 (3d ed. 2009). This is Black Letter. *DuPlaine's Estate*, 185 Pa. 332, 334-335, 39 A. 947, 948 (1898). And see also Scott *supra*, § 25.2 (5th ed) at p. 1842 ("The interest of a beneficiary who is under a liability to pay money into the trust estate is subject to a charge for the amount of the liability) and see also § 25.3 at p. 1866; Restatement (Second) Trusts, § 253; *Spencer v. Harris,* 70 Wyo. 505, 516, 252 P.2d 115, 118 (1953); *Roberts v. Michigan Trust*, 273 Mich. 91, 122, 262 N.W. 744, 755 (1935); *Matter or Abel*, 150 Misc.2d 767, 768, 570 N.Y.S.2d 268, 269 (Surr. Nassau Co. 1991) (quoting Scott, *supra*).

Bogert writes "If a beneficiary commits an act which violates [his fiduciary] duty he may be required to reimburse the trust fund or his co-beneficiaries for the damages suffered, his interest under the

trust being impounded for that purpose." *Id.* at 479-480 (citations omitted). Scott states: "When one of several beneficiaries misappropriates or otherwise wrongfully deals with trust property, the beneficiary's interest is subject to a charge for the amount of the loss. The wrongdoer is not entitled to receive a share of either income or principal without making good the loss." *Id.* § 25.2.3 at pp. 1845-1846. Restatement (Second) Trusts § 253 confirms: "If one of several beneficiaries misappropriates or otherwise wrongfully deals with trust property causing a loss to the other beneficiaries, he is personally liable for the amount of the loss, and his beneficial interest is subject to a charge thereof."

A surcharge is the penalty imposed to compensate beneficiaries for the loss caused by the fiduciary's want of care. *Estate of Munro v. Commonwealth Nat'l Bank* , 373 Pa. Super. 448, 452, 541 A.2d 756, 758 (1988), *alloc. denied*, 520 Pa. 607, 553 A.2d 969 (1989). The surcharge is further authorized by the Trust Agreement, ¶ 8(E)(3) which is controlling, 20 Pa.C.S. § 7705(a).

Because the surcharge is limited to actual damages, we are unable to compensate the DNC and its state, county and local Democratic party committees for expenses incurred in obtaining political technology, such as NGP-VAN, because all existing political technology does not duplicate, let alone parallel the Trust's Property's principal modules, *MyVoterPage.com™* and *Election Day Whip™*. The same is applicable to state, county and local Republican party committees for use of software, including GOP Data Center or i360. To that extent, we overrule our prior conclusions of law in Res. 2009-23A and Res. 2016-3A.

What we can do is compensate the DNC and its state, county and local Democratic Party committees a sum equal to the cost per voter incurred by the 2016 Clinton campaign for those voters we find would have cast a Democratic ballot, had all Democratic Party committees employed the Trust Property and obtained its 7.5% voter increase. In as Clinton spent $21.64 per voter, and use of the Trust Property would have netted her 1,136,253 additional votes for a total 333 Electoral Votes (versus 227) in Florida (MOV 1.19%), Georgia (MOV 5.10%), Michigan (MOV 0.22%), North Carolina MOV 3.66%), Pennsylvania (MOV 0.72%) and Wisconsin MOV 0.76%), the surcharge is $24,588,514.

Solely in the interest of avoiding the appearance of partiality, 20 Pa.C.S. § 7773 and despite the fact that then Republican Gov. Tom Corbett lost to his Democratic challenger, Tom Wolf in 2014 by a MOV of 9.5%, 2 points above the Trust Property's 7.5% TLI increase, we will compensate the Pennsylvania State Republican Committee the sum of $2,001,938.44 to equal the $17.11 Wolf spent per voter on 117,004 additional voters Corbett would have received had the PA GOP used the Trust Property. Corbett lost to Wolf by 339,261 votes.

We are at liberty to distinguish the Pennsylvania Republican Party from other state Republican committees, because in fact, the PA GOP (specifically the PA Senate Republican Caucus have twice employed the Trust to provide technical advice and assistance). We have no campaign finance caps under the Pennsylvania Election Code.

### (6) Payment of Surcharge Proceeds to Co-Beneficiaries Not Contributions.

 In *In re Larson*, AO 1995-21, the Federal Election Commission held "that funds received to settle a political committee's legal claim also fall outside the definition of contribution under [FECA]. The receipt of these funds is not subject to the contribution limits of 2 U.S.C. [§] 441a [now 52 U.S.C. § 30116]. Therefore, the Committee may accept the $1,500 paid in settlement of its damages claim against the [defendant]. However, the Committee must report and itemize the receipt * * *." We are authorized to rely on Commission Advisory Opinions when "involved in any specific transaction or activity which is indistinguishable in all its material aspects from the transaction or activity with respect to which such advisory opinion is rendered." 52 U.S.C. 30108(c) and 11 CFR § 112.5(2). We anticipate no such additional difficulty in distributing surcharge proceeds to state, county and local party committees that labor under similar state campaign finance caps.

## (7) Authority to Impound.

Our authority to impound the RNC's equitable interests is likewise without dispute. Bogert, § 191 *supra*, at 479-480; Scott, *supra* at 1845-1846; *In re Wormley's Estate*, 359 Pa. 295, 289-301, 59 A.2d 98, 100 (1948) (court allows impoundment for trustee to recover legal fees from beneficiary's misconduct); *In re Nirdlinger's Estate*, 331 Pa. 135, 142-143, 200 A. 656, 659 (1938) (trustee may impound interest to recoup loss from mistake of oversight). Scott writes: "The trustee is under a duty to the other beneficiaries to withhold payment from the wrongdoer until the loss is made good." *Id.* § 25.3.3 at 1845-1846 (citations omitted); *Las Vegas Railway and Power Co. v. Trust Co. of St. Louis*, 17 N.M. 286, 287, 126 P. 1009, 1010-101 (1912) (trustees entitled to impound); Bogert, *supra* at p. 482-483.

While not material for the instant discussion, we find no authority to dissuade us that the law governing surcharge of a trustee's breach should be any different regarding a fiduciary's breach. We also must access a surcharge that is not punitive, *In re Francis Edward McGillick Foundation*, 406 Pa. Super. 249, 266, 594 A.2d 322, 331 (1991), *rev'd on other grounds*, 537 Pa. 194, 642 A.2d 467 (1994), and is limited only to actual loss suffered by the co-beneficiaries. *In re Scheidmantel*, 868 A.2d 464, 493 (Pa.Super. 2005). The purpose of a surcharge is to compensate beneficiaries for the loss caused by the fiduciary's want of the appropriate level of care. *Trust of Munro v. Commonwealth National Bank*, 373 Pa.Super. 448, 541 A.2d 756, 758 (1988); *In re Scheidmantel*, 868 A.2d at 493. A loss is not limited to direct loss, but can also be indirect. *Id.*, citing *In re Scharlach*, 809 A.2d 376, 386 (Pa.Super. 2002). Ancient law assures the right of subrogation of the Trust's creditors as well. *Re Johnson* (1880) 15 Ch D 548; *Re Oxley* [1914] 1 Ch 604.

## (8) Authority to Prevent Future Damages.

"Equity has jurisdiction to do complete justice between the parties * * * equity will itself proceed to round out the whole circle of controversy, by deciding every other contention connected with the [controversy]" *McDavitt Estate*, 379 Pa. Super. 610, 550 A.2d 1015 (1988). A court of equity has broad powers to fashion relief according to the equities of the case, *Hicks v. Saboe*,521 Pa. 380, 555 A.2d 1241, 1345 (1989), and can also act, not only where the legal remedy is inadequate, but also where it is inconvenient. *Pa. R. Co. v. Bogert*, 209 Pa. 589, 600, 601, 59 A. 100, 101 (1904), *Equibank, N.A. v. Fidelco Growth Investors*, 1977 Pa. D. & C. Dec LEXIS 397, 3-4 (Pa. C.P. 1977). Likewise, we cannot defy principles of equity, punishing the party that sought to do the right thing and rewarding the party that does wrong. See *Kohler v. Bleem*, 654 A.2d 569, 575-576 (Pa. Super. 1995). "Judge Gesell, in the influential *Sibley Hospital* case, observed that the "function of equity is not to punish but merely to take such action as the Court in its discretion deems necessary to prevent the recurrence of improper conduct." *Stern v. Lucy Webb Hayes National Training School for Deaconesses and Missionaries*, 381 F. Supp. 1003, 1018 (D.D.C. 1974) as quoted in Columbia Law School Attorney General Conference (2008). We are also authorized to cure the RNC's fraud on the court perpetrated in the prior arbitration proceedings. *Invista North America, SA.R.l.. v. Rhodia Polyamide Intermediates S.A.S.*, 503 F.Supp.2d 195 (D.D.C. 2007) (If an arbitral tribunal finds that the named inventors of a patent should be corrected, the tribunal can order the parties to petition the Director of the Patent and Trademark Office to change inventorship).

## (9) Attorneys' Fees Exception to American Rule.

Attorney fees incurred by the trustee of a charitable trust is an exception to the American Rule.; *Dardovitch v. Haltzman,* 190 F.3d 125, 145-147 (3d Cir.) ("One of the more common exceptions to the American Rule is that attorney fees are available at the discretion of the court in cases involving trusts"); *Estate of Tose,* 482 Pa. 212, 393 A.2d 629 (1978). See *In re Rosenfeld Foundation Trust*, 29 Fiduc.Rep.2d 271, 2006 WL 3040020 (Phila. O.C. 2006) for in-depth analysis by the renown Judge John Herron. Nonetheless, the Court "has a duty and obligation" to review the reasonableness of counsel fees. *Estate of Thompson,* 426 Pa. 270, 232 A.2d 625 (1967); *Estate of Geniviva,* 450 Pa.Super. 54, 68, 675 A.2d 306, 313 (1996).

The test regarding attorney fees is (1) the amount of work performed; (2) the character of the

services rendered; (3) the difficulty of the problems involved; (4) the importance of the litigation; the amount of money or value of the property in question; (6) the degree of responsibility incurred; (7) whether the fund involved was 'created' by the attorney; (8) the professional skill and standing of the attorney in his profession; (9) the results he was able to obtain; (10) the ability of the client to pay a reasonable fee for the services rendered; and, (11) very importantly, the amount of money or the value of the property in question. *LaRocca Estate,* 431 Pa. 542, 546, 246 A.2d 337, 339 (1968); *Estate of Burch,* 402 Pa.Super. 314, 318, 586 A.2d 986, 988 (1991). The Pennsylvania Orphans Courts have adopted the original Pennsylvania Attorney General's Schedule of Fees as a prima facie criteria as to attorney's fee reasonableness, starting as the maximum for fees to be awarded. *Carr Estate*, 22 Fid.Rep.2d 364, 366 (O.C. Mont. 2002).

These fees are reasonable given the RNC's ongoing intractability through dilatory, obdurate and vexatious conduct so as to defeat the Trust's charitable purpose. *Rosenfeld*, 29 Fiduc.Rep.2d at 305, 2006 WL 3040020 at *39. Equally important, the legal fees are not to be extracted from the corpus of the trust, but are to be assessed as an additional surcharge on the RNC. *Rosenfeld*, 29 Fiduc.Rep.2d at 305-306, 2006 WL 3040020 at *40.

### (10) Authority to Appoint Receiver.

As noted *supra*, we possess the authority to act *ex aequo et bono* to resolve the dispute by applying broader principles of fairness, largely without reference to the law of a particular legal system, our solution "to reside in a moral, social, or political realm that is external to the law." roles appear to envision a degree of discretion and ability to depart from legal precedent and doctrine far beyond anything that an American court would regard as permissible, even a true court of equity like the Delaware Court of Chancery or a federal court wielding the full panoply of its equitable authority." *LG Elecs., Inc. v. Interdigital Commc'ns, Inc.*, 98 A.3d 135, 140-146 (Del. Ch., 2014).

And courts in equity have the power, when all else fails, to appoint judicial adjuncts, specifically receivers, to "restore legality." *Perez v. Boston Housing Authority*, 379 Mass. 703, 734-735, 400 N.E.2d 1231, 1250 (1980); *Judge Rotenberg Educational Center v. Commissioner, Dept. of Mental Health*, 424 Mass. 430, 467, 677 N.E.2d 127, 151 (1997).

"[R]eceivers are the most powerful and independent remedy in a court's arsenal to force an executive agency into compliance with its orders." Catherine Megan Bradley, *Note, Old Remedies Are New Again: Deliberate Indifference and the Receivership in Plata v. Schwarzenegger*, 62 N.Y.U. ANN. SURV. AM. L. 703, 706 (2007). "Unlike [the] monitor and special master, the receiver completely displaces the defendants..." Bradley, *supra*, citing Donald L. Horowitz, *Decreeing Organizational Change: Judicial Supervision of Public Institutions*, 1983 DUKE L.J. 1265, 1297 (1983).

"Receiverships are strictly a remedy of last resort and have been called, for example, "the nuclear option" . . . it is the most invasive remedial tactic that a court in equity may employ to enforce its decrees." Liat Weingart, *Receiverships in the Prison Litigation Context: Factors Necessary for an Effective Judicial Remedy of Last Resort*, 9 CARDOZO PUB. L. POL'Y & ETHICS J. 193, 195 (2010) "[L]astly, the court may invoke "in rem relief, in which the court or its officers themselves do that which the defendant has refused to do." James M. Hirschhorn, *Where The Money Is: Remedies To Finance Compliance With Strict Structural Injunctions*, 82 MICH. L. REV. 1815, 1826 (1984).

There is a two-prong test for appointment of a receiver, which is when the defendant fails "minimal standards of adequate performance *and* immune from conventional political mechanisms of correction." Charles F. Sabel & William H. Simon, *Destabilization Rights: How Public Law Litigation Succeeds*, 117 HARV.L.REV. 1015, 1062 (2004). This will arise due to the defendant's repeated failure to enforce law. *Judge Rotenberg*, 424 Mass. at 463, 677 N.E.2d at 149; the wasting of resources. *Judge Rotenberg*, 424 Mass. at 464, 677 N.E.2d at 149; *Perez*, 379 Mass. at 724-725, 737, 400 N.E.2d at 1244, and lack of leadership to solve problem in foreseeable future. *Judge Rotenberg*, 424 Mass. at 464, 677 N.E.2d at 149; *Perez*, 379 Mass. at 736, 400 N.E.2d at 1251-1252.

The RNC will have only two has only two "Remedial Formulation" responses to appointment of a receiver. See e.g., Susan P. Sturm, *A Normative Theory of Public Law Remedies*, 79 GEO.L.J. 1355, 1365-76 (1991); *Special Project: The Remedial Process in Institutional Reform Litigation*, 78 COLUM. L. REV. 784, 790-810 (1978). First, the RNC can continue, as it has over the past seven years, challenge the arbitrator's authority. 78 COLUM.L.REV. at 794-795. It could on the other hand, embrace this Award, as available remedy to provide opportunity heretofore non-existing. *Id.* at 796. Sabel & Simon, 117 HARV.L.REV. at 1063, and otherwise recognize it require assistance to effectuate restoration of legality. 78 COLUM.L. REV. at 795. Of course, this Arbitral tribunal, as any judicial tribunal, is obligated to provide the RNC first opportunity to propose or effectuate remedy. *Lewis v. Casey*, 518 U.S. 343, 362 (1996). The preferred response, now long past, is good faith effort to obtain consensus for remedial formulation. Sabel & Simon, 117 HARV.L.REV. at 1068.

Again, this Award is not rigidly bilateral, relief granted here is not about compensation for past wrongs, but instead, this Award's relief is remedial, flexible; and impacts entire communities, indeed the entire nation. This Award does not terminate proceeding, and we remain as active, not passive. Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 HARV.L.REV. 1281, 1282, 1291, 1302 (1976); see also *Beth v. Carroll*, 155 F.R.D. 529, 530-531 (E.D.Pa. 1994). The requirements for relief imposed by this Award requires ongoing quasi-judicial administration to assure remedial discretion, accountability-reinforcing, and public interest representation. Sabel & Simon, 117 HARV.L.REV. at 1082-1099. Focus is on results, *Id*, at 1048, citing *Perez*, per shift from command-control to experimentalist remedial formulation. *Id.* at 1052-1053.

After all is said and done, this Award must satisfy a three prong test. *Milliken v. Bradley*, 433 U. S. 267, 280-281 (1977) (*Milliken II*). First, due to nature and scope of constitutional violation, remedy must be related to the condition offending Constitution, instantly the First Amendment right of political association, along with the Fourteenth Amendment's equal protection of laws. Secondly, this Award must be remedial, designed as nearly as possible to restore parties to the position they would have occupied in absence of unconstitutional conduct. Thirdly, we must take into account interests of the parties in managing their own affairs, consistent with the Constitution.

Issuance of this Award with the injunctive relief is the Respondent's last opportunity to restore legality to its administration and comport fully with the United States Constitution and the Civil Rights Act of 1957. Continued obstinacy will regrettably, but necessarily result in appointment of a receiver to take over the Respondent until legality is restored. As with our Findings of Fact, our Conclusions of Law are final and not subject to judicial review.

### C. CONCLUSIONS OF LAW.
The Trustee finds the following conclusions of law:

### ¶ 1. Co-Beneficiaries Bound to Arbitration Notwithstanding Non-Signatory.
COL ¶ 1.    Arbitration is matter of contract law, and all beneficiaries are bound by Trust Agreement ¶ 8(E) and IOP Rule 4(d) notwithstanding absence of signatory approval under multiple common law principles, contract and agency law, as failure to disclaim constitutes assent to arbitration, and use of ADR provisions, let alone Trust's charitable purpose generally, is a direct benefit which accrue to all beneficiaries.

### ¶ 2. Arbitrarity as Violation of Civil Rights Act Violates Trust Agreement.
COL ¶ 2.    The Trustee has authority to sit as an arbitrator under the Pennsylvania Uniform Trust Act, 20 Pa.C.S. § 7780.6(a)(3) [UTC § 816(23)]. A violation of the Civil Rights Act of 1957 is simultaneously a breach of fiduciary duty owed by co-beneficiary to all other beneficiaries which in turn violates the Trust Agreement, ¶ 2(A), ¶ 8A, ¶ 8(B)(1)-(2), ¶ 30(L) and ¶ 30(M), of which any co-beneficiary's breach of fiduciary duty and terms of the Trust Agreement is a matter of interpretation and administration of the Trust, 20 Pa.C.S. § 7780.6(a)(3), that is an issue clearly and unmistakably reserved for

arbitrability. In furtherance thereof, the Trustee is exercising police and regulatory powers to the extent such are available by law.

### ¶ 3. Trustee Neutral, Award *Ex Auquo et Bono*.

COL ¶ 3.   Trustee sits a neutral in disputes among co-beneficiaries, 20 Pa.C.S. § 7773, and as an arbitral tribunal, has the power and authority to decide grievance on principles of equity and good conscience, and make his award *ex aequo et bono*, and otherwise required by law to achieve complete justice. Trustee's Findings of Fact and Conclusions of Law are not subject to dispute in any subsequent proceeding under the Federal Arbitration Act or the Pennsylvania Uniform Arbitration Act.

### ¶ 4. Interests in Charitable Trust Inalienable.

COL ¶ 4.   The Trust, being a charitable trust, 20 Pa.C.S. § 7735, cannot be disclaimed by a Qualified or Current Beneficiary, being barred by the Statutes of Elizabeth, long the common law and now statutory law, 20 Pa.C.S. § 7706, as Qualified and Current Beneficiaries are merely conduits through which the charitable purposes of protection of civil rights secured by law, flow to the general public.

### ¶ 5. Election Crimes, Fraud on Court Defeat Evidentiary Presumption.

COL ¶ 5.   Co-beneficiary committing election crimes and fraud on the court rebuts presumption that public officials act for public good.

### ¶ 6. Immediate and Irreparable Injury Requires Immediate Injunctive Relief.

COL ¶ 6.   Given co-beneficiary's protracted and obstinate conduct to defeat charitable trust continues to inflict immediate and irreparable injury on U.S. voters, which is chilling of exercise of First Amendment right of political association and Fifteenth Amendment right to vote, Trustee is required to proceed under the provisions of the Fed.R.Civ.P Rule 65 relating to preliminary and permanent injunctive relief, as the Trust Agreement, ¶ 8(E), ¶ 15(E), and IOP Rule 4(d) applies the Federal Rules of Civil Procedure as the procedural rules governing this Arbitration proceeding.

### ¶ 7. Co-Beneficiary Bound by Community of Interest.

COL ¶ 7.   While a co-beneficiary is not required to utilize the Trust Property for its own good, under community of interests doctrine, co-beneficiary cannot deny usage of Trust Property to all other co-beneficiaries, and must therefore undertake all duties, obligations and support of the Trust.

### ¶ 8. Violation of Civil Rights Act is Violation of Trust Agreement.

COL ¶ 8.   Because Trust's charitable purpose is protection of civil rights secured by law, co-beneficiary's violation of Civil Right Act of 1957 simultaneously violates the Trust Agreement, ¶ 2(A), ¶ 8(A), ¶ 8(B)(1)-(2), ¶ 30(L) and ¶ 30(M), which constitutes interpretation of the Trust Agreement and administration of the trust arbitrable under the Pennsylvania Uniform Trust Act, 20 Pa.C.S. § 7780.6(a)(3) and the Trust Agreement, ¶ 8(E) which is controlling. 20 Pa.C.S. § 7705(a).

### ¶ 9. Voter Challenges Limited Only to Those Authorized by Law.

COL ¶ 9.   Only election officials and party representatives expressly authorized by state law can challenge voter qualifications to cast ballots, and such challenges must make out a *prima facie* case that the person seeking to cast a ballot is either not currently registered or is attempting to cast a ballot in a precinct (district, or division) which he not eligible to cast a ballot.

### ¶ 10. Racial Euphemisms Violate Civil Rights Act & Trust Agreement.

COL ¶ 10.   Co-beneficiary's voter suppression efforts, despite being masked by racial and ethnic

animus euphemisms reputedly promoting voter outreach, but in fact is implicit segregation, constitutes intimidation, threats and coercion, notwithstanding its subtleness, and violates the First and Fourteenth Amendments, and thus a violation of the Civil Rights Act of 1957, multiple criminal statutes and the Trust Agreement, ¶ 2(A), ¶ 8A, ¶ 8(B)(1)-(2), ¶ 30(L) and ¶ 30(M), which constitutes a breach of fiduciary duty owed by one co-beneficiary to all other co-beneficiaries.

### ¶ 11. Usurping Party Officials Violate Civil Rights Act & Trust Agreement.

COL ¶ 11.  Co-beneficiary's usurpation powers and duties of elected precinct party representatives to perform the grave and important duties for which they were elected to perform, is a form of voter suppression by exclusion, and violates the First and Fourteenth Amendments, constitutes intimidation, threats and coercion, and thus a violation of the Civil Rights Act of 1957, multiple criminal statutes and the Trust Agreement, ¶ 2(A), ¶ 8A, ¶ 8(B)(1)-(2), ¶ 30(L) and ¶ 30(M), which constitutes a breach of fiduciary duty owed by one co-beneficiary to all other co-beneficiaries.

### ¶ 12. No Transparent Governance Violate Civil Rights Act & Trust Agreement.

COL ¶ 12.  When co-beneficiary provides no democratic means of governance and controls intra party participation by intimidation, threats or coercion, co-beneficiary ceases being a political party, because political parties, an essential component of our constitutional system of checks and balances, have no existence of their own, as they are only manifestations of their members who choose to associate among each other to influence control of government. Co-beneficiary's failure to facilitate representation of party electors is a violation of the First Amendment, Fourteenth Amendment, the Civil Rights Act of 1957, multiple criminal statutes and the Trust Agreement, ¶ 2(A), ¶ 8A, ¶ 8(B)(1)-(2), ¶ 30(L) and ¶ 30(M), which constitutes a breach of fiduciary duty owed by one co-beneficiary to all other co-beneficiaries.

### ¶ 13. Election Crimes, Public Corruption Violate Oath of Office.

COL ¶ 13.  Commission of election crimes and its resulting public corruption violates public official's constitutional oath of office, U.S. Const., Art. VI, cl 3, 5 U.S.C. § 3331.

### ¶ 14. Pledge to Charitable Trust Enforceable.

COL ¶ 14.  A pledge to a charitable entity, such as the Trust, is enforceable by law due to consideration and public policy, the consideration being the direct benefit of protection of civil rights secured by law that flow from the Trust to the general public.

### ¶ 15. Co-Beneficiary Breach of Fiduciary Duty Required to Make Trust Whole.

COL ¶ 15.  A beneficiary who breaches its fiduciary duty to other beneficiaries is required to make the charitable trust whole by surcharge, the Trustee possessing the authority to grant relief *ex aequo et bono* to enforce charitable trust's restoration and perpetuity.

### ¶ 16. Trustee Required to Grant Relief *Ex Auquo et Bono*.

COL ¶ 16.  Because a major political party is too important to fail and co-beneficiary's illegal customs and usages violate fundamental political science requirement of rationality, Trustee is required to exercise his power and authority to decide grievance on principles of equity and good conscience, and make his award *ex aequo et bono*, and otherwise achieve complete justice. If Respondent does not forthwith cease and desist in violation of Civil Rights Act of 1957 and otherwise effectuate ordered reforms no later than September 30, 2018, Trustee is authorized by law and equity to appoint receiver to assume control of Respondent to implement reforms to protect voters' First Amendment rights.

### D. AWARD ORDER.

Accordingly, it is herein ORDERED and DECREED that a Rule Nisi having been issued onto the Respondent Republican National Committee to show cause as to why the Trustee shall not issue a final Arbitration Award to permanently enjoin the Respondent and its officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, from any and all acts to intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose and to otherwise devise and intending to devise a scheme and artifice to defraud, injure and oppress qualified voters in the free exercise and enjoyment of certain rights and privileges secured to each of them by the Constitution and laws of the United States, specifically the Civil Rights Act of 1957, Pub. L. 85–315, 71 Stat. 637, 52 U.S.C. § 10101(b) and of their rights as beneficiaries under the Trust Agreement ¶ 2 to be protected of their civil rights secured by law, said rule is now made absolute, and this Final Arbitration Award shall issue and require that:

## I. Prohibition of Violating the Civil Rights Act of 1957.

Respondent Republican National Committee shall forthwith:

**A. Cease and Desist Violations of Civil Rights Act of 1957.** Cease and desist in any violation of the Civil Rights Act of 1957, Pub. L. 85–315, 71 Stat. 637, 52 U.S.C. ¶ 10101(b), including, but not limited to the following act or effort to intimidate, threaten or coerce, by commission or omission for the purpose to suppress participation in the political process of registering to vote, casting ballots, holding and discharging the duties of public or party office, and otherwise participate in the political party of choice, including but not limited to the following acts:

**(1)** Employing any process of a custom and usage commonly referred to as "caging" to verify a voter's domicile by any entity not the official election agency of the state or respective county or municipality authorized by law to verify the bona fides of registered electors.

**(2)** Disseminating, distributing, publishing or promulgating by print, electronic or digital media any matter regarding voting and compliance with voter registration and election conduct except on a statewide basis and is otherwise directed to the populace at large within the respective state and no particular community, county, municipality or similar political subdivision, and no particular identification or distinguishing voters by age, ethnicity, gender, race or social economic status or political or religious persuasions or views, *Provided that*, this prohibition does not include describing rights and remedies available to registered voters who are entitled to protection under the Americans with Disabilities Act of 1990, 101-336,104 Stat. 327, 42 U.S.C. § 12101 *et seq.*, and regulations promulgated thereto by the U.S. Dept. of Justice or any state counterpart.

**(3)** Recruiting and purporting to approve, or nominate for appointment, any person to be a poll watcher and similar election day monitor or observer, or otherwise interfere, directly or otherwise, with applicable state laws regulating the appointment of poll watchers and other election day monitors and observers.

**(4)** Acquiescing, directing, promoting or by any other means to challenge the bona fides of any registered elector to cast his ballot in any general, municipal or special election or primary or caucus or convention of any political party as authorized by law by any person not a registered elector of the respective political vote district, division, precinct, ward, or of the municipality, including a New England town, or a county, if and when state election laws authorize a person of a municipality or county to challenge voter qualifications, and only in the manner expressly and specifically provided by the applicable state election law and none other.

**(5)** Urging adoption of legislation requiring obtaining photographic identification to vote by procedures that are burdensome, taxing and vexatious and which do not provide alternative provisions for persons who are elderly, impoverished, disabled or developmentally challenged

265

and who otherwise are unable to obtain photographic identification on their own volition; *Provided that*, factors which are considered to be burdensome, taxing and vexatious is to travel to a location other than the county courthouse or local motor vehicle driver licensing facility which are open for business in evenings as well as during the business day for purposes of issuing photographic identification to vote and which the cost of obtaining such photographic identification does not exceed the actual cost of goods of said photographic identification and the pro rate labor expense to produce same.

**(6)** Superceding or usurping the powers and duties of duly elected precinct party representatives granted by law or custom, specifically the duty to (i) maintain strike lists to monitor and whip voter turnout by ascertaining which voters have cast ballots so as to contact those who have not cast a ballot to do so, (ii) question the bona fides and qualifications of a person appearing at the polls to cast a ballot, (iii) recommend appointment of Election board officials, poll watchers and other election day observers, and (iv) relay and otherwise advise and inform as voter opinions preferences, and sentiment as to the party's policies, platforms and candidate qualifications without fear of interference or retribution for advocating views which Respondent may not be in accord thereof.

**(7)** Segregating any class of voters by reason of age, ancestry, ethnicity, gender, race or social economic status or political or religious persuasions or views for purposes of voter registration and generic and Federal Election Activity, *Provided that*, the Respondent shall not prevent the establishment of any caucus or similar organizational entity consisting solely of members of and expressly for representing any particular age, ancestry, ethnicity, gender, race or social economic status or political or religious persuasions or views for advocacy of political policies and programs by such constituencies to the Respondent without fear of interference or retribution for advocating views which Respondent may not be in accord thereof.

**(8)** Undertaking any other act or omission of any act otherwise required by law to devise and intending to devise a scheme and artifice to defraud, injure and oppress qualified voters in the free exercise and enjoyment of certain rights and privileges secured to each of them by the Constitution and laws of the United States and to defraud the rights of all qualified voters as beneficiaries under the Trust Agreement to be protected of their civil rights secured by law, by means of false and fraudulent pretenses, representations, and promises, transmit and cause to be transmitted, by means of the United States Postal Service and by means of wire communications in ; and foreign commerce, writings and sounds, for the purposes of executing such scheme and artifice.

by of any person on account of age, domicile, ethnicity, gender, political opinions, race, religious affiliation, social-economic status, by reason of dissent or opposition to the Respondent's customs and usages, including but not limited to:

**(1)** Voters of African-American, Latino-American, Hispanic-American, Asian-American or Native American ancestry.

**(2)** Voters of the Jewish faith or of Jewish ancestry.

**(3)** Voters who are registered Republican electors who either possess a college degree, employed in a professional occupation or vocation, are of Jewish or Roman Catholic or Protestant religious affiliation or any combination thereof.

**(4)** Persons duly elected as Republican party representatives to a county or state Republican Committee from a voting district, division, precinct, ward or any other district or county.

**B. Reinstatement of Nov. 1, 1982 Consent Decree.** Consent to ongoing obedience to the Consent Decree entered November 1, 1982 in the United States District Court for the District of New Jersey

in the matter of *Democratic National Committee et al. v. Republican National Committee, et al.* docketed at Civil Action 81–03876 in full, which by this Award shall be **Reinstated**, with modification of the original Consent Decree at ¶ 2(a), ¶ 3, ¶ 4 and ¶ 6, as follows (new text <u>is underlined </u>and old text to be stricken is in ~~strikeout text)~~. the Republican National Committee will "in the future, in all states and territories of the United States:

[¶ 2]**(a)** comply with all applicable <u>statutory and decisional</u> state and Federal laws, protecting the rights of duly qualified citizens to vote for the candidate(s) of their choice, <u>and shall not</u> ~~shall~~ <u>intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for any public or political party</u> Federal, state, county or municipal office at any general, special, or primary election held solely or in part for the purpose of selecting or electing any such candidate, and shall not deny, deprive, dilute, diminish, supercede or usurp any and all powers and duties, privileges and emoluments of any elected representative to any state, county, municipal or voting division or precinct committee of any duly registered political party.

¶ 3. <u>(a)</u> * * *.

**(b)** <u>If the RNC or any of its state, county and local party committees develop or elect to utilize any undertaking regarding "ballot security" or "voter fraud" as is understood within this Consent Decree, the RNC shall submit the same to the Trustee prior to such implementation. The Trustee shall have forty-eight (48) hours to review the same *in camera* and decide if such undertaking is in compliance with this Consent Decree, and notify all parties of his decision, which shall be binding and final and not subject to appeal.</u>

**(c)** <u>The RNC and each state, county and local party committee shall exercise their best efforts to notify each and every elector who has arrived at his legally designated precinct to cast a ballot and who thereunder is precluded from casting his ballot by reason of state law, of his right under the Help America Vote Act of 2002, Pub.L. 107–252, 116 Stat. 1666, 42 U.S.C. § 15482 (except in the following states of Idaho, Minnesota, and New Hampshire which are exempt and have elected not to use provisional ballots) to cast a provisional ballot and to be assisted by the appropriate election official, i.e., Judge of Election.</u>

**(1)** <u>The RNC shall pay for and distribute for each 182,851 precincts two large posters in florescent yellow with print in type font no smaller than 48 point containing the following language: "If you believe you are Entitled to Vote, but are being denied to Cast Your Ballot, You have the right under Federal Law to cast a Provisional Ballot and to have the Election Official Assist You in Casting this Provisional Ballot. See 42 U.S.C. § 15482." Immediately under the above legend in type size no smaller than 28 point, 42 U.S.C. § 15482 shall be stated in its entity.</u>

**(2)** <u>The RNC shall also pay for and distribute to each 182,851 precincts not less than 1,000 handheld cards/leaflets, coated card stock containing a facsimile of the aforementioned language, to be passed out to electors by Democratic and Republican precinct committeepeople, or in the alternative, compensate each state, county or local party committee to imprint the aforementioned legend on their sample ballots which are distributed on Election Day. Said legend shall be in a font, point size and color distinguishable from the balance of the sample ballot.</u>

¶ 4. This Settlement Agreement, and the terms of the Consent Order entered pursuant <u>thereto, and any subsequent agreement whether or order </u>shall bind the ~~DNC, DSC,~~ RNC, and ~~RSC,~~ their agents, servants, employees whether acting directly or indirectly through other party committees. It is expressly understood and agreed that <u>unless the RNC has donated to or engage in joint-fundraising with or otherwise provided any support regarding Federal Election Activity as defined by the Federal Election Campaign Act, 52 U.S.C. § 30101(20), </u>the RNC ~~and the RSC~~ have no present right of control over other state party committees, county committees, or other national, state and local party organizations, and their agents, servants and employees.

¶ 6. ~~All parties agree that they should bear their own costs and attorney's fees and further agree that they shall not seek to recover the same in any action or proceeding instituted after execution of this Settlement Agreement and Consent Decree to be entered pursuant thereto. \* \* \*.~~

**C. Prohibition of Retaliation against Co-Beneficiaries and Trustee.** Respondent and its agents, employees, officers, assigns, and all persons acting in concert with Respondent are further **Prohibited** from intimidating, threatening or coercing any co-beneficiary, including but not limited to the Grievant, state, county and local Democratic and Republican party committees and their elected members thereto, and all other Qualified and Current Beneficiaries as defined by the Trust Agreement and its Internal Operating Procedures, from accessing availing themselves of and otherwise employing, using and utilizing the Trust Property for generic and Federal Election Activity, for bringing this Grievance and in regard to the Trustee, for adjudicating this and prior and any subsequent grievances and otherwise discharging his powers and duties as the Trustee, and for all other lawful purposes; or from accessing or otherwise availing themselves of and employing, using and utilizing the Trust Property, specifically *MyVoterPage.com*™ and *We the People National Conference Calls* ™ and any and all other Trust Property benefits for purposes of exercising their First Amendment rights of speech, assembly and redress of grievances and of political association with the party of their choice.

**D. Drafting Standards to Eliminate Unequal Electoral Resources.** Respondent shall join the Grievant in inviting the National Association of Secretaries of State, the National Association of State Election Officials, the League of Women Voters and other stakeholder organizations involved in Elections to join the Grievant and Respondent to propose minimal funding and performance standards to the Trustee no later than July 31, 2018 so that the Trust, through the NCOPO, may promulgate *Model Performance Standards to Eliminate Inequality of Electoral Resources* for dissemination among Current Beneficiaries (state legislatures, counties and municipal governments) no later than August 31, 2018.

**E. Future Grievances Commence under Fed.R.Civ.P. Rule 65.** Any commission of any act or omission of act alleged to violate this Part I of this Award shall be brought as a Formal Grievance before the Trustee who shall proceed accordingly under the Trust Agreement, ¶ 8(E) and IOP Rule 4(d) as amended, as a proceeding under Federal Rules of Civil Procedure, Rule 65.

**F. DNC or State Democratic Party to Prosecute Grievances.** The Democratic National Committee, or if the alleged commission of any act or omission of act is solely within a state, the respective State Democratic Committee shall be the Grievant and assume all attorney's fees and costs, to be reimbursed by the Respondent if the Respondent and its agents, employees, officers, assigns, and all persons acting in concert with Respondent are found to be in violation thereto.

## II. Surcharge.
Respondent Republican National Committee shall forthwith:

**A. Basic Surcharge.**
**(1)** Tender payment to the Trustee in full by electronic transfer or bank wire not later than five (5) business days subsequent to the date of issuance of the Final Award the surcharge imposed herein in the sum equal to all liabilities as reported in the semi-annual Report of Trust Assets and Liabilities & Receipts and Disbursements of the Trustee to be filed on July 1, 2018, being the amount of $287,691.507.81 and any attorney's fees and legal costs set forth in Paragraph M *infra*. If payment cannot be tendered in full, Respondent may move the Surcharge be satisfied in installments which such grant of relief shall not be unreasonably withheld, *Provided that*, a line of credit is granted by TD Bank, N.A. "Bank") or in the alternative, one or more litigation finance companies retained by the Trustee provide advances for the protection of the Trust as authorized by the Pennsylvania Uniform Trust Act, 20 Pa.C.S. §§ 7769, 7772(h)(5) and 7780.6(a)(7), in the amount determined solely by the Trustee.

(2) If the Respondent fails to comply with payment of the Surcharge as set forth in subparagraph (a) upon notice of issuance of this Award, the Respondent shall pay such Surcharge in the sum equal to all liabilities as reported in the next semi-annual Report of Trust Assets and Liabilities & Receipts and Disbursements of the Trustee, pro rated as is appropriate for compensation and interest rates therein due, upon the date of confirmation of this Award pursuant to the Federal Arbitration Act, 9 U.S.C. § 9.

**B. Supplemental Surcharges.** If payment of the Surcharge is not tendered not later than five (5) business days subsequent to the date of issuance of this Award as provided under the above Paragraph A(1), unless continuance is granted under Paragraph N of Part II of this Award, notwithstanding any subsequent action by Respondent pursuant to its rights under the Federal Arbitration Act, 9 U.S.C. §§ 10-12, or the filing of a petition under 11 U.S.C. §§ 301 302, or 303 (the "Bankruptcy Code"), a Supplemental Surcharge shall be imposed consisting thereof:

(1) The sum equal to advances and accompanying interest charges assessed by TD Bank or in the alternative, one or more litigation finance companies retained by the Trustee to provide advances for the protection of the Trust as authorized by the Pennsylvania Uniform Trust Act, 20 Pa.C.S. §§ 7769, 7772(h)(5) and 7780.6(a)(7), any such demand for payment in full or in part to be tendered thereof within three (3) business days by electronic transfer or wire.

(2) The sum equal to any retainer which may be required by counsel to the Grievant for the prosecution of any petition to confirm this Award under the Federal Arbitration Act, 9 U.S.C. § 9 or to answer any petition to modify or vacate this Award under the Federal Arbitration Act, 9 U.S.C. §§ 10-12 or any other remedy or action if law evoked by Respondent under the Federal Arbitration Act, the Bankruptcy Code, or any other applicable law, and any appeal thereafter, and a commission in the amount as set forth in Paragraph M of Part II of this Award for collection and enforcement of this surcharge and any judgment upon confirmation thereto.

(3) The sum of $24,588,514 to be paid out to the Democratic National Committee and the sum of $2,001,938.44 to be paid out to the Pennsylvania State Republican Committee per damages incurred in the 2016 presidential and 2014 gubernatorial elections respectively.

(4) The sum of $3,330,519 for each week State, County and Local Party Committees do not have access to the Trust Property *Anti Fat Cat*™ portal for soliciting and raising Levin Fund Campaign Contributions pursuant to 52 U.S.C. §§ 30104(e), 30111(a)(8), 30116(a), 30125, and 30143 as governed by 11 CFR §§ 300.31, 300.32.

(5) The sum of $30,000,000 plus legal interest of six percent per annum to be paid out to the State Treasurer of the Commonwealth of Pennsylvania for reimbursement of funds originally deposited in the Volunteer Companies Loan Fund ("VLAP") pursuant to 35 Pa.C.S. § 7365, a revolving loan fund under Chapter 73 of Title 35 Pa.C.S., relating to volunteer fire and rescue companies, which was thereafter transferred from VLAP under Section 2221 of Act of July 10, 2014, P.L. 3052 , No. 1A (HB 2328, PN 3895) (the 2014 FCA).

**C. UCC Blanket Lien.** Grievant, or TD Bank or the litigation finance company retained by the Trustee, upon entry of the Final Award in this matter, notwithstanding any subsequent action by Respondent pursuant to its rights under the Federal Arbitration Act, 9 U.S.C. §§ 10-12, as soon thereafter as is reasonably possible, shall file forthwith in the office of Recorder of Deeds of the District of Columbia, 1101 4th Street, SW, Suite 500, Washington, DC 20024, a UCC blanket lien (UCC Form Financial Statement) against **all assets** of the Respondent, now owned or hereafter acquired by the Respondent, irrespective of location, located at or relating to the operation of the Respondent, including but not limited to:

(1) Real property located at 310 First St SE, Washington, D.C. 20003, D.C. Tract No. 6500, Lot No. 48, Parcel No. 07330048, Lot, and any other real property now or hereinafter acquired and owned by Respondent; and

**(2)** Any and all current and future lines of credit, cash deposits, certificates of deposits, securities, chattel paper, general intangibles, personal property, property *in transitu* including all campaign contributions now or herein pursuant to the Federal Election Campaign Act of 1972 made out to Respondent and required to be deposited pursuant to 52 U.S.C. § 30102(h)(1) as regulated by 11 CFR § 103.3, and all other contributions and donations in cash or in kind; and

**(3)** All lines of credit at BB&T, 1909 K Street, N.W., Washington, DC 2006, Chain Bridge Bank, 1445-A Laughlin Ave, McLean, Virginia 22101 and Eagle Bank, 2001 K St NW, Washington, DC 20006, and any other current or future line of credit required to be reported by Respondent in its FEC Form 3X, Schedule C1 relating to loans and lines of credit from Lending Institutions, whether or not reported as required by FECA and applicable law; and

**(4)** All funds now or hereinafter set aside for coordinated party expenditures in Presidential elections as governed by 11 CFR § 109.32(a) and other Federal elections as governed by 11 CFR § 109.32(b); and

**(5)** All and all contributions now or hereinafter raised by Respondent in conjunction any authorized campaign committee, the National Republican Congressional Committee, the National Republican Senatorial Committee and any other political committee, political action committee or any other organization registered with the IRS under Section 527 of the Internal Revenue Code.

Said lien to be extinguished, terminated and withdrawn upon satisfaction of payment of the Surcharge by Respondent or by one or more third parties as provided in Paragraph I of Part II of this Award, *infra*.

**D. Respondent Prohibited from Change of Banks, etc.** Respondent shall not extinguish, terminate, transfer any current and future lines of credit, cash deposits, certificates of deposits, securities, chattel paper from said banks or financial institutions currently listed on the Respondents' Form 1, Line 9 and Form 3X, Schedule C-1 filed with the Federal Election Commission until such time a termination of the UCC Blanket Lien is filed with the Recorder of Deeds of the District of Columbia, unless the Respondent serves the Trustee of notification of a new depository designated under 11 CFR § 103.2 upon notice to the Federal Election Commission as required by 11 CFR § 103.1. As of the date of this Award said financial institutions noticed to the Federal Election Commission appears to be:

**(1)** BB&T, N.A. 1909 K Street NW, Washington, DC 20006.

**(2)** Chain Bridge Bank, 1445-A Laughlin Ave, McLean, Virginia 22101.

**(3)** Eagle Bank, 2001 K St NW, Washington, DC 20006.

**E. Additional Prohibition Imposed on Respondent.** Until this Award is satisfied and the Bank terminates the UCC Blanket Lien and the Trustee terminates jurisdiction as provided under Part VII, Paragraph F of this Award, Respondent is further prohibited from:

**(1)** Disputing this Award under 11 CFR § 116.10(a); or

**(2)** Requesting the Federal Election Commission under 11 CFR § 116.2(b) to determine that this Award is not that such debts are not payable under 11 CFR § 116.9; or

**(3)** File a Debt settlement plan as if a terminating committee with the Federal Election Commission for review as provided under 11 CFR § 116.7; or

**(4)** Assigning authority to make to make coordinated party expenditures authorized by 11 CFR § 109.32 to another political party committee pursuant to 11 CFR § 109.33; or

**(5)** Failing to report the Award as in indebtedness as required by 11 CFR § 104.11(a); or

**(6)** Violating by commission or omission to act abt other applicable Federal or state law governing campaign finance and reporting, which effectuation thereof would impair or impede enforcement of this Award; or

**(7)** Filing a petition for bankruptcy, insolvency, or for appointment of a conservator or receiver or any remedy under any other Federal or state law which effectuation thereof would impair or impede enforcement of this Award, and if such petition for bankruptcy or insolvency is filed, this Award shall not be subject to the automatic stay under 11 U.S.C. § 362 or any equivalent provision pursuant to the exercise of police and regulatory powers.

**F. Additional UCC Blanket Liens.** After issuance of a rule nisi to show cause as to why the Trust Agreement, ¶ 8(E)(4) should not be enforced, TD Bank or in the alternative, the litigation finance company retained by the Trustee, shall file in the office of the recorder of deeds or similar public official charged with recording judgments, a UCC blanket lien against all assets of the National Republican Senate Committee, the National Republican House Committee, state Republican Party committees, and campaign committees of candidates for Federal public office, whom the Respondent has donated proceeds to or undertakes joint-funding raising efforts thereto, now owned or hereafter acquired by the aforementioned, irrespective of location, located at or relating to the operation of the aforementioned, including but not limited to real property and any other real property owned thereto by the aforementioned, and any and all current and future lines of credit, cash deposits, certificates of deposits, securities, chattel paper, general intangibles, personal property, property in transitu, including all lines of credit and any other line of credit reported by the respective candidates' campaign committees in their respective Form 3 or Form 3P (Report of Receipts and Disbursements), Schedule C1 and by the respective state Republican Party committees in their FEC Form 3X (Report of Receipts and Disbursements), Schedule C1 to the Federal Election Commission and/or to the respective campaign finance authority within the respective state, relating to loans and lines of credit from Lending Institutions.

**G. Prohibitions Same Against State Committees.** The prohibitions against Respondent as provided in paragraphs C, D and E of Part II of this Award shall be equally applicable to the National Republican Senate Committee, the National Republican House Committee, state Republican Party committees, and campaign committees of candidates for Federal public office found liable after a hearing for payment of the Award under the Trust Agreement, ¶ 8(E)(4).

**H. All UCC Liens in First Position.** All said aforementioned liens shall be fully secured in first position to any other unsecured creditor, except that which is exempted by Title 15 of the District of Columbia Code or any other applicable law, and shall have first position to any other secured creditor to the extent authorized by applicable law.

**I. Third-Party Indemnification of Respondent for Surcharge.** The Respondent shall be indemnified and held harmless from any and all future claims for the Surcharge and the Supplemental Surcharges by the Trustee, if within five (5) business days subsequent to the date of issuance of the Final Award, one or more third parties advance a sum equal to the Surcharge only and not the Supplemental Surcharges to the Trustee by electronic transfer or bank wire, any liability herein accruing to the Trust shall hereinafter accrue to the one or more third parties in accordance with applicable law, unless the one or more third parties indemnify and hold harmless the Respondent from any and all future claims.

**J. Authority to Solicit Third Party for Indemnification.** The Respondent may solicit or otherwise assist and cooperate with the Trustee in soliciting one or more third parties to satisfy the aforementioned surcharge, the issuance of this Award being satisfactory evidence of a certification under 11 CFR § 300.11(d) pursuant to 52 U.S.C. § 30125(d).

271

**K. IRS Circular 230 Disclosure.** To ensure compliance with Treasury Department and IRS regulations, the third party or parties shall be informed by the Respondent that, unless expressly indicated otherwise, any federal tax advice contained in any communication (including any attachments) relating to this Award is not intended or written by the Trustee, Grievant or the Respondent to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

**L. Arbitrator Immunity re Third Party Solicitation.** To the extent allowed by law, the Respondent shall be and is immune from any violation of FECA or regulation promulgated by the Federal Election Commission for compliance with Paragraph J of Part II of this Award.

**M. Attorney Fees.**
 **(1)** Respondent shall be responsible for Grievant's attorney's fees and legal costs associated with filing the petition to confirm as required by Part VII-A of this Award.
 **(2)** Respondent shall be responsible for all attorney's fees and legal costs associated with collection of the Surcharge under Paragraph A and the Supplemental Surcharge under Paragraph B of this Subpart, retained by the Grievant, or in the alternative TD Bank or the litigation finance company retained by the Trustee, such attorney's fees and legal costs shall be in addition to the Corpus and at no time be extracted or subtracted from the Corpus. Attorney's fees shall be assessed as a commission of the amount collected pursuant to Pennsylvania Orphans' Court practice of $4,000,000.01 or greater, a ½% commission, all being subject to review by the U.S. District Court for the District of the District of Columbia.

**N. Continuance.** Respondent or the Third Party and counsel may seek a continuance of deadline imposed under Paragraph A or Paragraph I of Part II of this Award for reasonable time not to exceed five (5) business days, which granting such continuance will not be unreasonably withheld.

**O. Future Grievances Commence under Fed.R.Civ.P. Rule 65.** Any commission of any act or omission of act alleged to violate Part II of this Award shall be brought as a Formal Grievance before the Trustee who shall proceed accordingly under the Trust Agreement, ¶ 8(E) and IOP Rule 4(d) as amended, as a proceeding under Federal Rules of Civil Procedure, Rule 65.

**P. DNC or State Democratic Party to Prosecute Grievances.** The Democratic National Committee, or if the alleged commission of any act or omission of act is solely within a state, the respective State Democratic Committee shall be the Grievant and assume all attorney's fees and costs, to be reimbursed by the Respondent if the Respondent and its agents, employees, officers, assigns, and all persons acting in concert with Respondent are found to be in violation thereto.

### III. Restoration of the Trust Property.

Respondent Republican National Committee in conjunction with Grievant Democratic National Committee shall forthwith:

**A. Notice to Beneficiaries to Register with the Trust.** Upon notice by the Trustee that *We the People*™ Qualified Beneficiary registration module is online, shall transmit a *Notice to Beneficiaries to Register with the Trust* by email and by certified mail, return receipt required, to all persons as herein provided, that if said persons desire to access and usage of the Trust Property, such persons must file an Initial Registration Statement with the Trustee pursuant to IOP Rule 4(c)(1) within thirty (30) days and that without registration, the Trustee will be exempt from delivery of service of notice as required by 20 Pa.C.S. § 7780.3(i) and the Trust Agreement ¶ 18, including a copy of the Trust's annual financial statements and provide Trust services including processing of Levin Fund Campaign Contributions. This notice shall include, but not be limited to:
 **(1)** All members of the DNC and RNC, all members of the State Political Party Committees, and if not known, all chairmen of State Political Party Committees.

**(2)** All elected Federal and all legislative, statewide, county and municipal public officeholders, and if not known, any statewide organization representing state and municipal officeholders.

**B. Content of Notice to Beneficiaries.** The notice as required in Paragraph A shall basically constitute the contents as required by 20 Pa.C.S. § 7780.3(i) as follows:

## Official Legal Notice

This Official Legal Notice of the Trustee of the Lincoln Charitable Trust constitutes notice under the Pennsylvania Uniform Trust Code, to all Qualified Beneficiaries, any "regularly constituted" or "duly qualified national, state, county, municipal, ward, district and local committees of the Democratic or Republican Parties" as established by applicable state law and each individual member thereof; all Current Beneficiaries including officeholders, nominees, candidates, social advocacy groups established under Sections 501(c)(4), (5) or (6) of the Internal Revenue Code and PACs established under Section 527 of the Internal Revenue Code, and each individual member thereof, who shall be informed as follows:

**(1)** A trust has been created October, 4, 2007 in and of the City and County of Philadelphia, to which you are a Beneficiary thereto and accordingly, have certain rights and privileges under law.

**(2)** The Settlor (the party bequeathing the trust) is the 59th Republican Ward Executive Committee, Philadelphia PA of behalf John M. Templeton, Jr. M.D. (1940-2015), Bryn Mawr, PA.

**(3)** The name of the Trustee is Hon. Peter J. Wirs, P.O. Box 1776, Philadelphia, PA 19105-1776. Phone 717-584-1776. Email Trustee@LincolnCharitableTrust.org.

**(4)** All Beneficiaries of record are entitled to a copy of the Trust Agreement and the Trust's Internal Operating Procedures (IOP) Rules. Copy of the Trust Agreement and IOP Rules accompanies the Annual Report and the Beneficiary Kit available online at www.LincolnCharitableTrust.org. Qualified and Current beneficiaries must register with the Trustee at www.LincolnCharitableTrust.org pursuant to IOP Rule 4(c) to become a beneficiary of record to access use of certain components of the Trust Property, *We the People Today*™ online, interactive software program for constituent contact management, which are not available to the general public.

**(5)** All Beneficiaries of record are entitled to receive not less than annually, a written report of the trust's assets and their market values if feasible, the trust's liabilities and the trust's receipts and disbursements since the date of the last such report. Copies of the Trust's IRS Form 990PF and all other filings with the Internal Revenue Service and a copy of Trust's Finances accompanies the 2017 Annual Report available online at www.LincolnCharitableTrust.org.

*It is a violation of the Civil Rights Act of 1957, Pub. L 85-315, 71 Stat. 637, 52 U.S.C. § 10101(b), for any person, whether acting under color of law or otherwise, to intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, presidential elector, Member of the Senate, or Member of the House of Representatives, Delegates or Commissioners from the Territories or possessions, at any general, special, or primary election held solely or in part for the purpose of selecting or electing any such candidate. The definition of vote within the Civil Rights Act of 1957 includes your beneficiary rights under the aforementioned Trust Agreement.*

## LINCOLN CHARITABLE TRUST

*Of, By, and For the People* ™

P.O. BOX 1776, PHILADELPHIA, PA 19105
WWW.LINCOLNCHARITABLETRUST.ORG

**C. Requirement of State Party Committees to Retransmit Notice.**

**(1)** The *Notice to Beneficiaries to Register with the Trust* sent to the State Party Chairman of each State Political Party shall require the State Party Chairman to send by email and by certified mail, return receipt required, to all members of county, municipal and local party committees, and elected municipal and local officeholders not noticed by the Grievant or Respondent in Paragraph A of Part III of this Award.

**(2)** If the State Party Chairman does not have such a list all members of county, municipal and local party committees, and elected municipal officeholders he shall send the *Notice to Beneficiaries to Register with the Trust* by email and by certified mail, return receipt required, to all chairmen of county, municipal and local party committees and instruct them that pursuant to this Award, the chairman of the county, municipal and local party committees are required to send the *Notice to Beneficiaries to Register with the Trust* by email and by certified mail, return receipt required to all  members of county, municipal and local party committees, and elected municipal officeholders.

**D. Delivery of *MyVotePage.com™*.** Upon notice by the Trustee that *MyVoterPage.com™* portal is online, shall post a *MyVoterPage.com™* widget (a module on a website, in an application, or in the interface of a device that allows users to perform a function) on the Home Page of https://www.Democrats.org and on the Home Page of https://gop.com that is clearly visible on the home page without scrolling down which will redirect a voter to https://MyVoterPage.com to register and provide political preferences for access by Grievant, Respondent, and all elected public and party officeholders who represent the voter therein.

**E. Prohibition Against Maintaining Secret Voter Files.** Both the Grievant and Respondent and their agents, employees, officers, assigns, and all persons acting in concert with Grievant and Respondent are herein and hereinafter **Prohibited** from maintaining any data file on any registered voter without providing the voter complete and full access, without charge or imposition of cost to the Voter, to examine any data collected and maintained by the Grievant and Respondent or otherwise acquired, gathered, obtained, purchased or otherwise procured by Grievant and Respondent by themselves or by any contractor or subcontractor providing same to Grievant or Respondent; *Provided that*, satisfaction of this Paragraph E of Part III of this Award shall be had at such time *MyVoterPage.com™* declared to be online by the Trustee, the Grievant and Respondent shall forthwith transfer all data files from proprietary data files or data sets or other means of collection of same, of each voter, to the voter's respective data file within *MyVoterPage.com™* portal at https://MyVoterPage.com.

**F. Delivery of *We The People National Conference Calls™*.** Upon notice by the Trustee of availability of the *We the People National Conference Calls™* service, shall notify the Current Beneficiaries as described hereinafter the scheduling of the *We the People National Conference Calls™* pursuant to IOP Rule 7(g)(2) certain moderators of the *We the People National Conference Calls™* who shall serve as moderators pursuant to IOP Rule 7(g)(1) and (4) of as follows:

**(1)** On the first Tuesday of each month, the U.S. Senate Majority or Minority Leader or his designee, or the Speaker of the U.S. House or U.S. House Minority Leader.
**(2)** On the second Tuesday of each month, a Chief Executive (President, Governor, County Commissioner, County Executive, Mayor).
**(3)** On the third Tuesday of each month National or state Party Chairman.
**(4)** On the fourth Tuesday of each month, a candidate for Federal or statewide office, or presiding officer or executive director of a Current Organizational Beneficiary, or the Trustee.

**G. Delivery of Levin Fund Contribution Conduit Service.** Upon notice by the Trustee of availability of the *Anti Fat Cat Days™* portal, shall notify all State, County and local party committees who have filed their initial registration with the Trustee as required by IOP Rule 4(c)(1) by email availability of the Trust Service to enable the State, County and local party committees to

275

solicit and receive Levin Fund Campaign Contributions as governed by 11 CFR §§ 300.31 and 300.32, and that the Trustee will immediately commence solicitation of earmarked Levin Fund Campaign Contributions on behalf the aforementioned State, County and local party committees on the *MyVoterPage.com* portal pursuant to IOP Rule 5(e).

**H. Delivery of *Election Day Whip™*.** Upon notice by the Trustee of availability of the *Election Day Whip™* application, shall notify all State, County and local party committees who have filed their initial registration with the Trustee as required by IOP Rule 4(c)(1) by email availability of the Trust Service to enable the State, County and local party committees to start utilizing the aforementioned service pursuant to IOP Rule 9.

**I. Timing of Delivery of Trust Property Services.**
    **(1)** It shall be fully understood by the Grievant, Respondent and all eligible Qualified and Current Beneficiaries, that delivery of the aforementioned Trust Property services by the Trustee will be on a best efforts basis only and that no representations or warranties, expressed or implied, are made by the Trustee as to delivery of the aforementioned Trust Property services on a timely basis within the 2017-2018 campaign cycle regarding election for Federal offices of U.S. Representative, U.S. Senator, and Governor and state legislator in the several states, all due to the damages inflicted upon the Trust by the Respondent.

    **(2)** Various components and modules of the Trust Property, in particular voter input of personal data into *MyVoterPage.com* and delivery of same to the respective precinct party committeeman and committeewoman and input of historical voter data into *Election Whip* by county committees and/or precinct party committee members will require time considerations outside the Trustee's control. Accordingly, the later the various services of the Trust Property become operational the less efficient and effective such services.

    **(3)** Any further dilatory tactics by the Respondent will also continue to damage the Trust and all other co-beneficiaries who will continue to suffer immediate and irreparable damage for loss of their constitutional rights and shall constitute an additional violation of the Civil Rights Act of 1957 and the Trust Agreement.

**J. Collection of November 6, 2018 Election Day Data.** Should the Trustee be unable to deliver the Trust Property services before the November 6, 2018 General Election, Respondent shall notify each and all elected precinct party committee people of the Republican Party, and forward to the Grievant the sum of $250,000 for expenses to enable Grievant to notify each and all precinct party committee people of the Democratic Party, to take possession for safekeeping all poll books, strike lists and similar devises provided either by the state or county election authorities for recording of the time and name of electors arriving at the polls to cast ballots, so that the Trustee can subsequently capture such data for *Election Day Whip™* application. To the extent Respondent fails to comply with this provision, Grievant shall seek injunctive relief in aid of arbitration pursuant to Fed.R.Civ.P. Rule 65 when filing the petition to confirm under the FAA, 9 U.S.C. § 9.

**K. Future Grievances Commence under Fed.R.Civ.P. Rule 65.** Any commission of any act or omission of act alleged to violate Part III of this Award shall be brought as a Formal Grievance before the Trustee who shall proceed accordingly under the Trust Agreement, ¶ 8(E) and IOP Rule 4(d) as amended, as a proceeding under Federal Rules of Civil Procedure, Rule 65.

**L. DNC or State Democratic Party to Prosecute Grievances.** The Democratic National Committee, or if the alleged commission of any act or omission of act is solely within a state, the respective State Democratic Committee shall be the Grievant and assume all attorney's fees and costs, to be reimbursed by the Respondent if the Respondent and its agents, employees, officers, assigns, and all persons acting in concert with Respondent are found to be in violation thereto.

## IV. Renunciation of Fraud on the Court and Sanctionable Acts.

Respondent Republican National Committee shall forthwith:

**A. Cure Prior Fraud on Court.** Renounce all acts and omissions of acts perpetrated in furtherance of a fraud on the court committed in the Philadelphia Court of Common Pleas, Orphans Court Division, the Pennsylvania Superior Court and the United States District Court for the District of Columbia relating to false statements of material fact and clearly unreasonable legal arguments made relating to the confirmation of the Trust's prior awards docketed at 2009-22A (MUR 2009-1) and 2016-3A by:

**(1)** Moving to strike off judgment or similar procedural means within five (5) business days subsequent to the date of issuance of this Award; and

**(2) Cease and Desist** on making any further false statement of material fact or legal claims, defenses, and other legal contentions not warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law to any Federal or state judicial tribunal or to this arbitral tribunal; and

**(3)** Terminate all relationship(s) with those attorneys who appeared, authorized or otherwise on Respondent's behalf; and

**(4)** Require the Respondent's Chief Counsel to comply with his professional duty and obligation under the District of Columbia Rules of Professional Conduct, Rule 8.3(a) and report within five (5) business days subsequent to the date of issuance of this Award, those attorneys who appeared, authorized or otherwise on Respondent's behalf to the proper disciplinary authorities in both the District of Columbia and Pennsylvania, including the Untied States District Court for the District of Columbia, as required by LCvR 83.15(a); and

**(5)** Cooperate and be fully candid in the investigations by all prosecutorial and disciplinary authorities regarding the events on and subsequent to July 17, 2014 resulting from and in response to communication by telephone, email or otherwise, with Heather Sidwell, Esq., upon notice of pendency of the original confirmation petition in the Philadelphia Court of Common Pleas by Lawrence Otter, Esq.

**B. Full Cooperation and Candor with Prosecutorial Authorities.** Respondent, in addition to the matter described in Paragraph A(5) of Part IV of this Award *supra*, shall fully cooperate and be candid and honest with Federal and Pennsylvania prosecutorial agencies and Pennsylvania judicial and lawyer disciplinary agencies, including and not limited to the Special Counsel appointed by the U.S. Department of Justice pursuant to Order No. 3915-2017 on April 17, 2017, pursuant to 28 U.S.C. §§ 509, 510 and 515, whether or not such investigations arise from this matter.

**C. Prohibition of Retaliation Against Persons in this Case.** Respondent shall not retaliate, directly or indirectly, against a person known or suspected to have assisted or cooperated with an investigation of the Respondent by Federal or Pennsylvania prosecutorial authorities and Pennsylvania judicial and lawyer disciplinary agencies or with the Trustee in presiding over this, former or future arbitration proceedings, by bringing a Bad Faith Prosecution, committing libel and slander or by misuse or abuse of process, or specifically in regard to the Trustee, any form of harassment or retaliation which incurs the risk of inflicting the Trustee with acute situational physiological stress by reason of the Trustee being terminally ill with Mitochondrial Disease.

**D. Future Grievances Commence under Fed.R.Civ.P. Rule 65.** Any commission of any act or omission of act alleged to violate Part IV of this Award shall be brought as a Formal Grievance before the Trustee who shall proceed accordingly under the Trust Agreement, ¶ 8(E) and IOP Rule 4(d) as amended, as a proceeding under Federal Rules of Civil Procedure, Rule 65.

**E. DNC or State Democratic Party to Prosecute Grievances.** The Democratic National Committee, or any authority of the Commonwealth of Pennsylvania or the U.S. Dept. of Justice, shall be the Grievant and assume all attorney's fees and costs, to be reimbursed by the Respondent if the Respondent and its agents, employees, officers, assigns, and all persons acting in concert with Respondent are found to be in violation thereto.

## V. Conforming Conduct to Comply with Fiduciary Duties.

Respondent Republican National Committee shall forthwith:

**A. Adoption of Model Code of Official Conduct.** Adopt and promulgate as a rule of the Republican Party pursuant to Rule 12 of the *Rules of the Republican Party* by the procedure set forth in Rule 12 no later than September 30, 2018, by amending Rule 11 of the *Rules of the Republican Party*, concerning Candidate Support, a new paragraph (c) which shall require adoption of the NOCPO *Model Code of Official Conduct* promulgated by the Trustee and require any nominee of the Party for Federal Office and any state, county or municipal party committee that from this date forward receipt of campaign funds from the Respondent shall be contingent upon the same undertaking five (5) hours continuing professional education course required by the MODEL CODE OF OFFICIAL CONDUCT Rule 5.5, *Comment (3)*.

**B. Prohibiting Repudiation of Law Enforcement Agencies.** Require all public officials who were elected as Republican nominees for Federal office, and Republican nominees and candidates for the party's nominations for Federal office, and withhold from this date forward any campaign contributions or joint fund raising if any of the aforementioned to **Cease and Desist** in challenging the legitimacy of any law enforcement or prosecutorial or disciplinary or ethical oversight agency (such as an Inspector General) in the discharge of its powers and duties to investigate and prosecute criminal acts or breaches of public ethics or fiduciary duties, except when there is an evidentiary basis for allegations such prosecution or enforcement activity constitutes a bad faith or selective prosecution, or any lawful objection to which there is evidentiary support or legal claims, defenses, and other legal contentions supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; and to otherwise fully and unconditionally cooperate and be candid and honest with the aforementioned Federal and state entities, except where counsel advises such cooperation compromises due process and equal protection of law.

**C. Prohibiting Retaliation Against Whistle-Blowers.** Require all public officials who were elected as Republican nominees for Federal Office not to retaliate, directly or indirectly, against a person known or suspected to have assisted or cooperated with an investigation of the Respondent by Federal and state law enforcement, prosecutorial, disciplinary and ethical oversight agencies by initiating a bad faith or selective prosecution or malicious prosecution, misuse or abuse of process or any other form of barrity.

**D. Amend Bylaws for Election of RNC Members, Other Reforms.** Proceed with all due dispatch, but no later than the commencement of the next election cycle as defined by the Federal Election Campaign Act of 2002, 52 U.S.C. § 30301, or September 30, 2018, whichever is later, amend its bylaws pursuant to Rule 12 of the *Rules of the Republican Party* to provide:

    **(1)** For the election at large among registered party voters for a four-year term of the national committeeman and national committeewoman in each of the States and territories who possess membership on the Republican National Committee, unless state law provides otherwise.

    **(2)** For determining whether to endorse or conduct an open primary for the Republican Presidential nomination Adopt by amending Rule 13 of the *Rules of the Republican Party*, concerning Call of the Next Convention, a new paragraph (b) to provide within said Call, the Respondent shall set forth the pronouncement that it has either endorsed a candidate for President of United States, or in the alternative, to have such determined solely by the

Republican National Convention therein being called.

**(3)** For appointment of an Executive Director who shall serve as the chief operating officer supervising all subordinates to assure their compliance and fidelity to RNC policy and confirmation of the same, the general counsel and all other executive officers be with the advice and consent of two-thirds of all members in good standing by amending Rule 4(d) of the *Rules of the Republican Party*, concerning Officers of the Republican National Committee, which shall read in pertinent part "The chairman <u>with the concurrence of two-thirds vote of the Members of the Republican National Committee</u> shall appoint <u>an Executive Director and</u> a general counsel * * *."

**(4)** For abolishment of the procedure commonly used to evoke the Unit Rule by which delegates elected to cast ballots for one presidential candidate are coerced to vote for presidential candidates not of their choice and which is prohibited by Rule 39 of the *Rules of the Republican Party*, by allowing states to impose a "winner take all" rule in Republican Presidential primaries under Rule 16(a) of the *Rules of the Republican Party*, such state law null and void as the *Rules of the Republican Party* preempts all such state law.

**E. Establishment of Association of County Party Chairs** Both Grievant and Respondent shall organize, incorporate or otherwise establish no later than thirty (30) days of issuance of this Final Award an Association of County Party Chairs to function in form and manner similar to the Grievant's Association of State Democratic Chairs ("ASDC") so that the national party committees can maintain communications with grassroots volunteers. For purposes of Paragraph E of Part V of this Award counties shall include New England towns, Alaska boroughs and Louisiana parishes.

**F. Future Grievances Commence under Fed.R.Civ.P. Rule 65.** Any commission of any act or omission of act alleged to violate Part V of this Award shall be brought as a Formal Grievance before the Trustee who shall proceed accordingly under the Trust Agreement, ¶ 8(E) and IOP Rule 4(d) as amended, as a proceeding under Federal Rules of Civil Procedure, Rule 65.

**G. DNC or Individual RNC Members to Prosecute Grievances.** The Democratic National Committee or individual RNC Members shall be the Grievant and assume all attorney's fees and costs, to be reimbursed by the Respondent if the Respondent and its agents, employees, officers, assigns, and all persons acting in concert with Respondent are found to be in violation thereto.

## VI. Appointment of Receiver.
Respondent Republican National Committee is forthwith put on notice that:

**A. Appoint of Receiver to Take Control of Respondent.** If all provisions of this Award are not satisfied by 12:01 A.M., Friday, September 28, 2018, the Trustee, after issuing a rule *nisi* to show cause why relief should not be granted and a hearing for counsel to be heard, shall convert the Respondent into an estate and by transferring all assets thereto and therein appoint a Receiver to assume full control and possession of the Estate of the Respondent and all assets therein and all officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them.

**B. Cause for Appointment.** Cause for conversion of Respondent into an estate and appointment of a receiver prior to the aforementioned 12:01 A.M. Friday, September 28, 2018 deadline, shall constitute any willful disobedience of any provision of this Award and which is found to be in bad faith, vexatious, wanton or for oppressive reasons, including and not limited to proffering any extrajudicial statements prohibited under Paragraph C(3) of Part VII of this Award.

**C. Powers and Duties of Receiver.** The receiver shall have all powers and duties necessary and proper for the efficient administration of the estate and exercise all legal and equitable powers

required for or incidental to the exercise of his jurisdiction. The receiver shall execute the oath of office prior to assuming office and exercising any powers and duties. The receiver shall devote the time necessary for the prompt and proper disposition of the business of the administration of the estate and the discharge of the powers and duties of the court, which shall be given priority over any other occupation, business, profession, pursuit or activity.

**D. Candidates for Receiver.** The Trustee will consider only highly eminent individuals for appointment as receiver, including former Members of Congress, U.S. or state Attorneys General, governors, or deans of nationally prominent law schools, and if none are reasonably available, the Trustee may consider self-appointment until one of the aforementioned candidates become available.

**E. Compensation, Expenses, Termination.** The receiver shall serve without compensation, but shall be reimbursed for all reasonably incurred expenses. Appointment shall be terminated upon full and complete satisfactory enforcement of all provisions of this Award.

### VII. Additional Trust Administration Matters.

Grievant Democratic National Committee and/or Respondent Republican National Committee shall forthwith perform the following as provided below:

**A. Subsequent Action under Federal Arbitration Act.**
   **(1)** Respondent has the right to file a motion to vacate or modify this Award under Federal Arbitration Act ("FAA"), but must do so within ninety (90) days of this Award. Respondent set out such allegations as required by FAA, 9 U.S.C. § 10(a) and serve a copy of the motion on the Trustee by electronic mail.

   **(2)** Grievant shall advance the Trustee's attorney's fees and expenses to file a petition to confirm in the U.S. District Court for the District of Columbia pursuant to 9 U.S.C. § 9, if and when Respondent fails to file a motion to vacate or modify under the FAA, 9 U.S.C. § 10-11, and shall move for expedited consideration under Fed.R.Civ.P. Rule 1 and for preferential calendar treatment under 28 U.S.C. § 1657(a). This shall include seeking injunctive relief in aid of arbitration pursuant to Fed.R.Civ.P. Rule 65.

   **(3)** Grievant shall be solely responsible for advances for attorney's fees and the Trustee's expense of all other prosecutions and defenses of any and all litigation now pending or hereinafter brought under the FAA or the Pennsylvania Uniform Trust Act or any other applicable law concerning this Award, including, but not limited to seeking relief from automatic stay under the Federal Bankruptcy Code, 11 U.S.C. § 362(d), or any similar bankruptcy or insolvency statute whenever evoked by Respondent.

   **(4)** Grievant's advances shall thereafter be satisfied as required by 20 Pa.C.S. §§ 7769, 7772(h)(5), 7780.6(a)(7).

**B. Respondent Posting of Bond.** Unless prohibited by law or rule of the court, Respondent, if electing to oppose the Grievant's petition to confirm under the FAA, 9 U.S.C. § 9, shall post bond in form of a cash deposit, or an irrevocable letter of credit issued by a Federally-insured bank or a surety bond underwritten by an underwriter with an A.M. Best rating of A+, with the Trustee no later than 5:00 PM of the day and date Respondent files an answer in opposition to the Grievant's Petition to Confirm under 9 U.S.C. § 9 or an answer or reply to Grievant's application for injunctive relief in aid of arbitration, in the sum equal to one hundred and twenty percent (120%) of the Surcharge and one hundred percent (100%) of the Supplemental Surcharge, attorney's fees, and commissions due Grievant's counsel for enforcement of judgment under Paragraphs A, B and M of Part II of this Award.

**C. Prohibition against Certain Extrajudicial Statements.**

**(1)** That counsel for both the Grievant and the Respondent or any other lawyer who is participating or has participated in the investigation or litigation of this arbitration proceeding shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing this adjudicative proceeding in the matter and that does more than state, without elaboration: (1) the claim or defense involved; (2) material factual information contained in a public record which has not been or is not subject to the pending grievance; (3) that an investigation of the matter is in progress; (4) the scheduling or result of any step in litigation; (5) a request for assistance in obtaining evidence and information necessary thereto.

**(2)** Notwithstanding the aforementioned subparagraph (1), counsel may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client. A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity.

**(3)** Any assertion, declaration or statement, explicit or otherwise, which does or seeks to delegitimize, discredit, or disparage the integrity of the arbitration tribunal and these proceedings and of the Trust or the current or successor Trustee, or any counsel, accountant or other professional advising the Trustee, or any recipients of any grants from the Trustee; or any statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of the Trustee, or successor Trustee, or any counsel, accountant or other professional advising the Trustee, or any recipients of any grants from the Trustee, including reiterating or referring persons to materially false statements made in pleadings in the Pennsylvania courts or in the United States Court for the District of the District of Columbia which does or seeks to delegitimize, discredit, or disparage the integrity of the arbitration tribunal and proceedings and of the Trust or the current Trustee, including those false statements alleging the Trust is a "fake," "fraud" or "phony," and other words having similar import; or any additional or other act which willfully disobeys this Award and is found to have acted in bad faith, vexatiously, wantonly or for oppressive reasons.

**D. DNC and RNC Pay for Hearing Transcript.** Grievant and Respondent shall equally pay for the costs of transcription of court reporter, witness fees, and out-of-pocket travel & accommodation expenses, if any, incurred by the Trustee within thirty (30) days of invoice.

**E. Service of Award.** A copy of this Award and Order Imposing Injunctive Relief shall be served on Respondent by overnight delivery by the Grievant, email as expressly authorized by 20 Pa.C.S. § 7709(a) and the U.S. District Court's EF/CMS, and on parties-in-interest, including designated recipients of distribution of Trust income under Section 4942(a) of the Internal Revenue Code and other nonprofit entities having affinity with the defense of civil rights secured by law, by email, except that service by email on one or more potential third parties relative to prosecution of Respondent and others be *in camera*, and upon each court of record which suffered fraud on the court. A copy of this Award shall be posted on the Trust's website, http://LincolnCharitableTrust.org and its Facebook page.

**F. Retention of Jurisdiction.** The Trustee, sitting as the arbitrator pursuant to his statutory powers under 20 Pa.C.S. § 7780.6(a)(3) retains jurisdiction until all provisions of this Award are fully complied thereof and the Trustee is not *Functus Officio*, and his mandate does not expire until full compliance with all provision of this Award are certified by the Trustee after a hearing for counsel to be heard. We furthermore reserve the right to elaborate upon, without changing the result, our Findings of Fact and Conclusions of Law to further articulate what has been pronounced.

**G. Federal Income Tax Consequences.** For purposes of § 104(a) of the Internal Revenue Code, 26 U.S.C. [IRC] § 104(a)(2), compensation due the Trustee by reason of satisfaction of advances

under 20 Pa.C.S. §§ 7769(a), 7772(h)(5), 7780.6(a)(7) shall be as compensation on account of the Trustee's terminal illness, Mitochondrial Disease ("Mito"). *Commissioner v. Schleier*, 515 U.S. 323, 336-337 (1995) and see also *Estate of Wright v. Commissioner of Internal Revenue*, 2007 TC Memo 278 (2007). *Schleier* outlined the original two-part test that must be met in order to exclude damages under IRC § 104(a)(2): (1) the underlying cause of action giving rise to the recovery must be based on tort or tort-type rights; and (2) the damages must "have been received on account of personal injuries or sickness." "[T]he recovery for lost wages is also excludable [from gross income] as being 'on account of personal injuries,' so long as the lost wages resulted from time in which the taxpayer was out of work as a result of her injuries." *Schleier*, 515 U.S. at 329-330 and see also *Hauff v. Petterson*, 755 F. Supp.2d 1138, 1145 (D.C.N.M 2010). We are required to find a "strong[] causal connection," thereby making IRC § 104(a)(2) "applicable only to those personal injury lawsuit damages that were awarded by reason of, or because of, the personal injuries." *O'Gilvie v. United States*, 519 U.S. 79, 82-83 (1996); See also *Murphy v. IRS*, 493 F.3d 170, 175 (D.C. Cir. 2007) and *Braddock v. Commissioner*, T.C. Summary Opinion 2016-46. The Supreme Court specifically rejected a "but for" formulation in favor of a "stronger causal connection." *O'Gilvie*, 519 U.S. at 82-83.

Specifically, had not this author been suffering from Mito this matter would have been resolved much earlier than the current time frame. It is because of the Mito and resulting fatigue is why the Trust's restoration has taken so long. Without having suffering from Mito, this delay would not have occurred. In as this author's income would be taxable under the normal course of business. IRC § 61, it is only due the personal disease - Mito - that the Trustee's reimbursement of advances, being the equivalent of his annual compensation that the advance has not be paid earlier – indeed much earlier than now. Accordingly, the reimbursement of advances is the result of this author's terminal illness.

This author is required to rule on this matter not withstanding my personal interest in the outcome under the Rule of Necessity. *Stilp v. Commonwealth*, 588 Pa. 539,557-558, 905 A. 2d 918, 928 (2006) citing *United States v. Will*, 449 U.S. 200, 213-216 (1980) and *City of Philadelphia v. Fox*, 64 Pa. 169, 185 1870 WL 8678 (1870) ("The true rule unquestionably is that wherever it becomes necessary for a judge to sit even where he has an interest — where no provision is made for calling another in, or where no one else can take his place — it is his duty to hear and decide, however disagreeable it may be").

IT IS SO ORDERED

_____ Trustee

Dated: June 6, 2018
Updated: November 24, 2018

Copy List on Next Page

282

*Copy*
Mark A. Pacella, Esq.
Chief Deputy Attorney General
Charitable Trusts and Organizations
Attorney General of Pennsylvania
Strawberry Square Harrisburg, PA 17120-0001
mpacella@attorneygeneral.gov

Lawrence Barth, Esq.
Senior Deputy Attorney General
Charitable Trusts and Organizations Section
Attorney General of Pennsylvania
21 South 12th Street, 3rd Floor
Philadelphia, PA 19107-3604
lbarth@attorneygeneral.gov

Jaime R. Harrison, Esq.
Associate Chairman & Sr. Counselor
Democratic National Committee
2 Governors Hill
Columbia, SC 29201-2757
harrisonjaime@gmail.com

Robert Bauer, Esq.
General Counsel
Democratic National Committee
c/o Perkins Coie
Suite 600
607 Fourteenth Street N.W.
Washington, D.C. 20005-3960
rbauer@perkinscoie.com

Rajiv Parikh, Esq.
Democratic National Committee
c/o Genova Burns, LLC
494 Broad Street
Newark, NJ 07102-3230
Rparikh@genovaburns.com

John R Phillippe Jr., Esq.
General Counsel
Republican National Committee
310 First Street, S.E.
Washington, D.C. 20003-1885
Jphillippe@gop.com

Amy Rothstein, Esq.
Associate General Counsel
Federal Elections Commission
999 E Street, N.W.
Washington, D.C. 20463-0001
arothstein@fec.gov
*Parties-in-Interest*

283

Robert S. Mueller, III, Esq.
Special Counsel's Office, U.S. DOJ
950 Pennsylvania Avenue NW Room B-103
Washington, D.C. 20530
special.counsel@usdoj.gov

Barry M. Simpson, Esq.
Executive Director
Pennsylvania Bar Association
100 South Street
Harrisburg, PA 17101-1210
barry.simpson@pabar.org

Valentino F. DiGiorgio III
Chairman,
PA State Republican Com.
c/o Stradley Ronon
30 Valley Stream Parkway
Malvern, PA 19355
vdigiorgio@stradley.com

Thomas G. Wilkinson, Esq.
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, PA 19103
twilkinson@cozen.com

Victor A. Young, Esq.
Obermayer Rebmann
1500 Market Street, Suite 3400
Philadelphia, PA 19102
victor.young@obermayer.com

James C. Sargent, Jr., Esq.
Lamb McErlane
24 E. Market Street
P.O. Box 565
West Chester, PA 19381
jsargent@lambmcerlane.com

Mary E. Kohart, Esq.
Eliott Greenleaf
925 Harvest Drive
P.O. Box 3010
Blue Bell, PA 19422
mek@elliottgreenleaf.com

Charles A. Rothfeld, Esq.
Mayer Brown
1999 K Street, N.W.
Washington, DC 20006-1101
crothfeld@mayerbrown.com

William P. St. Clair, CPA (Pro Se)
St. Clair CPA Solutions
28 South Centre Street
Merchantville, NJ 08109
wstclair@cpasolutionsllc.net

Pamela A. Mann, Esq.
Carter, Ledyard & Milburn LLP
2 Wall Street
New York, NY 10015
mann@clm.com

Christopher McCleary, Esq.
General Counsel
U.S. Olympic Committee
One Olympic Plaza
Colorado Springs, CO 80909
chris.mccleary@usoc.org

Lee J. Dopkin, Esq.
Chief Counsel
Penn Medicine (PA Hospital)
2929 Walnut Street, Suite 400
Philadelphia, PA 19104
lee.dobkin@ogc.upenn.edu

David J. Toll, Esq.
Senior Vice President
Drexel University
3141 Chestnut Street, Suite 310
Philadelphia, PA 19104
dtoll@drexel.edu

Michael B. Gebhardt, Esq.
University Counsel Temple University
300 Sullivan Hall,
1330 W. Polett Walk
Philadelphia, PA 19122-6086
michael.gebhardt@temple.edu

Leslie Reynolds (Pro Se)
Executive Director
National Association of Secretaries of State
444 North Capitol Street NW, Suite 401
Washington, DC 20001
reynolds@sso.org

Frederick A. O. Schwarz, Jr., Esq.
Chief Counsel
120 Broadway
Suite 1750
New York, NY 10271
brennancenter@nyu.edu

Sherrilyn A. Ifill, Esq.
President and Director-Counsel
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th floor
New York, NY 10006
sIfill@naacpldf.org
mrosner@naacpldf.org

Amy Cohen
Executive Director
National Association of State Election Directors
1342 Florida Avenue, NW
Washington, DC 20009
info@nased.org

286